**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JAMES TRINKA,<br>5310 Sandyford Street<br>Alexandria, VA 22315<br>　　　　　　*Plaintiff*,<br>　　　　v.<br><br>SECRETARY OF VETERANS AFFAIRS<br>DENIS MCDONOUGH,<br>810 Vermont Avenue NW, Room 1000<br>Washington, DC 20420<br>(in his official capacity);<br><br>UNITED STATES<br>DEPARTMENT OF VETERANS AFFAIRS;<br>810 Vermont Avenue NW<br>Washington, DC 20420<br><br>　　　　　　*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff, James Trinka, by and though undersigned counsel, states for his cause of action the following:

### NATURE OF THE ACTION

James Trinka is a decorated combat veteran and a career federal civil servant.  In 2012, he was appointed to the senior executive service at the Department of Veterans Affairs (DVA), where he served with distinction and received top-level performance reviews. In September 2020, however, Defendants terminated Trinka from his federal employment.  Trinka's removal was based on an alleged false statement that Trinka purportedly made two years earlier in a

December 2018 interview with VA's Office of Inspector General ("VA OIG"). According to Defendants' removal decision, Trinka stated at the OIG interview that he had told three supervisors about his wife's immigration status, while (according to Defendants' removal decision) two of those supervisors stated in separate interviews that Trinka had not done so. Thus, what exactly Trinka and his supervisors said at the OIG interviews, and the accuracy of their statements and recollections, was central to whether had Trinka committed the misconduct alleged.

But DVA decisionmakers never saw or considered the transcripts or recordings of those interviews. Nor was Trinka ever allowed to see them, or to cross-examine the supervisors whose statements allegedly contradicted his own. Thus, while Trinka was fired for alleged false statements, both he and the DVA decisionmakers were denied access to the only direct evidence of what was actually said.

Instead, Defendants applied a substantial evidence standard of proof and removed Trinka based on after-the-fact, hearsay summaries of his and his supervisors' interviews. Trinka was denied an evidentiary hearing—before or after his termination—at which he could have tested the evidence and witnesses against him. Because Defendants applied the substantial evidence standard of proof and Trinka was denied an evidentiary hearing, the alleged false statements were never even found to be true; rather, DVA decisionmakers, including Defendant Secretary of Veterans Affairs, determined the allegations "might" be true. And to cap it off, his removal was justified by reference to unsubstantiated "aggravating" factors that pre-dated enactment of the governing statute and should never have been considered.

In doing so, Trinka's removal violated the statute, DVA's own policies, and fundamental due process guarantees. Trinka asks that this Court declare Defendants' action unlawful, vacate

Defendants' removal decision, order Trinka reinstated, and award Trinka all other appropriate relief.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction pursuant to 38 U.S.C. § 713(b)(5), 28 U.S.C. § 1346(a)(2) and 28 U.S.C. § 1331.

2.     Trinka's request for judicial review of Defendants' termination action was timely brought within six years of the action pursuant to 28 U.S.C. § 2401(a).

3.     Plaintiff requests the court review the record and set aside VA's termination action pursuant to 38 U.S.C. § 713(b)(6).

4.     Plaintiff seeks equitable, declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

5.     This Court is the proper venue for this action pursuant to 28 U.S.C. §§ 1367, 1391(e)(1).

## PARTIES

6.     Plaintiff James Trinka ("Trinka") was a career appointee in the Senior Executive Service.  He held the position of Chief Talent Management Officer in the Department of Veterans Affairs' Office of Information and Technology until the decision to remove (i.e., terminate) him from the Senior Executive Service and federal employment, dated and effective October 2, 2020.

7.     Defendant Secretary Denis McDonough ("Secretary" or "Secretary McDonough"), is the Secretary of the Department of Veterans Affairs ("Department," "VA," or "DVA"), an executive agency of the United States Government, with its headquarters located at 810 Vermont Avenue NW, Washington, DC 20420. Secretary McDonough's predecessor, Secretary Robert Wilkie, is the Secretary that took the action at issue in this complaint.

8.      Defendant United States Department of Veterans Affairs is an executive agency and division of the United States Government, with its headquarters located at 810 Vermont Avenue NW, Washington, DC 20420.

## LEGAL FRAMEWORK

### I.    THE SENIOR EXECUTIVE SERVICE AND THE CIVIL SERVICE REFORM ACT

9.      The Senior Executive Service, established by the Civil Service Reform Act (CSRA) in 1978, is a select group of civil servants responsible for ensuring "that the executive management of the Government…is responsive to the needs, policies, and goals of the Nation and otherwise is of the highest quality." 5 U.S.C. § 3131.

10.      The SES ensures that agencies "recruit and retain the highly competent and qualified executives needed to provide more effective management of agencies." 92 Stat. 1113.

11.      SES employees, like Mr. Trinka, are appointed through Title 5 of the U.S. Code.

12.      When Mr. Trinka was appointed to the SES in 2012, and until August 7, 2014, VA Senior Executives were subject only to the same termination procedures as other Executive Branch Senior Executives, pursuant to the CSRA, specifically 5 U.S.C. § 7543. After August 7, 2014, VA Senior Executives were subject to the CSRA termination procedures *and* newly created termination procedures provided in 38 U.S.C. § 713 (2014).

13.      Pursuant to 5 U.S.C. § 7543, Senior Executives may be removed from the SES and/or federal employment only for cause, including for "misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function." 5 U.S.C. § 7543(a).

14.      The CSRA provides statutory entitlements to pre-termination due process, including: (1) 30 days' advance written notice; (2) a reasonable time to answer orally and in writing and to furnish affidavits and other documentary evidence in support of that answer; (3) to be

4

represented by an attorney or other representative; and (4) a written decision and specific reasons

therefor at the earliest practicable date. 5 U.S.C. § 7543(b)(1)-(4).

15.     The CSRA also provides statutory entitlements to post-termination due process,

including "the entitlement to appeal to the Merit Systems Protection Board under section 7701

[of Title 5 of the U.S. Code]." 5 U.S.C. § 7543(d).

16.     A Merit Systems Protection Board ("MSPB") appeal under 5 U.S.C. § 7701 includes

an entitlement to a post-termination hearing. 5 U.S.C. § 7701(a)(1).

17.     MSPB appeals are processed in accordance with regulations prescribed by the MSPB.

5 U.S.C. § 7701(a). Those regulations provide a right to written discovery, depositions, and

examination of witnesses at a hearing. 5 C.F.R. §§ 1201.31-1201.37, 1201.51-1201.59, 1201.71-

75. MSPB administrative judges (AJs) can order the appearance of witnesses and documents for

examination. 5 C.F.R. §§ 1201.81 – 1201.85.

18.     The MSPB may uphold an agency's termination decision based on alleged

misconduct only if that decision "is supported by a preponderance of the evidence."  5 U.S.C.

§ 7701(c)(1).

## II.    THE 2014 ACT

19.     On August 7, 2014, in response to reports of an alleged access crisis at the Veterans

Health Administration, Congress enacted the Veterans Access, Choice, and Accountability Act

of 2014 ("2014 Act").  *See* Pub. L. 113-146, 127 Stat. 1754, codified as 38 U.S.C. § 713 (2014).

38 U.S.C. § 713 (2014) granted DVA additional authority, in addition to that available under

Title 5, to remove senior executives based on performance or misconduct.

20.     The 2014 Act afforded VA senior executives removed under § 713 "expedited

review" before an MSPB administrative judge.  MSPB's procedures for processing expedited

review under the new law included an evidentiary hearing before an MSPB AJ where the senior executive could engage in discovery and confront relevant witnesses and documents.

21.    The 2014 Act explicitly forbade, however, any appeal of the AJ's decision to the Presidentially-appointed, Senate-confirmed three-member panel of the Board itself. *See* 38 U.S.C. § 713(a), (e) (2014).  The AJ, who was not appointed in the manner required for officers of the United States, thus had authority to render a final decision on behalf of the United States without review by a superior Executive Branch officer.

22.    When a VA SES employee challenged the 2014 Act's constitutionality under the Appointments Clause, the Solicitor General of the United States decided not to defend the statute and conceded its unconstitutionality. The Federal Circuit Court of Appeals subsequently agreed that the law violated the Appointments Clause of the U.S. Constitution. *Helman v. Department of Veterans Affairs*, 856 F.3d 920 (Fed. Cir. 2017).  To remedy the violation, the Federal Circuit severed provisions of the statute that had prevented review of an AJ's decision by the Board itself. The result was a process that largely followed the traditional appeal process under Title 5. *See id.* at 932.

## III.    THE 2017 ACT

23.    Following the Federal Circuit's decision in *Helman*, Congress amended 38 U.S.C. § 713's termination procedures by enacting the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017 (Public Law 115-41) (the "2017 Act") on June 23, 2017.

24.    Under the 2017 Act, § 713 allows for removal of DVA senior executives from the SES and from federal service "if the Secretary determines that the misconduct or performance of the covered individual warrants such action." 38 U.S.C. § 713(a)(1).

6

25.    The 2017 Act defines "misconduct" to included "neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of position." 38 U.S.C. § 713(d). This definition of misconduct mirrors the grounds on which SES employees may be removed under 5 U.S.C. § 7543, which also remains available for DVA to use against senior executives.

26.    "In the case of a disciplinary action based on misconduct, the requirement that the Secretary 'determine' that the misconduct in question warrants disciplinary action implies that the Secretary must find that it is likely, i.e. more likely than not, that the employee has engaged in the misconduct that justifies the proposed discipline." *Rodriguez v. Dep't of Veterans Affairs*, 8 F.4rh 1290, 1298 (Fed. Cir. 2021).

27.    In the 2017 Act, however, Congress further altered the process available to VA Senior Executives whom the DVA seeks to remove under § 713.

28.    Although the Federal Circuit in *Helman* had remedied the constitutional infirmity in the 2014 Act by providing Board review to removed DVA senior executives, the 2017 Act drastically reduces the process available to DVA senior executives targeted for removal.

29.    Among other things, the new Section 713:

    a. Decreases the pre-termination notice given to senior executives from a *minimum* of 30 calendar days under 5 U.S.C. § 7543 to a *maximum* of 15 business days. 38 U.S.C. § 713(b)(2)(A);

    b. Limits the period for VA senior executives to respond to any proposed action to 7 business days, when there is no numbered limit on the response period under the CRSA. 38 U.S.C. § 713(b)(2)(B); 5 U.S.C. § 7543.

c. Denies VA senior executives a post-termination hearing, instead limiting their post-termination process to a written grievance and time-limited decision on the grievance by the Secretary. 38 U.S.C. § 713(b)(1)(C) (2017).

d. Requires the entire grievance process to "take fewer than 21 days." 38 U.S.C. § 713(b)(1)(C) (2017).

e. Replaces MSPB review of agency action with limited judicial review initiated by filing a separate post-termination lawsuit. 38 U.S.C. § 713(b)(5)-(6).

f. Establishes the government's burden of proof on judicial review to "substantial evidence" as opposed to the "preponderance of the evidence" burden of proof applicable to MSPB *de novo* review of agency actions under 5 U.S.C. §§ 7543(d), 7701(c)(1)(B). 38 U.S.C. § 713(b)(6)(c).

30.     Also as part of the 2017 Act, Congress created the Office of Accountability and Whistleblower Protection ("OAWP") within the VA.  OAWP is headed by the Assistant Secretary for Accountability and Whistleblower Protection.  38 U.S.C. § 323(b).

31.     Among other things, OAWP was charged with "[r]eceiving, reviewing, and investigating allegations of misconduct, retaliation, or poor performance" involving senior executives and "[m]aking such recommendations to the Secretary for disciplinary action as the Assistant Secretary considers appropriate after substantiating any allegation of misconduct or poor performance."  38 U.S.C.A. § 323(c)(1)(H), (I).

**A.  DVA Senior Executive Removal Procedures Under the 2017 Act**

32.     The 2017 Act required the Secretary, "in consultation with the Assistant Secretary for Accountability and Whistleblower Protection," to establish "an internal grievance process" through which senior executives could grieve decisions under Section 713.  38 U.S.C. § 713(b)(C).

33.     On July 7, 2017, VA published Corporate Senior Executive Management Office

Letter No: 006-17-1 – Senior Executive Accountability and Grievance Procedures ("CSEMO

Letter"), signed by then-Secretary David Shulkin.

34.     The CSEMO Letter published procedures for adverse employment actions based on

misconduct, performance, or whistleblower retaliation, and detailed procedural steps at the

investigatory, evidence review, adverse action, and grievance stages of the disciplinary process.

These procedures "implement 38 United States Code (U.S.C.) §§ 323, 713, 731, as amended by

the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017

(Public Law 115-41)." CSEMO Letter § 1.

35.     Under the CSEMO Letter, an investigation begins when an allegation of misconduct,

poor performance, or retaliation is referred to OAWP. CSEMO Letter § 7.a.i. At that point,

OAWP reviews and, if necessary, investigates the allegation. *Id.* § 7.a.iii.

36.     CSEMO Letter Section 7.a.iii.1 requires that "a Senior Executive who is the subject

of an investigation or review will be given an opportunity to respond to and provide evidence

relating to the matters under investigation" unless "the circumstances of the investigation make it

impossible, unreasonable, or unnecessary to do so." CSEMO Letter § 7.a.iii.1.

37.     Under Section 713, a senior executive whose removal is proposed must be provided

with "a file containing all evidence in support of the proposed action." 38 U.S.C. §

713(b)(1)(A).

38.     The CSEMO letter contemplates that OAWP will maintain both an "investigative

file" and an "evidence file." CSEMO Letter § 7a.iii.i.

39.     The CSEMO Letter requires that "[a]ny statement or evidence provided by the Senior

Executive will be included in the investigative file." CSEMO Letter § 7.a.iii.1.

40.    If the statement is "relevant *or* used in support of a subsequent proposed action," it must also be included in the "evidence file." CSEMO Letter § 7.a.iii.1. (emphasis added).

41.    Upon conclusion of an investigation, OAWP and the Office of General Counsel (OGC) must "brief the Secretary or his or her designee on the results of the investigation and whether disciplinary action is recommended." That recommendation is "limited to whether disciplinary action should be pursued." CSEMO Letter § 7.a.iii.3.

42.    If the Secretary or his or her designee concurs with the recommendation, OAWP and OGC identify a "Proposing Official," who must be "briefed regarding the results of the investigation and the evidence gathered." CSEMO Letter § 7.a.iii.4.

43.    The Proposing Official, not OAWP, must "review the *available* evidence to determine whether a Reprimand, Suspension, Demotion, or Removal should be proposed; or whether no action is warranted." [emphasis added] CSEMO Letter § 7.b.i.

44.    If the Proposing Official determines that action is warranted, the Proposing Official prepares a "Proposal" informing the Senior Executive of the proposed action and the basis for it; the evidence supporting the proposed action; and the senior executive's right to reply and to representation by an attorney or other representative. CSEMO Letter § 7.z, 7.aa.

45.    The Proposing Official is required to "propose a penalty that is reasonable and commensurate with the facts of the case and the rationale for determining what constitutes the appropriate level of discipline will be included in the Proposal." *Id.*

46.    The CSEMO Letter states that "[t]he Senior Executive will have 7 business days after receiving the Proposal to respond, in writing, to the Deciding Official." Although "[e]xtensions to the reply period may be granted by the Deciding Official, after consulting with OGC and OAWP," the Letter warns that extensions "should only be granted in the most exigent

circumstances" due to the statutory requirement to issue a decision within 15 business days from the date of the proposed action. CSEMO Letter § 7.d.ii-iii.

47.     The "Deciding Official" is an individual to whom the Secretary has delegated authority to make an "Initial Decision" on the proposed action. CSEMO Letter § 6.f. The Deciding Official prepares an "Initial Decision," which is a memorandum from the Deciding Official to the senior executive stating the Deciding Official's decision on the Proposal and the basis for that decision. CSEMO Letter § 6.l.

48.     Once a Deciding Official makes a decision based on the Proposal, the evidence, and the Senior Executive's reply, the Senior Executive is entitled to grieve the Initial Decision to a Grievance Official. CSEMO Letter § 8.a.

49.     The CSEMO Letter states that the "Standard of Proof," or "degree of evidence necessary to sustain an action taken under 38 U.S.C. § 713," is "Substantial Evidence." CSEMO Letter § 6.gg.

50.     The CSEMO Letter defines "Substantial Evidence" as "relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree." CSEMO Letter § 6.hh.

51.     Any adverse action, including termination, is imposed prior to resolution of the grievance. CSEMO Letter § 7.d.vi. Therefore, any grievance of termination filed by a Senior Executive is a post-termination process.

52.     After a grievance is filed by the Senior Executive, the Grievance Official "will consult with OAWP and OGC," who "advise the Grievance Official on issues raised by the grievant." CSEMO Letter § 8.a.iii.3. The Grievance Official is not permitted to consult other

parties. *Id.* The grievance process does not include an evidentiary hearing or other fact-finding procedure. *See generally* CSEMO Letter § 8.

53.    Within 20 calendar days, the Grievance Official must "issue a recommendation to the Secretary through OAWP on the grievance." CSEMO Letter § 8.a.ii.4.

54.    The Grievance Official may recommend setting aside an Initial Decision that is the subject of the grievance if he or she determines that the record reflects that the action was: (a) not supported by Substantial Evidence; or (b) Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; or (c) Obtained without procedures required by a provision of law having been followed." *Id.*

55.    The Secretary must then "review[] the record, including the Grievance Official's recommendation, the grievance, the Initial Decision, and the Proposal," before issuing a Final Decision. CSEMO Letter § 8.a.ii.5.

56.    The Secretary's "Final Decision will not uphold an Initial Decision that is … (a) not supported by Substantial Evidence; or (b) Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; or (c) Obtained without procedures required by a provision of law having been followed." CSEMO Letter § 8.a.ii.6.

57.    "The Final Decision shall be subject to judicial review under 38 U.S.C. §§ 713(b)(4)(-(6)." CSEMO Letter § 8.a.ii.7.

58.    The CSEMO Letter does not require allegations of misconduct or performance against DVA Senior Executives be found to be true, or even more likely true than not, to sustain an action under 38 U.S.C. § 713.

59.    The CSEMO Letter nowhere provides for a pre- or post-termination evidentiary hearing.

**B. OAWP and DVA's Deficient Implementation of the 2017 Act**

60.     In June 2018, the VA Office of Inspector General (OIG), at the request of several concerned lawmakers, initiated an investigation into OAWP's implementation of the 2017 Act.

61.     In October 2019, OIG summarized its findings in a report titled "Failures Implementing Aspects of the VA Accountability and Whistleblower Protection Act of 2017," VA OIG Report No. 18-04968-249, dated October 24, 2019, available at https://www.va.gov/oig/pubs/VAOIG-18-04968-249.pdf.

62.     The Report found that OAWP failed to "conduct investigations that were procedurally sound, accurate, thorough, and unbiased."

63.     The Report found that OAWP investigations lacked a balanced approach to fact-finding, because OAWP leaders "encouraged investigators to look for 'substantial evidence' to support the charge of misconduct without investigating further to identify any relevant exculpatory evidence."

64.     The Report found that OAWP focused only on finding evidence sufficient to substantiate the allegations without attempting to find potentially exculpatory or contradictory evidence.

65.     The Report found that OAWP violated the CSEMO Letter when it made no attempt to interview subject employees.

66.     The Report, in a section titled "The [OAWP Advisory and Analysis] Division Compiled Incomplete Evidence Files to Support Proposed Disciplinary Actions," found that while "the July 2017 accountability procedures contemplate the creation of separate investigative and evidence files, with the latter containing a subset of evidence developed during the investigation limited to what is *relevant*," (emphasis added), OAWP nevertheless "focused on

13

including material in the evidence file that supported the proposed disciplinary action, rather than compiling all relevant evidence."

67.     The Report found that when OAWP withheld statements made by Senior Executives from the evidence file, it made it "difficult for a disciplinary official to determine whether the [substantial evidence] standard is met without considering all relevant evidence developed during the investigation," and "impacted the OGC's ability to provide legal advice."

68.     In one example, the Report found that OAWP improperly withheld the interview transcript of an employee who was the subject of the proposed discipline. VA OIG criticized that "the employee's transcript was relevant because it contained the subject's denials, admissions, and *contextualization of alleged misconduct referenced in the proposed discipline*, and therefore, should have been included in the evidence file pursuant to the [CSEMO Letter]."

69.     One VA official commented that OAWP appeared to have "a mission to find wrongdoing," and pursued cases that were only "marginally supported at best" and "felt like . . . [disciplinary] action in search of evidence."

70.     VA OIG recommended that the Assistant Secretary for Accountability and Whistleblower Protection make "certain that in any disciplinary action recommended by [OAWP], *all relevant evidence* is provided to the VA Secretary (or the disciplinary officials designated to act on the Secretary's behalf." (emphasis added)

71.     DVA represented that it concurred with that recommendation, and stated that it "completed the actions required to resolve this recommendation in September 2019."

## FACTUAL ALLEGATIONS

I.    **JAMES TRINKA'S CAREER AND PERSONAL BACKGROUND**

A. **Trinka's Career**

72.    James Trinka is a decorated veteran and career civil servant.

73.    Trinka began his lifetime of government service on July 1, 1974, when he was nominated and appointed to the United States Air Force Academy. Trinka entered military service (with the Air Force) upon graduation on May 31, 1978.

74.    In the Air Force, Trinka served as a fighter pilot, flying F-4 and F-16 jets.

75.    Trinka earned numerous medals, awards and commendations for his military service, including the Aviator's Valor Award in 1986, the Air Medal in 1987, the Jabara Award for Airmanship in 1987, the Air Force Well Done Award in 1987, Meritorious Service Medals in 1991 and 2000, and the Air Force Commendation Medal in 1984, 1987, and 1990.

76.    Trinka served in the U.S. Air Force for almost 22 years, retiring in February 2000, as a Lieutenant Colonel.

77.    As a result of Trinka's military service, he was assessed as 80% disabled.

78.    After Trinka left the Air Force, he wanted to continue to serve his country. Trinka committed his life to service, in part to honor his grandfather who was killed in World War II. Trinka began his career as a member of the federal civil service as a Senior Executive in June 2001.

79.    Over a 20-year career in the federal civil service, Trinka held positions of increasing responsibility at several federal agencies, concluding at DVA.  In August 2000, for example, Trinka became the Director of Leadership and Organizational Effectiveness at the Internal Revenue Service. In June 2004, he was appointed Chief Learning Officer at the Federal Bureau

of Investigation. In July 2006, he was appointed as Director of the Air Traffic Organization Technical Training and Development Program at the Federal Aviation Administration.

80.     On January 15, 2012, Trinka was appointed to a career Senior Executive Service position at DVA as the Executive Director of Leading Edge, a government-wide senior executive development initiative.

81.     In June 2014, Trinka was assigned to DVA's Office of Information and Technology in the position of Chief Learning Officer.

82.     In July 2017, Trinka was promoted to the position of DVA's Office of Information and Technology Chief Talent Management Officer.

83.     As the Chief Talent Management Officer, Trinka was responsible for "providing executive leadership in the development, implementation and management of a comprehensive employee and leadership development and training program for [the Office of Information and Technology]." His duty station was at VA Central Office, in an office at 811 Vermont Avenue NW, Washington, DC 20420. Trinka served in that position, and performed those duties, until his termination on October 2, 2020.

84.     During his 20 years of federal civilian service, Trinka earned an exemplary employment record and received top-level performance ratings.

85.     In his final performance appraisal in September 2019, Trinka received the highest-possible rating, "Outstanding."

86.     On January 5, 2020, based on that Outstanding performance appraisal, Trinka received a performance-based pay increase pursuant to 5 C.F.R. § 534.404(B)(3).

87.     Prior to his termination, Trinka was never subject to disciplinary action for misconduct or sanctioned for unsatisfactory performance during his federal civilian service.

### B. Trinka's Personal Background

88.    Trinka has been married to Piyaporn Trinka ("Mrs. Trinka") since 2013.

89.    Mr. and Mrs. Trinka married on December 21, 2013.

90.    Mrs. Trinka applied for legal immigration status in the United States. On September 1, 2021, an immigration judge approved Mrs. Trinka's application for lawful permanent resident status, pending an appointment with U.S. officials to pick up her Permanent Resident Card.

## II.    TRINKA'S PRIOR DISCLOSURES OF HIS WIFE'S IMMIGRATION STATUS

### A. Trinka Uses Mrs. Trinka's Tax Identification Number on Insurance Forms

91.    On January 3, 2014, Trinka applied for federal health and life insurance benefits for Mrs. Trinka.  He used his wife's non-citizen IRS tax identification number in lieu of a Social Security number (which his wife did not have) on a Federal Employees Health Benefits (FEHB) Health Benefits Election Form and Federal Employees' Group Life Insurance (FEGLI) Designation of Beneficiary Form to ensure the correct person received the benefits.

92.    Neither the FEHB nor the FEGLI form required disclosure of Trinka's wife's immigration status. A spouse's immigration status has no bearing on benefit determination for either FEHB or FEGLI.

93.     Trinka, who had previously worked at the IRS, was aware that the first three numbers of the IRS tax identification number would identify his wife as a non-citizen.

### B. Trinka's Disclosure of Mrs. Trinka's Citizenship During an OPM Suitability Investigation

94.    The Office of Personnel Management has the legal authority to conduct suitability investigations.

95.    As part of a regular suitability and background reinvestigation, Trinka submitted on August 13, 2014, an e-QIP (Electronic Questionnaires for Investigations Processing) form.

96.     On page 14 of the e-QIP questionnaire, Trinka correctly listed Mrs. Trinka's place and country of birth as Chang Rai, Thailand.  On page 15 of the e-QIP questionnaire, Trinka mistakenly listed Mrs. Trinka's country of birth and citizenship as the United States.

97.     On December 3, 2014, United States Office of Personnel Management's Federal Investigative Services performed a supplemental subject interview of Trinka as part of the suitability investigation of Trinka.

98.     During the interview, Trinka stated that he mistakenly omitted from his e-QIP several of his degrees, mistakenly listed his spouse as a U.S. Citizen, and mistakenly omitted two other background investigations previously performed on him in the past.

99.     Based on this suitability and background investigation, Trinka was found suitable for continued federal employment, and remained in an SES position until his termination on October 2, 2020.

## III.    VA OIG's INVESTIGATION OF TRINKA

### A.      OIG's Initial Investigation

100.    Around May 2014, VA OIG initiated an investigation involving Trinka and his wife.

101.    On August 8, 2018, VA OIG attempted to interview Trinka at VA Central Office. VA OIG informed Trinka the interview was voluntary, and Trinka declined.

102.    On August 9, 2018, a prosecutor from Public Integrity told VA OIG that there "is not enough evidence to charge [Trinka] for false statements, based on the investigation to date."

### B.  Trinka's December 2018 Interview with VA OIG

103.    On or around December 7, 2018, VA OIG asked Trinka's supervisor, John Oswalt, to escort Trinka to VA OIG for an interview. While Trinka and Oswalt walked to VA OIG, Trinka informed Oswalt that he believed the interview may be regarding his wife's immigration and/or citizenship status.  Trinka told Oswalt that his wife had no legal immigration status.

104.    Once he arrived at VA OIG, Trinka requested an attorney be present for the
compelled interview, and the interview was delayed so that his attorney could be present.

105.    On December 21, 2018 at or around 12:03 p.m., VA OIG conducted a compelled
interview of Trinka via telephone.

106.    The December 21, 2018 interview was recorded by the VA OIG.

107.    VA OIG transcribed the recording of the December 21, 2018 interview.

108.    Over four months after the interview, VA OIG created a summary of the interview in
a "Memorandum of Interview," dated April 24, 2019.

109.    According to the Memorandum of Interview, Trinka "said he verbally disclosed his
wife's undocumented immigration status to three different supervisors who managed him during
his tenure in the VA Office of Information Technology."

110.    The Memorandum did not describe the circumstances under which Trinka allegedly
made that statement. It did not quote Trinka's alleged statement. It did not identify what
question or questions were asked to elicit that response. It did not give the names of the "three
different supervisors," or state whether Trinka had provided their names. It did not state whether
Trinka had further explained the circumstances of the disclosures. And it did not say whether
Trinka had prefaced the statement with a qualifying phrase such as "I think," or "I believe,"
which would have rendered Trinka's statement true as long as Trinka did sincerely "think" or
"believe" he had told his supervisors about his wife's status.

111.    VA OIG also summarized the interview in its "Comprehensive Report of
Investigation," dated June 24, 2019. This summary did not provide any additional information
about the details of Trinka's alleged statement that he had disclosed his wife's immigration status
to three supervisors.

112.    In May 2019, VA OIG interviewed three of Trinka's former supervisors: John Oswalt, Richard Chandler, and Martha Orr. On information and belief, those interviews were recorded or transcribed.

113.    In a Memoranda of interview prepared after the interview, investigators claimed that Chandler and Orr said they were unaware of Mrs. Trinka's immigration status.

114.    Another memorandum of interview later prepared by VA OIG stated that Oswalt said that Trinka had told him on December 7, 2018, that Mrs. Trinka was undocumented.

115.    In January 2020, VA OIG referred its report investigation of Trinka to OAWP for "further action as appropriate."

116.    Among other materials, VA OIG transmitted to OAWP the transcript and/or recording of Trinka's December 21, 2018 VA OIG interview, as well as the Memorandum of Interview regarding that interview prepared on April 24, 2019.

IV.    **DEFENDANTS REMOVE TRINKA FROM FEDERAL SERVICE**

A.  **OAWP Recommends Trinka's Termination Without Additional Investigation**

117.    On or before January 7, 2020, OAWP obtained VA OIG's entire underlying investigative file, including the transcript and/or recording of Trinka's December 2018 interview with VA OIG.

118.    OAWP subsequently reviewed VA OIG's report of investigation and investigative file.

119.    OAWP did not conduct a follow-on investigation to VA OIG's investigation.

120.    Under the CSEMO letter, OAWP was required to give Mr. Trinka "an opportunity to respond to and provide evidence relating to the matters under investigation" unless it was

"impossible, unreasonable, or unnecessary to do so." CSEMO Letter § 7.a.iii.1. OAWP did not
do so.

121.    OAWP did not interview or request a statement from Trinka.  In fact, Trinka was not
given *any* "opportunity to respond to" or "provide evidence relating to the matters under
investigation."  Nor did OWAP explain why it was "impossible, unreasonable, or unnecessary
to" allow Trinka to respond to the allegations and provide evidence.

122.    OAWP's failure to investigate the allegations against Mr. Trinka was consistent with
OAWP's historical practice of "focus[ing] only on finding evidence sufficient to substantiate the
allegations without attempting to find potentially exculpatory or contradictory evidence"—a
practice VA OIG found to be "inconsistent with reliably conducting an unbiased, balanced, and
thorough investigation[.]"

123.    On July 15, 2020, OAWP recommended that Trinka be removed from federal service
for allegedly making "false or inaccurate statements or provid[ing] false or inaccurate
information to the government on at least two occasions." The two allegedly "inaccurate"
statements identified by OAWP were: (1) Mr. Trinka's mistaken characterization of Mrs.
Trinka's citizenship on his August 2014 e-QIP questionnaire; and (2) Mr. Trinka's alleged
statement at the December 2018 interview with VA OIG investigators "that he had informed
three supervisors about his wife's immigration status."

124.    OAWP's recommendation was thus based in part on alleged conduct occurring prior
to the June 23, 2017 effective date of the 2017 Act—namely, the allegation that Trinka made a
false statement on his e-QIP form in August 2014.

125.    DVA's policies, as stated in the CSEMO Letter, required OAWP to limit its recommendation to whether disciplinary action should be pursued. OAWP nonetheless recommended a specific penalty—removal from federal service.

126.    OAWP justified its choice of penalty by stating that "[r]emoval is a reasonable penalty for making a false statement or exhibiting a lack of candor."

127.    On July 16, 2020, OAWP transmitted its recommendation to Dominic Cussatt, DVA's Principal Deputy Assistant Secretary for the Office of Information and Technology.

128.    OAWP instructed Mr. Cussatt to "carefully consider this recommendation, OAWP's investigative file, and other information that you or your designee consider relevant to determine whether the action recommended by OAWP should be proposed."

129.    OAWP instructed Mr. Cussatt that, should he or his designee "fail to propose the disciplinary action recommended in this paragraph within 60 calendar days from the date of this memorandum, [he or his designee] must provide OAWP with a detailed justification why the recommended action was not proposed." OAWP warned Mr. Cussatt that "[t]his justification, required under 38 U.S.C. § 323(f)(2), will be provided to Congress."

130.    When OAWP transmitted its recommendation and evidence file to Mr. Cussatt, OAWP withheld from Mr. Cussatt the transcript and/or recording of Trinka's VA OIG interview.

131.    OAWP also failed to include in the evidence file any transcripts of the interviews of Mr. Trinka's three former supervisors, or to explain why no such transcripts were included. Instead, the evidence file included only memoranda prepared by VA OIG investigators that purported to summarize those interviews.

132.    OAWP's exclusion of material evidence from the evidence file provided to the Proposing Official is consistent with OAWP's historical practice of culling evidence that did not

support the charged misconduct before sending the evidence file to the Proposing Official—a practice that VA OIG noted makes it "difficult for a disciplinary official to determine whether [the substantial evidence standard] is met."

133.    In 2019, after VA OIG criticized OAWP's practice of culling relevant evidence, DVA stated that it concurred with VA OIG's recommendation that "in any disciplinary action recommended by [OAWP], *all relevant evidence*" should be provided to the VA Secretary and any disciplinary officials acting on the Secretary's behalf. OAWP, however, failed to follow the OIG's recommendation in Trinka's case when it excluded from the evidence file relevant evidence, including but not necessarily limited to the transcript or recording of Trinka's interview and any transcripts or recordings of Trinka's supervisors' interviews.

### B. Defendants Propose Trinka's Removal from Federal Service Based on OAWP's Incomplete Evidence File and Pre-2017 Conduct

134.    Defendants appointed Paul Cunningham, DVA's Deputy Assistant Secretary and Chief Information Officer, Office of Information and Technology, as the Proposing Official. Assistant Secretary Cunningham was provided the culled evidence file that OAWP had prepared for Mr. Cussatt. That file did not contain, and Assistant Secretary Cunningham was not provided, the transcript or recording of Trinka's December 2018 interview and any transcript or recordings of the interviews with Trinka's supervisors.

135.    On September 11, 2020, Assistant Secretary Cunningham, acting on behalf of defendant DVA, proposed Trinka's termination "in accordance with 38 U.S.C. § 713" based on a charge of "Conduct Unbecoming a Federal Supervisor," and provided Trinka with seven business days to respond.

136.    In contrast to the two charges in OAWP's recommendation, Assistant Secretary Cunningham's charge of "Conduct Unbecoming a Federal Supervisor" contained only a single

specification of misconduct: that Trinka "provided false or inaccurate information, to VA Office

of Inspector General (OIG) investigators on December 21, 2018, when [he] stated that [he]

informed three supervisors about your wife's immigration status."

137.    Thus, the sole charge of misconduct concerned Trinka's responses to VA OIG's

questioning during his December 21, 2018 VA OIG interview.

138.    The only direct evidence of the lone charge of misconduct was the transcript and/or

recording of Trinka's December 21, 2018 VA OIG interview, and any transcript or recordings of

the interviews with Trinka's supervisors.

139.    Assistant Secretary Cunningham, however, did not review or consider the transcripts

and/or recordings of those interviews in deciding whether to propose Trinka's removal, as they

had been omitted from the evidence file prepared by OAWP. Instead, he relied on the after-the-

fact hearsay summaries of those interviews, prepared by the OIG, that OAWP had included in

the evidence file.

140.    Defendants' proposal did not explain why Defendants found it unnecessary to

consider the only direct, non-hearsay evidence of the specified charge, or why Defendants made

no attempt to obtain a copy of the transcripts or recordings that were in OAWP's possession.

141.    The proposed termination referenced and relied on conduct occurring prior to the

passage of the 2017 Act on June 23, 2017 to justify the penalty of removal.

142.    The proposed termination listed two specific instances of alleged conduct occurring

before enactment of the 2017 Act.  First, the proposal noted that Trinka had mistakenly identified

his wife as a U.S. citizen on his August 2014 e-QIP form; it also noted that Trinka had corrected

the mistake.  Second, the proposal noted that Trinka used his wife's non-citizen tax identification

number when he added her to his health and life insurance and when he applied for a military dependent identification card for her in 2013.

143.    The proposed termination referenced those two specific instances of alleged conduct that occurred before enactment of the 2017 Act in a section entitled "Aggravating Factors" to justify the penalty of removal.

144.    On the basis of an incomplete record and pre-2017 conduct, Deputy Assistant Secretary Cunningham proposed Mr. Trinka's removal from the federal civil service.

**C. Trinka's Reply Challenges the Proposed Removal**

145.    Mr. Trinka was notified of the proposed removal on September 11, 2020.

146.    With the proposed termination, Defendants issued to Trinka a 342-page evidence file.

147.    The vast majority of the 342-page evidence file was documentation created prior to enactment of the 2017 Act and relating to conduct occurring prior to enactment of the Act. For example, the evidence contained the full transcript of Mrs. Trinka's November 2015 interview, which predated Trinka's alleged misstatements in the December 2018 OIG interview by several years.

148.    The evidence file did not include the transcript or recording of the December 2018 OIG interview at which Trinka allegedly made the false statement on which the proposed removal was based.

149.    Defendants' failure to provide the transcript to Trinka impaired Trinka's ability to prepare his reply to the proposed removal. By the time Defendant DVA proposed removal, nearly two years had passed since the December 2018 VA OIG interview. Trinka's ability to respond to the allegations was harmed due to the lapse of time.

150.    Instead of a transcript or recording of Trinka's December 2018 interview, the evidence file included VA OIG's April 2019 memorandum purporting to summarize that interview.  That memorandum asserted that "TRINKA said he verbally disclosed his wife's undocumented immigration status to three different supervisors who managed him during his tenure in the VA Office of Information Technology."  The memorandum did not assert that Trinka specified when those disclosures occurred.

151.    The evidence file also did not include transcripts of the OIG interviews at which Trinka's former supervisors allegedly denied that Trinka had told them about his wife's immigration status.  Instead, the evidence file included VA OIG memoranda that purported to summarize those interviews.

152.    The VA OIG-produced summaries included in the evidence file contained conflicting accounts of the interviews VA OIG conducted, which call into question the accuracy and reliability of those summaries.  For example, VA OIG's summary of its investigatory findings in the Report of Investigation represented that Trinka's former supervisors John Oswalt, Richard Chandler, and Martha Orr each "denied having any prior knowledge of his wife's undocumented immigration status until after interview attempts were made by VA OIG investigators."  VA OIG's memorandum purporting to summarize Oswalt's interview, however, represented that Oswalt stated that Trinka did inform him of his wife's immigration status on December 7, 2018—prior to VA OIG's attempt to interview Trinka on that date.

153.    On September 16, 2020, Trinka requested a three-business-day extension of time to respond to his proposed termination. Defendants denied Trinka's extension request, citing the lack of "exigent circumstances."

154.    On September 22, 2020, Trinka responded in writing to the proposed termination under 38 U.S.C. § 713.

155.    In his written reply, Trinka "denie[d] that he knowingly provided false or inaccurate information to VA OIG investigators."

156.    Trinka's reply explained that, without the transcript of his December 2018 interview with VA OIG, the necessary context was missing and it was "impossible to assess whether VA OIG even asked Mr. Trinka about whether his supervisors were aware of his wife's immigration status, or what either party said to prompt the allegedly false statement."

157.    Trinka also argued that he was "entitled to the recordings and/or transcripts of interviews with his supervisors" if any were created by VA OIG.

158.    In addition to denying that he committed the charged misconduct, Trinka stated in his written reply that Defendants could not meet their burden to prove the charge by sufficient evidence. Trinka's written reply stated that the Agency provided no evidence for its lone charge other than VA OIG's hearsay summary of Trinka's interview, even though Defendants possessed a copy of the transcript.

159.    Trinka's written reply argued that the statute and DVA's implementation of the statute in his case violated the Due Process Clause of the Fifth Amendment of the United States Constitution.

160.    Trinka's written reply argued that the imposition of a strict seven-business day notice and opportunity to respond period violated the Due Process Clause, and that Defendants intended to hinder his ability to respond when it denied his request for an extension of three business days.

161.    Trinka's written reply also argued that the failure of 38 U.S.C. § 713 to afford a post-termination administrative hearing violated the Due Process Clause, and that DVA's internal grievance procedures did not provide sufficient post-termination due process.

162.    In addition, Trinka's written reply argued that Defendants violated the Due Process Clause by imposing a "substantial evidence" burden of proof at each stage of the proceedings, including the administrative fact-finding stage.

163.    Trinka's written reply also described how Defendants violated their own procedures in order to secure Trinka's termination.

164.    Trinka's written reply explained that Defendants violated CSEMO Letter § 7a.iii.3, which prohibits OAWP from recommending a specific penalty to the Proposing Official. Despite that prohibition, OAWP recommended removing Trinka from federal service. Trinka noted that OAWP's recommendation carried unlawful, undue influence because Proposing Officials who deviate from OAWP's recommendation must justify their decision in a letter that will be shared with the United States Congress.

165.    Trinka's written reply argued that Defendants violated CSEMO Letter Section 7.a.iii.1's requirement to include any statement or evidence provided by a Senior Executive who is under investigation "in the investigative file, and if relevant or used in support of a subsequent proposed action, the evidence file." Trinka argued that this evidence was necessary for him to be able to respond to the evidence against him.

166.    Trinka argued that it was not impossible, unreasonable, or unnecessary for Defendants to provide him with the best and only direct evidence of his alleged misconduct.

167.    Trinka argued that Defendants violated CSEMO Letter § 7.a.iii.1's requirement to transmit all "relevant" evidence to the subject of the proposed action when it did not transmit Trinka's VA OIG interview transcript.

168.    Trinka also argued that OAWP and Defendants purposefully honed down their evidence file to only those documents it believed supported the charges, thereby depriving the Proposing Official and Trinka of relevant, exculpatory evidence.

169.    In doing so, Trinka argued, Defendants deprived him of evidence that could exonerate him of the charged misconduct and clear his name, including the transcript or recording of his own December 2018 interview and the transcripts or recordings of the interviews with his supervisors.

170.    Trinka also noted that the evidence file contained the full transcript of Mrs. Trinka's November 2015 interview, even though Mrs. Trinka was not under investigation by Defendants. Nothing in Mrs. Trinka's transcript formed the basis of the charged misconduct against Trinka. Mr. Trinka's written reply noted that the inclusion of Mrs. Trinka's interview appeared to be an attempt to embarrass Mrs. Trinka.

171.    DVA employees are not obligated to share personal information, such as their spouse's immigration or citizenship status, with their supervisors. Defendants produced no legal authority or agency policy requiring Trinka to disclose to any supervisor his wife's immigration status.

172.    Trinka's written reply argued that there was no nexus between his immaterial statements to VA OIG regarding conversations with his supervisors about his personal life and his position as Chief Talent Management Officer at DVA.

173.    Following the enactment of the 2017 Act, in a presentation shared with staff on implementation of the Act, DVA conceded that in adverse employment actions under Title 38, it would be required to establish nexus between the articulated grounds for an adverse action and either the employee's ability to accomplish his duties satisfactorily or some other legitimate government interest.

174.    Trinka's written reply argued that the background and aggravating factors sections of the proposed termination asserted uncharged, unsubstantiated, and unsupported allegations of misconduct that unfairly cast Trinka as having a history of misleading his federal employer. For example, the proposed termination alleged that Trinka had "willfully misinformed federal financial, insurance, medical, and security programs on the citizenship status of [Mrs. Trinka]" and had "willfully chosen not to remediate or resolve the illegal status of [his] wife."

175.    There is no evidence that Mr. Trinka "willfully misinformed" federal financial, insurance, or medical programs about his wife's status as alleged in the proposed termination. To the contrary, Mr. Trinka used his wife's tax identification number on her insurance forms knowing that the tax identification number would identify her as a non-citizen. Furthermore, none of the insurance forms Mr. Trinka completed required disclosure of Mrs. Trinka's immigration status.

176.    Nor is it true that Trinka had "willfully chosen not to remediate or resolve" his wife's "illegal status," as alleged in the proposed termination. Mrs. Trinka had been making efforts to resolve her immigration status for several years by the time of the proposed removal, and Trinka supported her in those efforts. As of today, Mrs. Trinka was granted a change in her immigration status, and an immigration judge approved her application for lawful permanent resident status.

In any event, Trinka had no legal obligation to "remediate or resolve" his wife's immigration status.

177.    Trinka's written reply argued that removal was an unreasonable penalty given the totality of the circumstances.

**D. DVA Decides To Remove Trinka Without Further Investigation or Process**

178.    On October 2, 2020, Mr. Cussatt issued the decision to remove Trinka from the Senior Executive Service and federal service, effective as of that date.

179.    The October 2, 2020 Decision stated Defendants' position that Trinka had "been afforded all of the due process rights afforded to [him] by the Constitution."

180.    The Decision incorrectly stated that the CSEMO Letter required only that Trinka be provided with evidence used by the Proposing Official to support the action.

181.    The Decision admitted that OAWP did not provide the Proposing Official with Trinka's VA OIG transcript, and did not provide a reason for OAWP's decision to withhold the transcript and/or recording.

182.    The Decision asserted, however, that "[t]he recorded statement as mentioned in the Report of Investigation (ROI) was never provided to the proposing official or the deciding official," and that "OAWP is only required to forward evidence that is deemed necessary."

183.    The Decision rejected Trinka's demand for a post-termination administrative hearing and stated that Trinka was due only pre-termination notice of the charges and an opportunity to respond under the Fifth Amendment.

184.    The Decision did not deny that Defendants violated CSEMO Letter § 7.a.iii.3.

185.    The Decision did not deny that Defendants violated CSEMO Letter § 7.a.iii.1.

186.    The Decision stated, contrary to DVA's position following enactment of the 2017

Act, that "nexus between an employee's misconduct and his duties is not a requirement when

removal is proposed in accordance with 38 U.S.C. § 713."

187.    The Decision admitted that the VA OIG interview summary was hearsay, but asserted

that hearsay evidence was acceptable to rely on to support Trinka's termination. The Decision

did not explain what, if any, steps the Deciding Official took to obtain the available, direct

evidence of the alleged misconduct already in Defendants' possession.

188.    The Decision concluded that "substantial evidence supports the charge and removal is

warranted for such action."

189.    Trinka's termination was effective on October 2, 2020.

**E. Trinka Grieves the Decision**

190.    Trinka grieved the Decision pursuant to the CSEMO Letter and demanded a prompt

post-termination hearing consistent with the Supreme Court's decisions in *Cleveland Bd. of*

*Educ. v. Loudermill*, 470 U.S. 532, 546-57 (1985), and *Gilbert v. Homar*, 520 U.S. 924, 935

(1997), where he could review and confront evidence and witnesses against him.

191.    Trinka explained that failure to grant him a post-termination hearing would violate

the Fifth Amendment of the U.S. Constitution by depriving him of his protected property interest

in continued employment without due process.

192.    Trinka argued that hearsay evidence could not properly be used to terminate him

when there is no post-termination hearing and direct evidence of the alleged misconduct exists

and is available.

193.    Trinka argued that Defendants denied him due process when they intentionally

withheld the transcript of his VA OIG interview both before and after his termination. Due

32

process, Trinka argued, requires that he have notice and a meaningful opportunity to confront and respond to the actual *evidence* against him, not merely the government's hearsay summaries of the evidence.

194.    Trinka pointed out that there could be no reason to withhold the transcripts of his interview except to conceal potentially exculpatory evidence.

195.    Trinka also noted that Defendants had deprived him of access to the transcripts of his supervisors' interviews.  Trinka incorporated by reference the argument in his Reply that he was entitled to any recordings or transcripts of those interviews as well.

196.    To this day, Trinka has not seen the transcript of his December 2018 VA OIG interview or heard the recording of that interview.  Nor has he seen any transcript or recording of his supervisors' interviews.

### F.  The Secretary Denies Trinka's Grievance Based on an Undisclosed Recommendation by the Grievance Official

197.    Trinka's grievance was reviewed by the Grievance Official, Mr. James Gfrerer, DVA's Assistant Secretary for Information and Technology.

198.    The Grievance Official made a recommendation to the Secretary of the Department of Veterans Affairs related to Trinka's grievance. DVA refused to provide Trinka with a copy of the recommendation despite his express request.

199.    On November 3, 2020, Robert Wilkie, then-Secretary of the Department of Veterans Affairs, denied Trinka's grievance and request for a post-termination hearing.

200.    The Secretary claimed that he "carefully reviewed the Grievance Official's recommendation, [Trinka's] grievance, the materials [Trinka] attached in support of the grievance, and the underlying evidence for the grievance." He also claimed he "carefully reviewed *the entire record for myself* which includes the evidence file, the OAWP

33

recommendation, the Proposed Removal, [Trinka's] response to the Proposed Removal, the

Removal Decision, the Grievance Official's recommendation, [Trinka's] grievance and the

materials [Trinka] attached in support of the grievance." (emphasis added)

201.    Upon information and belief, the Secretary did not personally review the entire record

for himself.

202.    The Secretary did not explain why OAWP and DVA withheld Trinka's VA OIG

transcript or recording.

203.    The Secretary never claimed that it was impossible, unreasonable, or unnecessary to

provide the Proposing Official or Trinka with a copy of Trinka's VA OIG interview transcript or

recording. Instead, the Secretary claimed that the Proposing Official and the Deciding Official

were not "privy" to Trinka's VA OIG interview transcript.

204.    The Secretary claimed that Trinka's rights under the Due Process Clause were not

violated because he was afforded adequate notice and an opportunity to respond. The Secretary

did not address Trinka's argument that the Supreme Court has consistently held that public

employees who can only be removed for specific reasons must be granted a "comprehensive"

post-termination hearing when terminated for cause.

205.    The Secretary claimed that because Section 713 does not provide for a post-

termination hearing, Trinka was not entitled to a post-termination hearing.

206.    The Secretary's decision "conclude[d] based on the evidence and applying the

substantial evidence standard that [Trinka] engaged in conduct unbecoming a Federal

supervisor" and that "the removal was supported by substantial evidence."

207.    Pursuant to 38 U.S.C. § 713(b)(4), the Secretary's decision was "final and

conclusive."

## CLAIMS FOR RELIEF

### Count I – Deprivation of Property Without Due Process in Violation of the Fifth Amendment Due Process Clause

208.    Plaintiff re-alleges and incorporates by reference the allegations contained in all the preceding paragraphs.

209.    The Due Process Clause of the Fifth Amendment states that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

210.    Defendants' actions deprived Trinka of his property interest in continued federal employment without due process of law.

### *Trinka Had a Property Interest in Continued Employment*

211.    As relevant here, under both Section 713 (as amended by the 2017 Act) and the CSRA, DVA Senior Executives may only be removed from the Senior Executive Service and the civil service for cause, including for "misconduct or performance." 38 U.S.C. § 713(a)(1)-(2); *see* 5 U.S.C.A. §§ 7543(a).

212.    Through statutes limiting the circumstances under which DVA Senior Executive Service career appointees can be removed, Congress created a property interest in Trinka's continued federal employment.

213.    As a career appointee in the Senior Executive Service, Trinka had a property interest in continued federal employment.

214.    When Trinka was removed from the SES and the federal civil service, he was deprived of that property interest.

215.    Trinka was entitled to constitutionally adequate due process before and after his removal from the civil service.

*Defendants Denied Trinka Access To the Evidence Against Him*

216.    An essential principle of due process is that a deprivation of life, liberty, or property must be preceded by notice, and an opportunity to respond.

217.    Trinka was entitled to notice of the allegations against him and a meaningful opportunity to respond before he was removed from the SES and from the civil service.

218.    As part of that due process entitlement, Trinka was entitled to review and challenge the actual evidence of his misconduct, which was in DVA's possession at the time his termination was proposed.

219.    Defendants notified Trinka that he was being removed from federal service for allegedly providing false and inaccurate information to a VA OIG investigator in a December 21, 2018 interview.

220.    To propose and decide the termination action against Mr. Trinka, Defendants relied primarily on a VA OIG investigator's summary of Trinka's VA OIG interview.

221.    That summary in turn relied on the contents of the actual interview, either in transcript or recording form.

222.    Thus, the soundness and reliability of the VA OIG investigator's summary of Trinka's VA OIG interview is critical to the question of whether DVA had just cause to terminate Trinka.

223.    Trinka requested the written transcript of his OIG interview prior to his termination, but Defendants denied his request.

224.    Defendants possessed the transcript and/or recording of Trinka's VA OIG interview, and it would not have been burdensome to produce.

225.    Similarly, DVA decisionmakers relied only on hearsay summaries of VA OIG's interviews of Trinka's supervisors—even though the transcripts or recordings were direct

evidence of what the supervisors said, and even though the transcripts or recordings would not have been burdensome to produce.

226.    "One relatively immutable principle of due process is that 'where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.'" *Ramirez v. Department of Homeland Security,* 975 F.3d 1342, 1350 (Fed. Cir. 2020), *citing Greene v. McElroy,* 360 U.S. 474, 496 (1959); *Hicks v. Comm'r of Soc.*, 909 F.3d 786, 797 (6th Cir. 2018); *see also ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1076 (9th Cir. 2015) (acknowledging that "fundamental fairness—the touchstone to determining whether a plaintiff received due process—requires that a party against whom an agency has proceeded be allowed to rebut evidence offered by the agency if that evidence is relevant." (citations and internal quotation marks omitted)).

227.    It is not enough to provide the employee with summaries of relevant evidence when the underlying evidence is available for independent verification of its contents. *Ramirez* at 1350, *citing Banks v. Fed. Aviation Admin.*, 687 F.2d 92, 94–96 (5th Cir. 1982)

228.    An agency may not rely "indirectly rather than directly on the evidence at issue" in order to "excuse the Agency from making the evidence available to [the employee]." *Ramirez*, at 1351. *Hicks* at 798.

229.    Defendants relied on the VA OIG investigator's summary of Trinka's VA OIG interview, rather than the transcript or recording of Trinka's VA OIG interview, with the purpose and/or effect of excusing the Agency from making the evidence available to Trinka.

230.    The transcript of Trinka's VA OIG interview would exonerate Trinka of the charged misconduct because he did not make a false statement to the VA OIG investigator as alleged.

231.    To this day, Defendants have not provided Trinka with the underlying information and evidence that allegedly justified his removal from the SES.

### *Defendants Denied Trinka an Evidentiary Hearing*

232.    The Fifth Amendment entitled Trinka to an evidentiary hearing before an impartial adjudicator empowered to rectify error and to order his reinstatement if appropriate.

233.    The Fifth Amendment entitled Trinka to an evidentiary hearing at which DVA was required to prove cause for Trinka's removal by sufficient evidence.

234.    The manner in which Defendants applied 38 U.S.C. § 713 to Trinka's termination violated the Fifth Amendment.

235.    Defendants did not afford Trinka any evidentiary hearing at which DVA was required to prove cause for Trinka's removal.

236.    Defendants denied Trinka the opportunity to confront the evidence and witnesses allegedly supporting the allegations against him.

237.    That denial was especially significant in this case because DVA's conclusion that Mr. Trinka made false statements in his December 2018 interview was based on VA OIG's hearsay summaries of interviews of Mr. Trinka's supervisors. Because no hearing was permitted, Mr. Trinka had no opportunity to confront those witnesses to test the accuracy of the OIG Summary of their interviews, the truth of their statements to the OIG, the quality of their memory, or their general credibility. Trinka also had no opportunity to confront the VA OIG investigator who purported to summarize the supervisors' statements, to test the investigator's accuracy, memory, and/or credibility.

### DVA's Removal Process Did Not
### Otherwise Provide a Meaningful Opportunity To Be Heard

238.    DVA's removal procedures are not, and were not in this case, an adequate substitute for an evidentiary hearing.

239.    DVA's removal procedures do not permit any discovery or other factfinding by the senior executive.

240.    Given the lack of factfinding process and the 7-day reply period, the senior executive has no meaningful opportunity to investigate the basis for the charges against him or to collect potentially exculpatory evidence.

241.    Because the senior executive is not permitted access to OAWP's investigative file, he has no way of knowing the full scope of the evidence against him, or whether DVA possesses exculpatory evidence that it has not shared.

242.    DVA's removal procedures do not allow the senior executive to confront the witnesses against him, even on paper (for example, through written interrogatories).

243.    The seven (7) business day response period mandated by Section 713 is not adequate time to respond to a proposed termination, and Defendants denied Trinka's reasonable three (3) business day extension request.

### Defendants Improperly Relied on Ex Parte Communications

244.    *Ex parte* communications that "introduce new and material information to the deciding official" violate the Due Process Clause's "guarantee of notice (both of the charges and of the employer's evidence) and the opportunity to respond." *Stone v. F.D.I.C.*, 179 F.3d 1368, 1376-77 (Fed. Cir. 1999).

245.    In order to terminate Trinka, the Secretary relied, at least in part, on the Grievance Official's recommendation.

246.    Trinka requested a copy of the Grievance Official's recommendation.

247.    Defendants refused Trinka's request for a copy of the Grievance Official's recommendation to the Secretary regarding Trinka's removal and grievance of his removal.

248.    Defendants did not even describe the recommendation or say what the recommendation from the Grievance Official to the Secretary was.

249.    Upon information and belief, the Grievance Official's *ex parte* recommendation to the Secretary introduced "new and material information to the deciding official." *Stone*, 179 F.3d at 1377.

250.    If *ex parte* communications "may have undermined [Trinka's] due process rights," Trinka is entitled to a factual determination whether the *ex parte* communications "introduced new and material information to the deciding official." *Stone*, 179 F.3d at 1377.

251.    DVA's Grievance Official recommendation is an *ex parte* communication in violation of the Fifth Amendment.

### Defendants Applied an Unconstitutional Evidentiary Standard

252.    Adjudicating a matter pursuant to the correct standard of proof is integral to providing an individual with the process he is due under the Fifth Amendment of the U.S. Constitution.

253.    Substantial evidence is an unconstitutional standard of proof for a factfinder to apply in deciding to remove a tenured federal employee from the federal service. *See Multimax, Inc. v. Fed. Aviation Admin.*, 231 F.3d 882, 798 (D.C. Cir. 2000).

254.    Defendants improperly utilized the unconstitutional substantial evidence standard of proof at the fact-finding, investigatory, proposal, decision, and grievance stages to secure Trinka's termination.

255.    No agency official ever determined, by preponderant evidence, that the single charge

of misconduct against Trinka was more likely true than not.

256.    By terminating Trinka based on a substantial evidence standard of proof, Defendants

violated Trinka's right to due process under the Fifth Amendment of the U.S. Constitution.

257.    Because the standard of proof must be correctly calibrated in advance of an

adjudication, "only a new hearing can remedy" a decision rendered under an erroneous standard

of proof. *Reynoso-Rodriguez v. Napolitano*, E.D. Cal. No. CIV S-08-321 MCE KJM, 2009 WL

3157477 (Sept. 28, 2009) (interpreting *Addington v. Texas*, 441 U.S. 418, 233 (1979)).

### *Defendants' Retroactive Application of the Statute Violated Trinka's Due Process Rights*

258.    38 U.S.C. § 713 (2017) is not retroactive to conduct that occurred prior to its

enactment on June 23, 2017.

259.    Defendants removed Trinka in part based on conduct that occurred prior to the June

23, 2017 enactment date of the 2017 Act and prior to the 2014 Act.

260.    This conduct included Trinka's misstatement on his e-QIP form, which occurred in

August 2014; his use of his wife's non-citizen tax identification number on federal benefits

forms in January 2014; and his use of his wife's tax identification number to obtain a military

dependent card in 2013.

261.    Retroactive application of 38 U.S.C. § 713 (2017) to pre-June 23, 2017 and pre-

August 7, 2014 evidence and conduct "attach[es] new legal consequences" to that conduct.

*Brenner v. DVA*; *Martin v. Hadix*, 527 U.S. 343, 358 (1999), citing *Landgraf* at 270.

262.    Retroactive application of the 2017 Act violated Trinka's constitutional right to due

process.

41

### Count II – Defendants' Termination Action Was Not in Accordance with a Provision of Law and Was Obtained Without Procedures Required By Law under 38 U.S.C. § 713(b)(6)

263.    Plaintiff re-alleges and incorporates by reference the allegations contained in all the preceding paragraphs.

264.    The Due Process Clause only provides "the minimum process to which a public employee is entitled prior to removal." *Stone v. FDIC*, 179 F.3d 1377, 1378 (Fed. Cir. 1999). Public employees like Mr. Trinka are also entitled to procedural protections afforded them by statute, regulation, or agency procedure which is in addition to the protections afforded by the Constitution. *Id.*

265.    Under 38 U.S.C. § 713(b)(6)(A), in any case in which judicial review is sought under 38 U.S.C. § 713(b)(5), the court "shall review the record and may set aside any Department action found to be . . . not in accordance with a provision of law."

266.    Under 38 U.S.C. § 713(b)(6)(B), in any case in which judicial review is sought under 38 U.S.C. § 713(b)(5), the court "shall review the record and may set aside any Department action found to be . . . obtained without procedures required by a provision of law having been followed."

267.    Defendants' decision to terminate Trinka was not in accordance with several provisions of law and was obtained without required procedures having been followed.

### *Defendants' Decision Violated the Due Process Clause*

268.    The Due Process Clause of the Fifth Amendment is a provision of law.

269.    For the reasons explained in ¶¶ 208-262, which Plaintiff hereby re-alleges and incorporates by reference, Defendants' removal of Trinka violated the Due Process Clause.

### *Defendants' Removal Procedures Violated § 713*

270.    In addition to its violation of the Due Process Clause, DVA also violated 38 U.S.C. § 713(b)(1)(A)'s requirement to provide Trinka with "advance notice of the action and a file containing all evidence in support of the proposed action."

271.    DVA did not provide Trinka with "a file containing all evidence in support of the proposed action" because it withheld Trinka's VA OIG transcript and/or recording of his interview, as well as any transcripts of VA OIG's interviews with Trinka's supervisors.

272.    Defendants violated 38 U.S.C. § 713 by utilizing the improper substantial evidence standard to remove Trinka.

### *Defendants Failed To Follow Their Own Procedures*

273.    Prior to Trinka's termination, Defendants denied Trinka procedural protections required by DVA internal policies and procedures and published in the CSEMO Letter. Specifically, DVA violated, at minimum, CSEMO Letter §§ 7.a.iii.1, 7a.iii.3.

274.    CSEMO Letter Section 7.a.iii.1 states that DVA must include any statement or evidence provided by Mr. Trinka in the evidence file if it is "relevant" *or* was "used in support of a subsequent proposed action. *See* CSEMO Letter § 7.a.iii.1.

275.    The CSEMO Letter also requires that if the statement is "relevant," it must be included in the evidence file transmitted to the employee with proposed action. *See* CSEMO Letter § 7.a.iii.1.

276.    The transcript and/or recording is "relevant" because it is the only direct evidence of the alleged misconduct.

277.    The statement was also "used in support of a subsequent proposed action"—in fact, it was the basis for Mr. Trinka's removal.

278.    By not transmitting this statement to Mr. Trinka with the Proposal and by failing to transmit the statement to the Proposing Official, the Agency failed to follow the procedures required by the CSEMO Letter.

279.    CSEMO Letter Section 7.a.iii.3 states: "[u]pon conclusion of the OAWP investigation, OAWP and OGC shall brief the Secretary or his or her designee on the results of the investigation and whether disciplinary action is recommended. *The recommendation will be limited to whether disciplinary action should be pursued.*" *See* CSEMO Letter § 7.a.iii.3. (emphasis added). OAWP is not authorized to recommend *what* (if any) penalty should be imposed.

280.    It is the duty of the Proposing Official, not OAWP, to determine what penalty to propose. *See* CSEMO Letter § 7.b.i. ("The Proposing Official will review the available evidence to determine whether a Reprimand, Suspension, Demotion, or Removal should be proposed; or whether no action is warranted.")

281.    OAWP did not limit its recommendation to ***whether*** a disciplinary action should be pursued. It recommended a specific penalty: removal.

282.    By recommending the specific penalty of removal, OAWP applied pressure for DVA officials to propose Trinka's removal, because (as OAWP itself warned) failure to adopt OAWP's recommendation would require the relevant DVA official to justify that decision in a letter to Congress.

283.    Those violations harmed Trinka because if DVA had followed its own procedures, both the Proposing Official and Trinka would have gained access to the actual evidence underlying Trinka's proposed termination, and OAWP would not have recommended the penalty of removal.

### *Defendants Improperly Applied the 2017 Act Retroactively*

284.    DVA relied on conduct occurring prior to the enactment of the Department of Veterans Affairs Accountability and Whistleblower Protection Act, codified at 38 U.S.C. § 713 (2017), to justify the penalty of removal and terminate Trinka's employment.

285.    Review of DVA's decision encompasses not only the decision whether to sustain charges against an employee, but also the decision to impose a particular penalty based on those charges. *Brenner v. DVA*, 990 F.3d 1313, 1323 (Fed. Cir. 2021), *citing Sayers v. DVA*, 954 F.3d 1370, 1375 (Fed. Cir. 2020).

286.    The conduct on which DVA relied in justifying the penalty of removal included Mr. Trinka's misstatement on his e-QIP form, which occurred in August 2014; his use of his wife's non-citizen tax identification number on federal benefits forms in January 2014; and his use of his wife's tax identification number to obtain a military dependent card in 2013.

287.    The 2017 Act does not apply retroactively to conduct that occurred prior to its enactment on June 23, 2017. *Landgraf v. USI Film Products*, 511 U.S. 244, 271 (1994); *see also Brenner* at 1327-1328.

288.    Retroactive application of 38 U.S.C. § 713 (2017) to pre-June 23, 2017 evidence and conduct "attach[es] new legal consequences" to that conduct. *Brenner* at 1329-1330; *see also Martin v. Hadix*, 527 U.S. 343, 358 (1999), citing *Landgraf*, at 270.

289.    By applying 38 U.S.C. § 713 (2017) to remove Trinka based on pre-enactment conduct, DVA gave § 713 improper retroactive effect. Insofar as the 2014 Act may be relevant, it also does not apply retroactively to conduct preceding its August 7, 2014 enactment.

## Count III – Defendants' Termination Action Was Arbitrary, Capricious, and/or an Abuse of Discretion

290.    Plaintiff re-alleges and incorporates by reference the allegations contained in all the preceding paragraphs.

291.    Trinka is adversely affected by Defendants' decision to terminate his employment, and is entitled to judicial review of such pursuant to 38 U.S.C. § 713(b)(5).

292.    Under 38 U.S.C. § 713(b)(6)(A), in any case in which judicial review is sought under 38 U.S.C. § 713(b)(5), the court "shall review the record and may set aside any Department action found to be…arbitrary and capricious."

293.    Defendants' removal decision was arbitrary and capricious because by applying the substantial evidence standard Defendants merely concluded that a reasonable person might accept the evidence as adequate to support the action, rather than concluding that the allegations supporting the action were in fact more likely true than not.

294.    An agency decision is "arbitrary and capricious" if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)

295.    Trinka's September 22, 2020 written reply and October 14, 2020 grievance explained why and on what basis the September 11, 2020 proposed removal and October 2, 2020 removal decision erred, respectively.

296.    If true, Trinka's written reply arguments and evidence would have required Defendants to not sustain the charge in the proposed removal.

297.    Trinka timely grieved Defendant DVA's October 2, 2020 initial decision terminating him from the SES and federal service on October 14, 2020.

298.    Defendant Secretary issued his final decision on Trinka's grievance on November 3, 2020. The Secretary's decision was "final and conclusive" pursuant to 5 U.S.C. § 713(b)(4).

299.    Defendants' final decision is arbitrary, capricious, and/or an abuse of discretion, because neither the October 2, 2020 decision nor the November 3, 2020 grievance decision gave reasoned analysis in response to Trinka's arguments or evidence from his written reply or grievance.

300.    Defendants' final decision is arbitrary, capricious, and/or an abuse of discretion, because it did not connect its findings to evidence and sustained a charge that was unsupported by evidence.

301.    Defendants withheld the only direct evidence of the alleged misconduct, thereby preventing the Proposing Official, Deciding Official, or the Secretary from connecting their findings to the evidence.

302.    Defendants did not articulate a satisfactory explanation for its decision to withhold the evidence that was in its possession and was the sole piece of direct evidence of the alleged misconduct. DVA did not articulate a rational connection between the circumstances and the choice made.

303.    Defendants' final decision is thus arbitrary, capricious, and/or an abuse of discretion because it purposefully withheld the only direct evidence of the alleged misconduct without reason.

304.    Defendants' final decision is arbitrary, capricious, and/or an abuse of discretion because DVA refused to consider potential exculpatory evidence, including the full transcript of Trinka's interview.

305.    Defendants' final decision is arbitrary, capricious, and/or an abuse of discretion because DVA refused to consider other direct evidence of the charges against Trinka, including the transcripts or recordings of his supervisors' interviews.

306.    Defendants' final decision is arbitrary, capricious, and/or an abuse of discretion because it misstated the law to justify Trinka's termination.

307.    Defendants' final decision is arbitrary, capricious, and/or an abuse of discretion because it misstated and misapplied its own published policies to justify Trinka's termination.

### Count IV – The Termination Action Was Not Supported by Substantial Evidence

308.    Plaintiff re-alleges and incorporates by reference the allegations contained in all the preceding paragraphs.

309.    Defendants' termination action was not supported by substantial evidence because Defendants did not support the action with the only direct evidence of the alleged misconduct, and instead substituted a hearsay document purportedly summarizing that evidence.

310.    Defendants asserted that Trinka's allegedly false statements to a VA OIG investigator were misconduct because Trinka exhibited a "[l]ack of candor by a federal civilian employee with an agency investigator."

311.    Trinka denied that he willfully misled VA OIG investigators, and alleged that Defendants withheld the transcript because the context provided by the transcript would exonerate him from the allegations of misconduct.

48

312.    Trinka also pointed out that he was provided only hearsay summaries of his supervisors' interviews.

313.    Trinka did not receive a post-termination hearing where he could confront the evidence against him, test the reliability of his supervisors' statements, or confront the individuals who created the hearsay documents purporting to summarize the only direct evidence of the alleged misconduct.

314.    A federal agency cannot support a termination action affecting a protected property interest, even by the lower "substantial evidence" standard of proof, with only hearsay evidence when direct, non-hearsay evidence exists and is available to the agency or in the agency's possession and the employee does not have an opportunity to confront the direct evidence. *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

315.    Trinka's VA OIG transcript and/or recording was listed as an attachment to the "Comprehensive Report of Investigation" (ROI) prepared by VA OIG. VA OIG transmitted the transcript and recorded statement to OAWP on January 6, 2020, when it referred its completed ROI to OAWP. OAWP, prior to Trinka's termination, was in possession of a transcript and/or recorded statement by Mr. Trinka, wherein the exact words he said to a VA OIG investigator were present.

316.    Nevertheless, OAWP excluded from the evidence file the transcript and/or recorded statement in favor of a less reliable hearsay summary of the transcript and/or recorded statement. OAWP transmitted the hearsay summary to the Proposing Official with its recommendation to terminate Trinka. The Proposing Official then provided the hearsay summary to Trinka with the proposal to terminate Trinka.

317.    Although Trinka made the Deciding Official, Grievance Official, and Secretary of the Department of Veterans Affairs aware of the existence of the transcript and/or recorded statement, none of those individuals made any attempt to review that evidence.

318.    Defendants willfully ignored direct evidence of the alleged misconduct in their possession and control, and withheld access to that evidence from Trinka so that he could not exonerate himself.

319.    Defendants' termination action was therefore not supported by substantial evidence.

**PRAYER FOR RELIEF**

Wherefore, James Trinka, by and through counsel, requests that the Court enter judgment in his favor and award him the following relief:

1.    Set aside Trinka's removal from the Senior Executive Service and the civil service.

2.    Declare Trinka's removal from the SES was unlawful and unconstitutional.

3.    Declare Defendants' conduct removing Trinka from the SES was unlawful and unconstitutional.

4.    Cancel and expunge from Trinka's official personnel file his removal from the SES and federal service.

5.    Retroactively reinstate Trinka to his previous SES appointment and position.

6.    Award Trinka all back pay and benefits, with interest, owed as a result of his retroactive reinstatement to the SES and cancellation of his removal from the SES and federal service.

7.    Remove the Standard Form (SF) 50 and all other documents memorializing his unlawful and unconstitutional removal from the SES from Trinka's personnel file.

8.    Enjoin the Secretary from depriving Trinka of his property right in continued employment without statutory and constitutional due process.

9.  Award Trinka his costs and attorney's fees.

10. Grant other such relief as this Court deems just and proper.

Date:   November 3, 2021                          Respectfully submitted,

                                                 Christopher J. Keeven #993971
                                                 Debra L. Roth #422452
                                                 Conor D. Dirks #1022481
                                                 Shaw Bransford & Roth P.C.
                                                 1100 Connecticut Ave NW, Suite 900
                                                 Washington, DC 20036
                                                 Tel: 202-463-8400
                                                 Fax: 202-833-8082

                                                 *Counsel for Plaintiff James Trinka*