UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES TRINKA,<br><br>*Plaintiff,*<br><br>v.<br><br>DENIS McDONOUGH,<br>Secretary of Veterans Affairs, *et al.*,<br><br>*Defendants*. | Civil Action No. 21-2904 (RC) |

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO TRINKA'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iv

ARGUMENT .......... 1

I. Trinka Was Not Entitled To A Recording Of His Interview .......... 1

A. Trinka Fails To Show That The Recording's Unavailability Prejudiced Him .......... 1

1. "I think I told my supervisors about my wife's status, but I am not sure" . 3

2. "Responding to a compound of unclear question" .......... 4

3. "Referring to different supervisors than the ones interviewed" .......... 5

4. Adverse Inference .......... 6

B. Trinka Must Show Prejudice To Establish A Due Process Violation Based On VA's Failure To Provide Him The Recording .......... 7

C. Trinka Must Show That VA's Failure To Give Him The Recording Prejudiced Him In Order To Obtain Relief Under Section 713 .......... 10

D. Trinka Is Not Entitled To Relief Directly Under The Constitution .......... 13

E. Section 713(b)(1)(A) Did Not Entitle Trinka To A Recording Of His Interview .......... 14

F. VA Policy Did Not Entitle Trinka To A Recording Of His Interview .......... 15

II. Trinka Was Not Entitled To A Post-Termination Hearing Where He Could Confront Or Cross-Examine Witnesses .......... 16

III. The Secretary Relied On the Preponderance Standard To Sustain Trinka's Removal .......... 21

IV. The Secretary Did Not Improperly Rely On Ex Parte Communications .......... 24

V. VA Did Not Unlawfully Limit the Secretary's Power To Make Removal Decisions .......... 25

VI. VA Did Not Apply Section 713 In An Unlawfully Retroactive Manner .......... 27

VII. Trinka Was Not Entitled To Respond Or Offer Evidence During VA's Investigation .......... 28

VIII. The Office Can Recommend That VA Pursue Specific Discipline .......... 29

IX. VA Did Not Refuse To Consider Relevant Evidence ..... 30

A. The Recording of Trinka's Interview ..... 30

B. Trinka's Disclosure Of His Wife's Immigration Status To His Supervisor ..... 31

C. Trinka's Disclosure Of His Wife's Immigration Status To Other Agencies ..... 32

D. Trinka's Efforts To Help His Wife Obtain Legal Status ..... 34

E. Trinka's Assertions Of Innocence ..... 34

X. Substantial Evidence Supported VA's Decision To Remove Trinka ..... 35

A. The Summaries Of Trinka And His Supervisors' Interviews ..... 35

B. Trinka's Three Supervisors ..... 37

C. Trinka's Intent To Deceive ..... 38

D. VA's Penalty Determination ..... 39

CONCLUSION ..... 40

# TABLE OF AUTHORITIES

## Cases

*A.B. Leach Co. v. Peirson*,
275 U.S. 120 (1927) ... 6

*Adickes v. Kress Co.*,
398 U.S. 144 (1970) ... 33

*Affum v. United States*,
566 F.3d 1150 (D.C. Cir. 2009) ... 35

*Air Canada v. Dep't of Transp.*,
148 F.3d 1142 (D.C. Cir. 1998) ... 11

*Al-Tamimi v. Adelson*,
916 F.3d 1 (D.C. Cir. 2019) ... 22

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ... 13

*Appalachian Power Co. v. EPA*,
249 F.3d 1032 (D.C. Cir. 2001) ... 31

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ... 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 3

*Baird v. Bd. of Educ. Sch. Dist. #205*,
389 F.3d 685 (7th Cir. 2004) ... 21

*Banner Health v. Price*,
867 F.3d 1323 (D.C. Cir. 2017) ... 22

*Beach Commc'ns, Inc. v. FCC*,
959 F.2d 975 (D.C. Cir. 1992) ... 7

*Bragdon v. Abbott*,
524 U.S. 624 (1998) ... 15

*Brenner v. Dep't of Veterans Affs.*,
990 F.3d 1313 (Fed. Cir. 2021) ... 27

**Cases (cont.)**

*Bridges v. Wixon*,
326 U.S. 135 (1945) .......... 10

*Bruno Indep. Living v. Acorn Mobility*,
394 F.3d 1348 (Fed. Cir. 2005) .......... 38

*Bus. Commc'ns, Inc. v. Dep't of Educ.*,
739 F.3d 374 (8th Cir. 2013) .......... 21

*Butte County v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) .......... 31

*Carey v. Piphus*,
435 U.S. 247 (1978) .......... 9

*Chapman v. California*,
386 U.S. 18 (1967) .......... 11

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) .......... 18

*Ctr. for Auto Safety v. Dole*,
828 F.2d 799 (D.C. Cir. 1987) .......... 31

*District Hospital Partners, L.P. v. Burwell*,
786 F.3d 46 (D.C. Cir. 2015) .......... 31

*Doe v. Baum*,
903 F.3d 575 (6th Cir. 2018) .......... 21

*Doe v. DiGenova*,
779 F.2d 74 (D.C. Cir. 1985) .......... 11

*Doe v. Univ. of Cincinnati*,
872 F.3d 393 (6th Cir. 2017) .......... 21

*Elcon Enters., Inc. v. Wash. Metro. Area Trans. Auth.*,
977 F.2d 1472 (D.C. Cir. 1992) .......... 24

*Esparraguera v. Dep't of Army*,
981 F.3d 1328 (Fed. Cir. 2020) .......... 13

*Fed. Exp. Corp. v. Dep't of Transp.*,
434 F.3d 597 (D.C. Cir. 2006) .......... 35

**Cases (cont.)**

*Fogg v. Ashcroft*,
254 F.3d 103 (D.C. Cir. 2001) ..... 13

*Fred Meyer Stores, Inc. v. NLRB*,
865 F.3d 630 (D.C. Cir. 2017) ..... 38

*Friedman v. FAA*,
841 F.3d 537 (D.C. Cir. 2016) ..... 22

*Fuentes v. Shevin*,
407 U.S. 67 (1972) ..... 9

*Garza v. Dep't of Just.*,
5 F. App'x 894 (Fed. Cir. 2001) ..... 25

*Gerlich v. Dep't of Just.*,
711 F.3d 161 (D.C. Cir. 2013) ..... 22

*Goldberg v. Kelly*,
397 U.S. 254 (1970) ..... 19

*Greene v. McElroy*,
360 U.S. 474 (1959) ..... 20

*Haidak v. Univ. of Mass.-Amherst*,
933 F.3d 56 (1st Cir. 2019) ..... 21

*Handy v. U.S. Postal Serv.*,
754 F.2d 335 (Fed. Cir. 1985) ..... 12

*Harrington v. Dep't of Veterans Affs.*,
981 F.3d 1356 (Fed. Cir. 2020) ..... 28

*Harrison v. Bowen*,
815 F.2d 1505 (D.C. Cir. 1987) ..... 16, 17

*Helman v. Dep't of Veterans Affs.*,
856 F.3d 920 (Fed. Cir. 2017) ..... 12

*Hill v. Dep't of Def.*,
No. DC-0752-09-0042-I-2, 2010 WL 10840174 (M.S.P.B. Nov. 18, 2010) ..... 14

*Hoai v. Vo*,
935 F.2d 308 (D.C. Cir. 1991) ..... passim

**Cases (cont.)**


*Holy Land Found. v. Ashcroft*,
333 F.3d 156 (D.C. Cir. 2003) ........ 16

*Homemakers N. Shore, Inc. v. Bowen*,
832 F.2d 408 (7th Cir. 1987) ........ 24

*Humane Soc'y v. Kempthorne*,
527 F.3d 181 (D.C. Cir. 2008) ........ 13

*Huthnance v. District of Columbia*,
722 F.3d 371 (D.C. Cir. 2013) ........ 5, 7

*In re Grand Jury Investigation*,
916 F.3d 1047 (D.C. Cir. 2019) ........ 26

*In re Sealed Case*,
829 F.2d 50 (D.C. Cir. 1987) ........ 26

*In re Watts*,
354 F.3d 1362 (Fed. Cir. 2004) ........ 12

*Klein v. Dep't of Lab.*,
6 M.S.P.R. 292 (1981) ........ 15

*Koretoff v. Vilsack*,
707 F.3d 394 (D.C. Cir. 2013) ........ passim

*Lacson v. Dep't of Homeland Sec.*,
726 F.3d 170 (D.C. Cir. 2013) ........ 36

*Ludlum v. Dep't of Just.*,
278 F.3d 1280 (Fed. Cir. 2002) ........ 4

*Martel v. Dep't of Transp.*,
15 M.S.P.R. 141 (1983) ........ 14

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ........ 9, 18, 19, 20

*Milkovich v. Lorain J.*,
497 U.S. 1 (1990) ........ 3

*Miller v. Clinton*,
687 F.3d 1332 (D.C. Cir. 2012) ........ 13

**Cases (cont.)**

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
783 F.3d 1301 (D.C. Cir. 2015) .......... 10

*N. Ger. Area Council v. FLRA*,
805 F.2d 1044 (D.C. Cir. 1986) .......... 12

*Nat'l Archives & Records Admin. v. Favish*,
541 U.S. 157 (2004) .......... 37

*Nat'l Wildlife Fed'n v. EPA*,
286 F.3d 554 (D.C. Cir. 2002) .......... passim

*New LifeCare Hosps. of N.C., LLC v. Becerra*,
7 F.4th 1215 (D.C. Cir. 2021) .......... 21, 31, 32, 34

*New York v. EPA*,
413 F.3d 3 (D.C. Cir. 2005) .......... 33

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......... 11

*Novotny v. Dep't of Transp.*,
735 F.2d 521 (Fed. Cir. 1984) .......... 7

*Nuclear Regul. Comm'n v. FLRA*,
25 F.3d 229 (4th Cir. 1994) .......... 37

*Nw. Immig. Rts. Project v. U.S. Citizenship & Immigr. Servs.*,
496 F. Supp. 3d 31 (D.D.C. 2020) .......... 35

*Padilla-Agustin v. INS*,
21 F.3d 970 (9th Cir. 1994) .......... 10

*Penthouse Int'l, Ltd. v. Meese*,
939 F.2d 1011 (D.C. Cir. 1991) .......... 13

*People for the Ethical Treatment of Animals v. Dep't of Agric.*,
918 F.3d 151 (D.C. Cir. 2019) .......... 37

*PJM Power Providers Grp. v. FERC*,
880 F.3d 559 (D.C. Cir. 2018) .......... 35

*Porrazzo v. Dept't of Air Force*,
19 M.S.P.R. 496 (1984) .......... 14

**Cases (cont.)**

*Ramirez v. Immig. & Customs Enf't*,
471 F. Supp. 3d 88 (D.D.C. 2020) .......... 18

*Richardson v. Capital One, N.A.*,
839 F. Supp. 2d 197 (D.D.C. 2012) .......... passim

*Richardson v. Perales*,
402 U.S. 389 (1971) .......... 36

*Riffin v. Surface Transp. Bd.*,
733 F.3d 340 (D.C. Cir. 2013) .......... 21, 31, 32, 34

*Rodriguez v. Dep't Veterans Affs.*,
8 F.4th 1290 (Fed. Cir. 2021) .......... 22

*Sardo v. McGrath*,
196 F.2d 20 (D.C. Cir. 1952) .......... 10

*Sayers v. Dep't of Veterans Affs.*,
954 F.3d 1370 (Fed. Cir. 2020) .......... 28

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996) .......... 13, 14

*Serono Labs. v. Shalala*,
158 F.3d 1313 (D.C. Cir. 1998) .......... 24

*Sparrow v. Commissioner*,
949 F.2d 434 (D.C. Cir. 1991) .......... 13

*St. Marks Place Hous. v. Dep't Hous. & Urban Dev.*,
610 F.3d 75 (D.C. Cir. 2010) .......... 24

*Strickler v. Greene*,
527 U.S. 263 (1999) .......... 1, 7, 9, 10

*Tucker v. City of Chi.*,
907 F.3d 487 (7th Cir. 2018) .......... 8

*Twist v. Meese*,
854 F.2d 1421 (D.C. Cir. 1988) .......... 16, 17

*U.S. Info. Agency v. Krc*,
905 F.2d 389 (D.C. Cir. 1990) .......... 16, 17

**Cases (cont.)**

*United States v. Allen*,
960 F.2d 1055 (D.C. Cir. 1992) .......... 23

*United States v. Byers*,
740 F.2d 1104 (D.C. Cir. 1984) .......... 8

*United States v. Concord Mgmt. & Consulting LLC*,
317 F. Supp. 3d 598 (D.D.C. 2018) .......... 27

*United States v. Iannone*,
610 F.2d 943 (D.C. Cir. 1979) .......... 37

*United States v. Long*,
905 F.2d 1572 (D.C. Cir. 1990) .......... 36

*United States v. Mason*,
951 F.3d 567 (D.C. Cir. 2020) .......... 2

*United States v. Mendoza-Lopez*,
481 U.S. 828 (1987) .......... 7

*United States v. Oruche*,
484 F.3d 590 (D.C. Cir. 2007) .......... 2, 7

*United States v. Schwartz*,
899 F.2d 243 (3d Cir. 1990) .......... 23

*United States v. Spencer*,
720 F.3d 363 (D.C. Cir. 2013) .......... 28

*United States v. Williams*,
216 F.3d 611 (7th Cir. 2000) .......... 34

*United States v. Williams-Davis*,
90 F.3d 490 (D.C. Cir. 1996) .......... 2

*UnitedHealthcare Ins. Co. v. Becerra*,
9 F.4th 868 (D.C. Cir. 2021) .......... 6

*Univ. Med. Dentistry v. Corrigan*,
347 F.3d 57 (3d Cir. 2003) .......... 37

*Walsh v. Hodge*,
975 F.3d 475 (5th Cir. 2020) .......... 20

**Cases (cont.)**

*Wannall v. Honeywell, Inc.*,
775 F.3d 425 (D.C. Cir. 2014) .......... 1, 14

*Wawszkiewicz v. Dep't of Treasury*,
670 F.2d 296 (D.C. Cir. 1981) .......... 34

*Whitman-Walker Clinic, Inc. v. Dep't of Health & Human Servs.*,
485 F. Supp. 3d 1 (D.D.C. 2020) .......... 33

*Williams v. U.S. Elevator Corp.*,
920 F.2d 1019 (D.C. Cir. 1990) .......... 8

*Williams v. United States*,
394 F.2d 821 (5th Cir. 1968) .......... 6

*Wis. v. City of N.Y.*,
517 U.S. 1 (1996) .......... 23

*Wolff v. McDonnell*,
418 U.S. 539 (1974) .......... 19

**Statutes**

18 U.S.C. § 1621(1) .......... 3

28 U.S.C. § 1746 .......... 33

28 U.S.C. § 2111 .......... 11

38 U.S.C. § 303 .......... 23

38 U.S.C. § 323(f)(2) .......... 30

38 U.S.C. § 713 .......... 1, 16
§ 713(b)(1)(A) .......... 14
§ 713(b)(1)(C) .......... 22, 31, 32, 34
§ 713(b)(5) .......... 24
§ 713(b)(6) .......... 10

38 U.S.C. § 714 .......... 28
§ 714(c)(4)(A) .......... 12

5 U.S.C. § 3131 .......... 12

**Statutes (cont.)**

5 U.S.C. § 553 .......... 26
§ 553(a)(2) .......... 26
§ 553(b)(A) .......... 26

5 U.S.C. § 706 .......... 8
§ 706(2)(A) .......... 10, 11

5 U.S.C. § 7513(e) .......... 14

5 U.S.C. § 7701(c)(2)(A) .......... 12

5 U.S.C. app. 3 .......... 37

Act of Feb. 26, 1919,
Pub. L. No. 65-281, 40 Stat. 1181 .......... 11

**Other Authorities**

Dep't of Just.,
*Attorney General's Manual on the Administrative Procedure Act* (1947) .......... 11

*Mission*,
Off. of Inspector Gen. .......... 37

U.S. Sen. Comm. on Veterans' Affairs, Press Release,
*VA Accountability Measure Signed Into Law* (June 23, 2017) .......... 12

**Rules**

Fed. R. Civ. P. 61(a) .......... 11

Fed. R. Crim. P. 52(a) .......... 11

Fed. R. Evid. 801(c) .......... 35

Defendants Denis McDonough, Secretary of Veterans Affairs, and the Department of Veterans Affairs ("VA"), by and through undersigned counsel, respectfully submit this combined reply in support of their motion for summary judgment and opposition to Plaintiff James Trinka's cross-motion for summary judgment. Trinka, a former Senior Executive within VA, challenges his removal under the Due Process Clause and 38 U.S.C. § 713. But he waived many of his arguments by failing to raise them properly. Regardless, his claims all lack merit. This Court should grant Defendants summary judgment and deny Trinka's cross-motion for summary judgment.[1]

## ARGUMENT

### I. <u>Trinka Was Not Entitled To A Recording Of His Interview</u>

Trinka alleges that VA violated the Due Process Clause, 38 U.S.C. § 713, and VA's own policies by failing to provide him a recording of his interview with the Office of Inspector General ("OIG"), in which he made the statement underlying the charge against him. But he fails to show the prejudice required to establish a due process violation based on withholding of evidence, as he cannot show VA would not have fired him had the recording been available. Nor did Section 713 or VA policy entitle him to the recording. They entitled him only to materials the proposing official considered to propose his removal, and the proposing official did not consider the recording.

#### A. Trinka Fails To Show That The Recording's Unavailability Prejudiced Him

To establish a due process violation based on the government's withholding of evidence, a party must show that the withholding prejudiced him. *See Strickler v. Greene*, 527 U.S. 263, 282 (1999) ("there is never a real [] violation" of the government's "obligation to disclose exculpatory evidence" unless "there is a reasonable probability that the [withheld] evidence would have

---

[1] Trinka does not acknowledge, and thus concedes, Defendants' arguments that he was not entitled to discovery or an extension of the reply period. *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded").

produced a different" result, *i.e.*, "prejudice must have ensued"). Prejudice is not a further showing one must make to obtain relief after establishing a due process violation—rather, it is one of the "components" of a due process "violation" in the first place. *Id.*; *see also United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007) ("the question of prejudice is folded into the determination of whether a violation has occurred"). "[M]ere speculation is not sufficient to sustain" a claim that the withholding of evidence was prejudicial. *United States v. Mason*, 951 F.3d 567, 573 (D.C. Cir. 2020); *see also United States v. Williams-Davis*, 90 F.3d 490, 514 (D.C. Cir. 1996) ("[I]t is unwise to infer the existence of [exculpatory] material based upon speculation alone. . . . Except for bare speculation, [he] has nothing to suggest the existence of favorable materials.").

To demonstrate that VA's failure to furnish him the recording caused him prejudice, Trinka would need to show that VA would not have fired him had the recording been available. To do so, Trinka must show, at a minimum, that the recording would reveal one of the following—that (1) he did not really make the statement attributed to him, (2) the statement was not actually false or inaccurate, (3) context surrounding that statement casts doubt on whether he made it with intent to deceive, or (4) some other reason exists he should keep his job notwithstanding the statement. But Trinka does not argue any of those things. He argues only that the recording might possibly show one of these things, without giving any reason to think it actually would show any of these things. In short, he offers nothing but rank speculation to suggest that the recording might be exculpatory, or otherwise have made a difference to the decision to remove him, somehow—precisely the sort of conjecture that does not suffice to establish prejudice for purposes of a due process violation.[2]

---

[2] In moving for summary judgment, Defendants explained that Trinka did not deny that the summary of his interview was accurate. Defs.' Mem. Supp. MSJ at 13, ECF No. 14. Trinka takes issue with this remark, claiming that he denied knowingly giving OIG false information and the charged offense. Pl.'s Resp. at 19. But that does not go to the summary's accuracy—it stated simply that Trinka claimed to have told his supervisors about his wife's immigration status,

*1. "I think I told my supervisors about my wife's status, but I am not sure"*

First, Trinka speculates that the recording "might" show that he really told OIG "something like 'I think I told supervisors about my wife's status, but I am not sure.'" Pl.'s Mem. of P. & A. (ECF No. 15-1) at 19 ("Pl.'s Resp."). That is pure conjecture. Tellingly, he does not actually claim that he said this and that a recording would simply confirm that fact. He does not even claim that he thinks he said this. He claims only that he "might" have said this. *Id.* Notably, he never claimed that he said this, or even that he might have said this, when he replied to the removal proposal or grieved the initial removal decision, even though his memory of what he said during his interview presumably was better back then than now. And he furnishes no evidence that he had said this. For all these reasons, any claim that the recording would show that he had couched his statement in hedging qualifiers like "I think" or "but I am not sure" is completely speculative.

But even if the recording would show that Trinka had used the qualifiers "I think" or "but I am not sure," he offers no non-speculative basis to conclude that VA would not have fired him had it been available. Two of his supervisors attested that he had never told them about his wife's immigration status. AR 308, 310. As to them, VA easily could have found Trinka's statement to be false even had he used such qualifiers, because he in fact knew that he had not told them about his wife's immigration status. *See Milkovich v. Lorain J.*, 497 U.S. 1, 20 n.7 (1990) ("the statement, 'I think [X]' may be provable as false" if "the speaker really did not think [X]"); *cf.* 18 U.S.C. § 1621(1) (defining perjury as sworn statement one "does not believe to be true"). That is especially so given his failure to explain why he thought he told them, when he really had not.

---

AR 304, a fact that he does not deny. He also asserted that the recording would be exculpatory, but offers no non-speculative basis for this wholly conclusory assertion. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) ("the allegations are conclusory and not entitled to be assumed true.").

A third supervisor attested that Trinka only disclosed his wife's immigration status to him for the first time while he was escorting Trinka to the OIG interview.[3] AR 306. VA easily could have found that Trinka lacked candor by telling OIG that he disclosed his wife's immigration status to this supervisor, while omitting that he had only done so on his way to the OIG interview itself. *See Ludlum v. Dep't of Just.*, 278 F.3d 1280, 1284 (Fed. Cir. 2002) ("lack of candor is established by showing that [an employee] did not respond fully and truthfully to the questions he was asked" (quotation marks omitted)). While this statement may not have been literally false, Trinka was charged with providing not false information, but false "or inaccurate" information. AR 003. VA easily could have found that Trinka spoke inaccurately by omitting that he told his supervisor about his wife's immigration status only while walking to the OIG interview. *Ludlum*, 278 F.3d at 1284. And it easily could have found that Trinka's inaccuracy was willful given how recently he had told this supervisor about his wife's immigration status, making the notion that he had simply forgotten what had happened particularly unlikely. As such, any claim that VA would not have fired Trinka had he shown that he used the phrases "I think" or "but I am not sure" is entirely speculative.

*2. "Responding to a compound of unclear question"*

Second, Trinka speculates that the recording "might" show that he was "responding to a compound or unclear question." Pl.'s Resp. at 19. That too is wholly conjectural. Once again, Trinka does not actually claim that the question was compound or unclear, or even that he thinks it was compound or unclear—just that it "might" have been compound or unclear. *Id.* He did not claim that the question was (or even might have been) compound or unclear at any point in replying

[3] Trinka told his supervisor about his wife's immigration status while the two were walking to his OIG interview on December 7, 2018. AR 306. After Trinka arrived for the interview, he asked that his lawyer be present, and the interview was rescheduled for two weeks later. AR 320. Trinka offers no reason to believe that by the time the interview occurred, he had forgotten that he had told this supervisor about his wife's immigration status for the first time just two weeks earlier.

to the removal proposal or grieving the initial removal decision. And he furnishes no evidence that the question was compound or unclear. Indeed, he fails to explain how the question possibly could have been so compound or unclear as to make him falsely claim to have told three supervisors about his wife's immigration status, when he had not actually done so—an idea that is implausible on its face. Any claim that the recording would show that the question was too compound or unclear to support a charge of providing false or inaccurate information thus is entirely speculative.

*3. "Referring to different supervisors than the ones interviewed"*

Third, Trinka speculates that the recording "might" show that he was "referring to different supervisors than the ones interviewed." Pl.'s Resp. at 19. That is pure conjecture as well. Once again, Trinka does not actually claim that he was referring to different supervisors than the ones OIG interviewed, or even that he thinks he was referring to different supervisors—only that he "might" have been. *Id.* He never claimed that he had been referring to different supervisors during agency proceedings, much less identify which supervisors he ostensibly was referencing. And he offers no evidence that he was referring to different supervisors. Even now, he does not identify any different supervisors as the ones he ostensibly was referencing. The idea that Trinka believed that OIG had interviewed the wrong supervisors, but nonetheless chose to keep this fact—which if true would exonerate him completely—all to himself, even as he otherwise fought tooth and nail to keep his job, is utterly implausible. *See Huthnance v. District of Columbia*, 722 F.3d 371, 378 (D.C. Cir. 2013) ("when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him" (cleaned up)). If Trinka really believed that OIG had interviewed the wrong supervisors, he would have said so at some point. He did not, and still does not. That says everything. Any claim that the recording would show that Trinka was referring to different supervisors is thus entirely speculative.

#### 4. *Adverse Inference*

Finally, Trinka argues that VA's very failure to furnish the recording shows that it must be favorable to him. But failure to furnish ostensibly relevant evidence does not warrant an adverse inference "when there are innocuous explanations." *Id.* As Defendants previously explained, VA's Office of Accountability and Whistleblower Protection ("the Office"), which gave Trinka all the evidence the proposing official considered, did not give him the recording because OIG had never sent it the recording (and thus, the proposing official never considered it). *See* Defs.' Mem. at 20. Trinka cites nothing to show otherwise, as is his burden. *See UnitedHealthcare Ins. Co. v. Becerra*, 9 F.4th 868, 882 (D.C. Cir. 2021) ("The party challenging agency action bears the burden of proof."). He emphasizes that OIG had the recording, that the Office requested OIG's evidence, and that OIG sent the Office other materials, but none of this means that OIG sent the Office the recording. Trinka claims that VA never denied that the Office had the recording during his agency proceedings, but that is immaterial—nothing obliged VA to disclose this fact, and Trinka is not entitled to presume that the Office had the recording just because VA never specifically denied it. *See A.B. Leach Co. v. Peirson*, 275 U.S. 120, 128 (1927) ("a failure to answer such adverse assertions in the absence of further circumstances making an answer requisite or natural has no effect as an admission"); *Williams v. United States*, 394 F.2d 821, 822 (5th Cir. 1968) ("Failure to deny the story does not establish its truth as a matter of law."). Indeed, nothing in the record shows that Trinka even asked whether the Office had the recording. Trinka argues that VA implied that the Office had the recording by saying that the proposing and deciding officials never received it, and that the Office only needed to share "necessary" evidence. Pl.'s Resp. at 35. That is not the same as saying the Office had the recording, and Trinka reads far too much into these statements.

Perhaps Trinka thinks the Office should have done more to get the recording from OIG, but that is not the question—what matters is simply whether there is an "innocuous explanatio[n]" for its failure to give him the recording. *Huthnance*, 722 F.3d at 378. The fact that the Office never received, and the proposing official never considered, the recording is such an explanation. VA's failure to give Trinka the recording thus does not suggest that it was favorable to him.[4]

### B. Trinka Must Show Prejudice To Establish A Due Process Violation Based On VA's Failure To Provide Him The Recording

Perhaps recognizing his inability to show that the recording's unavailability prejudiced him in any way, Trinka argues that he need not show prejudice to establish that VA's failure to provide him the recording violated due process principles. But as explained, case law holds otherwise. *See Strickler*, 527 U.S. at 282; *Oruche*, 484 F.3d at 595. Trinka argues that these cases are inapposite because this is not a criminal case. That gets it backward. Due process protections are stronger in the criminal context than anywhere else—certainly than in removal hearings for public employees. Excusing Trinka from the prejudice showing that criminal defendants must satisfy to establish a due process violation based on withholding of evidence thus would be inappropriate. *See United States v. Mendoza-Lopez*, 481 U.S. 828, 839 n.17 (1987) ("the procedures required in an administrative proceeding are less stringent than those demanded in a criminal trial"); *Novotny v. Dep't of Transp.*, 735 F.2d 521, 524 (Fed. Cir. 1984) ("Contentions that government employees faced with removal are entitled to all the protections of a criminal trial have been authoritatively rejected." (quotation marks omitted)); *Williams v. U.S. Elevator Corp.*, 920 F.2d 1019, 1024 n.6

---

[4] Should this Court deem it helpful, Defendants would welcome an opportunity to submit a declaration from a knowledgeable VA official attesting that OIG simply never sent the Office the recording of Trinka's interview. *See Beach Commc'ns, Inc. v. FCC*, 959 F.2d 975, 987 (D.C. Cir. 1992) ("Where this court needs more evidence to enable it to understand the issues clearly, we have discretion to supplement an administrative record." (cleaned up)). Defendants reached out to Trinka's counsel to ask whether he would consent to such a filing, but Trinka strenuously opposed it. Trinka's opposition to putting actual, direct evidence on this issue before the Court is telling.

(D.C. Cir. 1990) (if a rule is "adequate to protect the important rights at stake in criminal cases, we think it follows that it must be adequate in the lesser burdened context of a civil" case); *Tucker v. City of Chi.*, 907 F.3d 487, 493 (7th Cir. 2018) ("one's liberty interest in a criminal prosecution" exceeds "property interest in continued employment").[5]

Trinka observes that criminal defendants enjoy "a panoply of procedural protections" he lacks, "which may compensate for the impact of alleged withholding" of evidence. Pl.'s Resp. at 17. But he cites no authority for the idea that withholding evidence is more acceptable in criminal than administrative settings because criminal defendants get other procedural protections, and Defendants know of none. In essence, Trinka argues that there should be rough parity between the due process protections available in criminal and administrative proceedings, and that because criminal defendants enjoy certain protections that he lacks, he in turn should get protections that they lack, to balance things out. But as the above cases make clear, the idea that due process affords more protection in criminal than administrative settings is part of the Constitution's design, not a bug for which courts should compensate. As such, the fact that Trinka is not entitled to the full set of due process protections that apply in criminal cases is no reason to excuse him from the rule that he must show prejudice to establish a due process violation based on withholding of evidence.

Trinka cites two cases to argue that he need not show prejudice to establish a due process violation, but neither one is on point. First, he cites *Carey v. Piphus*, 435 U.S. 247, 266 (1978), for the idea that "the right to procedural due process is 'absolute,'" and "does not depend upon the

---

[5] Because plaintiffs generally challenge agency action under 5 U.S.C. § 706, which sets out an express prejudicial error rule, there usually is no need in administrative law cases to ask whether prejudice is an element of a due process violation itself. For that reason, the dearth of cases holding that a plaintiff must show prejudice to establish a due process violation in agency proceedings does not suggest that such a plaintiff can establish a due process violation without showing prejudice. *Cf. United States v. Byers*, 740 F.2d 1104, 1116 (D.C. Cir. 1984) ("This court has never been presented with this specific question.").

merits of a claimant's substantive assertion." That is beside the point, as the idea that the right to due process is absolute says nothing about what constitutes a due process violation in the first place. *Carey* did not address that question, as there was no dispute that a due process violation had occurred, and it did not involve the withholding of evidence. *Id.* at 248. *Strickler* later held that a showing of prejudice is one of the essential "components" of a due process violation based on the withholding of evidence. 527 U.S. at 282. If anything, *Carey* undermines Trinka's argument that he need not show prejudice, as it held that a plaintiff who could not show any actual injury owing to a due process violation was entitled to nothing more than nominal relief. 435 U.S. at 266-67.

Second, Trinka cites *Fuentes v. Shevin*, 407 U.S. 67, 87 (1972), for the idea that "[i]t is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake, whatever the ultimate outcome of a hearing." That too is beside the point, as the idea that the state cannot deprive one of due process altogether by saying it would make no difference says nothing about what process is due in the first place—a question on which *Fuentes* said little. *See id.* at 96-97 ("The nature and form of such prior hearings . . . are legitimately open to many potential variations, and are a subject, at this point, for legislation"). *Fuentes* did not hold that due process violations never require prejudice, and *Strickler* later held that one must show prejudice to establish a due process violation based on the government's withholding of evidence. Because Trinka was not due a recording of his interview, as explained, *Fuentes* is inapposite.

Finally, any argument that requiring a showing of prejudice is inconsistent with *Mathews v. Eldridge*, 424 U.S. 319 (1976), is incorrect. *Mathews* held that the process due in any given circumstance turns on, among other things, "the risk of an erroneous deprivation of such interest

through the procedures used." *Id.* at 335. That risk is low in a circumstance where a plaintiff offers no more than speculation to argue that having certain evidence would have changed the outcome.[6]

Finally, Trinka argues that requiring him to show that the recording's unavailability caused him prejudice "asks for the impossible." Pl.'s Resp. at 18. But case law requires a showing of prejudice, *Strickler*, 527 U.S. at 282; *Oruche*, 484 F.3d at 595, and Trinka could make that showing simply by identifying some non-speculative, non-conclusory basis to believe VA would not have fired him had the recording been available. But he Trinka offers nothing more than speculation on this point, he cannot show prejudice, and thus cannot establish a due process violation.

### C. Trinka Must Show That VA's Failure To Give Him The Recording Prejudiced Him In Order To Obtain Relief Under Section 713

Even if Trinka could establish a due process violation based on VA's failure to furnish him the recording without needing to show any prejudice, he must still show prejudice to obtain relief under Section 713. *See Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1327 (D.C. Cir. 2015) ("Due process challenges to agency action are subject to the general prejudicial error rule."). But he cannot do so, as explained above. Trinka argues that Section 713 contains no prejudicial error rule. But Congress plainly modeled Section 713 on the analogous judicial review provision of the Administrative Procedure Act ("APA"), which contains a prejudicial error rule. *Compare* 38 U.S.C. § 713(b)(6), *with* 5 U.S.C. § 706(2)(A). As such, Section 713 most naturally

---

6 For the same reason, *Mathews* does not conflict with *Sardo v. McGrath*, 196 F.2d 20, 22 (D.C. Cir. 1952), which held that a plaintiff's ability to show a due process violation based on lack of cross-examination opportunity in agency proceedings hinged on whether it was "prejudicial." Notably, *Sardo* involved the deportation context, and so implies no general right to cross-examine witnesses in agency proceedings given the strong interest in avoiding improper deportation. *See Bridges v. Wixon*, 326 U.S. 135, 154 (1945) (deportation "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom . . . . Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness"); *Padilla-Agustin v. INS*, 21 F.3d 970, 974 (9th Cir. 1994) ("the private liberty interests involved in deportation proceedings are among the most substantial").

is read to contain such a rule as well. *See Doe v. DiGenova*, 779 F.2d 74, 82 (D.C. Cir. 1985) ("We presume that when enacting new legislation, Congress is aware of similar language in old statutes, and chooses to repeat that language based on an understanding of" what that law means).

Trinka notes that the APA expressly mentions the prejudicial error rule, while Section 713 does not. But text, history, and statutory purpose belie any notion that Congress abandoned the prejudicial error rule in enacting Section 713. The APA's phrasing—"due account shall be taken of the rule of prejudicial error," 5 U.S.C. § 706(2)(A)—makes clear that the rule is not one of the APA's own making, but a background principle that the APA merely did not displace. *See Air Canada v. Dep't of Transp.*, 148 F.3d 1142, 1157 (D.C. Cir. 1998) ("*As incorporated into the APA*, the harmless error rule requires the party asserting error to demonstrate prejudice from the error." (emphasis added)); Dep't of Just., *Attorney General's Manual on the Administrative Procedure Act* 110 (1947) (APA's "prejudicial error" rule "sums up in succinct fashion the 'harmless error' rule applied by the courts in the review of lower court decisions as well as of administrative bodies").[7] The modern concept of prejudicial error is embedded deeply in our legal system—it dates back over a century, and is reflected in the Federal Rules of Civil and Criminal Procedure, the statute governing appellate review generally, and the law of all 50 states. *See* Act of Feb. 26, 1919, Pub. L. No. 65-281, 40 Stat. 1181, 1181; Fed. R. Crim. P. 52(a); Fed. R. Civ. P. 61(a); 28 U.S.C. § 2111; *Chapman v. California*, 386 U.S. 18, 22 (1967) ("All 50 States have harmless-error statutes or rules"). Against this historical backdrop, the most natural conclusion is that Congress implicitly incorporated the prejudicial error rule into Section 713, rather than abandoning it.

[7] The Supreme Court has relied on the Attorney General's Manual to construe the APA many times, describing it as "a document whose reasoning we have often found persuasive." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (collecting cases).

That is particularly so given that Section 713's manifest purpose is to enable VA to remove misbehaving Senior Executives more easily and quickly than prior law permitted. *See* U.S. Sen. Comm. on Veterans' Affairs, Press Release, *VA Accountability Measure Signed Into Law* (June 23, 2017) (Section 713 "makes it easier for the VA to remove poor performing senior executives and replace them with qualified candidates . . . . under an expedited timeline"); *Helman v. Dep't of Veterans Affs.*, 856 F.3d 920, 923 (Fed. Cir. 2017) (Section 713 was "designed to make it easier . . . to remove or demote senior executives in the agency for poor performance"). Until Section 713 was amended in 2017, Senior Executives were entitled to a hearing before the Merit System Protection Board ("MSPB"), *Helman*, 856 F.3d at 923-25, in which employees must show that any procedural error an agency made in disciplining them was prejudicial, 5 U.S.C. § 7701(c)(2)(A); *Handy v. U.S. Postal Serv.*, 754 F.2d 335, 338 (Fed. Cir. 1985) ("It is insufficient simply to show that a statutory procedure was not followed at the agency level. Harmful error must be shown."). The MPSB's rulings are then themselves subject to the prejudicial error rule on judicial review. *In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004). The idea that Congress actually made it harder to remove Senior Executives in enacting the current version of Section 713, by lifting the prejudicial error rule that had previously governed their removal proceedings, defies credulity.

Moreover, non-Senior Executive civil servants at VA are subject to the ordinary MSPB process, in which they must show that any procedural error VA made in disciplining them, then any decision by the MSPB itself, was prejudicial. 38 U.S.C. § 714(c)(4)(A). To hold that Senior Executives need not show prejudice under Section 713 would give them more protection than low-level employees, contrary to the principle that Senior Executives are held to a higher standard. *See* 5 U.S.C. § 3131 (Senior Executives should be "of the highest quality"); *N. Ger. Area Council v. FLRA*, 805 F.2d 1044, 1049 (D.C. Cir. 1986) ("If anything, supervisors might be held to an even

higher standard of conduct because of the greater fiduciary nature of their duties."); *Esparraguera v. Dep't of Army*, 981 F.3d 1328, 1330 (Fed. Cir. 2020) ("Occupying significant positions of trust, senior executives are selected, in no small part, for their leadership abilities."). For these reasons, Trinka must show prejudice under Section 713 to obtain relief. Because he cannot, his claim fails.

**D. Trinka Is Not Entitled To Relief Directly Under The Constitution**

Trinka cannot evade the prejudicial error rule by suing directly under the Constitution. The relief he seeks—vacatur and expungement of his removal, reinstatement, backpay, a declaratory judgment, and an injunction, Compl. at 50-51, ECF No. 1—is equitable in nature. *See Miller v. Clinton*, 687 F.3d 1332, 1360 (D.C. Cir. 2012) (reinstatement); *Humane Soc'y v. Kempthorne*, 527 F.3d 181, 188 (D.C. Cir. 2008) (vacatur); *Fogg v. Ashcroft*, 254 F.3d 103, 110 (D.C. Cir. 2001) (expungement); *Sparrow v. Commissioner*, 949 F.2d 434, 438 n.6 (D.C. Cir. 1991) (back pay); *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1020 (D.C. Cir. 1991) (declaratory relief).

A judge-made equitable cause of action is unavailable when Congress provides a particular method to enforce a substantive rule. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328 (2015) ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations"); *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996) ("Where Congress has created a remedial scheme for the enforcement of a particular federal right, we have . . . refused to supplement that scheme with one created by the judiciary."). In passing Section 713, Congress carefully set out a detailed scheme by which Senior Executives can obtain judicial review of discipline imposed in violation of the Constitution. 38 U.S.C. § 713 (Senior Executives may challenge discipline that is "not in accordance with a provision of law"). In doing so, it implicitly foreclosed other, judge-made equitable relief. As explained above, Section 713 has a prejudicial

error rule. This Court "should hesitate before casting aside [that] limitatio[n] and permitting an action" under judge-made equitable causes of action. *Seminole Tribe of Fla.*, 517 U.S. at 74. Trinka thus cannot avoid Section 713's prejudicial error rule by suing directly under the Constitution.

**E. Section 713(b)(1)(A) Did Not Entitle Trinka To A Recording Of His Interview**

Trinka also argues that Section 713(b)(1)(A) entitled him to the recording, but Defendants have explained that Trinka waived this argument by failing to raise it during his administrative proceedings. Defs.' Mem. at 17. Trinka fails to address this point, thus conceding it. *See Wannall*, 775 F.3d at 428. In any event, this argument fails on the merits. As already explained, Section 713(b)(1)(A) entitled Trinka only to materials that the proposing official considered. Defs.' Mem. at 18-19. The proposing official did not consider the recording, so Trinka was not entitled to it. *Id.*

Trinka stresses Section 713(b)(1)(A)'s use of the broad term "all evidence," Pl.'s Resp. at 32, but it speaks of "all evidence *in support of the proposed action*," 38 U.S.C. § 713(b)(1)(A) (emphasis added). Semantics and common sense suggest that materials the proposing official never even considered is not evidence "in support of the proposed removal." *Id.* Section 713(b)(1)(A), moreover, appears to have been modeled on a provision of the Civil Service Reform Act requiring an agency to provide "any supporting material" to an employee it proposes to discipline. 5 U.S.C. § 7513(e). The MSPB has construed this language to exclude materials an agency did not consider in proposing discipline. *See Hill v. Dep't of Def.*, No. DC-0752-09-0042-I-2, 2010 WL 10840174, at *2 (M.S.P.B. Nov. 18, 2010) ("Because Col. Beck did not consider the information in the binder, the agency's failure to provide the binder to the appellant does not constitute harmful error or violate the appellant's due process rights."); *Porrazzo v. Dept't of Air Force*, 19 M.S.P.R. 496, 498 (1984) (employee "need not be given the entire file developed during the investigation of his activities, since the proposal to remove was based on only parts of the file, and [he] had access to all of those parts"); *Martel v. Dep't of Transp.*, 15 M.S.P.R. 141, 155 (1983) ("an employee against

whom an adverse action is proposed is not entitled to review material which was not relied upon by the agency"); *Klein v. Dep't of Lab.*, 6 M.S.P.R. 292, 295 (1981) (employee "is not entitled to material not relied upon"). Trinka gives no reason to reach a different result here, especially as Congress seems to have modeled Section 713(b)(1)(A) on Section 7513(e). *See Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative . . . interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative . . . interpretations as well.").

Trinka's argument that reading Section 713(b)(1)(A) this way would let VA "immunize the actual evidence from disclosure," Pl.'s Resp. at 33, is meritless. So long as the proposing official considers material in proposing a Senior Executive's discipline and that material supports the proposal, VA must produce it. The proposing official could not shield material from production by creating a summary of it—that would not undo the fact that he considered it, and if anything would only underscore its weight in his decision. But the proposing official never considered the recording—nor, for that matter, did the deciding official, grieving official, or Secretary, AR 530, 730, 744-45, 750, 753—as OIG never shared it with them. All they had was the summary.[8] For all these reasons, Section 713(b)(1)(A) did not entitle Trinka to a recording of his interview.

**F. VA Policy Did Not Entitle Trinka To A Recording Of His Interview**

Finally, Trinka argues that Letter No. 006-17-1 entitled him to a recording of his interview. But as Defendants have explained, the provision that he cites applies only to materials the Office possesses, and the Office never received the recording from OIG. Defs.' Mem. at 20. Trinka does not dispute that the provision applies only to materials the Office possesses, but insists that the

[8] Trinka's claim that the Office "expressly" relied on the recording to make a "preliminary finding" that he made the statement attributed to him, Pl.'s Resp'n at 33, is simply false. He seems to be relying on the Office's statement that it considered the documents OIG "provided." AR 001.

Office must have received the recording. He is wrong, and none of the record citations he provides show otherwise. At most, they show only that OIG possessed the recording, and that it transmitted some materials to the Office. *See* Pl.'s Resp. at 35 (citing portions of the record). Trinka seems to recognize this, because he next argues that even if the Office did not have the recording, it could have sought the recording from OIG. That is immaterial, as nothing in Letter No. 006-17-1 obliged the Office to ask OIG for materials it did not already have so that it could produce them to Trinka.

* * *

For these reasons, Trinka's challenges to VA's failure to provide him the recording all fail.

## II. Trinka Was Not Entitled To A Post-Termination Hearing Where He Could Confront Or Cross-Examine Witnesses

Trinka also argues that due process entitled him to a post-termination hearing to confront or cross-examine witnesses. Pl.'s Resp. at 20. But due process "do[es] not require an agency to provide procedures which approximate a judicial trial; therefore, [Trinka] has no right to confront and cross-examine witnesses" at a post-termination hearing. *Holy Land Found. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003). There is no exception to this rule for public employees facing removal. To the contrary, the D.C. Circuit has recognized that due process does not entitle public employees facing removal to post-termination hearings to confront or cross-examine witnesses. *See Harrison v. Bowen*, 815 F.2d 1505, 1519 (D.C. Cir. 1987); *U.S. Info. Agency v. Krc*, 905 F.2d 389, 399 (D.C. Cir. 1990); *Twist v. Meese*, 854 F.2d 1421, 1429 (D.C. Cir. 1988).[9]

[9] While Trinka refers variously to a right to (1) a post-termination hearing and (2) confront or cross-examine witnesses, this is the same argument—he does not identify any purpose that such a hearing would serve other than confrontation/cross-examination. He does not argue that statute entitled him to such a hearing either, and for good reason. Section 713 provides for no such hearing, contemplating that the only redress available to a Senior Executive who has been disciplined is a grievance to the Secretary, then APA-style judicial review on the agency record. 38 U.S.C. § 713.

*Harrison* held that a public employee's removal "did not violate the requirements of due process" where she had "30 days written notice of her proposed removal, an opportunity to respond orally and in writing, which she exercised by counsel, and a further opportunity personally to present her case to a higher official, who concurred in her supervisor's decision," 815 F.2d at 1519 (cleaned up)—almost exactly what Trinka received. "Having received the extensive procedural protections provided by the statute," which did not include confrontation or cross-examination, "and having had the right to seek relief through the [the Office of Special Counsel, the employee] received at least as much process as she was due as a matter of constitutional right." *Id.* Trinka speculates that the employee might not have asserted a right to confront adverse witnesses, but *Harrison* made clear that the protections that she received satisfied due process. 815 F.2d at 1519.

Trinka asserts that the public employee in *Krc* had only a "circumscribed" property interest in his employment. Pl.'s Resp. at 23. But that conclusion rested on the fact that the agency's own policies allowed it to remove the employee "for such cause as will promote the efficiency of the Service." 905 F.2d at 398 (quotation marks omitted). By that reasoning, an employee's removal does not divest him of a protected property interest so long as the agency removes him for reasons and in a manner that its own policies permit. Because Trinka's removal likewise comported with applicable statutes and VA policies, *Krc* is materially indistinguishable.

Finally, Trinka asserts that the public employee in *Twist* lacked any property interest in his continued employment at all. Pl.'s Resp. at 23. But *Twist* explained that because the employee had "received advance notice, an on-the-record hearing, and an opportunity to submit a written answer to the charges against him, *even if* [*he*] *had a property right to his continued employment*, . . . he has received all the process to which he would be due." 854 F.2d at 1428 (emphasis added). Trinka stresses that the employee had received "an on-the-record hearing," *id.*, but nothing in *Twist*

suggests that such hearing included an opportunity to confront or cross-examine witnesses. For all of these reasons, *Harrison*, *Krc*, and *Twist* confirm that due process principles did not entitle Trinka to an opportunity to confront or cross-examine witnesses.

Trinka contends that *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), entitles him to a post-termination hearing. But *Loudermill* held only that due process requires "an opportunity to respond . . . to present reasons, either in person *or in writing*, why proposed action should not be taken." *Id.* at 546 (emphasis added). Trinka received such an opportunity. *Loudermill* did not say that due process entitles a public employee to a hearing where he can confront or cross-examine witnesses—it did not even mention those concepts. *Id.* While it observed that state law provided for a "full post-termination hearing," *id.*, it did not say what protections that hearing entailed, nor did it hold that due process requires such protections—only that such protections sufficed to satisfy due process. *See Ramirez v. Immigr. & Customs Enf't*, 471 F. Supp. 3d 88, 183 (D.D.C. 2020) (rejecting "incorrec[t] suggest[ion] that a sufficient condition is a necessary one"). *Loudermill* thus does not entitle Trinka to a hearing to confront or cross-examine witnesses.

Nor does *Mathews v. Eldridge*, 424 U.S. 319 (1976), entitle Trinka to confront or cross-examine witnesses. *Mathews* identified the factors that courts weigh to determine what due process requires in a given setting, which include the "risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Id.* at 334.[10] Trinka offers no reason to believe that cross-examination or confrontation would meaningfully reduce the risk of error, either in his case specifically or Section 713 removal

[10] The other two *Mathews* factors are the private interest affected and government's interest. 424 U.S. at 334. As to these, *Loudermill* recognized that a public employee has a strong interest in retaining his job, but that the government likewise has strong interests in "expeditious removal of unsatisfactory employees and the avoidance of administrative burdens." 470 U.S. at 543.

proceedings generally. He does not suggest that any of his supervisors testified inaccurately, much less offer any non-speculative reason to think they did. To the contrary, his arguments for why his statement might not have been culpable (he really said "I think . . . but I'm not sure," misunderstood the question, or was referring to entirely different supervisors) each presuppose that his supervisors were telling the truth. He also suggests that the OIG interviewer's memory and credibility might have been unreliable, but that is pure speculation, and as explained, he offers no non-speculative reason to believe the transcript contains exculpatory information. In the end, Trinka offers nothing more than the bald conjecture that cross-examination or confrontation might unearth some sort of helpful information. Were that enough, a plaintiff could always prevail under the *Mathews* test simply by speculating that an additional safeguard might have changed the proceeding's outcome.

*Goldberg v. Kelly*, 397 U.S. 254, 269 (1970), which Trinka cites for the claim that he was entitled "to confront and cross-examine adverse witnesses," is equally unavailing. *Mathews* largely limited *Goldberg* to its facts, stressing that *Goldberg* had involved the denial of welfare assistance for "persons on the very margin of subsistence," where "issues of witness credibility and veracity often are critical to the decisionmaking process." 424 U.S. at 340, 343-44. *Mathews* noted that due process requires less procedural protection where (1) "the degree of potential deprivation" is lower and (2) "credibility and veracity" are less essential. *Id.* at 341, 344. To the extent that *Goldberg* can be read any more broadly, to suggest a general right to confront or cross-examine witnesses in agency proceedings, *Mathews* makes clear that this language is dicta and no longer good law.

Next, Trinka cites *Wolff v. McDonnell*, 418 U.S. 539 (1974), but it too is inapposite. *Wolff* involved a challenge to prison policies, not a claim that a public employee was fired without due process. *Id.* at 542. It said in passing that confrontation and cross-examination are essential "where a person may lose his job in society," *id.* at 567, but that was dicta—*Wolff* was not an employment

case, and the passage at issue was not limited to public employees, but on its face applies to the private sector too. In any event, *Wolff* offered the caveats that cross-examination and confrontation "are not rights universally applicable to all hearings," and "[r]ules of procedure may be shaped by consideration of the risks of error." *Id.* As explained, Trinka offers no non-speculative reason to think that cross-examination or confrontation would have meaningfully reduced the risk of error. For these reasons, *Wolff* does not entitle him to confront or cross-examine witnesses.

Trinka's reliance on *Greene v. McElroy* for the claim that the right to confront and/or cross-examine witnesses applies "in all types of cases where administrative and regulatory actions [are] under scrutiny," 360 U.S. 474, 497 (1959), fares no better. *McElroy* said only that confrontation and cross-examination are available in some agency contexts—*i.e.*, not categorically unavailable in the agency context—not in all agency contexts. *See id.* ("This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases, but also in all types of cases where administrative and regulatory actions were under scrutiny." (citations omitted)). That is entirely consistent with the idea that confrontation and cross-examination are unavailable in the specific context of a public employee's removal proceedings. *Cf. Mathews*, 424 U.S. at 334 ("Due process is flexible and calls for such procedural protections as the particular situation demands").

Finally, Trinka cites various out-of-Circuit cases for the claim that he had a right to confront and cross-examine witnesses. If these cases really said that, they would conflict with D.C. Circuit case law, as discussed above. But each of them is distinguishable, because in each one, the court expressly or implicitly determined that credibility determinations were important enough under the particular circumstances at hand that there was a beyond-speculative chance of confrontation or cross-examination making a difference to the outcome. *See Walsh v. Hodge*, 975 F.3d 475, 484-85 (5th Cir. 2020) ("the entire hearing boiled down to an issue of credibility . . . credibility

was critical"); *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 68 (1st Cir. 2019) (charge "turn[ed] on the witnesses' credibility"); *Doe v. Baum*, 903 F.3d 575, 578 (6th Cir. 2018) ("when credibility is at issue, the Due Process Clause mandates that a university provide accused students a hearing with the opportunity to conduct cross-examination"); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 401 (6th Cir. 2017) ("the circumstances of the present case pose [a] credibility contest"); *Bus. Commc'ns, Inc. v. Dep't of Educ.*, 739 F.3d 374, 380 (8th Cir. 2013) (if defendant's "reasons for its decision depend on the credibility of individual witness testimony, cross-examination must be available to minimize the risk of erroneous deprivation"); *Baird v. Bd. of Educ. Sch. Dist. #205*, 389 F.3d 685, 694 (7th Cir. 2004) (plaintiff "was deliberately prevented from ascertaining the identities of his accusers"). Trinka, in contrast, offers no non-speculative basis to believe that the outcome of his proceedings turns on the credibility of his supervisors or the OIG interviewer.

For all these reasons, due process principles did not entitle Trinka to confront and/or cross-examine witnesses. And even if they did, any denial of that right was harmless, as explained above.

## III. The Secretary Relied On the Preponderance Standard To Sustain Trinka's Removal

Trinka argues that VA unlawfully relied on the substantial evidence standard to sustain his removal. Pl.'s Resp. at 24-26. But he waived this argument by failing to raise it in his grievance. While he raised this argument in responding to the initial removal decision, AR 356, he abandoned it in his grievance, arguing only that VA failed to notify him that it was applying the preponderance standard—not that it had (unlawfully) applied the substantial evidence standard. AR 543. Trinka's failure to raise this argument to the Secretary constitutes waiver. *See New LifeCare Hosps. of N.C., LLC v. Becerra*, 7 F.4th 1215, 1224-25 (D.C. Cir. 2021) (plaintiff waived issue it had raised early in agency proceedings by failing to appeal that issue to appropriate agency decision-maker); *Riffin v. Surface Transp. Bd.*, 733 F.3d 340, 343 (D.C. Cir. 2013) ("reviewing courts generally will not

consider an argument that was not raised before the agency at the time appropriate under its practice" (cleaned up)); 38 U.S.C. § 713(b)(1)(C) (Senior Executive must grieve any discipline "in accordance with" the "grievance process that the Secretary . . . shall establish"); AR 392 (grievance must state "[t]he reasons for which the [Senior Executive] believes" the discipline was unlawful).[11]

Regardless, this argument fails on the merits. As Defendants have explained, the Secretary sustained his removal by a preponderance of the evidence. Defs.' Mem. at 26; AR 754 (Secretary's decision); *Rodriguez v. Dep't Veterans Affs.*, 8 F.4th 1290, 13001 (Fed. Cir. 2021) (substantial evidence is "lower burden of proof than preponderance of the evidence"). Trinka claims that there is no indication that the Secretary really applied the preponderance standard, but the Secretary said he applied it. AR 754. This Court should not lightly infer that the Secretary did not mean what he said, given the presumption of good faith and regularity that agencies are due. *See Banner Health v. Price*, 867 F.3d 1323, 1348 (D.C. Cir. 2017) ("agency proceedings enjoy a presumption of regularity." (quotation marks omitted)); *Friedman v. FAA*, 841 F.3d 537, 541 n.1 (D.C. Cir. 2016) ("Without evidence to the contrary, we must presume an agency acts in good faith." (cleaned up)).

Trinka says that the Secretary could not have applied the preponderance standard because doing so would violate VA policy in two ways, but neither argument has merit. First, he argues that VA policy required the Secretary to apply the substantial evidence standard. Pl.'s Resp. at 27. But the Secretary found his removal warranted under either standard. AR 754. Second, Trinka

---

[11] The grievance asserted "that all arguments made in the written reply, without exception, are incorporated into this written grievance," AR 541, but a party cannot simply incorporate by reference arguments made at an earlier stage of proceedings. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an argument . . . by incorporating by reference an argument made at an earlier stage of the litigation."); *Gerlich v. Dep't of Just.*, 711 F.3d 161, 173 (D.C. Cir. 2013) (party waived argument by purporting to incorporate it from earlier in proceedings). That is especially so given that Trinka offers no reason why his grievance could not have raised all of the claims he had raised in his response to the removal proposal—he had already written the response, and had more time to prepare his grievance than to prepare his response. AR 003, 353, 529, 538.

argues that VA policy prohibits the Secretary from countermanding any initial removal decision that is supported by substantial evidence. Pl.'s Resp. at 27. That is incorrect. VA policy requires the Secretary to countermand an initial removal decision unsupported by substantial evidence, but does not preclude him from countermanding a decision supported by substantial—but less than a preponderance—of the evidence. AR 393 (Secretary "will not uphold an Initial Decision that is the subject of the grievance if [he] determines that" the action was "[n]ot supported by [s]ubstantial [e]vidence").[12] In any event, the Secretary's decision on its face shows that he found Trinka's removal warranted by a preponderance of the evidence. AR 754. If this violated VA policy, it was an error that inured to Trinka's own benefit. *See United States v. Allen*, 960 F.2d 1055, 1058 (D.C. Cir. 1992) ("the error of submitting the question to the jury placed a greater burden of proof on the government . . . and thus was not prejudicial"); *United States v. Schwartz*, 899 F.2d 243, 248 (3d Cir. 1990) ("We will not reverse a conviction because the court placed an additional burden of proof upon the Government which it was not required to sustain under the statute." (cleaned up)).[13]

Trinka observes that the deciding official relied on the substantial evidence standard, but what that lesser official did is immaterial. The Secretary runs VA, and his decision is what matters. *See* 38 U.S.C. § 303 (Secretary "is the head of the Department and . . . . responsible for the proper execution and administration of all laws administered by the Department and for the control, direction, and management of the Department"); *Wis. v. City of N.Y.*, 517 U.S. 1, 23 (1996) ("it is

---

[12] Trinka notes that the Secretary mistakenly, but sincerely, believed the deciding official had applied the preponderance standard to render the initial removal decision. Pl.'s Resp. at 28. That only undermines any claim that the Secretary merely paid the preponderance standard lip service because he thought the deciding official's failure to apply it made the removal legally vulnerable.

[13] For the same reasons, Trinka's argument that applying the preponderance standard "failed the basic requirements of reasoned decisionmaking," Pl.'s Resp'n at 42, is equally meritless. The decision to apply a higher burden of proof than he expected could not possibly have harmed him.

[the Secretary] to whom Congress has delegated its constitutional authority . . . . the mere fact that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment in any judicial review of his decision."); *St. Marks Place Hous. v. Dep't Hous. & Urban Dev.*, 610 F.3d 75, 83 (D.C. Cir. 2010) (the "[S]ecretary, like all agency heads, usually makes decisions after consulting subordinates, and those subordinates often have different views. In the end, it is the agency head whose decision we review"); *Serono Labs. v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998) ("deference is owed to the decisionmaker authorized to speak on behalf of the agency, not to each individual agency employee"); *Elcon Enters., Inc. v. Wash. Metro. Area Trans. Auth.*, 977 F.2d 1472, 1480 (D.C. Cir. 1992) ("There is simply no support for the proposition that superior decisionmakers are duty-bound to follow the recommendations of staff. Instead, we find most persuasive the notion that such superior decisionmakers are not bound by [staff] recommendations . . . and may agree or disagree with the [staff's] findings" (quotation marks omitted)); *Homemakers N. Shore, Inc. v. Bowen*, 832 F.2d 408, 413 (7th Cir. 1987) ("The Secretary's position is the position of the Department as an entity" (quotation marks omitted)). Indeed, Section 713 expressly provides that when a Senior Executive grieves a decision to the Secretary, the Secretary's decision, not the deciding official's decision, is the proper subject of judicial review. 38 U.S.C. § 713(b)(5) (Senior Executive "adversely affected by a decision . . . that is not grieved, or by a grievance decision . . . may obtain judicial review of such decision"). The standard the deciding official used is irrelevant—all that matters is that the Secretary applied the preponderance standard.

## IV. The Secretary Did Not Improperly Rely On Ex Parte Communications

Trinka argues that the Secretary improperly relied on ex parte communications when he considered the grievance official's recommendation, to which Trinka was not privy, in sustaining his removal. Pl.'s Resp. at 29. Defendants have explained why the Secretary's reliance on the

grievance official's recommendation was proper. Defs.' Mem at 24-25. In response, Trinka simply repeats three arguments that Defendants have already addressed. First, he argues that the grievance official's recommendation contained "new and material" information. Pl.'s Resp. at 29. But as Defendants already explained, the grievance official's recommendation contained no new factual information—only analysis of facts that Trinka already knew. Defs.' Mem. at 25; AR 742-49. To the extent Trinka argues he was entitled to see this purely analytical material, he cites no authority for this claim, and the only on-point authority Defendants know held the opposite. *Garza v. Dep't of Just.*, 5 F. App'x 894, 896 (Fed. Cir. 2001) (ex parte communication was not improper where it consisted solely of agency's own "review of the arguments [the employee] made in challenging proposed removal," not "evidence upon which the agency proposed to remove" him).[14] Second, Trinka argues that he did not know the grievance official's recommendation and had no chance to respond to it. Pl.'s Resp. at 29. But as explained, he was not entitled to know it. In any event, the Secretary explained his reasons for removing Trinka, which he can challenge in this action. Third, Trinka argues that the grievance official's recommendation "unduly pressured" the Secretary to sustain his removal. *Id.* But he offers no evidence for this speculative and implausible assertion—the Secretary is the grievance official's superior, after all, not vice versa. *See supra* Part III. Trinka speculates that the Secretary may have feared explaining a choice to ignore the grievance official's recommendation to Congress, as 38 U.S.C. § 323(f)(2) requires, but that too is pure conjecture.

## V. VA Did Not Unlawfully Limit the Secretary's Power To Make Removal Decisions

Trinka argues that VA policy unlawfully limited the Secretary's authority to countermand the deciding official's initial removal decision. Pl.'s Resp. at 30. But he did not raise this claim

---

14 Trinka ignores Defendants' observation that his "argument, if accepted, seemingly would prohibit judges from discussing their cases privately with their clerks." Defs.' Mem. at 24.

during agency proceedings or in his complaint, and so cannot raise it now. *See Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013) ("We require the argument petitioner advances here to be raised before the agency, not merely the same general legal issue." (cleaned up)); *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002) ("[T]here is a near absolute bar against raising new issues—factual or legal—on appeal in the administrative context"); *Hoai v. Vo*, 935 F.2d 308, 314 (D.C. Cir. 1991) ("Because this allegation was not raised in the complaint, however, its introduction at this late date cannot save the appellants' action."); *Richardson v. Capital One, N.A.*, 839 F. Supp. 2d 197, 203 (D.D.C. 2012) ("As Plaintiff is not permitted to advance a claim . . . that was not alleged in his Complaint, the Court need not consider the merits of Plaintiff's argument.").

Regardless, this claim fails for two reasons. First, VA policy does not limit the Secretary's power to countermand an initial removal decision. It prevents him only from upholding a legally defective decision, AR 393, not from countermanding a decision for any reason. Second, even if VA policy purported to limit the Secretary's ability to countermand an initial removal decision, he could simply rescind the policy entirely. He would not even need to satisfy the notice and comment procedure to do so, as the policy is exempt from it. *See* 5 U.S.C. § 553(a)(2), (b)(A) (notice and comment procedure does not apply to "matter[s] relating to agency management or personnel" or "rules of agency organization, procedure, or practice"). Because the Secretary can remove at will any limits the policy might impose on his discretion simply by rescinding the policy, without notice or comment, the policy cannot unduly limit his authority in any constitutionally-relevant sense. *See In re Grand Jury Investigation*, 916 F.3d 1047, 1052 (D.C. Cir. 2019) (regulations providing Special Counsel a measure of autonomy did not unduly limit power of Acting Attorney General, who could "rescind at any time the [relevant] regulations or otherwise render them inapplicable to the Special Counsel"); *In re Sealed Case*, 829 F.2d 50, 56 (D.C. Cir. 1987) (Independent Counsel

was inferior officer despite regulations limiting Attorney General's supervision over him because "the Attorney General may rescind this regulation at any time"); *United States v. Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d 598, 615 (D.D.C. 2018) ("to the extent that the regulations threaten to impair the Acting Attorney General's ability to direct and supervise the Special Counsel, the Department of Justice may simply rescind or revise the regulations at any time").

## VI. VA Did Not Apply Section 713 In An Unlawfully Retroactive Manner

Trinka does not dispute that the sole charge against him involved misconduct post-dating 2017, when Section 713 was enacted in current form. Instead, he argues that VA applied Section 713 in an unlawfully retroactive manner simply by considering misconduct that predated 2017 in deciding to remove him. But he waived this argument by failing to raise it in agency proceedings. *See Koretoff*, 707 F.3d at 398; *Nat'l Wildlife Fed'n*, 286 F.3d at 562. Regardless, as Defendants explained, a long line of authority holds that a penalty is not unlawfully retroactive simply because the entity that imposed it considered misconduct predating the charged offense in fashioning it—even misconduct that was neither charged nor unlawful when it happened. Defs.' Mem. at 26-30. Trinka insists his removal was based on both the charged misconduct and his pre-2017 misconduct. But the charge against him concerned only his 2018 statement, and VA considered his pre-2017 misconduct simply as an aggravating factor to fashion a proper penalty for that charge. AR 003-05, 529, 750. Case law shows this is not unlawful retroactivity. Defs.' Mem. at 26-30. Any contrary rule would give Senior Executives facing removal more protection than criminal defendants facing sentencing—a result Congress surely did not mean, and which nothing in Section 713 compels.

The only authority Trinka cites for his claim that VA applied Section 713 in an unlawfully retroactive manner is a trio of Federal Circuit decisions. Pl.'s Resp. at 31-32 (citing *Brenner v. Dep't of Veterans Affs.*, 990 F.3d 1313, 1328 (Fed. Cir. 2021); *Harrington v. Dep't of Veterans*

*Affs.*, 981 F.3d 1356, 1359 (Fed. Cir. 2020); *Sayers v. Dep't of Veterans Affs.*, 954 F.3d 1370, 1380 (Fed. Cir. 2020)). But as Defendants have explained, these cases are distinguishable, because "in each of them, pre-enactment misconduct formed the basis of the actual charge that was brought and sustained—it was not used merely to fashion an appropriate penalty once an otherwise-valid charge had already been sustained." Defs.' Mem. at 30. Trinka offers no response to this point. He also cites language in these cases explaining that under 38 U.S.C. § 714, the "adverse action" under review includes both the charged conduct and penalty. Pl.'s Resp. at 31. But as Defendants have explained, this is a non-sequitur—it means simply that a Senior Executive may seek judicial review of both the decision to remove him and the specific penalty imposed. Defs.' Mem. at 30. That says nothing about whether any given penalty is lawful. Trinka's retroactivity arguments thus fail.

## VII. Trinka Was Not Entitled To Respond Or Offer Evidence During VA's Investigation

Trinka argues that he was entitled to provide a response or evidence before VA proposed his removal, while its investigation of him was still pending. But Trinka waived that argument by failing to raise it during agency proceedings or in his complaint. *See Koretoff*, 707 F.3d at 398; *Nat'l Wildlife Fed'n*, 286 F.3d at 562; *Hoai*, 935 F.2d at 314; *Richardson*, 839 F. Supp. 2d at 203.

Regardless, Trinka's argument fails on the merits, because he was not entitled to respond or offer evidence while VA's investigation of him was pending. He cites Letter No. 006-17-1, which says that "a Senior Executive who is the subject of an investigation or review will be given an opportunity to respond to and provide evidence relating to the matters under investigation." AR 393. But nothing in this language provides that such opportunity must come before VA proposes discipline, while its investigation remains pending. That this language appears under the heading "Investigation," *id.*, is immaterial, because "the heading of a section cannot limit the plain meaning of the text," *United States v. Spencer*, 720 F.3d 363, 367 (D.C. Cir. 2013) (quotation marks

omitted). In any event, this heading most naturally is read to mean simply that VA must provide a Senior Executive an opportunity to respond and offer evidence as to the matter under investigation, though not necessarily while its investigation remains pending. Trinka had two chances to respond and furnish evidence—he replied to the removal proposal, and then grieved the initial removal decision. He thus received all the opportunity to respond and offer evidence that he was due.

Even if Trinka was entitled to respond or offer evidence during the investigation, moreover, he cannot show that the denial of any such opportunity prejudiced him. He argues that his memory of the events underlying the charge might have eroded between his December 21, 2018 interview and September 11, 2020, when VA proposed his removal. But even accepting that VA should have let him respond and offer evidence while its investigation of him was pending, he was not entitled to do so any earlier than July 16, 2020, when VA finished its investigation. AR 001. VA proposed Trinka's removal less than two months later, on September 11, 2020, and Trinka does not argue that his memory eroded during this brief gap. As such, Trinka cannot show prejudice.

## VIII. <u>The Office Can Recommend That VA Pursue Specific Discipline</u>

Letter 006-17-1 also provides that "[u]pon conclusion of [VA's] investigation," the Office and VA's General Counsel "shall brief the Secretary or his or her designee on the results of the investigation and whether disciplinary action is recommended," and that "[t]he recommendation will be limited to whether disciplinary action should be pursued." AR 390. Trinka argues that the Office exceeded its authority because it recommended not merely that VA pursue discipline, but specifically that it pursue removal. But the language at issue most naturally is read to prohibit the Office only from recommending that the Secretary pursue a criminal investigation or prosecution. The immediately preceding section makes this clear, providing that the Office "will refer matters involving actual or possible violations of criminal laws to OIG." AR 389. Read together, these two

sections ensure that the Office recommends any criminal investigations or prosecutions to OIG, not the Secretary, to whom its recommendation should be limited only to the pursuit of disciplinary measures. Trinka's interpretation, in contrast, would serve little practical purpose, especially given that multiple VA decision-makers already must approve or sustain any discipline that is pursued against a Senior Executive. Trinka provides no reason to think that the Office's recommendation to pursue specific discipline would unduly influence any of these officials, let alone all of them.

Trinka also argues that the Office unduly pressured the proposing official by telling him that he would need to justify declining to propose Trinka's removal in a statement that Congress would receive. AR 001-02. But this admonition tracked the statutory requirement that "[i]f the Secretary receives a recommendation for disciplinary action . . . and does not take or initiate the recommended disciplinary action," he must send Congress "a detailed justification for not taking or initiating such disciplinary action." 38 U.S.C. § 323(f)(2). The Secretary delegated the deciding official authority to make an initial removal decision. AR 385, 759. The Office's admonition to the deciding official accurately stated the law, and the Office did not unduly pressure him in doing so. Trinka offers no evidence that the proposing official felt undue pressure, and there is no basis to believe he shied from his duty to propose only the discipline he felt was warranted, without fear of explaining his decision. Even if the proposing official felt pressure to propose Trinka's removal, Trinka cannot show prejudice, as the proposing official was not the one who removed him.

## IX. <u>VA Did Not Refuse To Consider Relevant Evidence</u>

Trinka argues that VA refused to consider certain items of ostensibly relevant evidence in removing him. But Trinka waived many of these arguments, and none of them have any merit.

### A. The Recording of Trinka's Interview

First, Trinka argues that VA erred in refusing to consider the recording of his interview. This argument is separate and distinct from Trinka's argument that VA should have given him the

recording, and Trinka did not raise it during his agency proceedings, thus waiving it. *See Koretoff*, 707 F.3d at 398; *Nat'l Wildlife Fed'n*, 286 F.3d at 562. In any event, this argument is meritless. Agencies need not consider evidence that was never placed before them. *See Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1059 (D.C. Cir. 2001) ("An agency is not required to consider issues and evidence . . . that are not timely filed."); *Ctr. for Auto Safety v. Dole*, 828 F.2d 799, 804 (D.C. Cir. 1987) ("The APA prohibits a reviewing court from considering new evidence that was not before the agency when it made its decision."). Because Trinka never introduced the recording for VA to consider, VA's failure to consider it was not erroneous. Trinka cites two cases for a contrary position, but neither one is on point. *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010), held only that agencies cannot ignore evidence that is "furnished" to them and "in the record." *District Hospital Partners, L.P. v. Burwell*, 786 F.3d 46, 56 (D.C. Cir. 2015), meanwhile, held only that an agency cannot use "inaccurate" data, and expressly declined to impose "a generic obligation on agencies to always use the best available data." Neither case held that an agency must consider evidence that a party never introduced. Trinka no doubt will argue that he could not have introduced the recording because VA never gave it to him, but that goes only to whether VA was obliged to give him the recording in the first place (it was not, as explained earlier)—not whether it was obliged to consider the recording given that Trinka never introduced it.

**B. Trinka's Disclosure Of His Wife's Immigration Status To His Supervisor**

Trinka also argues that VA overlooked that one of his supervisors attested that he disclosed his wife's immigration status. But he waived this argument by failing to raise it in his grievance or complaint. *See New LifeCare*, 7 F.4th at 1224-25; *Riffin*, 733 F.3d at 343; 38 U.S.C. § 713(b)(1)(C); AR 392; *Hoai*, 935 F.2d at 314; *Richardson*, 839 F. Supp. 2d at 203. Regardless, VA considered this evidence. As explained earlier, one of Trinka's supervisors attested that OIG contacted him in December 2018 to ask him to escort Trinka to an interview, and that Trinka

disclosed his wife's immigration status for the first time while walking to that interview. AR 306. He further attested that until then, he had not known Trinka's wife's immigration status, and had not discussed the matter with Trinka previously. *Id.* VA considered that statement—the proposing official noted that the supervisor had "denied having any prior knowledge of [Trinka's] wife's undocumented immigration status *until after interview attempts were made by VA OIG investigators*," AR 004 (emphasis added), and the Secretary said the same thing in sustaining Trinka's removal, AR 751. The charge against Trinka—not providing false information, but rather, providing false "or inaccurate" information, AR 003—also reflected that VA considered the supervisor's statement. VA did not err in concluding that Trinka provided inaccurate information when he claimed to have told his supervisor about his wife's immigration status, omitting that he did so only after OIG had reached out to interview him, and while walking to that very interview.

**C. Trinka's Disclosure Of His Wife's Immigration Status To Other Agencies**

Trinka also argues that VA overlooked evidence that he had voluntarily disclosed his wife's immigration status to other agencies. His reply to the removal proposal said that he (1) told the Office of Personnel Management ("OPM") that his wife was born in Thailand during his suitability interview, and (2) sought federal benefits for her using her Tax Identification Number, which he claimed to know would identify her as a non-citizen. Pl.'s Resp. at 41; AR 366-69. But he waived this argument by failing to raise it in his grievance or complaint. *See New LifeCare, LLC*, 7 F.4th at 1224-25; *Riffin*, 733 F.3d at 343; 38 U.S.C. § 713(b)(1)(C); AR 392; *Hoai*, 935 F.2d at 314; *Richardson*, 839 F. Supp. 2d at 203. In any event, VA considered all this information. Both the deciding official and the Secretary explained that they had carefully reviewed Trinka's "written response to the proposed removal and attachments." AR 529, 750. His claim that VA ignored this material is meritless. *See Whitman-Walker Clinic, Inc. v. Dep't of Health & Human Servs.*, 485 F.

Supp. 3d 1, 49 (D.D.C. 2020) ("Plaintiffs cannot show that determination to be arbitrary and capricious simply by pointing to evidence that the agency plainly took into account.").

That VA gave these claims little weight does not mean it ignored them, especially because the evidence Trinka offered did not corroborate his claims. He falsely identified his wife as a U.S. citizen on his security questionnaire. AR 293. While he eventually disclosed that this was untrue, the record does not show whether he did so unprompted, or only after OPM had indicated to him that it already knew. AR 153.[15] Likewise, even assuming Trinka really knew that his wife's Tax Identification Number would identify her as a non-citizen (a claim for which he offers nothing but his own say-so, AR 0304, 0368), he offers no evidence that he truly believed others would be able to tell that she is a non-citizen based only on her Tax Identification Number. To the contrary, he suggested that he only knew this himself because he had worked at the Internal Revenue Service, indicating that he understood it to be esoteric information beyond an ordinary person's knowledge. AR 321 ("TRINKA said he previously worked for the IRS and knew that the first three digits of his wife's tax ID number meant it was issued to someone with no lawful immigration status.").

Beyond that, there were at least four other good reasons to discount Trinka's claims. First, the claims in Trinka's reply were unsworn and not made under penalty of perjury. *See* 28 U.S.C. § 1746 (unsworn statements can support a claim if made under penalty of perjury); *Adickes v. Kress Co.*, 398 U.S. 144, 158 n.17 (1970) (unsworn statements cannot support a claim otherwise). Second, other evidence suggested Trinka's culpability—namely, his supervisors' statements. *See New York v. EPA*, 413 F.3d 3, 31 (D.C. Cir. 2005) ("Nor does the fact that the evidence in the record may also support other conclusions prevent us from concluding that the agency's decisions

[15] Trinka disclosed that his wife was born in Thailand, AR 293, but that did not suggest that she is not an American citizen—she could have been naturalized.

were rational and supported by the record." (cleaned up)); *Wawszkiewicz v. Dep't of Treasury*, 670 F.2d 296, 303 (D.C. Cir. 1981) ("That a different result may also be plausible does not make the administrative outcome arbitrary or irrational."). Third, evidence that Trinka had been truthful about his wife's immigration status on past occasions had limited relevance to whether he had been truthful during his OIG interview. *See United States v. Williams*, 216 F.3d 611, 614 (7th Cir. 2000) (noting "the possibility that even a liar tells the truth once in a while"). Fourth, the subject of the false or inaccurate statement that Trinka was charged with making was not his wife's immigration status, but rather, whether he had told his supervisors about her immigration status. AR 003.

**D. Trinka's Efforts To Help His Wife Obtain Legal Status**

Trinka also argues that he had "informed [VA] decisionmakers that he had made efforts to assist his wife in seeking legal immigration status." Pl.'s Resp. at 41. But Trinka waived this argument by failing to raise it in his grievance or his complaint. *See New LifeCare*, 7 F.4th at 1224-25; *Riffin*, 733 F.3d at 343; 38 U.S.C. § 713(b)(1)(C); AR 392; *Hoai*, 935 F.2d at 314; *Richardson*, 839 F. Supp. 2d at 203. In any event, nothing in the record suggests that VA ignored this evidence. As explained, both the deciding official and the Secretary explained that they had reviewed all of the evidence Trinka had offered, AR 529, 750. That VA gave this evidence little weight is unsurprising—Trinka did not tell it of his efforts to help his wife obtain legal status until after VA had already proposed his removal. AR 369-70. His belated attempt to disclose his wife's legal status only after VA proposed to remove him has little relevance to the charge against him.

**E. Trinka's Assertions Of Innocence**

Finally, Trinka argues that VA "offered no explanation . . . for disbelieving [his] assertions of innocence." Pl.'s Resp. at 42. But he waived this argument by failing to raise it during agency proceedings. *See Koretoff*, 707 F.3d at 398; *Nat'l Wildlife Fed'n*, 286 F.3d at 562. In any event, VA considered his claim of innocence but rejected it as inconsistent with the evidence at hand, and

explained its reasoning for doing so. AR 004, 529, 750. Given all the evidence that Trinka made a false or misleading statement, VA was not obliged to accept his claim of innocence. *See Affum v. United States*, 566 F.3d 1150, 1164 (D.C. Cir. 2009) ("agency need not accept a store owner's claim" if it "reasonably concludes that a store owner is not telling the truth"); *Fed. Exp. Corp. v. Dep't of Transp.*, 434 F.3d 597, 603 (D.C. Cir. 2006) (agency "was not obliged to accept [the] assertions at face value."); *Nw. Immig. Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 75 (D.D.C. 2020) ("agencies need not accept uncritically any evidence submitted").

## X. <u>Substantial Evidence Supported VA's Decision To Remove Trinka</u>

Finally, Trinka argues that substantial evidence did not support VA's decision to remove him. But Trinka waived many of these arguments, and none of them have any merit.

### A. The Summaries Of Trinka And His Supervisors' Interviews

Trinka argues that the summaries of his and his supervisors' interviews were inadmissible hearsay. But as Defendants have explained, these summaries were admissible. Defs.' Mem. at 32-33. The summary of Trinka's own interview was not hearsay at all because VA relied on it to prove the falsity—not the truth—of the matter asserted. *Id.*; Fed. R. Evid. 801(c) (statement is not hearsay unless offered "to prove the truth of the matter asserted"). Trinka calls this "frivolous," Pl.'s Resp. at 43, but Defendants cited ample authority for it, Defs.' Mem. at 32, all of which he ignores. The summaries of his supervisors' interviews, meanwhile, were admissible despite their hearsay status. Hearsay is admissible in agency proceedings if made by someone "uniquely in a position to know the relevant information." *PJM Power Providers Grp. v. FERC*, 880 F.3d 559, 563 (D.C. Cir. 2018). As explained, "Trinka's supervisors were uniquely well-positioned to know whether he had told them about Mrs. Trinka's immigration status. Indeed, it is hard to imagine who could be better positioned to know whether Trinka told his supervisors about his wife's immigration status than the very supervisors he claims to have told." Defs.' Mem. at 33. Trinka just ignores this point, too.

Trinka argues that hearsay is admissible in agency proceedings only when one can cross-examine the declarant. He cites *Richardson v. Perales*, 402 U.S. 389, 402 (1971), for this claim, but *Perales* did not say that at all. While *Perales* noted that the petitioner could have sought an opportunity for cross-examination, it did not hold that hearsay is admissible only if an opportunity for cross-examination exists. *Id.* The D.C. Circuit, meanwhile, has made clear that "agencies may consider hearsay evidence as long as it bears satisfactory indicia of reliability," without requiring any opportunity for cross-examination. *Lacson v. Dep't of Homeland Sec.*, 726 F.3d 170, 178 (D.C. Cir. 2013). Indeed, letting agencies consider hearsay only if the declarant can be cross-examined would largely defeat the entire purpose of letting agencies rely on hearsay at all, given that hearsay by its very nature is not subject to cross-examination. *See United States v. Long*, 905 F.2d 1572, 1580 (D.C. Cir. 1990) (hearsay "cannot be tested through cross-examination").

Trinka also cites *Perales* for the claim that the interview summaries were insufficiently detailed to be admissible hearsay. But he waived this claim by failing to raise it during agency proceedings or in his complaint. *See Koretoff*, 707 F.3d at 398; *Nat'l Wildlife Fed'n*, 286 F.3d at 562; *Hoai*, 935 F.2d at 314; *Richardson*, 839 F. Supp. 2d at 203. Regardless, this argument lacks merit—nothing in *Perales* requires hearsay to be detailed to be admissible. And in any event, the summaries on their face provide a reasonably detailed account of what Trinka and his supervisors told OIG. AR 304-10. Trinka offers no reason to conclude that they lack sufficient detail.

Trinka also cites *Perales* for the claim that hearsay is admissible only if "prepared by disinterred third parties." Pl.'s Resp. at 43. But he waived this claim by failing to raise it during agency proceedings or in his complaint. *See Koretoff*, 707 F.3d at 398; *Nat'l Wildlife Fed'n*, 286 F.3d at 562; *Hoai*, 935 F.2d at 314; *Richardson*, 839 F. Supp. 2d at 203. In any event, *Perales* did not say that, either. Moreover, an OIG Special Agent conducted each interview, and an OIG

Resident Agent In Charge signed and approved each summary. AR 303-10. Trinka offers no reason to doubt that they were disinterested third parties, especially given OIG's substantial independence and autonomy within VA. *See People for the Ethical Treatment of Animals v. Dep't of Agric.*, 918 F.3d 151, 157 (D.C. Cir. 2019) ("A 'presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004))); *Mission*, Off. of Inspector Gen., https://www.va.gov/oig/pubs/VA-OIG-Mission-Vision-Values.pdf (OIG's mission is "conducing meaningful independent oversight of [VA]"); *Univ. Med. Dentistry v. Corrigan*, 347 F.3d 57, 61 (3d Cir. 2003) ("Offices of Inspector General are designed to be 'independent and objective units' separate from their respective departments and agencies.'" (quoting 5 U.S.C. app. 3)); *United States v. Iannone*, 610 F.2d 943, 946 (D.C. Cir. 1979) ("The Inspector General is not an agent of the Secretary, but is intended to be and is an independent officer."); *Nuclear Regul. Comm'n v. FLRA*, 25 F.3d 229, 233 (4th Cir. 1994) ("One of the most important goals of the Inspector General Act was to make Inspectors General independent enough that their investigations and audits would be wholly unbiased").[16]

**B. Trinka's Three Supervisors**

Trinka also argues that VA failed to identify the three supervisors to whom Trinka claimed he disclosed his wife's immigration status during his OIG interview. But he waived this argument by failing to raise it during agency proceedings or in his complaint. *See Koretoff*, 707 F.3d at 398; *Nat'l Wildlife Fed'n*, 286 F.3d at 562; *Hoai*, 935 F.2d at 314; *Richardson*, 839 F. Supp. 2d at 203. In any event, substantial evidence supports VA's finding that the three supervisors whom Trinka

[16] Trinka argues that VA's refusal to give him the recording or let him cross-examine his supervisors "itself gives rise to an inference that the evidence was unfavorable to" it. Pl.'s Resp'n at 43 (quotation marks omitted). VA has explained why that is not so. *See supra* Parts I.A.4, II.

identified to OIG are the same ones OIG interviewed. The OIG Special Agent who interviewed Trinka was the same agent who interviewed all three supervisors, and the same Resident Agent In Charge approved all four summaries. AR 303-10. Moreover, as explained, Trinka's own failure to suggest at any point during agency proceedings that OIG had interviewed the wrong supervisors, despite his obvious incentive to do so, is itself strong evidence that OIG interviewed the right ones. Altogether, this is "more than a scintilla" of evidence that the supervisors Trinka named were the same ones OIG interviewed. *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 637 (D.C. Cir. 2017).

**C. Trinka's Intent To Deceive**

Next, Trinka argues that there is no evidence that he intended to deceive OIG, as there may be an innocent explanation for his statement. But he waived this claim by failing to raise it during agency proceedings or in his complaint. *See Koretoff*, 707 F.3d at 398; *Nat'l Wildlife Fed'n*, 286 F.3d at 562, *Hoai*, 935 F.2d at 314; *Richardson*, 839 F. Supp. 2d at 203. Regardless, this argument fails on the merits. Trinka claimed that he told three supervisors about his wife's immigration status. AR 0304. Two supervisors said that Trinka had never done so, while the third one said that Trinka had only done so while walking to the OIG interview itself. AR 0306-10. Trinka gave no innocent explanation for this statement during agency proceedings, and gives no non-speculative explanation now. The false and inaccurate nature of Trinka's statement, combined with his failure to offer any explanation for it during agency proceedings or any non-speculative explanation for it now, amounts to substantial evidence that Trinka had intended to deceive OIG. *See Bruno Indep. Living v. Acorn Mobility*, 394 F.3d 1348, 1354 (Fed. Cir. 2005) ("[I]n the absence of a credible explanation, intent to deceive is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information."). Trinka argues that he had no incentive to lie about his wife's immigration status because he had already disclosed it to the government during

his OPM interview and by seeking benefits for her using her Tax Identification Number. But as explained, VA had many reasons to discount this claim's probative value. *See supra* Part IX.C.

**D. VA's Penalty Determination**

Finally, substantial evidence supported VA's penalty determination. Trinka argues that VA lacked evidence that he had willfully misrepresented his wife's citizenship to the government in the past. Defendants have already explained why that is not so. *See supra* Part IX.C. Trinka also argues that VA lacked evidence that he willfully chose not to remediate his wife's immigration status, but there is no indication that VA ultimately considered that factor in removing him. The removal proposal said that Trinka had chosen not to remediate his wife's immigration status. AR 004-05. But in his reply, Trinka offered evidence that he had in fact helped his wife obtain lawful permanent resident status. AR 369-70, 499-528. The deciding official considered these materials in making the initial removal decision, AR 529 ("In reaching my decision, I considered . . . your written response"), and did not repeat the claim that Trinka had chosen not to remediate his wife's immigration status. Trinka apparently was satisfied that the deciding official had not relied on that factor, as his grievance to the Secretary did not expressly challenge the initial removal decision on that basis. AR 538-47. The Secretary did not mention that factor in sustaining Trinka's removal, either. AR 750-58. In short, nothing in the record indicates that a belief that Trinka had chosen not to remediate his wife's immigration status played any role in VA's decision to remove him.

*          *          *

## CONCLUSION

This Court should grant Defendants summary judgment and deny Trinka's cross-motion for summary judgment.

Dated: June 27, 2022

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar #481052

BRIAN P. HUDAK
Chief, Civil Division

By: /s/
BRADLEY G. SILVERMAN
Assistant United States Attorney
D.C. Bar #1531664
601 D Street NW
Washington, DC 20530
(202) 252-2675

*Attorneys for the United States*