# TAB A

**Department of Veterans Affairs**

# Memorandum

**Date:** July 16, 2020

**From:** Executive Director for Investigations, Office of Accountability and Whistleblower Protection (OAWP)

**Subj:** OAWP case number Washington-DC-14,000

**To:** Dominic Cussatt, Principal Deputy Assistant Secretary, Office of Information and Technology

**BACKGROUND:**

1. On January 6, 2020, the Department of Veterans Affairs (VA), Office of Accountability and Whistleblower Protection (OAWP), received a report of investigation (ROI) from VA's Office of Inspector General (OIG) about James Trinka, a Senior Executive Service employee with VA's Office of Information and Technology (OIT).

2. After reviewing OIG's ROI and documentation provided by OIG, OAWP concludes that Mr. Trinka made false or inaccurate statements or provided false or inaccurate information to the government on at least two occasions: when completing his Electronic Questionnaire for Investigations Processing (e-QIP) and when he stated to OIG investigators that he had informed three supervisors about his wife's immigration status.

**RECOMMENDATION FOR DISCIPLINARY ACTION:**

3. OAWP recommends proposing Mr. Trinka's removal from federal service.

4. This is a recommendation for disciplinary action under 38 U.S.C. § 323(c)(1)(I). You or your designee should carefully consider this recommendation, OAWP's investigative file, and other information that you or your designee consider relevant to determine whether the action recommended by OAWP should be proposed. You have been provided with access to OAWP's investigative file in this matter.[1] If additional individuals need access to this file, please contact Nicole Craven at Nicole.Craven@va.gov.

5. If you or your designee propose the recommended action against Mr. Trinka, please send a copy of the proposed action along with the OAWP case number for this matter to OAWPCOD@va.gov.[2]

6. Under 38 U.S.C. § 323(f)(2), if you or your designee fail to propose the disciplinary action recommended in this paragraph within 60 calendar days from the date of this memorandum, you must provide OAWP with a detailed justification why the

[1] OAWP's investigative file can be found here.
[2] If you or your designee need legal advice, please reach out to the Office of General Counsel. If you or your designee need human resources assistance on this matter, please contact your servicing human resources office.

recommended action was not proposed. You should submit this justification to OAWPCOD@va.gov along with the OAWP case number for this matter. This justification, required under 38 U.S.C. § 323(f)(2), will be provided to Congress.

**QUESTIONS:**

7. If you have questions about the above recommendation, please contact Nicole Craven at Nicole.Craven@va.gov. Please provide the OAWP case number for this matter on all communications.

________________
Hansel Cordeiro

# TAB B

September 11, 2020

James A. Trinka
Chief Talent Management Officer
Office of Information and Technology
810 Vermont Avenue NW
Washington, DC 20420

**1.** It is proposed to remove you from federal service in accordance with 38 U.S.C. § 713 based on the following reason listed below:

**CHARGE: Conduct Unbecoming a Federal Supervisor.**

**THE SPECIFICATION:** You provided false or inaccurate information, to VA Office of Inspector General (OIG) investigators on December 21, 2018, when you stated that you informed three supervisors about your wife's immigration status (Exhibits 8, 9, 10, 11, 12 and 14).

**2. BACKGROUND**

On January 15, 2012, you began your career with the VA in the SES as the Executive Director, Office of the Secretary, Washington, DC (Exhibit 1). You currently serve as the Chief Talent Management Officer, Office of Information and Technology (OIT), Washington, DC (Exhibit 2 and 3).

On May 22, 2014, the VA was informed by U.S. Department of Homeland Security (DHS) that you were a subject of an investigation (Exhibit 12) and it was revealed that you are married to a non-US citizen who is illegally in the country. The investigation noted that you were aware of the federal immigration law regarding non-US citizenry and the proper procedures to seek citizenship for your spouse (Exhibit 8 and 12). It was also noted that your spouse was involved in illegal activity to which included human trafficking and associated with other known criminals (Exhibit 6, 8 and 12).

Additionally, VA OIG issued a report of investigation (ROI), dated June 24, 2019, based on a joint investigation with the Department of Homeland Security (Exhibits 8 and 12). Specifically, the ROI stated, in relevant part, that you made false statements to the government on the following occasions:

> a. You listed your spouse, as a United States (US) citizen on your electronic background investigation (E-QIP) to the Office of Personnel Management (OPM). You later told OPM investigators you made a mistake and admitted she was not a U.S. citizen, but is instead a citizen of Thailand. However, you failed to disclose to OPM your wife was in the U.S. illegally (Exhibits 8 and 12).

b. You failed to disclose your wife's unlawful immigration status to the VA when adding her as a dependent on your life insurance and health insurance records (Exhibit 8, 12, 16 and 17). You knowingly used your wife's IRS assigned tax identification (Exhibits 8, 12, 16 and 17). You again used your wife's ITIN to obtain a military dependent identification card, allowing her to access any military installation. You admitted you were previously employed by the IRS and were aware the first three digits of your wife's ITIN designated the number was issued to an individual with no lawful immigration status (Exhibits 8 and 12).

c. You were interviewed by VA OIG investigators. During the interview, you stated you verbally reported your wife's undocumented immigration status to three different supervisors who managed you during your tenure in the VA Office of Information Technology (Exhibits 8 and 12). In May 2019, VA OIG investigators independently interviewed your former supervisors to corroborate the information (Exhibit 8, 9, 10, 11 and 12). All three denied having any prior knowledge of your wife's undocumented immigration status until after interview attempts were made by VA OIG investigators (Exhibits 9, 10 and 11).

On January 6, 2020, VA Office of Accountability and Whistleblower Protection (OAWP), received the ROI from VA's OIG regarding you (Exhibit 13). OAWP conducted their own investigation into the allegations against you as a Senior Leader (Exhibit 13). OAWP substantiated allegations that you made false or inaccurate statements or provided false or inaccurate information to the government on at least two occasions: when completing your Electronic Questionnaire for Investigations Processing (e-QIP) and when you stated to OIG investigators that you had informed three supervisors about your wife's immigration status (Exhibits 12, 14 and 15).

On July 16, 2020, OAWP recommended your removal from federal service (Exhibit 15).

**3. AGGRAVATING FACTORS:** I have examined the charge and reviewed the evidence in this case. I find the evidence compelling and believe it fully supports the charge brought forward. Based on this opinion, I support OAWP's recommendation and find that your misconduct is appropriate grounds for your removal from the SES and from Federal service.

This decision is based on several factors. The evidence demonstrates that you have a propensity to misinform, mislead or otherwise provide false answers and narratives. On numerous occasions, it seems clear that you have willfully misinformed federal financial, insurance, medical, and security programs on the citizenship status of your spouse. In the case of security investigation, your lack of candor could have resulted in access to sensitive information you would have not otherwise been entitled. Your failure to disclose information seemed to be intentional; a direct effort not to bring attention to the fact that your spouse is in the country illegally or to the nature of your meeting.

Furthermore, based on the investigative report, it seems you have willfully chosen not to remediate or resolve the illegal status of your wife within federal guidelines and

requirements (Exhibit 12). As a result, you may still be cohabitating with and supporting a known foreign national without legal entry into the United States.

As a member of the SES, you are expected to exhibit a high standard of professionalism, integrity, care, candor, and judgement. Also, you are expected to make every effort to uphold the core and foundational values that apply across the entire VA organization. These values are Integrity, Commitment, Advocacy, Respect and Excellence (I CARE); and they strengthen our culture and dedication to those we serve. These values provide a mere baseline for the standards of behavior expected of all VA employees especially those in management and in executive positions. Integrity being the first and a key value (Exhibit 19).

Based off of your actions, it is evident that you failed to meet the expectations. You intentionally misrepresented the citizenship and legal status of your spouse to federal investigators. The external agency investigation revealed reoccurring incidents of poor judgement and lack of candor to federal authorities by you. The investigation further documented an ongoing association with several individuals involved in known or suspected criminal activities. It is important to note that the investigation did not specifically state that you or your spouse are currently engaged in or affiliated with such activities. However, coupled with your lack of candor and your spouse's past affiliation with illegal activity, the preponderance of evidence provides and supports a narrative of high-risk behaviors unbecoming of the position you hold.

Due to the totality of the circumstances and your lack of candor, you have compromised the trust and confidence required of an employee of your position. Your continued refusal to accept responsibility and failure to take appropriate action to rectify the immigration status of your spouse only aggravates the situation and calls into question your judgement in difficult situations. Based on the evidence and testimonies, you have failed to act with high moral principle, adhere to the highest professional standards, and uphold the values expected of a VA SES employee.

Therefore, I am proposing that you be removed from the SES and from Federal service. I believe this action is appropriate in measure and proportionate to charge presented. I do not believe that a lesser alternative sanction, such as suspension, reprimand or demotion, are adequate to deter further misconduct by you.

**4. RIGHT TO REPLY:** In accordance with 38 U.S.C. § 713(b)(2), the time period for you to respond to this notice of proposed removal is seven (7) business days from receipt of this notice. Business days are defined as Monday through Friday in Washington, D.C. excluding Federal Holidays. If you choose to reply, you may do so in writing and you may submit affidavits and other documentary evidence in support of your reply, showing why the charge is unfounded and any other reasons the proposed action should not be effected. If you elect to submit a written reply, it must be submitted through Mia Abraham at Mia.Abraham@va.gov and addressed to:

Dominic Cussatt
Principal Deputy Assistant Secretary
Office of Information and Technology
810 Vermont Avenue NW
Washington, DC 20420

**5. RIGHT TO REPRESENTATION:** You may be represented by an attorney or other representative of your choice at all stages of this matter, up to and including the issuance of the decision. Please advise Mr. Dominic Cussatt and Ms. Mia Abraham, Human Resources Specialist, at (202) 461-7821 or via email at Mia.Abraham@va.gov in writing of any representative designated.

**6. RIGHT TO REVIEW EVIDENCE:** The evidence on which this notice of proposed action relies will be provided to you electronically. You will be allowed eight (8) hours of official duty time for reviewing the evidence relied on to support the reasons in this notice, preparing a written reply, and for securing affidavits. Arrangements for the use of official time or requests for additional time should be made with me.

**7. DECISION:** The decision to affect the action proposed has not been made. The Deciding Official will make the decision in this matter and will give full and impartial consideration to your reply, if submitted, and the evidence upon which this notice of proposed action is based. You will be given a written decision within fifteen (15) business days of the date you receive this notice of proposed action.

**8. DUTY STATUS:** You will be retained in your current pay and duty status during the advance notice period. If you have any questions or do not understand the above reasons why your removal is proposed, contact Ms. Mia Abraham, Human Resources Specialist, at (202) 461-7821 or via email at Mia.Abraham@va.gov.

If you have any questions or do not understand the above reasons why your Removal is proposed, you may contact Mia Abraham, Human Resources Specialist, at Mia.Abraham@va.gov or (202) 461-7821.

________________________________
Paul Cunningham
Deputy Assistant Secretary
Chief Information Officer
Office of Information and Technology

Attachment(s):
Evidence File

**ACKNOWLEDGEMENT OF RECEIPT OF PROPOSED REMOVAL AND EVIDENCE FILE:**

________________________________________ ________________

James A. Trinka Date

# TAB C

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296−33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| TRINKA,JAMES A | | | 1/15/2012 |

## FIRST ACTION

| 5−A. Code | 5−B. Nature of Action |
|---|---|
| 143 | REINSTATEMENT-SES CAREER |
| **5−C. Code** | **5−D. Legal Authority** |
| VBJ | 5 U.S.C. 3593/A/ |
| **5−E. Code** | **5−F. Legal Authority** |
| | |

## SECOND ACTION

| 6−A. Code | 6−B. Nature of Action |
|---|---|
| | |
| **6−C. Code** | **6−D. Legal Authority** |
| | |
| **6−E. Code** | **6−F. Legal Authority** |
| | |

7. FROM: Position Title and Number

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| | | | |

14. Name and Location of Position's Organization

15. TO: Position Title and Number
EXECUTIVE DIRECTOR

DVES0965

| 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19.Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| ES | 0301 | 00 | 00 | $179,700 | PA |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| $179,700 | $0 | $179,700 | $0 |

22. Name and Location of Position's Organization
VA CENTRAL OFFICE
OFFICE OF THE SECRETARY
WASHINGTON DC

## EMPLOYEE DATA

23. Veterans Preference: **1**
1 – None; 2 – 5–Point; 3 – 10–Point/Disability; 4 – 10–Point/Compensable; 5 – 10–Point/Other; 6 – 10–Point/Compensable/30%

24. Tenure: **0**
0 – None; 1 – Permanent; 2 – Conditional; 3 – Indefinite

25. Agency Use:

26. Veterans Preference for RIF: YES [ ] NO [X]

27. FEGLI: C0 BASIC LIFE ONLY

28. Annuitant Indicator: 9 NOT APPLICABLE

29. Pay Rate Determinant: 0 REGULAR RATE

30. Retirement Plan: K FERS & FICA

31. Service Comp. Date (Leave): 10/10/1999

32. Work Schedule: F FULL-TIME

33. Part−Time Hours Per Biweekly Pay Period:

## POSITION DATA

34. Position Occupied: **3**
1 – Competitive Service; 2 – Excepted Service; 3 – SES General; 4 – SES Career Reserved

35. FLSA Category: **E**
E – Exempt; N – Nonexempt

36. Appropriation Code: 1101.0000

37. Bargaining Unit Status: 8888

38. Duty Station Code: 11-0010-001

39. Duty Station (City − County − State or Overseas Location): WASHINGTON DC

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| 101 | | | | |

45. Remarks

PROBATIONARY PERIOD FOR SES POSITION IS NOT REQUIRED.
VETERAN'S PREFERENCE IS NOT APPLICABLE TO THE SENIOR EXECUTIVE SERVICE.
TENURE AS USED FOR 5 USC 3502 IS NOT APPLICABLE TO THE SENIOR EXECUTIVE SERVICE.

46. Employing Department or Agency
DEPARTMENT OF VETERANS AFFAIRS

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date |
|---|---|---|
| VA AA | 1713 | 1/15/2012 |

50. Signature/Authentication and Title of Approving Official
CARMEN D MONTGOMERY
HUMAN RESOURCES OFFICER
ELECTRONICALLY SIGNED


Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540−01−333−6238

# TAB D

# Exhibit 6

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF INSPECTOR GENERAL

INTERVIEW OF )
) Case No.
PIYAPORN TRINKA ) 2014-03234-IW-0009
)
) 03:18:44

Thursday,
November 19, 2015

The above-entitled matter came on for interview, pursuant to notice, at 12:33 p.m.

BEFORE:

MR. [redacted] (phonetic)
Special Agent
Homeland Security Investigations

MR. [redacted]
Special Agent
Homeland Security Investigations

MR. LARRY McDONALD
Special Agent
Office of Inspector General
Department of Veterans Affairs

This transcript was produced from an audio CD provided by the Department of Veterans Affairs Office of Inspector General.

CERTIFICATE

MATTER: Interview of Piyaporn Trinka

DATE: November 19, 2015

I hereby certify that the attached transcription of pages 1 to 353 inclusive are, to the best of my belief and ability, a true, accurate, and complete record of the above referenced proceedings, as contained on the provided audio recording.

Signature: Date: March 15, 2016

Mary Ellen Feinberg

# TAB E

As listed on the security questionnaire, the subject traveled to the Dominican Republic in 10/13 for vacation and tourism. The subject was there for 4 days. The subject has not maintained contact with any foreign national with whom he has, or has had, ties of friendship, loyalty, obligation, or affection, and/or any contact with foreign entities. The subject did not have any problems with customs or law enforcement during this travel.

As listed on the security questionnaire, the subject traveled to South Korea in 10/11. The purpose of this travel was to attend a martial arts festival because he studies martial arts. The subject has not maintained contact with any foreign national with whom he has, or has had, ties of friendship, loyalty, obligation, or affection, and/or any contact with foreign entities. The subject did not have any problems with customs or law enforcement.

As listed on the security questionnaire, the subject traveled to Thailand from 8/08 to 9/08 and Hong Kong in 7/08. The subject was in each place for 2-3 days for sightseeing and tourism. From his trip to Thailand and Hong Kong, the subject has not maintained contact with any foreign national with whom he has, or has had, ties of friendship, loyalty, obligation, or affection, and/or any contact with foreign entities. The subject did not have any problems with customs or law enforcement in Thailand or Hong Kong.

As listed on the security questionnaire, the subject traveled to New Zealand for business. The subject traveled to New Zealand in 4/04, 11/06 and 5/07. During these trips, the subject gave presentations and coaching on leadership development. The subject has not maintained contact with any foreign national with whom he has, or has had, ties of friendship, loyalty, obligation, or affection, and/or any contact with foreign entities. The subject did not have any problems with customs or law enforcement during any travel to New Zealand.

Former Spouse:
The subject has two previous marriages. The subject is divorced from his first and second spouse because they grew apart, did not get along and were better as friends than partners. The subject's first spouse receives 1/3 of his military retirement. The subject's second spouse receives $3,200.00 per month in alimony for six years, which began in 2011/2012 (exact date not recalled). There are no issues or ongoing obligations as a result of his divorces.

Spouse:
Due to mistake, the subject listed his spouse, Piyaporn Trinka, as being a U.S. citizen. P.Trinka is a citizen of Thailand and her listed social security number is actually her tax ID number (discrepant). P.Trinka is unemployed. The subject and P.Trinka met approximately three years ago and have daily contact. P.Trinka is not employed. The subject does not have any close or personal contact with foreign nationals as a result of his spouse. P.Trinka

FRIEND. THE SUBJECT HAS PHONE CONTACT WITH EDOSOMWAN WEEKLY AND IN-PERSON WORK OR SOCIAL CONTACT EVERY 2-3 MONTHS.

LISTED REFERENCE RONALD SANDERS IS A WORK ASSOCIATE. THE SUBJECT HAS PHONE CONTACT WITH SANDERS ONCE EVERY 2-3 MONTHS. THE SUBJECT DOES NOT HAVE IN-PERSON SOCIAL CONTACT WITH SANDERS.

LISTED REFERENCE WALTER MCFARLAND IS A WORK ASSOCIATE. THE SUBJECT HAS PHONE CONTACT ONCE A MONTH WITH MCFARLAND.

OUTSIDE OF WORK, THE SUBJECT ENJOYS PRACTICING MARTIAL ARTS WITH HIS WIFE. SUBJECT PROVIDED MARTIAL ART INSTRUCTOR, QUYEN VINGH PHAN, 703-455-3700 AS AN ADDITIONAL SOCIAL LEAD. THE SUBJECT HAS CONTACT WITH PHAN 2-3 TIMES A WEEK.

THE SUBJECT IS MARRIED TO ANACLITA VELARDO TRINKA, BORN [redacted] IN PASIG CITY, PHILIPPINES. THE SUBJECTS WIFE USED A PREVIOUS MARRIED NAME OF ANACLITA VELARDO ROTH FROM 3/85 TO 5/00. THE SUBJECT FAILED TO LIST HIS WIFE'S MAIDEN NAME (DISCREPANT). THE SUBJECTS WIFE'S MAIDEN NAME WAS ANACLITA VELARDO MENDOZA FROM BIRTH TO 3/85. ANACLITA VELARDO TRINKA IS A CURRENTLY A UNITED STATES CITIZEN; UNITED STATES PASSPORT NUMBER IS LISTED ON CASE PAPERS. THE SUBJECT WAS MARRIED ON 5/19/00 IN FAIRFAX, VA.

THE SUBJECTS DIVORCE FROM HIS FORMER SPOUSE, MELANIE FAJARDO TRINKA IN 2/00 OCCURRED AS A RESULT OF JUST NOT GETTING ALONG. NO FURTHER EXPLANATION GIVEN. THE DIVORCE DID NOT RESULT FROM VIOLENCE BY EITHER PARTY. THE DIVORCE RECORD IS LOCATED IN SUMTER, SC. MELANIE TRINKA WAS BORN [redacted] IN THE PHILIPPINES AND IS A CITIZEN OF THE PHILIPPINES. MELANIE TRINKA WAS LAST KNOWN TO HAVE A GREEN CARD. THE SUBJECT AND MELANIE TRINKA WERE MARRIED ON 4/10/95 IN ALEXANDRIA, VA. THE SUBJECT DID NOT LIST AN ADDRESS FOR MELANIE TRINKA (DISCREPANT) BECAUSE HE DOES NOT KNOW HER ADDRESS. SINCE COMPLETING CASE PAPERS, MELANIE TRINKA CONTACTED THE SUBJECT AND ADVISED SHE IS CURRENTLY LIVING IN HONOLULU, HI, EXACT ADDRESS NOT KNOWN. THE PROVIDED PHONE NUMBER IS BELIEVED TO BE A CURRENT CELL PHONE NUMBER. THE SUBJECT DOES NOT HAVE ANY CONTINUING OBLIGATIONS TO MELANIE TRINKA AND THERE HAVE BEEN NO ISSUES SINCE DIVORCE. MELANIE TRINKA IS A NURSE AND DOES NOT HAVE ANY AFFILIATION WITH A FOREIGN GOVERNMENT. THE SUBJECT DOES NOT HAVE ANY CONTACT WITH FOREIGN NATIONALS AS A RESULT OF MELANIE TRINKA'S PLACE OF BIRTH OR CITIZENSHIP. MELANIE TRINKA IS NOT AWARE THE SUBJECT IS CURRENTLY UNDER CONSIDERATION FOR A NATIONAL SECURITY POSITION, ALLOWING ACCESS TO SENSITIVE AND POSSIBLY CLASSIFIED INFORMATION. MELANIE TRINKA HAS NEVER APPROACHED THE SUBJECT WITH A REQUEST OR SOLICITATION TO PROVIDE CLASSIFIED, SENSITIVE, OR PROPRIETARY INFORMATION, ACCESS TO WHICH SHE IN NOT AUTHORIZED. THE SUBJECT HAS NOT DEVELOPED ANY PREFERENCE, SYMPATHY, OR ALLIANCES WITH FOREIGN INTERESTS OR GOVERNMENT BECAUSE OF HIS ASSOCIATION WITH MELANIE TRINKA. THE SUBJECT HAS PHONE CONTACT WITH MELANIE TRINKA APPROXIMATELY ONCE EVERY 6 MONTHS.

THE SUBJECTS DIVORCE FROM HIS FORMER SPOUSE, HELGA MARIA TRINKA IN 9/94 OCCURRED AS A RESULT OF GROWING APART AND THE MARRIAGE JUST NOT WORKING OUT. NO FURTHER EXPLANATION GIVEN. THE DIVORCE DID NOT RESULT FROM VIOLENCE BY EITHER PARTY. THE DIVORCE RECORD IS LOCATED IN ALEXANDRIA, VA. HELGA TRINKA WAS BORN [redacted] IN WERTZBURG, GERMANY AND IS A UNITED STATES CITIZEN. THE SUBJECT AND HELGA TRINKA WERE MARRIED 5/31/78 IN COLORADO SPRINGS, CO. THE SUBJECT IS OBLIGATED TO PROVIDE HELGA TRINKA WITH A PORTION OF HIS RETIREMENT; THE SUBJECT IS COMPLIANT. THERE HAVE BEEN NO ISSUES SINCE DIVORCE. THE SUBJECT DOES NOT HAVE CONTACT WITH FOREIGN NATIONALS AS A RESULT OF HELGA TRINKA'S PLACE OF BIRTH.

THE SUBJECT FAILED TO LIST HIS FATHER-IN-LAW AND MOTHER-IN-LAW (DISCREPANT) BECAUSE HE DOES NOT KNOW THEIR INFORMATION. THE SUBJECTS WIFE, ANACLITA TRINKA DOES NOT SPEAK OF HER PARENTS OR ANY OF HER FAMILY MEMBERS. THE SUBJECT HAS NEVER MET HIS IN-LAWS. NO FURTHER INFORMATION IS KNOWN.

ANACLITA TRINKA HAS CONTACT WITH FOREIGN FRIENDS AS A RESULT OF BEING BORN IN A FOREIGN COUNTRY. THE SUBJECT HAS CONTACT WITH HIS WIFE'S FOREIGN FRIENDS WHEN TRAVELING TO THE PHILIPPINES BUT DOES NOT HAVE CLOSE OR CONTINUING CONTACT WITH ANY OF THEM. NAMES/ADDRESSES NOT KNOWN.

THE SUBJECT HAS HAS CONTINUING CONTACT WITH CYNTHIA (NMN) JOHNSON, A CITIZEN OF NEW ZEALAND BY TELEPHONE, EMAIL AND IN-PERSON, 3-7 TIMES A YEAR. JOHNSON IS IN HER MID 40'S (EXACT DATE OF BIRTH NOT KNOWN) AND IS BELIEVED TO HAVE BEEN BORN IN NEW ZEALAND. JOHNSON RESIDES IN AUCKLAND, NEW ZEALAND (EXACT ADDRESS NOT KNOWN). JOHNSON IS THE TRAINING MANAGER FOR FONTERRA CO-OPERATIVE DAIRY GROUP IN NEW ZEALAND. JOHNSON IS NOT AFFILIATED WITH A FOREIGN GOVERNMENT. JOHNSON IS NOT AWARE THE SUBJECT IS CURRENTLY UNDER CONSIDERATION FOR A NATIONAL SECURITY POSITION, ALLOWING ACCESS TO SENSITIVE AND POSSIBLY CLASSIFIED INFORMATION. JOHNSON HAS NEVER APPROACHED THE SUBJECT WITH A REQUEST OR SOLICITATION TO PROVIDE CLASSIFIED, SENSITIVE, OR PROPRIETARY INFORMATION, ACCESS TO WHICH SHE IN NOT AUTHORIZED. THE SUBJECT HAS NOT DEVELOPED ANY PREFERENCE, SYMPATHY, OR ALLIANCES WITH FOREIGN INTERESTS OR GOVERNMENT BECAUSE OF HIS ASSOCIATION WITH JOHNSON.

THE SUBJECT HAS HAS CONTINUING CONTACT WITH PAUL (NMN) MCGILVARY, A CITIZEN OF NEW ZEALAND BY TELEPHONE, EMAIL AND IN-PERSON, 3-7 TIMES A YEAR. MCGILVARY IS IN HIS EARLY 50'S (EXACT DATE OF BIRTH NOT KNOWN) AND IS BELIEVED TO HAVE BEEN BORN IN NEW ZEALAND. MCGILVARY RESIDES IN AUCKLAND, NEW ZEALAND (EXACT ADDRESS NOT KNOWN). MCGILVARY IS THE TRAINING MANAGER FOR TATUA CO-OPERATIVE DAIRY IN NEW ZEALAND. MCGILVARY IS NOT AFFILIATED WITH A FOREIGN GOVERNMENT. MCGILVARY IS NOT AWARE THE SUBJECT IS CURRENTLY UNDER CONSIDERATION FOR A NATIONAL SECURITY POSITION, ALLOWING ACCESS TO SENSITIVE AND POSSIBLY

# Electronic Questionnaires for Investigations Processing (e-QIP) Investigation Request #16970760

## ARCHIVAL COPY - RETAIN FOR YOUR RECORDS

The information contained in this document represents data submitted by **James Alan Trinka** (Applicant) for **the e-QIP Investigation Request #16970760.** Applicant certified the accuracy of this information at **2014-08-13 10:56:19**.

This Investigation Request contains the following documents:

**Page 1: Investigation Request Cover Sheet**
**Page 2-21: Questionnaire for Public Trust Positions (SF85P Format)**

Note: To conserve paper only the first entry in multiple-entry lists displays completion instructions. The completion instructions for the first entry also applies to each additional entry unless otherwise noted.


442b04fba300e01311241284ad904d9989083524f15d176410f41ffe8d141a6a

Telephone Number
International or DSN: { } Number: 2022664660 Extension: Time: Day

2. Dates Known
From (Month/Year): 08/2000 To (Month/Year): Present
Name: Ronald Sanders
Home or Work Address
Street: 8283 Greensboro Drive
City: McLean State: VA Country: Zip Code: 20511
Telephone Number
International or DSN: { } Number: 7039840016 Extension: Time: Day

3. Dates Known
From (Month/Year): 08/2000 To (Month/Year): Present
Name: Johnson Edosomwan
Home or Work Address
Street: 3970 Chain Bridge Rd.
City: Fairfax State: VA Country: Zip Code: 22030
Telephone Number
International or DSN: { } Number: 7033595969 Extension: Time: Day

*(End of List)*

## Section 14: Your Marital Status

Mark one item to show your current marital status.
Marital Status
Never Married: { }
Married: { x }
Separated: { }
Legally Separated: { }
Divorced: { }
Widowed: { }
Other: { }
Current Spouse ( Not Applicable: { } )

- Complete the following about your current spouse only.

If no first name or middle name is used, select No First Name (NFN) or No Middle Name (NMN), as appropriate. If only an initial is used as the first name or middle name, enter the initial (without the period) and select Initial Only (IO). If this person is a "Jr.," "Sr.," "II," etc., enter this under Suffix.
Full Name
Last: Trinka First: Piyaporn Middle: (NMN) Suffix:
Date of Birth [redacted]
Month/Day/Year:
Social Security Number ( Not Applicable: { } )

Place of Birth
City: Chiang Rai State: Country: Thailand

Provide your current spouse's address only if different than your current address; otherwise, check the "Use My Current Address" box.
Current Address ( Use My Current Address: { x } )
Street:


442b04fba300e01311241284ad904d9989083524f15d176410f41ffe8d141a6a

Country of Birth
Country: United States
Country(ies) of Citizenship

1. Country(ies) of Citizenship: Country: United States

*(End of Country(ies) of Citizenship List)*

Provide the following information if this person is living.
Current Address
Street:
City: State: Country:

2. Relationship Type: Father
Full Name
Last: Trinka First: Leonard Middle: Frank Suffix:
Deceased
Yes: { x } No: { }
Date of Birth [redacted]
Month/Day/Year:
Country of Birth
Country: United States
Country(ies) of Citizenship

1. Country(ies) of Citizenship: Country: United States

*(End of Country(ies) of Citizenship List)*

Current Address
Street:
City: State: Country:

*(End of List)*

## Section 16: Your Military History

a. Have you served in the United States military?
Yes: { x } No: { }

b. Have you served in the United States Merchant Marine?
Yes: { } No: { x }

List all of your military service below, including service in Reserve, National Guard, and U.S. Merchant Marine. If you had a break in service, each separate period should be listed. If your service was with other than the U.S. Armed Forces, identify the country for which you served.
Military History ( Not Applicable: { } )

1. Dates of Activity
From (Month/Year): 05/1978 To (Month/Year): 03/2000

Use one of the codes listed below to identify your branch of service:
Branch of Service

# TAB F

# Exhibit 8

**Department of Veterans Affairs**
**Office of Inspector General**
**Criminal Investigations Division**
**Phoenix Resident Agency**
**3333 N Central Avenue, Suite 1063**
**Phoenix, AZ 85012**

## MEMORANDUM OF INTERVIEW

Date: 04/24/2019
Appr: RAC A. Russo
A. Russo

| | |
|---|---|
| Case File: | 2014-03234-IW-0009 |
| Date of Interview: | December 21, 2018 |
| Time: | 12:03 p.m. |
| Place of Interview: | VA OIG (51PX) by telephone |
| Interviewee: | James A. TRINKA |
| Interviewed By: | SA Larry McDonald, also present, Julia Perkins, attorney for James Trinka |

On December 21, 2018, I interviewed James A. TRINKA by telephone with his private attorney, Julia Perkins present, regarding his wife's legal status in the country and false statements he may have made to the VA. The interview was recorded. Prior to the start of questioning, I read TRINKA his VA employee rights under an administrative Kalkines warning **(Attachment)**. TRINKA said he understood his rights and agreed to answer questions voluntarily. TRINKA stated substantially as follows:

TRINKA first met his wife in the summer of 2010 through an escort service. His wife is identified as Piyaporn Trinka. The escort service also involved sexual activity. TRINKA estimated he had approximately five dates with his wife using the escort service. The relationship progressed, and they eventually began dating outside of the escort service.

TRINKA said he learned sometime in 2011 that Piyaporn Trinka was in the country illegally. In October 2013, Piyaporn Trinka moved in with him. They married in December 2013. TRINKA said he and his wife spoke with an attorney about her immigration status but couldn't recall specific dates when this occurred.

Once he and his wife were married, TRINKA took steps to obtain a military dependent ID card for his wife through the U.S. Department of Defense (DOD), so that she could obtain health insurance through TRINKA'S military retirement benefits. The ID card also gave his wife the ability to shop on U.S. military bases, using the services of the post exchange and/or commissary. TRINKA said he provided a copy of his wife's IRS assigned tax identification number to DOD personnel as proof of her identity.

TRINKA used this same tax ID number on life insurance and health insurance forms with the VA, using the number as a Social Security Number (SSN). TRINKA said he previously worked for the IRS and knew that the first three digits of his wife's tax ID number meant it was issued to someone with no lawful immigration status. I told TRINKA the VA would not know the origin of the number and would assume it was an actual SSN and its use was therefore a false statement. TRINKA took issue with that assessment and said he had several ex-spouses and wanted to make sure his current spouse was the intended recipient of the benefits.

TRINKA said he verbally disclosed his wife's undocumented immigration status to three different supervisors who managed him during his tenure in the VA Office of Information Technology. None of these disclosures were in writing. All were done verbally. TRINKA said none of his supervisors had an issue with his wife's immigration status.

# TAB G

# Exhibit 9

**Department of Veterans Affairs**
**Office of Inspector General**
**Criminal Investigations Division**
**Phoenix Resident Agency**
**3333 N Central Avenue, Suite 1063**
**Phoenix, AZ 85012**

## MEMORANDUM OF INTERVIEW

Date: 05/[illegible]/2019
Appr: RAC Anthony Russo
A. Russo

| | |
|---|---|
| Case File: | 2014-03234-IW-0009 |
| Date of Interview: | May 21, 2019 |
| Time: | 12:30 p.m. |
| Place of Interview: | VA OIG (51PX) by telephone |
| Interviewee: | John Oswalt |
| Interviewed By: | SA Larry McDonald |

On May 21, 2019, I interviewed John Oswalt regarding his knowledge of James A. TRINKA. Oswalt agreed to answer questions voluntarily. Oswalt has been a VA employee for more than 33 years and has supervised TRINKA for the past 11 months. Prior to his promotion, Oswalt said he and TRINKA worked together at the VA Office of Information Technology (VA/OI&T) located at 811 Vermont Avenue N.W., Washington, D.C. Oswalt said he and TRINKA were work colleagues only and never socialized outside of work hours.

In early December 2018, Oswalt said he was contacted by an individual from the VA OIG and was asked to escort TRINKA on 12/7/2018 from the VA/OI&T office to the VA OIG office located in Washington, D.C. for an interview. The offices are closely located within walking distance from one another.

On December 7, 2018, Oswalt escorted TRINKA to the VA OIG office. While walking together, Oswalt told TRINKA he wondered what this was all about. TRINKA told Oswalt he had an idea why and told him he and his wife had previously been questioned by U.S. Customs officials while returning from a trip from the U.S. Virgin Islands. TRINKA also admitted to Oswalt his wife was illegally in the country and had used his wife's tax ID number as a Social Security Number on VA benefits forms. Prior to this date, Oswalt said he had no knowledge of the immigration status of TRINKA's wife and had never been approached by TRINKA to discuss the matter at any other time.

# TAB H

# Exhibit 10

**Department of Veterans Affairs**
**Office of Inspector General**
**Criminal Investigations Division**
**Phoenix Resident Agency**
**3333 N Central Avenue, Suite 1063**
**Phoenix, AZ 85012**

## MEMORANDUM OF INTERVIEW

Date: 05/22/2019
Appr: RAC Anthony Russo
A. Russo

| | |
|---|---|
| Case File: | 2014-03234-IW-0009 |
| Date of Interview: | May 21, 2019 |
| Time: | 4:45 p.m. |
| Place of Interview: | VA OIG (51PX) by telephone |
| Interviewee: | Richard Chandler |
| Interviewed By: | SA Larry McDonald and RAC Anthony Russo Jr. |

On May 21, 2019, RAC Russo and I interviewed Richard Chandler by telephone regarding his knowledge of James A. TRINKA. Chandler agreed to answer questions voluntarily. Chandler has been a VA employee for approximately 4 years, having transferred from another federal agency. Chandler stated substantially as follows:

Chandler said he supervised TRINKA during the timeframe July 2016 – June 2018. Chandler described TRINKA as a private person who didn't talk much about his private life. Chandler recalled TRINKA was a cigar aficionado who traveled to different part of the country to attend cigar conventions, etc. While traveling to these conventions, TRINKA traveled separately from his wife. Chandler also recalled TRINKA was involved in the martial arts.

Chandler said TRINKA never approached him to discuss his wife's immigration status and he did not know TRINKA's wife was illegally present in the U.S. Chandler stated that he had previously worked for the Immigration and Naturalization Service. Chandler said if he had been told, he would have immediately notified his chain of command.

# TAB I

# Exhibit 11

**Department of Veterans Affairs**
**Office of Inspector General**
**Criminal Investigations Division**
**Phoenix Resident Agency**
**3333 N Central Avenue, Suite 1063**
**Phoenix, AZ 85012**

## MEMORANDUM OF INTERVIEW

Date: 05/22/2019
Appr: RAC Anthony Russo
A. Russo

| | |
|---|---|
| Case File: | 2014-03234-IW-0009 |
| Date of Interview: | May 22, 2019 |
| Time: | 11:00 a.m. |
| Place of Interview: | VA OIG (51PX) by telephone |
| Interviewee: | Martha Orr |
| Interviewed By: | SA Larry McDonald |

On May 22, 2019, I interviewed Martha Orr by telephone regarding her knowledge of James A. TRINKA. Orr agreed to answer questions voluntarily. Orr has been a VA employee for more approximately 29 years. Orr stated substantially as follows:

Orr said she supervised TRINKA during the approximate timeframe Apr 2014 – Apr 2016 while working in the VA Office of Information Technology. During her tenure as supervisor, Orr said she had no social interactions with TRINKA and only dealt with him as his supervisor. Orr said she knew TRINKA was married but did not know anything about TRINKA'S wife.

Orr said TRINKA never approached her about the immigration status of his wife and said if he had told her at the time, she wouldn't have known what to do with that information. However, Orr said she would have remembered if TRINKA had come to her to discuss the matter.

**FOR OFFICIAL USE ONLY**
**(Public Availability to be Determined Under 5 USC 552 and 552a)**

# TAB J

seeking assistance from an immigration attorney there due to their sanctuary policies. Glick said his wife is afraid of being deported at any time.

I explained to Glick I had no interest in arresting his wife for any immigration related issue and consider her a witness in this case. Glick said he will speak with his wife to see if he can get her to agree to be interviewed.

On August 8, 2018, SA [redacted] and I located and attempted to interview James TRINKA at his place of business at the VA Central office, located at 810 Vermont Avenue NW, Washington, D.C **(Attachment 16)**. TRINKA refused to be interviewed when informed he would have to be read his Garrity rights warning. After this interview attempt, we drove to TRINKA'S residence in Alexandria, VA to speak with Piyaporn Trinka. Neither TRINKA nor his wife were at the residence location.

On August 9, 2018, I spoke with AUSA [redacted] Public Integrity Group, Washington D.C. reference the status of the investigation. I told [redacted] we attempted to interview James TRINKA and he had refused to answer any questions. [redacted] said there is not enough evidence to charge TRINKA for false statements, based on the investigation to date. [redacted] said he had no objection to interviewing TRINKA under an administrative Kalkines warning.

On December 7, 2018, VA OIG RAC Anthony Russo and I attempted to interview TRINKA at the VA OIG Headquarters office located at 801 I Street NW, Washington, D.C., 20001 **(Attachment 17)**. TRINKA came to the office at our request. I explained to TRINKA the interview was administrative in nature and that he would be read a Kalkines warning prior to the start of the interview. TRINKA requested an attorney be present during questioning. I asked TRINKA to contact his attorney by telephone to allow the interview to proceed while his attorney was able to listen in. TRINKA left the room for approximately 10 minutes. TRINKA returned and said his attorney was unavailable for the interview. I provided TRINKA my business card with my contact information and asked for his attorney to contact me to schedule an interview.

On December 21, 2018, I telephonically interviewed James TRINKA with his attorney present **(Attachment 18)**. TRINKA'S attorney is identified as Julie Perkins of Shaw, Bransford and Roth P.C. The interview was recorded **(Attachment 19)**. TRINKA was read his Kalkines warning before questioning **(Attachment 20)**. TRINKA agreed to answer questions voluntarily. TRINKA stated substantially as follows: TRINKA first met his wife in the summer of 2010 through an escort service. His wife is identified as Piyaporn Trinka. The escort service also involved sexual activity. TRINKA estimated he had approximately five dates with his wife using the escort service. The relationship progressed, and they eventually began dating outside of the escort service.

TRINKA said he learned sometime in 2011 that Piyaporn Trinka was in the country illegally. In October 2013, Piyaporn Jindachai moved in with him. They married in December 2013. TRINKA said he and his wife spoke with an attorney about her

immigration status but couldn't recall specific dates when this occurred.

Once he and his wife were married, TRINKA took steps to obtain a military dependent ID card for his wife through the U.S. Department of Defense (DOD), so that she could obtain health insurance through TRINKA'S military retirement benefits. The ID card also gave his wife the ability to shop on U.S. military bases, using the services of the post exchange and/or commissary. TRINKA said he provided a copy of his wife's IRS assigned tax identification number to DOD personnel as proof of her identity.

TRINKA used this same tax ID number on life insurance and health insurance forms with the VA, using the number as a Social Security Number (SSN). TRINKA said he previously worked for the IRS and knew that the first three digits of his wife's tax ID number meant it was issued to someone with no lawful immigration status.

I told TRINKA the VA would not know the origin of the number and would assume it was an actual SSN and its use was therefore a false statement. TRINKA took issue with that assessment and said he had several ex-spouses and wanted to make sure his current spouse was the intended recipient of the benefits.

TRINKA said he verbally disclosed his wife's undocumented immigration status to three different supervisors who managed him during his tenure in the VA Office of Information Technology. None of these disclosures were in writing. All were done verbally. TRINKA said none of his supervisors had an issue with his wife's immigration status.

## <u>ADDITIONAL INFORMATION</u>

TRINKA is described as a white male, 6'0" tall and approximately 185 pounds. A review of [redacted] was conducted and revealed no relevant criminal history.

### Attachments

1. DHS, HSI Report of Investigation, dated August 12, 2013.
2. Copy of AUSA Letter, dated September 12, 2014.
3. Copies of Health Insurance and Life insurance forms submitted by James TRINKA, dated January 3, 2014.
4. Flight record of Piyaporn TRINKA, January 30, 2014 – June 26, 2015.
5. Copy of ID card and boarding pass of Piyaporn Trinka, dated August 7, 2015
6. Copy of Piyaporn TRINKA'S marriage certificate, dated December 20, 2013.
7. Copy of CBP memorandum, dated November 14, 2015.
8. Copy of I-213, Record of Inadmissable Alien, dated November 14, 2015.
9. Copy of interview of Piyaporn TRINKA, dated November 19, 2015.
10. Copy of OPM FIS memorandum, dated December 10, 2015.

11. Copy of TRINKA'S OPM Background Investigation records, dated December 10, 2015.
12. Interview transcripts of Piyaporn TRINKA, dated November 19, 2015.
13. Copy of DEERS enrollment documents, dated January 10, 2014.
14. Copy of request for assistance memorandum, dated January 8, 2018.
15. Copy of attempted interview of Jaruda Glick, dated August 7, 2018.
16. Copy of attempted interview of James TRINKA, dated August 8, 2018.
17. Copy of attempted interview of James TRINKA, dated December 7, 2018.
18. Copy of interview of James TRINKA, dated December 21, 2018.
19. Copy of recorded interview of James TRINKA, dated December 21, 2018.
20. Copy of Kalkines warning of James TRINKA, dated December 21, 2018.

# TAB K

**From:** Cordeiro, Hansel (OAWP)
**To:** OAWP
**Subject:** FW: OIG Referral to OAWP re Senior Executive
**Date:** Tuesday, January 7, 2020 7:32:07 AM
**Attachments:** image001.png

---

Hi Jeff,

Routing this to Intake for processing. Please get the underlying evidence file in this senior leader misconduct matter.

Thank you,
Hansel
---
Hansel J. Cordeiro | Executive Director for Investigations | U.S. Department of Veterans Affairs (VA) | Office of Accountability and Whistleblower Protection (OAWP)

Tel: (202) 461-6322 | Fax: (202) 495-5601 | Email: Hansel.Cordeiro@va.gov | Address: 810 Vermont Avenue, NW, Mail Stop 70, Washington, DC 20420

To make a disclosure: Complete the optional form found at https://www.va.gov/accountability | Contact us toll-free at: (855) 429-6669 | Contact us by email at OAWP@va.gov.
---
This e-mail (including any attachments) may contain information that is private, confidential, or protected by law. If you received this e-mail in error, you are notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately and destroy the e-mail and any attachments.

---

**From:** Wilber, Chris (OIG) <Chris.Wilber@va.gov>
**Sent:** Monday, January 6, 2020 5:52 PM
**To:** Cordeiro, Hansel (OAWP) <Hansel.Cordeiro@va.gov>
**Cc:** Fredrikson, Roy (OIG) <Roy.Fredrikson@va.gov>; Connor, Christopher (OIG) <Christopher.Connor@va.gov>
**Subject:** OIG Referral to OAWP re Senior Executive

Hansel,

The OIG's Office of Investigations recently conducted an investigation relating to false statements made in official government records by James A. Trinka, Chief Talent Management Officer, VA Office of Information & Technology. The OIG developed evidence that Mr. Trinka made such false statements. This matter was referred to the Department of Justice, which declined to prosecute. Mr. Trinka is a member of the Senior Executive Service and is therefore within OAWP's investigative and disciplinary referral authority. The OIG is referring this matter to OAWP for further action as

appropriate. You may contact Chris Connor, Chief Information Release Officer, VA OIG Office of Information Release (50C1), at (202) 461-4269 or Christopher.Connor@va.gov to request an official evidence file of the OIG's investigation. If you have any questions or require additional information, please let me know.

Regards,

Chris

**Christopher A. Wilber**
Counselor to the Inspector General
U.S. Department of Veterans Affairs
810 Vermont Avenue NW
Washington, DC 20420

*E-mail:* Chris.Wilber@va.gov
*Phone:* (202) 461-4753
*Mobile:* (202) 531-4122
*Webpage:* www.va.gov/oig

This e-mail message and all attachments may contain confidential information intended solely for the addressee(s). If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, forwarding or other use of this message or its attachments is strictly prohibited. If you received this message in error, please notify the sender immediately and delete this message and all copies and backups thereof.

# TAB L

**VA OFFICE OF ACCOUNTABILITY AND WHISTLEBLOWER PROTECTION**
**Washington-DC-14,000**

**OAWP Investigator:** Brooke Turner
**OAWP Approving Investigator:** Nikki Craven
**Date submitted to Executive Director for Investigations for review:** July 6, 2020
**Date approved by Executive Director for Investigations:** July 15, 2020

## I. EXECUTIVE SUMMARY

The Department of Veterans Affairs (VA), Office of Accountability and Whistleblower Protection (OAWP), received a report of investigation (ROI), dated June 24, 2019, from the VA Office of Inspector General (OIG) based on a joint investigation with the U.S. Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations (HSI).[1] On January 6, 2020, the OIG referred its ROI to OAWP for review as it involves James Trinka, a Senior Executive Service (SES) employee with VA's Office of Information and Technology (OIT).[2]

After reviewing OIG's ROI and documentation provided by OIG, OAWP concludes that Trinka made false or inaccurate statements or provided false or inaccurate information to the government on at least two occasions: when completing his Electronic Questionnaire for Investigations Processing (e-QIP) and when he stated to OIG investigators that he had informed three supervisors about his wife's immigration status.[3]

OAWP recommends proposing Trinka's removal from federal service.

## II. BACKGROUND

Trinka began his VA career as a Senior Executive Service (SES) employee on January 15, 2012.[4]

According to OIG's ROI, its investigation was initiated based on information received from a special agent with HSI.[5] The information alerted OIG that an email sent to Trinka's VA email account was from an individual believed to be involved in a sex trafficking organization.[6]

OIG launched an investigation into the information received from HSI. According to OIG's ROI, investigators discovered that Trinka made false statements, specifically about his wife's immigration status.[7]

[1] Exhibit 001
[2] Exhibit 020
[3] Exhibit 001, pp.1-2
[4] Exhibit 002
[5] Exhibit 001
[6] *Id.*, p. 1
[7] Exhibit 001, pp.1-2

***

The information contained herein is covered by the Privacy Act, 38 U.S.C. 323(c)(3), and other laws. This information is being shared with you under the Privacy Act's need to know exception, 5 U.S.C. § 552a(b)(1), which allows for the disclosure of information to agency personnel who have a need for information for the performance of their duties. You may not share the information contained herein with any individual, unless it is necessary for the performance of that individual's duties and after you have consulted with OAWP.

**VA OFFICE OF ACCOUNTABILITY AND WHISTLEBLOWER PROTECTION**
**Washington-DC-14,000**

## III. SCOPE

OAWP's investigation relied upon OIG's Criminal Investigations Division File 2014-03234-IW-0009 and documentation provided by OIG.

OAWP specifically reviewed whether:

Allegation 1: Trinka made false or inaccurate statements, or provided false or inaccurate Information, about his wife's immigration status on his e-QIP form, dated August 13, 2014.

Allegation 2: Trinka made false or inaccurate statements, or provided false or inaccurate Information, to OIG investigators on December 21, 2018, when he stated he informed three supervisors about his wife's immigration status.

## IV. STATUTORY AUTHORITY

38 U.S.C. § 323 establishes the authority for OAWP to investigate allegations of senior leader misconduct within VA.

## V. FINDINGS OF FACT

On December 17, 2015[8], OIG obtained and reviewed a copy of Trinka's e-QIP form[9]. Trinka listed Piyaporn Trinka (P. Trinka) as a U.S. citizen on his e-QIP form.[10] Trinka told an Office of Personnel Management (OPM) investigator that he made a mistake on his e-QIP form and that his wife is a citizen of Thailand.[11] On August 13, 2014, Trinka certified his e-QIP form as "true, complete, and correct to the best of [his] knowledge and belief and are made in good faith."[12]

On December 21, 2018, Trinka was interviewed by OIG investigators.[13] He stated that he had verbally reported his wife's undocumented immigration status to three VA OIT supervisors.[14] In May 2019, OIG investigators attempted to corroborate Trinka's

---

[8] Exhibit 001, p. 6
[9] Exhibit 021
[10] Exhibit 021, pp. 153-54
[11] *Id.*, p. 14
[12] *Id.*, p. 161
[13] Exhibit 004, p. 2. P. Trinka was also interviewed by OIG. *See* Exhibit 009.
[14] *Id.*

***

The information contained herein is covered by the Privacy Act, 38 U.S.C. 323(c)(3), and other laws. This information is being shared with you under the Privacy Act's need to know exception, 5 U.S.C. § 552a(b)(1), which allows for the disclosure of information to agency personnel who have a need for information for the performance of their duties. You may not share the information contained herein with any individual, unless it is necessary for the performance of that individual's duties and after you have consulted with OAWP.

statement by interviewing: John Oswalt (Oswalt), Richard Chandler (Chandler), and Martha Orr (Orr). Oswalt indicated that Trinka first brought up P. Trinka's undocumented immigration status in December 2018, when Oswalt was escorting Trinka to VA OIG.[15] Chandler stated that Trinka did not discuss P. Trinka's undocumented immigration status with him.[16] Orr stated that Trinka did not discuss P. Trinka's undocumented immigration status with her.[17]

## VI. ANALYSIS

Trinka inaccurately or falsely listed P. Trinka as a U.S. citizen on his e-QIP form.[18] Trinka certified his e-QIP form as "true, complete, and correct to the best of [his] knowledge and belief and are made in good faith."[19] He stated that he made a mistake, however, OAWP notes that he did not inform the OPM investigator about his wife's undocumented immigration status.[20]

On December 21, 2018, Trinka was interviewed by OIG investigators.[21] VA employees must "furnish information . . . freely and honestly."[22] "Refusal to testify, concealment of material facts, or willfully inaccurate testimony in connection with an investigation . . . may be ground for disciplinary action."[23] Trinka inaccurately or falsely stated that he had verbally reported his wife's undocumented immigration status to three VA OIT supervisors.[24] Two of the three supervisors did not recall Trinka discussing P. Trinka's undocumented immigration status with them.[25] Only one of the supervisors recalled Trinka raising P. Trinka's undocumented immigration status, and that was while the supervisor was escorting Trinka to an interview with VA OIG about the instant matter on December 7, 2018.[26]

## VII. CONCLUSIONS

OAWP substantiates both allegations:

---

15 Exhibit 005
16 Exhibit 006
17 Exhibit 007
18 Exhibit 021, pp. 153-54
19 *Id.*, p. 161
20 *Id.*, p. 14
21 Exhibit 004, p. 2
22 38 CFR 0.735-12(b)
23 *Id.*
24 Exhibit 004, p. 2
25 Exhibit 006 and Exhibit 007
26 Exhibit 005

***

The information contained herein is covered by the Privacy Act, 38 U.S.C. 323(c)(3), and other laws. This information is being shared with you under the Privacy Act's need to know exception, 5 U.S.C. § 552a(b)(1), which allows for the disclosure of information to agency personnel who have a need for information for the performance of their duties. You may not share the information contained herein with any individual, unless it is necessary for the performance of that individual's duties and after you have consulted with OAWP.

**VA OFFICE OF ACCOUNTABILITY AND WHISTLEBLOWER PROTECTION**
**Washington-DC-14,000**

Allegation 1: Trinka made false or inaccurate statements, or provided false or inaccurate information, about his wife's immigration status on his e-QIP form, dated August 13, 2014.

Allegation 2: Trinka made false or inaccurate statements, or provided false or inaccurate information, to OIG investigators on December 21, 2018, when he stated he informed three supervisors about his wife's immigration status.

## VIII. RECOMMENDATION

Trinka is a VA Senior Executive Service (SES) employee.[27] Supervisors are held to a higher standard than non-supervisors because they occupy positions of trust and responsibility.[28]

OAWP has substantiated that Trinka made false or inaccurate statements or provided false or inaccurate information. Removal is a reasonable penalty for making a false statement or exhibiting a lack of candor.[29] Consequently, OAWP recommends proposing Trinka's removal from the federal service.

---

[27] Exhibit 002
[28] *See, e.g., Gebhardt v. Dep't of the Air Force*, 99 M.S.P.R. 49 (M.S.P.B. 2005).
[29] *See, e.g., Ford v. Dep't of Defense*, 30 M.S.P.R. 43 (M.S.P.B. 1986).

***
The information contained herein is covered by the Privacy Act, 38 U.S.C. 323(c)(3), and other laws. This information is being shared with you under the Privacy Act's need to know exception, 5 U.S.C. § 552a(b)(1), which allows for the disclosure of information to agency personnel who have a need for information for the performance of their duties. You may not share the information contained herein with any individual, unless it is necessary for the performance of that individual's duties and after you have consulted with OAWP.

# TAB M

# Exhibit 16

FEHB
Federal Employees Health Benefits Program

Form Approved: OMB No. 3206-0160

# Health Benefits Election Form

## Part A - Enrollee and Family Member Information *(For additional family members use a separate sheet and attach.)*

| 1. Enrollee name *(last, first, middle initial)* | 2. Social Security number | 3. Date of birth *(mm/dd/yyyy)* | 4. Sex | 5. Are you married? |
|---|---|---|---|---|
| Trinka, James A. | [redacted] | [redacted] | [X] M [ ] F | [X] Yes [ ] No |

6. Home mailing address *(including ZIP Code)*
[redacted]

7. If you are covered by Medicare, check all that apply. [ ] A [ ] B [ ] D

8. Medicare Claim Number

9. Are you covered by insurance other than Medicare? [X] Yes, indicate in item 10 below. [ ] No

10. Indicate the type(s) of other insurance:
[X] TRICARE [ ] Other: *Name of other insurance:* ______ *Policy number:* ______
[X] FEHB *An FEHB self and family enrollment covers all eligible family members. No person may be covered under more than one FEHB enrollment. See Instructions for item 10 on page 1.*

| 11. Name of family member *(last, first, middle initial)* | 12. Social Security number | 13. Date of birth *(mm/dd/yyyy)* | 14. Sex | 15. Relationship code |
|---|---|---|---|---|
| Trinka, Piyaporn | 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 | [redacted] | [ ] M [X] F | 01 |

16. Address *(if different from enrollee)*

17. If you are covered by Medicare, check all that apply. [ ] A [ ] B [ ] D

18. Medicare Claim Number

19. Are you covered by insurance other than Medicare? [ ] Yes, indicate in item 20 below. [ ] No

20. Indicate the type(s) of other insurance:
[X] TRICARE [ ] Other: *Name of other insurance:* ______ *Policy number:* ______
[ ] FEHB *An FEHB self and family enrollment covers all eligible family members. No person may be covered under more than one FEHB enrollment. See Instructions for item 10 on page 1.*

21. Email address *(if home address is different from enrollee's)*

22. Preferred telephone number *(if home address is different from enrollee's)*

| 23. Name of family member *(last, first, middle initial)* | 24. Social Security number | 25. Date of birth *(mm/dd/yyyy)* | 26. Sex | 27. Relationship code |
|---|---|---|---|---|
| | | | [ ] M [ ] F | |

28. Address *(if different from enrollee)*

29. If you are covered by Medicare, check all that apply. [ ] A [ ] B [ ] D

30. Medicare Claim Number

31. Are you covered by insurance other than Medicare? [ ] Yes, indicate in item 32 below. [ ] No

32. Indicate the type(s) of other insurance:
[ ] TRICARE [ ] Other: *Name of other insurance:* ______ *Policy number:* ______
[ ] FEHB *An FEHB self and family enrollment covers all eligible family members. No person may be covered under more than one FEHB enrollment. See Instructions for item 10 on page 1.*

33. Email address *(if home address is different from enrollee's)*

34. Preferred telephone number *(if home address is different from enrollee's)*

| 35. Name of family member *(last, first, middle initial)* | 36. Social Security number | 37. Date of birth *(mm/dd/yyyy)* | 38. Sex | 39. Relationship code |
|---|---|---|---|---|
| | | | [ ] M [ ] F | |

40. Address *(if different from enrollee)*

41. If you are covered by Medicare, check all that apply. [ ] A [ ] B [ ] D

42. Medicare Claim Number

43. Are you covered by insurance other than Medicare? [ ] Yes, indicate in item 44 below. [ ] No

44. Indicate the type(s) of other insurance:
[ ] TRICARE [ ] Other: *Name of other insurance:* ______ *Policy number:* ______
[ ] FEHB *An FEHB self and family enrollment covers all eligible family members. No person may be covered under more than one FEHB enrollment. See Instructions for item 10 on page 1.*

45. Email address *(if home address is different from enrollee's)*

46. Preferred telephone number *(if home address is different from enrollee's)*

NSN 7540-01-231-6227
U.S. Office of Personnel Management

*(continued on the reverse)*

For agency distribution of copies, see page 5 of the instructions.

Standard Form 2809
Revised August 2011
Previous edition is not usable

TRINKA, JAMES

[redacted]

**Part B - FEHB Plan You Are Currently Enrolled In** *(If applicable)*

1. Plan name: BlueCross BlueShield
2. Enrollment code: 104

**Part C - FEHB Plan You Are Enrolling In or Changing To**

1. Plan name: BlueCross BlueShield
2. Enrollment code: 105

**Part D - Event That Permits You To Enroll, Change, or Cancel** *(see page 2)*

1. Event code: 1C
2. Date of event: 12 / 20 / 2013

**Part E - Election NOT to Enroll** *(Employees Only)*

☐ I do NOT want to enroll in the FEHB Program.
*My signature in Part H certifies that I have read and understand the information on page 3 regarding this election.*

**Part F - Cancellation of FEHB**

☐ I CANCEL my enrollment.
*My signature in Part H certifies that I have read and understand the information on page 3 regarding cancellation of enrollment.*

**Part G - Suspension of FEHB** *(Annuitants/Former Spouses Only)*

☐ I SUSPEND my enrollment.
*My signature in Part H certifies that I have read and understand the information on page 4 regarding suspension of enrollment.*

**Part H - Signature**

*WARNING: Any intentionally false statement in this application or willful misrepresentation relative thereto is a violation of the law punishable by a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001.)*

1. Your signature *(do not print)*: James G. Trinka
2. Date *(mm/dd/yyyy)*: 01 / 03 / 2014
3. Email address: jim.trinka@va.gov
4. Preferred telephone number: ( 202 ) 578-7558

**Part I - To be completed by agency or retirement system**

*REMARKS*

| | | |
|---|---|---|
| 1. Date received *(mm/dd/yyyy)*: 01/03/2014 | 2. Effective date of action *(mm/dd/yyyy)*: 01/12/2014 | 3. Personnel telephone number: (202) 461-7899 |
| 4. Name and address of agency or retirement system: DEPT of VET AFF 810 VERMONT AVE NW WASHINGTON DC 20420 | | 5. Authorizing official *(please print)*: DEIDRE ROBINSON |
| | | 6. Signature of authorized agency official: Deidre R |
| 7. Payroll office number: 97-381600 | 8. Payroll office contact *(please print)*: CATHERINE MUIR | 9. Payroll telephone number: (512) 460-5353 |



Standard Form 2809
Reverse of revised August 2011
Previous edition is not usable

Employee Express

## Health Benefits History Report

This is an official document to be filed on the right side of the employee's official Personnel Folder.

Effective Date: 01/10/2016

| Employee Name (Last, First, MI): | SSN | Gender | DOB | Married |
|---|---|---|---|---|
| TRINKA JAMES A | [redacted] | M | [redacted] | Y |

| Home Mailing Address | |
|---|---|
| [redacted] | Nature of Transaction: FEHB Change<br>New Enrollment Code: 106<br>New Plan Name: Blue Cross and Blue Shield Service |

| Name of Family Members | Zip | Date of Birth | Gender | Relationship | SSN |
|---|---|---|---|---|---|
| TRINKA PIYAPORN | [redacted] | | F | 01 | [redacted] |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Medicare Coverage A? N Medicare Coverage B? N Medicare Coverage D? N TRICARE? Y

Other Insurance? Y Other Private Insurance:

Other Insurance Policy #:

| Present Plan Name | Enrollment Code | Event Code | Date of Event |
|---|---|---|---|
| Blue Cross and Blue Shield Service | 105 | 1B | 11/09/2015 |

| Acceptance Date | CPDF Code | Personnel Office ID | Payroll Office Number |
|---|---|---|---|
| 11/16/2015 15:27:40 | VAAA | 1007 | 97381600 |

# TAB N

FEGLI
Federal Employees Group Life Insurance

# Designation of Beneficiary

**Federal Employees' Group Life Insurance (FEGLI) Program**
*(DO NOT erase or cross-out. Use a new form.)*

Form Approved
OMB No. 3206-0136

Important:
Read instructions on the Back of Part 2 before completing this form.

## A. Information About the Insured (not the Assignee, if there is one) (type or print)

| Name of Insured *(Last, first, middle)* | Date of birth of Insured *(mm/dd/yyyy)* | Social Security Number of Insured |
|---|---|---|
| Trinka, James A. | [redacted] | [redacted] |

The Insured is: *Place an "X" in the appropriate box.*
- [X] an employee
- [ ] a retiree
- [ ] a compensationer

If the Insured is retired or receiving Federal Employees' Compensation, give CSA, CSI, or OWCP claim number:

Department or agency where the Insured works *(If retired, last department or agency where the Insured worked)*:

| Department or agency | Bureau or division | Location *(city, state, and ZIP code)* |
|---|---|---|
| Department of Veterans Affairs | OSVA | Washington, DC 20006 |

## B. Information About the Beneficiary or Beneficiaries (See Back of Part 1 for examples) (type or print)

| First name, middle initial, and last name of each beneficiary | Social Security Number | Address *(including ZIP code)* | Relationship | Percent or fraction designated |
|---|---|---|---|---|
| Piyaporn Trinka | 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 | [redacted] | Spouse | 100% |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Total (Must equal 100% or 1.0) (Do not use dollar amounts) → 100%
*(Do not put a Total if you designated types of insurance. See example 4 on Back of Part 1.)*

## C. Statement of Insured or Assignee (type or print)

Your name and address *(including ZIP code)*
James A. Trinka
[redacted]

Please check one: I am:
- [X] the Insured
- [ ] an Assignee

*See Back of Part 2 for definitions*

Please check all three:
- [X] I have not assigned the insurance.
- [X] Two people who witnessed my signature signed below.
- [X] I did not name either witness as a beneficiary.

I understand that if there is a valid assignment on file, only the assignee has the right to designate a beneficiary. If a valid assignment is not on file, but there is a valid court order on file with the agency or the U.S. Office of Personnel Management, any designation I complete for the same benefits is not valid.

I understand that if this Designation is valid, it will stay in effect unless it is canceled. (See "When Is A Designation Canceled?" on the Back of Part 2).

I understand that if this Designation is invalid for any reason, the Office of Federal Employees' Group Life Insurance will pay benefits according to the next most recent valid designation. If there isn't one, it will pay according to the order listed on the Back of Part 2.

I am canceling any and all previous Designations of Beneficiary under the Federal Employees' Group Life Insurance Program and am now designating the beneficiary(ies) named above.

Signature of Insured/Assignee *(Only the Insured/Assignee may sign. Signatures by guardians, conservators or through a power of attorney are not acceptable.)* This form is not valid unless the Insured/Assignee signs in this box.
➲ [signature]

Date *(mm/dd/yyyy)*: 01/06/2014

## D. Witnesses To Signature (A witness is not eligible to receive a payment as a beneficiary)

| Signature of witness | Address *(including ZIP code)* |
|---|---|
| ➲ [signature] | 6033 Greenspring Rd Fredericksburg VA 22407 |
| ➲ [signature] | 4008 Ranch Rd, Upper Marlboro MD 20772 |

## E. For Agency Use Only

| Receiving agency | Date of receipt *(mm/dd/yyyy)* | Signature of authorized agency official | Title |
|---|---|---|---|
| Dept. of Vet Aff | 01/08/2014 | [signature] | HR SPECIALIST |

Part 1 - Original File

# TAB O

WAYS I CARE
VALUES WE LIVE BY







# VA CORE VALUES AND CHARACTERISTICS

*Because I CARE, I Will...*

INTEGRITY COMMITMENT ADVOCACY RESPECT EXCELLENCE

This document contains U.S. Department of Veterans Affairs proprietary business information and may not be reproduced without permission.



U.S. Department of Veterans Affairs

# VA Core Values and Characteristics




No organization can succeed without values to match its mission.

Our mission, as the Department of Veterans Affairs, is to care for those "who shall have borne the battle" and for their families and survivors.

Our core values focus our minds on our mission of caring and thereby guide our actions toward service to others.

# VA Core Values and Characteristics




- Position VA to be the provider of choice for all Veterans
- Demonstrate how much we truly care about Veterans, through:
  - Stewardship
  - Responsiveness
  - Quality
- Overcome negative perceptions

# VA Core Values and Characteristics



- In a changing world, Core Values provide an enduring description of our culture and how we care for Veterans
- Not new, just formalized– we live by them every day
- Relevant, meaningful and actionable for all VA employees–no matter where we work

## VA Core Values

# Who We Are

# VA Core Values

## BECAUSE I CARE, I WILL…

| | |
|---|---|
| ☐ INTEGRITY | Act with high moral principle. Adhere to the highest professional standards. Maintain the trust and confidence of all with whom I engage. |
| ☐ COMMITMENT | Work diligently to serve Veterans and other beneficiaries. Be driven by an earnest belief in VA's mission. Fulfill my individual responsibilities and organizational responsibilities. |
| ☐ ADVOCACY | Be truly Veteran-centric by identifying, fully considering, and appropriately advancing the interests of Veterans and other beneficiaries. |
| ☐ RESPECT | Treat all those I serve and with whom I work with dignity and respect. Show respect to earn it. |
| ☐ EXCELLENCE | Strive for the highest quality and continuous improvement. Be thoughtful and decisive in leadership, accountable for my actions, willing to admit mistakes, and rigorous in correcting them. |

# VA Core Values

Core Values also serve a bonding function across VA

- Unified in our mission:
  - To fulfill President Lincoln's promise, "To care for him who shall have borne the battle and for his widow, and his orphan."



## VA Core Characteristics

# What We Stand For

# VA Core Values and Characteristics



Core Characteristics describe what we stand for, what we must be:

- Trustworthy
- Accessible
- Quality
- Innovative
- Agile
- Integrated

# VA Core Values and Characteristics



Every day, you demonstrate who we are and what we stand for

- Look for every opportunity to demonstrate our values in action
- Think, “I CARE, therefore I will…” in everything you do and everyone you encounter
- Recognize and celebrate I CARE behaviors when you see them in action
- Embrace our quest to achieve the characteristics that will continue VA’s transformation
- Consider ways our Core Values can further unify us all in our mission

# TAB P

SB
&R

SHAW BRANSFORD & ROTH P.C.
*Attorneys at Law*
1100 Connecticut Avenue NW Suite 900
Washington DC 20036
Tel 202.463.8400 www.shawbransford.com Fax 202.833.8082

September 22, 2020

SENT VIA ELECTRONIC MAIL

Mr. Dominic Cussatt
Principal Deputy Assistant Secretary
Office of Information and Technology
810 Vermont Avenue NW
Washington, DC 20420
dominic.cussatt@va.gov

Re: Written Reply/Mr. James Trinka – Proposed Removal

Dear Mr. Cussatt:

This law firm is the designated representative of Mr. James Trinka with regard to the Proposed Removal under 38 U.S.C. § 713 ("Proposal"), issued to him on Friday, September 11, 2020. We write to you because page 2 of the Proposal identifies you as the Deciding Official in this matter, and indicates that Mr. Trinka should direct any reply to you.

Based on the Agency's multiple violations of due process and its own policies, as well as the lack of sufficient evidence to support the Proposal's sole specification, you must cancel the Proposal.

## I. INTRODUCTION

First, the Agency provides no evidence for its charge save hearsay. Although the evidence file is hundreds of pages in length, it fails to include the recording or transcript of Mr. Trinka's recorded interview with VA OIG. It was purportedly in this recorded interview that Mr. Trinka made a statement regarding his personal life that VA OIG later concluded was not true. That purportedly false statement to the OIG provides the sole basis for his removal. Yet the Agency has concealed from Mr. Trinka what he actually said to the OIG in a recorded interview almost two years ago.

The VA OIG's summary of Mr. Trinka's recorded interview, in place of a transcript or recording of that same interview, will not carry the Agency's burden of proof, and will not withstand judicial review. Failure to include this evidence also violates the Agency's own policies and Mr. Trinka's entitlement to due process under the Fifth Amendment of the U.S. Constitution. Whether the Agency ignores or willfully violates its own policies, it affects Mr. Trinka the same; Mr. Trinka is entitled to any due process protections provided by the

Constitution, or written into statute, regulation, or Agency policy. Stripping those protections to obtain his termination is impermissible.

The Agency (and specifically, OAWP) was recently criticized by the VA OIG for this same unfair practice of not providing you and Mr. Trinka with relevant evidence in a published report. The Agency may not simply ignore its policies, nor decline to collect additional evidence for fear it may exonerate Mr. Trinka or any other employee.

Second, even if the Agency had evidence of this purported misconduct, Mr. Trinka's alleged statement to VA OIG is not "neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function" under the definition of "misconduct" in 38 U.S.C. § 713(d)(2). Mr. Trinka was under no obligation to disclose to his supervisor the national origin or immigration status of his wife. VA OIG, OAWP, and the Proposing Official all fail to cite any legal requirement that he do so. Mr. Trinka's statements regarding conversations he had with his supervisors about his personal life were not material to VA OIG's underlying investigation.

Setting aside the Agency's own evidence demonstrating Mr. Trinka did inform at least one supervisor of his wife's immigration status, the Agency has not established the requisite nexus between Mr. Trinka's conversations with supervisors about his personal life and his federal employment. Indeed, there is no legal basis, jurisdiction, or mission-related reason for the Department of Veterans Affairs to inquire into Mr. Trinka's conversations regarding his wife's immigration status.

Although the Proposal muddies the waters, and Mr. Trinka's reputation, with uncharged allegations that it cannot prove,[1] there is in reality only one specification of alleged "misconduct," whether Mr. Trinka "provided false or inaccurate information, to VA Office of Inspector General (OIG) investigators on December 21, 2018, when [he] stated that [he] informed three supervisors about [his] wife's immigration status." *See* Proposal, p. 1 That lone allegation is unsupported by record evidence and has no connection to his performance or conduct in the federal workplace. Therefore, Mr. Trinka's termination cannot be justified, and the Proposal cannot be sustained.

---

[1] Indeed, the Proposal accepts as true VA OIG's three faulty conclusions (listed as "a," "b," and "c" on Page 1 of the Proposal) without new evidence. Allegations "a" and "b" were investigated in 2015 by the Office of Personnel Management (OPM), the subject matter experts in federal employment and suitability. *See* 5 C.F.R. Part 731. VA chose not to charge Mr. Trinka with either of these allegations, but still asserts them as true. Therefore, the VA is aware, or should be aware, it created a false record with this Proposal that affects Mr. Trinka's liberty interest. *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1111 (D.C. Cir. 1985). To remedy the government's error, the Proposal must be canceled.

## II. ARGUMENT

The Proposal charges Mr. Trinka with one specification of "Conduct Unbecoming a Federal Supervisor," alleging that Mr. Trinka "provided false or inaccurate information, to VA Office of Inspector General (OIG) investigators on December 21, 2018, when you stated that you informed three supervisors about your wife's immigration status." *See* Proposal, p. 1.

The Agency does not have sufficient evidence to prove Mr. Trinka provided false or inaccurate information to VA OIG investigators. And regardless, the Agency cannot establish the requisite nexus between Mr. Trinka's conversations with his colleagues about his personal life and his employment with the VA.

First, we address constitutional deficiencies in the Agency's implementation of 38 U.S.C. § 713 and the statute itself.

### A. *The Statute and the Agency's Implementation of the Statute Are Unconstitutional and Designed to Make It More Difficult for Employees to Vindicate Themselves.*

When Congress passed 38 U.S.C. § 713 and § 714 and granted enhanced removal authority to the Secretary of the Department of Veterans Affairs in 2017, it altered several aspects of the termination process. These changes to the termination process were designed to make it more difficult for employees to prevail. This new statutory process is unconstitutional.

#### 1. *Statutory Changes in the Agency's Removal Authority Make 38 U.S.C. § 713 Unconstitutional.*

First, Section 713 authorized a decrease of the notice period from a minimum of 30 calendar days to a maximum of 15 business days. This requires deciding officials to make hasty decisions, and requires employees to make even hastier replies, most often within 7 business days as set by statute. *See* 38 U.S.C. § 713(b)(2)(B). In this case, you denied a request for an extension of three business days, despite our request listing specific reasons why it was necessary. In doing so, you cited your consultation with VA Office of General Counsel and the lack of "exigent circumstances."[2] *See* Ex. 1. As such, this written reply cannot fully respond to all the reasons why

[2] The word "exigent" means "requiring immediate aid or action." *See* Merriam-Webster.com, "exigent," September 22, 2020, http://www.merriam-webster.com/dictionary/exigent. On September 16, 2020, we told you that we could not assist Mr. Trinka with his reply during the week of September 14-18, 2020 because of deadlines on September 16 and September 18, 2020. By definition, deadlines require immediate aid or action. Yet you denied Mr. Trinka's request, only stating your conclusion and that you consulted with OGC. Your denial was an unreasonable, arbitrary, and capricious decision, especially given the length of time that the Agency deliberated internally regarding its course of action with regard to Mr. Trinka's employment. Indeed, VA OIG's investigation began over five years ago, and OAWP received VA OIG's report on January 6, 2020, over eight months ago. OAWP transmitted its report and recommendation to you personally over two months ago. Therefore, you have been aware of the allegations and had possession of the evidence for at least two months, but refused to afford Mr.

removal is unwarranted,[3] a result anticipated and intended by you when you denied our request for an extension. That in itself makes any decision you issue against Mr. Trinka unconstitutional.

This statutory imposition of a shortened notice, reply and decision period without exception is unconstitutional on its face in circumstances when an employee cannot muster the resources to put on an adequate defense. And it is so here as applied to Mr. Trinka.

Second, Section 713 stripped the post-termination administrative hearing[4] at the Merit Systems Protection Board previously available to VA career senior executives terminated under 5 U.S.C. § 7543(d). Thus, under Section 713, VA career senior executives are denied an adversarial, evidentiary hearing where the Agency bears the burden of proof to prove its charge by preponderant evidence. Instead, the statute substitutes an internal grievance procedure, with no right to a comprehensive hearing. The lack of any "full adversarial post-termination hearing" where the Agency bears the burden of proof to establish the statutory preconditions for removal is unconstitutional. *See Ramirez v. DHS,* Case No. 2019-1534 (Fed. Cir. 2020) at 9, *citing Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 547-548 (1985).

Third, Section 713 unconstitutionally decreased the burden of proof on judicial review at federal district court from "preponderance of the evidence" to "substantial evidence."

---

Trinka three additional days to review and consult with his attorneys regarding the 342-page evidence file, the legal arguments available to him, the ramifications of those arguments, and the potential end of his decades of service to the United States. Imposing an unrealistic and unfair notice and reply period on Mr. Trinka violates his right to due process. It does so because this shortened deadline denies Mr. Trinka "a fair opportunity to challenge the agency's evidence against him," especially given the lack of "alternative means by which [Mr. Trinka can] challenge the evidence against him," like a "full adversarial post-terminating hearing." *Ramirez v. DHS*, Case No. 2019-1534 (Fed. Cir. 2020), pp. 8-9, and fn. 6. But your denial of Mr. Trinka's extension request also disadvantages the Agency. A less thorough reply weakens your ability to make an accurate decision as to whether the government has sufficient cause to take Mr. Trinka's livelihood from him. Applying the Supreme Court's precedent in *Loudermill*, "an error might have been avoided had [Mr. Trinka] been provided [a fair] opportunity to make his case to [you]." *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 543-544 (1985).

[3] This written reply provides a multitude of legal and factual challenges to the Proposal. Due to the insufficient amount of time allotted to us to prepare this reply, our arguments are not necessarily fully presented. Our goal is to identify and preserve arguments for later judicial review.

[4] Because no full adversarial post-termination hearing exists, these pre-termination proceedings take on greater importance. *See Ramirez v. DHS*, Case No. 2019-1534 (Fed. Cir. 2020), at fn. 6, *citing Loudermill*, 470 U.S. 532, at 547-548 (1985).

With each change to the removal process, the statute made it more difficult for employees to successfully vindicate themselves. These reductions in due process, taken alone and together, make the relevant portions of 38 U.S.C. § 713 unconstitutional on its face and as applied here by the Agency.

2. *The Agency's Implementation of the Statute Renders the Process Unconstitutional.*

Beyond the text of the statute, the Agency implemented an internal policy that makes it even more difficult for an employee to prevail. *See* Ex. 2 ("CSEMO Letter"). And the Agency itself frequently violates its own published procedures in ways that promote non-thorough, and procedurally deficient investigations and proposed disciplinary actions against employees, curtailing investigations prior to the collection of exculpatory information, or deliberately excluding exculpatory information so that the employee will be unable to rebut the charges against them. *See* "Failures Implementing Aspects of the VA Accountability and Whistleblower Protection Act of 2017," VA OIG Report No. 18-04968-249, attached as Ex. 3. The Agency's implementation of the statute render the termination process imposed on Mr. Trinka unconstitutional.

Because continuing to process the Proposal pursuant to the CSEMO Letter will violate Mr. Trinka's statutory and constitutional rights to due process, VA should rescind the Proposal.

B. *The Agency Violated Its Own Procedures to Secure Mr. Trinka's Termination.*

Violations of Agency policy will entitle Mr. Trinka to an entirely new, correct removal procedure if he is removed without correction of those violations. *See Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999). We list below those violations of which we are currently aware. But due to the unreasonably short response period and failure to provide us with the entire OAWP investigative file, more violations may have occurred than we are able to ascertain at the time of this reply.

1. *The Agency Violated CSEMO Letter Section 7.a.iii.3.*

First, the CSEMO Letter states that "[u]pon conclusion of the OAWP investigation, OAWP and OGC shall brief the Secretary or his or her designee on the results of the investigation and whether disciplinary action is recommended. *The recommendation will be limited to whether disciplinary action should be pursued.*" *See* CSEMO Letter Section 7.a.iii.3. (emphasis added). OAWP disregarded this policy and instead recommended a specific penalty: removal. *See* Proposal, Ex. 15. It is the duty of the Proposing Official, not OAWP, to determine what penalty to propose. *See* CSEMO Letter Section 7.b.i. ("The Proposing Official will review the available evidence to determine whether a Reprimand, Suspension, Demotion, or Removal should be proposed; or whether no action is warranted."). Public employees like Mr. Trinka are entitled the protections of the Due Process Clause as well as "whatever other procedural protections are afforded them by statute, regulation, or agency procedure which is in addition to the protections afforded by the Constitution." *See Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999). Therefore,

because the Agency violated its own procedures when OAWP recommended to the Proposing Official and Deciding Official a specific penalty, the removal must be canceled.

Moreover, VA's policy that OAWP not recommend specific disciplinary actions or penalties is consistent with constitutional due process. OAWP violated the Due Process Clause when it created the presumption that its choice of penalty was correct, and stripped you of your constitutional authority and power to determine the "appropriateness or necessity" of the removal action before Mr. Trinka even had an opportunity to respond to the charge against him. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985). In usurping your constitutional role, OAWP requires you to explain (to them) in writing any deviation from their recommendation. ("[i]f you or your designee fail to propose the disciplinary action recommended in this paragraph within 60 calendar days from the date of this memorandum, you must provide OAWP with a detailed justification why the recommended action was not proposed.") *See* Proposal, Ex. 15. OAWP's choice of penalty, and requirement that you justify to them any deviation from that choice, violates the Due Process Clause of the United States Constitution, because you no longer have unfettered constitutional discretion to decide the appropriate penalty, and the penalty was chosen for you prior to Mr. Trinka having any "meaningful opportunity to invoke the discretion of the decisionmaker." *Id.* The Proposal must be rescinded, and the Agency must find a way to reverse the undue influence OAWP wielded over the Proposing Official and you in this process.

2. *The Agency Violated CSEMO Letter Section 7.a.iii.1.*

Second, the Agency was required to provide any statement or evidence provided by Mr. Trinka in the evidence file, unless the circumstances of the investigation make it "impossible, unreasonable, or unnecessary to do so." *See* CSEMO Letter Section 7.a.iii.1.

The sole charge in the Proposal is an allegation that Mr. Trinka made a false statement to the VA OIG. It was not "impossible, unreasonable, or unnecessary" to include the best, and only, direct evidence[5] of the alleged misconduct: a recorded "statement" by Mr. Trinka to the VA OIG. *See* Proposal, p. 1. That recorded statement was listed as Attachment 19 to the VA OIG's ROI. *See* Proposal, Ex. 12, p. 314 of the evidence file. VA OIG transmitted this statement to OAWP on January 6, 2020, when it referred its completed ROI to OAWP. *See* Proposal, Ex. 13. Therefore, OAWP was in possession of a recorded statement by Mr. Trinka, wherein the exact words he said to VA OIG were present. It appears that after OAWP received this direct evidence of what Mr. Trinka actually said to the VA OIG, it decided to conceal that evidence, excluding it from the evidence file eventually transmitted to you and the Proposing Official, in favor of a hearsay summary of Mr. Trinka's statements, written by the VA OIG Special Agent. Although we do not

[5] The CSEMO Letter also requires that if the statement is "relevant," it must be transmitted to the employee with proposed action. *See* CSEMO Letter Section 7.a.iii.1. Clearly, the only direct evidence of the alleged misconduct is relevant. Therefore, by not transmitting this recorded statement to Mr. Trinka with the Proposal, the Agency violated its own policy. As a result, the Proposal must be canceled.

have a copy of the recorded statement, it is likely OAWP did so in order to choose the evidence less favorable to Mr. Trinka; in other words, OAWP excluded exculpatory evidence in favor of inculpatory evidence. This violated CSEMO Letter Section 7.a.iii.1.

If OAWP concealed from the Proposing Official, Mr. Trinka and you the VA OIG records of Mr. Trinka's interview, it may also have violated federal law. Concealing evidence in a federal investigation, even an administrative one, is a crime.[6] Federal employees are not exempt from the law. The record makes clear that VA OIG transmitted Mr. Trinka's recorded statement to OAWP (as Attachment 19 to its ROI), and that by the time the action was proposed, the recorded statement had been removed from the evidence file.

In addition, just last year, VA OIG found that OAWP inappropriately, and knowingly, excluded evidence from evidence files that was required to be included pursuant to the CSEMO Letter. *See* VA OIG Report, p. 30. VA OIG also found that OAWP had adopted an inappropriate policy that encouraged investigators to only collect evidence that supported a finding of misconduct by substantial evidence, rather than evidence that might exonerate the employee.

Indeed, VA OIG collected guidance from OAWP leadership instructing investigators to "hone down our evidence files to just those documents that support charges." *See* VA OIG Report, at pg. 30. VA OIG found that "OAWP's practice of only including documents that support its charges when it prepares evidence files for disciplinary cases (and not those that might be exculpatory) has injected the appearance of bias, which could undermine employees' trust in the OAWP's process." *Id.*

Although an OAWP investigative[7] file can be, and is even anticipated to be, different than an evidence file used in a proposed disciplinary action, VA OIG found that the eventual evidence

---

[6] VA officials may have committed federal crimes punishable by imprisonment up to 20 years. *See* 18 U.S.C. §§ 1512(c), 1519. If VA possesses or uncovers evidence that OAWP personnel knowingly altered, concealed, and/or covered up evidence in this official proceeding by withholding from you, the Proposing Official, and Mr. Trinka his exculpatory recorded OIG interview at Attachment 19 of the VA OIG ROI, VA should refer them to the OIG for criminal investigation.

[7] We note here that in Mr. Trinka's case OAWP did not conduct an "investigation." OAWP did not interview Mr. Trinka, in violation of CSEMO Letter Section 7.a.iii.1. If OAWP collected any evidence included as exhibits with its ROI, Mr. Trinka did not receive that evidence. Therefore, the Proposal's statement that "OAWP conducted its own investigation" is inaccurate and misleading. *See* Proposal, p. 2. Instead, OAWP merely reviewed the OIG's ROI and attachments, then repackaged and restated the OIG's findings. Thus, OAWP is in no better position than you to decide whether to sustain the charge or what penalty is reasonable given the totality of the circumstances. OAWP should receive no deference from you, just as its finding will receive no deference on judicial review. At federal district court, *your* decision will be evaluated, not OAWP's, because only you have the constitutional authority to be "the decisionmaker" in this

file used by the Proposing Official should "contain all relevant evidence and not simply evidence that tends to support the charges." *Id*, at 42. VA OIG concluded that it would be "difficult for a disciplinary official to determine whether [the applicable evidence standard] is met without considering all relevant evidence developed during the investigation." *Id.*

In one case referenced in the VA OIG Report, which mirrors the circumstances here, VA OIG wrote: "the July 2017 accountability procedures call for the inclusion of the Covered Executive's statement in the evidence file. Its non-inclusion prevented the proposing official from considering all relevant evidence." *Id,* at 43. In another example, VA OIG criticized OAWP for excluding the transcript of an employee's recorded interview, stating that "the employee's transcript was relevant because it contained the subject's denials, admissions, and contextualization of alleged misconduct referenced in the proposed discipline and, therefore, should have been included in the evidence file pursuant to the [CSEMO Letter]." *Id*, at 43.

Indeed, OAWP's apparent decision to continue this practice here against Mr. Trinka after VA OIG's findings demonstrates the Agency's bias towards finding misconduct, even if the evidence as a whole does not support that finding. You should therefore cancel the Proposal because it violated VA's own policy by not providing Mr. Trinka with his actual statement at issue in the only charged specification.

C. *The Agency Violated Mr. Trinka's Entitlement to Constitutional Due Process by Withholding the Recording or Transcript of his Interview and Other Evidence.*

We now know that the Agency's failure to provide Mr. Trinka with a copy of his recorded statement violates his entitlement to due process under the Fifth Amendment. Just last week, the Federal Circuit found that due process required a government agency to provide an employee with the records underlying an adverse action, even when an agency does not directly review or consider the records in making the removal decision. *See Ramirez v. DHS,* Case No. 19-1534 (Fed. Cir. 2020), p. 16.

The Federal Circuit found that an agency's decision to rely indirectly rather than directly on the evidence at issue did not excuse the Agency from making the evidence available to the employee. According to the Federal Circuit, "[t]he Agency cannot shield the evidence underlying that finding from production by simply relaying it through the report of another expert." *Id.*

Likewise, the Federal Circuit in *Ramirez* found that the agency was required to produce the records regardless of whether they were in the agency's custody. *Id,* at 15.

Here, someone excluded the recording or transcript of Mr. Trinka's OIG interview (Attachment 19 to the VA OIG's ROI transmitted to OAWP on January 6, 2020) from the eventual evidence file issued to Mr. Trinka. *Ramirez* now makes clear that even if VA OIG failed to transmit

---

removal proceeding. *See Loudermill*, at 543. It is therefore incumbent upon you to make a decision independent of OAWP's recommendation.

the recording or transcript, at this stage, the VA was required to collect the evidence and provide it to Mr. Trinka.[8] Failing to do so violates the Fifth Amendment of the United States Constitution.

In addition to the recording or transcript of Mr. Trinka's VA OIG interview, the Agency did not provide Mr. Trinka with the exhibits to OAWP's ROI. OAWP's ROI was included in the Proposal's evidence file as Exhibit 14. But OAWP's exhibit list and exhibits themselves were excluded. OAWP's ROI at Exhibit 14 to the Proposal contained intranet links to each exhibit that were accessible to the Proposing Official, but not to Mr. Trinka. You certified to us that Mr. Trinka "was provided with the file containing all of the evidence in support of the proposed action." *See* Ex. 1. That does not appear to be true.

Because OAWP's conclusions relied on those exhibits, and the Proposing Official relied on OAWP's ROI to support the charged misconduct, the Agency will violate the Fifth Amendment if it does not produce the exhibits.

D. *The Agency May Have Engaged in Constitutionally Impermissible Ex Parte Communications with the Deciding Official during the Disciplinary Process*.

On July 16, 2020, the Executive Director for Investigations at OAWP transmitted a memorandum to you. *See* Proposal, Ex. 15. Footnote 1 of that memorandum includes an intranet link to download OAWP's "investigative file." Pursuant to the CSEMO Letter, the "investigative file" is a separate file than the "evidence file." *See* CSEMO Letter, Section 7.a.iii.1. The "investigative file" is compiled by OAWP, whereas the "evidence file" contains materials relied upon by the Proposing Official to support the proposed action. Therefore, the record reflects that you received for review the "investigative file," which was not provided to Mr. Trinka. Mr. Trinka attempted to access the link in Footnote 1 of Ex. 15 of the Proposal. It is no longer active, and therefore Mr. Trinka could not review the materials previously stored there. *See* Ex. 4.

The record also reflects that you received the OAWP ROI, with links to each exhibit cited in the ROI summary. *See* Proposal, Ex. 14. Those exhibits are enumerated separately from the exhibits in the VA OIG report, and appear to reference different documents. Mr. Trinka attempted to access those records via the links in the ROI, but was denied access to the vast majority of the links, and could not review the materials stored there. *See* Ex. 5. Three links functioned and led to copies of Proposal Exs. 1, 11, and 13.

Deciding officials *cannot* review and consider evidence relevant to the proposed action that is not also provided to Mr. Trinka. If you did so, you must cancel the Proposal.

---

[8] By the same token, Mr. Trinka is entitled to the recordings and/or transcripts of interviews with his supervisors, if such were created by VA OIG.

As the Federal Circuit held in *Stone*:

> "[T]he introduction of new and material information by means of *ex parte* communications to the deciding official undermines the public employee's constitutional due process guarantee of notice (both of the charges and of the employer's evidence) and the opportunity to respond. When deciding officials receive such ex parte communications, employees are no longer on notice of the reasons for their dismissal and/or the evidence relied upon by the agency. Procedural due process guarantees are not met if the employee has notice only of certain charges or portions of the evidence and the deciding official considers new and material information. It is constitutionally impermissible to allow a deciding official to receive additional material information that may undermine the objectivity required to protect the fairness of the process. Our system is premised on the procedural fairness at each stage of the removal proceedings. An employee is entitled to a certain amount of due process rights at each stage and, when these rights are undermined, the employee is entitled to relief regardless of the stage of the proceedings."

*See Stone* at 1376.

E. *The Agency's Only Evidence of the Only Charged Allegation of Misconduct is Hearsay, and the Charge Cannot Be Sustained.*

As noted above, there is only one specification of misconduct. The Agency bears the burden to prove its specification by sufficient evidence. The Agency's evidence is insufficient to prove the charged misconduct.

The only evidence the Agency produced to prove the only specification it charged is a summary, unsworn hearsay memorandum summarizing Mr. Trinka's purported testimony during a VA OIG interview. This memorandum has little, if any, probative value. *See Prouty v. GSA*, 122 M.S.P.R. 117, 123 (2014). Thus, it alone will not be sufficient evidence to withstand judicial review if you sustain the charge.

Mr. Trinka denies that he knowingly provided false or inaccurate information to VA OIG investigators. Mr. Trinka's interview with VA OIG interview was recorded. VA OIG transmitted to OAWP the recorded interview (Attachment 19 to the VA OIG ROI), along with the Special Agent's summary (Attachment 18 to the VA OIG ROI). *See* Proposal, Ex. 12, p. 314, List of VA OIG ROI Attachments. There is simply no reason to rely on the hearsay summary OIG memorandum when the central fact at issue is what Mr. Trinka said. A recording or transcript of the recording is the best evidence, and the Agency cannot conceal that evidence and survive judicial review.[9]

---

[9] Whether it was OAWP or someone else at the Proposal stage, a complete transcript of Ms. Trinka's OIG interview was included in the evidence file issued to Mr. Trinka with the Proposal

Additionally, the Agency's own evidence controverts the charged misconduct. The evidence demonstrates that Mr. Trinka did indeed inform his most recent supervisor[10] that his wife was not a U.S. citizen, despite no legal obligation to do so. *See* Proposal, Ex. 9.

F. *There is no nexus between Mr. Trinka's statements to VA OIG regarding conversations with his supervisors about his personal life and his position as Chief Talent Management Officer at the Department of Veterans Affairs.*

Mr. Trinka's statements to VA OIG regarding conversations with supervisors about his personal life do not implicate in any way his federal employment and therefore lack the requisite nexus to justify removal. *See* 38 U.S.C. § 713(a)(1), (d)(2)[11]; *See also e.g. Booth v. Department of Veterans Affairs*, MSPB Docket No. AT-0714-19-0167-I-1 (May 8, 2019); *Holmes v. Department of Veterans Affairs*, No. AT-0714-19-0581-I-1 (November 19, 2019) (finding that provisions of

---

as Exhibit 6. While including her OIG interview transcript in the disciplinary evidence file, some government employee had the audacity to exclude the transcript of Mr. Trinka's OIG interview. That omission is stunning given the charged misconduct is what Mr. Trinka, not Ms. Trinka, supposedly said to the OIG Special Agent during his interview. Inclusion of the complete OIG transcript of Ms. Trinka's interview appears to be an attempt by the government to win by innuendo, and serves no purpose other than to attempt to embarrass Ms. Trinka, considering the omission of Mr. Trinka's transcript. In other words, the decision to include Ms. Trinka's interview transcript, but omit Mr. Trinka's interview transcript, lacks any reasoned analysis that can withstand judicial review.

[10] Despite clear evidence of this disclosure on December 7, 2018 (*see* Proposal, Ex. 9), the Special Agent nevertheless concludes that Mr. Trinka made a false statement when he allegedly stated during his December 21, 2018, VA OIG interview that he had informed three different supervisors of his wife's immigration status. *See* Proposal, Ex. 12. In reaching this finding, VA OIG discounts its own evidence that Mr. Trinka told his supervisor John Oswalt, because Mr. Trinka told Mr. Oswalt while being escorted to speak with VA OIG on December 7, 2018. In discounting this evidence, it seems VA OIG simply dislikes the timing of Mr. Trinka's disclosure to Mr. Oswalt. Nonetheless, the timing of Mr. Trinka's disclosure does not make his alleged statement to the VA OIG untrue; the record shows he did indeed disclose to Mr. Oswalt on December 7, 2018, prior to his December 21, 2018 interview, his wife's immigration status.

[11] Mr. Trinka's alleged conduct does not constitute "misconduct" or "malfeasance" under the agency's definition of "an act that is unjustified, harmful, or contrary to law, rule or regulation." *See* CSEMO Letter, Section 6.n-o.

38 U.S.C. § 714 require proof of nexus).[12] Thus, without any assertion or proof of nexus, removing Mr. Trinka on this charge will not withstand judicial review.

In addition to the requirement that the agency prove the conduct set forth in the charge, the agency must also prove that there is a nexus, i.e., a clear and direct relationship between the articulated grounds for an adverse action and either the employee's ability to accomplish his duties satisfactorily or some other legitimate government interest. *Hoofman v. Dep't of Army*, 118 M.S.P.R. 532 (2012), *aff'd sub nom. Hoofman v. Dep't of the Army*, 526 F. App'x 982 (Fed. Cir. 2013), *citing Ellis v. Department of Defense*, 114 M.S.P.R. 407, ¶ 8 (2010). In other words, to sustain the charge of misconduct, the agency must have established by sufficient evidence the existence of a nexus between the employee's misconduct and the work of the agency, i.e., the agency's performance of its functions. *See Doe v. Dep't of Justice*, 565 F.3d 1375, 1379 (Fed. Cir. 2009), *citing Brown v. Dep't of the Navy*, 229 F.3d 1356, 1358 (Fed. Cir. 2000).

Federal appellate courts have acknowledged that misconduct that is private in nature and that does not implicate job performance in any direct and obvious way is often insufficient to justify removal. *See Doe,* at 1380-81, *citing Brown v. Dep't of the Navy*, 229 F.3d 1356, 1360 (Fed.Cir.2000), *Bonet v. U.S. Postal Serv.*, 661 F.2d 1071, 1078 (5th Cir.1981) (it is insufficient for an agency to rely on internal regulations that proscribe in general certain employee conduct, e.g., "immoral" or "disgraceful," as proof of the required nexus between dishonesty/immorality[13] and the efficiency of the service).

Indeed, in *Doe*, the Federal Circuit warned that when federal employees are not on notice as to what non-work related behavior (such as allegedly lying about the immigration status of a spouse) is subject to investigation, the government could remove an employee for "any number of 'clearly dishonest misrepresentations,' from those made to preserve the sanctity of a romantic relationship to cheating in a Friday night poker game." *Doe*, at 1381.

There is no legal standard or reason that establishes Mr. Trinka was required to inform his supervisors of his wife's immigration or citizenship status. Notably, neither the VA OIG, OAWP, nor the Proposing Official cite to one. And thus, there was no legal standard or reason for VA OIG (*contra, e.g.* a federal immigration investigatory entity) to inquire about Mr. Trinka's conversations with his colleagues about his wife's immigration or citizenship status. The VA OIG's jurisdiction simply does not expand to investigating the immigration status of VA employees' family members, or friends. To conclude otherwise grossly expands VA OIG powers

---

[12] *See also* Ex. 6. In a presentation by VA OHRM Employee Relations and Performance Management Service on July 12, 2017, the Agency admitted it would likely have to prove nexus despite the new removal authority.

[13] The Proposal alleges in part that Mr. Trinka should be fired because he "failed to act with high moral principle." *See* Proposal, p. 2.

to intrude into the private personal lives of VA employees, which is the antithesis of our American democracy. Mr. Trinka does not live and work in a police state.

A clear articulation of a standard requiring disclosure of a spouse's immigration or citizenship status is "essential to the government's ability to reasonably and legitimately remove an [employee] for off-duty conduct relation to personal relationships." As the D.C. Circuit held in *Doe v. Hampton*, 556 F.2d 265, 272 n. 20, 273 (D.C. Cir. 1977), particularized requirements for removal serve to "minimize unjustified governmental intrusions into the private activities of federal employees." None is articulated here.

The government strains to remove Mr. Trinka. What began as an investigation into whether Mr. Trinka lied on a government employment form about his wife's citizenship ended in a proposed termination based solely on a charge of whether Mr. Trinka was truthful when he allegedly told a VA Special Agent, with no need to know,[14] that he had previously informed supervisors that his wife was a non-citizen. Several purported falsehoods on government employment forms were explored and abandoned in between the start of VA OIG's investigation and the issuance of the Proposal. The Proposal itself is based solely on an allegation unrelated to the reason for the underlying VA OIG investigation.

Courts have long recognized that, at a minimum, the government is bound to accord due process and set basic substantive limits on its prerogative to remove its employees. *See, e.g., Norton v. Macy*, 417 F.2d 1161, 1164 (D.C.Cir.1969) ("The Due Process Clause may also cut deeper into the government's discretion where a dismissal involves an intrusion upon that ill-defined area of privacy which is increasingly if indistinctly recognized as a foundation of several specific constitutional protections."). Mr. Trinka's private life is just that: private.

Mr. Trinka is free to have conversations about his personal life with his supervisors. Mr. Trinka is free to disclose or omit information about his personal life with his supervisors, including information about his wife's current immigration status. Mr. Trinka's supervisors have no right to know details about Mr. Trinka's wife's current immigration status so long as her current immigration status does not affect Mr. Trinka's ability to perform in the workplace or the agency's mission (providing healthcare and benefits for Veterans). Nowhere in VA OIG's or OAWP's

---

[14] Whether Mr. Trinka informed his supervisor of his wife's immigration status is non-material to VA OIG's underlying investigation. In order to qualify as a false statement under 18 U.S.C. § 1001, the alleged falsehood must be "materially false" or be made regarding a "material fact." Mr. Trinka's conversations with his supervisor had nothing to do with his intent to mislead the government by utilizing an ITIN number instead of a SSN to identify his non-citizen wife on VA forms. When VA OIG presented this case, several times, to Department of Justice prosecutors for potential prosecution, the prosecutors informed VA OIG the same: (1) on February 14, 2017, an AUSA stated "based on the information we have obtained, he cannot open a criminal case without more overt criminal activity."; (2) on August 9, 2018, another AUSA told the VA OIG Special Agent "there is not enough evidence to charge TRINKA for false statements, based on the investigation to date." *See* Proposal, Ex. 12.

respective ROIs, or in the Proposal itself, does *any* official of the VA assert *any* legal authority that required Mr. Trinka to disclose to anyone at the VA his wife's immigration status. Likewise, no one asserts a nexus between the immigration status of Mr. Trinka's wife and the work of the VA or the job duties of Mr. Trinka. Mr. Trinka does not work for CBP or ICE. He, and you, work for the VA. Thus, the VA OIG exceeded its jurisdiction and had no right to inquire into Mr. Trinka's private life beyond what is needed to establish facts material to their investigation into how Mr. Trinka completed forms associated with his VA employment.

Because Mr. Trinka's recorded statement to the VA OIG was not provided, it is impossible to assess whether VA OIG even asked Mr. Trinka about whether his supervisors were aware of his wife's immigration status, or what either party said to prompt the allegedly false statement. In other words, without the VA OIG recording or transcript of Mr. Trinka's interview, there is *no* context in which to assess Mr. Trinka's alleged statements to VA OIG. Assuming that VA OIG asked Mr. Trinka whether he apprised his supervisors of his wife's immigration status, the VA OIG investigator had no lawful reason and no jurisdiction to inquire about Mr. Trinka's supervisors' knowledge of Ms. Trinka's immigration status.

G. *The Background Section of the Proposal Contains Untrue Allegations that Unfairly Prejudice Mr. Trinka.*

The "background" section of the Proposal details the procedural history of the VA OIG investigation underlying the charged misconduct. But it also unfairly asserts unproven, uncharged, and potentially criminal misconduct as true when it is not. When a proposing and/or deciding official are under the mistaken impression that an employee's conduct violated the law, reliance on that mistaken impression can lead to reversal of the adverse action. *See Doe v. Department of Justice*, 565 F.3d 1375, 1382-1383 (Fed. Cir. 2009).

Here, VA OIG "substantiated" three false statements by Mr. Trinka, and then transmitted its report and evidence to OAWP. *See* Proposal, Exs. 12, 13. Next, OAWP "substantiated" only two false statements by Mr. Trinka, abandoning one of VA OIG's findings. OAWP then transmitted its report and evidence to you. *See* Exs. 14, 15. Your proposing official charged only one false statement, choosing to abandon VA OIG's other two findings and one of OAWP's findings (that Mr. Trinka falsified his August 2014 e-QIP form). *See* Proposal, p. 1. But the latter portions of the Proposal ("background" and "aggravating factors" sections) reincorporated *all* of VA OIG's unsubstantiated and uncharged misconduct, by claiming Mr. Trinka has a "propensity to misinform, mislead or otherwise provide false answers and narratives." That "propensity" is based on VA OIG's findings. However, the Proposal fails to actually charge the other two supposedly false statements as actionable misconduct.

Specifically, the Proposal states that VA OIG concluded that Mr. Trinka made three false statements: (1) Mr. Trinka failed to disclose to OPM that his wife was in the U.S. illegally; (2) Mr. Trinka allegedly made a false statement when he input his wife's IRS assigned tax identification (ITIN) in place of a Social Security number on VA forms; and (3) Mr. Trinka allegedly made a

false statement to OIG investigators when allegedly stated he verbally reported his wife's undocumented immigration status to three different supervisors while employed at VA.

Because we already addressed the only charged misconduct (finding no. 3), we address the other two findings below.

1. *VA OIG's First Finding is not Supported by Evidence.*

VA OIG's first finding of a false statement was that Mr. Trinka allegedly failed to disclose to OPM that his wife was in the U.S. illegally.[15]

That finding is arbitrary and capricious, and unsupported by evidence. The only evidence of what Mr. Trinka disclosed to OPM are his August 2014 e-QIP and the OPM summary of his OPM background interview. *See* Ex. 7, pp. 143, 272 of Evidence File. The e-QIP did not ask Mr. Trinka for the immigration status of his wife. Rather, it asked for her place of birth, and country of citizenship. During the OPM interview, the summary memorializes that he disclosed he made a mistake on the e-QIP when he listed her place of birth as the United States. OPM appears to have accepted this as a "mistake." *See* Proposal, Ex. 7, p. 145 of Evidence File. No one knows whether the OPM investigators followed up with Mr. Trinka when he revealed his wife was a Thai citizen to ask her immigration status, because no complete record of such an inquiry or any response by Mr. Trinka exists.

It was squarely in front of OPM investigators and adjudicators that Mr. Trinka had listed his wife's citizenship as the United States, but then corrected it to Thailand during his OPM interview. For the VA OIG, OAWP, and Proposing Official to find Mr. Trinka did not disclose to OPM his wife's immigration status is mere speculation. The interview was memorialized in an OPM investigation summary, not a verbatim transcript. *See* Proposal, Ex. 7, pp. 143-146 of Evidence File. Thus, the evidence does not support a finding that he failed to disclose to OPM his wife's immigration status or that he was asked to or required to do so.

Equally relevant is that OPM has the legal authority to bring an action directly against a federal employee for falsifying or lying in the background and suitability process. *See* 5 C.F.R. § 731.105(d). OPM declined to do so in this case, following Mr. Trinka's 2014 SF-85 process and subsequent December 2014 interview. Per VA OIG's ROI, it shared with an AUSA Mr. Trinka's OPM background file on April 21, 2016. The Department of Justice subsequently declined to prosecute Mr. Trinka for supposedly falsifying information to OPM, citing a lack of evidence. Thus, OPM, the government's subject matter expert on suitability and DOJ, the government's legal

[15] The Proposal described it as follows: "You listed your spouse, as a United States (US) citizen on your electronic background investigation (E-QIP) to the Office of Personnel Management (OPM). You later told OPM investigators you made a mistake and admitted she was not a U.S. citizen, but is instead a citizen of Thailand. However, you failed to disclose to OPM your wife was in the U.S. illegally (Exhibits 8 and 12)." *See* Proposal, pg. 1.

experts in prosecuting false statements, both declined to act on the information now presented to you by VA OIG for punishment. VA OIG asks you to pass judgment on Mr. Trinka for morality reasons, rather than any valid legal reason.

2. *VA OIG's Second Finding is not Supported by Evidence.*

The VA OIG's second finding referenced in the Proposal was that Mr. Trinka allegedly made a false statement when he failed to disclose his wife's unlawful immigration status by inputting his wife's IRS assigned tax identification (ITIN) in place of a Social Security number on VA insurance forms and to obtain her a military dependent identification card.[16]

VA OIG's finding is based on a false premise. When Mr. Trinka input his wife's IRS ITIN, it in fact disclosed his wife's immigration status.[17] As the Agency's own evidence demonstrates, "the first three digits of his wife's ITIN designated the number was issued to an individual with no lawful immigration status." *See* Proposal, Ex. 12, p. 2. Therefore, Mr. Trinka disclosed his wife's immigration status when he input her ITIN, and it is unclear why VA OIG found otherwise.[18]

In addition, neither the FEHB nor the FEGLI forms included in the evidence file require disclosure of citizenship, or immigration status. Therefore, aside from Mr. Trinka's use of an ITIN clearly belonging to a non-citizen, there would be no opportunity for disclosure of his wife's immigration status. *See* Exs. 16-17. Moreover, VA OIG and the Deciding Official fail to assert or cite to any legal authority that immigration status determines FEHB and/or FEGLI spousal beneficiary eligibility.

---

[16] The Proposal describes it as follows: "You failed to disclose your wife's unlawful immigration status to the VA when adding her as a dependent on your life insurance and health insurance records (Exhibit 8, 12, 16 and 17). You knowingly used your wife's IRS assigned tax identification (Exhibits 8, 12, 16 and 17). You again used your wife's ITIN to obtain a military dependent identification card, allowing her to access any military installation. You admitted you were previously employed by the IRS and were aware the first three digits of your wife's ITIN designated the number was issued to an individual with no lawful immigration status (Exhibits 8 and 12)."

[17] At the time Mr. Trinka completed this form, his wife did not have an SSN, and so this ITIN was the only identifying number available for use. Ms. Trinka was assigned an SSN on August 3, 2016. *See* Ex. 7.

[18] We note that OAWP, likely recognizing the same factual inconsistency in VA OIG's reasoning, did not substantiate that Mr. Trinka made a false statement when he input his wife's IRS assigned tax identification (ITIN) in place of a Social Security number on VA insurance forms and to obtain her a military dependent identification card. *See* Proposal, Ex. 14.

The only reasoning VA OIG provides for its conclusion is merely the personal opinion of the VA OIG Special Agent. In the VA OIG report, the Special Agent states: "I told TRINKA the VA would not know the origin of the number and would assume it was an actual SSN and its use was therefore a false statement." *See* Proposal, Ex. 12. This conclusion (that VA would not recognize the ITIN) is based solely on an assumption made by the investigator, and moreover does not speak to Mr. Trinka's intent. To reach this conclusion, the investigator ignored the feedback of two AUSAs that there was not enough evidence to charge a "false statement" based on this incident. *See* Proposal, Ex. 12. As is clear from the evidence, Mr. Trinka intended to provide an identification number that clearly disclosed his wife's immigration status, and did so.[19] Therefore, you should disregard any implication that Mr. Trinka made a false statement with regard to this incident.

3. *The Proposing Official Based his Decision to Propose Mr. Trinka's Termination on Unsupported, Uncharged Allegations of Misconduct.*

During a virtual meeting on Microsoft Teams or Zoom to issue the Proposal to Mr. Trinka, the Proposing Official stated that he was proposing Mr. Trinka's removal in part because of a "pattern of deception." However, as demonstrated above, there is no such pattern. The Proposing Official specifically mentioned Mr. Trinka's e-QIP form[20] and use of Ms. Trinka's ITIN instead of her SSN on forms to gain "access" to health insurance, life insurance, and military installations.[21]

The Proposing Offical also stated that a factor in his recommendation was that Mr. Trinka "was married to an illegal immigrant and made no attempt to legalize her immigration status," or words to that effect. Mr. Trinka responded that he and his wife were working through the legal

[19] When Mr. Trinka filled out the military dependent ID form, the enlisted officer he was working with informed him that if his wife did not have an SSN due to her immigration status, he should utilize her ITIN.

[20] The Agency's own evidence demonstrate that OPM, in its suitability investigation, did not find that Mr. Trinka made a false statement when it investigated the same conduct VA OIG later substantiated as a false statement. After conducting its own investigation, OPM (the subject matter experts) accepted Mr. Trinka's reasonable explanation that he made a mistake on his e-QIP form. *See* Proposal, Ex. 7, (p. 145 of evidence file).

[21] There is no reason Ms. Trinka should not have access to health insurance (5 C.F.R. § 890.302), life insurance (5 C.F.R. § 870.802), military dependent identification, and any other benefit gained due to her spousal status. Any implication otherwise is likely colored by animus towards her national origin or immigration status rather than concern for law or policy. Therefore, it may be that the proposed termination was infected with discriminatory animus under Title VII. *See James T. Hewitt v. Department of the Navy*, EEOC Appeal No. 01920086 (April 23, 1992) (finding that Complainant can meet *prima facie* case of national origin discrimination based on discrimination for having a spouse with a different national origin).

immigration process, and had a court date in December 2020 (which had been rescheduled from August 2019). The Proposing Official stated that he would "consider that in rebuttal," or words to that effect. But as you know, no such process exists for a Proposing Official to consider arguments on rebuttal. While Ms. Trinka is not yet a United States citizen, she is not in the United States illegally. This is not an unimportant distinction, given that the Proposing Official, without evidence, criticized[22] Mr. Trinka's alleged "continued refusal to accept responsibility and failure to take appropriate action to rectify the immigration status of your spouse," and stated that Mr. Trinka has "willfully chosen not to remediate or resolve the illegal status of your wife within federal guidelines and requirements." *See* Proposal, p. 2.

In this country, the process for naturalization of a spouse does not flow in its entirety overnight. Ms. Trinka has maintained a valid, and current, work authorization. *See* Ex. 7. She is therefore legally in the United States. Ms. Trinka has an individual hearing date for her green card application on December 7, 2020. *Id.* The Proposal's reliance on VA OIG's finding is unsubstantiated, and continued reliance on that finding will result in cancelation of the removal on judicial review.

The Proposing Official's comments doubled down on the false assertions in the Proposal. This conversation demonstrates that the Proposing Official based his decision to charge Mr. Trinka with Conduct Unbecoming a Federal Supervisor, and to propose Mr. Trinka's removal in part on unsupported and uncharged allegations of misconduct. The conversation also demonstrates that the Proposing Official based his decision to propose Mr. Trinka's termination in part based on false information about Mr. and Ms. Trinka's efforts to work through the legal immigration process. As a result, the Proposal must be canceled.

## III. PENALTY DETERMINATION

The CSEMO Letter directs Proposing Officials to propose a penalty that is "reasonable" and "commensurate with the facts of the case and the rationale for determining what constitutes the appropriate level of discipline will be included in the Proposal." *See* CSEMO Letter Section

[22] Throughout the Proposal, the Agency expresses animus towards Ms. Trinka for her immigration status. It also expresses animus towards Mr. Trinka for his association with her. At one point, the Proposal states that Mr. Trinka "may still be cohabitating with and supporting a known foreign national without legal entry into the United States." *See* Proposal, pp. 2-3. Put simply, the Department of Veterans Affairs does not get to determine, or criticize, who Mr. Trinka lives with in his home. It has nothing to do with his employment. Mr. Trinka is married to Ms. Trinka, and the Proposing Official cites no legal authority prohibiting Mr. Trinka from associating with her as they work through the legal naturalization process. The Agency is wrong to criticize Mr. Trinka's alleged failure to ensure that Ms. Trinka's immigration status was rectified, as that allegation is without evidence and controverted by the evidence attached to this reply. The Proposing Official's animus demonstrates the Agency's bias against Mr. Trinka for reasons other than the charged misconduct.

7.b. On judicial review, the court will review "the entirety of the VA's removal decision—including the penalty." *See Sayers v. Department of Veterans Affairs*, 954 F.3d 1370, 1379 (Fed. Cir. 2020).

The seminal case for adjudicating the "reasonableness" of a penalty in federal employee adverse actions is *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981). In *Douglas*, the MSPB[23] established the basic parameters of its authority to review the reasonableness of a penalty imposed by an agency. The *Douglas* decision cites twelve (12) factors that are referenced below, some or all of which are usually considered in determining whether the penalty imposed by an agency is appropriate under the circumstances. Douglas mandates that selection of an appropriate penalty be undertaken through a responsible balancing of all of the relevant factors present in an individual case. All of the factors will not be pertinent in every instance, but the relevant factors must be balanced in each case to arrive at the appropriate penalty. *Douglas*, at 306.

An agency may not simply go through the motions with regard to the Douglas factors; there must be "real consideration by the deciding official of the relevant mitigating factors and the particular circumstances of the case." *Zazueta v. Dep't of Justice*, 94 M.S.P.R. 493, 497 (2003) citing *Omites v. U.S. Postal Serv.*, 87 M.S.P.R. 223, 228 (2000). If the record fails to show that the deciding official considered both the relevant aggravating and mitigating Douglas factors, little deference is usually given to the agency's choice of penalty. *See Wynne v. Dep't of Veterans Affairs*, 75 M.S.P.B. 127, 133 (1997).

Under Douglas, the following factors are generally recognized as relevant to assessing an appropriate penalty:

(1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

(2) The employee's job level and type of employment, including supervisory, or fiduciary role, contacts with the public, and prominence of the position;

---

[23] In discussion of the *Douglas* factors in this reply, we cite to a number of MSPB cases. We recognize that 38 U.S.C. § 713 stripped VA senior executives of an MSPB appeal right, and that Mr. Trinka's statutory right is for judicial review of the VA decision. However, a federal court, even when evaluating an adverse personnel action under a statutory scheme independent of Title 5 of the U.S. Code, will defer to MSPB's expertise and holdings in the arena of federal personnel law. *See Butler v. West*, 164 F.3d 634, 642 (D.C. Cir. 1999). Federal courts "do not discount the special role that the MSPB has been assigned in the adjudication of federal personnel disputes, nor do we impugn its expertise. The degree of deference that federal courts must accord MSPB resolutions of nondiscrimination claims, see 5 U.S.C. § 7703(c) (limiting review to actions found to be arbitrary, capricious, an abuse of discretion, contrary to law, or unsupported by substantial evidence), speaks directly to its preeminent role in this area."

(3) The employee's past disciplinary record;

(4) The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

(5) The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties;

(6) Consistency of the penalty with those imposed upon other employees for the same or similar offenses;

(7) Consistency of the penalty with any applicable agency table of penalties;

(8) The notoriety of the offense or its impact upon the reputation of the agency;

(9) The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about conduct in question;

(10) Potential for the employee's rehabilitation;

(11) Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and;

(12) The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

*Douglas*, at 332.

The Proposal should be canceled because the charge is not supported by sufficient evidence, and because of the violations of VA policy and due process stated above. Following through with this Proposal will lead to reversal of your decision on judicial review. But because of VA's propensity to proceed against its employees in the face of clear violations of policy and due process, we provide an analysis of the relevant *Douglas* factors.

In directing you to consider the well-established *Douglas* factors that apply to agency consideration of penalty, we remind you again of your constitutional authority and power. We do so because of the historic pattern and practice of OAWP, OGC, and senior VA management officials pressuring and influencing the person designated to be the decisionmaker on a proposed disciplinary action. None of those employees, official or offices have any constitutional authority to direct your decision. Bowing to or allowing your decision to be influenced or dictated by anyone else is unconstitutional and will not withstand judicial review. According to well-established Supreme Court law, only you have the full constitutional authority to make this decision. As the decisionmaker, you are allowed to exercise your discretion to determine "the appropriateness or necessity" of the penalty, and to "decide [] not to dismiss [Mr. Trinka], notwithstanding [your] authority to do so." *Loudermill*, at 543-544.

*Douglas Factor #1 – Nature and Seriousness of the Offense*

In evaluating whether a penalty is merited, consideration is to be given to the nature and seriousness of the misconduct, including whether the offense was committed maliciously, was repeated after notice of its impropriety, or was committed for material gain. *See Dogar v. Dep't of Defense*, 95 M.S.P.R. 52, 60 (2003); *Rackers v. Dep't of Justice*, 79 M.S.P.R. 262, 282 (1998), *aff'd* 194 F.3d 1336 (Fed. Cir. 1999).

The Proposal finds that Mr. Trinka's alleged misconduct "seemed to be intentional; a direct effort not to bring attention to the fact that your spouse is in the country illegally or to the nature of your meeting." *See* Proposal. As stated above, there is no nexus between the alleged misconduct and Mr. Trinka's position at the Department of Veterans Affairs. As to the nature of his meeting his wife, nothing in this record explains how or why an employee's "how I met my wife" story is the Department of Veterans Affairs' business. It may be that many of your employees do not volunteer the real story of how they met their spouse. Employees are allowed to keep some aspects of their life private from their employer; how they met their spouse is one example. In addition, the record as it stands is devoid of evidence of intent.

You should also consider how often the Proposal relied on unearned, and baseless, attacks on Mr. Trinka's character in assessing whether removal was the appropriate penalty under these circumstances.

On Page 3 of the Proposal, in the "aggravating factors" section, the Proposing Official stated that Mr. Trinka "failed to act with high moral principle, adhere to the highest professional standards, and uphold the values expected of a VA SES employee." As an initial matter, the morality of any employee is not the government employer's business unless it interferes with the employee's service to the government. There is no evidence that Mr. Trinka committed misconduct related to his job as the Chief Talent Management Officer at the Department of Veterans Affairs. The only charged misconduct is a charge completely unrelated to his professionalism in that position or his supervisory or leadership responsibilities as an SES employee. Indeed, in the same paragraph, the Proposal mistakenly bases this conclusion on something that did not happen, accusing Mr. Trinka of failing "to take appropriate action to rectify the immigration status of [his] spouse." *Id.* Mr. and Ms. Trinka are fully engaged in the naturalization process. *See* Ex. 7. This allegation is based on erroneous speculation, and cannot be relied upon to support the penalty conclusions reached by the Proposing Official.

The harm of this false insinuation is also crystallized on page 3 of the proposal, which claims that Mr. Trinka "failed to meet the [I CARE] expectations" of "Integrity, Commitment, Advocacy, Respect and Excellence." *Id.* The Proposing Official singles out "Integrity," calling it the "first and a key value." *Id.* Thereby, the Proposal based its determination that removal was appropriate in part on its belief that Mr. Trinka's integrity was lacking. But outside of the Proposing Official's moral judgment about how Mr. Trinka met his wife, which is of no legal significance to the VA, there is no evidence in the file that demonstrates Mr. Trinka lacks integrity.

The United States Court of Appeals for the Federal Circuit, in *Russo v. USPS,* 284 F.3d 1304 (Fed. Cir. 2002), held that when an Agency imposes the maximum penalty based in part on an exaggerated perception of the conduct or an insinuation that the conduct was more sinister than it was in reality, removal is unreasonable.

In *Russo*, a Notice of Proposed Removal alleged that an employee made a "racist" comment to a co-worker. But after a hearing, the MSPB held that while the Agency proved the employee's conduct was unbecoming, he did not make a racist comment. Because the Proposal relied on its belief that the comment was racist to aggravate the penalty to removal, the appeals court found that removal was inappropriate. ("In other words, the agency imposed the maximum penalty because of its view as to the seriousness of the offense… However, the Board did not find that Mr. Russo engaged in conduct unbecoming a postal supervisor by making a racist comment. Rather, it found that he engaged in such conduct by making a comment that was offensive to Mr. Young."). *Id.*

The issue here is analogous to *Russo.* In both cases, the Proposal relies on insinuations about an employee's character that are unfounded. The Proposal here several times links the seriousness of the offense to concerns about Mr. Trinka failing to take steps to naturalize his spouse. Those concerns are not reasonable given the evidence that contradicts that claim. Because the Proposal improperly relies on serious and unfounded allegations of dishonesty and lack of integrity, mitigation of the penalty is warranted here.

Finally, you should take into consideration that Mr. Trinka is not charged with misconduct related to the original allegations under investigation by VA OIG. Instead, after a five-year series of investigations into how Mr. Trinka completed certain employment forms, the Agency charges Mr. Trinka with making a false statement to VA OIG about an unrelated conversation with his supervisors. We also note that it is a significant mitigating factor that there is evidence that one of Mr. Trinka's supervisors testified that Mr. Trinka *did* tell him about his wife's immigration status. *See* Proposal, Ex. 9.

The charged misconduct, minus the Proposal's irrelevant, unfounded and hyperbolic comments about Mr. Trinka's character, does not warrant the end of Mr. Trinka's federal career.

In sum, this *Douglas* factor requires you mitigate the penalty.

*Douglas Factor #2 – Employee's Job Level*

A supervisory role does not preclude penalty mitigation. *See Halper v. United States Postal Serv.*, 91 M.S.P.R. 170, 174 (2002) (mitigating proposed penalty for supervisor); *Vitanza v. United States Postal Serv.*, 89 M.S.P.R. 319, 322 (2001).

This *Douglas* factor does not preclude mitigation of the penalty.

*Douglas Factor #3 – Prior Disciplinary Record*

The absence of a prior permanent disciplinary record is a significant mitigating factor. *See Wentz v. U.S. Postal Serv.*, 91 M.S.P.R. 176, 185 (2002); *Robertson v. Dep't of Justice*, 81

M.S.P.R. 658, 664 (1999) (employee's past work record, which included more than twenty (20) years of federal service, and his lack of a prior disciplinary record were significant factors resulting in mitigation of proposed penalty). Mr. Trinka has no prior disciplinary record in his record of service. Mr. Trinka's record of service to the United States (both in the military and as a civilian employee) spans decades without any disciplinary action. That includes over eight years with the Department of Veterans Affairs.

Mr. Trinka's considerable record of prior service without a disciplinary record supports the imposition of penalty less than removal. *See Gibb v. Dep't of Treasury*, 88 M.S.P.R. 135, 148 (2001) (MSPB concluded the fact that an employee was never previously disciplined during his twenty (20) years of service to be significant mitigating factor); *Dangerfield v. U.S. Postal Serv.*, 77 M.S.P.R. 678, 686, (1998) (employee's more than thirty-five (35) years of service warranted mitigation); *Shelly v. Dep't of Treasury*, 75 M.S.P.B. 67, 68 (1997) ("The appellant's 23 years of service with no prior discipline is a factor supporting leniency."); *Marler v. Dep't of Veterans Affairs*, 58 M.S.P.R. 116, 118, (1993) (where an employee had thirty-nine (39) years of service, it was a mitigating factor); *Ceja v. Def. Logistics Agency*, 27 M.S.P.R. 531, 534 (1985) (thirty (30) years of service without prior discipline was a significant factor in penalty mitigation). Indeed, Mr. Trinka's years of excellent service, highlighted by numerous deserved recognitions, professional accomplishments, benefits to his employing Agency and the offices he was assigned, and promotions to increasingly complex assignments, illustrate that he has spent a lifetime serving the United States of America in accordance with the established rules and regulations.

The lack of any prior disciplinary action supports mitigating the penalty.

*Douglas Factor #4 – Past Work Record*

Performance records and years of service are significant mitigating factors. *Douglas*, 4 M.S.P.R. at 315. An employee's past work record is an appropriate factor to consider in evaluating the reasonableness of an agency-imposed penalty. *Luciano v. Dep't of Treasury*, 88 M.S.P.R. 325, 342-43 (2001). This includes his length of service, performance on the job and his dependability. *See Douglas*, 5 M.S.P.R. at 332.

Mr. Trinka's performance appraisals have been uniformly positive, and his job performance has earned him numerous recognitions and merit-based performance bonuses since he joined the VA.

This *Douglas* factor supports mitigation.

*Douglas Factor #5 – Effect on the Employee's Ability to Satisfactorily Perform His Duties*

An agency's claim that supervisors have lost trust and confidence in an appellant must be supported by evidence and cannot be based solely on a mere conclusory statement. See *Ciulla* v. USPS, 37 M.S.P.R. 627, 630-31 (1988); see also *Scott v. Department of Justice*, 69 M.S.P.R. 211, 243 (1995) (agency demonstrated that appellant's misconduct adversely affected agency's

trust in his performance, *citing Royster v. Department of Justice*, 58 M.S.P.R. 495, 499 (1993)), *aff'd*, 99 F.3d 1160 (Fed.Cir.1996)

In *Jefferson v. USPS,* 73 M.S.P.R. 376 (1997), the MSPB canceled the removals of several appellants, mitigating the penalty to suspensions, where an Agency merely concluded that it had lost trust in the appellants, citing vaguely to concerns about "integrity." *Id* at 384. The Board found that there was no specific evidence regarding any loss of trust, or any explanation as to why the Agency believed supervisors had lost trust in appellants. *Id.*

In its discussion of "aggravating factors," the Proposal casts Mr. Trinka in an unfair and false light, based on unfounded assessments of his character. It states on Page 3: "Due to the totality of the circumstances and your lack of candor, you have compromised the trust and confidence required of an employee of your position. Your continued refusal to accept responsibility and failure to take appropriate action to rectify the immigration status of your spouse only aggravates the situation and calls into question your judgement in difficult situations." These assessments assume as true a falsehood (that Mr. Trinka is not taking appropriate action to rectify the immigration status of his wife). Therefore, the Proposing Official's concern with Mr. Trinka's judgment is unfounded. Because the Proposal links the agency's "trust and confidence" in Mr. Trinka directly to its unfounded concerns about Mr. Trinka's "judgment," you should find that lack of trust and confidence unwarranted.

During the entirety of the VA OIG investigation and OAWP investigation, as well as during the brief notice period for this proposed termination, Mr. Trinka has performed his duties satisfactorily. In terms of his job duties and what the Agency expects of him at the workplace, there has been no reduction in responsibility signifying a loss of trust or confidence.

Accordingly, *Douglas* factor #5 supports mitigation of the penalty.

*Douglas Factor #6 – Consistency of the Penalty with Those Imposed on Other Employees*

The penalty imposed on an employee should be consistent with those imposed on other employees for the same or similar offenses that are charged. Where an agency knowingly and intentionally treats similarly situated employees differently with respect to a penalty, reversal or mitigation of the penalty is warranted. *See Williams v. Social Security Administration*, 586 F.3d 1365 (Fed. Cir. 2009); *Lewis v. Dep't of Veterans Affairs*, 113 M.S.P.R. 657 (2010); *Villada v. U.S. Postal Service*, 115 M.S.P.R. 268 (2010).

The Proposal does not state whether the Agency believes the penalty proposed against Mr. Trinka is consistent with penalties imposed for other similarly situated employees who committed similar misconduct.

Thus, this *Douglas* factor does not preclude mitigation.

*Douglas Factor #7 – Consistency of the Penalty with the Table of Offenses and Penalties*

The Agency's Table of Penalties lists "Reprimand" to "Removal" as the range of appropriate penalties for a first offense of "Intentional falsification, misstatement, or concealment of material fact."

Therefore, it is fundamentally within your constitutional authority and discretion and consistent with the Table of Penalties to mitigate Mr. Trinka's removal to a lesser penalty based on all of the factors at issue and in light of the circumstances presented, given the wide range of potential penalty decisions available to you. In accordance with this *Douglas* factor, you should mitigate the penalty.

*Douglas Factor #8 – Notoriety of the Charged Offense*

There is no evidence that the alleged misconduct became notorious or known by the community at all. Pure speculation about the actual notoriety in the community is improper. *See Brown v. USPS*, MSPB No. 0752-97-0123-I-1 (June 12, 1998).

Thus, this *Douglas* factor supports mitigation.

*Douglas Factor #9 – Notice of Relevant Rules*

While Mr. Trinka believes that employees must avoid making false statements or omitting material facts when rendering their official duties, there is no allegation that he did so. Indeed, the courts have found that when an agency proposes an employee's removal in whole or in part based on conduct in the employee's personal life, the removal is unwarranted. *See Doe v. Dep't of Justice*, 565 F.3d 1375, 1379 (Fed. Cir. 2009), *citing Brown v. Dep't of the Navy*, 229 F.3d 1356, 1358 (Fed. Cir. 2000).

Misconduct that is private in nature and that is allegedly "immoral" but does not implicate job performance in any direct and obvious way is often insufficient to justify removal. *See Doe,* at 1380-81, *citing Brown v. Dep't of the Navy*, 229 F.3d 1356, 1360 (Fed.Cir.2000), *Bonet v. U.S. Postal Serv.*, 661 F.2d 1071, 1078 (5th Cir.1981).

Mr. Trinka could not have been aware that he had any duty to tell his federal supervisors of his wife's immigration status. Indeed, neither the OIG, OAWP, or the Proposing Official assert or cite to any requirement to do so. Likewise, Mr. Trinka had no expectation that VA OIG had reason or permission to inquire about his conversations with his supervisors about his personal life, given that the investigation was purposed to determine whether Mr. Trinka made false statements on government employment forms, not to his supervisors. Although it appears Mr. Trinka did tell his most recent supervisor about his wife's immigration status, he had no duty to do so or to answer questions about conversations regarding his personal life.

If you sustain the charged misconduct, you should therefore mitigate the penalty due to the lack of notice provided to Mr. Trinka.

*Douglas Factor #10 – Employee's Potential for Rehabilitation*

The potential for rehabilitation is a consideration that relates to whether an employee has the ability to change his behavior and become a reliable, suitable employee who does not commit further misconduct. *Swazy v. Dep't of the Interior*, MSPB. No. AT-0752-02-0611-I-1 (2002). An employee who has served for a substantial period of time and possesses a good work ethic shows a good potential for rehabilitation. *Wentz v. U.S. Postal Serv.*, 91 M.S.P.R. 176 (2002); *Boltz v. Social Security Admin.*, 111 M.S.P.R. 568 (2009) (employee found to have potential for rehabilitation where she worked for agency for about 10 years with no prior disciplinary record, and supervisor consistently rated her performance as acceptable or higher levels and awarded her performance). Where an employee denies a charge or its underlying misconduct, that fact cannot be considered in determining the reasonableness of the penalty. *Montes v. U.S. Postal Serv.*, MSPB No. SF-0752-08-0487-I-1 (2009). An employee's service record alone can demonstrate a potential for rehabilitation, which constitutes a significant mitigating factor. *Omites v. U.S. Postal Serv.*, 87 M.S.P.R. 223, 228 and 230 (2000) (finding rehabilitative potential based on length of service and good performance record).

Mr. Trinka denies the charged misconduct. This record fails to include the actual evidence of what Mr. Trinka was asked in his VA OIG interview and how he actually answered those questions. If the Agency ever produced such evidence and it proved Mr. Trinka made false or inaccurate statements to VA OIG, then this factor would surely support mitigating a penalty of removal.

*Douglas Factor #11 – Additional Mitigating Circumstances*

In this written reply, Mr. Trinka provides evidence to you that controverts a central assumption of the "aggravating factors" section of the Proposal: that Mr. Trinka made no effort to go through the lawful immigration process with his wife.

Mr. Trinka and Ms. Trinka have for years sought to adhere to the lawful immigration process. Ms. Trinka obtained a Social Security number in 2016, has a recently renewed work authorization, and has a hearing date for her green card application on December 7, 2020. *See* Ex. 7. You should not penalize Mr. Trinka for the length of the process. Instead, you should take Mr. Trinka's attempts to "rectify the immigration status of [his] spouse" into consideration when you consider whether removal is the appropriate penalty.

*Douglas Factor #12 – Alternative Sanctions*

A separation is not the only corrective action available to the Agency. You, as the only VA official with the unfettered constitutional authority to decide the "appropriateness or necessity of the discharge," *Loudermill* at 543, have tremendous flexibility to take action based on all of the