circumstances of each individual case. In this case, the Agency can impose a sanction less than removal that will still serve the purpose of providing notice to Mr. Trinka of the Agency's concerns, and notice that any similar future incident will not be tolerated. A lesser penalty recognizes that this is Mr. Trinka's first offense.

Accordingly, this *Douglas* factor supports mitigating the penalty.

## IV. CONCLUSION.

Based on the Agency's multiple violations of due process and its own policies, as well as the lack of sufficient evidence to support the Proposal's sole specification, you must cancel the Proposal.

Sincerely,

Debra L. Roth
Conor D. Dirks

Enclosures

1. Exhibits 1-7 to the Written Reply.

cc: Ms. Mia Abraham
Human Resources Specialist
Mia.Abraham@va.gov

# TAB Q

**From:** Cussatt, Dominic (SES)
**To:** Conor Dirks
**Cc:** Abraham, Mia; Debra Roth; Hackett, Tokay (OGC)
**Subject:** RE: Mr. James Trinka/Request for Extension to Respond to Proposed Removal
**Date:** Friday, September 18, 2020 8:59:27 AM

---

Mr. Dirks,

In accordance with 38 U.S.C. Section 713 (b)(1)(A), Mr. Trinka was provided with the file containing all of the evidence in support of the proposed action. The evidence file was provided to Mr. Trinka by the proposing official Mr. Cunningham.

V/R,

Dom Cussatt

-------------------------------------------------------------------

Dominic A. Cussatt, CGEIT, CISM
Principal Deputy Assistant Secretary for Information & Technology
Deputy Chief Information Officer (CIO)

Office of Information & Technology
Department of Veterans Affairs
810 Vermont Ave. NW
Washington, D.C. 20420
Phone: 202-461-6910
UNCLASS: dominic.cussatt@va.gov
SECRET: dominic.cussatt@dhs.sgov.gov
JWICS: dcussatt@dva.id.ic.gov

*VA Core Values:* **Integrity Commitment Advocacy Respect Excellence**
*VA Core Characteristics:* **Trustworthy | Accessible | Quality | Innovative | Agile | Integrated**

---

**From:** Conor Dirks <cdirks@shawbransford.com>
**Sent:** Thursday, September 17, 2020 8:14 PM
**To:** Cussatt, Dominic (SES) <Dominic.Cussatt@va.gov>
**Cc:** Abraham, Mia <Mia.Abraham@va.gov>; Debra Roth <droth@shawbransford.com>; Hackett, Tokay (OGC) <Tokay.Hackett@va.gov>
**Subject:** [EXTERNAL] RE: Mr. James Trinka/Request for Extension to Respond to Proposed Removal

Mr. Cussatt,

Exhibit 1

In addition to our request for extension, our letter asked whether the proposing official provided Mr. Trinka all the materials relied upon to support the proposed termination. Your e-mail below does not address that question. Please confirm that Mr. Trinka received all the evidence relied upon to support the proposed termination, and all evidence that you will review in making your decision on the proposed termination.

Thank you,

**Conor D. Dirks**
Associate Attorney

Shaw Bransford & Roth P.C. | Attorneys at Law
1100 Connecticut Avenue, NW, Suite 900
Washington, DC 20036
Phone: (202) 463-8400 Ext. 310 | Fax: (202) 833-8082
www.shawbransford.com | cdirks@shawbransford.com

This message originates from the law firm of Shaw Bransford & Roth P.C. This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying, or other use of this message or its attachments is strictly prohibited. All personal messages express solely the sender's views and not those of Shaw Bransford & Roth P.C. If you received this message in error, please notify us immediately at sbr@shawbransford.com.

---

**From:** Cussatt, Dominic (SES) <Dominic.Cussatt@va.gov>
**Sent:** Thursday, September 17, 2020 1:40 PM
**To:** Conor Dirks <cdirks@shawbransford.com>
**Cc:** Abraham, Mia <Mia.Abraham@va.gov>; Debra Roth <droth@shawbransford.com>; Hackett, Tokay (OGC) <Tokay.Hackett@va.gov>
**Subject:** RE: Mr. James Trinka/Request for Extension to Respond to Proposed Removal

Mr. Dirks,

After carefully reviewing your request for an extension and consulting with the VA Office of General Counsel, I do not find that exigent circumstances exist. Therefore, your request for an extension is hereby denied.

V/R,

Dom Cussatt

------------------------------------------------------------------

Dominic A. Cussatt, CGEIT, CISM
Principal Deputy Assistant Secretary for Information & Technology
Deputy Chief Information Officer (CIO)

Office of Information & Technology
Department of Veterans Affairs
810 Vermont Ave. NW
Washington, D.C. 20420
Phone: 202-461-6910
UNCLASS: dominic.cussatt@va.gov
SECRET: dominic.cussatt@dhs.sgov.gov
JWICS: dcussatt@dva.id.ic.gov

*VA Core Values:* **Integrity Commitment Advocacy Respect Excellence**
*VA Core Characteristics:* **Trustworthy | Accessible | Quality | Innovative | Agile | Integrated**

---

**From:** Conor Dirks <cdirks@shawbransford.com>
**Sent:** Wednesday, September 16, 2020 7:08 PM
**To:** Cussatt, Dominic (SES) <Dominic.Cussatt@va.gov>
**Cc:** Abraham, Mia <Mia.Abraham@va.gov>; Debra Roth <droth@shawbransford.com>
**Subject:** [EXTERNAL] Mr. James Trinka/Request for Extension to Respond to Proposed Removal

Principal Deputy Assistant Secretary Cussatt:

This law firm represents Mr. James Trinka with regard to the Notice of Proposed Removal, dated September 11, 2020. Attached please find our notice of appearance and request for a brief, three-day extension of time to respond.

Thank you,

**Conor D. Dirks**
Associate Attorney

Shaw Bransford & Roth P.C. | Attorneys at Law
1100 Connecticut Avenue, NW, Suite 900
Washington, DC 20036
Phone: (202) 463-8400 Ext. 310 | Fax: (202) 833-8082
www.shawbransford.com | cdirks@shawbransford.com

This message originates from the law firm of Shaw Bransford & Roth P.C. This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you should immediately stop reading this

message and delete it from your system. Any unauthorized reading, distribution, copying, or other use of this message or its attachments is strictly prohibited. All personal messages express solely the sender's views and not those of Shaw Bransford & Roth P.C. If you received this message in error, please notify us immediately at sbr@shawbransford.com.

# TAB R

THE SECRETARY OF VETERANS AFFAIRS
WASHINGTON

July 7, 2017

**CORPORATE SENIOR EXECUTIVE MANAGEMENT OFFICE**
**LETTER NO: 006-17-1**
**Senior Executive Accountability and Grievance Procedures**

1. **Purpose:** To provide procedures to implement 38 United States Code (U.S.C.) §§ 323, 713, 731, as amended by the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017 (Public Law 115-41).

2. **Policy:** The Secretary of Veterans Affairs, or his or her designee, may reprimand, suspend, demote, or remove a Senior Executive at the Department of Veterans Affairs (VA) if the Secretary, or his or her designee, determines the employee's performance or misconduct warrants such an action. Procedural entitlements contained in VA Directive and Handbook 5021, part I, chapter 3, and 5027 do not apply to actions taken pursuant to this authority.

3. **Scope:** These procedures apply to all VA Senior Executives, as that term is defined herein. The content of this memorandum applies to both misconduct and performance, which results in the Secretary, or his or her designee, making a determination to reprimand, suspend, demote, or remove a Senior Executive, as defined below.

4. **References:**

   a. 38 U.S.C. § 713, as amended by title II, section 201, of the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017 (Public Law 115-41).

   b. 38 U.S.C. § 323, as added by title I, section 102, and title II, section 206, of the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017 (Public Law 115-41).

   c. 38 U.S.C. § 731, as renumbered and amended by title I, section 102, and title II, section 206, of the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017 (Public Law 115-41).

   d. VA Directive and Handbook 5013 (performance actions against Senior Executive Service equivalent employees).

   e. VA Directive and Handbook 5021 (disciplinary and adverse actions and related grievance procedures).

Exhibit 2

f. VA Directive and Handbook 5027 (performance actions against members of the Senior Executive Service).

g. 5 U.S.C. chapter 43, subchapter II.

h. 38 U.S.C. chapters 73 and 74.

5. **Delegation:** The Secretary of Veterans Affairs delegates his or her authority to reprimand, suspend, demote, or remove a VA Senior Executive, as provided in this policy and other applicable delegations.

6. **Definitions:** For the purpose of the Act and this policy, the following terms apply:

a. "Accompany a Position in a Transfer of Function" is the movement of a Senior Executive when a continuing function transfers from one competitive area to one or more other competitive areas where the function was not being performed, or the movement of the entire competitive area to another Commuting Area.

b. “Act” refers to the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017 (Public Law 115-41).

c. “Business days” refers to weekdays, which are Monday through Friday in Washington, D.C., except when such a day is designated as a Federal holiday by the Office of Personnel Management.

d. "Closeout rating" refers to the rating assigned by the Rating Official when a Senior Executive changes positions or transfers to another agency.

e. "Commuting Area" refers to the geographic area surrounding a work site that encompasses the localities where people live and reasonably can be expected to travel daily back and forth to work.

f. "Deciding Official" refers to the individual to whom the Secretary has delegated the authority to make an Initial Decision on an action. A Deciding Official must be a PAS or an individual delegated by the Secretary.

g. "Demotion" or “demote” refers to the involuntary transfer of a Senior Executive to a non-Senior Executive position at a grade for which the individual is qualified and the Secretary, or his or her designee, determines is appropriate.

h. "Directed Reassignment" means the management directed reassignment of a Senior Executive, while serving continuously within the same agency, from

one position to another.

i. "Final Decision" refers to a decision made by the Secretary. The decision will be based on the record that has been developed, including the Proposal, any response provided by the Senior Executive to the Proposal, the Initial Decision, the grievance, and the recommendation from the Grievance Official. The Final Decision states the:

    i. Decision of the Secretary of Veterans Affairs;
    ii. Basis of that decision;
    iii. Discipline, if any, to be imposed, and the effective date of the discipline; and
    iv. Right to seek judicial review.

j. "Final rating" refers to the annual summary rating that an appointing authority assigns at the end of the appraisal period after considering a Performance Review Board's recommendations.

k. "Grievance Official" refers to the official who has been designated to examine a grievance and make a recommendation to the Secretary on that grievance. A Grievance Official may be designated by the Secretary or otherwise is a head of an organization. A Grievance Official cannot have also served as the Deciding Official on the action.

l. "Initial Decision" refers to a memorandum from the Deciding Official to the Senior Executive that states the:

    i. Initial decision of the Deciding Official on a Proposal;
    ii. Basis of that initial decision;
    iii. Discipline, if any, to be imposed, and the effective date of the discipline;
    iv. Right to grieve the initial decision through the grievance process described in this policy or seek judicial review, if applicable; and
    v. Requirement that any grievance must be filed no later than 7 business days after the Initial Decision is issued and a failure to timely file a grievance would result in an Initial Decision becoming final and conclusive.

m. "Interim rating" refers to the rating assigned by the Rating Official, who is leaving his/her position, and provided to the Senior Executive who has been under the Rating Official's supervision.

n. "Malfeasance" is defined as an act that is unjustified, harmful, or contrary to law, rule, or regulation. It includes, but is not limited to:

    i. Conduct, actions, or inactions that are unbecoming a Senior

Executive or a civil service employee;

ii. Conduct, actions, or inactions that negatively impact VA or detract from VA's mission;
iii. Intentionally or negligently violating the law, rule, regulation, or VA policy; or
iv. Insubordination.

o. “Misconduct" refers to, but is not limited to:

i. "Neglect of Duty," as such term is defined herein;
ii. "Malfeasance," as such term is defined herein;
iii. "Failure to Accept a Directed Reassignment," as the term "Directed Reassignment" is defined herein;
iv. "Failure to Accompany a Position in a Transfer of Function," as the term "Accompany a Position in a Transfer of Function" is defined herein; or
v. Retaliation against a “whistleblower” for making a lawful “whistleblower disclosure” as those terms are defined by 38 U.S.C. § 323(g).

p. "Neglect of Duty" includes, but is not limited to, failure to provide appropriate oversight, supervision, or control over matters or personnel that are assigned to or are the responsibility of the Senior Executive; and failure of Senior Executives to follow the guidance herein to address in a timely manner performance or disciplinary issues of their subordinates.

q. “OAWP” refers to the VA Office of Accountability and Whistleblower Protection, as represented by the Assistant Secretary for Accountability and Whistleblower Protection or his or her designee.

r. “OGC” refers to the VA Office of General Counsel, as represented by the General Counsel or his or her designee.

s. “OHRA” refers to the VA Office of Human Resources and Administration, as represented by the Assistant Secretary for Human Resources and Administration or his or her designee.

t. "OIG" refers to the VA Office of Inspector General, as represented by the Inspector General or his or her designee.

u. “OPM” refers to the U.S. Office of Personnel Management.

v. "Organization" refers to a VA Administration or Staff Office.

w. “PAS” refers to an individual who is appointed by the President and confirmed by the Senate.

x. "PPA" refers to Prohibited Personnel Action, as described in 38 U.S.C. § 733(c) (to be renumbered to 38 U.S.C. § 731(c)).

y. "Progress review" refers to a formal or informal feedback provided to a Senior Executive on his/her progress in meeting the performance elements and requirements described in the performance plan.

z. "Proposal" refers to a documentation from the Proposing Official to the Senior Executive that:

i. Notifies the Senior Executive of the proposed action;
ii. Notifies the Senior Executive of the basis of the proposed action;
iii. Provides the evidence supporting the proposed action;
iv. Notifies the Senior Executive that the action is being taken pursuant to 38 U.S.C. § 713;
v. Notifies the Senior Executive of the opportunity to provide a written reply to the Deciding Official within 7 business days and the means of transmitting such reply; and
vi. Notifies the Senior Executive of the ability to be represented by an attorney or other representative of the Senior Executive's choice.

Note: See paragraph 9 if a Proposal is taken based on matters covered by 38 U.S.C. § 731.

aa. "Proposing Official" refers to the official, usually the Senior Executive's immediate supervisor, who issues a notice of proposed Reprimand, Suspension, Demotion, or Removal.

bb. "Rating Official" refers to the official, usually the Senior Executive's immediate supervisor, who is responsible for developing the Senior Executive's performance plan, appraising the Executive's performance, and assigning an Initial Summary Rating.

cc. "Removal" or "remove" refers to the involuntary separation of a Senior Executive from the civil service.

dd. "Reprimand" is a written statement of censure given to a Senior Executive for Misconduct.

ee. "Retaliation" refers to a personnel action, as defined in 5 U.S.C. § 2302, or as described in 38 U.S.C. § 731, taken, threatened to be taken, or not taken by a supervisor against a "whistleblower" for making a lawful "whistleblower disclosure" as those terms are defined by 38 U.S.C. § 323(g).

ff. "Senior Executive" refers to:

i. A "career appointee" in a "Senior Executive Service position" as those terms are defined by 5 U.S.C. §§ 3132(a)(4) and (a)(2), respectively; or
ii. An individual who occupies an administrative or executive position and who was appointed under 38 U.S.C. §§ 7306(a), 7401(1), and 7401(4), including, but not limited to, medical center directors, chiefs of staff, and nurse executives appointed under those titles; except that an individual who is appointed under 38 U.S.C. § 7401(1) will not be considered a "Senior Executive" under this policy if the basis for either a Reprimand, suspension, Demotion, or Removal under this policy involves or includes a question of professional conduct or competence, as defined under 38 U.S.C. § 7461(c)(3). In such a case, 38 U.S.C. §§ 7461 and 7462, and applicable VA policies, will govern.

gg. "Standard of Proof" refers to the degree of evidence necessary to sustain an action taken under 38 U.S.C. § 713. For actions taken under this authority, Substantial Evidence is the Standard of Proof.

hh. "Substantial Evidence" means relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree.

ii. "Suspend" or "suspension" means placing a Senior Executive in a temporary status without duties and pay.

jj. "Title 5" refers to title 5 of the United States Code.

kk. "Title 38" refers to title 38 of the United States Code.

ll. "VA" refers to the U.S. Department of Veterans Affairs.

**7. Procedures:**

a. Actions based on Misconduct, performance, or Retaliation:

i. Organization heads or their designees shall refer all allegations of Misconduct, poor performance, or Retaliation involving Senior Executives to OAWP.
ii. OAWP will refer matters involving actual or possible violations of criminal laws to the OIG pursuant to section 1.204 of title 38 of the Code of Federal Regulations (C.F.R.).

iii. Investigation: OAWP or, as specifically delegated by OAWP, an Organization, shall review and, if necessary, investigate any allegation or other evidence of Misconduct, poor performance, or Retaliation, using appropriate processes such as administrative investigation boards or fact-finding inquiries.

1. Unless the circumstances of the investigation make it impossible, unreasonable, or unnecessary to do so, a Senior Executive who is the subject of an investigation or review will be given an opportunity to respond to and provide evidence relating to the matters under investigation. Any statement or evidence provided by the Senior Executive will be included in the investigative file, and if relevant or used in support of a subsequent proposed action, the evidence file; and
2. OAWP or, as specifically delegated by OAWP, the organization, will consult with OGC should procedural or legal questions arise about the investigation.
3. Upon conclusion of the OAWP investigation, OAWP and OGC shall brief the Secretary or his or her designee on the results of the investigation and whether disciplinary action is recommended. The recommendation will be limited to whether disciplinary action should be pursued.
4. If the Secretary or his or her designee concurs with OAWP and OGC's recommendation, OAWP and OGC shall coordinate with the organization or the Secretary to identify a Proposing Official who shall be briefed regarding the results of the investigation and the evidence gathered.

b. Acting on the Investigation and Evidence:

i. The Proposing Official will review the available evidence to determine whether a Reprimand, Suspension, Demotion, or Removal should be proposed; or whether no action is warranted. The Proposing Official will consult with OGC, OAWP, and OHRA.

Note: See the restrictions that apply on discipline in paragraph 9 of this policy.

Note: The Proposing Official will propose a penalty that is reasonable and commensurate with the facts of the case and the rationale for determining what constitutes the appropriate level of discipline will be included in the Proposal.

ii. "No action" may be warranted if the Proposing Official determines, by Substantial Evidence, that the evidence does not support any of the allegations against the Senior Executive.

iii. Once the Proposing Official has decided on a course of action,

the Proposing Official will work with OAWP and OGC to prepare a Proposal.

c. Additional requirements for actions based on performance:

i. Senior Executives may be demoted or removed for performance under the Act, as implemented in this policy.
ii. There is no requirement for the Senior Executive to have served a 90-day performance appraisal period prior to a performance-based Demotion or Removal. Such a performance-based action could, among other things, be based on a current progress review or immediately preceding Final rating, Interim rating, or Closeout rating against approved performance standards.
iii. Organizations will work with OHRA, OGC and OAWP to identify a Proposing Official.
iv. Proposing Officials will work with OHRA, OAWP, and OGC to prepare a performance-based Proposal. In addition to the requirements for a Proposal, defined earlier in this document, the Proposal will articulate or provide in evidence:
    1. The Senior Executive's performance standards;
    2. The Senior Executive's last performance rating, if one exists;
    3. Documentation that supports the Senior Executive's performance deficiencies; and
    4. A copy of the notice provided to the Senior Executive of the performance deficiencies.

d. Processing an action under the Act:

i. The Proposing Official will, through OAWP in consultation with OHRA and OGC, provide the Senior Executive with a copy of the Proposal. OAWP will also provide a copy of the issued Proposal to OGC.

<u>Note:</u> In cases where a Senior Executive is being demoted, the Proposal shall state the position, title, grade, salary, and location of the position to which the individual will be demoted.

ii. The Senior Executive will have 7 business days after receiving the Proposal to respond, in writing, to the Deciding Official.
iii. Extensions to the reply period may be granted by the Deciding Official, after consulting with OGC and OAWP, but should only be granted in themost exigent circumstances and recognizing the statutory requirement to issue a decision within 15 business days from the date that the Proposal was issued.
iv. The Deciding Official will give full and impartial consideration to

the Senior Executive's reply, if any, along with the Proposal. The Deciding Official will consult with OGC, OAWP and OHRA, but shall not consult or discuss the Proposal, response, or the pending matter with any other individual at VA.

v. Not later than 15 business days after the date of the Proposal, the Deciding Official shall issue an Initial Decision, after independently reviewing the Proposal, the evidence being relied upon, and considering the Senior Executive's reply. An Initial Decision that is not grieved within the timeframes prescribed in this policy shall be final and conclusive and shall only be entitled to judicial review as provided for under the Act. A copy of the Initial Decision should be provided to OAWP, OHRA, and OGC.
   1. In cases where a Senior Executive is being demoted, the Initial Decision shall state the position, title, grade, salary, and location of the position to which the individual will be demoted.
   2. In cases where a Senior Executive is to be demoted, the Secretary, or his or her designee, is the approving official for pay setting determinations.

vi. The aggregate period for notice, reply, and Initial Decision on a proposed action may not exceed 15 business days.

**8. Grievance Process:**

a. A Senior Executive who receives an Initial Decision for an action taken under the Act and this policy is entitled to grieve such an Initial Decision to a Grievance Official. The grievance must be in writing and contain the following information:

i. The specific action on which the grievance is based, the date the action occurred, and the date the individual first learned of the action (if appropriate);

ii. The reasons for which the individual believes that the action was not supported by Substantial Evidence; is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with a provision of law; or obtained without procedures required by a provision of law having been followed; and

iii. The corrective action desired by the individual.
   1. If the grievance does not include the above information, the Grievance Official will consider the grievance, as written, along with the record established under this policy.
   2. A grievance must be filed with the Grievance Official, containing the information in paragraph 8a of this policy, within seven business days from the date that the Initial Decision was received by the Senior Executive. A failure to file a grievance within this timeframe would result in an

Initial Decision becoming final and conclusive and subject only to judicial review under the Act.

3. Upon receipt of a grievance, the Grievance Official will consult with OAWP and OGC, who will advise the Grievance Official on issues raised by the grievant. The Grievance Official may not consult with other parties.
4. The Grievance Official will, within 20 calendar days of receiving the grievance, issue a recommendation to the Secretary through OAWP on the grievance. The Grievance Official may, after reviewing the record, including the grievance, Initial Decision, and Proposal, recommend to the Secretary to mitigate the discipline. The Grievance Official may recommend setting aside an Initial Decision that is the subject of the grievance if he or she determines that the record reflects that the action was:
   a. Not supported by Substantial Evidence; or
   b. Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with a provision of law; or
   c. Obtained without procedures required by a provision of law having been followed.
5. The Secretary, after reviewing the record, including the Grievance Official's recommendation, the grievance, the Initial Decision, and the Proposal, will issue a Final Decision.
   a. In cases where a Senior Executive is being demoted, the Final Decision shall state the position, title, grade, salary, and location of the position to which the individual will be demoted.
   b. In cases where a Senior Executive is to be demoted, the Secretary is the approving official for pay setting determinations.
6. The Final Decision will not uphold an Initial Decision that is the subject of the grievance if the Secretary determines that the record reflects that the action was:
   a. Not supported by Substantial Evidence; or
   b. Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with a provision of law; or
   c. Obtained without procedures required by a provision of law having been followed.
7. The Final Decision shall be subject to judicial review under 38 U.S.C. §§ 713(b)(4)-(6).

**9. Adverse Actions against Senior Executives who commit PPAs under 38 U.S.C. § 731:**

a. A Senior Executive against whom the Secretary, or his or her designee, the OIG, or unless the matter is still pending or under appeal, an administrative judge, the Merit Systems Protection Board, the Office of Special Counsel, an adjudicating body provided under a union contract, or a Federal judge, determines committed a PPA will face the following proposed discipline:

i. With respect to the first time such a determination has been made against the Senior Executive, a suspension of no less than 12 days and not more than removal; and
ii. With respect to the second time such a determination has been made against the Senior Executive, removal.

b. A Proposal issued against a Senior Executive for a PPA, as determined in paragraph 9a, should state that the proposed discipline is taken under the authority in this policy, as amended by 38 U.S.C. § 731, and that the 7 business day timeframe for reply (as stated in paragraph 7c(2)) for an action taken under this policy is amended to 10 calendar days.

c. For the purposes of paragraph 9:

i. An "administrative judge" refers to an administrative judge of the Merit Systems Protection Board; and
ii. An "adjudicating body provided under a union contract" refers to an arbitrator who VA and a union have selected to adjudicate a matter described in 5 U.S.C. § 7121(f).

David J. Shulkin, M.D.

# TAB S

DEPARTMENT OF VETERANS AFFAIRS

# OFFICE OF INSPECTOR GENERAL

*Office of Special Reviews*

OFFICE OF ACCOUNTABILITY & WHISTLEBLOWER PROTECTION

# Failures Implementing Aspects of the VA Accountability and Whistleblower Protection Act of 2017

Exhibit 3

REVIEW | REPORT #18-04968-249 | OCTOBER 24, 2019

The mission of the Office of Inspector General is to serve veterans and the public by conducting effective oversight of the programs and operations of the Department of Veterans Affairs through independent audits, inspections, reviews, and investigations.

*In addition to general privacy laws that govern release of medical information, disclosure of certain veteran health or other private information may be prohibited by various federal statutes including, but not limited to, 38 U.S.C. §§ 5701, 5705, and 7332, absent an exemption or other specified circumstances. As mandated by law, the OIG adheres to privacy and confidentiality laws and regulations protecting veteran health or other private information in this report.*

**Report suspected wrongdoing in VA programs and operations to the VA OIG Hotline:**

**www.va.gov/oig/hotline**

**1-800-488-8244**

# Executive Summary

The VA Office of Accountability and Whistleblower Protection (OAWP) was established in 2017 to improve VA's ability to hold employees accountable and enhance protections for whistleblowers.[1] This goal was to be accomplished, in part, by expanding VA's ability to hold senior executives accountable for specified misconduct; preventing retaliation against whistleblowers and initiating action against supervisors who retaliate; and addressing senior executives' poor performance.

A year later, in June 2018, the VA Office of Inspector General (OIG) received requests from Senators Tammy Baldwin, Richard Blumenthal, Sherrod Brown, Patty Murray, Jon Tester, and Representative Timothy Walz raising concerns that VA was not properly implementing the Department of Veterans Affairs Accountability and Whistleblower Protection Act (the Act). These requests came as a number of other complaints were being considered by the OIG regarding OAWP operations. In response, the OIG's Office of Special Reviews conducted an initial review from June 2018 through December 2018. During the review, additional allegations arose, prompting further work through August 2019.[2]

The OIG's review focused on answering the following questions that emerged from these complaints and allegations:

1. Whether the OAWP was exercising its authority in accordance with the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017 and other applicable laws
2. Whether the OAWP conducted adequate, thorough, and procedurally fair investigations of matters it investigated
3. Whether VA employees were held accountable by making appropriate use of the authorities provided in the Act

---

[1] *See* Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017, P.L. 115-41, 131 Stat. 862 (June 23, 2017). The legislation codified the establishment of the OAWP following an executive order issued in April 2017 to create an entity to "improve accountability and whistleblower protection" at VA. Improving Accountability and Whistleblower Protection at the Department of Veterans Affairs, Exec. Order No. 13793, 82 Fed. Reg. 20539 (Apr. 27, 2017). *See also* Dep't of Veterans Affairs, News Release, "Secretary David Shulkin Announces Establishment of Office of Accountability and Whistleblower Protection and Names Peter O'Rourke as its Senior Advisor and Executive Director" (May 12, 2017).

[2] From June 23, 2017, until January 7, 2019, the OAWP operated without an assistant secretary—a position called for by the Act. It was led by Executive Director Peter O'Rourke from June 23, 2107, to February 28, 2018, followed by Executive Director Kirk Nicholas until January 7, 2019. The current Assistant Secretary for Accountability and Whistleblower Protection took office on January 7, 2019, and soon began implementing changes, some of which address matters identified throughout the review.

4. Whether the OAWP was adequately protecting whistleblowers from retaliation as required by the Act and other applicable laws
5. Whether VA complied with other requirements of the Act, including making timely and accurate reports to Congress.

The OIG identified significant deficiencies with respect to each of these questions. Notably, in its first two years of operation, the OAWP acted in ways that were inconsistent with its statutory authority while it simultaneously floundered in its mission to protect whistleblowers. Even recognizing that organizing the operations of any new office is challenging, OAWP leaders made avoidable mistakes early in its development that created an office culture that was sometimes alienating to the very individuals it was meant to protect. Those leadership failures distracted the OAWP from its core mission and likely diminished the desired confidence of whistleblowers and other potential complainants in the operations of the office. A summary of key findings related to each of the review questions follows.

## The OAWP Misinterpreted Its Statutory Mandate, Resulting in Failures to Act Within Its Investigative Authority

The OAWP misconstrued its statutory investigative mandate both by accepting matters that it should not have and declining matters the Act requires it to investigate. The OAWP also investigated individuals who were not included within the scope of the OAWP's authority under the Act. This included investigating one of its own directors for allegations relating to the director's earlier position at another VA office. At the same time, it was too narrowly interpreting the scope of *what* the office should investigate. The OAWP inappropriately excluded investigations of misconduct and poor performance of covered individuals if the person making the allegations did not meet the statutory definition of whistleblower.

In addition to misinterpreting its statutory investigative mandate, the OAWP also failed to refer matters for investigation to other more appropriate investigative entities. VA employees must, for example, refer to the OIG matters that may be serious violations of criminal law related to VA. The OAWP investigated criminal matters involving possible felonies that it was required to refer to the OIG. Allegations of discrimination similarly should have been referred to VA's designated equal employment opportunity (EEO) office, the Office of Resolution Management (ORM), unless they fell within the OAWP's authority to investigate. Although the law does not require that the OAWP refer such matters to the ORM, filing with the ORM is the only way for employees to preserve their EEO rights and it has more expertise to handle investigations of discrimination.

## The OAWP Did Not Consistently Conduct Procedurally Sound, Accurate, Thorough, and Unbiased Investigations and Related Activities

Written policies and procedures are crucial to effective operations. During the tenures of Executive Directors O'Rourke and Nicholas, the OAWP did not adopt comprehensive written policies and procedures on any topic. As of July 2019, it still lacked OAWP-specific written policies and procedures.[3] The office also did not have a quality assurance process for identifying and preventing errors in its work.

The lack of clear written guidance for OAWP personnel contributed to the failure to consistently conduct investigations that were procedurally sound, accurate, thorough, and unbiased. Moreover, the OAWP Investigations Division was primarily staffed with human resources specialists whose position descriptions did not require extensive investigative training or experience. This deficiency was aggravated by the OAWP's failure to provide sufficient training on such critical topics as interviewing witnesses, conducting investigations, and writing reports.

A further investigative deficiency was the OAWP's practice of investigating to the "substantial evidence" standard. That is, OAWP investigators did not conduct investigations designed to ensure that all known or obviously relevant evidence was obtained.[4] Rather, in many instances, they focused only on finding evidence sufficient to substantiate the allegations without attempting to find potentially exculpatory or contradictory evidence. One disciplinary official described OAWP investigations as "a [disciplinary] action in search of evidence."

## VA Has Struggled with Implementing the Act's Enhanced Authority to Hold Covered Executives Accountable

A critical purpose of the Act was to facilitate holding Covered Executives accountable for misconduct and poor performance.[5] However, as of May 22, 2019, VA had removed only one Covered Executive from federal service pursuant to the authority provided by the Act. The OIG found that officials tasked with proposing and deciding disciplinary action had insufficient direction for how to determine the appropriate level of discipline that would ensure consistency and fairness for specific acts of misconduct and poor performance. In many cases, a disciplinary official mitigated the discipline recommended by OAWP as too severe or based on advice from

[3] OAWP staff reported during the review that written policies and procedures were being drafted.

[4] For example, the Council of Inspectors General on Integrity and Efficiency, Quality Standards for Investigations (November 15, 2011) provide that all known or obviously relevant evidence should be obtained during an investigation. While OAWP is not governed by these standards, they provide relevant guidance for conducting thorough and objective investigations in a similar context.

[5] "Covered Executives" in this report refer to VA personnel holding statutorily enumerated senior-level positions as defined in 38 U.S.C. §§ 323(c)(1)(H)(i) and (ii).

the VA's Office of General Counsel. In part, this was because of the absence of clear guidance and the OAWP's practice of not always including relevant exculpatory evidence.[6]

### The OAWP Failed to Fully Protect Whistleblowers from Retaliation

From June 2017 to May 2018, the OAWP referred 2,526 submissions to other VA program offices, facilities, or other components that were not all equipped to undertake such investigations and without adequate measures to track the referrals or safeguards to protect whistleblowers' identities.[7] Of these, at least 51 involved allegations of whistleblower retaliation by a supervisor (and so properly within the investigative authority of the OAWP). Complainants were not always advised of these referrals. Without guidance, OAWP personnel did not take sufficient steps to protect complainants' identities and prevent their concerns from being sent to the very facilities or network offices where the complainant worked or that were the subject of the allegations.

The OAWP also failed to establish safeguards sufficient to protect whistleblowers from becoming the subject of retaliatory investigations. One troubling instance involved the OAWP initiating an investigation that could itself be considered retaliatory. At the request of a senior leader who had social ties to the OAWP Executive Director, the OAWP investigated a whistleblower who had a complaint pending against the senior leader. After a truncated investigation, the OAWP substantiated the allegations without even interviewing the whistleblower.

In addition, former OAWP leaders made comments and took actions that reflected a lack of respect for individuals they deemed "career" whistleblowers. Moreover, at a time when the office was failing to meet its statutory requirements and purposes, then Executive Director Nicholas directed about 15 percent of the OAWP's FY 2018 budget to be obligated for contracts beyond its core mission.

## VA Did Not Comply with Additional Requirements of the Act and Other Authorities

VA did not meet many other requirements of the Act and other authorities. Significant among these shortcomings were the following failures:

- To revise supervisors' performance plans and provide required training
- To implement whistleblower protection training for all employees

[6] Under a pilot initiative implemented by Dr. Bonzanto in March 2019, VA's Office of General Counsel attorneys are now routinely provided access to the entire investigative file.

[7] In April and May 2019, Dr. Bonzanto directed, as part of an effort to review all 539 investigations of whistleblower retaliation allegations received from June 23, 2017, through April 15, 2019, to determine if they were properly developed. A plan has been submitted for reviewing 42 disclosures determined to need further review.

- To meet its statutory obligation to submit responsive congressionally mandated reports
- To file systems of records notices
- To disclose routine uses of information

A worthy objective of the OAWP is to promote an environment in which whistleblowers feel comfortable in making complaints without fear of retaliation or reprisal. The former leaders of OAWP engaged in misdeeds and missteps that appeared unsupportive of whistleblowers while also failing to meet many of the other important objectives of the Act. Given the magnitude of the situation inherited by new OAWP leaders in January 2019, significant enhancements are needed for OAWP to meet its mission and purpose.

The OIG made 22 recommendations to improve VA processes that increase employee accountability and whistleblower protection.

R. JAMES MITCHELL, ESQ.
Acting Executive Director
for the Office of Special Reviews

# Contents

Abbreviations .......... vii

Introduction .......... 1

Findings and Analysis .......... 7

Finding 1: The OAWP Misinterpreted Its Statutory Mandate, Resulting in Failures to Act Within Its Investigative Authority .......... 7

Finding 2: The OAWP Did Not Consistently Conduct Procedurally Sound, Accurate, Thorough, and Unbiased Investigations and Related Activities .......... 21

Finding 3: VA Has Struggled with Implementing the Act's Enhanced Authority to Hold Covered Executives Accountable .......... 37

Finding 4: The OAWP Failed to Fully Protect Whistleblowers from Retaliation .......... 45

Finding 5: VA Did Not Comply with Additional Requirements of the Act, Including Timely and Accurate Congressional Reporting .......... 57

Finding 6: The OAWP Lacked Transparency in Its Information Management Practices .......... 65

Conclusion .......... 71

Recommendations 1–22 .......... 71

Management Comments .......... 73

OIG Response .......... 74

Concerns with VA Action Plans .......... 75

Appendix A: Scope and Methodology .......... 77

Appendix B: Management Comments .......... 79

OIG Contact and Staff Acknowledgments .......... 90

Report Distribution .......... 91

# Abbreviations

| | |
|---|---|
| A&A | Advisory & Analysis (Division) |
| HR&A | Human Resources and Administration |
| HVAC | U.S. House of Representatives Committee on Veterans' Affairs |
| OAR | Office of Accountability Review |
| OAWP | Office of Accountability and Whistleblower Protection |
| OGC | Office of General Counsel |
| OIG | Office of Inspector General |
| OMI | Office of the Medical Inspector |
| SVAC | U.S. Senate Committee on Veterans' Affairs |
| VISN | Veterans Integrated Service Network |

# Introduction

On May 12, 2017, then VA Secretary David Shulkin announced the establishment of the VA Office of Accountability and Whistleblower Protection (OAWP). Created by executive order, the OAWP was intended to improve VA's efforts to hold its "employees accountable for their actions if they violate the public trust, and at the same time protect whistleblowers from retaliation."[8] In June, Congress passed the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017, which was signed into law on June 23, 2017. The Act "codified and expanded [the] OAWP, assigned it specific responsibilities, and implemented new authorities to hold senior leaders and employees accountable."[9]

A year later, in June 2018, the VA Office of Inspector General (OIG) received requests from Senators Tammy Baldwin, Richard Blumenthal, Sherrod Brown, Patty Murray, Jon Tester, and Representative Timothy Walz for a review of how VA was implementing the Act in light of allegations they received that its authorities were being "used in an inconsistent and inappropriate manner." The OIG had also been receiving complaints from current and former VA employees, veterans, and members of the public raising similar concerns, particularly about OAWP's operations and leaders' actions. Although allegations varied in their specifics, some common themes emerged that focused the scope of the OIG's review on answering the following questions:

1. Whether the OAWP was exercising its authority in accordance with the Act and other applicable laws
2. Whether the OAWP conducted adequate, thorough, and procedurally fair investigations of matters it investigated
3. Whether VA employees were held accountable by making appropriate use of the authorities provided in the Act
4. Whether the OAWP was adequately protecting whistleblowers from retaliation as required by the Act and other applicable laws
5. Whether VA complied with other requirements of the Act, including making timely and accurate reports to Congress

During its review, the OIG also identified concerns relating to OAWP's compliance with the Privacy Act of 1974 and the Freedom of Information Act.

---

[8] VA Office of Public Affairs, Press Release: "Secretary David Shulkin Announces Establishment of Office of Accountability and Whistleblower Protection and Names Peter O'Rourke as its Senior Advisor and Executive Director," news release, May 12, 2017, https://www.va.gov/opa/pressrel/pressrelease.cfm?id=2904.

[9] VA Office of Accountability and Whistleblower Protection, *Report to the Committee on Veterans Affairs of the Senate and the Committee on Veterans Affairs of the House of Representatives on the Activities of the Office of Accountability and Whistleblower Protection for the Period June 30, 2017 – June 30, 2018*, June 30, 2018.

The OIG's primary review period began with the statutory establishment of the OAWP on June 23, 2017, and ended on December 31, 2018. Unless otherwise noted, the information and data presented in this report pertain to this period. Upon taking office in January 2019, the current Assistant Secretary for Accountability and Whistleblower Protection began to implement changes. To provide the most current information practicable, and address more recent complaints, the OIG conducted additional work through August 2019, including document review and interviews with the Assistant Secretary and other OAWP staff.[10]

## Creation of the Office of Accountability and Whistleblower Protection

Before the OAWP was established, the Office of Accountability Review (OAR) was responsible for investigating allegations of senior executive misconduct. Established as part of the VA Office of General Counsel (OGC) in 2014 at the direction of former VA Chief of Staff Jose Riojas, the OAR had a mandate to "receive, review, investigate, and resolve allegations of misconduct and lack of oversight by senior leaders."[11]

In April 2017, President Donald Trump issued an executive order directing that

> the Secretary shall establish in the VA the Office of Accountability and Whistleblower Protection (Office), and shall appoint a Special Assistant, reporting directly to the Secretary, to serve as Executive Director of the Office. The VA shall provide funding and administrative support for the Office, consistent with applicable law and subject to the availability of appropriations.[12]

Executive Order 13793 did not prescribe a particular scope of authority for the OAWP and it did not provide the OAWP with any specific investigative or disciplinary authority.

When the Act was signed into law on June 23, 2017, it statutorily established the OAWP and defined its functions and scope. The Act defined the functions of the OAWP as follows:

> (A) Advising the Secretary on all matters of the Department relating to accountability, including accountability of employees of the Department, retaliation against whistleblowers, and such matters as the Secretary considers similar and affect public trust in the Department.

---

[10] The OIG received several allegations of improper hiring practices within the OAWP. Most of these allegations related to past practices. However, some personnel moves made between January and June 2019 were also the subject of complaints. A commonly received complaint was that competitive service vacancies were being filled on a basis other than merit. The investigation of individual complaints of prohibited personnel practices was not within the scope of this review, although deidentified information was transmitted to VA. Witnesses raising allegations of whistleblower retaliation or prohibited personnel practices were encouraged to file complaints with the Office of Special Counsel or submit the allegations to the OIG hotline for handling in accordance with its usual protocols.

[11] OAR disbanded after OAWP was created and its staff and pending cases were reassigned to OAWP.

[12] Exec. Order No. 13793 (Apr. 27, 2017).

(B) Issuing reports and providing recommendations related to the duties described in subparagraph (A).

(C) Receiving whistleblower disclosures.

(D) Referring whistleblower disclosures received under subparagraph (C) for investigation to the Office of the Medical Inspector, the Office of Inspector General, or other investigative entity, as appropriate, if the Assistant Secretary has reason to believe the whistleblower disclosure is evidence of a violation of a provision of law, mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to public health or safety.

(E) Receiving and referring disclosures from the Special Counsel for investigation to the Medical Inspector of the Department, the Inspector General of the Department, or such other person with investigatory authority, as the Assistant Secretary considers appropriate.

(F) Recording, tracking, reviewing, and confirming implementation of recommendations from audits and investigations carried out by the Inspector General of the Department, the Medical Inspector of the Department, the Special Counsel, and the Comptroller General of the United States, including the imposition of disciplinary actions and other corrective actions contained in such recommendations.

(G) Analyzing data from the Office and the Office of Inspector General telephone hotlines, other whistleblower disclosures, disaggregated by facility and area of health care if appropriate, and relevant audits and investigations to identify trends and issue reports to the Secretary based on analysis conducted under this subparagraph.

(H) Receiving, reviewing, and investigating allegations of misconduct, retaliation, or poor performance involving—

> (i) an individual in a senior executive position (as defined in section 713(d) of this title) in the Department;
>
> (ii) an individual employed in a confidential, policy-making, policy-determining, or policy-advocating position in the Department; or
>
> (iii) a supervisory employee, if the allegation involves retaliation against an employee for making a whistleblower disclosure.

(I) Making such recommendations to the Secretary for disciplinary action as the Assistant Secretary considers appropriate after substantiating any allegation of misconduct or poor performance pursuant to an investigation carried out as described in subparagraph (F) or (H).

## Structure, Staffing, and Authorities of the OAWP

The Act established an Assistant Secretary for Accountability and Whistleblower Protection who is appointed by the President, confirmed by the Senate, and reports directly to the VA Secretary.[13] The Act mandated that the OAWP "shall not be established as an element of the Office of the General Counsel and the Assistant Secretary may not report to the General Counsel,"[14] and that "the Secretary may only assign to the Assistant Secretary responsibilities relating to the functions of the Office."[15]

From June 23, 2017, until January 7, 2019, the OAWP operated without an assistant secretary. It was instead led by an executive director—a role that was filled first by Mr. Peter O'Rourke and subsequently by Mr. Kirk Nicholas. Since January 7, 2019, the OAWP has been led by Dr. Tamara Bonzanto, DNP, the first Assistant Secretary of Veterans Affairs for Accountability and Whistleblower Protection.[16]

### OAWP's Structure and Staffing

The OAWP is organized into five divisions: Triage, Investigations, Advisory & Analysis, Knowledge Management, and Human Resources & Office Support. The functions of each division are summarized in Figure 1.




*Figure 1. Organizational components of the Office of Accountability and Whistleblower Protection*
*Source: VA OIG Analysis*

On June 12, 2017, then VA Secretary Shulkin reassigned OAR personnel to staff the OAWP. At that time, the OAR was composed of 52 staff (five executive leaders, six operations staff, five data analytics staff, 30 investigative staff, and six triage staff). By June 18, 2018, the OAWP

[13] 38 U.S.C. § 323(b).
[14] 38 U.S.C. § 323(e).
[15] 38 U.S.C. § 323(b)(4).
[16] DNP is an individual with a doctorate in nursing practice.

brought on additional employees to nearly double its personnel to 103 staff, distributed among its leadership and five divisions.

**Table 1. OAWP Staffing Numbers as of June 18, 2018**

| Division | Count |
|---|---|
| Executive Leadership | 9 |
| Triage Division | 26 |
| Investigations Division | 30 |
| Advisory & Analysis Division | 15 |
| Human Resources and Office Support | 14 |
| Knowledge Management Division | 9 |
| **Total** | **103** |

*Source: OIG Analysis of organizational charts dated June 18, 2018, confirmed as current by the OAWP as of March 7, 2019*

The primary organizational difference between the former OAR and the OAWP was the establishment of the Advisory & Analysis Division (A&A Division). Mr. O'Rourke explained to OIG investigators that the A&A Division was created to handle disciplinary decisions and related analysis to focus the Investigations Division's efforts on fact-finding and not discipline. Since November 2017, the A&A Division has been led by the A&A Director, a lawyer whose experience included practicing employee relations law for the U.S. Department of Justice for more than four years (hereafter A&A Director).

## OAWP's Investigative Authority

The Act broadly authorized the OAWP to investigate the conduct of any VA supervisory employee "if the allegation involves retaliation against an employee for making a whistleblower disclosure."[17] In addition, the Act gave the OAWP a specific scope of authority to investigate "allegations of misconduct, retaliation, or poor performance" for certain senior executives.[18] The Act did not authorize the OAWP to conduct investigations of any other class of employees or subject matters.

The OAWP receives submissions (typically complaints or allegations of wrongdoing) from many sources, including current, former, and prospective VA employees; veterans; elected officials; and members of the general public. All submissions are first reviewed by the Triage Division, and then routed in accordance with the Triage Division's procedures.

[17] 38 U.S.C. § 323(c) (1)(H)(iii).

[18] 38 U.S.C. § 323(c) (1)(H) (defining scope of OAWP investigative authority).

Submissions determined to fall within OAWP's investigative authority are referred to the OAWP Investigations Division. For other submissions, the Act authorizes the OAWP to refer

> whistleblower disclosures received [pursuant to the Act] for investigation to the Office of the Medical Inspector [OMI], the Office of Inspector General, or other investigative entity, as appropriate, if the Assistant Secretary has reason to believe the whistleblower disclosure is evidence of a violation of a provision of law, mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to public health or safety.[19]

To the extent that the OAWP receives allegations of potential felony criminal conduct, the OAWP must refer these to the OIG.[20] From June 23, 2017, to December 31, 2018, the OAWP referred 38 allegations to the OIG, eight allegations to VA's Office of Resolution Management (ORM), and 13 allegations to OMI.

## OAWP's Authority to Recommend Disciplinary Action

Once a matter has been investigated, the results of the investigation are forwarded to the A&A Division for review. The A&A Division assesses the results of the investigation and determines whether disciplinary action is appropriate. If disciplinary action is deemed appropriate, a memorandum is provided to the VA Secretary indicating that the OAWP is recommending disciplinary action without further details. Unless the Secretary objects, the OAWP then engages with a proposing official and drafts a proposal containing the A&A Division's disciplinary recommendation in consultation with the VA Office of General Counsel.[21]

OAWP's authority is limited to making recommendations about discipline. The determination about whether to discipline an employee is made by officials within the employee's supervisory chain or as designated by the VA Secretary. When the A&A Division recommends a disciplinary action, it engages with VA Office of General Counsel attorneys and management officials who are senior to the employee who is the subject of the recommendation. The management officials include a "proposing official" and "deciding official." The proposing official is responsible for reviewing the evidence file and proposing the disciplinary action to be taken. The deciding official reviews the proposed disciplinary action and reply from the subject employee, and

[19] 38 U.S.C. § 323(c)(1)(D).

[20] 38 CFR § 1.204. As discussed in Finding 1, VA employees are required to report potential criminal conduct to a supervisor or the OIG. Felonies must be referred to the OIG. Because of the potential challenge in parsing a felony versus a misdemeanor, the OIG encourages VA employees to refer all potential criminal conduct involving VA to its Office of Investigations or hotline.

[21] The memorandum simply indicates the OAWP is recommending a disciplinary action against an employee; it does not indicate the specific disciplinary action recommended, nor does it describe the circumstances giving rise to the recommendation. See Figure 6 on page 61 for more information on the OAWP triage and subsequent processes.

determines whether to sustain, mitigate, or set aside the proposed disciplinary action. A Covered Executive may also file a grievance contesting the deciding official's determination to a grievance official, who makes a final decision.[22]

# Findings and Analysis

## Finding 1: The OAWP Misinterpreted Its Statutory Mandate, Resulting in Failures to Act Within Its Investigative Authority

Under the Act, the functions of the OAWP include (1) receiving and referring whistleblower disclosures and (2) receiving, reviewing, and investigating defined categories of allegations involving specific VA employees. The OAWP, however, misconstrued its statutory mandate and investigative authority resulting in its staff investigating individuals outside the legislative scope, failing to refer matters to other investigative entities when appropriate, and simultaneously declining to investigate other matters that were within its scope.

[22] Corporate Senior Executive Management Office Letter No. 006-17-1, *Senior Executive Accountability and Grievance Procedures*, July 7, 2017.

## The OAWP's Advertisement of Its Scope Reflected a Lack of Understanding

The OAWP held itself out on its public website for more than a year as having "a broad and expansive mission" and as committed to "unbiased investigation of all allegations and concerns" relating to VA employees.[23]




*Figure 2. Excerpts from the OAWP website, describing its mission*
*Source: OIG analysis, website accessed on May 21, 2019*

Contrary to this description, however, the Act gives the OAWP a narrower scope of authority to investigate allegations against specific VA employees. Under the Act, the OAWP is authorized to investigate "allegations of misconduct, retaliation, or poor performance" as to three categories of employees.[24] First, it may investigate such allegations against a VA supervisory employee, but only "if the allegation involves retaliation against an employee for making a whistleblower disclosure."[25] It may also investigate such allegations against individuals who fall into one of two additional categories:

- VA personnel holding statutorily enumerated senior-level positions (Covered Executives).[26] This includes career members of the Senior Executive Service

[23] This language appeared on the OAWP website from April 2018 until July 18, 2019.
[24] 38 U.S.C. § 323(c)(1)(H).
[25] 38 U.S.C. § 323(c)(1)(H)(iii).
[26] 38 U.S.C. §§ 323(c)(1)(H)(i) and 713(d)(3).

(SES).[27] It also applies to individuals in an "administrative or executive position" who are
(a) members of the Office of the Under Secretary for Health,[28] or (b) "physicians, dentists, podiatrists, chiropractors, optometrists, registered nurses, physician assistants, and expanded-function dental auxiliaries."[29]

- VA personnel "employed in a confidential, policy-making, policy-determining, or policy-advocating position" (VA Policy Makers).[30]

From June 23, 2017, to December 31, 2018, the OAWP Triage Division received at least 3,694 submissions. Of these, only 547 were referred by the Triage Division to the Investigations Division (as discussed below, these submissions included allegations that the OIG determined exceeded the OAWP's statutory mandate to investigate). The OAWP's advertised mission of investigating "all allegations and concerns" was not consistent with its practices—which could have contributed to the frustration expressed by some complainants to the OIG hotline that OAWP was not fulfilling its stated objectives.

## The OAWP Investigated Employees and Matters Beyond Its Authority

Some of the confusion OAWP staff expressed surrounding OAWP's investigative authority can be attributed to a misplaced dependence on the former OAR duties and then a "delegation of authority" granted to OAWP's executive director—neither of which aligned with the OAWP's actual statutory authority. From June 23, 2017, until January 2019, the OAWP operated without an assistant secretary and was, instead, led by an executive director. Initially, the OAWP executive director relied on the authority delegated to the former OAR, which included authority to conduct investigations of certain senior officials. On February 7, 2018, the executive director was delegated authority to carry out various functions of the OAWP.[31] The delegation included

[27] 5 U.S.C. § 3132(a)(4). Other members of the Senior Executive Service that are not included are noncareer appointees, limited-term appointees, and limited emergency appointees. See 5 U.S.C. § 3132(a)(4) – (7).

[28] 38 U.S.C. § 7306(a).

[29] 38 U.S.C. § 7401(1).

[30] 38 U.S.C. § 323(c)(1)(H)(ii). Although the OAWP has not defined which positions fall within the VA Policy Makers classification, it has included political appointees in its scope.

[31] VA Memo No. VAIQ 7819162, Delegation of Authority—Executive Director of the Office of Accountability and Whistleblower Protection, February 7, 2018.

the authority to "receive, review, and as necessary, investigate allegations of misconduct related to accountability and whistleblower issues" for the following seven categories of personnel:

(1) All positions centralized to the Secretary of Veterans Affairs;

(2) Members of the Senior Executive Service;

(3) Employees who occupy an administrative or executive position and who are appointed under 38 U.S.C. §§ 7306, 7401(1), or 7401(4);

(4) Associate and Assistant Directors in the Veterans Health Administration;

(5) Cemetery Directors in the National Cemetery Administration;

(6) Individuals employed in a confidential, policy-making, policy-determining, or policy-advocating position in the Department; [32] and

(7) General Schedule (GS)-15 Program Office and Regional Office heads within VA Central Office and reporting directly to VA Central Office, including staff offices.

An OAWP Senior Advisor (hereafter the Senior Advisor), at the direction of then Executive Director O'Rourke, drafted the delegation. It appears from email records that the categories of personnel identified in the delegation were based, in part, on incorporating into the delegation the investigative scope of the defunct OAR, even though its authority differed from OAWP's statutory authority. The OAWP does not have authority to investigate individuals in all seven categories if the allegation is not whistleblower retaliation.[33] Specifically, not all positions centralized to the Secretary, cemetery directors, and GS-15 program and regional office heads are Covered Executives or VA Policy Makers under OAWP's legislative authority.[34]

Although the VA Secretary generally has broad latitude to delegate to subordinate officials to carry out VA's duties,[35] Congress limited the VA Secretary's ability to delegate to the OAWP in the Act. The Act provides that "the Secretary may only assign to the Assistant Secretary responsibilities relating to the functions of the Office set forth in [the Act]."[36] Accordingly, the

[32] Mr. O'Rourke told the OIG that the OAWP had not determined how to interpret "Individuals employed in a confidential, policy-making, policy-determining, or policy-advocating position in the Department."

[33] 38 U.S.C. § 323(c)(1)(H).

[34] Only the SES-level employees would be subject to the OAWP's authority to investigate misconduct and poor performance unless the allegation included whistleblower retaliation. See 38 U.S.C. § 323(c)(1)(H)(iii). With respect to cemetery directors, OAWP officials were aware that position-level grades range from GS-11 to SES, and that SES positions are "few and far between."

[35] 38 U.S.C. § 308(b).

[36] 38 U.S.C. § 323(b)(4).

Secretary did not have the authority to expand OAWP's investigative scope by delegating authority to investigate categories of individuals other than those identified in the Act.[37]

The VA Office of General Counsel (OGC) reviewed and approved a prior version of the delegation. Although it was revised slightly before it was signed by the former VA Secretary, the revisions did not change the OGC-approved categories of individuals covered by the delegation, which included individuals outside the scope of OAWP's investigative authority. In February 2018, soon after the delegation was signed and distributed, OGC attorneys raised concerns about the scope of the delegation.[38] On April 24, 2018, then General Counsel James Byrne provided Mr. Nicholas with a draft revision to the delegation, which aligned with the Act's description of the OAWP's investigative scope. Between April and November 2018, OGC attorneys had multiple communications with OAWP leaders regarding the delegation. OGC attorneys had understood that the OAWP had committed to changing the delegation to a version the OGC had approved that aligned with the Act. Additional emails reflect that the OGC continued raising this issue with Mr. Nicholas as late as November 2018, but that the delegation remained in effect.[39] Emails among OAWP leaders indicate that from at least June 2018 to March 2019, the OAWP was continuing to seek a delegation that was materially different from OGC's recommendation and included individuals in the investigative scope who were not within OAWP's authority under the Act.

### The OAWP Investigated Employees Not Within Its Statutory Scope

The OIG found that the OAWP investigated individuals who were outside of its statutory scope. In some instances, these individuals were within the scope of the February 2018 delegation; however, in others, the individuals were outside the scope of both OAWP's statutory and delegated authority. Instead of investigating these allegations, the OAWP should have declined or referred all such matters for investigation to another VA component or outside entity.

In its June 2018 annual report to Congress, the OAWP acknowledged limitations on its scope and requested congressional consideration of an expansion.

---

[37] The delegation at issue was to the executive director, not an assistant secretary. However, that distinction does not appear relevant to whether the scope of the OAWP's investigative authority under the Act could be expanded by a delegation from the VA Secretary. See 38 U.S.C. § 323(b)(4). The functions of the office are clearly defined in the statute and an expansion of the function of the office via a delegation to the executive director, even if not directly prohibited by the Act, appears contrary to Congress's intent.

[38] Two days after the delegation was signed, the then Executive Secretary to VA sent an email stating that the delegation "is rescinded" and that a "revised version will be issued upon approval." No memo of rescission nor a revised version of the delegation was ever issued. An OGC attorney told OIG investigators that it was unclear whether the delegation was, in fact, rescinded. The OAWP continued to operate as if the delegation were in effect.

[39] The delegation appears to be of little current effect given that an assistant secretary has been confirmed and there is no longer an executive director of OAWP. Nonetheless, to the extent that the delegation is being used by the OAWP to shape its scope, rescission would be appropriate to avoid perpetuating confusion.

> The current language in 38 U.S.C. section 323(c)(1)(H) describes a specific sub-set of individuals to be investigated by OAWP. While the listed individuals represent some senior leaders in the VA, a broader definition is needed to ensure all supervisors and managers responsible for leading major VA activities are consistently held to the same standard of accountability. For example, a typical VA medical center is led by a group of five employees (Medical Center Director; Chief of Staff; Nurse Executive; Assistant Director, and Associate Director). As currently written only three (Medical Center Director, Chief of Staff and Nurse Executive) of the five are within the scope of OAWP's statutory charter. Additionally, the senior leadership of other major VA facilities fall outside the current statutory coverage such as Cemetery Directors and General Schedule office directors of VBA Regional Offices.[40]

At the time of OAWP's report to Congress, the OAWP was operating under a delegation that purported to grant it authority to investigate some of these categories of individuals, which it conceded were outside the scope of its authority. The OIG identified a number of instances in which OAWP investigated individuals outside its authority, both before and after its June 2018 report to Congress.

### Example 1

> *In June 2018, the OAWP investigated allegations that a police officer, a GS-6, used excessive force against a patient. The allegation was investigated at the request of former Executive Director Nicholas "due to [VA Secretary] awareness." The OAWP did not substantiate the allegations.*

The allegation in Example 1 involved a GS-6 employee who is not within OAWP's statutory scope (where there is no allegation of whistleblower retaliation by a supervisor). This was similarly outside the scope of the February 2018 delegation, and the potentially serious criminal nature of the violation necessitated a referral to the OIG by the OAWP.[41] The OIG's records reflect reports about this incident from multiple other sources, but do not indicate any OAWP referrals.

### Example 2

> *In September 2018, a VHA employee relations specialist sought information relating to OAWP's scope. The Triage Division advised that the OAWP*

---

[40] VA Office of Accountability and Whistleblower Protection, *VA Report to the Committee on Veterans Affairs of the Senate and the Committee on Veterans Affairs of the House of Representatives on the Activities of the Office of Accountability and Whistleblower Protection for the Period June 30, 2017 – June 30, 2018*. This requested expansion is not the subject of any pending legislation at this writing.

[41] 38 CFR § 1.204.

*"currently does have jurisdiction over all GS-15 employees." This is an improper statement of OAWP's authority under the Act as well as the February 2018 delegation, which included only those "General Schedule (GS)-15 Program Office and Regional Office heads within VA Central Office and reporting directly to VA Central Office." As a result of the Triage Division's incorrect advice, a submission was made to the OAWP relating to allegations of misconduct by a GS-15 public affairs specialist. The Triage Division referred the matter to the Investigations Division. The OAWP determined there was no basis for a formal disciplinary action. However, changes were made to the public affairs specialist's performance standards and a "performance expectation" memorandum was prepared to reflect such changes.*

The OAWP did not have statutory authority to investigate the allegations in Example 2 because a GS-15 employee is not within the category of individuals the OAWP may investigate unless the allegation was whistleblower retaliation. This employee was also not covered by the February 2018 delegation because that was limited to only certain GS-15 employees. The public affairs specialist was not a program office or regional office head within, and reporting directly to, VA Central Office.

### Example 3

*In September 2018, the OAWP received a submission alleging gross mismanagement, including contracting issues, related to capital improvement projects at a VA medical center. The allegations involved three individuals: a division chief (GS-14), a capital asset manager (GS-14), and a contracting director (GS-15). In May 2019, the Triage Division referred the matter to the OIG, and the OIG declined because the allegations primarily related to personnel matters. Following the declination, the Triage Division referred the matter to the OAWP Investigations Division where it remains.*

Example 3 was not within OAWP's statutory authority to investigate because it does not have authority to investigate allegations of misconduct or poor performance involving GS-14 and GS-15 employees. These individuals also were not within the scope of the delegation, which included some, but not all, GS-15 employees. Following the OIG's declination, the matter should have been referred to another VA component for review, such as the Office of Acquisition, Logistics, and Construction for major construction or the VISN in which the allegations arose for minor construction.

### Example 4

*Also in September 2018, the OAWP received a submission with multiple allegations concerning a GS-13 cemetery director. The OAWP elected to*

> *investigate the portion of the allegations pertaining to the cemetery director's misuse of government time and resources. The remainder of the allegations, including that the cemetery director was disrespectful to the staff, were referred to the National Cemetery Administration leaders. This matter remained pending as of the end of May 2019.*

Although the February 2018 delegation included cemetery directors in the scope of the investigative authority delegated to the OAWP, this was inconsistent with the Act. In Example 4, the GS-13 cemetery director was not a Covered Executive or a VA Policy Maker and the allegations the OAWP investigated did not relate to whistleblower retaliation. As a result, the investigation exceeded OAWP's statutory mandate. The VA Office of Resolution Management had also received the allegations and was prepared to investigate if the OAWP declined.

### *The OAWP Investigated Its Own Division Director in a Matter Outside Its Scope*

OIG investigators received allegations and information from multiple sources within the OAWP alleging that OAWP staff had investigated one of its own directors but failed to hold this individual accountable for misconduct. The OIG partially substantiated the allegations, finding that the OAWP did investigate one of its directors and she/he had engaged in misconduct when this individual worked at another component of VA. As of July 2019, no disciplinary action had been taken against the director, who remains employed by VA. The OIG, however, identified no evidence that OAWP officials purposefully attempted to influence the investigation or the still-pending disciplinary process.

This investigation was not within OAWP's scope because it did not involve a Covered Executive or VA Policy Maker, nor did the allegations include a claim of whistleblower retaliation. The alleged misconduct related to when the subject employee was a Veterans Health Administration (VHA) employee prior to joining the OAWP. Emails reflect that OAWP staff considered referring this matter for investigation to the VHA component in which the alleged misconduct occurred. According to an email exchange, the OAWP retained the investigation, in part, because the VHA component "might feel intimidated by having to interview a now-OAWP employee." To mitigate the appearance of bias, an OAWP official assigned the matter to an investigator who did not know the OAWP leader in question "well."

Case notes reflect that the investigator submitted the investigation report on January 7, 2019, substantiating the misconduct allegations. An OAWP official told the OIG that after receiving the results of the investigation, the OAWP official directed another senior OAWP official to take another look to "make sure" because it was "a pretty serious matter." In late March 2019, multiple OAWP officials (excluding the director who was the subject of the investigation)

reviewed the results of the investigation, which resulted in referring the case file to OGC for advice.

In July 2019, the OIG learned that the matter remained unresolved and that current OAWP leaders are evaluating whether it is necessary to refer the matter to another investigative entity for independent investigation. Immediate referral to another investigative entity would have been appropriate both to adhere to its statutory scope and to avoid the appearance of bias or impropriety that can undermine confidence in an office trying to establish trust among VA employees.

## *The OAWP Investigated Subject Matters That It Should Have Referred*

The Act requires the OAWP to refer a whistleblower disclosure

> for investigation to the Office of the Medical Inspector, the Office of Inspector General, or other investigative entity, as appropriate, if the Assistant Secretary has reason to believe [a] whistleblower disclosure [received by the OAWP] is evidence of a violation of a provision of law, mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to public health or safety.[42]

Unless such a disclosure falls within the OAWP's statutory authority to investigate, it should be referred to another investigative entity, as appropriate. When the matter involves a felony, it must be referred to the OIG, and good practice would be to refer any possible crime to the OIG for consideration.

### *Some Allegations of Potential Crimes Not Referred to the OIG*

The OAWP investigated allegations of potential criminal matters that should have been referred to the OIG for consideration. VA regulations require VA employees to report potential criminal acts to a supervisor or to the OIG.[43] However, where the potential criminal act involves a felony, VA employees must *refer* the matter to the OIG.[44] The distinction between a crime that is classified as a felony and one that is classified as a misdemeanor is based on the seriousness of the offense and the length of the associated prison sentence.[45] In some cases, determining whether an alleged crime involves a felony may not be possible until after an investigation. As such, it may be difficult for VA employees to determine which potential crimes involve felonies

[42] 38 U.S.C. § 323(c)(1)(D).

[43] 38 CFR § 1.201.

[44] 38 CFR § 1.204.

[45] Under federal law, a felony is an "offense punishable by a maximum term of imprisonment of more than one year." 18 U.S.C. § 3156.

that must be referred to the OIG and which involve misdemeanors that need only be reported to a supervisor. Given that difficulty, the best practice for any VA employee is to refer *any* possible criminal acts to the OIG for potential investigation.[46]

Examples 5 and 6 summarize two allegations involving potential criminal conduct that the OAWP should have referred to the OIG or, at the very least, have coordinated with the OIG prior to initiating an investigation.[47]

### Example 5

> *In April 2018, the OAWP received allegations that a Covered Executive was engaging in contracting abuse, conflicts of interest, and violations of federal ethics rules. Some of these matters included alleged abuses of authority and/or potential felony criminal violations. These allegations were bundled with several others that included whistleblower retaliation and issues within OAWP's scope. The OIG could locate no records in OAWP's or OIG's databases indicating that the contracting abuse, conflict of interest, and ethics allegations had been referred to the OIG despite possibly involving felony violations of federal laws on receiving gifts, making false statements, or other related crimes.*[48]

In Example 5, the allegations the OAWP investigated included potential criminal violations (such as an employee's improper financial gain) that should have been referred to the OIG as required by regulation.[49] In this case, some of the allegations of potential criminal activity appear to have been sparked by the complainant's review of an OIG audit report, which analyzed the administration of a VA program but did not address individual wrongdoing.[50] Although there may have been some overlap between the scope of the OIG's audit and the allegations the OAWP investigated, there were sufficient differences in the allegations the OAWP received that

---

[46] As a practical matter, any serious allegations of waste, fraud, and abuse that affect VA programs, operations, or put veterans at risk for harm or financial loss should be reported to the OIG to determine if its resources and expertise should be employed, particularly those matters that are due to more than a single individual's error or action.

[47] The OIG review team referred these allegations, identified during its OAWP review, to the OIG hotline for processing.

[48] The OAWP initially substantiated that the Covered Executive's spouse received $520 worth of tickets to accompany the Covered Executive to a sporting event acting in an official capacity. It was later determined that the spouse had not received a gift after all.

[49] It is a felony to receive compensation for or have a financial interest in a federal government contract in which you are involved as a federal employee. See 18 U.S.C. §§ 203 and 208.

[50] Because the complainant was not a VA employee (or individual seeking VA employment), the complaint in Example 5 did not meet the statutory definition of a whistleblower disclosure under the Act. Nevertheless, the OAWP should have referred the matter to the OIG because of the potential felony violations as required by regulation (38 CFR § 1.204).

staff should have referred them to the OIG prior to conducting their own investigation.[51] The OAWP should not have assumed that the OIG had no further interest in the allegations simply because there was a somewhat-related audit report.

### Example 6

*In January 2018, the OAWP received multiple allegations related to a GS-15 employee. The allegations included that the employee was attempting to steer the award of a contract to a personal friend's employer. OAWP's documentation is insufficient to determine whether its personnel reviewed the contract steering allegation as part of its investigation. As of May 2019, OAWP's investigation remained open.*

In Example 6, the allegation of steering a contract suggests a potential felony that should have been referred to the OIG under the Act and as required by regulation.[52]

#### *Inadequate Procedures and Role Clarification for Allegations of Discrimination*

The Senior Advisor indicated that allegations of a hostile work environment, which is a complaint predicated upon discriminatory workplace harassment, is one of OAWP's most commonly received complaints. It is a violation of law for an employer to discriminate on the basis of an employee's statutorily protected status.[53] To the extent that such allegations otherwise satisfy the Act's definition of a whistleblower disclosure and are not within OAWP's investigative authority, the Act requires the OAWP to refer such allegations to an "other investigative entity, as appropriate." It would be appropriate to refer allegations of discrimination to VA's Office of Resolution Management. ORM is responsible for providing equal employment opportunity (EEO) complaint processing services within VA, which includes conducting investigations pursuant to complaints of discrimination. Filing with the ORM is the only way for employees to preserve their EEO rights.[54] In addition, participating in the ORM's EEO process is

[51] Among other considerations, the OAWP should have confirmed that the OIG did not have an open criminal investigation stemming from the audit.

[52] 18 U.S.C. § 205. It is a crime to act as agent for another party in a matter in which the United States has an interest, including a federal contract. This is a good example of why it is difficult for OAWP or other VA components to determine whether an alleged criminal act is potentially a felony that must be referred to the OIG. A "willful" violation of the statute may be punished by up to five years in prison, and is thus considered a felony, whereas a violation that is not "willful" is subject to no more than one year imprisonment. 5 U.S.C. § 216(a) (setting forth the penalties for a violation of 18 U.S.C. § 205).

[53] *See*, *e.g*, 42 U.S.C. § 2000e-2 (prohibiting discrimination on the basis of race, color, religion, sex, or national origin). There are other statutorily protected classes.

[54] An aggrieved VA employee must begin the process with ORM within 45 calendar days of the date the alleged discrimination occurred, otherwise the right to pursue an EEO complaint may be lost. See the VA Office of Diversity and Inclusion's "Equal Employment Opportunity, Diversity and Inclusion, No FEAR, and Whistleblower Rights and Protection Policy Statement," July 5, 2017, rev. August 27, 2018 (EEO Policy Statement).

generally the only way that an aggrieved employee may be made whole through enforceable adjudication if a supervisor is found to have discriminated.[55]

It is not uncommon for an allegation of discrimination to coincide with allegations of other misconduct or poor performance that may be within the OAWP's statutory authority to investigate. In such circumstances, the OAWP needs a process to ensure that its review of the remaining allegations can proceed in a coordinated manner with the work of the ORM. In addition, the OAWP must communicate clearly about its investigative scope so that individuals submitting allegations of discrimination understand that the appropriate avenue for redress of EEO matters is with the ORM. The OIG determined that the Triage Division's procedures did not fully address the need to ensure that disclosing parties are advised that discrimination allegations should be raised with the ORM, and fully documenting OAWP's advisement in each case.

## The OAWP Declined Matters Within Its Statutory Mandate by Misconstruing Its Investigative Authority

Matters that fall within OAWP's statutory authority likely were overlooked because OAWP's triage procedures excluded complaints that did not qualify as whistleblower disclosures under the Act. The OAWP staff appear to have conflated its authority *to investigate* with its duty *to receive and refer whistleblower disclosures*.[56] The written standard operating procedures adopted by the Triage Division (the triage SOPs) limit investigations by the OAWP to submissions that meet the definition of a whistleblower disclosure under the Act.[57] This restriction does not appear to have any basis in the Act.[58] It is also inconsistent with the procedures issued by the VA Secretary in July 2017 (2017 accountability procedures), stating, "OAWP or, as specifically delegated by OAWP, an Organization, *shall* review and, if necessary, investigate *any* allegation or other evidence of Misconduct, poor performance, or Retaliation, using appropriate processes …." (emphasis added).[59]

---

www.diversity.va.gov/policy/statement.aspx. Allegations raised to avenues outside ORM—including the OAWP—do not constitute initiation of an EEO complaint and do not extend the 45-calendar day time limit.

[55] VA Directive 5977, *Equal Employment Opportunity Discrimination Complaints Process*, May 5, 2011; 38 U.S.C. § 516(b) and the VA Office of Diversity and Inclusion's EEO Policy Statement.

[56] 38 U.S.C. §§ 323(c)(1)(C) and 323(c)(1)(D).

[57] The OAWP appears to continue to misconstrue the statute. The OAWP's current website states that it "directly investigates *whistleblower* disclosures that raise allegations of misconduct, retaliation, or poor performance involving—" Covered Executives, VA Policy Makers, and supervisory employees if it is an allegation of whistleblower retaliation. (emphasis added)

[58] 38 U.S.C. § 323(c)(1)(H).

[59] VA Letter No. 006-17-1, *Senior Exec. Accountability and Grievance Procedures,* July 7, 2017. The July 2017 accountability procedures only apply to Covered Executives. The procedures do not apply to political appointees or

The OAWP has the authority to investigate *all allegations of misconduct and poor performance* involving Covered Executives or VA Policy Makers.[60] This would include allegations that do not qualify as whistleblower disclosures. The Act defines a whistleblower disclosure as

> any disclosure of information by an employee of the Department or individual applying to become an employee of the Department which the employee or individual reasonably believes evidences—(A) a violation of a law, rule, or regulation; or (B) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.[61]

Consequently, an allegation made by a non-employee or non-applicant (such as a former employee, member of Congress, veteran, family or community member) does not qualify as a whistleblower disclosure under the Act.

Moreover, an allegation that involves employee misconduct as defined in the statute—such as neglect of duty—may not be considered a whistleblower disclosure under the Act because it does not evidence a violation of law, rule or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; or a substantial and specific danger to public health or safety.[62]

OAWP's overly restrictive interpretation of its investigative authority could have resulted in allegations that fall within OAWP's scope being closed without further examination. One individual interviewed by the OIG said that he identified at least one instance in which an allegation against a Covered Executive or VA Policy Maker was closed by the Triage Division without an investigation because it did not rise to the level of a whistleblower disclosure. Notwithstanding what is in the triage SOPs, the former director of the Triage Division and the current OAWP Acting Deputy Executive Director reported that, in practice, the Triage Division did refer allegations involving "senior leaders" that did not qualify as whistleblower disclosures to the OAWP Investigations Division.[63]

Witnesses provided the OIG with conflicting responses when explaining whether the OAWP curtailed its investigative authority to investigate only matters that arose from whistleblower complaints. Similarly, the OIG's review of cases identified examples in which the source of the allegation was not a whistleblower. The conflicting information on this subject underscores the

---

supervisory employees, if the allegation is whistleblower retaliation, which the OAWP also has authority to investigate.

[60] 38 U.S.C. § 323(c)(1)(H).

[61] 38 U.S.C. § 323(g)(3).

[62] Misconduct is defined in 38 U.S.C. § 713 as "neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function."

[63] The Triage SOPs' definition of "senior leaders" mirrors the definition in the February 7, 2018, Delegation of Authority, which improperly expands the OAWP's scope to include categories of personnel not identified in the statute.

need for the OAWP to issue clear written triage guidance that conforms with the OAWP's statutory scope.

## Finding 1 Conclusion

The OIG determined that the OAWP investigated matters outside its scope; failed to refer certain matters, as appropriate, to other investigative entities; and misconstrued its investigative authority in ways that excluded matters actually within its scope.

## Recommendations 1–4

1. The Assistant Secretary for Accountability and Whistleblower Protection directs a review of the Office of Accountability and Whistleblower Protection's compliance with the VA Accountability and Whistleblower Protection Act of 2017 requirements in order to ensure proper implementation and eliminate any activities not within its authorized scope.
2. The VA Secretary rescinds the February 2018 Delegation of Authority and consults with the Assistant Secretary for Accountability and Whistleblower Protection, the VA Office of General Counsel, and other appropriate parties to determine whether a revised delegation is necessary, and if so, ensures compliance with statutory requirements.
3. The Assistant Secretary for Accountability and Whistleblower Protection, in consultation with the Office of General Counsel, Office of Inspector General, Office of the Medical Inspector, and the Office of Resolution Management establishes comprehensive processes for evaluating and documenting whether allegations, in whole or in part, should be handled within the Office of Accountability and Whistleblower Protection or referred to other VA entities for potential action or referred to independent offices such as the Office of Inspector General.
4. The Assistant Secretary for Accountability and Whistleblower Protection makes certain that policies and processes are developed, in consultation with the VA Office of General Counsel and Office of Resolution Management, to consistently and promptly advise complainants of their right to bring allegations of discrimination through the Equal Employment Opportunity process.

## Finding 2: The OAWP Did Not Consistently Conduct Procedurally Sound, Accurate, Thorough, and Unbiased Investigations and Related Activities

The OIG recognizes it takes tremendous effort to stand up a new office that operates under different statutory authority than its predecessor. That said, the failure to put in place key systems and quality controls has resulted in OAWP conducting investigations that were not always thorough, objective, and unbiased—undermining OAWP's credibility among some VA employees.

This finding discusses deficiencies that the OIG identified in the following areas:

- The OAWP lacks comprehensive policies and procedures suitable for its personnel. This is particularly important given that individuals' reputations are at stake, whistleblowers' identities must be protected, and the issues on which the OAWP is reporting affect veterans' lives in tremendously significant ways. Staff are either missing guidance or are piecing together direction largely based on the mandates of a prior office not entirely aligned with OAWP's legislative scope.
- The absence of quality control measures is particularly troubling given the hodgepodge of policies and procedures. Depending on disciplinary officials and VA's Office of General Counsel to identify OAWP's investigatory inadequacies cannot be a sustainable solution to effective oversight.
- The OAWP has failed to provide the staffing and training necessary to ensure it has the expertise, experience, and commitment that yield objective and thorough investigations that are critical to OAWP's success. While the OIG appreciates the dedication and commitment of the staff within OAWP to conduct investigations, they have not been given the training and access to expertise needed to perform at the level expected of that office.
- The OAWP has fallen short of its commitment to conduct "timely, thorough, and unbiased investigations" in all cases within its investigative jurisdiction. VA employees and other complainants must be assured that OAWP investigations are conducted with the highest ethical standards, which does not yet appear to have been achieved.

### The OAWP Lacked Suitable Policies and Procedures

The OAWP did not publish comprehensive policies and procedures on any topic during the tenures of then Executive Directors O'Rourke or Nicholas.[64] The OAWP continues to operate without comprehensive written policies and procedures specific to and consistent with its scope

[64] Mr. O'Rourke served as OAWP's executive director from June 23, 2017, until February 28, 2018. Mr. Nicholas then held that position until January 25, 2019.

of authority as of July 2019, although staff reported drafting was in progress. This affected triage activities, general operations, and the integrity of investigations.

### Triage Division's Procedures Blurred Scope of OAWP Authority

The Triage Division adopted written standard operating procedures (SOPs) dated August 2018 that it updated in November 2018. The triage SOPs cover many processes of the division in depth but may have perpetuated confusion about OAWP's scope of investigative authority.[65] The triage SOPs misconstrued OAWP's statutory scope, which, as discussed in Finding 1, contributed to OAWP staff

- Investigating matters outside the scope of OAWP's investigative authority,
- Failing to refer matters that should have been referred to other investigative entities, and
- Limiting investigations to submissions that met the definition of a whistleblower disclosure under the Act.

In addition, the triage SOPs do not provide direction for evaluating whether there is the risk of a conflict of interest or the appearance of bias in OAWP's acceptance of a matter for investigation.

### Operational Procedures Were Incomplete and Outdated

During its review, the OIG was provided a copy of a draft manual with SOPs maintained by the OAWP Knowledge Management Division. The draft SOPs cover numerous topics, including how a matter received by the OAWP makes its way through the case process, and how the OAWP "use[s] Sharepoint to support case management and reporting." Although accessible to OAWP staff via SharePoint, the draft SOPs have not been implemented or finalized, were last updated in December 2017, and continue to reference former activities and processes of the OAR, which disbanded when the OAWP was established. In particular, with respect to report-writing guidance, the related draft SOP incorporates by reference VA Directive 0700 and VA Handbook 0700, neither of which have been adopted by the OAWP in full.

### Investigations Division Used Selective Portions of Preexisting VA Procedures

The Investigations Division of the former OAR conducted its work in accordance with the policies and procedures published in VA Directive 0700 and VA Handbook 0700, both of which were last updated in 2002.[66] These policies and procedures were issued at the direction of former

[65] The categories of personnel identified in the triage SOPs as within the OAWP's scope to investigate are consistent with the February 2018 delegation but inconsistent with the Act. See Finding 1.

[66] VA Directive 0700, *Administrative Investigations*, March 25, 2002; VA Handbook 0700, *Administrative Investigations*, July 31, 2002.

VA Secretary Anthony Principi and included delegations of his authority for conducting investigations. OAWP's authority to conduct investigations comes from the Act, not from VA Directive 0700, and thus VA Directive 0700 and its related handbook are not mandatory procedures for the OAWP.[67] Former OAWP Executive Director O'Rourke told OIG investigators that the OAWP did not adopt VA Directive 0700 and VA Handbook 0700 because the procedures were "owned by OGC." Although the Act mandates that the OAWP not be established as an element of the OGC, it does not foreclose the OAWP from seeking or following legal advice provided by the OGC or from being guided by VA policies of general applicability.[68]

Nevertheless, the OIG determined that the OAWP Investigations Division continued to use certain forms and processes from VA Handbook 0700, with some investigative staff confused about the extent to which the handbook applied to their operations. This confusion created unnecessary work. For example, Dr. Bonzanto told OIG investigators that she questioned OAWP staff about the necessity of preparing charge memos, documents required by VA Handbook 0700 for convening an administrative investigation board. She stated that "no one could … explain where this all came from. They just said, well, we did that in OAR." The OIG did not assess to what extent the handbook provisions used related to any identified investigative inadequacies beyond some reported inefficiencies, but recognizes that policies and procedures should be tailored to OAWP's statutory scope and reflect standards of quality for investigations.

## The OAWP Lacked Effective Quality Assurance Processes to Ensure Thorough and Accurate Investigations

The OAWP did not have measures in place to ensure that investigations met high quality standards. Quality assurance programs are fundamental for any organization but are particularly critical for those entities whose activities affect the lives and reputations of employees and the population they serve. The OIG determined that the OAWP did not implement adequate quality assurance processes designed to detect and prevent errors in its work. The A&A Division observed some deficiencies in the thoroughness of the investigations conducted by the Investigations Division. The VA Office of General Counsel also identified concerns with the

---

[67] In addition to the authority to investigate granted by the Act, OAWP investigators have authority to administer oaths and issue subpoenas pursuant to a specific delegation from the VA Secretary.

[68] 38 U.S.C. §323(e). VA Handbook 0700 was adopted "to standardize and enhance the efficiency and usefulness of administrative investigations within VA." The handbook states that the "provisions of this Handbook are mandatory, except where the text or context indicates otherwise." The handbook specifically excludes several types of investigations, including those conducted by the OIG and OMI. Investigations conducted by the OAWP could fit within the handbook's definition of an administrative investigation ("a systematic process for determining facts and documenting evidence about matters of significant interest to VA"), and VA could elect to require the OAWP to follow the provisions of VA Handbook 0700. The OAWP did not exist when the handbook was adopted, and VA has issued no guidance as to the handbook's applicability to the OAWP.

work conducted by both the Investigations and A&A Divisions. Neither the A&A Division nor the OGC was responsible for overseeing the work quality of investigators.

### *The A&A Division Identified Issues with the Thoroughness of Investigations*

From June 23, 2017, until approximately March 2019, Investigations Division staff were responsible for fact-gathering as well as writing up their conclusions in an "executive summary" as to whether allegations were substantiated.[69] The investigators' executive summaries included their conclusions and supporting evidence. The OAWP Director of Investigations(hereafter, Investigations Director)was responsible for reviewing and approving summaries. After a summary was reviewed, the investigative file and executive summary were sent to the A&A Division for review and consideration of whether disciplinary action was appropriate. As mentioned above, the A&A Division was not established to supervise the work quality of the Investigations Division, an independent coequal division. Nonetheless, during their disciplinary analysis, A&A Division staff would identify material deficiencies in the evidentiary record.

The A&A Director indicated in a March 2019 interview with OIG staff that from OAWP's statutory inception in June 2017, she and her staff determined that there were instances in which investigations were inadequate or incomplete. When asked to describe these instances, the A&A Director attributed the shortcomings to lack of documentation, insufficient numbers of witnesses interviewed, absence of contemporaneous writings such as emails to corroborate testimony, and misinterpretations of witness statements. These shortcomings are evidenced in the following three examples.

#### *Example 7*

*In September 2018, an A&A Division staff member reviewed an allegation that a supervisor retaliated against an employee who filed a grievance (a protected activity) by modifying a telework agreement, issuing written counseling, and reducing the employee's performance rating. The Investigations Division determined that no retaliation occurred, but the A&A Division identified the following issues with the investigation: failure to develop issues raised in testimony, missing documents, omissions and inaccuracies in a timeline created by investigators based on the record, and redundant documents in the investigative file. The A&A Division recommended gathering additional documents, thoroughly reviewing all documentation, and conducting follow-up interviews. The Investigations Division responded to these concerns, agreeing to*

[69] After March 2019, Dr. Bonzanto transferred the responsibility for determining whether the allegations are substantiated from the Investigation Division to the A&A Division. As a result, OAWP investigators are no longer responsible for drafting the executive summary.

*follow-up interviews, but disagreeing that additional document collection was necessary as it would be "too voluminous." After conducting additional interviews and case development, the Investigations Division maintained its original conclusion that the allegations of retaliation were not substantiated. The A&A Division rejected the Investigations Division's conclusion and found that the evidence showed that the subject employee had experienced retaliation. A proposed notice of disciplinary action has not been issued due to additional allegations brought to the OAWP's attention, which have not yet been resolved.*

### Example 8

*During the review of an investigation relating to alleged retaliation in the form of removal as a contracting officer representative, an A&A Division staff member identified the following issues with the investigation: the scope of the allegations in the charge memo "provided no latitude for potential underlying misconduct that an investigation may reveal"; investigators uncovered and failed to investigate allegedly "unfounded statements" made by a subject during the investigation, which were potentially "slanderous or defamatory"; and investigators failed to consider action taken by a subject that may have been a prohibited personnel action. The Investigations Division responded to these concerns, focusing on the final one, and explained its view that the action by subject employees was not a personnel action, and thus, not retaliation. Following this response, the Investigations and A&A Divisions discussed the concerns, after which it was agreed that the retaliation allegations within OAWP's scope were not substantiated and the matter was referred to the VA administration for further investigation of other allegations.*

### Example 9

*An A&A Division staff member reviewed the results of an investigation into alleged prohibited personnel actions related to illegal hiring practices and retaliation. The Investigations Division substantiated the allegations that three VHA supervisory employees engaged in prohibited personnel practices and retaliation. The A&A Division staff member agreed with the Investigations Division's conclusion as to two of the supervisory employees, but disagreed as to the third. The staff member identified the following issues with the investigation: lack of evidence and failure to state the specific prohibited personnel action at issue. The A&A Division recommended conducting follow-up interviews. The Investigations Division questioned the A&A Division's analysis, and—apart from adding a copy of a relevant performance appraisal to its evidence—it elected not to conduct additional field work. The A&A Division continued to disagree that the*

> *evidence was sufficient to demonstrate that the third supervisory employee engaged in prohibited personnel practices and retaliation, and instead proposed a suspension for failure to follow instructions. This proposed suspension was mitigated by the proposing official to a less severe written counseling.*

The Investigations Director acknowledged that there had been occasions when the A&A Division disagreed with investigators' conclusions, but maintained they were limited to a handful of situations. When asked whether the Investigations Division has standards to determine which witnesses need to be interviewed, the Investigations Director indicated that this assessment and decision are left to the investigator, but a decision not to interview disclosing parties or subjects must be discussed with the regional directors. The Investigations Director explained that he has communicated to investigators that not every witness identified by a complainant or other witness is relevant to the investigation.

### *VA Office of General Counsel Attorneys Identified Deficiencies in the Work of the A&A Division and the Investigations Division*

The Office of General Counsel Personnel Law Group is responsible for providing legal advice on a range of issues relating to human resources, labor relations, and security and law enforcement. The group also receives and reviews all draft proposals prepared by the A&A Division. An attorney in the group provided the OIG with multiple examples of flaws in the OAWP investigations identified through legal reviews of draft disciplinary proposals between June 23, 2017, and December 31, 2018. The flaws generally related to the sufficiency of the evidence, failure to interview witnesses with potentially exculpatory information, thoroughness, the appearance of bias, or concerns about the excessive weight that OAWP investigators ascribed to details such as a witness's demeanor.

An OGC attorney told OIG investigators that the OGC attorney's role was to advise, but not to supervise, the OAWP. The OGC could not dictate outcomes or compel the Investigations Division to interview specific witnesses. Instead, the OGC attorney reviewing the case would spot vulnerabilities in the conclusion reached by the investigator and bring those to the OAWP's attention. OAWP staff were not obligated to take OGC's advice, and in some instances officials deciding disciplinary cases (deciding officials) would independently question the evidence and learn that the OGC had previously disagreed with the OAWP's position on the sufficiency of OAWP's evidence. Former OAWP Executive Director Nicholas explained his view on addressing the OGC's concerns about the sufficiency of OAWP's evidence-gathering in this way: "At the end of the day, our job is a recommendation. The recommendation should give enough to someone to say this did happen, it is substantiated, and we need to take some action, okay? You know, don't make this into solving world hunger. It doesn't have to be that." The following example highlights the types of issues identified by the OGC attorneys.

### *Example 10*

*One OGC attorney recalled an instance in which investigators had not interviewed witnesses previously identified by the subject as individuals who could support the subject's side of the story. The existence of these witnesses was not discovered by the deciding official until the subject responded to the notice of proposed disciplinary action and again made mention of such witnesses. According to an OGC attorney familiar with the matter, it appeared that investigators had either rushed through the investigation or simply failed to interview individuals that spoke favorably about the subject. Had the investigation been thorough and all relevant evidence made available to the proposing and deciding officials, the OGC attorney posited that these officials would have received a "fair picture of the individual" at the outset versus being surprised with new information during the reply period. When an OGC attorney raised this issue with the OAWP, the investigators stated that a determination was made to not waste more resources to interview additional people. In the OGC attorney's opinion, such an approach to investigations was problematic as investigations should be thorough. OAWP's records reflect that in April 2018, the subject employee in this instance was permitted to retire pursuant to a settlement agreement.*

## The Investigations Division Staff Did Not All Have Appropriate Expertise and Training

Determining appropriate staff competencies and recruiting for qualified staff were challenges that the OAWP faced in establishing its new organization. Former OAWP Executive Director O'Rourke told OIG investigators that he determined that the Investigations Division needed to recruit for administrative investigators, which was not a job classification that OAWP's predecessor had used. The OAWP also faced challenges providing appropriate training for its investigators.

### *The Investigations Division Shifted Its Staffing Strategy Away from Human Resources Specialists*

The OAWP inherited the investigative staff of the former OAR, which relied primarily on Human Resources (HR) specialists, whose position descriptions do not require extensive investigative training or experience. As of June 2018, the Investigations Division was staffed by a director, two regional supervisors, 23 HR specialists, one administrative investigator, and had five vacancies. Mr. O'Rourke told the OIG that his staffing strategy for the Investigations Division contemplated the use of administrative investigators rather than HR specialists. In his

view, the work of OAWP's Investigations Division required hiring staff with broader investigative expertise.

The OAWP began recruiting for administrative investigators in May 2018. The Investigations Director told OIG investigators that he was pleased with the recruiting effort and that it attracted many candidates with significant investigative experience. The Investigations Director also said the OAWP had explored whether it was possible to train and convert the HR specialists assigned from the OAR to become administrative investigators, but that the decision was put on hold indefinitely in December 2018. OAWP Deputy Executive Director Todd Hunter told the OIG that he was indirectly made aware that some of the HR specialists did not want to convert to administrative investigator positions and that the OAWP was "going to allow them options" because there were other roles for HR specialists. As of March 5, 2019, the staffing for the Investigations Division was composed of its director, two regional directors, 19 HR specialists, and five administrative investigators, with three vacancies. Although the composition of job types has changed slightly, the total number of staff allocated to the Investigations Division remained at 30 from June 23, 2017, to March 5, 2019.

### *The Investigations Division Lacked a Coordinated Strategy for Training*

The Investigations Director told OIG investigators that from June 23, 2017, until approximately July 2018, the Investigations Division had only provided its staff with web-based training on Administrative Investigation Boards, which the Investigations Director described as "not very good."[70] He acknowledged that in his view, the Investigations Division staff needed better training. According to the Investigations Director, the OAWP hired a senior advisor to assist with developing training programs for investigators. That senior advisor told the OIG that OAWP investigators were not receiving adequate training on interviewing witnesses, conducting investigations, and writing reports. He also told OIG investigators that due in part to quality issues that required frequent reworking, Investigations Division staff average seven cases per year, which he viewed as insufficient productivity. As of June 2019, no internal training program had been developed.

The Investigations Director told OIG investigators that the OAWP sought to address the Investigations Division's training needs by sending staff to training sessions provided by the U.S. Department of Homeland Security's Immigration and Customs Enforcement (ICE). The Investigations Director told the OIG that ICE's Management Inquiry Training Program contained practical exercises on witness interviewing, relevant for Investigations Division staff. The Investigations Division sent six HR specialists to the training in July 2018. According to the

---

[70] An Administrative Investigation Board is a group of individuals appointed to analyze evidence, ascertain facts, and document complete and accurate information regarding matters of interest to VA. VA Handbook 0700, *Administrative Investigations*, July 31, 2002. The Act does not require the OAWP to use Administrative Investigation Boards for conducting its investigative work.

Investigations Director, by September 30, 2019, nearly all Investigations Division staff will have attended this training. The OAWP training participants rated the practical aspects of the program highly, but also commented that significant portions of the agenda were ICE-specific and had no application to VA.

As part of the arrangement with ICE, the Investigations Director and the senior advisor also attended a week-long advanced interviewing course and received assurance that there would be opportunities for OAWP investigators to take the course in the future. The Investigations Director found the advanced interviewing course to be highly effective and advised OIG investigators that he would like to develop a similar program internally so that OAWP can have highly trained investigators going through the right courses.

## The Investigations Division Lacked a Timely, Thorough, and Balanced Approach to Fact-Finding

The OAWP did not have an approach that ensured comprehensive and impartial investigations. In part, this was because former leaders encouraged investigators to look for "substantial evidence" to support the charge of misconduct without investigating further to identify any relevant exculpatory evidence. The OAWP also conducted investigations involving political appointees instead of referring them to other qualified entities when it appeared OAWP personnel should not be involved because their ability to appear unbiased was impeded, as well as investigating one of its own directors as previously discussed. In addition, complainants voiced concern that investigations appeared to take too long, and that the OAWP did not always communicate promptly with complainants.

### *The Evidence Standard and Its Application Contributed to Limited and Unbalanced Investigations*

In its investigations, the OAWP sought to develop "substantial evidence," defined as "relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree."[71] That is, OAWP investigators did not conduct investigations designed to ensure that all known or obviously relevant evidence is obtained.[72] Rather, in many instances, they focused only on finding evidence sufficient to substantiate the allegations without attempting to find potentially exculpatory or contradictory evidence. This approach was inconsistent with reliably conducting an unbiased,

[71] VA adopted "substantial evidence" as the standard of proof necessary to sustain an action under the Act. Department of Veterans Affairs, Letter No. 006-17-1, Senior Exec. Accountability and Grievance Procedures (July 7, 2017).

[72] *See, e.g.*, Council of Inspectors General on Integrity and Efficiency, Quality Standards for Investigations (November 15, 2011). While OAWP is not governed by these standards, they provide relevant guidance for conducting thorough and objective investigations in a similar context.

balanced, and thorough investigation that includes developing relevant evidence that may disprove the allegations. In part, this was a result of failing to adopt policies and procedures requiring investigators to seek and consider contradictory or exculpatory evidence.

One deciding official described the appearance of a one-sided effort on the part of the Investigations Division stating, "[my] humble observation is that [the OAWP] had a mission to find wrongdoing." The deciding official elaborated, "from my perspective [I] certainly received cases that I thought were marginally supported at best and that it felt like . . . there was a [disciplinary] action in search of evidence." [73] In an interview with the OIG, one investigator recalled expressing a need to develop exculpatory information during the course of an investigation and being told by the A&A Director that this sort of information could be developed by the subject employee when replying to a disciplinary proposal.

Figure 3 provides an excerpt from an email with draft guidance prepared in June 2017 by a former OAWP investigator, which illustrates the impact that the substantial evidence burden of proof was anticipated to have on OAWP's investigative work.

> We must, however, take full advantage of the efficiency this lower burden of proof gives us to
>
> * end our investigations at the moment we have substantial evidence of misconduct,
> * make and communicate our assessments at that point, and
> * hone down our evidence files to just those documents that support charges.

***Figure 3.*** *Excerpt of Draft Guidance Prepared for OAWP Investigative Staff*
*Source: VA*

In response to then OAWP Executive Director O'Rourke's request for comment concerning the draft language excerpted in Figure 3, the Investigations Director wrote, "I think it hits the nail on the head and believe it is in keeping with the Secretary's intent. I would not change anything in it." Although this email does not appear to have been sent as drafted to all OAWP investigators, Mr. O'Rourke instructed the Investigations Director to apply this guidance to OAWP's investigations.[74] The Investigations Director confirmed that he expected investigators to exercise judgment and that the substantial evidence standard factors into that judgment.

[73] In examining whether employees were being properly held accountable under the Act's provisions, the OIG found that in some cases, employees appeared to be facing disciplinary action without sufficient supporting evidence. See Table 2, page 40.

[74] On June 9, 2017 in anticipation of the Act's passage, the Investigations Director emailed all investigators, instructing "Please stop what you are doing and let me [and other senior staff] know if you have any current investigations where you currently have 'substantial evidence' (less than preponderant evidence) substantiating misconduct." A senior OAWP investigator explained that this was part of an effort to identify at least ten pending

In the Investigations Director's view, an investigator would be justified to cease interviewing witnesses once "four or five" witnesses provided consistent testimony because at that point substantial evidence has been marshalled. The OIG identified one instance in which OAWP investigators reached a conclusion based on evidence collected that did not include any effort to interview the subject employee.[75] The 2017 accountability procedures require that, "unless the circumstances of the investigation make it impossible, unreasonable, or unnecessary to do so, a Senior Executive who is the subject of an investigation or review will be given an opportunity to respond to and provide evidence relating to the matters under investigation."

The OIG believes that the application of the substantial evidence standard by the OAWP may have contributed to its investigations being skewed to prove charges instead of to conduct fair and comprehensive investigations. As discussed, the Investigations Division has not published any written procedures to assist investigators in the exercise of this judgment. To reach objective and balanced findings, adequate guidance and training must be provided for investigative staff to apply standards correctly. Additionally, as discussed below, OAWP's practice of only including documents that support its charges when it prepares evidence files for disciplinary cases (and not those that might be exculpatory) has injected the appearance of bias, which could undermine employees' trust in the OAWP's process.

### *OAWP's Investigations of Some Political Appointees Had the Appearance of Bias*

The OAWP has statutory authority to investigate matters that overlaps with the authority granted several other investigative bodies, which means more than one entity can potentially investigate the same matters. The OIG identified instances in which the OAWP's objectivity was impaired by at least the appearance of bias.[76] In these instances, the OAWP should have referred the matters elsewhere or implemented measures sufficient to avoid the appearance of impropriety.[77] Key to this process is having the filter or apparatus for triaging which issues should remain within the OAWP. Guidance for employing that judgment would help ensure consistency and enhance the integrity of the office.

---

investigations where the OAWP could take prompt disciplinary action once the anticipated new authorities from the Act took effect. The investigator stated that Mr. O'Rourke set the goal of identifying ten actions that could be taken.

[75] See Finding 4, page 55.

[76] As discussed in Finding 1, the OAWP decided to investigate one of its directors in a case outside its statutory scope. The appearance of bias in that case was exacerbated by the slow progress of the matter at the discipline stage. Some OAWP staff familiar with the investigation questioned whether OAWP leaders were protecting a senior staff member.

[77] The OAWP has statutory authority to refer whistleblower disclosures to other investigative entities, including the OIG. 38 U.S.C. § 323(c)(1)(D).

Although the OAWP has authority to *investigate* a political appointee, the A&A Division would have no role in advising on any resulting disciplinary action.[78] The two provisions of the Act that govern the VA Secretary's authority *to take disciplinary action* against VA employees exclude political appointees.[79]

The OAWP has investigated misconduct allegations brought against four political appointees: a former VA Deputy Secretary, a former VA Chief of Staff, a former VA Assistant Secretary for Human Resources and Administration, and a former VA Assistant Secretary for Operations, Security, and Preparedness. None of these cases resulted in the OAWP substantiating misconduct.

As with its other work, the OAWP has an obligation to perform its investigation of political appointees in a manner that avoids bias, both actual and apparent. The OIG identified multiple instances in which the investigation of a political appointee posed special challenges for the OAWP with respect to managing at least the appearance of bias.

### Example 11

*From July 2017 to November 2017, the OAWP received four submissions from four different individuals relating to allegations involving Peter Shelby, who was then serving as VA Assistant Secretary for Human Resources and Administration. The allegations included retaliation, harassment, discrimination, and creating a hostile work environment.*

*By the time the allegations were under OAWP review, Mr. Shelby had developed a personal relationship with Mr. O'Rourke (then the OAWP executive director) and Mr. Nicholas (then a senior advisor to the OAWP), which included golf outings and other social engagements.*[80]

*Beyond social engagements, Mr. Shelby had influence over matters of importance to Mr. O'Rourke and Mr. Nicholas. For example, on September 19, 2017, Mr. Nicholas wrote to Mr. Shelby, "Please don't forget to see about a waiver on my retired annuity. It is a fairly large sum of money for me . . ."*[81] *Emails reflect that Mr. Nicholas pressed Mr. Shelby for assistance in obtaining the waiver*

[78] 38 U.S.C. §§ 323(c)(1)(H), 713, and 714. In general, presidential appointees serve at the pleasure of the President. Consistent with OAWP's interpretation of its authority, political appointees are not included in the adverse action authority given to the VA Secretary in 38 U.S.C. §§ 713-714. Presidential appointees are also specifically excluded by 5 C.F.R. § 752.401 from coverage under the adverse actions provision set forth in 5 C.F.R. § 752.

[79] 38 U.S.C. § 713(d)(1)(A) and 5 U.S.C. §3132(a)(4).

[80] Calendars and emails reflect at least five social events involving Mr. Shelby and/or Mr. O'Rourke and/or Mr. Nicholas during the OAWP investigation.

[81] Like any retiree of federal service, Mr. Nicholas was subject to a prohibition against receiving the dual compensation of his federal retirement plus a federal salary. In unusual circumstances, a waiver can be obtained.

> *through at least October 2017 and that the matter remained an open question through February 2018.*[82]
>
> *Email correspondence reflects that, as of March 9, 2018, the Investigations Director had completed the OAWP investigation and was drafting the report. The report was finalized on May 21, 2018, and it concluded that allegations against Mr. Shelby were not substantiated.*

With respect to the Shelby investigation, Mr. O'Rourke acknowledged there could be an appearance of bias, and told OIG investigators that because Mr. Shelby "was a political appointee, we firewall political employees away from them and give it to the career employees to investigate." The OIG determined that the OAWP had no procedures for "firewalling" its senior leaders from cases. Moreover, the OIG determined that Mr. O'Rourke personally intervened to change the investigator assigned to this matter from a career employee who was Mr. O'Rourke's indirect subordinate to the Investigations Director, who was a direct subordinate.[83]

Mr. O'Rourke also had periodic contact with Mr. Shelby relating to the investigation while it was pending. Mr. O'Rourke told OIG investigators that Mr. Shelby "vented" to him about the investigation, and that "[Mr. Shelby] had asked [Mr. O'Rourke] about the allegations," but he told OIG investigators that any discussion was related to the allegations, not the investigation itself. On September 25, 2017, an OAWP investigator emailed Mr. Shelby to request his availability for an interview on either October 3 or 4, 2017. Mr. Shelby did not respond. On October 4, 2017, Mr. O'Rourke wrote to Mr. Shelby, "Can you make yourself available to my investigator *so we can move this along*?" (emphasis added) Later, on December 7, 2017, when the investigator contacted Mr. Shelby to inquire about a new allegation relating to an incident that occurred subsequent to his initial interview, Mr. Shelby forwarded the email to Mr. O'Rourke commenting, "Sure... I'll meet with them but this is becoming ridiculous."[84]

In addition, one of the whistleblowers in the matter was a nonpolitical Covered Executive with whom Mr. O'Rourke had disagreed repeatedly. The whistleblower became the subject of an OAWP investigation requested by Mr. Shelby while the whistleblower's allegations concerning

---

[82] Mr. Nicholas wrote to Mr. Shelby on October 3, 2017, "Hey Golf Pro, Any movement on my retirement waiver yet?" Mr. Shelby responded, "My best folks are on it." Emails reflect that Mr. Shelby continued following up on this request for Mr. Nicholas through at least October 2017, and a determination was made in November 2017 that Mr. Nicholas's stated justification did not meet the requirements for a waiver. Mr. Shelby resumed inquiring on behalf of Mr. Nicholas's requested waiver on February 23, 2018, in connection with an anticipated change in position for Mr. Nicholas to executive director of the OAWP.

[83] The investigator to whom the allegations were originally assigned was a long-tenured VA employee with more than 14 years of experience conducting investigations.

[84] The OAWP's records reflect that investigators met with Mr. Shelby for 66 minutes on October 5, 2017, and 35 minutes on December 13, 2017.

Mr. Shelby were still pending.[85] Other VA employees familiar with the case told the OIG that they were reluctant to report allegations of wrongdoing pertaining to Mr. Shelby because of their perceptions of the close relationship between Mr. O'Rourke and Mr. Shelby.

### Example 12

*In August 2018, the OAWP received a referral from the U.S. Office of Special Counsel and initiated an investigation into the alleged misuse of executive protection services by then VA Deputy Secretary Thomas Bowman, reportedly authorized by then Assistant Secretary for Operations, Security and Preparedness Donald Loren.[86] After interviewing Mr. Loren, the investigator determined that it would be necessary to interview the then VA General Counsel James Byrne. The investigator wanted to speak to Mr. Byrne because Mr. Loren told the investigator that he relied upon advice provided by Mr. Byrne. the Investigations Director and Mr. Nicholas intervened to prevent the investigator from interviewing Mr. Byrne. Mr. Nicholas permitted the investigator to ask the witness only three questions in written form, each of which was subject to his preapproval.[87]*

Example 12 evidences the need for the OAWP to have adequate procedures for mitigating the appearance of bias in cases that have the potential to jeopardize its objectivity. In this instance, Mr. Nicholas's preapproval of the content and manner of questions to be posed of a fellow political appointee has the appearance of bias.

The OIG determined that the OAWP has not instituted procedures sufficient to ensure that investigations are safeguarded against actual or perceived bias. In Example 11, the allegations of discrimination were within the purview of the Office of Resolution Management. However, given Mr. Shelby's position as the Assistant Secretary of HR&A, referral to the Office of Resolution Management—which was within HR&A—may not have avoided the appearance of bias with respect to the discrimination allegations. Instead, the allegations could have been referred to the OIG. To the extent that other allegations of misconduct on the part of Mr. Shelby could not be referred to other investigative entities, the OAWP needed to implement and adhere to procedures reasonably designed to mitigate the appearance of bias. For allegations of misconduct involving senior VA officials, the matter may be investigated by the OIG.

---

[85] Finding 4, page 53 presents further discussion of this case.

[86] Consistent with the ordinary process for referrals received by VA from the U.S. Office of Special Counsel, the OIG also received these allegations. The OIG did not elect to initiate an investigation of its own. In such circumstances, VA is obligated to investigate the matters raised by the U.S. Office of Special Counsel's referral.

[87] The OAWP did not substantiate misconduct in this matter. When interviewed by the OIG, the investigator expressed frustration in the limitations placed on the investigation by OAWP managers.

### *Investigations Did Not Meet the Timeliness Expectations of Whistleblowers*

On its website, the OAWP promised "timely and unbiased investigation" of allegations and committed to "timely remedial resolutions." The OIG received numerous complaints from whistleblowers who felt that their submissions to the OAWP were not being handled in a timely manner, and that they were not even sure that the OAWP had accepted their allegations for investigation. In one example, the OIG found that an August 2017 submission by a VA employee (a veteran) alleged supervisor retaliation, which was followed the next month by a proposed termination and same-day resignation. After a year of inaction within the Triage Division, work was undertaken for several months before the OAWP investigator learned in January 2019 that the complainant had passed away in August 2018 with the matter unresolved.

Lengthy processing times can discourage whistleblowers from making further reports.[88] The OIG recognizes, however, that investigations must be afforded adequate time to ensure accurate results. Still, the OIG evaluated the time taken by the OAWP to resolve matters that were received by the OAWP Triage Division and referred for administrative investigation and found many took a year or more to close.[89]

Dr. Bonzanto told OIG investigators that she prioritized the need for prompt resolution of matters due in part to impacts on the subjects of investigations. She also stated that she was introducing standardized "touchpoints" with whistleblowers to improve communication about case statuses. She told OIG investigators that she instituted new expectations relating to timeliness of investigations. Her stated goal is to reduce to 90 days the time it takes from the receipt of a submission to the end of the A&A Division's involvement. Dr. Bonzanto explained that she is instituting check-in points to ensure that the staff of the Investigations Division are keeping up with their workload.

[88] GAO, *Office of Special Counsel: Actions Needed to Improve Processing of Prohibited Personnel Practice and Whistleblower Disclosure Cases*, GAO-18-400, (June 2018) 16, 21, https://www.gao.gov/assets/700/692545.pdf (discussing importance of timeliness in resolving whistleblower claims).

[89] The data show that from June 23, 2017, through December 31, 2018, the OAWP opened 628 matters for investigation and inherited 131 matters that had been pending with the OAR. Of the 628 OAWP matters, 299 were closed by the end of 2018, but 20 took more than a year to resolve. Of the 329 matters still pending at the end of 2018, 52 had been open more than a year. According to VA's *Administrative Investigations: Resource Guidebook* (June 2004), "[a]n administrative investigation is an impartial inquiry, authorized by a facility director or higher level manager, to be conducted at any time deemed necessary, to determine facts and collect evidence in connection with a matter in which the VA is or may be a part in interest." Directive 0700 also provides, "The term 'administrative investigation' refers to a systematic process for determining facts and documenting evidence about matters of significant interest to VA."

## Finding 2 Conclusion

The lack of comprehensive written procedures has left OAWP staff without sufficient and consistent guidance for conducting its work appropriately and fairly, particularly in regard to triaging and investigating complaints. These deficiencies have perpetuated confusion about OAWP's scope of authority discussed in Finding 1. In addition, the OAWP has not had a quality assurance program to ensure investigations are thorough and accurate. OAWP also had not established training for its investigative staff, which could affect staff's ability to conduct comprehensive and balanced investigations.

The OIG determined that the OAWP has struggled to meet its commitment to objective and timely investigations. Recent complaints to OIG's hotline reflect persistent concerns regarding OAWP's investigative processes.[90] The OAWP could have avoided some of these issues by referring investigative matters to another authorized entity when OAWP's objectivity and bias would be questioned. Investigations must take sufficient time to be accurate; however, the OAWP has created a timeliness expectation for whistleblowers that it has only recently been addressing.

## Recommendations 5–8

5. The Assistant Secretary for Accountability and Whistleblower Protection ensures that the divisions of the Office of Accountability and Whistleblower Protection adopt standard operating procedures and related detailed guidance to make certain they are fair, unbiased, thorough, and objective in their work.
6. The VA General Counsel updates VA Directive 0700 and VA Handbook 0700 with revisions clarifying the extent to which VA Directive 0700 and VA Handbook 0700 apply to the Office of Accountability and Whistleblower Protection, if at all.
7. The Assistant Secretary for Accountability and Whistleblower Protection assigns a quality assurance function to an entity positioned to review Office of Accountability and Whistleblower Protection divisions' work for accuracy, thoroughness, timeliness, fairness, and other improvement metrics.
8. The Assistant Secretary for Accountability and Whistleblower Protection directs the establishment of a training program for all relevant personnel on appropriate investigative techniques, case management, and disciplinary actions.

[90] Deidentified information regarding these complaints was transmitted to VA.

## Finding 3: VA Has Struggled with Implementing the Act's Enhanced Authority to Hold Covered Executives Accountable

The Act includes provisions to reduce perceived barriers to VA's ability to hold Covered Executives accountable for misconduct and poor performance.[91] These include a reduced standard of review, shorter deadlines for the presentation of defenses, and bypassing the Merit Systems Protection Board (MSPB) in favor of litigating all Covered Executive appeals directly before federal judges.[92]

Despite statements by former VA leaders—including former Secretary Shulkin—extolling the new accountability authority, as of May 22, 2019, VA removed only one Covered Executive from federal service pursuant to the authority provided by the Act (38 U.S.C. § 713).[93] Other disciplinary actions, such as demotions, suspensions, and reprimands have also been taken under this authority. From June 23, 2017, to March 22, 2019, officials involved in Covered Executive disciplinary actions (proposing, deciding, or grievance officials) mitigated the discipline recommended by the OAWP in 32 of the 35 Covered Executive cases that proceeded to a final decision.[94] The OIG found that the lack of adequate guidance for officials involved with the disciplinary process and the limited evidence the OAWP provided OGC and proposing officials could have led to reductions in the discipline OAWP recommended.

### VA Did Not Provide Adequate Guidance for Determining Appropriate Disciplinary Actions for Covered Executives

On July 7, 2017, then VA Secretary Shulkin issued Senior Executive Accountability and Grievance Procedures for implementing the Act.[95] Those procedures adopted a decision-making process that involves three management officials: a proposing official, who suggests what disciplinary action should be taken against the subject employee; a deciding official, who issues a decision on the proposed discipline; and a grievance official, who hears an appeal from the employee. The use of a proposing official and deciding official for Covered Executive discipline

[91] 38 U.S.C. § 713.

[92] 38 U.S.C. § 713.

[93] This Covered Executive, the medical center director of the Washington, DC VA Medical Center, was originally removed in July 2017. The MSPB ordered a stay of VA's removal action, the director was reinstated, and then subsequently removed under the Act's new authority. He filed an appeal in the U.S. District Court for the District of Columbia. On May 14, 2019, VA rescinded the removal action, reinstating his employment with back pay to a different position. As of July 2, 2019, VA and the former medical center director were negotiating a settlement.

[94] Mitigation, as used here, includes instances in which the OAWP made a recommendation, but the proposing official decided not to propose any disciplinary action. A final decision includes the decision of the proposing official not to propose discipline.

[95] VA Corporate Senior Executive Management Office Letter No. 006-17-1, Senior Executive Accountability and Grievance Procedures, July 7, 2017.

cases is consistent with the decision-making approach that VA used for all staff prior to the passage of the Act.[96]




***Figure 4.*** *VA disciplinary process for Covered Executives for June 23, 2017, to June 2019*
*Source: OIG Analysis*

## VA Did Not Provide Adequate Guidance to Disciplinary Officials

Although the process is similar to prior practices, VA eliminated the use of prior guidance and failed to adopt replacement guidance for proposing and deciding officials. Previously, such decision makers consulted VA's table of penalties and the *Douglas* factors (an MSPB-compiled list of factors for deciding officials to consider when making disciplinary determinations) to aid in determining the appropriate discipline.[97] The July 2017 accountability procedures provide that the proposing official will propose "a penalty that is reasonable and commensurate with the facts."[98] The A&A Director told OIG investigators that in making their recommendations to the proposing officials, A&A Division staff attempt to be consistent with prior A&A Division recommendations for similar cases.[99] The A&A Division's recommendations are not binding,

[96] There was no requirement in the Act that VA adopt the existing model.

[97] The table of penalties is published by VA as a "guide" "in the administration of disciplinary and major adverse actions to help ensure that like actions are taken for like offenses." According to OIG interviews, it was not used in disciplinary actions under the Act because of the different standard of proof required by the Act (substantial evidence instead of preponderance of the evidence). The *Douglas* factors are a summary of factors lifted by the MSPB from court decisions, the U.S. Office of Personnel Management, and other relevant guidance that the MSPB views as "relevant for consideration in determining the appropriateness of a penalty." *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981). Because senior executives are no longer able to appeal to the MSPB, VA determined that the *Douglas* factors, which are a feature of MSPB case law, do not apply to disciplinary actions under the Act.

[98] In addition, the July 2017 accountability procedures state that the degree of evidence necessary to sustain an action under 38 U.S.C. § 713 is "substantial evidence," however the application of that standard was not well understood by proposing and deciding officials.

[99] From June 23, 2017, to March 22, 2019, the A&A Division made 48 disciplinary recommendations for Covered Executives.

and the proposing official has discretion to propose whatever disciplinary actions he or she deems appropriate.

Deciding officials also have discretion to decide whether to accept, mitigate, or set aside the proposed disciplinary action. One deciding official told OIG investigators that, when determining the appropriate discipline to impose, he consulted OGC for advice in an effort to be consistent with discipline imposed in other cases. He also said that he applied his own judgment and attempted to be consistent with prior decisions he made in similar cases.

### *Disciplinary Officials Relied on Subjective Judgment to Decide Penalties*

It is appropriate for an official to mitigate a recommended penalty due to the consideration of additional evidence or predetermined standardized disciplinary factors. It is concerning, however, when the mitigation appears to result from officials substituting their own personal judgment for consistent and defensible criteria. A large number of OAWP's recommended actions appear to have been mitigated by disciplinary officials for subjective reasons or because the investigation or evidence was not adequate.

Some OAWP officials expressed concern about the frequency with which the OAWP's recommended disciplinary actions were declined by proposing and deciding officials. The A&A Director attributed this to some disciplinary officials applying subjective mitigating factors, such as, "I've known them for 25 years and they're a great guy." The OIG's review of OAWP data shows that, of the 35 Covered Executive disciplinary cases that proceeded to a final decision from June 23, 2017, to March 22, 2019, OAWP's recommended discipline was accepted only three times.[100] In all other cases, a disciplinary official mitigated the recommended discipline. Eleven cases were mitigated by more than one official. In an additional five cases, the subject resigned or retired before discipline was proposed.

The OAWP provided explanations for 10 of the actions in which the disciplinary officials mitigated the action recommended by OAWP. Table 2 provides a summary (without individual identifiers) of the disciplinary officials' reasons for mitigating those 10 actions.

[100] As discussed in Finding 5, VA did not report on the instances in which disciplinary officials mitigated the discipline recommended by the OAWP because of the OAWP's interpretation of the Act. A final decision, as used here, includes the proposing official's decision not to propose disciplinary action.

### Table 2. Reasons Officials Declined OAWP's Recommended Actions

| OAWP | Proposing Official | Deciding Official | Grievance Official | Disciplinary Officials' Rationale[101] |
|---|---|---|---|---|
| 5-day suspension | no action[102] | n/a | n/a | The proposing official declined to issue any discipline because the subject's conduct in the circumstances that gave rise to the recommendation was consistent with the way the proposing official would have conducted himself. |
| 14-day suspension | 5-day suspension | 5-day suspension | n/a | Although the proposing official was comfortable with the evidence file, the penalty was lowered to a 5-day suspension. The proposing official acknowledged the mandatory minimum penalty of 12-day suspension for actions resulting from whistleblower retaliation, but interpreted the statute to be inapplicable. |
| 15-day suspension to removal | written counseling | n/a | n/a | The proposing official consulted OGC and factored internal issues at the facility into the decision to mitigate to counseling. |
| removal | 12-day suspension | retired in lieu of removal | n/a | The proposing official disagreed with the Office of Special Counsel's finding and did not want to damage the subject's career at its end. |
| 60-day suspension | 3-day suspension | reprimand | n/a | The proposing official relied upon OGC advice that OAWP's recommendation was "too high." The deciding official told the OAWP that he/she elected to further mitigate after "reviewing the totality of the evidence and the credibility of the witnesses." |
| removal | demotion from SES to GS-14 | demotion from SES to GS-14 | demotion from SES to GS-15 | The proposing official felt that [the subject] could still be a productive and beneficial VA employee, but not as a medical center director. The deciding official told the OAWP that he/she "concur[red] with the demotion to GS-14." The grievance official "felt jumping to the GS14 level was too harsh." |
| 10-day suspension | 3-day suspension | reprimand | n/a | The proposing official felt that OAWP's recommendation was too severe. The deciding official further mitigated due to the subject's medical condition and lack of any prior discipline. |
| 5- to 7-day suspension | 5-day suspension | written counseling | n/a | The proposing official consulted OGC because he/she disagreed with OAWP's recommendation. The deciding official found that the evidence was insufficient. |
| 5- to 10-day suspension | written counseling | n/a | n/a | The proposing official explained that the subject was a minor player in the action, it was a first offense and the subject's supervisor gave him/her bad advice. |
| 15- to 30-day suspension | no action | n/a | n/a | The proposing official relied on OGC's advice that the Administrative Judge erred in finding discrimination, and that VA's decision to accept that conclusion was incorrect. |

*Source: OIG analysis of mitigated cases*

[101] The rationale is based on the explanations provided by the OAWP to the OIG and is supplemented by information provided by the disciplinary officials to the OAWP.

[102] "No action" means the disciplinary official declined to issue a disciplinary action and "n/a" means the corresponding disciplinary official did not have to make a decision because the disciplinary process had ended.

In nine instances, the discipline was mitigated based on the subjective judgment of the disciplinary official that OAWP's recommended action was too severe for the conduct or under the given circumstances. In at least four cases, the proposing or deciding official consulted with the OGC in reducing the discipline originally recommended by OAWP.[103] Several cases reflected concern with the thoroughness of the investigation, including the sufficiency of the evidence presented.

### *Proposing Officials Also Need Additional Guidance on Statutorily Mandated Adverse Actions for Whistleblower Retaliation*

VA also uses proposing officials and deciding officials to determine disciplinary action in cases involving supervisors who have engaged in prohibited personnel actions.[104] By statute, VA is mandated to impose a minimum penalty of a 12-day suspension whenever the

> Secretary, an administrative judge, the Merit Systems Protection Board, the Office of Special Counsel, an adjudicating body provided under a union contract, a Federal judge, or the Inspector General of the Department determines [a supervisor] committed a prohibited personnel action.[105]

Second offenses carry a mandatory penalty of removal. The July 2017 accountability procedures include provisions that senior executives "will face" the mandatory penalties.

The OIG identified instances in which proposing officials would have benefited from guidance regarding mandatory minimum adverse actions beyond the admonition that senior executives "will face" the mandatory penalties. In one instance, the OAWP found a Covered Executive engaged in a prohibited personnel action, but the proposing official declined to propose the minimum 12-day suspension because he reasoned that the OAWP is not among the list of individuals identified in 38 U.S.C. § 731. In a second instance, a proposing official received a finding from the U.S. Office of Special Counsel, via the OAWP, that the subject employee (a Covered Executive) had engaged in a prohibited personnel action. The OAWP recommended removal. The proposing official (the subject's supervisor) disagreed and sought to develop evidence in support of the subject employee. In this instance, the issue became moot because the

[103] An OGC attorney explained that when OGC and the A&A Division disagreed, proposing officials were often confused about whose advice to follow.

[104] Although the July 2017 accountability procedures relate exclusively to Covered Executives, 38 U.S.C. § 731 applies to any supervisor found to have committed a prohibited personnel practice.

[105] The prohibited personnel actions described in this statutory provision relate primarily to whistleblower retaliation. 38 U.S.C. § 731(c). These mandatory minimum penalties were enacted in 2016. See *Continuing Appropriations and Military Construction, Veterans Affairs, and Related Agencies Appropriations Act, 2017, and Zika Response and Preparedness Act*, Public Law No. 114-223, 130 Stat 857 (2016) (codified as amended at 38 U.S.C. § 731).

subject employee resigned. These examples illustrate the need for further clarification and guidance for proposing officials on when mandatory penalties should be imposed.

## The A&A Division Compiled Incomplete Evidence Files to Support Proposed Disciplinary Actions

The A&A Division adopted a practice of culling OAWP's investigative files to prepare an evidence file that it provided to the OGC and the proposing official. The A&A Division focused on including material in the evidence file that supported the proposed disciplinary action, rather than compiling all relevant evidence. According to the A&A Director, the content of the evidence file was determined by "[t]he A&A specialist. When they're drafting the proposal, they are putting the evidence in there that they believe, as they're drafting it, supports the charges. So, the A&A specialist makes the decision of what goes in there."

The July 2017 accountability procedures contemplate the creation of separate investigative and evidence files, with the latter containing a subset of the evidence developed during the investigation limited to what is relevant.[106] Contrary to the A&A Division's practice, however, the July 2017 procedures seem to anticipate that the evidence file made available to proposing officials would contain all relevant evidence and not simply evidence that tends to support the charges.[107] The July 2017 accountability procedures specifically state that the evidence file should include "[a]ny statement or evidence provided by the [Covered Executive] . . . if *relevant or used in support of* the proposed action" (emphasis added). Further, by requiring "substantial evidence" to sustain an action, the procedures imply that other relevant evidence, even if not provided by the Covered Executive, also should be included.[108] The July 2017 accountability procedures define "substantial evidence," as "*relevant evidence* that a reasonable person, considering the *record as a whole* might accept as adequate to support a conclusion, even though other reasonable persons might disagree." (emphasis added)[109] It would be difficult for a disciplinary official to determine whether this standard is met without considering all relevant evidence developed during the investigation.

[106] The OAWP's draft SOPs reference an evidence file, developed by the investigator, to be provided to the proposing official, deciding official, and the subject. However, this requirement appears to have originated in the OAR procedures and was not updated to reflect the July 2017 accountability procedures or OAWP processes.

[107] The July 2017 accountability procedures do not define "relevant," however, the Federal Rules of Evidence, for example, state that evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401.

[108] The July 2017 accountability procedures state that the proposing official "shall be briefed on the investigation and the evidence be gathered" and "will review the available evidence to determine whether a Reprimand, Suspension, Demotion, or Removal should be proposed."

[109] Although this standard ultimately applies to the decision of the deciding official, the July 2017 accountability procedures state that "'No action' may be warranted if the Proposing Official determines, by Substantial Evidence, that the evidence does not support any of the allegations against the Senior Executive."

### Example 13

> *After receiving investigative results from the Investigations Division, the A&A Division determined that a Covered Executive's conduct constituted neglect of duty. In February 2019, the proposing official (the Covered Executive's supervisor) issued a proposed disciplinary action and provided the Covered Executive with access to the evidence file. The OAWP's evidence file did not contain a statement prepared by the Covered Executive, referenced in his/her testimony and provided to the OAWP investigators. The statement set forth a chronology of events that appeared to conflict with the neglect of duty charge. The Covered Executive's counsel referenced this statement and its non-inclusion in the evidence file when submitting the Covered Executive's response to the deciding official. The deciding official subsequently issued a written decision referencing the materials that the Covered Executive's attorney attached to his/her response to the disciplinary proposal. The deciding official wrote, "After carefully reviewing the proposed suspension and the documentary evidence supporting the proposed action, as well as your written response to the proposed suspension, I find that the charge is not supported by substantial evidence."*

With respect to Example 13, the July 2017 accountability procedures call for the inclusion of the Covered Executive's statement in the evidence file. Its non-inclusion prevented the proposing official from considering all relevant evidence.

The non-inclusion of relevant evidence in the preparation of the evidence file also impacted the OGC's ability to provide legal advice to the A&A Division. As it did with proposing officials, the A&A Division provided OGC attorneys with access to the evidence file it prepared. In September 2017, the OAWP provided an evidence file to an OGC attorney as support for a possible disciplinary action proposal. The evidence file did not contain the interview transcript of the employee who was the subject of the proposed discipline.

In response to the OGC attorney's request for access to the transcript, the A&A Director wrote,

> We will not be providing the transcript [of the employee facing discipline]. It's not relevant to the charges in the proposal. I do not think it's important for the proposing official to review it, since it is not relevant. I also fail to see how a document that is not referenced in the proposal is necessary to determine whether substantial evidence exists for the charges.

The OIG concluded that the employee's transcript was relevant because it contained the subject's denials, admissions, and contextualization of alleged misconduct referenced in the proposed discipline and, therefore, should have been included in the evidence file pursuant to the July 2017 accountability procedures.

The A&A Director recalled this instance and told the OIG that then OAWP Executive Director O'Rourke directed her not to provide the transcript to the OGC attorney who requested it.[110] The A&A Director could not recall other instances when the A&A Division denied the OGC access to requested evidence but caveated that it was "absolutely" possible.

The A&A Director told OIG investigators that, in other instances, the A&A Division would provide additional information from the investigative file if requested by the OGC. The OIG determined that this practice was problematic because OGC attorneys might not know what information to request. As one OGC attorney explained, neither the OGC attorney nor the disciplinary officials know what other information is in the investigative file until the subject responds, and even the subject might not know what is in the investigative file.[111]

Under a pilot initiative implemented by Dr. Bonzanto, OGC attorneys are now routinely provided access to the entire investigative file. The results of that pilot were not yet available.

## Finding 3 Conclusion

The OIG determined that VA's lack of adequate written guidance concerning penalties left disciplinary officials to largely rely upon subjective judgments in actions involving Covered Executives, which has resulted in frequent mitigation of OAWP's recommended discipline. The A&A Division also had a practice of providing only the evidence that supported the proposed action, which effectively excluded some relevant evidence from being provided to the OGC and disciplinary officials.

## Recommendations 9–11

9. The VA Secretary, in consultation with the VA Office of General Counsel, provides comprehensive guidance and training reasonably designed to instill consistency in penalties for actions taken pursuant to 38 U.S.C. §§ 713 and 714.
10. The VA Secretary ensures the provision of comprehensive guidance and training to relevant disciplinary officials to maintain compliance with the mandatory adverse action criteria outlined in 38 U.S.C. § 731.
11. The Assistant Secretary for Accountability and Whistleblower Protection makes certain that in any disciplinary action recommended by the Office of Accountability and Whistleblower Protection, all relevant evidence is provided to the VA Secretary (or the disciplinary officials designated to act on the Secretary's behalf).

[110] The A&A Director eventually provided the transcript to the OGC attorney.

[111] This problem is exacerbated by the Act's timelines, which provide only seven business days for the subject to respond and an additional eight business days for the deciding official to process and review new information before rendering a decision. An evidence file provided by the proposing official to the deciding official with all relevant information would reduce the information the subject must collect and the deciding official must review.

## Finding 4: The OAWP Failed to Fully Protect Whistleblowers from Retaliation

Under its former leadership, the OAWP did not fully exercise its authority under the Act to investigate allegations of whistleblower retaliation. Instead, it referred many complaints of whistleblower retaliation to other VA program offices, facilities, or other components that were not equipped to undertake such investigations and without adequate safeguards to protect whistleblowers' identities.

In addition, comments and actions of OAWP's former leaders evidenced that they did not properly value and respect the important role of whistleblowers in identifying fraud, waste, and abuse within the agency. Further, one of OAWP's former leaders allowed the diversion of a significant amount of resources to non-OAWP uses. Finally, the OAWP itself engaged in actions that could be considered retaliatory.

### OAWP's Referral Process Did Not Ensure Thorough Investigations by Other VA Components or Have Adequate Safeguards to Protect Whistleblowers' Identities

As referenced earlier, the OAWP held itself out on its public website as conducting "thorough, timely, and unbiased investigation of all allegations and concerns."[112] Although OAWP does have statutory authority to investigate allegations of misconduct by Covered Executives and whistleblower retaliation by all supervisory employees, the OAWP did not investigate "all allegations and concerns" itself, but instead made more than 2,500 referrals to other VA components for investigation over the approximately 18-month review period—without always notifying the complainant of those actions. Triaging matters to ensure that OAWP's investigative resources are focused on submissions that fall squarely within its statutory scope (and raise no appearance of bias) and referring other submissions to entities best positioned to address them is not inherently problematic. The concerns raised by OAWP's referrals are primarily threefold:

1. The recipient agency must be competent to conduct the investigation of the type of matter being referred in a comprehensive, accurate, and balanced manner.
2. The OAWP must have tracking and monitoring processes to determine if the recipient entity has reasonably and appropriately handled the referral.
3. The OAWP must be transparent with complainants about the referral process and have procedures in place to ensure that complainants' identities will be protected—particularly from individuals in VA who are the subject of the allegations or are

[112] As detailed in Finding 1, this statement exceeds the OAWP's statutory charge. It is not empowered to investigate "all allegations and concerns," but rather only those within the ambit of its enabling statute. See 38 U.S.C. § 323(c). In July 2019, the OAWP removed this statement from its website.

positioned to identify the complainant based on the nature of the submission or other released information.

As reflected in Table 3, from June 23, 2017, to December 31, 2018, the OAWP Triage Division referred 547 submissions to the OAWP Investigations Division and 2,526 submissions to other VA components (with 38 referrals to the VA OIG).[113]

**Table 3. OAWP Referrals – June 23, 2017, to December 31, 2018**

| VA Component | Count |
|---|---|
| Board of Veterans' Appeals (BVA) | 21 |
| National Cemetery Administration (NCA) | 4 |
| Office of Accountability and Whistleblower Protection (OAWP) | 547 |
| Office of Acquisition, Logistics and Construction (OALC) | 7 |
| Office of General Counsel (OGC) | 6 |
| Office of Human Resources and Administration (HR&A) | 2 |
| Office of Information and Technology (OIT) | 23 |
| Office of Inspector General (OIG) | 38 |
| Office of Medical Inspector (OMI) | 13 |
| Office of Operations, Security and Preparedness (OSP) | 6 |
| Office of Resolution Management (ORM) | 8 |
| Office of Small and Disadvantaged Business Utilization (OSDBU) | 1 |
| Office of the Secretary of Veterans Affairs | 3 |
| Veterans Benefits Administration (VBA) | 205 |
| VBA Office of Client Relations (VBA-OCR) | 122 |
| Veterans Experience Office (VEO) | 2 |
| Veterans Health Administration (VHA) | 1,624 |
| VHA Office of Client Relations (VHA-OCR) | 441 |
| **Total** | 3,073 |

*Source: OAWP Knowledge Management Division*

[113] There were 621 submissions received that OAWP triage staff did not refer because they lacked sufficient information, were duplicative, or for other reasons—bringing the total submissions to 3,694.

### *Some VA Components Mishandled Whistleblower Retaliation Allegations Referred by the OAWP*

Of the 2,526 referrals to other VA components, at least 51 of these involved allegations of whistleblower retaliation. The Act provides that one of the functions of the OAWP is to investigate retaliation allegations lodged against any VA supervisor irrespective of GS level (or equivalent).[114] Former OAWP Executive Director O'Rourke stated that he understood the Act to mean that the OAWP was "supposed to investigate every instance of retaliation across" the whole of VA, making "no exclusion for rank." However, he acknowledged that resource limitations played a role in the scope and referral decisions that were made. Other OAWP leaders echoed Mr. O'Rourke's sentiments about resource limitations necessitating the referral of whistleblower retaliation allegations to other VA components for investigation.

The A&A Director told OIG investigators that when she reviewed the results from investigations conducted by VA components, she identified instances in which the referral recipient concluded that no retaliation had occurred but that her review of the same evidence determined otherwise. In approximately April 2018, after assessing the results of some referred investigations, the OAWP determined that those VA components were not equipped to handle whistleblower retaliation investigations. As a result, in June 2018, the OAWP decided to begin investigating all whistleblower retaliation disclosures, including both senior executive and non-senior employees, from that point forward.[115] When it made this change, the OAWP did not reassess investigations that had already been completed by VA components. However, these were reviewed in April and May 2019 at the direction of Dr. Bonzanto as part of an effort to examine all 539 investigations of whistleblower retaliation allegations received from June 23, 2017, through April 15, 2019, to determine if they were properly developed. This review resulted in the identification of 42 cases that merit additional review. A plan has been submitted to Dr. Bonzanto for reviewing these 42 cases.

### *The OAWP Faced Challenges Ensuring Follow-Up on Referrals*

The former Triage Director explained to the OIG that it was a challenge to conduct follow-up once referrals were made for investigation by other VA components. She stated that the OAWP established deadlines for responses but had no ability to compel reports of work conducted. In her experience some referral recipients were responsive, but others were not.

In addition to being unable to compel reports of findings, the OIG determined that the Triage Division lacked adequate procedures for conducting follow-up. For example, email records indicate that Triage Division staff learned in March 2018 that 29 matters thought to have been referred by the OAWP to VISN 22 between July and December 2017 "fell through the cracks

[114] 38 U.S.C. § 323(c)(1)(H).

[115] The latest referral involving allegations of whistleblower retaliation was made on May 23, 2018.

and were not referred," and therefore no VISN investigations had commenced. This circumstance went undetected by the OAWP for nine months.

### *The OAWP Referred Allegations to Other VA Components for Investigation Without Sufficiently Safeguarding Whistleblowers' Identities*

The Act provides that, with respect to whistleblower disclosures it receives, the OAWP "may not disclose the identity of the employee without the consent of the employee, except in accordance with the provisions of section 552a of title 5, or as required by any other applicable provision of Federal law."[116] As discussed below, the OAWP would not investigate allegations of whistleblower retaliation unless the complainant consented to disclose his or her name.

The former Triage Director told OIG investigators that individuals making submissions to the OAWP were not always informed that their allegations might be referred to another VA component for investigation. The former Triage Director stated that, for allegations other than whistleblower retaliation, if a disclosing party did not consent to the disclosure of his or her name, the party's name was not disclosed in the referral. When asked whether steps were taken to exclude information that could be used to identify the disclosing party even if the individual's name was redacted, the former Triage Director stated, "I believe we talked about taking those efforts, you know, because you get an email string and you can trace it back. We talked about de-identifying more than just names." The triage SOP indicates only that case managers shall make "redacted copies of all case documents for further referral of the case outside of the OAWP," but no guidance is provided as to what information must be redacted or how to assess whether redaction alone is sufficient to safeguard the whistleblower's identity. This is particularly important in smaller components of VA where gender, job function, or even the nature of the complaint can trace an allegation to a specific individual.

The Investigations Director recalled situations in which the VISN receiving the referral simply directed the matter back to the very facility that the whistleblower was complaining about for investigation, which created "an obvious conflict of interest." Similarly, the former Triage Director recalled disclosing parties expressing concerns such as "I'm say[ing] this person retaliated against me and then you're sending it back to this facility, and although it's not going to that same person, it's still in that chain-of-command somehow."

### The OAWP Would Not Investigate Whistleblower Retaliation Unless the Whistleblower Consented to Disclose His or Her Identity

The OAWP took the position that allegations of whistleblower retaliation could not be investigated unless the whistleblower was willing to disclose his or her identity. The consent to disclose allowed the OAWP to further disclose the whistleblower's identity to other VA

[116] 38 U.S.C. § 323 (c)(3).

components. This policy places OAWP's obligation to investigate whistleblower retaliation in conflict with its obligation to maintain confidentiality of whistleblowers' identities. The Senior Advisor told the OIG that the OAWP adopted this policy because of the belief that to "investigate retaliation, you have almost no choice but to disclose the individual's identity." He said that the U.S. Office of Special Counsel takes this same position. Figure 5 displays OAWP's advisement to disclosing parties making allegations of retaliation that has been in use since February 2018.

| PART 4: CONSENT, SIGNATURE AND SUBMISSION | |
|---|---|
| 1. PLEASE SELECT ONE *(If you are claiming retaliation review will not be possible without your consent.)*: ☐ I DO CONSENT TO RELEASE OF MY IDENTITY ☐ I DO NOT CONSENT TO RELEASE OF MY IDENTITY | |
| 2. SIGNATURE | 3. DATE SUBMITTED |

***Figure 5.** Excerpt from the disclosure form*
*Source: Employee Disclosure Form published by the OAWP, last revised in February 2018*

In the following example, OAWP staff insisted that an allegation of whistleblower retaliation be referred to the VISN and that the employee consent to disclose his or her identity in order to make the referral, even though the allegation was within OAWP's authority to investigate. The OAWP did not need to refer the matter to the VISN. In the end, the employee requested the OAWP stop work (and not refer the matter) pending the outcome of a related pending case with the U.S. Office of Special Counsel.

### Example 14

*In November 2017, a GS-13 psychologist in a VA medical center made a submission to the OAWP alleging misconduct and whistleblower retaliation. An employee with the OAWP Triage Division responded and informed the psychologist that the matter would be referred to the VISN for investigation. The consent form used by the OAWP at the time of the psychologist's submission did not contain the disclaimer that investigations of retaliation require consent to disclosure of the whistleblower's identity. The psychologist wanted to remain anonymous and objected to OAWP's referral for investigation by the VISN, stating, "I guess, bottom line--the facility knows it's me" and "I just don't want my own HR to 'investigate' this and stir up yet more problems when they've been involved at every step." The psychologist had a parallel case open with the Office of Special Counsel relating to the same issues. Correspondence between the psychologist and OAWP triage staff reflects that the psychologist was dissatisfied with the approach that the Office of Special Counsel was taking and wanted to pursue an alternative path. After learning that identity disclosure was required for the OAWP to proceed, the psychologist requested that the OAWP stop its work*

*pending the outcome of that related case. Triage Division staff subsequently closed the psychologist's case.*

Although the psychologist was able to pursue allegations through a non-VA office, this example demonstrates the issues created by the OAWP's approach of referring whistleblower disclosures without adequate safeguards to protect the confidentiality of whistleblowers. It effectively closed the OAWP's doors to VA employees who alleged retaliation for whistleblowing and did not want their identities revealed to other VA components.

## Investment in Former Whistleblower Mentorship Program Did Not Achieve Measurable Success and Motives for Its Creation Were Suspect

In 2017, the OAWP established a whistleblower reintegration program, which was later renamed the Whistleblower Mentorship Program. The OIG received complaints that the program was being used inappropriately to target whistleblowers.

The stated purpose of the program was to provide whistleblowers who had made complaints with transitional support resources if needed after the whistleblowing experience. The OIG recognizes that the goal of helping whistleblowers transition back into a workplace where colleagues or supervisors may be aware of allegations is laudable, but OIG interviews indicate that the motivation for the program was also focused on breaking the perceived routine of whistleblowers to continue reporting. According to then OAWP Deputy Executive Director Hunter, the purpose of the program was to "reintegrate those individuals into doing something very productive for the organization" and not become a "whistleblower as [a] profession." Stopping whistleblower activity is consistent with the complaints the OIG has received about the goals of former OAWP leaders that are detailed below.

Ultimately, in its approximately 18-month existence, the program served one whistleblower as a test case, which was described by OAWP staff as successful.[117] Dr. Bonzanto placed the program on hold because her assessment revealed that it had not met with identifiable or measurable success sufficient to warrant devotion of the resources that would be required to expand the program to serve more individuals.[118]

[117] The mentorship involved pairing a senior leader with the whistleblower to accomplish a local facility project. In this instance a VA medical center director agreed to mentor the whistleblower, a social worker in the medical center. The two were tasked with identifying and completing a project on which the mentor and mentee would collaborate and build a working relationship to achieve a common goal. According to OAWP staff, at the time of the program's cancellation, plans existed to expand the program to serve additional whistleblowers.

[118] Dr. Bonzanto has alternatively considered whether there was a need to provide resources to whistleblowers who had been returned to federal service after wrongful termination, but stated that, in her view, the OAWP lacks the capacity to attend to this, and such a role is not specifically required under the Act.

### *Leaders' Statements on the Whistleblower Mentorship Program Evidenced an Attitude of Disfavor Toward Some Whistleblowers*

The OIG received allegations from complainants characterizing the OAWP Whistleblower Mentorship Program in an unfavorable manner. Underlying these complaints was a concern that the OAWP was using the program to monitor or silence whistleblowers. The OIG confirmed that the OAWP gathered and analyzed whistleblower data from OAWP systems to identify candidates who might benefit from the mentoring services.

The OIG did not substantiate that the Whistleblower Mentorship Program was being used to silence whistleblowers. However, the OIG observed that some former OAWP leaders made statements that could be interpreted as evidencing an attitude of disfavor toward some whistleblowers. The comments by former OAWP leaders focused on a perceived need to return some whistleblowers to productive work:

- According to former OAWP Executive Director O'Rourke, VA was experiencing rampant abuse of the process by employees who would make what they deemed a whistleblower disclosure to gain protections related to activities or circumstances that did not merit such protection. Mr. O'Rourke told OIG investigators that VA has a "subculture" that evolved into a "community, a network" of whistleblowers as compared to other agencies where whistleblowing activity occurs in "isolated incidents."
- Subsequent OAWP Executive Director Nicholas told OIG investigators that from his perspective, some VA employees treat the whistleblower title as "a position description for them. They've joined Whistleblowers of America. They're in the papers. They can't seem to let go of it." He broadly characterized these employees as individuals who have "quit working or they decided that their new job was to go find more stuff to whistleblow on…and weren't performing what they had been hired to do."
- Former OAWP Deputy Executive Director Hunter told the OIG, "[u]nfortunately, some [of] our whistleblowers become career – a legacy of whistleblowers. They believe that's their only job."
- The Senior Advisor referred to the OAWP's perceived need "to get the employee out of the wearing [of] whistleblower as a [position description]. There is no job description in the federal government that says being a whistleblower is your job. You know, …—yes, please, by all means, make the disclosure. Let us know what's wrong in the agency. We'll work on going to go fix it. But your part is done, go forth, do good, avoid evil."

The culture of an organization is determined by its leaders. Setting the tone at the top can influence internal controls and the behaviors of subordinate managers and employees.[119]

[119] U.S. Government Accountability Office, *Standards for Internal Control in the Federal Government* (2014).

Mr. O'Rourke's perspective that VA had a problematic "subculture" of whistleblowers set an unwelcoming tone. These sentiments were communicated not just to the OIG but were also published by the OAWP in its June 2018 annual report to Congress: "An aspect of making disclosures of alleged wrongdoing is that the employee making the disclosure may feel themselves marginalized or excluded from the organizational group. Additionally, *for some employees, whistleblowing turns into an ad-hoc job description*." (emphasis added) Although the goal of helping whistleblowers transition back into a workplace is admirable and consistent with OAWP's mission, it is not required by the Act and draws on limited OAWP resources. Even if properly supported, any such effort must be designed to support and value whistleblowers rather than characterize repeat whistleblowing as an unwelcome recidivist behavior.

## Significant OAWP Resources Were Obligated for Purposes Not Related to Its Core Mission

During Mr. Nicholas's tenure, VA obligated \$2.6 million from OAWP's fiscal year 2018 budget of \$17.37 million (15 percent) on two separate contracts for process improvement and leadership development services. The first contract related to process improvements. According to Dr. Bonzanto, shortly after she became the assistant secretary she learned about the existence of the process improvement contract. She told OIG investigators that the contractor "was supposed to be helping us with our directives and our workload," but she learned after inquiring further that "everything that they were doing, none of it was related to OAWP." She also told the OIG that she ordered then Deputy Director Todd Hunter to refocus the contractor to "come back and start doing work that's related to OAWP." According to Dr. Bonzanto, by March 2019 the contractor's work was redirected to assisting the OAWP with developing its processes and procedures.

The services to be acquired under the second contract related to leadership development and coaching, which Mr. Nicholas intended for VA generally, not just the OAWP.[120] Each contract had two subsequent option years which, if exercised, would have brought the potential total obligation to over \$6.8 million. In response to the OIG's inquiry concerning the contracts, VA suspended performance on the contract for leadership development and coaching, which limited VA's cost to the \$88,000 already expended. The OIG did not find any evidence that VA leaders requested that Mr. Nicholas initiate either procurement or redirect OAWP funds to these contracts.[121] The connection between these services and OAWP's core mission appears tenuous.

[120] At the same time, Mr. Nicholas told a staff member that the OAWP did not have the resources available to do the work necessary to comply with a reporting obligation mandated by Congress under §103 of the Act. See Finding 5.

[121] The OIG identified evidence that the canceled contract was awarded to a vendor associated with an individual with whom Mr. Nicholas had a personal relationship, and that Mr. Nicholas had communications with this individual regarding both contractual opportunities before they were awarded. The individual was associated with vendors who bid on both contracts. Mr. Nicholas attempted unsuccessfully to cancel one of the contracts when he

The current VA chief of staff and the assistant secretary for Enterprise Integration both told OIG investigators that, in their view, attempting to address what Mr. Nicholas perceived to be VA's leadership and human resources issues was not within OAWP's mandate or Mr. Nicholas's job responsibilities.

## Under Its Former Leadership, the OAWP Participated in Two Actions That Could Be Considered Retaliatory

Contrary to its core mission to protect whistleblowers, the OAWP—under Mr. O'Rourke's leadership—participated in two actions that could be considered retaliatory. The first related to the proposed removal of an OAWP employee who had made a disclosure of misconduct. The second related to the initiation of an investigation of a whistleblower who had made allegations of misconduct relating to a senior political appointee.

### *Mr. O'Rourke Proposed the Removal of an OAWP Employee Who Made a Protected Whistleblower Disclosure*

Shortly after the OAWP was established, a senior OAWP employee (Whistleblower 1) reported that a senior VA official was interfering in a disciplinary matter and seeking to affect a predetermined outcome. This disclosure was made to then Executive Director O'Rourke and others.

According to Whistleblower 1, within a matter of days, Mr. O'Rourke downgraded Whistleblower 1's responsibilities and attempted to block Whistleblower 1 from leaving the OAWP for another job within VA. Within a few weeks, Mr. O'Rourke initiated an investigation by gathering documents and instructing the A&A Director to draft a disciplinary proposal to remove Whistleblower 1 from federal employment. Mr. O'Rourke issued a proposed removal action that Whistleblower 1 believed was calculated and timed to prevent Whistleblower 1 from starting a new job within VA. In December 2017, the OAWP rescinded its proposed removal action. Whistleblower 1 remains a VA employee (outside of the OAWP) and has a pending matter before the U.S. Office of Special Counsel relating to these circumstances.

### *The OAWP Failed to Guard Against the Initiation of Retaliatory Investigations*

Being the subject of an investigation can be stressful, time-consuming, intimidating, and humiliating. Congress recognized the possibility that the investigative process itself could be used in a retaliatory fashion, and protected VA whistleblowers from these negative impacts by

---

learned that it was not awarded to the vendor associated with this individual. Given the nature of the conduct at issue, the OIG referred this matter to the U.S. Department of Justice, where it remains under review.

expanding the definition of a prohibited personnel action to include the opening of a "retaliatory investigation" against a whistleblower.[122]

In OIG interviews, OAWP's leaders—including former Executive Directors O'Rourke and Nicholas, the A&A Director, and the Senior Advisor —demonstrated a lack of familiarity with this statutory provision. The OIG determined that the OAWP did not design any of its processes to evaluate whether the submission of an allegation could be an effort in itself to retaliate against a whistleblower. For example, although reference is made to the prohibitions of "retaliatory investigations," the triage SOP does not provide guidance to evaluate whether an investigation may be retaliatory, nor does it include any procedures to flag or otherwise code the incoming allegations as potentially retaliatory.

The OIG identified an instance in which the OAWP opened an investigation that could be considered retaliatory against a whistleblower. From September 2017 until at least July 2018, Peter Shelby, the then Assistant Secretary for Human Resources and Administration (HR&A), was the subject of multiple complaints lodged with the OAWP as well as the Office of Special Counsel and EEO Commission. In September 2017, a long-time career employee serving in an SES position within HR&A (Whistleblower 2) accused Mr. Shelby of violations of law including retaliation and discrimination against Whistleblower 2. Accusations made by Whistleblower 2 were investigated by the OAWP. Documents reflect that in August 2017, then OAWP Executive Director O'Rourke and Mr. Shelby began to view Whistleblower 2 as an obstacle to Mr. O'Rourke's effort to staff the OAWP because Whistleblower 2 had concurrence authority for some hiring actions.[123] In addition, Mr. O'Rourke told OIG investigators that Mr. Shelby had consulted him about reassigning Whistleblower 2 and some subordinate staff to other VA positions outside of Mr. Shelby's office.

While the allegations against Mr. Shelby were still pending, Whistleblower 2 became the subject of an OAWP investigation initiated after Mr. Shelby wrote to Mr. O'Rourke, "I am requesting an investigation and seeking disciplinary action for the pattern of negative conduct demonstrated by [Whistleblower 2]." Mr. Shelby alleged that Whistleblower 2 was "insubordinate" and had intimidated a fellow employee. Email records show that Mr. O'Rourke was personally involved in receiving the allegations from Mr. Shelby and communicating these to the OAWP staff assigned to the matter. OAWP's records show that its investigation of Whistleblower 2 began on

[122] 38 U.S.C. § 731(c)(3). The Act imposed a requirement that the Assistant Secretary for Accountability and Whistleblower Protection submit a report on whether VA's investigative processes were being used to retaliate against whistleblowers. Public Law 115-41, Title I, § 103(b)(2). The OIG determined that the report submitted by the OAWP in response did not fully respond to Congress's request. See Finding 5.

[123] At the time, Whistleblower 2's job functions included concurrence authority over certain senior hiring decisions made by Mr. O'Rourke, and Whistleblower 2 had raised concerns about the number and nature of senior executive positions considered for allocation to the OAWP. Whistleblower 2 also questioned the qualifications of a candidate for a senior OAWP position who was selected by Mr. O'Rourke, but did "not appear to have any significant experience with whistleblower protections or accountability . . ."

or about January 5, 2018, and concluded nine days later.[124] An OAWP employee took testimony from a single witness concerning the alleged intimidating altercation between that witness and Whistleblower 2. The OAWP never sought any testimony or information from Whistleblower 2.[125] The OAWP staff substantiated the allegations and referred the matter directly to the A&A Division for a disciplinary recommendation without further inquiry.

In February 2018, Whistleblower 2 received information revealing that disciplinary action may be proposed against him/her, which was the first time Whistleblower 2 had any information concerning the investigation. Whistleblower 2 voluntarily sought new employment and left VA in March 2018 prior to any disciplinary action being taken.

Multiple witnesses aware of the circumstances relating to Whistleblower 2 told OIG investigators that the treatment of Whistleblower 2 had a chilling effect on their willingness to come forward with allegations of wrongdoing. One witness quoted Mr. Shelby as saying, "I'll whip out my Accountability Act and just start firing people." When OIG investigators questioned another witness about whether he/she had filed an OAWP complaint about some additional allegations raised concerning Mr. Shelby, the witness responded,

> No, I did not, and I deliberately would never have because I didn't trust the office since the person that I had problems with, my boss at the time, Peter Shelby, seemed to be very tight with Peter O'Rourke, who led OAWP. So, frankly, I didn't trust the office.

Recent complaints to OIG's hotline, although outside the scope of this review, reflect ongoing concerns about the OAWP's commitment to preventing retaliation, including fear that raising concerns has recently resulted in, or may prompt, disciplinary action.[126]

## Finding 4 Conclusion

The OIG determined that, under its former leadership, the OAWP failed to take appropriate steps to protect whistleblowers, which is in direct conflict with its core mission. The OAWP referred allegations of whistleblower retaliation to other components of VA that were not equipped for such investigations, without sufficient tracking or oversight. This resulted in some cases going uninvestigated for long periods of time and without adequate safeguards to protect the identities

[124] The matter was opened and closed in fewer than nine days, compared to an average of 215 days.

[125] The OAWP was required to give a Senior Executive who is the subject of an investigation an opportunity to respond to and provide evidence relating to the matters under investigation unless the circumstances of the investigation made it impossible, unreasonable, or unnecessary to do so, VA Corporate Senior Executive Management Office Letter No. 006-17-1, Senior Executive Accountability and Grievance Procedures, July 7, 2017. The Privacy Act also requires agencies to "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal Programs." 5 U.S.C. § 552a(e)(2).

[126] Deidentified information regarding these complaints was transmitted to the VA and the OIG will monitor VA's response and evaluate the need for further oversight work through quarterly follow-up on open recommendations.

of whistleblowers who might be easily recognizable by the receiving facility or office. OAWP leaders lacked knowledge of processes for identifying whether accusations made to the OAWP could have been submitted to instigate an investigation as a means of retaliation. The OAWP itself participated in at least two actions that could be considered retaliatory. These actions occurred within a climate in which former leaders revealed their unfavorable opinion of some whistleblowers and focused resources on activities that did not support the core mission of the OAWP. More recent communications to the OIG hotline indicate that some individuals continue to report fear of OAWP retaliation or disciplinary action for reporting suspected wrongdoing.

## Recommendations 12–14

12. The Assistant Secretary for Accountability and Whistleblower Protection implements safeguards consistent with statutory mandates to maintain the confidentiality of employees that make submissions, including guidelines for communications with other VA components.
13. The Assistant Secretary for Accountability and Whistleblower Protection leverages available resources, such as VA's National Center for Organizational Development and the Office of Resolution Management, to conduct an organizational assessment of Office of Accountability and Whistleblower Protection employee concerns and develop an appropriate action plan to strengthen Office of Accountability and Whistleblower Protection workforce engagement and satisfaction.
14. The Assistant Secretary for Accountability and Whistleblower Protection develops a process and training for the Triage Division staff to identify and address potential retaliatory investigations.

## Finding 5: VA Did Not Comply with Additional Requirements of the Act, Including Timely and Accurate Congressional Reporting

VA has failed to comply with several other requirements of the Act. For example, VA has not modified supervisors' performance plans to include criteria relating to whistleblower protection and trained employees regarding whistleblower disclosures. In addition, the OIG identified deficiencies with the reports the Act mandated that VA submit to Congress.

### VA Has Failed to Revise Supervisors' Performance Plans and Provide Training as Required by the Act

The Act requires the VA Secretary, in consultation with the Assistant Secretary for Accountability and Whistleblower Protection, to "develop criteria that (1) the Secretary shall use as a critical element in any evaluation of the performance of a supervisory employee; and (2) promotes the protection of whistleblowers."[127]

The required criteria must include principles for the protection of whistleblowers. These include the degree to which supervisory employees

- Respond constructively when employees of the Department relay concerns,
- Take responsible action to resolve such concerns, and
- Foster an environment in which employees of the Department feel comfortable reporting concerns to the supervisory employees or to the appropriate authorities.[128]

In addition, the Act requires VA to periodically train its supervisory employees on whistleblower rights, employee motivation, and employee performance management.[129]

When asked in March 2019 whether supervisory performance plans had been modified to include the criteria required by the Act, the A&A Division Director indicated that the Senior Advisor had drafted an initial element "just to take a stab at it." The A&A Director further explained that it was complicated "because … it's … a strange element to have in a performance standard because it's hard to attach a metric or any sort of … measurement to that." The A&A Director added that there was ultimately a question of who would be responsible for this task since adding criteria to performance appraisals "tends to be more of [a VA Human Resources and Administration] responsibility, not necessarily something that OAWP would take on."

The Act assigns responsibility for updating supervisory performance plans to the VA Secretary, with the advice of the Assistant Secretary for Accountability and Whistleblower Protection.

[127] 38 U.S.C. § 732(a).

[128] 38 U.S.C. § 732(b).

[129] Public Law 115-41, Title II, § 209.

According to a work plan provided to the OIG by Dr. Bonzanto, the OAWP will be working with Human Resources and Administration as well as the OGC to implement this requirement. VA did not provide an update on the status of efforts to implement the requirement for periodic supervisory training, although it is listed on the chart of other responsibilities of the Act requiring implementation provided by Dr. Bonzanto.

## VA Has Not Implemented Whistleblower Protection Training for All Employees as Required by the Act

The Act requires VA to provide biennial training to all employees regarding whistleblower disclosures.[130] The VA Secretary delegated this responsibility to the OAWP on February 7, 2018. In its 2018 annual report to Congress, the OAWP acknowledged that VA did not have training that met the Act's requirements. The OAWP projected that it would finalize the training materials and deployment plan by September 30, 2018. This did not occur. In his November 2018 interview with the OIG, OAWP Executive Director Nicholas acknowledged that the OAWP did not meet the deadline and that a new deadline had not been set. He explained that setting a new deadline was dependent on preparing the materials, which was difficult because of uncertainties about OAWP's scope under the statute.

In May 2019, Dr. Bonzanto told the OIG that she maintains a lengthy slide presentation that forms the basis of what this training should contain. She instructed her staff to consult with the Office of Special Counsel, the OGC, and the OIG to obtain comments, which she indicated have been received and addressed. OAWP staff have met with the VA training specialists to convert the draft presentation into training material that will be used for all VA employees. Dr. Bonzanto did not have an anticipated timeline of when the training would be complete.

## VA Failed to Meet Its Statutory Obligations to Submit Multiple Congressionally Mandated Reports

The Act mandates that VA file reports providing information about accountability and whistleblower protection.[131] In addition, Congress requires VA to file a report whenever disciplinary recommendations made to the VA Secretary are not taken or initiated within 60 days of the recommendation.[132] VA's responses fell short of the statutory requirements.

[130] 38 U.S.C. § 733.

[131] Public Law 115-41 §§ 211 and 103(b)(1).

[132] 38 U.S.C. § 323(f)(2).

## *VA Failed to Meet Act Requirements for Its December 2017 Report to Congress Analyzing Disciplinary Outcomes for the Prior Three Years*

The Act required VA to submit a report no later than December 31, 2017, detailing the "outcomes of disciplinary actions carried out by the Department of Veterans Affairs" from June 23, 2014, to June 23, 2017 (Outcomes Report).[133] VA failed to file this report on time, citing inadequate data. Although VA did have data challenges, this is only part of the story.[134] VA failed to disclose that the individual assigned to produce the Outcomes Report, then OAWP Executive Director Peter O'Rourke, was unaware of the requirement.

Documents show that, as of July 17, 2017, the Outcomes Report was added to VA's master tracking list of Congressionally Mandated Reports maintained by the Office of Congressional and Legislative Affairs (OCLA). The master tracking list indicated that the Outcomes Report was assigned to Mr. O'Rourke, a copy of which was sent to him by email on July 17, 2017. The OIG could not locate any records indicating that the OAWP took any affirmative steps to prepare the Outcomes Report before its due date.

On December 28, 2017, an OCLA staff member requested a status report from Mr. O'Rourke, which prompted a series of emails between Mr. O'Rourke, the Senior Advisor, Mr. Hunter, and others within the OAWP reflecting that Mr. O'Rourke was unaware that the OAWP was responsible for the Outcomes Report. After learning from the Senior Advisor that the report would require significant effort to prepare, Mr. O'Rourke responded, "If we're going to do it then [VA will] have to give us contract support, pulling folks off current issues to research the past makes no sense." In a subsequent reply, Mr. O'Rourke wrote to the Senior Advisor, "We need to all get together and we'll lead the effort -- please begin drafting a list of requirements that will satisfy the statue [sic] that can be shaped into a [Performance Work Statement for a contract proposal]."

Three weeks later, during his January 17, 2018, testimony before the Senate Committee on Veterans' Affairs (SVAC), Secretary Shulkin stated that VA staff "had extreme difficulty tracking what you've required in that report prior to the implementation of the accountability act. I've instructed them to give whatever data they have to you and tell you what data they can collect." He committed to submitting the Outcomes Report within two weeks. Internal emails show that the OAWP began working to devise a methodology for the report the next morning, January 18.

---

133 Public Law 115-41 § 211. The Act required the Outcomes Report to include detailed information about VA's disciplinary actions, including length of time actions were pending, number of steps and reviews involved, data concerning the use of alternative dispute resolution, appeals data, and information concerning the use of paid administrative leave.

134 As discussed in Appendix A, the OAWP did not have an adequate database for tracking and managing submissions, investigations, and disciplinary actions. The OAWP is implementing new systems that are expected to streamline data collection, enhance reporting capabilities, and create efficiencies.

VA finalized its report to Congress on January 29, 2018. The report was expedited through VA's concurrence process. In June 2018, the OAWP supplemented its annual report by appending several tables of data. The material was accompanied by a disclaimer indicating that VA lacked data sufficient to conduct the effectiveness analysis mandated by the Act. According to the Senior Advisor, VA has received persistent feedback (as recently as March 2019) from staff of the House Committee on Veterans' Affairs (HVAC) and SVAC that the report submitted and its supplement were insufficient.

### *OAWP's Report on Investigative Methods and Retaliation Was Not Responsive to the Act's Mandate*

The Act required the Assistant Secretary for Accountability and Whistleblower Protection to submit to the VA Secretary and Congress a report on the methods used to investigate VA employees (Report on Methods). The Act further required that the Report on Methods include the following:

> (1) An assessment of the use of administrative investigation boards, peer review, searches of medical records, and other methods for investigating employees of the Department.
>
> (2) A determination of whether and to what degree the methods described in paragraph (1) are being used to retaliate against whistleblowers.
>
> (3) Recommendations for legislative or administrative action to implement safeguards to prevent the retaliation described in paragraph (2).[135]

The Report on Methods was submitted by VA in December 2018. It analyzed only OAWP's data, which constitutes a small fraction of investigations conducted by VA, and is not representative of all methods of investigation conducted by VA.

The Senior Advisor told OIG investigators that in July 2018, he submitted a proposal to Mr. Nicholas that the OAWP gather and analyze relevant data from various VA components. The Senior Advisor stated that Mr. Nicholas rejected the broader proposal in August 2018 because the OAWP had insufficient resources to conduct the field work.[136] Instead, Mr. Nicholas directed the Senior Advisor to "describe the investigation tools and methods that we have available in the VA and leave it at that." Although Congress allotted 18 months for VA to perform the analysis, the OAWP did not begin work on the Report on Methods until approximately two months before it was due. The Senior Advisor told OIG investigators that it

[135] Public Law 115-41 § 103(b)(1) June 23, 2017.

[136] The Act mandates the VA Secretary to "ensure that the Assistant Secretary has such staff, resources, and access to information as may be necessary to carry out the functions of the Office." 38 U.S.C. § 323(d). The OIG could locate no evidence that the OAWP ever requested resources to support the statutorily required analysis.

took him approximately a week and a half to review the relevant OAWP case files for the analysis.

### *VA Does Not Interpret the Act as Requiring Congressional Notification When Disciplinary Officials Decline OAWP's Recommended Action*

The Act requires the submission of a detailed report if the VA Secretary receives a recommendation for discipline from the Assistant Secretary for Accountability and Whistleblower Protection and "does not take or initiate the recommended disciplinary action" within 60 days of receipt.[137] The Act directs the VA Secretary to submit the report to the Committees on Veterans' Affairs of both the Senate and the House of Representatives.[138] No reports have been provided to Congress pursuant to section 323(f)(2) of the Act.

On July 7, 2017, Secretary Shulkin issued the accountability procedures discussed earlier in the report, which require the OAWP to brief the Secretary on whether disciplinary action is recommended. This requirement is limited to whether an action should be pursued and not the specific action recommended. In practice, the OAWP has fulfilled this requirement by issuing a written accountability notification memorandum such as the one displayed in Figure 6.

**Department of Veterans Affairs** — **Memorandum**

Date: August 23, 2017

From: Executive Director, Office of Accountability and Whistleblower Protection (OAWP)

Subj: Accountability Notification

To: David J. Shulkin, Secretary, U.S. Department of Veterans Affairs

Pursuant to 38 U.S.C. § 323(c)(1)(I), the Office of Accountability and Whistleblower Protection is informing you that it is recommending that disciplinary action be proposed against the following individuals. Section 323(f)(2) requires that action be initiated within 60 days of your receipt of this recommendation.

***Figure 6.*** *Sample Accountability Notification provided by the OAWP to the VA Secretary*
*Source: OAWP*

In August 2018, staff of the HVAC majority asked VA to explain its "interpretation and implementation of the new section 323(f)(2) as it relates to congressional notification when a recommendation from OAWP is mitigated." VA responded as follows,

> Under 38 USC 323(f)(2), if "the Secretary receives a recommendation for disciplinary action" from the Assistant Secretary for Accountability and

[137] 38 U.S.C. § 323(f)(2).

[138] 38 U.S.C. § 323(f)(2).

> Whistleblower Protection under 38 USC 323(c)(1)(I) and does not take or initiate the recommended disciplinary action within 60 days from the receipt of the recommendation, the Secretary must notify the House and Senate Committees on Veterans' Affairs and provide a detailed justification for not taking or initiating such disciplinary action.
>
> VA does not have an Assistant Secretary for Accountability and Whistleblower Protection. Instead, OAWP is headed by an Executive Director. Significantly, the Executive Director for OAWP has not been delegated the functions of the Assistant Secretary for Accountability and Whistleblower Protection nor has he been designated the Acting Assistant Secretary. Instead, the Executive Director has been delegated a series of functions that are similar to, but do not mirror, the functions that would be performed by the Assistant Secretary.
>
> As implemented by VA, the Executive Director for OAWP makes a recommendation to the Secretary for disciplinary action. The Executive Director for OAWP does not recommend a specific disciplinary action to the Secretary; rather, the recommendation is simply that "disciplinary action be proposed against" the respective employee. Following the Executive Director's recommendation, disciplinary action is *initiated* against the respective employee in that VA *begins the process of engaging* with the proposing official regarding the action and drafting a proposed charge letter. Those steps are accomplished within 60 days from the receipt of the Executive Director's recommendation to the Secretary. Consequently, VA is in compliance with 38 USC 323(f)(2) in that it initiates an action, as described above, within 60 days from the receipt of the Executive Director's recommendation to the Secretary. (emphasis added)
>
> It is important to note that 38 USC 323(f)(2) does not require the Secretary to take the disciplinary action recommended by the Assistant Secretary for Accountability and Whistleblower Protection, even if a specific disciplinary action was recommended.[139]

According to VA's response, it viewed itself compliant with section 323(f)(2) of the Act because it "begins the process of engaging with the proposing official" within 60 days of the OAWP Executive Director recommending to the VA Secretary that disciplinary action be taken. In other words, as stated in the letter, VA equates "take or initiate the recommended disciplinary action" with "begins the process of engaging with the proposing official."[140]

---

139 VA Office of Congressional and Legislative Affairs, Response to HVAC Majority, Email. (2018).

140 In the response, VA noted that it did not have an assistant secretary at the time and that the executive director had not been delegated the same responsibilities. The Senior Advisor similarly told OIG investigators that VA took the

As a consequence, VA has not reported to Congress on the 32 instances from June 23, 2017, to March 22, 2019, in which the OAWP recommended a specific disciplinary action to a proposing official that was later mitigated.[141] Notwithstanding VA's interpretation of the Act, the OAWP did track the rationale for some, but not all, instances in which recommended penalties were mitigated.[142] To the extent that Congress's intent was to receive reports that illuminate the reasons why particular disciplinary actions initially recommended by OAWP were mitigated or otherwise not taken, VA has implemented the requirement in a manner that does not disclose this information.

## Finding 5 Conclusion

The OIG determined that VA failed to implement various requirements under the Act, including revising supervisors' performance plans and developing supervisors' training regarding whistleblower rights. VA also has not provided whistleblower protection training for all other employees. On numerous occasions, VA did not submit timely, responsive, and/or accurate reports to Congress on whistleblower investigations and related disciplinary actions as required by the Act. The causes of these lapses included

- OAWP's lack of an adequate database system to capture required information,
- OAWP leaders' failure to understand their responsibilities and deadlines under the Act and plan accordingly, and
- OAWP's inadequate procedures or processes to track the information requested by Congress.

In addition, VA has interpreted the requirement that it submit reports to Congress when the Secretary "does not take or initiate the recommended disciplinary action" within 60 days of receipt of a recommendation in such a way that VA disciplinary officials' mitigation or declination of OAWP's recommended actions are not reported to Congress.[143] By failing to meet these statutory obligations, the OAWP has undermined Congress's intent to create greater transparency with respect to employee accountability and whistleblower protection within VA.

position that section 323(f)(2) referenced an action by the Assistant Secretary for Whistleblower Protection, and that "without an assistant secretary, that [section 323(f)(2)] did not attach to the department's actions yet."

[141] In the July 2017 accountability procedures, the VA Secretary delegated to the proposing official the duty of reviewing the evidence and determining whether *or not* disciplinary action is warranted. This means that the VA Secretary gave the proposing official the authority to decide on behalf of the VA Secretary that no discipline is warranted.

[142] Justifications for 10 mitigations are presented in Table 2 on page 40.

[143] 38 U.S.C. § 323(f)(2).

## Recommendations 15–20

15. The Assistant Secretary for Accountability and Whistleblower Protection collaborates with the Assistant Secretary for Human Resources and Administration, and the VA Secretary to develop performance plan requirements as required by 38 U.S.C. § 732.
16. The Assistant Secretary for Accountability and Whistleblower Protection ensures the implementation of whistleblower disclosure training to all VA employees as required under 38 U.S.C. § 733.
17. The VA Secretary makes certain supervisors' training is implemented as required under § 209 of the VA Accountability and Whistleblower Protection Act of 2017.
18. The Assistant Secretary for Accountability and Whistleblower Protection confers with the VA Office of General Counsel to develop processes for collecting and tracking justification information related to proposed disciplinary action modifications consistent with 38 U.S.C. § 323(f)(2).
19. The VA Secretary in consultation with the Office of General Counsel and the Assistant Secretary for Accountability and Whistleblower Protection ensures compliance with the 60-day reporting requirement in 38 U.S.C. § 323(f)(2) consistent with congressional intent.
20. The Assistant Secretary for Accountability and Whistleblower Protection develops or enhances database systems to provide the capability to track all data required by the VA Accountability and Whistleblower Protection Act of 2017.

## Finding 6: The OAWP Lacked Transparency in Its Information Management Practices

In the course of the OIG review, staff identified issues outside the initial scope regarding OAWP's information management practices. VA has obligations under the Privacy Act of 1974 to disclose its uses of information collected from individuals, and it has obligations under the Freedom of Information Act (FOIA) to provide timely and accurate responses to requests for information. The OAWP failed to publish notices required by the Privacy Act concerning the collection of information from individuals and VA's routine uses of that information. The OIG also found that the OAWP did not communicate appropriately with individuals who made submissions to it, and that its responses to requests for information pursuant to FOIA have not met statutory deadlines and lag significantly behind other VA components.

### The OAWP Failed to File Systems of Records Notices Required by the Privacy Act

The Privacy Act's broadly stated purpose is to balance the federal government's "need to maintain information about individuals with the rights of individuals to be protected against unwarranted invasions of their privacy stemming from federal agencies' collection, maintenance, use, and disclosure of personal information about them."[144]

The Privacy Act, which applies to all federal agencies, requires agencies to publish a System of Records Notice (SORN) in the Federal Register whenever the agency establishes or modifies an existing system of records.[145] A "system of records" is "a group of any records under the control of an agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying information assigned to the individual."[146] According to the VA Privacy Act procedures, "[t]he requirement for agencies to publish a SORN allows the Federal Government to accomplish one of the basic objectives of the Privacy Act – fostering agency accountability through public notice."[147]

---

[144] Office of Privacy and Civil Liberties, U.S. Dept. of Justice, *Overview of the Privacy Act*, 2015.

[145] VA Handbook 6300.5, *Procedures for Establishing and Maintaining Privacy Act Systems of Records*, August 3, 2017.

[146] 5 U.S.C. § 552a(a)(5).

[147] VA Handbook 6300.5, *Procedures for Establishing and Maintaining Privacy Act Systems of Records*, August 3, 2017.

### *The OAWP Failed to Comply with the Public Notice Requirements of the Privacy Act of 1974*

The OAWP assumed control of its predecessor OAR system of records on or about June 23, 2017 (the legacy records system). The legacy system was operated until May 28, 2019, when the OAWP established and began using a new system of records.[148] Both records systems contain the following information: the names of whistleblowers and other individuals who make submissions to the OAWP; the allegations raised by these individuals and the OAWP's triage assessment of the allegations; data pertaining to OAWP investigations; and information relating to disciplinary actions against employees.

Records in both systems have unique case identifiers and can be retrieved using that identifier, or by searching the name of the person of interest, among other methods.[149] Because these records are retrievable by identifiers specific to individuals, they are considered a system of records covered by the Privacy Act. Figure 7 provides a screen capture of the Whistleblower Disclosure Tracker and the various methods by which staff could search for records, including "Disclosing Party Search," which provides the ability to identify records by whistleblower name.




***Figure 7.*** *Screen Capture of Menu from VA OAWP Whistleblower Disclosure Tracker (May 2019).*
*Source: VA OAWP*

[148] It has been preserved in a read-only state for reference purposes. Its data has been migrated to the OAWP 2019 records system.

[149] The VA-Wide Adverse Action Database does not appear to be searchable by name, but it was found to be a system of records subject to the Privacy Act by the arbitrator in a recent decision in a union grievance dispute between VA and the American Federation of Government Employees.

The OIG confirmed that OAWP staff are required to and did in fact search the OAWP legacy records system using individuals' names and other identifiers.[150] Based on the information contained in both systems and that the records in both are retrievable by identifiers specific to individuals, they are considered systems of records covered by the Privacy Act. Thus, the publication of a SORN was required with respect to both systems. The OAWP did not publish a SORN with respect to either system.

## OAWP's Submission Form Does Not Disclose Routine Uses of Information as Required by the Privacy Act

The OIG interviewed several complainants who expressed dissatisfaction in the way OAWP handled their allegations. The Accountability and Whistleblower Protection Act does not impose upon the OAWP any obligation to communicate status information about its work after receiving a submission. The OIG attributes many of these complaints to OAWP's failure to adequately *disclose its uses of information* and its process for communicating about matters to people before they submit information. Individuals submitting complaints may also have their own ideas of what customer service and response style should be, based on their individual experiences with federal or private sector agencies.

The Privacy Act requires agencies to disclose to individuals supplying information the reasons that the information is being collected and the uses to which the information may potentially be put. Specifically, agencies are required to

> inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual – (A) the authority (whether granted by statute, or by executive order of the President) which authorizes the solicitation of the information and whether disclosure of such information is mandatory or voluntary; (B) the principal purpose or purposes for which the information is intended to be used; (C) the routine uses which may be made of the information as published pursuant to paragraph (4)(D) of this subsection; and (D) the effects on him, if any, of not providing all or any part of the requested information.[151]

The OAWP submission form in use since at least February 2018 does not include any of this information. The VA OGC advised the OAWP that the draft submission form would not need to disclose the information required by the Privacy Act unless the information would be stored in a Privacy Act System of Records. As discussed above, however, the information submitted to the

[150] In addition, the OIG determined that the OAWP made use of the information within its legacy tracking system to identify and analyze whistleblowers who might benefit from participation in its whistleblower reintegration program. See Finding 4, at page 50. This potential use of the individuals' data was not disclosed by the OAWP on its submission form or anywhere else.

[151] 5 U.S.C. § 552a(e)(3).

OAWP was stored within a Privacy Act System of Records and therefore the OAWP needed to disclose the routine uses of the information being collected.

## The OAWP Lags Behind the VA Average for Response Time to Requests Made Pursuant to the Freedom of Information Act

FOIA provides members of the public with a statutory right to access federal agency records, subject to certain statutory exemptions and exclusions.[152] Individuals (including VA employees) who are seeking information about the activities of the OAWP can obtain information by submitting a request for information pursuant to FOIA.[153] After receiving a FOIA request, a federal agency must review its records and produce those that are not subject to an exemption or exclusion.[154] An agency has 20 days to review a FOIA request to determine whether to comply,[155] but this deadline can be extended in "unusual" circumstances.[156]

The OIG received several complaints about OAWP's FOIA process. According to the former Triage Director, the Triage Division also received complaints about the length of time it took for the OAWP to respond to FOIA requests. The OIG's review of VA's FOIA data revealed that the OAWP's response time significantly exceeded statutorily mandated processing times and the average processing times within VA, as detailed in Table 4.

**Table 4. Average Response Time for FOIA Requests Made to the OAWP from June 2017 to January 2019**

| Type of Request | OAWP Response Time | Overall VA Response Time |
|---|---|---|
| **Simple** | 110 days | 45 days |
| **Complex** | 193 days | 75 days |

*Source: VA Central FOIA Office.*

Data provided by the OAWP reflects processing times ranging from five to 739 days.

[152] 5 U.S.C. § 552.

[153] 5 U.S.C. § 552(a); see also https://www.oprm.va.gov/foia/howto_file_foia_request.aspx.

[154] 5 U.S.C. §§ 552(a)(3)(A)– (D).

[155] 5 U.S.C. § 552(a)(6)(A)(i).

[156] 5 U.S.C. § 552(a)(6)(B)(i). The deadline may be extended by up to 10 working days, but the agency must provide written notice to the requesting party detailing the unusual circumstances for such extension and the date on which a determination is expected to be made. 5 U.S.C. § 552(a)(7)(A). If the response to a FOIA request is expected to exceed 10 days, the agency is required to provide the requesting party with the tracking number assigned to the request; 5 U.S.C. § 552(a)(6)(E)(ii)(I). For expedited requests, agencies must make a determination of whether to provide expedited processing and notice of that determination must be provided to the requesting party within 10 days after the date of the request.

Email records reflect that the OAWP began focusing attention on assessing the size and status of its pending FOIA requests in August 2018, at which time the OAWP had 70 pending FOIA requests. Figure 8 depicts summary data from an internal OAWP report dated August 31, 2018:

| | | |
|---|---|---|
| 5 | | |
| 6 | **OAWP FOIA Summary** | |
| 7 | # of Open Requests: | 70 |
| 8 | # of Requests Closed YTD: | 4 |
| 9 | Average Backlog (Days): | 175 |
| 10 | | |
| 11 | # in Litigation: | 2 |
| 12 | # in Appeal: | 2 |
| 13 | | |

***Figure 8.*** *Summary Information Regarding OAWP Responses to FOIA Requests.*
*Source: OAWP records*

OAWP staff told the OIG that the volume of FOIA requests received by the OAWP was higher than what had been experienced by its predecessor OAR, but that staffing had not increased to meet the higher demand. A single staff member handled all FOIA requests received by the OAWP until November 2018. OAWP leaders also assigned this staff member duties unrelated to FOIA request processing, including purchase and travel card management. Considering these other assigned duties, the OAWP had the equivalent of one part-time FOIA officer until November 2018.

OAWP leaders began directing additional resources to address the pending FOIA requests in approximately January 2019. OAWP data reflects that, as of February 19, 2019, the OAWP had 116 pending FOIA requests. Staffing for OAWP's FOIA group has increased from a single staff person working part time on requests to seven staff people (three of whom are on detail from the OAWP Human Resources Office) working full time on FOIA issues. Once the pending requests are resolved, the detailed staff are expected to return to their regular duties.[157]

## Finding 6 Conclusion

The OIG determined that the OAWP failed to comply with the Privacy Act by failing to publish required notices related to its systems of records, operating two unauthorized systems of records, and failing to disclose its routine uses of information submitted by individuals. In addition, the OIG determined that the OAWP did not routinely and effectively communicate to whistleblowers the status of matters they submitted and failed to provide for the timely

[157] These staff members did not receive any formal training regarding FOIA requests, but the OAWP's FOIA officer provided informal training in February 2019.

disclosure of information under FOIA, due in large part to insufficient staffing of the OAWP's FOIA group. The OAWP's failures to comply with the Privacy Act and inability to respond to requests for information in a timely and complete manner undermine its accountability to the public and VA stakeholders.

## Recommendations 21–22

21. In consultation with the VA Office of General Counsel, the Assistant Secretary for Accountability and Whistleblower Protection completes the publication of Systems of Records Notices for all systems of records maintained by the Office of Accountability and Whistleblower Protection, and adopts procedures reasonably designed to ensure that the Office of Accountability and Whistleblower Protection does not create additional systems of records without complying with the requirements of the Privacy Act of 1974.
22. The Assistant Secretary for Accountability and Whistleblower Protection consults with the VA Chief Freedom of Information Act Officer to ensure adequate training and staffing of the Office of Accountability and Whistleblower Protection's Freedom of Information Act Office, and establishes procedures to comply with FOIA requirements including timeliness.

# Conclusion

The OIG found that VA has failed to properly implement several key provisions of the VA Accountability and Whistleblower Protection Act of 2017, as well as other authorities. In particular, OAWP's former leaders failed to understand the office's statutory mandates and investigative authority. They were also ineffective at establishing clear policies, procedures, and training sufficient to ensure that the OAWP and VA met their obligations to protect whistleblowers' identities and hold VA employees accountable. Although the OIG recognizes that there have been a series of improvements planned by the Assistant Secretary in 2019, there are significant steps that must be taken to restore the trust of whistleblowers and other complainants due to missteps and a culture set by former leaders who did not appear to value their contributions. The very office established to protect whistleblowers and enhance accountability lacked the basic structures needed to achieve its core mission. Recent communications to the OIG hotline indicate that some individuals continue to report fear of OAWP retaliation or disciplinary action for reporting suspected wrongdoing. The OAWP leaders and staff who are committed to improving VA programs and operations face considerable challenges in overcoming the deficiencies identified in the OIG review.

# Recommendations 1–22

1. The Assistant Secretary for Accountability and Whistleblower Protection directs a review of the Office of Accountability and Whistleblower Protection's compliance with the VA Accountability and Whistleblower Protection Act of 2017 requirements in order to ensure proper implementation and eliminate any activities not within its authorized scope.

2. The VA Secretary rescinds the February 2018 Delegation of Authority and consults with the Assistant Secretary for Accountability and Whistleblower Protection, the VA Office of General Counsel, and other appropriate parties to determine whether a revised delegation is necessary, and if so, ensures compliance with statutory requirements.

3. The Assistant Secretary for Accountability and Whistleblower Protection, in consultation with the Office of General Counsel, Office of Inspector General, Office of the Medical Inspector, and the Office of Resolution Management establishes comprehensive processes for evaluating and documenting whether allegations, in whole or in part, should be handled within the Office of Accountability and Whistleblower Protection or referred to other VA entities for potential action or referred to independent offices such as the Office of Inspector General.

4. The Assistant Secretary for Accountability and Whistleblower Protection makes certain that policies and processes are developed, in consultation with the VA Office of General Counsel and Office of Resolution Management, to consistently and promptly advise complainants of their right to bring allegations of discrimination through the Equal Employment Opportunity process.

5. The Assistant Secretary for Accountability and Whistleblower Protection ensures that the divisions of the Office of Accountability and Whistleblower Protection adopt standard operating procedures and related detailed guidance to make certain they are fair, unbiased, thorough, and objective in their work.

6. The VA General Counsel updates VA Directive 0700 and VA Handbook 0700 with revisions clarifying the extent to which VA Directive 0700 and VA Handbook 0700 apply to the Office of Accountability and Whistleblower Protection, if at all.

7. The Assistant Secretary for Accountability and Whistleblower Protection assigns a quality assurance function to an entity positioned to review Office of Accountability and Whistleblower Protection divisions' work for accuracy, thoroughness, timeliness, fairness, and other improvement metrics.

8. The Assistant Secretary for Accountability and Whistleblower Protection directs the establishment of a training program for all relevant personnel on appropriate investigative techniques, case management, and disciplinary actions.

9. The VA Secretary, in consultation with the VA Office of General Counsel, provides comprehensive guidance and training reasonably designed to instill consistency in penalties for actions taken pursuant to 38 U.S.C. §§ 713 and 714.

10. The VA Secretary ensures the provision of comprehensive guidance and training to relevant disciplinary officials to maintain compliance with the mandatory adverse action criteria outlined in 38 U.S.C. § 731.

11. The Assistant Secretary for Accountability and Whistleblower Protection makes certain that in any disciplinary action recommended by the Office of Accountability and Whistleblower Protection, all relevant evidence is provided to the VA Secretary (or the disciplinary officials designated to act on the Secretary's behalf).

12. The Assistant Secretary for Accountability and Whistleblower Protection implements safeguards consistent with statutory mandates to maintain the confidentiality of employees that make submissions, including guidelines for communications with other VA components.

13. The Assistant Secretary for Accountability and Whistleblower Protection leverages available resources, such as VA's National Center for Organizational Development and the Office of Resolution Management, to conduct an organizational assessment of Office of Accountability and Whistleblower Protection employee concerns and develop an appropriate action plan to strengthen Office of Accountability and Whistleblower Protection workforce engagement and satisfaction.

14. The Assistant Secretary for Accountability and Whistleblower Protection develops a process and training for the Triage Division staff to identify and address potential retaliatory investigations.

15. The Assistant Secretary for Accountability and Whistleblower Protection collaborates with the Assistant Secretary for Human Resources and Administration, and the VA Secretary to develop performance plan requirements as required by 38 U.S.C. § 732.

16. The Assistant Secretary for Accountability and Whistleblower Protection ensures the implementation of whistleblower disclosure training to all VA employees as required under 38 U.S.C. § 733.

17. The VA Secretary makes certain supervisors' training is implemented as required under § 209 of the VA Accountability and Whistleblower Protection Act of 2017.

18. The Assistant Secretary for Accountability and Whistleblower Protection confers with the VA Office of General Counsel to develop processes for collecting and tracking justification information related to proposed disciplinary action modifications consistent with 38 U.S.C. § 323(f)(2).

19. The VA Secretary in consultation with the Office of General Counsel and the Assistant Secretary for Accountability and Whistleblower Protection ensures compliance with the 60-day reporting requirement in 38 U.S.C. § 323(f)(2) consistent with congressional intent.

20. The Assistant Secretary for Accountability and Whistleblower Protection develops or enhances database systems to provide the capability to track all data required by the VA Accountability and Whistleblower Protection Act of 2017.

21. In consultation with the VA Office of General Counsel, the Assistant Secretary for Accountability and Whistleblower Protection completes the publication of Systems of Records Notices for all systems of records maintained by the Office of Accountability and Whistleblower Protection, and adopts procedures reasonably designed to ensure that the Office of Accountability and Whistleblower Protection does not create additional systems of records without complying with the requirements of the Privacy Act of 1974.

22. The Assistant Secretary for Accountability and Whistleblower Protection consults with the VA Chief Freedom of Information Act Officer to ensure adequate training and staffing of the Office of Accountability and Whistleblower Protection's Freedom of Information Act Office, and establishes procedures to comply with FOIA requirements including timeliness.

## Management Comments

The Assistant Secretary for OAWP concurred on behalf of VA with all 22 OIG recommendations in the report. Comments related to individual recommendations indicate that VA considers nine recommendations to be completed based on its issuance of Directive 0500 or other recent actions.

Action plans are provided for the remaining 13 recommendations.[158] The Assistant Secretary for OAWP also submitted general comments which took issue with two aspects of the OIG's report:

(1) The OIG implies "that the [Accountability and Whistleblower Protection] Act was designed to target senior executives for discipline. In reality, the Act included expanded disciplinary authorities that apply to all VA employees..."

(2) The OIG's report does not address in either the executive summary or the body of the report the many improvements and reforms made by the OAWP, and instead relegates them to footnotes.

The comments in their entirety can be found in Appendix B.[159]

## OIG Response

The following responds to the two issues raised by the general comments and then outlines concerns with the VA's proposed corrective action plans.

The first comment simply misses the point. The OIG's report is focused on the OAWP's operations and efforts to implement relevant sections of the Act. The expanded disciplinary authorities of the Secretary over VA employees generally, although part of the same legislation, are not directly relevant to OAWP's operations and, thus, this report. The VA Accountability and Whistleblower Protection Act of 2017 did expand the Secretary's disciplinary authority as to all VA employees (see 38 U.S.C. § 714), but that authority applies without regard to any involvement or action by OAWP. Indeed, the Act provides no role for OAWP in the disciplinary process of employees other than its authority to recommend discipline based on its investigation of allegations of misconduct, poor performance, and retaliation involving certain senior executives (i.e., the defined categories of Covered Executives) and allegations of retaliation on the part of supervisors.[160] It is this authority of the OAWP with respect to disciplinary proceedings that are addressed in this report.

Second, the report does, in fact, make multiple references in the text to OAWP progress. Moreover, as indicated by the OAWP's comments and related action plans for each OIG recommendation, many of the improvements and reforms to which the OAWP refers largely occurred between June and October 2019 and were outside the scope of the OIG's primary

[158] The OAWP states that it has taken actions that resolve 10 recommendations, but the OIG only identified nine recommendations for which the OAWP stated that actions were completed.

[159] The OIG publishes VA comments in full in response to every OIG report to provide VA with the opportunity to detail any accomplishments since the end of the review period and to highlight any concerns. In addition, the OIG gave the OAWP and the Office of General Counsel (OGC) an opportunity to provide technical comments to the draft during an in-person meeting on October 1, 2019.

[160] 38 U.S.C. § 323(c)(1)(H). The OAWP may also recommend appropriate discipline for employees based on investigations carried out by other entities such as the OIG, the Office of the Medical Inspector, and the Office of Special Counsel. 38 U.S.C. § 323(c)(1)(I).

review period, which was June 23, 2017, through December 31, 2018. Nevertheless, the OIG noted several of these efforts to acknowledge the changes the OAWP started implementing under its new leadership. Many of the issues that the OAWP purports to have "independently identified" were actually raised by the OIG during interviews with OAWP senior leaders months before any improvements were made to address these issues, as the following examples demonstrate:

- Determining when matters should be referred for review outside the OAWP (Recommendation 3) was raised as early as November 2018.
- Ensuring all relevant evidence is provided to disciplinary officials (Recommendation 11) was raised as early as March 2019.
- Maintaining the confidentiality of employees who make submissions (Recommendation 12) was raised as early as November 2018 and was brought to the direct attention of Dr. Bonzanto in April 2019.
- Developing processes for collecting and tracking justification information related to 38 U.S.C. § 323(f)(2) (Recommendation 18) was raised as early as December 2018.
- Ensuring compliance with the 60-day reporting requirement in 38 U.S.C. § 323(f)(2) (Recommendation 19) was raised in December 2018 and again in June 2019.
- Developing a database system to track all data required under the Act (Recommendation 20) was raised as early as June 2018 and continuously during interviews of OAWP senior leaders.

## Concerns with VA Action Plans

The Assistant Secretary's comments were generally responsive to the intent of the recommendations. However, some of the planned actions lacked sufficient clarity or specific steps to ensure corrective actions will adequately address the recommendations. In particular, the actions detailed in the responses to Recommendations 2, 3, 4, 7, 11, 12, 18, 19, and 20 were identified as completed as of October based on the issuance of Directive 0500 on September 10, 2019, or other actions taken in recent months. The OIG has not received sufficient documentation to determine whether recent actions and attempts to implement Directive 0500 fully address the recommendations.

The OIG notes that the planned actions for the following two recommendations do not appear sufficient to address the findings and will require updated action plans.

- **Recommendation 2.** The VA Secretary rescinds the February 2018 Delegation of Authority and consults with the Assistant Secretary for Accountability and Whistleblower Protection, the VA Office of General Counsel, and other appropriate

parties to determine whether a revised delegation is necessary, and if so, ensures compliance with statutory requirements.

The VA action plan relies on issuance of Directive 0500. That directive, however, continues to suffer from the same defects as the prior delegation, which the OIG identified in Finding 1. Specifically, it expands the scope of the OAWP's authority to investigate misconduct and poor performance for individuals other than those identified in the statute (38 U.S.C. § 323(c)(1)(H)).[161] The OIG has seen no evidence of consultation with Office of General Counsel or other analysis to justify how such an expansion of the OAWP's investigative authority complies with statutory requirements.

- **Recommendation 12.** The Assistant Secretary for Accountability and Whistleblower Protection implements safeguards consistent with statutory mandates to maintain the confidentiality of employees that make submissions, including guidelines for communications with other VA components.

The VA's action plan states that this recommendation is resolved by VA Directive 0500, paragraph 4a(3), which requires that whistleblowers' identities for matters received by the OAWP are not disclosed without the whistleblowers' consent, except in accordance with the Privacy Act, or as required by law. This, however, may not be sufficient to resolve the OIG's recommendation if the OAWP continues its practice of requiring whistleblowers to consent to the release of their identities in order for OAWP to investigate the allegations of whistleblower retaliation. The OAWP only provides complainants with two options: to consent to release identity or not. As a result, employees could only receive OAWP's investigative services, if they consented to release and risk disclosure of their identity.[162]

The OIG considers all 22 recommendations open and will monitor implementation of VA's planned and recently implemented actions to ensure that they have been effective and sustained.

[161] The delegated authority in Directive 0500 includes the following categories of employees outside the scope of OAWP's investigative authority (unless the employee is a supervisor and the allegation is whistleblower retaliation): Senior-level (SL) positions described in 5 CFR § 319.102; Scientific and Professional (ST) positions described in 5 CFR § 319.103; Veterans law judges (including chief veterans law judges); Veterans Health Administration (VHA) and Veterans Benefits Administration (VBA) directors, associate and assistant directors at General Schedule grade 14 or above; National Cemetery Administration (NCA) cemetery directors and district chiefs of operation at General Schedule grade 14 or above; and Other SES appointees (e.g., noncareer SES appointees and limited term SES appointees).

[162] In contrast, the U.S. Office of Special Counsel does not make investigations contingent on full consent and provides complainants three disclosure options related to information on their identity—full consent to disclose, consent to communicate with the agency but not disclose identity, and no consent to disclose.

# Appendix A: Scope and Methodology

## Scope

The OIG's review period extended from the statutory establishment of the Office of Accountability and Whistleblower Protection on June 23, 2017, through December 31, 2018. The OIG updated its fact-gathering through additional document review and interviews with the Assistant Secretary for Accountability and Whistleblower Protection and other OAWP staff in May, June, and August 2019.

## Methodology

To accomplish its objectives, the OIG team reviewed applicable laws, regulations, policies, procedures, and guidelines. The OIG team interviewed 74 individuals, including current and former OAWP senior leaders Dr. Tamara Bonzanto, Peter O'Rourke, Kirk Nicholas, and Todd Hunter; current and the former OAWP Division Director, the A&A Director, and the Investigations Director; the Senior Advisor; 29 current and former OAWP employees, VA Office of General Counsel staff, current and former VA Human Resources and Administration senior leaders and staff, VA Office of the Medical Inspector staff, and U.S. Office and Special Counsel staff; and 22 complainants and complainant representatives. Additionally, the OIG team collected and reviewed emails of relevant VA staff, including OAWP staff; data from the OAWP's SharePoint database; and documents received from the OAWP in response to document requests.

In this report, the OIG has generalized narratives and case scenarios, and has removed identifiers for individuals when appropriate to protect the privacy and identity of parties and witnesses.

## Scope Limitation

Prior to May 28, 2019, the OAWP managed and tracked its intake submissions, investigations, and disciplinary actions using a series of interconnected homegrown Microsoft SharePoint lists and libraries (collectively, OAWP databases). These systems were originally designed to support the workflows of the Office of Accountability Review (OAR). When the OAWP was established, the existing OAR SharePoint lists and libraries were retained and formed the basis of what became the OAWP databases. Over time, the OAWP's Knowledge Management Operations Division (KMO Division) modified the data elements collected in the OAWP databases to collect information needed for congressionally mandated reports as well as other requests from OAWP leaders. The OIG determined that while the OAWP databases lacked flexible built-in reporting capabilities, the staff of the KMO Division had sufficient expertise to extract, query, and report on the data using other software. These processes took significant

manual intervention and did not provide the KMO Division much flexibility to revise the reports to present data differently without significant additional effort.

The KMO director characterized the OAR data inherited by the OAWP as "basically unreportable because different folks were using different fields for different things, and those sorts of examples of just, you know, bad data in, bad data out." The KMO Division has been incrementally refining the OAWP databases and standardized inputs to enforce data integrity. These refinements have applied only to newly collected data, not revisions of old records. According to the KMO director, any reporting that relied upon the OAWP databases would be "looked at very, very closely . . . to ensure that [it is] as accurate as possible." The OAWP has implemented a new system using the Microsoft Dynamics business management platform, which is expected to have more streamlined data collection and reporting capabilities than the current OAWP databases. Additionally, the OAWP is working to create an online case submission form that will allow those reports to flow automatically into Microsoft Dynamics—creating efficiencies for the Triage Division staff currently responsible for data entry at intake.

Consistent with the KMO director's assessment, the OIG's review of the OAWP's SharePoint tracking lists revealed several areas of weakness related to blank fields, duplicate options, and a lack of standardization among the three primary lists used for tracking: Disclosure Tracker, Matter Tracker, and Discipline Tracker. The OAWP advised OIG investigators that there was a lack of quality control with respect to data entry, which changed over time as measures were taken to improve data integrity. In addition, data points were added through new fields, but the preexisting records were not updated, which results in incomplete searches for queries using the added fields.

As a result of these and other limitations, the OIG cannot independently validate the OAWP's reported data without a prohibitively resource-intensive review of all related underlying records, which may also be incomplete.

## Government Standards

The OIG conducted this review in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Investigations.*

# Appendix B: Management Comments

**Department of Veterans Affairs Memorandum**

Date: October 11, 2019

From: Assistant Secretary, Accountability and Whistleblower Protection (70)

Subj: VA OIG Draft Report, Office of Accountability and Whistleblower Protection: Failures Implementing Aspects of the VA Accountability and Whistleblower Protection Act of 2017 (VIEWS 01503662)

To: Inspector General (50)

1. I have reviewed the draft report and attached are general comments and responses to the recommendations. I concur with the report's 16 recommendations for the Assistant Secretary for Accountability and Whistleblower Protection. On behalf of the Department, I concur with the remained of the recommendations.
2. If you have any questions, please contact if you have questions about this information, please contact Mr. Matthew Gentil, Executive Assistant, at (202) 632-9626 or by e-mail at Matthew.Gentil@va.gov.

(Original signed by:)

Tamara Bonzanto, DNP, RN

Attachment

*For accessibility, the original format of this appendix has been modified to comply with Section 508 of the Rehabilitation Act of 1973, as amended.*

## General Comment

Under the leadership of the Department of Veterans Affairs' (VA) first Assistant Secretary for Accountability and Whistleblower Protection, Dr. Tamara Bonzanto, the Office of Accountability and Whistleblower Protection (OAWP) independently identified many of the issues highlighted by the Office of Inspector General (OIG). In fact, VA has already taken and resolved ten of the OIG's recommendations. Additional improvements include:

- restructuring OAWP to facilitate better oversight;
- improving communications with whistleblowers about the status of their matters;
- ensuring OAWP directly investigates all whistleblower retaliation allegations;
- implementing an information system to track investigations and begin to identify trends, as required by the Act;
- establishing a quality review team to ensure thorough and accurate investigations; and
- developing whistleblower rights and protections training in order to better protect whistleblowers and prevent retaliation.

While OAWP continues to improve under its new leadership, VA's institutional approach to accountability is completely different than that of past administrations, and the VA Accountability and Whistleblower Protection Act of 2017 (the Act) has been a key factor in that culture change.

When problems arise, VA quickly tackles them head on, and the Act gives VA another tool to help the Department hold those responsible accountable. In fact, since June 23, 2017, when the Act became law, VA has fired more than 8,630 people.

VA takes issue with two aspects of OIG's report. The first is its implication that the Act was designed to target senior executives for discipline. In reality, the Act included expanded disciplinary authorities that apply to all VA employees compared to the 2014's Veteran Access, Choice and Accountability Act which aimed at holding only VA senior executives accountable. This is a key distinction the report misses.

VA is also concerned that the report does not address OAWP's many improvements and reforms in the executive summary or body of the report, relegating them instead to fine-print footnotes.

Regardless, VA appreciates OIG's review and is committed to consistent improvement, and under OAWP's new leadership, the office will deliver just that.

## OAWP

Dr. Bonzanto appreciates the courage that it takes to report wrongdoing. Disclosures by VA employees and other individuals save Veterans' lives, combat fraud, and improves services delivered to Veterans.

Dr. Bonzanto recognizes the need for comprehensive, timely, and unbiased investigations into whistleblower disclosures, allegations of whistleblower retaliation, and allegations of senior leader misconduct and poor performance. Dr. Bonzanto recognizes the need for improvements in the way OAWP staff communicate to and about whistleblowers. Since Dr. Bonzanto's appointment, she has been assessing OAWP's operations and procedures to ensure that the organization properly implements the Act.

By April 2019, Dr. Bonzanto identified several deficiencies that needed to be corrected, including staff who were making decisions on her behalf with little to no oversight; teams who were duplicating efforts; investigators who were conducting investigations without sufficient training; a lack of communication with whistleblowers about the status of their matters; a lack of written policies and standard operating procedures; and reports and recommendations that displayed a lack of training.

Dr. Bonzanto developed and implemented a plan to correct these deficiencies. By April 2019, Dr. Bonzanto started reviewing all OAWP recommendations, including recommendations for disciplinary action or no action. She also stopped OAWP contractors from performing work unrelated to OAWP's statutory functions. She mandated that staff update whistleblowers about the status of their matters. In August 2019, Dr. Bonzanto realigned OAWP's operations to ensure that teams were not duplicating efforts and to increase the number of investigators. OAWP investigators also received training on conducting investigations in August and September 2019. OAWP is currently developing a customized investigative training course for its investigators. On September 10, 2019, VA issued Directive 0500. The directive governs how OAWP receives whistleblower disclosures; allegations of senior leader misconduct or poor performance; and allegations of whistleblower retaliation. The directive covers a number of the recommendations made by OIG.

Since her appointment in January 2019, Dr. Bonzanto made one recommendation for disciplinary action on September 20, 2019. Dr. Bonzanto recognizes that this number is low, but she believes that OAWP recommendations need to be accurate and based on thoroughly conducted investigations. Recommendations that she received before September 2019 had several deficiencies, including:

- citing to investigative reports where witnesses were not interviewed;
- conclusory statements that were not tied into evidence; and
- failing to properly address the elements required for whistleblower retaliation.

In August 2019, OAWP developed checklists to ensure that investigative reports and recommendations addressed some of the above deficiencies. So far, the quality review team have identified discrepancies in over 45 investigative reports, which have been routed back for further investigation.

Dr. Bonzanto continues to improve OAWP operations, including ensuring that investigations are conducted in a timely and thorough manner; improving customer service; developing whistleblower rights and protections training; ensuring that OAWP complies with its statutory functions, including tracking and confirming compliance with recommendations made by OIG, VA's Office of Medical Inspector, the U.S. Government Accountability Office, and the U.S. Office of Special Counsel; and identifying trends to proactively identify areas of improvement based on data collected by OAWP.

**Department of Veterans Affairs (VA) Action Plan**

OIG Draft Report, Office of Accountability and Whistleblower Protection: Failures Implementing Aspects of the VA Accountability and Whistleblower Protection Act of 2017.

**Date of Draft Report: September 20, 2019**

**Recommendation 1. The Assistant Secretary for Accountability and Whistleblower Protection directs a review of the Office of Accountability and Whistleblower Protection's compliance with the VA Accountability and Whistleblower Protection Act of 2017 requirements in order to ensure proper implementation and eliminate any activities not within its authorized scope.**

**VA Comment:** Concur. VA is completing actions to ensure that OAWP is not performing activities outside its authorized scope or responsibilities that are unrelated to the functions specified by the Act.

Since her appointment in January 2019, the Assistant Secretary for Accountability and Whistleblower Protection has assessed OAWP's operations and procedures to ensure that the organization properly implements the Act and is operating within its authorized scope. As part OAWP's ongoing performance assessment, Dr. Bonzanto plans on having a third-party conduct an evaluation of the investigations process and compliance with the Act targeting commencement in January 2020.

**Recommendation 2. The VA Secretary rescinds the February 2018 Delegation of Authority and consults with the Assistant Secretary for Accountability and Whistleblower Protection, the VA Office of General Counsel, and other appropriate parties to determine whether a revised delegation is necessary, and if so, ensures compliance with statutory requirements**

**VA Comment:** Concur. VA is completing the actions required to resolve this recommendation in October 2019.

On October 11, 2019, the Secretary of Veterans Affairs rescinded the February 2018 delegation of authority, which is no longer needed in light of VA Directive 0500, which was issued on September 10, 2019.

**Recommendation 3. The Assistant Secretary for Accountability and Whistleblower Protection, in consultation with the Office of General Counsel, Office of Inspector General, Office of the Medical Inspector, and the Office of Resolution Management establishes comprehensive processes for evaluating and documenting whether allegations, in whole or in part, should be handled within OAWP or referred to other VA entities for potential action or referred to independent offices such as the Office of Inspector General.**

**VA Comment:** Concur. VA completed the actions required to resolve this recommendation in September 2019.

VA Directive 0500, issued on September 10, 2019, governs how OAWP receives whistleblower disclosures; allegations of senior leader misconduct or poor performance; and allegations of whistleblower retaliation. The directive identifies matters that are more appropriately addressed by other remedial administrative processes, including equal employment opportunity allegations and hostile work environment allegations. Individuals making these allegations are notified that OAWP does not

investigate them and are provided information on the right forum to file their complaint. Allegations involving actual or potential crimes are sent to OIG for review. Templates and guidance about these processes have been disseminated to staff.

Recommendation 4. **The Assistant Secretary for Accountability and Whistleblower Protection makes certain that policies and processes are developed, in consultation with the VA Office of General Counsel and Office of Resolution Management, to consistently and promptly advise complainants of their right to bring allegations of discrimination through the Equal Employment Opportunity process.**

**VA Comment:** Concur. VA completed the actions required to resolve this recommendation in September 2019.

VA Directive 0500, issued on September 10, 2019, governs how OAWP receives whistleblower disclosures; allegations of senior leader misconduct or poor performance; and allegations of whistleblower retaliation. The directive identifies matters that are more appropriately addressed by other remedial administrative processes, including equal employment opportunity allegations and hostile work environment allegations. Individuals making these allegations to OAWP are notified that OAWP does not investigate them and are provided information on the right forum to file their complaint. Templates and guidance about these processes have been disseminated to staff.

Recommendation 5. **The Assistant Secretary for Accountability and Whistleblower Protection ensures that the divisions of the Office of Accountability and Whistleblower Protection adopt standard operating procedures and related detailed guidance to make certain they are fair, unbiased, thorough, and objective in their work.**

**VA Comment:** Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

The Assistant Secretary recognizes that the actions of OAWP staff must be unbiased, thorough, and objective. The Assistant Secretary is taking a number of steps to ensure that this occurs, including:

- issuing VA Directive 0500 on September 10, 2019. The directive governs how OAWP receives whistleblower disclosures; allegations of senior leader misconduct or poor performance; and allegations of whistleblower retaliation;
- establishing a quality review team to ensure thorough and accurate investigations;
- developing a comprehensive training program for its investigators. The program will cover investigative techniques, including report writing. The program will incorporate best practices from the Office of Special Counsel (OSC), the Council of Inspectors General on Integrity and Efficiency (CIGIE), and other governmental and non-governmental offices. This will serve as the foundation for continuous professional training and development that will be conducted throughout the next fiscal year;
- developing a comprehensive training program for individuals who review investigative reports to ensure the reports are done in a fair, unbiased, thorough, and objective manner. The program will incorporate best practices from OSC, CIGIE, and other governmental and non-governmental offices;
- developing standard operating procedures (SOP), checklists, and a reporting template to ensure consistent quality and timeliness with OAWP investigations;

- developing additional SOPs and policy as it complies with the other provisions of 38 United States Code (U.S.C.) § 323, including tracking and confirming the implementation of recommendations made by the Government Accountability Office, OSC, the Office of Medical Inspector, and OIG;
- ensuring that all staff are trained in and held accountable for providing customer service; and
- establishing a customer survey to measure the impact of these customer service improvements.

**Recommendation 6. The VA General Counsel updates VA Directive 0700 and VA Handbook 0700 with revisions clarifying the extent to which VA Directive 0700 and VA Handbook 0700 apply to the Office of Accountability and Whistleblower Protection, if at all.**

**VA Comment**: Concur. OAWP is not an element of the Office of General Counsel (OGC) and does not report to the General Counsel.

With regard to VA Directive 0700 and VA Handbook 0700, VA is taking actions required to resolve this recommendation and anticipates completing these actions by early 2020. OGC assigned a workgroup the task of updating VA Directive 0700 and VA Handbook 0700. The update will include clarification of the extent, if any, the Directive and Handbook apply to OAWP. As required under VA policy, impacted VA offices, including OAWP, will provide feedback on the Directive and Handbook.

**Recommendation 7. The Assistant Secretary for Accountability and Whistleblower Protection assigns a quality assurance function to an entity positioned to review OAWP divisions' work for accuracy, thoroughness, timeliness, fairness, and other improvement metrics.**

**VA Comment**: Concur. VA completed the actions required to resolve this recommendation in August 2019.

The Assistant Secretary recognizes that the actions of OAWP staff must be unbiased, thorough, and objective. In August of 2019, OAWP underwent a realignment of its operations to ensure quality performance: investigate matters on a timely basis; prepare and issue recommendations on a timely basis; reduce its backlog of cases and ensure that it can comply with the other provisions of 38 U.S.C. § 323. As part of this realignment, OAWP established a quality review team to ensure thorough and accurate investigations.

OAWP is developing a comprehensive training program for individuals who review investigative reports to ensure the reports are done in a fair, unbiased, thorough, and objective manner. The program will incorporate best practices from OSC, CIGIE, and other governmental and non-governmental offices. The quality review team is also developing SOPs, checklists, and a reporting template to ensure consistent quality and timeliness with OAWP investigations.

**Recommendation 8. The Assistant Secretary for Accountability and Whistleblower Protection directs the establishment of a training program for all relevant personnel on appropriate investigative techniques, case management, and disciplinary actions.**

**VA Comment**: Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

The Assistant Secretary recognizes that the actions of OAWP staff must be unbiased, thorough, and objective. OAWP is developing a comprehensive training program for its investigators. The program will cover investigative techniques, including report writing. The program will incorporate best practices from OSC, CIGIE, and other governmental and non-governmental offices. This will serve as the foundation of continuous professional training and development that will be conducted throughout the next fiscal year.

OAWP investigators have already started to receive standardized training on conducting investigations, which was presented in August and September 2019.

Recommendation 9. **The VA Secretary, in consultation with the VA Office of General Counsel, provides comprehensive guidance and training reasonably designed to instill consistency in penalties for actions taken pursuant to 38 U.S.C. §§ 713 and 714.**

**VA Comment:** Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions by the end of the calendar year.

Office of Human Resources and Administration/Operations, Security, and Preparedness (HRA/OSP) will prepare guidance regarding penalty selection for actions taken pursuant to 38 U.S.C. §§ 713 and 714. VA Handbook 5021 will be modified to incorporate this guidance. The guidance will be consistent with the authorities provided to the VA by Public Law 115-41, Executive Order 13839, and recent Office of Personnel Management comments posted in the Federal Register regarding Agency use of a Table of Penalties.

Recommendation 10. **The VA Secretary ensures the provision of comprehensive guidance and training to relevant disciplinary officials to maintain compliance with the mandatory adverse action criteria outlined in 38 U.S.C. § 731**

**VA Comment:** Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

HRA/OSP will issue guidance clarifying the procedures for actions taken under 38 U.S.C. § 731. VA Handbook 5021 will be modified to incorporate this guidance, and VA's enterprise-wide employee relations case management system will be used to maintain relevant evidence provided to the VA Secretary (or the designated disciplinary officials) and monitor compliance with the guidance.

Recommendation 11. **The Assistant Secretary for Accountability and Whistleblower Protection makes certain that in any disciplinary action recommended by the OAWP, all relevant evidence is provided to the VA Secretary (or the disciplinary officials designated to act on the Secretary's behalf).**

**VA Comment:** Concur. VA completed the actions required to resolve this recommendation in September 2019.

As described in VA Directive 0500, issued on September 10, 2019, OAWP no longer provides Human Resources (HR) services. Instead, these services are provided directly by HR servicing offices. In the case of senior executives, that would be the Corporate Senior Executive Management Office.

As required under VA Directive 0500, OAWP provides disciplinary officials with recommendations for disciplinary action and also provides those officials with access to the investigative file, so that they can consider it when deciding whether to propose or take a disciplinary action.

**Recommendation 12. The Assistant Secretary for Accountability and Whistleblower Protection implements safeguards consistent with statutory mandates to maintain the confidentiality of employees that make submissions, including guidelines for communications with other VA components.**

VA Comment: Concur. VA completed the actions required to resolve this recommendation in September 2019.

VA Directive 0500, paragraph 4a(3), requires that whistleblowers' identities for matters received by OAWP are not disclosed without the whistleblowers' consent, except in accordance with the Privacy Act, or as required by law.

When allegations are received, OAWP staff ask the individual whether they would like to remain anonymous. If so, OAWP staff go through a list of questions to determine what information the individual is willing to disclose and whether there are restrictions on sharing the information with specific individuals. Before referring a matter for investigation, OAWP redacts any information that the individual is not willing to disclose or identifies individuals who should not undertake the investigation. If an investigation is conducted by OAWP staff, staff abides by the restrictions on the disclosure of the individual's identity.

Additional training will be provided to staff about interacting with and conducting investigations regarding individuals who chose to remain anonymous.

**Recommendation 13. The Assistant Secretary for Accountability and Whistleblower Protection leverages available resources, such as VA's National Center for Organizational Development and the Office of Resolution Management, to conduct an organizational assessment of OAWP employee concerns and develop an appropriate action plan to strengthen OAWP workforce engagement and satisfaction.**

VA Comment: Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

VA's National Center for Organizational Development (NCOD) reviewed the results of OAWP's 2019 All Employee Survey with OAWP's management. Notably, the survey was conducted in June 2019, during a key transition point for OAWP when changes to bring the organization into alignment with the statute were underway. OAWP continues to engage with NCOD to improve OAWP workforce engagement and satisfaction.

OAWP is also establishing four employee workgroups, designed to solicit employee feedback as OAWP continues its realignment. The workgroups include a training workgroup, which will advise on training that is beneficial for OAWP staff; policy/process workgroup, which will advise on SOPs and policy for OAWP; employee engagement workgroup, which will advise on ways to improve employee engagement; and a technology workgroup, which will advise on ways to better utilize technology in OAWP.

OAWP is also collaborating with the Veterans Experience Office (VEO) to provide customer service training to all staff. OAWP is also working with VEO to develop a customer survey to measure the impact of these customer service improvements.

Recommendation 14. **The Assistant Secretary for Accountability and Whistleblower Protection develops a process and training for the Triage Division staff to identify and address potential retaliatory investigations.**

**VA Comment:** Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

On August 18, 2019, OAWP realigned staff and offices to ensure that it can: investigate matters on a timely basis; prepare and issue recommendations on a timely basis; reduce its backlog of cases and ensure that it can comply with the other provisions of 38 U.S.C. § 323. As part of this realignment, the Triage team was eliminated, and its responsibility for the informal development of matters was moved to the Investigations team to prevent a duplication of effort by both teams. The realignment did not result in a reduction in grade or a loss of pay for any OAWP employee.

OAWP will collaborate with OSC and consult with OGC on ways to help train OAWP staff to identify and address potential retaliatory investigations.

Recommendation 15. **The Assistant Secretary for Accountability and Whistleblower Protection collaborates with the Assistant Secretary for Human Resources and Administration, and the VA Secretary to develop performance plan requirements as required by 38 U.S.C. § 732.**

**VA Comment:** Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

HRA/OSP collaborated with OAWP to develop criteria as required by 38 U.S.C. § 732. The criteria will be incorporated in Senior Executive Service performance plans in the first quarter of Fiscal Year (FY) 2020, and guidance issued to Under Secretaries, Assistant Secretaries, and Key Officials by the Assistant Secretary of HRA/OSP to evaluate the performance of supervisors under the same criteria.

Recommendation 16. **The Assistant Secretary for Accountability and Whistleblower Protection ensures the implementation of whistleblower disclosure training to all VA employees as required under 38 U.S.C. § 733.**

**VA Comment:** Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

OAWP has been working with OSC and OIG to collaborate and develop training required for all employees under 38 U.S.C. § 733. This training has been developed at the same time as OAWP continues to improve its operations, including ensuring that investigations are conducted in a timely and thorough manner; establishing a compliance team; and issuing written policy on OAWP investigations.

VA anticipates issuance of the 38 U.S.C. § 733 training, including a specialized module for supervisors, via VA's Talent Management System (TMS) which captures completed training for each employee.

Recommendation 17. **The VA Secretary makes certain supervisors' training is implemented as required under § 209 of the VA Accountability and Whistleblower Protection Act of 2017.**

**VA Comment:** Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions by the end of the calendar year.

VA's Chief Learning Officer is working with OAWP and other organizations to design the training required under § 209 and implement through TMS. TMS will allow VA to assign the training to certain supervisors and monitor compliance with the requirement.

**Recommendation 18. The Assistant Secretary for Accountability and Whistleblower Protection confers with the VA Office of General Counsel to develop processes for collecting and tracking justification information related to proposed disciplinary action modifications consistent with 38 U.S.C. § 323(f)(2).**

**VA Comment:** Concur. VA completed the actions required to resolve this recommendation in June 2019.

In June 2019, OAWP implemented an information system to track investigations and recommendations made by the Assistant Secretary. This system will allow OAWP to identify trends, as required by the Act. VA Directive 0500 also requires that Under Secretaries, Assistant Secretaries, and other Key Officials, will in accordance with 38 U.S.C. § 323(f)(2), respond to OAWP recommended actions, including providing a copy of the action taken or proposed and, if the recommended action was not taken or proposed, providing a detailed justification why such an action was not taken or proposed within 60 calendar days of OAWP's recommendation. This information is then relayed to Congress, as required under 38 U.S.C. § 323(f)(2). Data on disciplinary actions impacting pay are maintained in VA's official systems of records for the Department, HRSmart.

**Recommendation 19. The VA Secretary in consultation with the Office of General Counsel and the Assistant Secretary for Accountability and Whistleblower Protection ensures compliance with the 60-day reporting requirement in 38 U.S.C. § 323(f)(2) consistent with congressional intent.**

**VA Comment:** Concur. VA completed the actions required to resolve this recommendation in September 2019.

The Secretary fully intends to comply with the Act, including that reporting requirement. This requirement is memorialized in VA Directive 0500, issued on September 10, 2019, which states that Under Secretaries, Assistant Secretaries and other Key Officials will respond to OAWP recommended actions, including providing a copy of the action taken or proposed and, if the recommended action was not taken or proposed, providing a detailed justification why such an action was not taken or proposed within 60 calendar days of OAWP's recommendation. This information is then relayed to Congress, as required under 38 U.S.C. § 323(f)(2).

**Recommendation 20. The Assistant Secretary for Accountability and Whistleblower Protection develops or enhances database systems to provide the capability to track all data required by the VA Accountability and Whistleblower Protection Act of 2017.**

**VA Comment:** Concur. VA completed the actions required to resolve this recommendation in June 2019.

In June 2019, OAWP implemented an information system to track investigations and begin to identify trends, as required by the Act. Data on disciplinary actions impacting pay are maintained in VA's official systems of records for the Department, HRSmart, which is managed by HRA/OSP.

**Recommendation 21. In consultation with the VA Office of General Counsel, the Assistant Secretary for Accountability and Whistleblower Protection completes the publication of Systems of Records Notices for all systems of records maintained by the Office of Accountability and Whistleblower Protection, and adopts procedures reasonably designed to ensure that the OAWP does not create additional systems of records without complying with the requirements of the Privacy Act of 1974.**

**VA Comment:** Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

OAWP is consulting with OGC and the Office of Information and Technology (OIT) as it develops and publishes a Systems of Records Notice to cover the information that it obtains and maintains. OAWP will ensure that it does not create additional systems of records without complying with the requirements of the Privacy Act.

**Recommendation 22. The Assistant Secretary for Accountability and Whistleblower Protection consults with the VA Chief Freedom of Information Act Officer to ensure adequate training and staffing of the Office of Accountability and Whistleblower Protection's Freedom of Information Act Office, and establishes procedures to comply with FOIA requirements including timeliness.**

**VA Comment:** Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

OAWP is working with OIT to ensure that its Freedom of Information Act (FOIA) staff are properly trained. OAWP FOIA staff are also solely focused on OAWP FOIA matters. OAWP is also developing a FOIA SOP and has leveraged contract FOIA services already established in VA to assist the office with eliminating its FOIA backlog and handling future FOIA requests.

There are 65 pending FOIA requests that OAWP is currently reviewing. OAWP is working expeditiously so that it can eliminate its FOIA backlog before the end of the calendar year.

# OIG Contact and Staff Acknowledgments

| | |
|---|---|
| **Contact** | For more information about this report, please contact the Office of Inspector General at (202) 461-4720. |
| **Primary Contributors** | R. James Mitchell, Esq., Acting Executive Director, Office of Special Reviews<br><br>Domingo Alvarez, Administrative Investigator<br>Sabrina Gregory, Auditor<br>Dyanne Griffith, Attorney-Advisor<br>Michele Hale, Administrative Investigator<br>Daniel Hollis, Administrative Investigator<br>Nate Landkammer, Special Agent in Charge<br>Sarah Lanks, Attorney-Advisor<br>Jonathan Lebruto, Attorney-Advisor<br>Samantha Petrich, Attorney-Advisor<br>Martha Plotkin, Special Assistant to the Inspector General<br>Barbara H. Wright, Esq., Senior Advisor |
| **Other Acknowledgments** | Katharine Brown, Attorney-Advisor<br>Debbie Crawford, Program Manager<br>Scott Eastman, Supervisory Management & Program Analyst<br>Sharon Forbes, IT Specialist<br>Lisette Howells, Attorney-Advisor<br>Charles Millard, Senior Administrative Investigator<br>Thomas Pasquini, Executive Assistant<br>Deborah Raviv, Attorney-Advisor<br>Tamara Schulman, Attorney-Advisor<br>Jonathan Toy, Special Agent<br>Leanne Watkins, Administrative Investigator |

# Report Distribution

## VA Distribution

Office of the Secretary
Veterans Health Administration
Assistant Secretaries
General Counsel

## Non-VA Distribution

House Committee on Veterans' Affairs
House Appropriations Subcommittee on Military Construction, Veterans Affairs, and Related Agencies
House Committee on Oversight and Reform
Senate Committee on Veterans' Affairs
Senate Appropriations Subcommittee on Military Construction, Veterans Affairs, and Related Agencies
Senate Committee on Homeland Security and Governmental Affairs
National Veterans Service Organizations
Government Accountability Office
Office of Management and Budget
U.S. Senate: Tammy Baldwin, Richard Blumenthal, Sherrod Brown, Patty Murray, and Jon Tester

**OIG reports are available at www.va.gov/oig**

# TAB T

**Jim Trinka**

**From:** Matthew W. Rau <immigrantlawyer@aol.com>
**Sent:** Friday, January 3, 2020 8:07 PM
**To:** [redacted] jtrinka@cox.net
**Subject:** [redacted]

Dear Piya & Jim:

[redacted]

As you know, our individual hearing date on Piya's green card application is Pearl Harbor Day, December 7, 2020 at 1:00 p.m. at the immigration court in Arlington. [redacted]

Happy New Year!

Best wishes,

Matthew W. Rau, Esq.

*Law Office of Matthew W. Rau*
*2007 15th Street N., Suite 7*
*Arlington, VA 22201*
*Tel. (703) 312-8310*
*Fax (703) 312-8312*

Exhibit 7

Department of Homeland Security
U.S. Citizenship and Immigration Services

# I-797, Notice of Action

THE UNITED STATES OF AMERICA

| | | |
|---|---|---|
| RECEIPT NUMBER<br>[redacted] | | CASE TYPE I130 PETITION FOR ALIEN RELATIVE |
| RECEIPT DATE<br>January 8, 2016 | PRIORITY DATE<br>January 8, 2016 | PETITIONER<br>TRINKA, JAMES A. |
| NOTICE DATE<br>May 16, 2016 | PAGE<br>1 of 1 | BENEFICIARY [redacted]<br>TRINKA, PIYAPORN |

JAMES ALAN TRINKA
[redacted]

**Notice Type:** Approval Notice
**Section:** Husband or wife of U.S. Citizen, 201(b) INA

The above petition has been approved. The petition indicates that the person for whom you are petitioning is in the United States and will apply for adjustment of status. He or she should contact the local USCIS office to obtain Form I-485, Application for Permanent Residence. A copy of this notice should be submitted with the application.

If the person for whom you are petitioning decides to apply for a visa outside the United States based on this petition, the petitioner should file Form I-824, Application for Action on an Approved Application or Petition, to request that we send the petition to the Department of State National Visa Center (NVC).

The NVC processes all approved immigrant visa petitions that require consular action. The NVC also determines which consular post is the appropriate consulate to complete visa processing. It will then forward the approved petition to that consulate.

The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status.

**THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA.**

NOTICE: Although this application/petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify the information submitted in this application, petition and/or supporting documentation to ensure conformity with applicable laws, rules, regulations, and other authorities. Methods used for verifying information may include, but are not limited to, the review of public information and records, contact by correspondence, the internet, or telephone, and site inspections of businesses and residences. Information obtained during the course of verification will be used to determine whether revocation, rescission, and/or removal proceedings are appropriate. Applicants, petitioners, and representatives of record will be provided an opportunity to address derogatory information before any formal proceeding is initiated.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

USCIS
CALIFORNIA SERVICE CENTER
P. O. BOX 30111
LAGUNA NIGUEL CA 92607-0111
**Customer Service Telephone: (800) 375-5283**



Form I-797 (Rev. 01/31/05) N

# COMMONWEALTH OF VIRGINIA
## MARRIAGE REGISTER

BOOK 00143 / 1607

COPY A
FOR CLERK OF COURT

00143 1607

CIRCUIT COURT FOR CITY OR COUNTY OF **FAIRFAX COUNTY, VIRGINIA**

CLERK'S NUMBER **2013 05326**

**GROOM**

1. FULL NAME OF GROOM (first) (middle) (last): **JAMES ALAN TRINKA**

2. AGE: [redacted] Years

3. DATE OF BIRTH (Month, Day, Year): [redacted]

4. PLACE OF BIRTH (state or foreign country): **NORTH DAKOTA**

5. RACE: [redacted]

6. NUMBER OF THIS MARRIAGE (first, second, etc.): [redacted]

7. MARITAL STATUS (If previously married): WIDOWED ☐ DIVORCED ☑

8. EDUCATION (Specify only highest grade completed): Elementary or Secondary [redacted] College (1-4 or 5+) [redacted]

9a. USUAL RESIDENCE: STREET ADDRESS OR RT. NUMBER: [redacted]

9b. CITY OR TOWN OF RESIDENCE: [redacted]

9c. COUNTY (if independent city, leave blank): [redacted]

9d. STATE (OR FOREIGN COUNTRY): [redacted]

10. NAME OF FATHER: [redacted]

11. FULL MAIDEN NAME OF MOTHER: [redacted]

**BRIDE**

12. PRESENT NAME OF BRIDE (first) (middle) (last): **PIYAPORN JINDACHAI**

MAIDEN SURNAME (if different):

13. AGE: [redacted] Years

14. DATE OF BIRTH (Month, Day, Year): [redacted]

15. PLACE OF BIRTH (state or foreign country): **THAILAND**

16. RACE: [redacted]

17. NUMBER OF THIS MARRIAGE (first, second, etc.): [redacted]

18. MARITAL STATUS (If previously married): WIDOWED ☐ DIVORCED ☑

19. EDUCATION (Specify only highest grade completed): Elementary or Secondary [redacted] College (1-4 or 5+) [redacted]

20a. USUAL RESIDENCE: STREET ADDRESS OR RT. NUMBER: [redacted]

20b. CITY OR TOWN OF RESIDENCE: [redacted]

20c. COUNTY (if independent city, leave blank): [redacted]

20d. STATE (OR FOREIGN COUNTRY): [redacted]

21. NAME OF FATHER: [redacted]

22. FULL MAIDEN NAME OF MOTHER: [redacted]

## MARRIAGE LICENSE

23. TO ANY PERSON LICENSED TO PERFORM MARRIAGES
You are hereby authorized to join the above-named persons in marriage under procedures outlined in the statutes of the Commonwealth of Virginia.

Signature ▶ [signature] Clerk of Court or Deputy

Date Issued **DECEMBER 11, 2013**
License Expires Sixty Days After Above Date

Date Received by Clerk of Court from Officiant **DEC 26 2013**

## MARRIAGE CERTIFICATE

TO OFFICIANT:
Complete and sign certificates on both copies.
Return both copies within five days to Clerk of Court issuing license.
Section 32.1-267, Code of Virginia

24. DATE OF MARRIAGE (Month, Day, Year): 12-20-2013

25. PLACE OF MARRIAGE (county or independent city): Fairfax VIRGINIA

26. TYPE OF CEREMONY: CIVIL ☑ RELIGIOUS ☐

27. I CERTIFY THAT I JOINED THE ABOVE-NAMED PERSONS IN MARRIAGE ON THE DATE AND AT THE PLACE SPECIFIED.

SIGNATURE OF OFFICIANT: [signature] TITLE OF OFFICIANT: Marriage Celebrant

Authorized to perform marriages by the Circuit Court for Fairfax (city or county), Virginia, in 1992 (year of authorization)

NAME OF OFFICIANT (type or print): Leora M Motley

ADDRESS OF OFFICIANT: 6110 Castletown Way (street or route number) Alexandria (city or town), Virginia (state)

VS3-7/01

A COPY TESTE:
JOHN T. FREY, CLERK
BY: [signature] Deputy Clerk
Date: 01-02-2014
Original retained in the office of the Clerk of the Circuit Court of Fairfax County, Virginia

1/31/14 LR/VR/SP

VIRGINIA

FAIRFAX CIRCUIT COURT

2014-00063

In the matter of the change of name of
Piyaporn Jindachai

to Piyaporn Trinka

Civil No. ____________

## FINAL ORDER

This day came the petitioner, seeking to change her name.

IT APPEARING to the Court that:

The current address of the petitioner, including street, city and state of residence is [redacted].

The petitioner has never previously had a change of name.

**ADJUDGED, ORDERED and DECREED** that the name of the petitioner is hereby changed from Piyaporn Jindachai to Piyaporn Trinka, and further

**ADJUDGED, ORDERED, and DECREED** that the Clerk of this Court, pursuant to the provisions of Virginia Code §8.01-217 shall spread this order upon the current deed book, index it in both the old and new names, and transmit a certified copy to both the State Registrar of Vital Statistics and the Criminal Records Exchange.

Entered this 28 day of January, 2014.

[signature]
JUDGE

I ASK FOR THIS:

[signature]
Signature of Petitioner(s)

A COPY TESTE:
JOHN T. FREY, CLERK
BY: [signature]
Deputy Clerk
Date: 1/31/2014
Original retained in the office of the Clerk of the Circuit Court of Fairfax County, Virginia



CCR A-160 5-6 October 2006


UNITED STATES OF AMERICA
EMPLOYMENT AUTHORIZATION
Surname
TRINKA
Given Name
PIYAPORN
USCIS#
Category
Card#
[redacted]
Country of Birth
Thailand
Terms and Conditions
None
Date of Birth
[redacted]
Sex
F
Valid From
12/27/19
Card Expires
12/26/20
NOT VALID FOR REENTRY TO U.S.


FORM I-766
Rev (02-2016)
35813153
123
[redacted]<<
[redacted]<<<<<<<<<<<<<2
TRINKA<<PIYAPORN<<<<<<<<<<<<<<<


YOUR SOCIAL SECURITY CARD
ADULTS: Sign this card in ink immediately.
CHILDREN: Do not sign until age 18 or your first job, whichever is earlier.
Keep your card in a safe place to prevent loss or theft.
DO NOT CARRY THIS CARD WITH YOU.
Do not laminate.
SOCIAL SECURITY
VALID FOR WORK ONLY
WITH DHS AUTHORIZATION
[redacted]
THIS NUMBER HAS BEEN ESTABLISHED FOR
PIYAPORN
TRINKA
SIGNATURE
08/03/2016

**THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.**

| NOTICE TYPE | | NOTICE DATE |
|---|---|---|
| Receipt | | March 30, 2016 |
| CASE TYPE | | USCIS ALIEN NUMBER |
| I-765, Application for Employment Authorization | | [redacted] |
| RECEIPT NUMBER | RECEIVED DATE | PAGE |
| [redacted] | March 17, 2016 | 1 of 1 |
| | | DATE OF BIRTH [redacted] |

PIYAPORN TRINKA
[redacted] [redacted]

NAME AND MAILING ADDRESS

**PAYMENT INFORMATION:**

| | |
|---|---|
| **Application/Petition Fee:** | $0.00 |
| **Biometrics Fee:** | $0.00 |
| **Total Amount Received:** | $0.00 |
| **Total Balance Due:** | $0.00 |

The above application/petition has been received by our office and is in process.

Please verify your personal information listed above and immediately notify the USCIS National Customer Service Center at the phone number listed below if there are any changes.

Please note that if a priority date is printed on this notice, the priority does not reflect earlier retained priority dates.

As a reminder, if you have an underlying Form I-140 that is approved or is still pending, you may request to change employers under INA 204(j) if your Form I-485 Adjustment application has been pending for at least 180 days. In order to do so, you should supplement the Form I-485 record of proceeding with documentation relating to the new job offer that forms the basis of the INA 204(j) portability request. For more information on how to request to change employers and what information is required to supplement the Form I-485, please visit www.uscis.gov.

If you have questions about possible immigration benefits and services, filing information, or USCIS forms, please call the USCIS National Customer Service Center (NCSC) at **1-800-375-5283**. If you are hearing impaired, please call the NCSC TDD at **1-800-767-1833**. Please also refer to the USCIS website: www.uscis.gov.

If you have any questions or comments regarding this notice or the status of your case, please contact our customer service number.

You will be notified separately about any other case you may have filed.

**USCIS Office Address:**

USCIS
National Benefits Center
P.O. Box 648003
Lee's Summit, MO 64002

**USCIS Customer Service Number:**

(800)375-5283

2007 15th Street N., Suite 7
Arlington, Virginia 22201
(Admitted in MO & KS)

**Matthew W. Rau**
*Attorney-at-Law*
*Virginia Practice Limited to Immigration*

Tel. (703) 312-8310
Fax (703) 312-8312
ImmigrantLawyer@aol.com

VIA CERTIFIED MAIL (7015 0640 0004 0336 4702)

March 14, 2016

COPY

USCIS
P. O. Box 805887
Chicago, IL 60680-4120

RE: **Form I-765, Application for Employment Authorization**
**Alien:** **TRINKA, Piyaporn (a.k.a. JINDACHAI, Piyaporn)**
**A Number:** [redacted]

To Whom It May Concern:

The above-referenced individual, represented by this office, is the beneficiary of an I-130 petition filed by her U.S. citizen husband and her I-485 application (for which the fee was paid as reflected by the receipt issued by the USCIS Texas Service Center) has been filed and is currently pending with the immigration court in Arlington, Virginia. She hereby applies for employment authorization. There is no filing fee for this I-765, as the I-485 filing fee has already been paid.

Enclosed please find:

1. Form I-765, Application for Employment Authorization, with two (2) color photos of the applicant attached thereto
2. Form G-28, Notice of Entry of Appearance as Attorney, for undersigned counsel
3. Form I-797C, USCIS Receipt Notice, reflecting payment of $1,070.00 for filing/biometrics fee for I-485 application on 02/19/2016, along with biometrics appointment notice for pending I-485 application
4. Copy of court-stamped adjustment of status cover and court stamped I-485 application filed with the immigration court in Arlington, Virginia on 03/14/2016
5. Copy of next master calendar hearing notice for the immigration court
6. Copy of the applicant's current passport, I-94 and court order changing her name

Very truly yours,

[signature]

Matthew W. Rau
Attorney-at-Law

Enclosures (as stated)

cc: Mrs. Piyaporn Trinka
[redacted]

Department of Homeland Security
U.S. Citizenship and Immigration Services

OMB No. 1615-0040; Expires 02/28/2018

# I-765, Application For Employment Authorization

| For USCIS Use Only | Fee Stamp | Action Block | Initial Receipt | Resubmitted |
|---|---|---|---|---|
| | | | Relocated | |
| | | | Received | Sent |
| | | | Completed | |
| | | | Approved | Denied |

☐ Application Approved
☐ Authorization/Extension Valid From ______
☐ Authorization/Extension Valid To ______
Subject to the following conditions: ______

☐ Application Denied - Failed to establish:
☐ Eligibility under 8 CFR 274a.12 (a) or (c)
☐ Economic necessity under 8 CFR 274a.12(c)(14), (18) and 8 CFR 214.2(f)

A# ______

☐ Applicant is filing under section 274a.12 ______

I am applying for: ☒ Permission to accept employment. ☐ Replacement (of lost employment authorization document).
☐ Renewal of my permission to accept employment (attach a copy of your previous employment authorization document).

1. **Full Name**
(Family Name) Trinka (First Name) Piyaporn (Middle Name)

2. **Other Names Used** (include Maiden Name)
Piyaporn Jindachai

3. **U.S. Mailing Address**
(Street Number and Name) [redacted] (Apt. Number)
(Town or City) [redacted] Code)

4. **Country of Citizenship or Nationality**
Thailand

5. **Place of Birth**
(Town or City) [redacted] (State/Province) (Country)
Thailand

6. **Date of Birth** (mm/dd/yyyy) [redacted]

7. **Gender** ☐ Male ☒ Female

8. **Marital Status**
☒ Married ☐ Single ☐ Divorced ☐ Widowed

9. **Social Security Number** (Include all numbers you have ever used if any)
[redacted]

10. **Alien Registration Number (A-Number) or Form I-94 Number** (if any)
[redacted]

11. **Have you ever before applied for employment authorization from USCIS?**
☐ Yes (Complete the following questions.)
Which USCIS Office? Dates
Results (Granted or Denied - attach all documentation)
☒ No (Proceed to Question 12.)

12. **Date of Last Entry into the U.S.** [redacted] yyyy)

13. **Place of Last Entry into the U.S.**
[redacted]

14. **Status at Last Entry** (B-2 Visitor, F-1 Student, No Lawful Status, etc.)
[redacted]

15. **Current Immigration Status** (Visitor, Student, etc.)
[redacted]

16. **Eligibility Category.** Go to the "**Who May File Form I-765?**" section of the Instructions. In the space below, place the letter and number of the eligibility category you selected from the instructions. For example, (a)(8), (c)(17)(iii), etc.
[redacted] ) ( )

17. **(c)(3)(C) Eligibility Category.** If you entered the eligibility category (c)(3)(C) in **Question 16** above, list your degree, your employer's name as listed in E-Verify, and your employer's E-Verify Company Identification Number or a valid E-Verify Client Company Identification Number in the space below.
Degree Employer's Name as listed in E-Verify
Employer's E-Verify Company Identification Number or a Valid E-Verify Client Company Identification Number

18. **(c)(26) Eligibility Category.** If you entered the eligibility category (c)(26) in **Question 16** above, please provide the receipt number of your H-1B principal spouse's most recent Form I-797 Notice of Approval for Form I-129.

**Certification**

I certify, under penalty of perjury, that the foregoing is true and correct. Furthermore, I authorize the release of any information that U.S. Citizenship and Immigration Services needs to determine eligibility for the benefit I am seeking. I have read the "**Who May File Form I-765?**" section of the instructions and have identified the appropriate eligibility category in **Question 16**.

**Applicant's Signature** [signature]
**Date of Signature** (mm/dd/yyyy) 03/14/2016
**Telephone Number** (703) 577-0889

**Signature of Person Preparing Form, If Other Than Applicant**

I declare that this document was prepared by me at the request of the applicant and is based on all information of which I have any knowledge.

**Preparer's Signature** [signature]
**Date of Signature** (mm/dd/yyyy) 03/14/2016
**Printed Name** Matthew W. Rau, Esq.
**Address** 2007 15th Street N., Suite 7
Arlington, VA 22201

# Notice of Entry of Appearance as Attorney or Accredited Representative

Department of Homeland Security

DHS Form G-28
OMB No. 1615-0105
Expires 03/31/2018

## Part 1. Information About Attorney or Accredited Representative

1. USCIS ELIS Account Number *(if any)*
▶

### *Name and Address of Attorney or Accredited Representative*

2.a. Family Name *(Last Name)*: Rau
2.b. Given Name *(First Name)*: Matthew
2.c. Middle Name: William
3.a. Street Number and Name: 2007 15th Street North
3.b. Apt. ☐ Ste. ☒ Flr. ☐ 7
3.c. City or Town: Arlington
3.d. State: VA 3.e. ZIP Code: 22201
3.f. Province:
3.g. Postal Code:
3.h. Country: USA
4. Daytime Telephone Number: 7033128310
5. Fax Number: 7033128312
6. E-Mail Address *(if any)*: ImmigrantLawyer@aol.com
7. Mobile Telephone Number *(if any)*: 7035979952

## Part 2. Notice of Appearance as Attorney or Accredited Representative

This appearance relates to immigration matters before *(Select **only one** box)*:

1.a. ☒ USCIS
1.b. List the form numbers: I-765
2.a. ☐ ICE
2.b. List the specific matter in which appearance is entered:
3.a. ☐ CBP
3.b. List the specific matter in which appearance is entered:

I enter my appearance as attorney or accredited representative at the request of:

4. Select **only one** box:
☒ Applicant ☐ Petitioner ☐ Requestor
☐ Respondent (ICE, CBP)

### *Information About Applicant, Petitioner, Requestor, or Respondent*

5.a. Family Name *(Last Name)*: Trinka
5.b. Given Name *(First Name)*: Piyaporn
5.c. Middle Name:
6. Name of Company or Organization *(if applicable)*:

## Part 2. Notice of Appearance as Attorney or Accredited Representative *(continued)*

### *Information About Applicant, Petitioner, Requestor, or Respondent (continued)*

7. USCIS ELIS Account Number *(if any)*

▶

8. Alien Registration Number (A-Number) or Receipt Number

[redacted]

9. Daytime Telephone Number

[redacted]

10. Mobile Telephone Number *(if any)*

[redacted]

11. E-Mail Address *(if any)*

[redacted]

### *Mailing Address of Applicant, Petitioner, Requestor, or Respondent*

**NOTE:** Provide the mailing address of the applicant, petitioner, requestor, or respondent. If the applicant, petitioner, requestor, or respondent has used a safe mailing address on the application, petition, or request being filed with this Form G-28, provide it in these spaces.

12.a. Street Number and Name [redacted]

12.b. Apt. ☐ Ste. ☐ Flr. ☐

12.c. City or Town [redacted]

12.d. State [redacted] 12.e. ZIP Code [redacted]

12.f. Province

12.g. Postal Code

12.h. Country

[redacted]

## Part 3. Eligibility Information for Attorney or Accredited Representative

Select **all applicable** items.

1.a. ☒ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest courts of the following states, possessions, territories, commonwealths, or the District of Columbia. *(If you need additional space, use **Part 6**.)*

Licensing Authority

Missouri

1.b. Bar Number *(if applicable)*

39582

1.c. Name of Law Firm

Law Office of Matthew W. Rau

1.d. **I** *(choose one)* ☒ ***am not*** ☐ ***am***

subject to any order of any court or administrative agency disbarring, suspending, enjoining, restraining, or otherwise restricting me in the practice of law. If you are subject to any orders, explain in the space below. *(If you need additional space, use **Part 6**.)*

2.a. ☐ I am an accredited representative of the following qualified nonprofit religious, charitable, social service, or similar organization established in the United States, so recognized by the Department of Justice, Board of Immigration Appeals, in accordance with 8 CFR 292.2. Provide the name of the organization and the expiration date of accreditation.

2.b. Name of Recognized Organization

2.c. Date accreditation expires

*(mm/dd/yyyy)* ▶

## Part 3. Eligibility Information for Attorney or Accredited Representative *(continued)*

3. ☐ I am associated with ____________, the attorney or accredited representative of record who previously filed Form G-28 in this case, and my appearance as an attorney or accredited representative is at his or her request.

**NOTE:** If you select this item, also complete **Item Numbers 1.a. - 1.b. or Item Numbers 2.a. - 2.c.** in **Part 3.** *(whichever is appropriate).*

4.a. ☐ I am a law student or law graduate working under the direct supervision of the attorney or accredited representative of record on this form in accordance with the requirements in 8 CFR 292.1(a)(2)(iv).

4.b. Name of Law Student or Law Graduate

## Part 4. Applicant, Petitioner, Requestor, or Respondent Consent to Representation, Contact Information, and Signature

### *Consent to Representation and Release of Information*

1. I have requested the representation of and consented to being represented by the attorney or accredited representative named in **Part 1.** of this form. According to the Privacy Act of 1974 and DHS policy, I also consent to the disclosure to the named attorney or accredited representative of any record pertaining to me that appears in any system of records of USCIS, ICE or CBP.

When you (the applicant, petitioner, requestor, or respondent) are represented, DHS will send notices to both you and your attorney or accredited representative either through mail or electronic delivery.

DHS will also send the Form I-94, Arrival Departure Record, to you **unless** you select **Item Number 2.a.** in **Part 4.** All secure identity documents and Travel Documents will be sent to you (the applicant, petitioner, requestor, or respondent) unless you ask us to send those documents to your attorney of record or accredited representative.

If you do not want to receive original notices or secure identity documents directly, but would rather have such notices and documents sent to your attorney of record or accredited representative, please select **all applicable** boxes below:

2.a ☐ I request DHS send any notice (including Form I-94) on an application, petition, or request to the business address of my attorney of record or accredited representative as listed in this form. I understand that I may change this election at any future date through written notice to DHS.

2.b. ☐ I request that DHS send any secure identity document, such as a Permanent Resident Card, Employment Authorization Document, or Travel Document, that I am approved to receive and authorized to possess, to the business address of my attorney of record or accredited representative as listed in this form. I consent to having my secure identity document sent to my attorney of record or accredited representative and understand that I may request, at any future date and through written notice to DHS, that DHS send any secure identity document to me directly.

3.a. Signature of Applicant, Petitioner, Requestor, or Respondent [signature]

3.b. Date of Signature *(mm/dd/yyyy)* ► 3/14/2016

## Part 5. Signature of Attorney or Accredited Representative

I have read and understand the regulations and conditions contained in 8 CFR 103.2 and 292 governing appearances and representation before the Department of Homeland Security. I declare under penalty of perjury under the laws of the United States that the information I have provided on this form is true and correct.

1. Signature of Attorney or Accredited Representative [signature]

2. Signature of Law Student or Law Graduate

3. Date of Signature *(mm/dd/yyyy)* ► 03/14/2016

## Part 6. Additional Information

Use the space below to provide additional information pertaining to **Part 3., Item Numbers 1.a. - 1.d.**

I am also licensed to practice in Kansas, by the Supreme Court of Kansas, Kansas Bar No. 14668

[redacted] "JINDACHAI, Piyaporn"

Department of Homeland Security
U.S. Citizenship and Immigration Services

I-797, Notice of Action

THE UNITED STATES OF AMERICA

| Receipt Number | USCIS Account Number | Case Type |
|---|---|---|
| [redacted] | | I765 - APPLICATION FOR EMPLOYMENT AUTHORIZATION |
| Received Date 03/20/2017 | Priority Date | Applicant [redacted] PIYAPORN TRINKA |
| Notice Date 07/18/2017 | Page 1 of 1 | |

PIYAPORN TRINKA
[redacted]

Notice Type: Approval Notice
Class: [redacted]
Valid from 07/18/2017 to 07/17/2018

**We have approved your application for employment authorization.** We will send your Employment Authorization Document (EAD) (also known as an EAD card or Form I-766) to you separately.

Your EAD card is proof that you are allowed to work in the United States. Show the card to your employer to verify your authorization to work during the dates on the card. You cannot use this approval notice as proof of your employment authorization.

When you receive your EAD card, please check that all the information on the card is correct. If you need to change any information on the card, please mail all of the following to the office listed below:

- A letter explaining what information needs to be corrected,
- Your EAD card,
- A photocopy of this notice, and
- Evidence to show what the correct information should be. For example, if you need to correct your name, submit a copy of your birth certificate or official name change.

If You Have a Pending Form I-485

If you have a pending or approved Form I-140 and a pending Form I-485, you may request to change employers if your Form I-485 has been pending for at least 180 days. In order to do so, you need to submit documentation about your new job offer. For more information on how to request a change of employers and what information you must submit, please visit the USCIS website at www.uscis.gov.

If your EAD card expires before we make a final decision on your Form I-485, you may apply for a new EAD card.

**THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA OR EVIDENCE OF EMPLOYMENT AUTHORIZATION.**

**NOTICE:** Although this application or petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

National Benefits Center
U. S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 648004
Lee's Summit MO 64064

**Customer Service Telephone: 800-375-5283**



Form I-797 (Rev. 01/31/05) N

THE UNITED STATES OF AMERICA

# I-797 | NOTICE OF ACTION | DEPARTMENT OF HOMELAND SECURITY U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| Receipt Number | USCIS Account Number | Case Type |
|---|---|---|
| [redacted] | | I765 - APPLICATION FOR EMPLOYMENT AUTHORIZATION |
| **Received Date** 03/21/2018 | **Priority Date** | **Applicant** [redacted] PIYAPORN TRINKA |
| **Notice Date** 11/05/2018 | **Page** 1 of 1 | |

PIYAPORN TRINKA
[redacted]

**Notice Type:** Approval Notice
Class: [redacted]
Valid from 11/05/2018 to 11/04/2019

**We have approved your application for employment authorization.** We will send your Employment Authorization Document (EAD) (also known as an EAD card or Form I-766) to you separately.

Your EAD card is proof that you are allowed to work in the United States. Show the card to your employer to verify your authorization to work during the dates on the card. You cannot use this approval notice as proof of your employment authorization.

When you receive your EAD card, please check that all the information on the card is correct. If you need to change any information on the card, please mail all of the following to the office listed below:

- A letter explaining what information needs to be corrected,
- Your EAD card,
- A photocopy of this notice, and
- Evidence to show what the correct information should be. For example, if you need to correct your name, submit a copy of your birth certificate or official name change.

If You Have a Pending Form I-485

If you have a pending or approved Form I-140 and a pending Form I-485, you may request to change employers if your Form I-485 has been pending for at least 180 days. In order to do so, you need to submit documentation about your new job offer. For more information on how to request a change of employers and what information you must submit, please visit the USCIS website at www.uscis.gov.

If your EAD card expires before we make a final decision on your Form I-485, you may apply for a new EAD card.

**THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA OR EVIDENCE OF EMPLOYMENT AUTHORIZATION.**

**NOTICE:** Although this application or petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

National Benefits Center
U. S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 648004
Lee's Summit MO 64064

**Customer Service Telephone: 800-375-5283**



FORM I-797 [REV. 08/01/16]

THE UNITED STATES OF AMERICA

# I-797 | NOTICE OF ACTION

DEPARTMENT OF HOMELAND SECURITY
U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| Receipt Number | USCIS Account Number | Case Type |
| --- | --- | --- |
| [redacted] | | I765 - APPLICATION FOR EMPLOYMENT AUTHORIZATION |
| Received Date<br>05/09/2019 | Priority Date | Applicant<br>[redacted]<br>PIYAPORN TRINKA |
| Notice Date<br>12/27/2019 | Page<br>1 of 1 | |

PIYAPORN TRINKA
[redacted]

**Notice Type:** Approval Notice
Class: [redacted]
Valid from 12/27/2019 to 12/26/2020

**We have approved your application for employment authorization.** We will send your Employment Authorization Document (EAD) (also known as an EAD card or Form I-766) to you separately.

Your EAD card is proof that you are allowed to work in the United States. Show the card to your employer to verify your authorization to work during the dates on the card. You cannot use this approval notice as proof of your employment authorization.

When you receive your EAD card, please check that all the information on the card is correct. If you need to change any information on the card, please mail all of the following to the office listed below:

- A letter explaining what information needs to be corrected,
- Your EAD card,
- A photocopy of this notice, and
- Evidence to show what the correct information should be. For example, if you need to correct your name, submit a copy of your birth certificate or official name change.

If You Have a Pending Form I-485

If you have a pending or approved Form I-140 and a pending Form I-485, you may request to change employers if your Form I-485 has been pending for at least 180 days. In order to do so, you need to submit documentation about your new job offer. For more information on how to request a change of employers and what information you must submit, please visit the USCIS website at www.uscis.gov.

If your EAD card expires before we make a final decision on your Form I-485, you may apply for a new EAD card.

**THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA OR EVIDENCE OF EMPLOYMENT AUTHORIZATION.**

**NOTICE:** Although this application or petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

National Benefits Center
U. S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 648003
Lee's Summit MO 64002

**Customer Service Telephone: 800-375-5283**



FORM I-797 [REV. 08/01/16]

Department of Homeland Security
U.S. Citizenship and Immigration Services

**Form I-797C, Notice of Action**

# THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| NOTICE TYPE | | NOTICE DATE |
|---|---|---|
| Receipt | | August 22, 2020 |
| CASE TYPE | | USCIS ALIEN NUMBER |
| I-765, Application for Employment Authorization | | [redacted] |
| RECEIPT NUMBER | RECEIVED DATE | PAGE |
| [redacted] | August 11, 2020 | 1 of 1 |
| | | DATE OF BIRTH |
| | | [redacted] |

PIYAPORN TRINKA
[redacted]

NAME AND MAILING ADDRESS

**PAYMENT INFORMATION:**

| | |
|---|---|
| **Application/Petition Fee:** | $0.00 |
| **Biometrics Fee:** | $0.00 |
| **Total Amount Received:** | $0.00 |
| **Total Balance Due:** | $0.00 |

**Eligibility Category:** [redacted]

The above case has been received by our office and is in process. Please verify your personal information listed above and immediately notify the USCIS Contact Center if there are any changes.

Please note that if a priority date is printed on this notice, the priority does not reflect earlier retained priority dates.

As a reminder, if you have an underlying Form I-140 that is approved or is still pending, you may request to change employers under INA 204(j) if your Form I-485 Adjustment application has been pending for at least 180 days. In order to do so, you should supplement the Form I-485 record of proceeding with documentation relating to the new job offer that forms the basis of the INA 204(j) portability request. For more information on how to request to change employers and what information is required to supplement the Form I-485, please visit www.uscis.gov.

If you have questions, please visit the USCIS Contact Center at www.uscis.gov/contactcenter to connect with a live USCIS representative in English or Spanish.

If you have any questions or comments regarding this notice or the status of your case, please contact the USCIS Contact Center.

You will be notified separately about any other case you may have filed.

This notice, by itself, does not grant any immigration status or benefit, nor is it evidence that this case is still pending. However, **if**:

- You have timely filed to renew your current Form I-766 Employment Authorization Document (EAD); **and**
- Your EAD renewal is under a category that is eligible for an automatic 180-day extension (see www.uscis.gov/I-765 for a list of categories); **and**
- The Category on your current EAD matches the "Class Requested" listed on this Notice of Action; (Note: If you are a TPS beneficiary or applicant, your EAD and this Notice must contain either the A12 or C19 class, but they do not need to match each other.); **and**
- You do not receive your renewal EAD before your current EAD expires;,
- **then** this Notice of Action automatically extends the validity of your EAD for up to 180 days from the expiration date printed on the face of the card. If all of the above conditions apply with respect to your EAD renewal application, you may present this Notice of Action with your expired EAD to your employer for employment eligibility verification (Form I-9) purposes. If your renewal application is denied, the automatic extension immediately terminates, and you may not provide this Notice of Action with your expired EAD for Form I-9 purposes. If your EAD is a combo card, the automatic extension does not apply to advance parole. For more information, please visit our website at www.uscis.gov/I-765.

**USCIS Office Address:**

USCIS
National Benefits Center
P.O. Box 648003
Lee's Summit, MO 64002

**USCIS Contact Center Number:**

(800)375-5283



**If this is an interview or biometrics appointment notice, please see the back of this notice for important information.**

Form I-797C 04/01/19

2007 15th Street N., Suite 7
Arlington, Virginia 22201
(Admitted in MO & KS)

*Matthew W. Rau*
*Attorney-at-Law*
*Virginia Practice Limited to Immigration*

Tel. (703) 312-8310
Fax (703) 312-8312
ImmigrantLawyer@aol.com

VIA CERTIFIED MAIL (7019 2970 0000 6388 8462)

August 6, 2020

COPY

USCIS
Attn: FBAS
P. O. Box 805887
Chicago, IL 60680-4120

RE: **Form I-765, Application for Employment Authorization (Renewal)**
**Alien:** **TRINKA, Piyaporn (f.k.a. JINDACHAI, Piyaporn)**
**A Number:** [redacted]

To Whom It May Concern:

The above-referenced individual, represented by this office, is the beneficiary of an approved I-130 petition filed by her U.S. citizen husband and her I-485 application (for which the fee was paid as reflected by the receipt issued by the USCIS Texas Service Center) has been filed and is currently pending with the immigration court in Arlington, Virginia. She hereby applies to renew her employment authorization. There is no filing fee for this I-765 renewal application, as the I-485 filing fee has already been paid.

Enclosed please find:

1. Form I-765, Application for Employment Authorization, with two (2) color photos of the applicant attached thereto
2. Form G-28, Notice of Entry of Appearance as Attorney, for undersigned counsel
3. Copy of current employment authorization card, which expires on 12/26/2020, along with copies of previously issued EADs
4. Form I-797C, USCIS Receipt Notice, reflecting payment of $1,070.00 for filing/biometrics fee for I-485 application on 02/19/2016, along with biometrics appointment notice for pending I-485 application
5. Copy of court-stamped adjustment of status cover page, showing that the I-485 was filed with the immigration court in Arlington, Virginia on 03/14/2016
6. Copy of next hearing notice for the immigration court

Very truly yours,

Matthew W. Rau
Attorney-at-Law

Enclosures (as stated)

cc: Mrs. Piyaporn Trinka
[redacted]

# Application For Employment Authorization

Department of Homeland Security
U.S. Citizenship and Immigration Services

USCIS
Form I-765
OMB No. 1615-0040
Expires 05/31/2020

| For USCIS Use Only | ☐ Authorization/Extension Valid From | Fee Stamp | Action Block |
|---|---|---|---|
| | ☐ Authorization/Extension Valid Through | | |
| | Alien Registration Number A- | | |
| | Remarks | | |

| To be completed by an attorney or Board of Immigration Appeals (BIA)-accredited representative (if any). | ☒ Select this box if Form G-28 is attached. | Attorney or Accredited Representative USCIS Online Account Number (if any) |
|---|---|---|

► **START HERE - Type or print in black ink.**

## Part 1. Reason for Applying

**I am applying for** (select **only one** box):

**1.a.** ☐ Initial permission to accept employment.

**1.b.** ☐ Replacement of lost, stolen, or damaged employment authorization document, or correction of my employment authorization document **NOT DUE** to U.S. Citizenship and Immigration Services (USCIS) error.

**NOTE:** Replacement (correction) of an employment authorization document due to USCIS error does not require a new Form I-765 and filing fee. Refer to **Replacement for Card Error** in the **What is the Filing Fee** section of the Form I-765 Instructions for further details.

**1.c.** ☒ Renewal of my permission to accept employment. (Attach a copy of your previous employment authorization document.)

## Part 2. Information About You

### *Your Full Legal Name*

**1.a.** Family Name (Last Name): Trinka

**1.b.** Given Name (First Name): Piyaporn

**1.c.** Middle Name:

### *Other Names Used*

Provide all other names you have ever used, including aliases, maiden name, and nicknames. If you need extra space to complete this section, use the space provided in **Part 6. Additional Information**.

**2.a.** Family Name (Last Name): Jindachai

**2.b.** Given Name (First Name): Piyaporn

**2.c.** Middle Name:

**3.a.** Family Name (Last Name):

**3.b.** Given Name (First Name):

**3.c.** Middle Name:

**4.a.** Family Name (Last Name):

**4.b.** Given Name (First Name):

**4.c.** Middle Name:

## Part 2. Information About You (continued)

### *Your U.S. Mailing Address*

5.a. In Care Of Name (if any)

5.b. Street Number and Name [redacted]

5.c. ☐ Apt. ☐ Ste. ☐ Flr.

5.d. City or Town [redacted]

5.e. State [redacted] 5.f. ZIP Code [redacted]

6. Is your current mailing address the same as your physical address? ☒ Yes ☐ No

NOTE: If you answered "No" to **Item Number 6.**, provide your physical address below.

### *U.S. Physical Address*

7.a. Street Number and Name

7.b. ☐ Apt. ☐ Ste. ☐ Flr.

7.c. City or Town

7.d. State 7.e. ZIP Code

### *Other Information*

8. Alien Registration Number (A-Number) (if any)
► A- [redacted]

9. USCIS Online Account Number (if any)
►

10. Gender ☐ Male ☒ Female

11. Marital Status
☐ Single ☒ Married ☐ Divorced ☐ Widowed

12. Have you previously filed Form I-765? ☒ Yes ☐ No

13.a. Has the Social Security Administration (SSA) ever officially issued a Social Security card to you? ☒ Yes ☐ No

NOTE: If you answered "No" to **Item Number 13.a.**, skip to **Item Number 14.** If you answered "Yes" to **Item Number 13.a.**, provide the information requested in **Item Number 13.b.**

13.b. Provide your Social Security number (SSN) (if known).
► [redacted]

14. Do you want the SSA to issue you a Social Security card? (You must also answer "Yes" to **Item Number 15.**, **Consent for Disclosure**, to receive a card.) ☐ Yes ☒ No

NOTE: If you answered "No" to **Item Number 14.**, skip to **Part 2.**, **Item Number 18.a.** If you answered "Yes" to **Item Number 14.**, you must also answer "Yes" to **Item Number 15.**

15. **Consent for Disclosure:** I authorize disclosure of information from this application to the SSA as required for the purpose of assigning me an SSN and issuing me a Social Security card. ☐ Yes ☐ No

NOTE: If you answered "Yes" to **Item Numbers 14. - 15.**, provide the information requested in **Item Numbers 16.a. - 17.b.**

**Father's Name**

Provide your father's birth name.

16.a. Family Name (Last Name)

16.b. Given Name (First Name)

**Mother's Name**

Provide your mother's birth name.

17.a. Family Name (Last Name)

17.b. Given Name (First Name)

### *Your Country or Countries of Citizenship or Nationality*

List all countries where you are currently a citizen or national. If you need extra space to complete this item, use the space provided in **Part 6. Additional Information.**

18.a. Country
Thailand

18.b. Country

## Part 2. Information About You (continued)

### *Place of Birth*

List the city/town/village, state/province, and country where you were born.

19.a. City/Town/Village of Birth

[redacted]

19.b. State/Province of Birth

[redacted]

19.c. Country of Birth

Thailand

20. Date of Birth (mm/dd/yyyy) [redacted]

### *Information About Your Last Arrival in the United States*

21.a. Form I-94 Arrival-Departure Record Number (if any)

▶

21.b. Passport Number of Your Most Recently Issued Passport

[redacted]

21.c. Travel Document Number (if any)

21.d. Country That Issued Your Passport or Travel Document

Thailand

21.e. Expiration Date for Passport or Travel Document (mm/dd/yyyy) [redacted]

22. Date of Your Last Arrival Into the United States, On or About (mm/dd/yyyy) [redacted]

23. Place of Your Last Arrival Into the United States

[redacted]

24. Immigration Status at Your Last Arrival (for example, B-2 visitor, F-1 student, or no status)

[redacted]

25. Your Current Immigration Status or Category (for example, B-2 visitor, F-1 student, parolee, deferred action, or no status or category)

[redacted]

26. Student and Exchange Visitor Information System (SEVIS) Number (if any)

▶ N-

### *Information About Your Eligibility Category*

27. **Eligibility Category.** Refer to the **Who May File Form I-765** section of the Form I-765 Instructions to determine the appropriate eligibility category for this application. Enter the appropriate letter and number for your eligibility category below (for example, (a)(8), (c)(17)(iii)).

( [redacted] ) ( ) ( )

28. **(c)(3)(C) STEM OPT Eligibility Category.** If you entered the eligibility category **(c)(3)(C)** in **Item Number 27.**, provide the information requested in **Item Numbers 28.a - 28.c.**

28.a. Degree

28.b. Employer's Name as Listed in E-Verify

28.c. Employer's E-Verify Company Identification Number or a Valid E-Verify Client Company Identification Number

29. **(c)(26) Eligibility Category.** If you entered the eligibility category (c)(26) in **Item Number 27.**, provide the receipt number of your H-1B spouse's most recent Form I-797 Notice for Form I-129, Petition for a Nonimmigrant Worker.

▶

30. **(c)(8) Eligibility Category.** If you entered the eligibility category (c)(8) in **Item Number 27.**, have you **EVER** been arrested for and/or convicted of any crime?

☐ Yes ☐ No

**NOTE:** If you answered "Yes" to **Item Number 30.**, refer to **Special Filing Instructions for Those With Pending Asylum Applications (c)(8)** in the **Required Documentation** section of the Form I-765 Instructions for information about providing court dispositions.

31.a. **(c)(35) and (c)(36) Eligibility Category.** If you entered the eligibility category (c)(35) in **Item Number 27.**, please provide the receipt number of your Form I-797 Notice for Form I-140, Immigrant Petition for Alien Worker. If you entered the eligibility category (c)(36) in **Item Number 27.**, please provide the receipt number of your spouse's or parent's Form I-797 Notice for Form I-140.

▶

31.b. If you entered the eligibility category (c)(35) or (c)(36) in **Item Number 27.**, have you **EVER** been arrested for and/or convicted of any crime? ☐ Yes ☐ No

**NOTE:** If you answered "Yes" to **Item Number 31.b.**, refer to **Employment-Based Nonimmigrant Categories, Items 8. - 9.**, in the **Who May File Form I-765** section of the Form I-765 Instructions for information about providing court dispositions.

## Part 3. Applicant's Statement, Contact Information, Declaration, Certification, and Signature

**NOTE:** Read the **Penalties** section of the Form I-765 Instructions before completing this section. You must file Form I-765 while in the United States.

### *Applicant's Statement*

**NOTE:** Select the box for either **Item Number 1.a.** or **1.b.** If applicable, select the box for **Item Number 2.**

**1.a.** [X] I can read and understand English, and I have read and understand every question and instruction on this application and my answer to every question.

**1.b.** [ ] The interpreter named in **Part 4.** read to me every question and instruction on this application and my answer to every question in ______, a language in which I am fluent, and I understood everything.

**2.** [X] At my request, the preparer named in **Part 5.**, Matthew W Rau Esq, prepared this application for me based only upon information I provided or authorized.

### *Applicant's Contact Information*

3. Applicant's Daytime Telephone Number
[redacted]

4. Applicant's Mobile Telephone Number (if any)
[redacted]

5. Applicant's Email Address (if any)
[redacted]

6. [ ] Select this box if you are a Salvadoran or Guatemalan national eligible for benefits under the ABC settlement agreement.

### *Applicant's Declaration and Certification*

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS may require that I submit original documents to USCIS at a later date. Furthermore, I authorize the release of any information from any and all of my records that USCIS may need to determine my eligibility for the immigration benefit that I seek.

I furthermore authorize release of information contained in this application, in supporting documents, and in my USCIS records, to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

1) I reviewed and understood all of the information contained in, and submitted with, my application; and

2) All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that all of the information in my application and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my application and that all of this information is complete, true, and correct.

### *Applicant's Signature*

**7.a.** Applicant's Signature
➡ [signature]

**7.b.** Date of Signature (mm/dd/yyyy) 08/06/2020

**NOTE TO ALL APPLICANTS:** If you do not completely fill out this application or fail to submit required documents listed in the Instructions, USCIS may deny your application.

## Part 4. Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter.

### *Interpreter's Full Name*

**1.a.** Interpreter's Family Name (Last Name)

**1.b.** Interpreter's Given Name (First Name)

**2.** Interpreter's Business or Organization Name (if any)

## Part 4. Interpreter's Contact Information, Certification, and Signature

### *Interpreter's Mailing Address*

3.a. Street Number and Name

3.b. ☐ Apt. ☐ Ste. ☐ Flr.

3.c. City or Town

3.d. State 3.e. ZIP Code

3.f. Province

3.g. Postal Code

3.h. Country

### *Interpreter's Contact Information*

4. Interpreter's Daytime Telephone Number

5. Interpreter's Mobile Telephone Number (if any)

6. Interpreter's Email Address (if any)

### *Interpreter's Certification*

I certify, under penalty of perjury, that:

I am fluent in English and ________, which is the same language specified in **Part 3., Item Number 1.b.**, and I have read to this applicant in the identified language every question and instruction on this application and his or her answer to every question. The applicant informed me that he or she understands every instruction, question, and answer on the application, including the **Applicant's Declaration and Certification**, and has verified the accuracy of every answer.

### *Interpreter's Signature*

7.a. Interpreter's Signature

7.b. Date of Signature (mm/dd/yyyy)

## Part 5. Contact Information, Declaration, and Signature of the Person Preparing this Application, If Other Than the Applicant

Provide the following information about the preparer.

### *Preparer's Full Name*

1.a. Preparer's Family Name (Last Name)
Rau

1.b. Preparer's Given Name (First Name)
Matthew

2. Preparer's Business or Organization Name (if any)
Law Office of Matthew W Rau

### *Preparer's Mailing Address*

3.a. Street Number and Name: 2007 15th Street North

3.b. ☐ Apt. ☒ Ste. ☐ Flr. 7

3.c. City or Town: Arlington

3.d. State: VA 3.e. ZIP Code: 22201

3.f. Province

3.g. Postal Code

3.h. Country
USA

### *Preparer's Contact Information*

4. Preparer's Daytime Telephone Number
7033128310

5. Preparer's Mobile Telephone Number (if any)
7035979952

6. Preparer's Email Address (if any)
ImmigrantLawyer@aol.com

**Part 5. Contact Information, Declaration, and Signature of the Person Preparing this Application, If Other Than the Applicant** (continued)

***Preparer's Statement***

**7.a.** ☐ I am not an attorney or accredited representative but have prepared this application on behalf of the applicant and with the applicant's consent.

**7.b.** ☒ I am an attorney or accredited representative and my representation of the applicant in this case ☒ extends ☐ does not extend beyond the preparation of this application.

**NOTE:** If you are an attorney or accredited representative, you may need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, with this application.

***Preparer's Certification***

By my signature, I certify, under penalty of perjury, that I prepared this application at the request of the applicant. The applicant then reviewed this completed application and informed me that he or she understands all of the information contained in, and submitted with, his or her application, including the **Applicant's Declaration and Certification**, and that all of this information is complete, true, and correct. I completed this application based only on information that the applicant provided to me or authorized me to obtain or use.

***Preparer's Signature***

**8.a.** Preparer's Signature

[signature]

**8.b.** Date of Signature (mm/dd/yyyy) 08/06/2019

## Part 6. Additional Information

If you need extra space to provide any additional information within this application, use the space below. If you need more space than what is provided, you may make copies of this page to complete and file with this application or attach a separate sheet of paper. Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.a.** Family Name (Last Name) Trinka

**1.b.** Given Name (First Name) Piyaporn

**1.c.** Middle Name

**2.** A-Number (if any) ▶ A- [redacted]

**3.a.** Page Number **3.b.** Part Number **3.c.** Item Number

**3.d.**

**4.a.** Page Number **4.b.** Part Number **4.c.** Item Number

**4.d.**

**5.a.** Page Number **5.b.** Part Number **5.c.** Item Number

**5.d.**

**6.a.** Page Number **6.b.** Part Number **6.c.** Item Number

**6.d.**

**7.a.** Page Number **7.b.** Part Number **7.c.** Item Number

**7.d.**

# Notice of Entry of Appearance as Attorney or Accredited Representative

Department of Homeland Security

DHS
Form G-28
OMB No. 1615-0105
Expires 05/31/2021

## Part 1. Information About Attorney or Accredited Representative

1. USCIS Online Account Number (if any) ▶

### *Name of Attorney or Accredited Representative*

2.a. Family Name (Last Name): Rau

2.b. Given Name (First Name): Matthew

2.c. Middle Name: William

### *Address of Attorney or Accredited Representative*

3.a. Street Number and Name: 2007 15th Street North

3.b. ☐ Apt. ☒ Ste. ☐ Flr. 7

3.c. City or Town: Arlington

3.d. State: VA 3.e. ZIP Code: 22201

3.f. Province:

3.g. Postal Code:

3.h. Country: USA

### *Contact Information of Attorney or Accredited Representative*

4. Daytime Telephone Number: 7033128310

5. Mobile Telephone Number (if any): 7035979952

6. Email Address (if any): ImmigrantLawyer@aol.com

7. Fax Number (if any): 7033128312

## Part 2. Eligibility Information for Attorney or Accredited Representative

Select **all applicable** items.

1.a. ☒ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest courts of the following states, possessions, territories, commonwealths, or the District of Columbia. If you need extra space to complete this section, use the space provided in **Part 6. Additional Information.**

Licensing Authority: Supreme Court of Missouri

1.b. Bar Number (if applicable): 39582

1.c. I (select **only one** box) ☒ am not ☐ am subject to any order suspending, enjoining, restraining, disbarring, or otherwise restricting me in the practice of law. If you are subject to any orders, use the space provided in **Part 6. Additional Information** to provide an explanation.

1.d. Name of Law Firm or Organization (if applicable): Law Office of Matthew W Rau

2.a. ☐ I am an accredited representative of the following qualified nonprofit religious, charitable, social service, or similar organization established in the United States and recognized by the Department of Justice in accordance with 8 CFR part 1292.

2.b. Name of Recognized Organization:

2.c. Date of Accreditation (mm/dd/yyyy):

3. ☐ I am associated with ________, the attorney or accredited representative of record who previously filed Form G-28 in this case, and my appearance as an attorney or accredited representative for a limited purpose is at his or her request.

4.a. ☐ I am a law student or law graduate working under the direct supervision of the attorney or accredited representative of record on this form in accordance with the requirements in 8 CFR 292.1(a)(2).

4.b. Name of Law Student or Law Graduate:

## Part 3. Notice of Appearance as Attorney or Accredited Representative

If you need extra space to complete this section, use the space provided in **Part 6. Additional Information.**

This appearance relates to immigration matters before (select **only one** box):

**1.a.** [X] U.S. Citizenship and Immigration Services (USCIS)

**1.b.** List the form numbers or specific matter in which appearance is entered.

I-765

**2.a.** [ ] U.S. Immigration and Customs Enforcement (ICE)

**2.b.** List the specific matter in which appearance is entered.

**3.a.** [ ] U.S. Customs and Border Protection (CBP)

**3.b.** List the specific matter in which appearance is entered.

**4.** Receipt Number (if any)

▶

**5.** I enter my appearance as an attorney or accredited representative at the request of the (select **only one** box):

[X] Applicant [ ] Petitioner [ ] Requestor
[ ] Beneficiary/Derivative [ ] Respondent (ICE, CBP)

### *Information About Client (Applicant, Petitioner, Requestor, Beneficiary or Derivative, Respondent, or Authorized Signatory for an Entity)*

**6.a.** Family Name (Last Name) Trinka

**6.b.** Given Name (First Name) Piyaporn

**6.c.** Middle Name

**7.a.** Name of Entity (if applicable)

**7.b.** Title of Authorized Signatory for Entity (if applicable)

**8.** Client's USCIS Online Account Number (if any)

▶

**9.** Client's Alien Registration Number (A-Number) (if any)

▶ A- [redacted]

### *Client's Contact Information*

**10.** Daytime Telephone Number

[redacted]

**11.** Mobile Telephone Number (if any)

[redacted]

**12.** Email Address (if any)

[redacted]

### *Mailing Address of Client*

**NOTE:** Provide the client's mailing address. **Do not** provide the business mailing address of the attorney or accredited representative **unless** it serves as the safe mailing address on the application or petition being filed with this Form G-28.

**13.a.** Street Number and Name [redacted]

**13.b.** [ ] Apt. [ ] Ste. [ ] Flr.

**13.c.** City or Town [redacted]

**13.d.** State [redacted] **13.e.** ZIP Code [redacted]

**13.f.** Province

**13.g.** Postal Code

**13.h.** Country

USA

## Part 4. Client's Consent to Representation and Signature

### *Consent to Representation and Release of Information*

I have requested the representation of and consented to being represented by the attorney or accredited representative named in **Part 1.** of this form. According to the Privacy Act of 1974 and U.S. Department of Homeland Security (DHS) policy, I also consent to the disclosure to the named attorney or accredited representative of any records pertaining to me that appear in any system of records of USCIS, ICE, or CBP.

## Part 4. Client's Consent to Representation and Signature (continued)

### *Options Regarding Receipt of USCIS Notices and Documents*

USCIS will send notices to both a represented party (the client) and his, her, or its attorney or accredited representative either through mail or electronic delivery. USCIS will send all secure identity documents and Travel Documents to the client's U.S. mailing address.

If you want to have notices and/or secure identity documents sent to your attorney or accredited representative of record rather than to you, please select **all applicable** items below. You may change these elections through written notice to USCIS.

**1.a.** ☐ I request that USCIS send original notices on an application or petition to the business address of my attorney or accredited representative as listed in this form.

**1.b.** ☐ I request that USCIS send any secure identity document (Permanent Resident Card, Employment Authorization Document, or Travel Document) that I receive to the U.S. business address of my attorney or accredited representative (or to a designated military or diplomatic address in a foreign country (if permitted)).

**NOTE:** If your notice contains Form I-94, Arrival-Departure Record, USCIS will send the notice to the U.S. business address of your attorney or accredited representative. If you would rather have your Form I-94 sent directly to you, select **Item Number 1.c.**

**1.c.** ☐ I request that USCIS send my notice containing Form I-94 to me at my U.S. mailing address.

### *Signature of Client or Authorized Signatory for an Entity*

**2.a.** Signature of Client or Authorized Signatory for an Entity

➡ [signature]

**2.b.** Date of Signature (mm/dd/yyyy) 08/06/2020

## Part 5. Signature of Attorney or Accredited Representative

I have read and understand the regulations and conditions contained in 8 CFR 103.2 and 292 governing appearances and representation before DHS. I declare under penalty of perjury under the laws of the United States that the information I have provided on this form is true and correct.

**1. a.** Signature of Attorney or Accredited Representative

[signature]

**1.b.** Date of Signature (mm/dd/yyyy) 08/06/2020

**2.a.** Signature of Law Student or Law Graduate

**2.b.** Date of Signature (mm/dd/yyyy)

## Part 6. Additional Information

If you need extra space to provide any additional information within this form, use the space below. If you need more space than what is provided, you may make copies of this page to complete and file with this form or attach a separate sheet of paper. Type or print your name at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

1.a Family Name (Last Name): Trinka

1.b. Given Name (First Name): Piyaporn

1.c. Middle Name:

2.a. Page Number 2.b. Part Number 2.c. Item Number

2.d.

3.a. Page Number 3.b. Part Number 3.c. Item Number

3.d.

4.a. Page Number 4.b. Part Number 4.c. Item Number

4.d.

5.a. Page Number 5.b. Part Number 5.c. Item Number

5.d.

6.a. Page Number 6.b. Part Number 6.c. Item Number

6.d.



UNITED STATES OF AMERICA
EMPLOYMENT AUTHORIZATION CARD
Surname
TRINKA
Given Name
PIYAPORN
USCIS# Category Card#
[redacted]
Country of Birth
Thailand
Terms and Conditions
None
Date of Birth [redacted] Sex F
Valid From: 06/09/16
Card Expires: 06/08/17
NOT VALID FOR REENTRY TO U.S.



28134373

U.S. Citizenship and Immigration Services

This card is not evidence of U.S. citizenship or permanent residence.
This document is void if altered, and may be revoked by the U.S. Government.
The person identified is authorized to work in the U.S. for the validity of this card.

FORM I-766 Rev. (10-2014)

52 If found, drop in any US Mailbox. USPS: Mail to USCIS, PO Box 648005, Lee's Summit, MO 64002-8005

[redacted]<<
[redacted]<<<<<<<<<<<<[redacted]
[redacted]<<<<<<<<<<<<<<<



UNITED STATES OF AMERICA
EMPLOYMENT AUTHORIZATION CARD
Surname
TRINKA
Given Name
PIYAPORN
USCIS# Category Card#
[redacted]
Country of Birth
Thailand
Terms and Conditions
None
[redacted] Sex F
Valid From: 07/18/17
Card Expires: 07/17/18
Signature Waived
NOT VALID FOR REENTRY TO U.S.



30404697

U.S. Citizenship and Immigration Services

This card is not evidence of U.S. citizenship or permanent residence.
This document is void if altered, and may be revoked by the U.S. Government.
The person identified is authorized to work in the U.S. for the validity of this card.

FORM I-766 Rev. (10-2015)

51 If found, drop in any US Mailbox. USPS: Mail to USCIS, 7 Product Way, Lees Summit, MO 64002

[redacted]<<
[redacted]<<<<<<<<<<<[redacted]
[redacted]<<<<<<<<<<<<<<<



UNITED STATES OF AMERICA
EMPLOYMENT AUTHORIZATION
Surname
TRINKA
Given Name
PIYAPORN
USCIS# Category Card#
[redacted]
Country of Birth
Thailand
Terms and Conditions
None
Date of Birth [redacted] Sex F
Valid From: 11/05/18
Card Expires: 11/04/19
NOT VALID FOR REENTRY TO U.S.



FORM I-766 Rev (02-2016) 33579993

This card is not evidence of U.S. citizenship or permanent residence.
This document is void if altered, and may be revoked by the U.S. Government.
The person identified is authorized to work in the U.S. for the validity of this card.

112 If found, drop in any US Mailbox. USPS: Mail to USCIS, 7 Product Way, Lees Summit, MO 64002

[redacted]<<
[redacted]<<<<<<<<<<<<5
[redacted]<<<<<<<<<<<<<<<

# TAB U

October 2, 2020

James A. Trinka
Chief Talent Management Officer
Office of Information and Technology
810 Vermont Avenue NW
Washington, DC 20420
c/o Shaw Bransford & Roth P.C.
cdirks@shawbransford.com

**Subject: Decision on Proposed Removal**

In accordance with 38 U.S.C. §713, this is an initial decision on the notice of proposed removal issued to you on September 11, 2020. My decision is to uphold the charge and specification as written and uphold the penalty of removal from your position of Chief Talent Management Officer, Office of Information and Technology and the Senior Executive Service (SES). The proposed removal set forth one charge. Specifically, the charge was: Conduct Unbecoming A Federal Supervisor.

You were notified in the proposed removal that you had seven business days to provide a written response to me. On September 22, 2020, you submitted a written response to me. After carefully reviewing the proposed removal and the documentary evidence supporting the proposed action, as well as your written response to the proposed removal and attachments, I find that substantial evidence supports the proposed charge. Your removal will be effective October 2, 2020.

**DISCUSSION**

In reaching my decision, I considered the proposed removal, the evidence file supporting the proposed removal and your written response. I have also considered the nature of your position, and your responsibilities and duties as a member of the SES.

I find that you engaged in conduct unbecoming a Federal Supervisor when you provided false and inaccurate information to VA Office of Inspector General (OIG) investigators. Senior Executives are held to a higher standard of conduct. In your written reply, you contend that the agency provides no evidence for the charge except hearsay. According to the Federal Rules of Evidence, Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. *See*, Federal Rules of Evidence 801. Further, Hearsay is usually not admitted in a court proceeding or hearing unless a hearsay exception applies. Some examples of hearsay exceptions are present sense impression, excited utterance, recorded recollection, etc. However, in this administrative process as governed by 38 U.S.C. §713, hearsay evidence can be used to meet the burden of substantial evidence.

The Due Process Clause of the United States Constitution provides that certain substantive rights such as life, liberty, and property, cannot be deprived. In federal removal cases such as yours, due process requires that the employee be provided with "notice of the charges, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Young v. Department of Housing and Urban Development*, 706 F.3d 1372, 1377 (Fed. Cir. 2013). Mr. Trinka you have been afforded all of the due process rights afforded to you by the U.S. Constitution. Further, in accordance with 38 U.S.C. §713[1] and the CSEMO Letter, the individual who is the subject of a proposed action is entitled to advance notice of the action and a file containing all of the evidence used in support of the proposed action. You were provided with advanced notice as prescribed within the law and were also provided with the evidence file used to support the proposed charge. The proposing official provided you with the exact evidence he used to make the decision to propose the action. You were supplied with all of the evidence relied upon by the proposing official. Further, you were afforded an opportunity to be heard when you submitted a response to the proposal. Therefore, you were afforded the due process rights pursuant to the law.

The VA OIG's summary of your interview was used by the proposing official to make the determination to propose the action. The proposing official was not privy to the transcript or recording of your interview. You were provided with all the documents used by the proposing official to make his determination. The agency strictly adhered to 38 U.S.C. §713 and agency policy based on the law. By providing you **the evidence file *in support of the proposed action***, the agency has provided you the due process afforded to you by the U.S. Constitution and 38 U.S.C. §713.

In your written reply, you also contend that the fact that you provided false or misleading statements is not misconduct as defined by 38 U.S.C. §713(d)(2). The statue states that misconduct is "neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function. Malfeasance is defined as wrongful or unjust conduct.[2] Lack of candor by a federal civilian employee with an agency investigator is wrongful conduct. As a supervisor and member of the SES, there is an expectation to exhibit a high standard of professionalism, integrity, care, candor and judgement. Not only is this a nexus between your work with the VA, it is an inherent trait that all federal employees should exhibit within their day to day duties. In accordance with 38 U.S.C. §713(a)(1), the Secretary may reprimand or suspend, involuntarily reassign, demote, or remove a covered individual from a senior executive position at the Department, if the Secretary determines that the misconduct or performance of the covered individual warrants such action. Here, I find that substantial evidence supports the charge and removal is warranted for such action.

[1] 38 U.S.C. Section 713 (b)(1) also affords the covered individual the right to be represented by an attorney or other representative to grieve the action in accordance with an internal grievance process.
[2] Bouvier's Law Dictionary, Desk Edition, (Lexis Nexis)

Next, I will address your other assertions as written in your reply:

**A. The Statute and the Agency's Implementation of the Statute Are Unconstitutional and Designed to Make it More Difficult for Employees to Vindicate Themselves.**

According to the legislative history, the intent of the 38 U.S.C. §713 The purpose of the statue was to hold senior executives accountable by providing swift discipline to its senior leaders who were not performing or displaying the conduct necessary and required to fulfill the nature of their roles within the VA. Regarding your contention that changes in the agency's removal authority makes 38 U.S.C. §713 unconstitutional is unfounded. This argument is not supported by case precedence. According to 38 U.S.C. §713, you were provided with 7 business days to respond. I consulted with the Office of General Counsel (OGC) before making my decision as to whether I should have granted your extension request and whether I concluded that your situation was, as stated in the CSEMO letter, "in the most exigent circumstances." After careful deliberation, I found that your request did not warrant exigent circumstances.[3] Your attorney stated in the extension request that they could not assist you with the reply during the week of September 14-18, 2020, because of deadlines on September 16 and September 18, 2020. Deadlines are not exigent circumstances. When you retained Shaw Bransford and Roth, P.C., you retained the entire firm to assist you with your case, not just a single attorney. Therefore, it was the firm's responsibility after being retained by you, to ensure that it could meet any statutory deadlines regarding your case. Pursuant to 38 U.S.C. §713, a decision shall be issued not later than 15 business days after notice of the action is provided to the covered individual. All parties involved must adhere to a strict timeline unless exigent circumstances exist for an extension. There were no exigent circumstances in your request.

Regarding your argument that 38 U.S.C. §713 is unconstitutional because it removed the post-termination administrative hearing at the Merit Systems Protection Board (MSPB) as previously available to career SES under 5 USC 7543(d). I find this argument without merit and unsupported by case precedence. As aforementioned, in federal removal cases such as yours, due process requires that the employee be provided with "notice of the charges, and explanation of the employer's evidence, and

[3] Emergency. Exigency has several distinct senses, both of which depict a circumstance that requires action without delay. In its primary (and older) sense, exigency is an urgent condition requiring immediate action. This urgent sense of exigence is still very important in law as the sense in which an exigent circumstance is an exception to the warrant requirement for searches. In this sense, an exigent condition is immediate and compelling, and not merely important or difficult. The term comes from the medieval Latin exigentia, or urgency. An exigent condition in this sense may justify or excuse an official who omits a legal or procedural requirement in carrying out an official task. This allowance is only available in circumstances in which the official might reasonably believe that whatever permission, approval, or form might have been sought would be granted, but the present emergency would make such procedures moot. Exigency has a second, distinct sense, as a condition that must be overcome to achieve some goal. This sense gives rise to a third, in which something exigent is the means of overcoming the condition interfering with attaining a goal, and in this sense, exigence might not even be intended to suggest that some exigent action is the only means of overcoming such a condition. This sense of exigency is unlikely to have anything urgent about it. In this sense, the exigency of a situation is just the requirements of some task, such as the exigency of feeding a prisoner. It is easy to confuse these various senses of the word, but it is essential to distinguish them. Exigency in the first sense, which excuses procedural defects, can be confused with exigency in the second, which ought not to be the basis for altering procedures or excusing a failure of any procedural safeguard. Erosion of procedural safeguards from such confusion is apparent in the use of the term, as exigencies are more and more suggested that turn out to be mere obligations or inconveniences, rather than a genuinely urgent demands for action.

an opportunity to present his side of the story." *Young v. Department of Housing and Urban Development*, 706 F.3d 1372, 1377 (Fed. Cir. 2013). Further, 38 U.S.C. §713 offers extensive due process rights because if you disagree with my decision you have the opportunity to grieve this decision with the Secretary of the VA. In addition, if you disagree with the Secretary's decision, 38 U.S.C. §713(6) provides you the opportunity to seek judicial review.

**B. The Agency Violated Its Own Procedures to Secure Your Termination.**

You state in your response that the Agency violated CSEMO Letter Section (7)(a)(iii)(3) which states "The recommendation will be limited to whether disciplinary action should be pursued." You allege that OAWP disregarded this policy and instead recommended a specific penalty: removal. You also stated that this was a violation of the Due Process Clause of the U.S. Constitution. Conversely, Section (7)(a)(iii)(4) states that if the Secretary or his or her designee concurs with OAWP and OGC's recommendation, OAWP and OGC shall coordinate with the organization or the Secretary to identify a Proposing Official who shall be briefed regarding the results of the investigation and the evidence gathered. Further, Section (7)(b)(i) of the CSEMO Letter states that the Proposing Official will review the available evidence to determine whether a Reprimand, Suspension, Demotion, or Removal should be proposed; or whether no action is warranted while consulting with OGC, OAWP, and Office of Human Resources and Administration. In the current case, after adhering to the CSEMO policy letter, OAWP made a recommendation to the proposing official (or his designee). The OAWP recommendation memorandum dated July 16, 2020, stated in pertinent part:

> This is a ***recommendation*** for disciplinary action under 38 U.S.C. § 323(c)(1)(I)….Under 38 U.S.C. § 323(f)(2), if you or your designee fail to propose the disciplinary action recommended in this paragraph within 60 calendar days from the date of this memorandum, you must provide OAWP with a detailed justification why the recommended action was not proposed.

OAWP merely made a recommendation to the proposing official in accordance with its investigation. The proposing official, pursuant to the CSEMO letter, has the ultimate authority to recommend a specific punishment (or no punishment) to the deciding official; therefore, the Due Process Clause was not violated and there was no violation of internal policy or procedure.

In your response, you allege that the Agency violated CSEMO Letter Section (7)(a)(iii)(1) which states that the Agency is required to provide any statement or evidence unless the circumstances of the investigation make it impossible, unreasonable, or unnecessary to do so. The agency provided you with the evidence that was relevant and used in support of the proposed action in accordance with CSEMO letter Section 7.a.iii.1. The recorded statement as mentioned in the Report of Investigation (ROI) was never provided to the proposing official or the deciding official. Bear in mind that OAWP is only required to forward evidence that is deemed necessary.

Based on the evidence provided, I find that the charge is supported by substantial evidence.

**C. The Agency Violated Your Entitlement to Constitutional Due Process by Withholding the Recording or Transcript of your Interview and Other Evidence.**

The exhibits as listed within OAWP's ROI were provided to you; however, the exhibits were renamed when the evidence file was complied. Specifically, they were renamed as described below:

- 001 Comprehensive Report of Investigation renamed exhibit 12
- 002 SF-50 Trinka SES Redacted renamed exhibit 2
- 004 Interview with James Trinka renamed exhibit 8
- 005 Interview with John Oswalt renamed exhibit 9
- 006 Interview with Richard Chandler renamed exhibit 10
- 007 Interview with Martha Orr renamed exhibit 11
- 009 Interview with Piyaporn Trinka renamed exhibit 6
- 020 OIG Referral to OAWP renamed exhibit 13
- 021 OPM Investigative File- Trinka renamed exhibit 7

You were provided with the exhibits as listed above. Nevertheless, it is your contention that the Agency's failure to provide the actual interview recording or transcript of the interview violated your due process rights. In your response, you cite to *Ramirez v. Department of Homeland Security, Case No. 19-1534 (Fed. Cir. 2020)*. The facts in Ramirez are distinguishable different from your case. In *Ramirez*, the petitioner sought judicial review of an arbitrator's final award sustaining his removal from his job as a Customs and Border Protection Officer for the Department of Homeland Security. Among other things, Mr. Ramirez contended that he was denied due process when the agency refused to provide him with the records of the written psychological assessments (Minnesota Multiphasic Personality Inventory) underlying his psychiatric evaluations. *Id.* at 2-3. The Court held that when an agency relies directly or indirectly on the results of a ***psychological assessment*** in justifying an employee's removal, the agency must provide the employee with a meaningful opportunity to review and challenge the data, analysis, and results of that assessment.[4] *Id.* at 19. Here, your removal was proposed because you gave false or misleading information to OIG investigators when you stated that you had informed three supervisors about your wife's undocumented immigration status when in fact substantial evidence supports a conclusion that you did not.[5] The OIG report was provided to you and you were given the opportunity to rebut the allegation that was the basis for the charge.

---

[4] In comparable circumstances, the Fifth Circuit has held that when a government agency removes its employees based on drug charges established through urinalysis, due process requires that the employees have access to samples of the urinalysis for independent verification, *Banks v. Fed. Aviation Admin.*, 687 F.2d 92, 94-96 (5th Cir. 1982).

[5] In May 2019, VA OIG investigators independently interviewed your former supervisors to corroborate the information and all three denied having any prior knowledge of your wife's undocumented immigration status until after interview attempts were made by OIG investigators.

**D. The Agency may have engaged in Constitutionally Impermissible Ex Parte Communications with the Deciding Official during the Disciplinary Process.**

OAWP submitted the memorandum directly to me on July 16, 2020, as the proposing official or his/her designee. I did not utilize any of the links therein. It had been sent to me (or my designee) as proposing official. After further review, it was decided that Mr. Cunningham would be designated as the proposing official and that I would assume the role of the deciding official. The decision for the change was approved by OGC; OAWP was apprised accordingly. At no point did I speak with Mr. Cunningham regarding this case. I limited my discussions regarding to this case to Human Resources and OGC. I was provided with only the evidence used by the proposing official which is the same evidence provided to you. There was no ex-parte communication involved in this case and no violation of your due process rights.

**E. The Agency's only Evidence of the Only Charged Allegation of Misconduct is Hearsay and the Charge Cannot be Sustained.**

As stated above, within this administrative process, 38 U.S.C. §713 does not preclude the use of hearsay as acceptable evidence. The burden of proof in this case is limited to substantial evidence pursuant to 38 U.S.C.§713(6)(C). I find that the charge is supported by substantial evidence.

**F. There is no nexus between your statements to VA OIG regarding conversations with your supervisors about your personal life and your position as Chief Talent Management Officer at the Department of Veterans Affairs**

You assert that there is no nexus between your statement and your position at the VA. A nexus between an employee's misconduct and his duties is not a requirement when removal is proposed in accordance with 38 U.S.C. §713. The Secretary may remove a covered individual from a senior executive position if the Secretary determines that the misconduct or performance of the covered individual warrants such action. You are a senior executive and a top official of the agency. A review of the evidence reveals that you engaged in an unacceptable example of behavior for a leader of your position. At all times, you are expected to exhibit the highest standards of integrity. You exhibited dishonest conduct of a serious nature (providing false or misleading information to OIG Agents). Your position requires credibility, generally tied to the Agency's interest in maintaining public trust.

A review of the evidence file before me reveals several decision-making lapses that set an unacceptable example for those you lead. An essential function of your position as a Senior Executive is to lead people and to behave in an honest, fair and ethical manner; to model a high standard of ethics. It is also imperative that supervisors make good, honest and well-informed decisions even when they may produce unpleasant consequences, also to perceive the impact of the decisions made and the implications therein. Your failure to provide accurate information to OIG investigators is unacceptable behavior for a federal civilian employee and constitutes Conduct

Unbecoming a Federal Supervisor. I find that pursuant to 38 U.S.C. §713 the charge is supported by substantial evidence. After weighing the evidence and considering the nature and seriousness of your misconduct and the fact that you are an SES employee, I find, in accordance with 38 U.S.C. §713, that your conduct warrants removal from federal service.

**APPEAL RIGHTS**

You may:

a. grieve this decision in accordance with CSEMO Letter 006-17-1; or

b. file a discrimination complaint with the Office of Resolution Management (ORM).

If you choose to grieve this action you must submit your written grievance to the Grievance Official within seven (7) business days from the date you received this Initial Decision. Your written grievance must contain the following information:

a. the specific action on which the grievance is based, the date the action occurred, and the date you first learned of the action (if appropriate);

b. the reasons you believe that the action was not supported by the substantial evidence; is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with a provision of law; or obtained without procedures required by a provision of law having been followed; and

c. the corrective action you desire.

If your written grievance does not include the above information, the Grievance Official will consider your grievance as written, along with the developed record. If you do not grieve this action, or your grievance is untimely filed, this Initial Decision will become final and conclusive as the Final Decision in this matter. Otherwise, the Grievance Official will submit a recommendation to the Secretary who will issue the Final Decision in this matter. The Final Decision is subject to judicial review in accordance with 38 U.S.C. §713(b)(4)-(6).

Your written grievance should be addressed to Mr. James Gfrerer, Assistant Secretary for Information and Technology, Department of Veterans Affairs. You may submit your written grievance to Hughes Brandon, Executive Assistant, Assistant Secretary for Information and Technology, at Brandon.Hughes1@va.gov, and Mia R. Abraham, Human Resources Specialist, CSEMO Policy & Programs Division, at Mia.Abraham@va.gov . “Business days” refers to weekdays, which are Monday through Friday in Washington, D.C., except when such a day is designated as a Federal holiday by the Office of Personnel Management.

If you believe this action is based on discrimination on the basis of race, color, religion, sex, national origin, age, or handicap, you may file a complaint of discrimination. If you elect to file a complaint of discrimination, you may do so by contacting the Office of Resolution Management (ORM) at 1-888-737-3361. Your complaint will be processed in accordance with EEOC regulations at 29 C.F.R. Part 1614. Your initial contact with the ORM office must be done within 45 calendar days of the effective date of this action.

A further explanation of your appeal rights may be obtained by consulting Ms. Abraham at Mia.Abraham@va.gov or (202) 461-7821.

Dominic Cussatt
Principal Deputy Assistant Secretary

# TAB V

SB
&R

SHAW BRANSFORD & ROTH P.C.
*Attorneys at Law*
1100 Connecticut Avenue NW Suite 900
Washington DC 20036
Tel 202.463.8400 www.shawbransford.com Fax 202.833.8082

October 14, 2020

SENT VIA ELECTRONIC MAIL

The Honorable James P. Gfrerer
Assistant Secretary for Information and Technology
Office of Information and Technology
810 Vermont Avenue NW
Washington, DC 20420
james.gfrerer@va.gov

Re: Written Grievance/Mr. James Trinka – Decision on Proposed Removal

The Honorable Assistant Secretary Gfrerer:

This law firm is the designated representative of Mr. James Trinka with regard to the Decision on Proposed Removal under 38 U.S.C. § 713 ("Decision"), issued to him on Friday, October 2, 2020. We write to you because page 7 of the Decision identifies you as the Grievance Official in this matter, and indicates that Mr. Trinka should address any written grievance to you.

I. INTRODUCTION

The grievance process outlined in CSEMO Letter 006-17-1 is unconstitutional, as it does not provide for a full, adversarial post-termination evidentiary hearing. Therefore, before the Secretary issues a final decision, you must provide Mr. Trinka with a full, adversarial post-termination evidentiary hearing, where the Agency bears the burden of proof to prove its charge by sufficient evidence before an impartial decisionmaker empowered to rectify error. Without such a hearing, the Agency will deprive Mr. Trinka of his property interest in continued employment, as well as his liberty interest in his good name, without minimum due process. Therefore, Mr. Trinka demands a post-termination hearing that meets the requirements of constitutional due process, where he can confront the purported evidence and witnesses against him.

Despite the unconstitutional process, Mr. Trinka grieves the October 2, 2020 Decision, which he learned about on October 2, 2020. The decision was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with a provision of law; obtained without procedures required by a provision of law having been followed; and unsupported by substantial evidence. *See* 38 U.S.C. § 713(b)(1)(C). *See also* CSEMO Letter 006-17-01, Sections 8.a.ii, 8.a.iii.4. For the reasons stated in our written reply to the proposed removal, you must "[set] aside [the] Initial Decision that is the subject of the grievance," as described in the Agency's grievance procedures. *See* CSEMO Letter 006-17-01, Section 8.a.iii.4.

## II. MR. TRINKA DEMANDS A POST-TERMINATION EVIDENTIARY HEARING.

The Decision argues that the lack of any post-termination administrative hearing is constitutional. *See* Decision, p. 3. It argues that 38 U.S.C. § 713 offers "extensive due process rights because if [Mr. Trinka] disagree[s] with my decision [he has] the opportunity to grieve this decision with the Secretary of the VA." *See* Decision, pp. 3-4. This opportunity to file a written grievance does not meet minimum constitutional due process. The Agency's position is incorrect. 38 U.S.C. § 713 is unconstitutional either on its face or as implemented by the Agency.

### A. *Mr. Trinka Has a Property Interest in Continued VA Employment.*

The Due Process Clause of the Fifth Amendment to the United States Constitution protects individuals from being deprived of life, liberty, and property without "constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). Property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Before a federal agency finally deprives a federal employee of his property right to continued employment, that agency must prove it satisfied the statutory conditions placed on that deprivation. *Stone v. FDIC*, 179 F. 3d 1368, 1374-1375 (Fed. Cir. 1999).

38 U.S.C. § 713 created a property interest in continued employment for covered senior executives like Mr. Trinka. Section 713 limited the authority of the government to remove senior executives from the civil service to instances where "the misconduct or performance of the covered individual warrants such action." 38 U.S.C. § 713(a)(1)-(2). These statutory conditions on termination create a property interest in continued employment and entitle VA senior executives to constitutionally adequate deprivation procedures, namely a "pretermination opportunity to respond, coupled with post-termination administrative procedures" for reviewing the termination decision, where the agency bears the burden of proof. *See Loudermill*, at 547-548.

### B. *Mr. Trinka is Entitled to a Post-Termination Evidentiary Hearing*.

The Supreme Court has long recognized the requirement for a comprehensive post-termination hearing when a public employee with a property interest in continued employment is terminated. *See Gilbert v. Homar,* 520 U.S. 924, 929 (1997); *See also Loudermill*, at 546. Even where an employee receives an adequate pre-removal hearing, due process is not satisfied unless "a full adversarial hearing is provided afterwards." *Locurto v. Safir*, 264 F.3d 154, 171 (2d Cir. 2001) (*citing Loudermill*, 470 U.S. at 545-46). The VA, defending the original iteration of 38 U.S.C. § 713, recognized this much. In a brief before the United States Court of Appeals for the Federal Circuit, the VA took the position that a senior executive receives constitutionally adequate post-removal process where he is afforded "an evidentiary hearing before an impartial [adjudicator] in a proceeding in which the agency carrie[s] the burden to prove its charges by a preponderance of the evidence." Brief for Respondent 32-33, *Helman v. Dep't of Veterans Affairs* (Fed. Cir. No. 15-3086) (ECF #68). *See* Enclosure D (Excerpt from DVA Brief).

While due process's requirements are flexible, certain basic requirements for a post-termination hearing are clear. The hearing must be conducted by an "impartial" decisionmaker. *Walker v. City of Berkeley*, 951 F.2d 182, 184 (9th Cir. 1991). That decisionmaker must be "empowered to . . . rectify error," *Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 22 (1978), including by ordering the employee's "reinstatement," *Reeves v. Claiborne Cty. Bd. of Educ.*, 828 F.2d 1096, 1101 (5th Cir. 1987). The employee must be allowed to "call witnesses and produce evidence on his own behalf" to "challenge the evidence against" him. *Carter v. W. Reserve Psychiatric Habilitation Ctr.*, 767 F.2d 270, 273 (6th Cir. 1985). And the agency must justify its action with sufficient evidence. Particularly where "a post-termination hearing represents the only meaningful opportunity the employee has to challenge the employer's action, . . . requiring a dismissed employee to prove . . . that he was terminated without just cause may increase the risk of an erroneous deprivation." *Benavidez v. City of Albuquerque*, 101 F.3d 620, 626 (10th Cir. 1996).

When a property interest subject to the Due Process Clause is implicated, an impartial decisionmaker is essential. *See Goldberg v. Kelly,* 397 U.S. 254, 271 (1970). The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. *See Mathews v. Eldridge*, 424 U.S. 319, 344 (1976). At the same time, it preserves both the appearance and reality of fairness, "generating the feeling, so important to a popular government, that justice has been done," *Joint Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 172 (1951) (Frankfurter, J., concurring), by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him. *See Marshall v. Jericho*, 446 U.S. 238, 242 (1980).

C. *VA Denied Mr. Trinka Constitutionally Adequate Post-Termination Due Process*.

Here, neither Section 713 nor the Agency's procedures at CSEMO Letter No. 006-17-1 provide Mr. Trinka with the required post-termination evidentiary hearing. Even if the Agency were to provide Mr. Trinka with a real post-termination evidentiary hearing as required (which it will not), the Secretary of the VA is not an independent decisionmaker as required by *Goldberg* and its progeny. The CSEMO Letter contains unconstitutional provisions setting the Secretary of the VA as the final post-termination decisionmaker, where the Secretary makes a decision based on the recommendation of an Agency Grievance Official. This Grievance Official is in turn restricted from consulting with anyone other than the Agency's Office of General Counsel and OAWP. *See* CSEMO Letter, Section 8.a.iii.3-6. This VA-imposed restriction clearly prohibits the Grievance Official (you), or the Secretary, from engaging in an evidentiary hearing in which you could independently consider evidence, examination, and testimony presented by either party.

D. *Mr. Trinka Was Denied An Opportunity to Review and Confront Purported Witnesses and Evidence Against Him.*

In this case,[1] a secret OAWP process occurred, whereby evidence was cherry-picked, and only the evidence deemed "necessary" to meet the substantial evidence standard was included in the evidence presented to the Proposing Official and Deciding Official, rather than relevant evidence necessary for the Proposing Official and Deciding Official to make informed decisions.[2] *See* Decision, p. 3. That incomplete evidence file was accompanied by an OAWP recommendation to the Proposing Official, sent also to the Deciding Official, to take an adverse action and impose a specific penalty, which violated Agency procedures and constitutional due process.

Then, the Proposing Official based his decision to propose Mr. Trinka's termination based on a hearsay summary of Mr. Trinka's OIG interview, although OAWP possessed the complete OIG interview transcript and withheld it from the Proposing Official to hide exculpatory information.[3] Withholding the transcript of Mr. Trinka's OIG interview violated Agency procedures (CSEMO Letter 006-17-1, Section 7.a.iii.1) as well as constitutional due process. Mr. Trinka demanded that the Agency produce the document so that he could confront the actual contents of the transcript and defend the allegations against him with the best available evidence of the charged misconduct, and the purported statements used to aggravate the penalty. In response, the Deciding Official told Mr. Trinka he was not entitled to a copy of the transcript *because* OAWP withheld the transcript from the Proposing Official. *See* Decision, p. 2.

Following his termination, Mr. Trinka will be deprived of the required evidentiary hearing, where he could confront witnesses and challenge evidence against him. In the Decision, the Agency takes the position that minimum constitutional due process has been observed by the right to this grievance. It has not, and it likewise will not be observed under the Agency's deficient grievance procedures.[4]

---

[1] We take care to note here that all arguments made in the written reply, without exception, are incorporated into this written grievance.

[2] A copy of the evidence file used to support the Proposal was provided to Mr. Trinka with the issuance of the Proposed Removal notice. That evidence file is an agency record and a record in this removal proceeding. We incorporate it by reference herein. It is available to you to review as the Grievance Official.

[3] We note that the evidence file also included hearsay summaries of Mr. Trinka's supervisor's testimony to VA OIG, rather than transcripts of those interviews.

[4] In *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 171 (1951), Justice Felix Frankfurter wrote: "Man being what he is cannot safely be trusted with complete immunity from outward responsibility in depriving others of their rights. At least such is the conviction underlying our Bill of Rights. That a conclusion satisfies one's private conscience does not attest its reliability. The validity and moral authority of a conclusion largely depend on the mode by

E. *Failure to Grant a Post-Termination Evidentiary Hearing Will Violate the Due Process Clause.*

For these reasons, you must grant Mr. Trinka an evidentiary hearing before an impartial decisionmaker empowered to rectify error where the Agency bears the burden to prove its charge by sufficient evidence. If you do not, you will violate the Due Process Clause.[5]

III. MR. TRINKA DEMANDS A POST-TERMINATION NAME-CLEARING HEARING.

Federal employees have a constitutionally protected liberty interest in their "reputation and good name." *Jones v. Dep't of Navy*, 978 F.2d 1223, 1225 (Fed. Cir. 1992). A federal agency may not publish stigmatizing and false statements about an employee in connection with termination without affording due process. *Holley v. United States*, 124 F.3d 1462, 1470 (Fed. Cir. 1997). A liberty interest is impacted where an agency falsely "charg[es] the employee with dishonesty" or impugns him with stigma that could hamper the employee's future employment prospects. *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1111 (D.C. Cir. 1986). The government's asserted bases for removing a tenured government employee from the civil service may stigmatize that employee. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972). Publication of derogatory remarks in the employee's personnel file, such as notation that the employee was terminated for cause, suffices. *See id.* at 1113 n.24.

Therefore, the Due Process Clause entitles Mr. Trinka to "an opportunity to hear and answer first-hand any stigmatizing charges, clearing his name of any false statements made about him, and curing the injury to his reputation." *Patterson v. City of Utica*, 370 F.3d 322, 335 (2d Cir. 2004). This nameclearing hearing generally must occur before those responsible for impugning the employee's reputation. *See McDonald v. Wise*, 769 F.3d 1202, 1214 (10th Cir. 2014).

Mr. Trinka will receive no such nameclearing hearing in this grievance process. Therefore, he demands the Agency provide him a hearing where he has the opportunity to rehabilitate his reputation as due process requires.

---

which it was reached. Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness." *Id.* at 171 (Frankfurter, J., concurring). Here, OAWP deprived the Proposing Official, Deciding Official, and Mr. Trinka of the only direct evidence of the charged misconduct, and yet still advised and will advise the Proposing Official, Deciding Official, Grievance Official, and the Secretary to propose and sustain Mr. Trinka's termination. OAWP's secrecy is "not congenial to truth-seeking." *Id.*

[5] The Agency has an alternative removal authority available to them that provides the constitutionally sufficient post-termination evidentiary hearing requested by Mr. Trinka. *See* 5 U.S.C. § 7543(d). Issuing a final decision under 38 U.S.C. § 713 will demonstrate the Agency's deliberate choice to deprive Mr. Trinka of his property interest in continued employment without adequate post-termination due process.

IV. THE DECISION ON THE PROPOSED REMOVAL MUST BE REVERSED.

We attach to this grievance Mr. Trinka's written reply to the proposed removal, and incorporate all arguments made in that reply into this grievance. Mr. Trinka does not accede to any argument made by the Agency in the Decision, and grieves the Decision in its entirety as arbitrary, capricious, an abuse of discretion, otherwise not in accordance with a provision of law; obtained without procedures required by a provision of law having been followed; and unsupported by substantial evidence.

A. *The Removal Action Must Be Canceled Because the Agency Misinformed Mr. Trinka About the Applicable Standard of Proof.*

"Since the litigants and the factfinder must know at the outset of a given proceeding how the risk of error will be allocated, the standard of proof necessarily must be calibrated *in advance*." *See Santosky v. Kramer,* 455 U.S. 745, 757 (1982). Here, the Agency informed Mr. Trinka that it was applying the preponderance of the evidence standard of proof in the Proposed Removal. *See* Enclosure 1, p. 3 ("the preponderance of evidence provides and supports a narrative of high-risk behaviors unbecoming of the position you hold.")

In the Decision, the Agency reverses course, and states that its decision is supported by merely the substantial evidence standard of proof. *See* Decision, p. 7 ("I find that pursuant to 38 U.S.C. §713 the charge is supported by substantial evidence.").

For this reason, the Agency must cancel the removal and provide Mr. Trinka with notice of the applicable standard of proof.

B. *The Hearsay Evidence Used to Terminate Mr. Trinka Is Not Sufficient Evidence Where there is No Post-Termination Hearing.*

The Decision concedes that hearsay "is usually not admitted in a court proceeding or hearing unless a hearsay exception applies." *See* Decision, p. 1. Yet, the Agency does not identify any exception applicable to Mr. Trinka's termination. Nevertheless, the Decision states that "in this administrative process as governed by 38 U.S.C. § 713," hearsay evidence can be used to meet the burden of substantial evidence." *See* Decision, pp. 1, 6. It cannot.

In *Richardson v. Perales*, 402 U.S. 389, 402 (1971), the United States Supreme Court held that hearsay evidence (specifically a written report by a licensed physician) was only sufficient to meet a substantial evidence burden because a social security disability claimant had the opportunity to cross-examine the reporting physician at a post-deprivation hearing, but declined to do so. Here, Mr. Trinka has no such opportunity, and never will unless you grant him a full post-termination evidentiary hearing where he can challenge evidence and confront witnesses against him as required by the Constitution. Therefore, the Decision is wrong that hearsay evidence can be used in this instance to meet the Agency's burden of proof.

C. *VA Denied Mr. Trinka Due Process When it Intentionally Withheld from Him the OIG Interview Transcript Over His Objection.*

Moreover, direct evidence of the charged misconduct exists. As Mr. Trinka demonstrated in his written reply and the Agency admitted in the Decision, the Agency is in possession of the

transcript of Mr. Trinka's OIG interview wherein Mr. Trinka purportedly committed the charged misconduct. In its lengthy Decision, obviously written by VA counsel rather than the Deciding Official, the Agency never explains why it did not simply produce the transcript to the Proposing Official, the Deciding Official, and Mr. Trinka. Instead, the Agency argues that because "[t]he Proposing Official was not privy to the transcript or recording of [Mr. Trinka's] interview," Mr. Trinka was not entitled to a copy of the transcript or recording. The Agency argues that "[b]y providing [Mr. Trinka] **the evidence file in support of the proposed action**, the agency has provided [Mr. Trinka] the due process afforded to [him] by the U.S. Constitution and 38 U.S.C. § 713."[6] (emphasis original). *See* Decision, p. 2. This is not true.

In our written reply, we raised the Federal Circuit's recent decision in *Ramirez v. DHS*, Case No. 19-1534 (Fed. Cir. 2020), prohibiting agencies from withholding the evidence forming the basis for materials relied upon to support an employee's termination. The Decision attempts to distinguish Mr. Trinka's matter from the facts in *Ramirez* by improperly narrowing the procedural due process question in that case to apply *only* to psychological assessments. But the holding in *Ramirez* is not so narrow.

The Decision states that "[t]he OIG report was provided to you[7] and you were given the opportunity to rebut the allegation that was the basis for the charge." *See* Decision, p. 5. Because there is no post-termination administrative hearing, the Agency was, and still is, required to provide Mr. Trinka an opportunity to confront the *evidence*, rather than merely the *allegation*, at some point prior to finally depriving Mr. Trinka of his property interest in continued employment. Failing to do so here will result in a federal court vacating the Agency's removal action against Mr. Trinka. *See Ramirez v. DHS*, Case No. 19-1534 (Fed. Cir. 2020), pp. 19-21 (holding that removal need not be vacated so long as employee, who did not press request for records in pre-termination proceedings, is able to confront the records that formed the basis for his termination in post-termination hearing).

---

[6] The Agency omits any meaningful argument here that it afforded Mr. Trinka the protections enshrined in Agency procedure. That is because the Agency knows it violated its own procedures, as described in Mr. Trinka's attached written reply. As a fundamental rule, agencies are required to follow their own rules, regardless of whether those rules go beyond the requirements of government-wide statutes and regulations. *See Service v. Dulles*, 354 U.S. 363, 388 (1957), *Vitarelli v. Seaton*, 359 U.S. 535, 539 (1959). In violating its own procedures, the Agency did not afford Mr. Trinka due process. Public employees like Mr. Trinka are entitled the protections of the Due Process Clause as well as "whatever other procedural protections are afforded them by statute, regulation, or ***agency procedure*** which is in addition to the protections afforded by the Constitution." *See Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999) (emphasis added).

[7] As an initial matter, this is hardly true. The OIG transcript was part of the OIG Report, and OAWP withheld it.

In *Ramirez*, the Federal Circuit found that the Agency denied the employee due process when it did not provide him the underlying assessment forming the basis for the materials relied on to remove him, even though the Proposing Official did not rely upon the underlying assessment and the assessment was not in the agency's possession. Here, the Agency has possession of the transcript, and would rather issue an eight-page decision explaining why it did not have to provide Mr. Trinka with a copy of the transcript rather than provide the transcript.[8] And while the Federal Circuit remanded the *Ramirez* case for a second post-termination hearing where the employee could review the underlying records and confront them with new evidence and testimony of his own, Mr. Trinka will have no such opportunity under Section 713 and the Agency's current, unconstitutional procedures.

D. *OAWP's Decision to Withhold the OIG Transcript Violates Agency Procedures and Requires Reversal*

The Decision states that the Agency "provided [Mr. Trinka with the evidence that was ***relevant*** and used in support of the proposed action in accordance with CSEMO letter Section 7.a.iii.1." (emphasis added) *See* Decision, p. 4. It is outrageous to suggest that the only piece of direct evidence as to what Mr. Trinka said during the interview is not "relevant," where the Agency relied solely on a summary of what he said during the interview. The Agency excuses its own behavior by chiding Mr. Trinka to "[b]ear in mind that OAWP is only required to forward evidence that is deemed necessary." *Id.* Necessary for what?[9]

Regardless, the Decision is wrong.[10] The CSEMO Letter requires OAWP to include all relevant statements made by the executive in the evidence file presented to the Proposing

---

[8] Hiding the transcript of Mr. Trinka's VA OIG interview from the Proposing Official, Deciding Official and Mr. Trinka only magnifies the appearance that it must contain exculpatory information. The lack of any legitimate reason or barrier to production of the VA OIG transcript is evidence that this evidence does not support a finding of misconduct.

[9] The answer seems to be: "necessary to convince the Proposing Official and Deciding Official to propose and sustain Mr. Trinka's termination." OAWP's decision to use its power to withhold relevant evidence of the charge against Mr. Trinka amounts to undue pressure on Agency officials to terminate Mr. Trinka, violating Mr. Trinka's due process rights by cooking the books at the procedural level.

[10] A federal court will likely find that the agency did not engage in reasoned decisionmaking. In *Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2569 (2019), the Supreme Court cited *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105 (1983), and articulated the scope of judicial review of agency decisionmaking, defining the role of the federal courts as "ensuring that [the Secretary] remained 'within the bounds of reasoned decisionmaking.'" Here, agency officials did not examine "the relevant data" and articulate "a satisfactory explanation" for the Decision. *See Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). Instead, it excused procedural and

Official. *See* CSEMO Letter, Section 7.a.iii.1. ("Any statement or evidence provided by the Senior Executive will be included in the investigative file, ***and if relevant*** *or used in support of the proposed action, the evidence file.")* Therefore, OAWP (and the Agency) cannot hide behind its excuse as written in the Decision that only evidence deemed "necessary" need be provided to the Proposing Official. Purposefully withholding a relevant statement made by Mr. Trinka from the Proposing Official, Deciding Official and Mr. Trinka violates agency procedures, and demonstrates that the Agency's stated reason for terminating Mr. Trinka is pretext.[11]

The Agency has been on notice for almost a year that it is improper to withhold relevant statements made by its charged senior executives. Likewise, the Agency has been on notice for almost a year that it is improper to remove relevant evidence from the evidence file, hiding it from the Proposing Official and Deciding Official who are constitutionally empowered to exercise their discretion in removal proceedings, in order to secure a finding of misconduct by substantial evidence. In our written reply, we attached an October 24, 2019 VA OIG Report that placed OAWP and VA on notice of the impropriety of this exact practice: providing Proposing Officials only the minimum evidence necessary to support the charge under the substantial evidence standard, while withholding exculpatory, "relevant" evidence that might provide Proposing Officials with a better understanding of the relevant facts and whether the charge was supported by sufficient evidence. *See* Written Reply, Ex. 3, pp. 30, 43 (finding employee interview transcript relevant "because it contained the subject's denials, admissions, and contextualization of alleged misconduct referenced in the proposed discipline and, therefore, should have been included in the evidence file pursuant to the July 2017 accountability procedures."). Thus, despite VA OIG's findings against OAWP, OAWP violated its own procedures here yet again to secure its desired outcome. You should not allow employees of your agency to be subjected to unlawful conduct by OAWP, nor should you allow your managers to be manipulated by OAWP's misleading curation of evidence files to exclude relevant evidence in violation of agency procedure.

Page 6 of the Decision states that "[a] review of the evidence file before me reveals several decision-making lapses that set an unacceptable example for those you lead." Mr. Trinka was interviewed, at length, regarding each of the so-called "decision-making lapses" the Decision now cites. OAWP then withheld the only full record of that interview, which included exculpatory testimony from Mr. Trinka to the VA OIG. Based on that *complete* record, never shared with the Proposing Official, Deciding Official, or Mr. Trinka, OAWP decided to abandon one of VA OIG's findings of false statements. And so, OAWP did not recommend Mr. Trinka be charged with making all false statements alleged by VA OIG. Yet both the Proposing Official and the Deciding Official, who did not have access to the full record, incorporated all of VA OIG's findings of false statements into their respective decisions to propose and sustain Mr.

---

due process violations with false readings of its own procedures, choosing to proceed with an unlawful removal action instead of remedying obvious error.

[11] A Decision is arbitrary, capricious, or an abuse of discretion when its stated reasons for the termination were pretext.

Trinka's removal, because the only thing they had possession of was the VA OIG summary of the case and Mr. Trinka's VA OIG interview. The Agency's insistence that Mr. Trinka made "several decision-making lapses that set an unacceptable example for those you lead" is belied by the fact that the Agency declined to charge Mr. Trinka with those alleged lapses.[12]

Mr. Trinka provided explanation for the purported "decision-making lapses" in his VA OIG interview, and convinced OAWP they were not actionable misconduct. But OAWP, in a secret process, decided to withhold those explanations from the Proposing Official as "unnecessary" and instead produce a summary of Mr. Trinka's interview that excluded the contextualization of the evidence in Mr. Trinka's full interview, as well as exculpatory and mitigating information. This information could have swayed the Proposing Official to alter course, and at minimum would have provided the Proposing Official and Deciding Official with the "relevant" information to make an informed choice on whether adverse action was appropriate and what penalty, if any, to impose.

Thus, Mr. Trinka grieves the Decision because it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with a provision of law; obtained without procedures required by a provision of law having been followed; and unsupported by substantial evidence.

V. CONCLUSION

For the foregoing reasons, Mr. Trinka demands as corrective action that his removal be canceled and his employment at the Department of Veterans Affairs be restored. If the Agency will not cancel the termination based on the arguments as presented here and in the written reply, Mr. Trinka demands a post-termination evidentiary hearing prior to the Secretary's final decision on this grievance. That hearing should be consistent with the proceedings VA represented as satisfying minimum post-termination due process in *Helman*.

Sincerely,

Debra L. Roth
Conor D. Dirks

Enclosures

A. Proposed Removal, dated September 11, 2020.
B. Written Reply, dated September 22, 2020, with Exhibits to Written Reply 1-7.
C. Decision on Proposed Removal, dated October 2, 2020.
D. Excerpt from Respondent DVA's initial brief in *Helman v. DVA*.

cc: Brandon Hughes, Executive Assistant, brandon.hughes1@va.gov
Mia Abraham, Human Resources Specialist, mia.abraham@va.gov

[12] Given this context, OAWP's decision to keep the transcript secret without any reason, legitimate or otherwise, makes the risk of an erroneous deprivation of property in this case high. *See Matthews v. Eldridge*, 424 U.S. 319, 344 (1976).

# TAB W

SB
&R

SHAW BRANSFORD & ROTH P.C.
*Attorneys at Law*
1100 Connecticut Avenue NW Suite 900
Washington DC 20036
Tel 202.463.8400 www.shawbransford.com Fax 202.833.8082

September 22, 2020

SENT VIA ELECTRONIC MAIL

Mr. Dominic Cussatt
Principal Deputy Assistant Secretary
Office of Information and Technology
810 Vermont Avenue NW
Washington, DC 20420
dominic.cussatt@va.gov

Re: Written Reply/Mr. James Trinka – Proposed Removal

Dear Mr. Cussatt:

This law firm is the designated representative of Mr. James Trinka with regard to the Proposed Removal under 38 U.S.C. § 713 ("Proposal"), issued to him on Friday, September 11, 2020. We write to you because page 2 of the Proposal identifies you as the Deciding Official in this matter, and indicates that Mr. Trinka should direct any reply to you.

Based on the Agency's multiple violations of due process and its own policies, as well as the lack of sufficient evidence to support the Proposal's sole specification, you must cancel the Proposal.

## I. INTRODUCTION

First, the Agency provides no evidence for its charge save hearsay. Although the evidence file is hundreds of pages in length, it fails to include the recording or transcript of Mr. Trinka's recorded interview with VA OIG. It was purportedly in this recorded interview that Mr. Trinka made a statement regarding his personal life that VA OIG later concluded was not true. That purportedly false statement to the OIG provides the sole basis for his removal. Yet the Agency has concealed from Mr. Trinka what he actually said to the OIG in a recorded interview almost two years ago.

The VA OIG's summary of Mr. Trinka's recorded interview, in place of a transcript or recording of that same interview, will not carry the Agency's burden of proof, and will not withstand judicial review. Failure to include this evidence also violates the Agency's own policies and Mr. Trinka's entitlement to due process under the Fifth Amendment of the U.S. Constitution. Whether the Agency ignores or willfully violates its own policies, it affects Mr. Trinka the same; Mr. Trinka is entitled to any due process protections provided by the

Grievance Enclosure B

Constitution, or written into statute, regulation, or Agency policy. Stripping those protections to obtain his termination is impermissible.

The Agency (and specifically, OAWP) was recently criticized by the VA OIG for this same unfair practice of not providing you and Mr. Trinka with relevant evidence in a published report. The Agency may not simply ignore its policies, nor decline to collect additional evidence for fear it may exonerate Mr. Trinka or any other employee.

Second, even if the Agency had evidence of this purported misconduct, Mr. Trinka's alleged statement to VA OIG is not "neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function" under the definition of "misconduct" in 38 U.S.C. § 713(d)(2). Mr. Trinka was under no obligation to disclose to his supervisor the national origin or immigration status of his wife. VA OIG, OAWP, and the Proposing Official all fail to cite any legal requirement that he do so. Mr. Trinka's statements regarding conversations he had with his supervisors about his personal life were not material to VA OIG's underlying investigation.

Setting aside the Agency's own evidence demonstrating Mr. Trinka did inform at least one supervisor of his wife's immigration status, the Agency has not established the requisite nexus between Mr. Trinka's conversations with supervisors about his personal life and his federal employment. Indeed, there is no legal basis, jurisdiction, or mission-related reason for the Department of Veterans Affairs to inquire into Mr. Trinka's conversations regarding his wife's immigration status.

Although the Proposal muddies the waters, and Mr. Trinka's reputation, with uncharged allegations that it cannot prove,[1] there is in reality only one specification of alleged "misconduct," whether Mr. Trinka "provided false or inaccurate information, to VA Office of Inspector General (OIG) investigators on December 21, 2018, when [he] stated that [he] informed three supervisors about [his] wife's immigration status." *See* Proposal, p. 1 That lone allegation is unsupported by record evidence and has no connection to his performance or conduct in the federal workplace. Therefore, Mr. Trinka's termination cannot be justified, and the Proposal cannot be sustained.

---

[1] Indeed, the Proposal accepts as true VA OIG's three faulty conclusions (listed as "a," "b," and "c" on Page 1 of the Proposal) without new evidence. Allegations "a" and "b" were investigated in 2015 by the Office of Personnel Management (OPM), the subject matter experts in federal employment and suitability. *See* 5 C.F.R. Part 731. VA chose not to charge Mr. Trinka with either of these allegations, but still asserts them as true. Therefore, the VA is aware, or should be aware, it created a false record with this Proposal that affects Mr. Trinka's liberty interest. *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1111 (D.C. Cir. 1985). To remedy the government's error, the Proposal must be canceled.

## II. ARGUMENT

The Proposal charges Mr. Trinka with one specification of "Conduct Unbecoming a Federal Supervisor," alleging that Mr. Trinka "provided false or inaccurate information, to VA Office of Inspector General (OIG) investigators on December 21, 2018, when you stated that you informed three supervisors about your wife's immigration status." *See* Proposal, p. 1.

The Agency does not have sufficient evidence to prove Mr. Trinka provided false or inaccurate information to VA OIG investigators. And regardless, the Agency cannot establish the requisite nexus between Mr. Trinka's conversations with his colleagues about his personal life and his employment with the VA.

First, we address constitutional deficiencies in the Agency's implementation of 38 U.S.C. § 713 and the statute itself.

### A. *The Statute and the Agency's Implementation of the Statute Are Unconstitutional and Designed to Make It More Difficult for Employees to Vindicate Themselves.*

When Congress passed 38 U.S.C. § 713 and § 714 and granted enhanced removal authority to the Secretary of the Department of Veterans Affairs in 2017, it altered several aspects of the termination process. These changes to the termination process were designed to make it more difficult for employees to prevail. This new statutory process is unconstitutional.

#### 1. *Statutory Changes in the Agency's Removal Authority Make 38 U.S.C. § 713 Unconstitutional.*

First, Section 713 authorized a decrease of the notice period from a minimum of 30 calendar days to a maximum of 15 business days. This requires deciding officials to make hasty decisions, and requires employees to make even hastier replies, most often within 7 business days as set by statute. *See* 38 U.S.C. § 713(b)(2)(B). In this case, you denied a request for an extension of three business days, despite our request listing specific reasons why it was necessary. In doing so, you cited your consultation with VA Office of General Counsel and the lack of "exigent circumstances."[2] *See* Ex. 1. As such, this written reply cannot fully respond to all the reasons why

---

[2] The word "exigent" means "requiring immediate aid or action." *See* Merriam-Webster.com, "exigent," September 22, 2020, http://www.merriam-webster.com/dictionary/exigent. On September 16, 2020, we told you that we could not assist Mr. Trinka with his reply during the week of September 14-18, 2020 because of deadlines on September 16 and September 18, 2020. By definition, deadlines require immediate aid or action. Yet you denied Mr. Trinka's request, only stating your conclusion and that you consulted with OGC. Your denial was an unreasonable, arbitrary, and capricious decision, especially given the length of time that the Agency deliberated internally regarding its course of action with regard to Mr. Trinka's employment. Indeed, VA OIG's investigation began over five years ago, and OAWP received VA OIG's report on January 6, 2020, over eight months ago. OAWP transmitted its report and recommendation to you personally over two months ago. Therefore, you have been aware of the allegations and had possession of the evidence for at least two months, but refused to afford Mr.

removal is unwarranted,[3] a result anticipated and intended by you when you denied our request for an extension. That in itself makes any decision you issue against Mr. Trinka unconstitutional.

This statutory imposition of a shortened notice, reply and decision period without exception is unconstitutional on its face in circumstances when an employee cannot muster the resources to put on an adequate defense. And it is so here as applied to Mr. Trinka.

Second, Section 713 stripped the post-termination administrative hearing[4] at the Merit Systems Protection Board previously available to VA career senior executives terminated under 5 U.S.C. § 7543(d). Thus, under Section 713, VA career senior executives are denied an adversarial, evidentiary hearing where the Agency bears the burden of proof to prove its charge by preponderant evidence. Instead, the statute substitutes an internal grievance procedure, with no right to a comprehensive hearing. The lack of any "full adversarial post-termination hearing" where the Agency bears the burden of proof to establish the statutory preconditions for removal is unconstitutional. *See Ramirez v. DHS,* Case No. 2019-1534 (Fed. Cir. 2020) at 9, *citing Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 547-548 (1985).

Third, Section 713 unconstitutionally decreased the burden of proof on judicial review at federal district court from "preponderance of the evidence" to "substantial evidence."

---

Trinka three additional days to review and consult with his attorneys regarding the 342-page evidence file, the legal arguments available to him, the ramifications of those arguments, and the potential end of his decades of service to the United States. Imposing an unrealistic and unfair notice and reply period on Mr. Trinka violates his right to due process. It does so because this shortened deadline denies Mr. Trinka "a fair opportunity to challenge the agency's evidence against him," especially given the lack of "alternative means by which [Mr. Trinka can] challenge the evidence against him," like a "full adversarial post-terminating hearing." *Ramirez v. DHS*, Case No. 2019-1534 (Fed. Cir. 2020), pp. 8-9, and fn. 6. But your denial of Mr. Trinka's extension request also disadvantages the Agency. A less thorough reply weakens your ability to make an accurate decision as to whether the government has sufficient cause to take Mr. Trinka's livelihood from him. Applying the Supreme Court's precedent in *Loudermill*, "an error might have been avoided had [Mr. Trinka] been provided [a fair] opportunity to make his case to [you]." *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 543-544 (1985).

[3] This written reply provides a multitude of legal and factual challenges to the Proposal. Due to the insufficient amount of time allotted to us to prepare this reply, our arguments are not necessarily fully presented. Our goal is to identify and preserve arguments for later judicial review.

[4] Because no full adversarial post-termination hearing exists, these pre-termination proceedings take on greater importance. *See Ramirez v. DHS*, Case No. 2019-1534 (Fed. Cir. 2020), at fn. 6, *citing Loudermill*, 470 U.S. 532, at 547-548 (1985).

With each change to the removal process, the statute made it more difficult for employees to successfully vindicate themselves. These reductions in due process, taken alone and together, make the relevant portions of 38 U.S.C. § 713 unconstitutional on its face and as applied here by the Agency.

2. *The Agency's Implementation of the Statute Renders the Process Unconstitutional.*

Beyond the text of the statute, the Agency implemented an internal policy that makes it even more difficult for an employee to prevail. *See* Ex. 2 ("CSEMO Letter"). And the Agency itself frequently violates its own published procedures in ways that promote non-thorough, and procedurally deficient investigations and proposed disciplinary actions against employees, curtailing investigations prior to the collection of exculpatory information, or deliberately excluding exculpatory information so that the employee will be unable to rebut the charges against them. *See* "Failures Implementing Aspects of the VA Accountability and Whistleblower Protection Act of 2017," VA OIG Report No. 18-04968-249, attached as Ex. 3. The Agency's implementation of the statute render the termination process imposed on Mr. Trinka unconstitutional.

Because continuing to process the Proposal pursuant to the CSEMO Letter will violate Mr. Trinka's statutory and constitutional rights to due process, VA should rescind the Proposal.

B. *The Agency Violated Its Own Procedures to Secure Mr. Trinka's Termination.*

Violations of Agency policy will entitle Mr. Trinka to an entirely new, correct removal procedure if he is removed without correction of those violations. *See Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999). We list below those violations of which we are currently aware. But due to the unreasonably short response period and failure to provide us with the entire OAWP investigative file, more violations may have occurred than we are able to ascertain at the time of this reply.

1. *The Agency Violated CSEMO Letter Section 7.a.iii.3.*

First, the CSEMO Letter states that "[u]pon conclusion of the OAWP investigation, OAWP and OGC shall brief the Secretary or his or her designee on the results of the investigation and whether disciplinary action is recommended. *The recommendation will be limited to whether disciplinary action should be pursued.*" *See* CSEMO Letter Section 7.a.iii.3. (emphasis added). OAWP disregarded this policy and instead recommended a specific penalty: removal. *See* Proposal, Ex. 15. It is the duty of the Proposing Official, not OAWP, to determine what penalty to propose. *See* CSEMO Letter Section 7.b.i. ("The Proposing Official will review the available evidence to determine whether a Reprimand, Suspension, Demotion, or Removal should be proposed; or whether no action is warranted."). Public employees like Mr. Trinka are entitled the protections of the Due Process Clause as well as "whatever other procedural protections are afforded them by statute, regulation, or agency procedure which is in addition to the protections afforded by the Constitution." *See Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999). Therefore,

because the Agency violated its own procedures when OAWP recommended to the Proposing Official and Deciding Official a specific penalty, the removal must be canceled.

Moreover, VA's policy that OAWP not recommend specific disciplinary actions or penalties is consistent with constitutional due process. OAWP violated the Due Process Clause when it created the presumption that its choice of penalty was correct, and stripped you of your constitutional authority and power to determine the "appropriateness or necessity" of the removal action before Mr. Trinka even had an opportunity to respond to the charge against him. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985). In usurpring your constitutional role, OAWP requires you to explain (to them) in writing any deviation from their recommendation. ("[i]f you or your designee fail to propose the disciplinary action recommended in this paragraph within 60 calendar days from the date of this memorandum, you must provide OAWP with a detailed justification why the recommended action was not proposed.") *See* Proposal, Ex. 15. OAWP's choice of penalty, and requirement that you justify to them any deviation from that choice, violates the Due Process Clause of the United States Constitution, because you no longer have unfettered constitutional discretion to decide the appropriate penalty, and the penalty was chosen for you prior to Mr. Trinka having any "meaningful opportunity to invoke the discretion of the decisionmaker." *Id.* The Proposal must be rescinded, and the Agency must find a way to reverse the undue influence OAWP wielded over the Proposing Official and you in this process.

2. *The Agency Violated CSEMO Letter Section 7.a.iii.1.*

Second, the Agency was required to provide any statement or evidence provided by Mr. Trinka in the evidence file, unless the circumstances of the investigation make it "impossible, unreasonable, or unnecessary to do so." *See* CSEMO Letter Section 7.a.iii.1.

The sole charge in the Proposal is an allegation that Mr. Trinka made a false statement to the VA OIG. It was not "impossible, unreasonable, or unnecessary" to include the best, and only, direct evidence[5] of the alleged misconduct: a recorded "statement" by Mr. Trinka to the VA OIG. *See* Proposal, p. 1. That recorded statement was listed as Attachment 19 to the VA OIG's ROI. *See* Proposal, Ex. 12, p. 314 of the evidence file. VA OIG transmitted this statement to OAWP on January 6, 2020, when it referred its completed ROI to OAWP. *See* Proposal, Ex. 13. Therefore, OAWP was in possession of a recorded statement by Mr. Trinka, wherein the exact words he said to VA OIG were present. It appears that after OAWP received this direct evidence of what Mr. Trinka actually said to the VA OIG, it decided to conceal that evidence, excluding it from the evidence file eventually transmitted to you and the Proposing Official, in favor of a hearsay summary of Mr. Trinka's statements, written by the VA OIG Special Agent. Although we do not

[5] The CSEMO Letter also requires that if the statement is "relevant," it must be transmitted to the employee with proposed action. *See* CSEMO Letter Section 7.a.iii.1. Clearly, the only direct evidence of the alleged misconduct is relevant. Therefore, by not transmitting this recorded statement to Mr. Trinka with the Proposal, the Agency violated its own policy. As a result, the Proposal must be canceled.

have a copy of the recorded statement, it is likely OAWP did so in order to choose the evidence less favorable to Mr. Trinka; in other words, OAWP excluded exculpatory evidence in favor of inculpatory evidence. This violated CSEMO Letter Section 7.a.iii.1.

If OAWP concealed from the Proposing Official, Mr. Trinka and you the VA OIG records of Mr. Trinka's interview, it may also have violated federal law. Concealing evidence in a federal investigation, even an administrative one, is a crime.[6] Federal employees are not exempt from the law. The record makes clear that VA OIG transmitted Mr. Trinka's recorded statement to OAWP (as Attachment 19 to its ROI), and that by the time the action was proposed, the recorded statement had been removed from the evidence file.

In addition, just last year, VA OIG found that OAWP inappropriately, and knowingly, excluded evidence from evidence files that was required to be included pursuant to the CSEMO Letter. *See* VA OIG Report, p. 30. VA OIG also found that OAWP had adopted an inappropriate policy that encouraged investigators to only collect evidence that supported a finding of misconduct by substantial evidence, rather than evidence that might exonerate the employee.

Indeed, VA OIG collected guidance from OAWP leadership instructing investigators to "hone down our evidence files to just those documents that support charges." *See* VA OIG Report, at pg. 30. VA OIG found that "OAWP's practice of only including documents that support its charges when it prepares evidence files for disciplinary cases (and not those that might be exculpatory) has injected the appearance of bias, which could undermine employees' trust in the OAWP's process." *Id.*

Although an OAWP investigative[7] file can be, and is even anticipated to be, different than an evidence file used in a proposed disciplinary action, VA OIG found that the eventual evidence

---

[6] VA officials may have committed federal crimes punishable by imprisonment up to 20 years. *See* 18 U.S.C. §§ 1512(c), 1519. If VA possesses or uncovers evidence that OAWP personnel knowingly altered, concealed, and/or covered up evidence in this official proceeding by withholding from you, the Proposing Official, and Mr. Trinka his exculpatory recorded OIG interview at Attachment 19 of the VA OIG ROI, VA should refer them to the OIG for criminal investigation.

[7] We note here that in Mr. Trinka's case OAWP did not conduct an "investigation." OAWP did not interview Mr. Trinka, in violation of CSEMO Letter Section 7.a.iii.1. If OAWP collected any evidence included as exhibits with its ROI, Mr. Trinka did not receive that evidence. Therefore, the Proposal's statement that "OAWP conducted its own investigation" is inaccurate and misleading. *See* Proposal, p. 2. Instead, OAWP merely reviewed the OIG's ROI and attachments, then repackaged and restated the OIG's findings. Thus, OAWP is in no better position than you to decide whether to sustain the charge or what penalty is reasonable given the totality of the circumstances. OAWP should receive no deference from you, just as its finding will receive no deference on judicial review. At federal district court, *your* decision will be evaluated, not OAWP's, because only you have the constitutional authority to be "the decisionmaker" in this

file used by the Proposing Official should "contain all relevant evidence and not simply evidence that tends to support the charges." *Id*, at 42. VA OIG concluded that it would be "difficult for a disciplinary official to determine whether [the applicable evidence standard] is met without considering all relevant evidence developed during the investigation." *Id.*

In one case referenced in the VA OIG Report, which mirrors the circumstances here, VA OIG wrote: "the July 2017 accountability procedures call for the inclusion of the Covered Executive's statement in the evidence file. Its non-inclusion prevented the proposing official from considering all relevant evidence." *Id,* at 43. In another example, VA OIG criticized OAWP for excluding the transcript of an employee's recorded interview, stating that "the employee's transcript was relevant because it contained the subject's denials, admissions, and contextualization of alleged misconduct referenced in the proposed discipline and, therefore, should have been included in the evidence file pursuant to the [CSEMO Letter]." *Id*, at 43.

Indeed, OAWP's apparent decision to continue this practice here against Mr. Trinka after VA OIG's findings demonstrates the Agency's bias towards finding misconduct, even if the evidence as a whole does not support that finding. You should therefore cancel the Proposal because it violated VA's own policy by not providing Mr. Trinka with his actual statement at issue in the only charged specification.

C. *The Agency Violated Mr. Trinka's Entitlement to Constitutional Due Process by Withholding the Recording or Transcript of his Interview and Other Evidence*.

We now know that the Agency's failure to provide Mr. Trinka with a copy of his recorded statement violates his entitlement to due process under the Fifth Amendment. Just last week, the Federal Circuit found that due process required a government agency to provide an employee with the records underlying an adverse action, even when an agency does not directly review or consider the records in making the removal decision. *See Ramirez v. DHS,* Case No. 19-1534 (Fed. Cir. 2020), p. 16.

The Federal Circuit found that an agency's decision to rely indirectly rather than directly on the evidence at issue did not excuse the Agency from making the evidence available to the employee. According to the Federal Circuit, "[t]he Agency cannot shield the evidence underlying that finding from production by simply relaying it through the report of another expert." *Id.*

Likewise, the Federal Circuit in *Ramirez* found that the agency was required to produce the records regardless of whether they were in the agency's custody. *Id,* at 15.

Here, someone excluded the recording or transcript of Mr. Trinka's OIG interview (Attachment 19 to the VA OIG's ROI transmitted to OAWP on January 6, 2020) from the eventual evidence file issued to Mr. Trinka. *Ramirez* now makes clear that even if VA OIG failed to transmit

---

removal proceeding. *See Loudermill*, at 543. It is therefore incumbent upon you to make a decision independent of OAWP's recommendation.

the recording or transcript, at this stage, the VA was required to collect the evidence and provide it to Mr. Trinka.[8] Failing to do so violates the Fifth Amendment of the United States Constitution.

In addition to the recording or transcript of Mr. Trinka's VA OIG interview, the Agency did not provide Mr. Trinka with the exhibits to OAWP's ROI. OAWP's ROI was included in the Proposal's evidence file as Exhibit 14. But OAWP's exhibit list and exhibits themselves were excluded. OAWP's ROI at Exhibit 14 to the Proposal contained intranet links to each exhibit that were accessible to the Proposing Official, but not to Mr. Trinka. You certified to us that Mr. Trinka "was provided with the file containing all of the evidence in support of the proposed action." *See* Ex. 1. That does not appear to be true.

Because OAWP's conclusions relied on those exhibits, and the Proposing Official relied on OAWP's ROI to support the charged misconduct, the Agency will violate the Fifth Amendment if it does not produce the exhibits.

D. *The Agency May Have Engaged in Constitutionally Impermissible Ex Parte Communications with the Deciding Official during the Disciplinary Process*.

On July 16, 2020, the Executive Director for Investigations at OAWP transmitted a memorandum to you. *See* Proposal, Ex. 15. Footnote 1 of that memorandum includes an intranet link to download OAWP's "investigative file." Pursuant to the CSEMO Letter, the "investigative file" is a separate file than the "evidence file." *See* CSEMO Letter, Section 7.a.iii.1. The "investigative file" is compiled by OAWP, whereas the "evidence file" contains materials relied upon by the Proposing Official to support the proposed action. Therefore, the record reflects that you received for review the "investigative file," which was not provided to Mr. Trinka. Mr. Trinka attempted to access the link in Footnote 1 of Ex. 15 of the Proposal. It is no longer active, and therefore Mr. Trinka could not review the materials previously stored there. *See* Ex. 4.

The record also reflects that you received the OAWP ROI, with links to each exhibit cited in the ROI summary. *See* Proposal, Ex. 14. Those exhibits are enumerated separately from the exhibits in the VA OIG report, and appear to reference different documents. Mr. Trinka attempted to access those records via the links in the ROI, but was denied access to the vast majority of the links, and could not review the materials stored there. *See* Ex. 5. Three links functioned and led to copies of Proposal Exs. 1, 11, and 13.

Deciding officials *cannot* review and consider evidence relevant to the proposed action that is not also provided to Mr. Trinka. If you did so, you must cancel the Proposal.

[8] By the same token, Mr. Trinka is entitled to the recordings and/or transcripts of interviews with his supervisors, if such were created by VA OIG.

As the Federal Circuit held in *Stone*:

> "[T]he introduction of new and material information by means of *ex parte* communications to the deciding official undermines the public employee's constitutional due process guarantee of notice (both of the charges and of the employer's evidence) and the opportunity to respond. When deciding officials receive such ex parte communications, employees are no longer on notice of the reasons for their dismissal and/or the evidence relied upon by the agency. Procedural due process guarantees are not met if the employee has notice only of certain charges or portions of the evidence and the deciding official considers new and material information. It is constitutionally impermissible to allow a deciding official to receive additional material information that may undermine the objectivity required to protect the fairness of the process. Our system is premised on the procedural fairness at each stage of the removal proceedings. An employee is entitled to a certain amount of due process rights at each stage and, when these rights are undermined, the employee is entitled to relief regardless of the stage of the proceedings."

*See Stone* at 1376.

E. *The Agency's Only Evidence of the Only Charged Allegation of Misconduct is Hearsay, and the Charge Cannot Be Sustained*.

As noted above, there is only one specification of misconduct. The Agency bears the burden to prove its specification by sufficient evidence. The Agency's evidence is insufficient to prove the charged misconduct.

The only evidence the Agency produced to prove the only specification it charged is a summary, unsworn hearsay memorandum summarizing Mr. Trinka's purported testimony during a VA OIG interview. This memorandum has little, if any, probative value. *See Prouty v. GSA*, 122 M.S.P.R. 117, 123 (2014). Thus, it alone will not be sufficient evidence to withstand judicial review if you sustain the charge.

Mr. Trinka denies that he knowingly provided false or inaccurate information to VA OIG investigators. Mr. Trinka's interview with VA OIG interview was recorded. VA OIG transmitted to OAWP the recorded interview (Attachment 19 to the VA OIG ROI), along with the Special Agent's summary (Attachment 18 to the VA OIG ROI). *See* Proposal, Ex. 12, p. 314, List of VA OIG ROI Attachments. There is simply no reason to rely on the hearsay summary OIG memorandum when the central fact at issue is what Mr. Trinka said. A recording or transcript of the recording is the best evidence, and the Agency cannot conceal that evidence and survive judicial review.[9]

---

[9] Whether it was OAWP or someone else at the Proposal stage, a complete transcript of Ms. Trinka's OIG interview was included in the evidence file issued to Mr. Trinka with the Proposal

Additionally, the Agency's own evidence controverts the charged misconduct. The evidence demonstrates that Mr. Trinka did indeed inform his most recent supervisor[10] that his wife was not a U.S. citizen, despite no legal obligation to do so. *See* Proposal, Ex. 9.

F. *There is no nexus between Mr. Trinka's statements to VA OIG regarding conversations with his supervisors about his personal life and his position as Chief Talent Management Officer at the Department of Veterans Affairs.*

Mr. Trinka's statements to VA OIG regarding conversations with supervisors about his personal life do not implicate in any way his federal employment and therefore lack the requisite nexus to justify removal. *See* 38 U.S.C. § 713(a)(1), (d)(2)[11]; *See also e.g. Booth v. Department of Veterans Affairs*, MSPB Docket No. AT-0714-19-0167-I-1 (May 8, 2019); *Holmes v. Department of Veterans Affairs*, No. AT-0714-19-0581-I-1 (November 19, 2019) (finding that provisions of

as Exhibit 6. While including her OIG interview transcript in the disciplinary evidence file, some government employee had the audacity to exclude the transcript of Mr. Trinka's OIG interview. That omission is stunning given the charged misconduct is what Mr. Trinka, not Ms. Trinka, supposedly said to the OIG Special Agent during his interview. Inclusion of the complete OIG transcript of Ms. Trinka's interview appears to be an attempt by the government to win by innuendo, and serves no purpose other than to attempt to embarrass Ms. Trinka, considering the omission of Mr. Trinka's transcript. In other words, the decision to include Ms. Trinka's interview transcript, but omit Mr. Trinka's interview transcript, lacks any reasoned analysis that can withstand judicial review.

[10] Despite clear evidence of this disclosure on December 7, 2018 (*see* Proposal, Ex. 9), the Special Agent nevertheless concludes that Mr. Trinka made a false statement when he allegedly stated during his December 21, 2018, VA OIG interview that he had informed three different supervisors of his wife's immigration status. *See* Proposal, Ex. 12. In reaching this finding, VA OIG discounts its own evidence that Mr. Trinka told his supervisor John Oswalt, because Mr. Trinka told Mr. Oswalt while being escorted to speak with VA OIG on December 7, 2018. In discounting this evidence, it seems VA OIG simply dislikes the timing of Mr. Trinka's disclosure to Mr. Oswalt. Nonetheless, the timing of Mr. Trinka's disclosure does not make his alleged statement to the VA OIG untrue; the record shows he did indeed disclose to Mr. Oswalt on December 7, 2018, prior to his December 21, 2018 interview, his wife's immigration status.

[11] Mr. Trinka's alleged conduct does not constitute "misconduct" or "malfeasance" under the agency's definition of "an act that is unjustified, harmful, or contrary to law, rule or regulation." *See* CSEMO Letter, Section 6.n-o.

38 U.S.C. § 714 require proof of nexus).[12] Thus, without any assertion or proof of nexus, removing Mr. Trinka on this charge will not withstand judicial review.

In addition to the requirement that the agency prove the conduct set forth in the charge, the agency must also prove that there is a nexus, i.e., a clear and direct relationship between the articulated grounds for an adverse action and either the employee's ability to accomplish his duties satisfactorily or some other legitimate government interest. *Hoofman v. Dep't of Army*, 118 M.S.P.R. 532 (2012), *aff'd sub nom. Hoofman v. Dep't of the Army*, 526 F. App'x 982 (Fed. Cir. 2013), *citing Ellis v. Department of Defense*, 114 M.S.P.R. 407, ¶ 8 (2010). In other words, to sustain the charge of misconduct, the agency must have established by sufficient evidence the existence of a nexus between the employee's misconduct and the work of the agency, i.e., the agency's performance of its functions. *See Doe v. Dep't of Justice*, 565 F.3d 1375, 1379 (Fed. Cir. 2009), *citing Brown v. Dep't of the Navy*, 229 F.3d 1356, 1358 (Fed. Cir. 2000).

Federal appellate courts have acknowledged that misconduct that is private in nature and that does not implicate job performance in any direct and obvious way is often insufficient to justify removal. *See Doe,* at 1380-81, *citing Brown v. Dep't of the Navy*, 229 F.3d 1356, 1360 (Fed.Cir.2000), *Bonet v. U.S. Postal Serv.*, 661 F.2d 1071, 1078 (5th Cir.1981) (it is insufficient for an agency to rely on internal regulations that proscribe in general certain employee conduct, e.g., "immoral" or "disgraceful," as proof of the required nexus between dishonesty/immorality[13] and the efficiency of the service).

Indeed, in *Doe*, the Federal Circuit warned that when federal employees are not on notice as to what non-work related behavior (such as allegedly lying about the immigration status of a spouse) is subject to investigation, the government could remove an employee for "any number of 'clearly dishonest misrepresentations,' from those made to preserve the sanctity of a romantic relationship to cheating in a Friday night poker game." *Doe*, at 1381.

There is no legal standard or reason that establishes Mr. Trinka was required to inform his supervisors of his wife's immigration or citizenship status. Notably, neither the VA OIG, OAWP, nor the Proposing Official cite to one. And thus, there was no legal standard or reason for VA OIG (*contra, e.g.* a federal immigration investigatory entity) to inquire about Mr. Trinka's conversations with his colleagues about his wife's immigration or citizenship status. The VA OIG's jurisdiction simply does not expand to investigating the immigration status of VA employees' family members, or friends. To conclude otherwise grossly expands VA OIG powers

---

[12] *See also* Ex. 6. In a presentation by VA OHRM Employee Relations and Performance Management Service on July 12, 2017, the Agency admitted it would likely have to prove nexus despite the new removal authority.

[13] The Proposal alleges in part that Mr. Trinka should be fired because he "failed to act with high moral principle." *See* Proposal, p. 2.

to intrude into the private personal lives of VA employees, which is the antithesis of our American democracy. Mr. Trinka does not live and work in a police state.

A clear articulation of a standard requiring disclosure of a spouse's immigration or citizenship status is "essential to the government's ability to reasonably and legitimately remove an [employee] for off-duty conduct relation to personal relationships." As the D.C. Circuit held in *Doe v. Hampton*, 556 F.2d 265, 272 n. 20, 273 (D.C. Cir. 1977), particularized requirements for removal serve to "minimize unjustified governmental intrusions into the private activities of federal employees." None is articulated here.

The government strains to remove Mr. Trinka. What began as an investigation into whether Mr. Trinka lied on a government employment form about his wife's citizenship ended in a proposed termination based solely on a charge of whether Mr. Trinka was truthful when he allegedly told a VA Special Agent, with no need to know,[14] that he had previously informed supervisors that his wife was a non-citizen. Several purported falsehoods on government employment forms were explored and abandoned in between the start of VA OIG's investigation and the issuance of the Proposal. The Proposal itself is based solely on an allegation unrelated to the reason for the underlying VA OIG investigation.

Courts have long recognized that, at a minimum, the government is bound to accord due process and set basic substantive limits on its prerogative to remove its employees. *See, e.g., Norton v. Macy*, 417 F.2d 1161, 1164 (D.C.Cir.1969) ("The Due Process Clause may also cut deeper into the government's discretion where a dismissal involves an intrusion upon that ill-defined area of privacy which is increasingly if indistinctly recognized as a foundation of several specific constitutional protections."). Mr. Trinka's private life is just that: private.

Mr. Trinka is free to have conversations about his personal life with his supervisors. Mr. Trinka is free to disclose or omit information about his personal life with his supervisors, including information about his wife's current immigration status. Mr. Trinka's supervisors have no right to know details about Mr. Trinka's wife's current immigration status so long as her current immigration status does not affect Mr. Trinka's ability to perform in the workplace or the agency's mission (providing healthcare and benefits for Veterans). Nowhere in VA OIG's or OAWP's

---

[14] Whether Mr. Trinka informed his supervisor of his wife's immigration status is non-material to VA OIG's underlying investigation. In order to qualify as a false statement under 18 U.S.C. § 1001, the alleged falsehood must be "materially false" or be made regarding a "material fact." Mr. Trinka's conversations with his supervisor had nothing to do with his intent to mislead the government by utilizing an ITIN number instead of a SSN to identify his non-citizen wife on VA forms. When VA OIG presented this case, several times, to Department of Justice prosecutors for potential prosecution, the prosecutors informed VA OIG the same: (1) on February 14, 2017, an AUSA stated "based on the information we have obtained, he cannot open a criminal case without more overt criminal activity."; (2) on August 9, 2018, another AUSA told the VA OIG Special Agent "there is not enough evidence to charge TRINKA for false statements, based on the investigation to date." *See* Proposal, Ex. 12.

respective ROIs, or in the Proposal itself, does *any* official of the VA assert *any* legal authority that required Mr. Trinka to disclose to anyone at the VA his wife's immigration status. Likewise, no one asserts a nexus between the immigration status of Mr. Trinka's wife and the work of the VA or the job duties of Mr. Trinka. Mr. Trinka does not work for CBP or ICE. He, and you, work for the VA. Thus, the VA OIG exceeded its jurisdiction and had no right to inquire into Mr. Trinka's private life beyond what is needed to establish facts material to their investigation into how Mr. Trinka completed forms associated with his VA employment.

Because Mr. Trinka's recorded statement to the VA OIG was not provided, it is impossible to assess whether VA OIG even asked Mr. Trinka about whether his supervisors were aware of his wife's immigration status, or what either party said to prompt the allegedly false statement. In other words, without the VA OIG recording or transcript of Mr. Trinka's interview, there is *no* context in which to assess Mr. Trinka's alleged statements to VA OIG. Assuming that VA OIG asked Mr. Trinka whether he apprised his supervisors of his wife's immigration status, the VA OIG investigator had no lawful reason and no jurisdiction to inquire about Mr. Trinka's supervisors' knowledge of Ms. Trinka's immigration status.

G. *The Background Section of the Proposal Contains Untrue Allegations that Unfairly Prejudice Mr. Trinka.*

The "background" section of the Proposal details the procedural history of the VA OIG investigation underlying the charged misconduct. But it also unfairly asserts unproven, uncharged, and potentially criminal misconduct as true when it is not. When a proposing and/or deciding official are under the mistaken impression that an employee's conduct violated the law, reliance on that mistaken impression can lead to reversal of the adverse action. *See Doe v. Department of Justice*, 565 F.3d 1375, 1382-1383 (Fed. Cir. 2009).

Here, VA OIG "substantiated" three false statements by Mr. Trinka, and then transmitted its report and evidence to OAWP. *See* Proposal, Exs. 12, 13. Next, OAWP "substantiated" only two false statements by Mr. Trinka, abandoning one of VA OIG's findings. OAWP then transmitted its report and evidence to you. *See* Exs. 14, 15. Your proposing official charged only one false statement, choosing to abandon VA OIG's other two findings and one of OAWP's findings (that Mr. Trinka falsified his August 2014 e-QIP form). *See* Proposal, p. 1. But the latter portions of the Proposal ("background" and "aggravating factors" sections) reincorporated *all* of VA OIG's unsubstantiated and uncharged misconduct, by claiming Mr. Trinka has a "propensity to misinform, mislead or otherwise provide false answers and narratives." That "propensity" is based on VA OIG's findings. However, the Proposal fails to actually charge the other two supposedly false statements as actionable misconduct.

Specifically, the Proposal states that VA OIG concluded that Mr. Trinka made three false statements: (1) Mr. Trinka failed to disclose to OPM that his wife was in the U.S. illegally; (2) Mr. Trinka allegedly made a false statement when he input his wife's IRS assigned tax identification (ITIN) in place of a Social Security number on VA forms; and (3) Mr. Trinka allegedly made a

false statement to OIG investigators when allegedly stated he verbally reported his wife's undocumented immigration status to three different supervisors while employed at VA.

Because we already addressed the only charged misconduct (finding no. 3), we address the other two findings below.

1. *VA OIG's First Finding is not Supported by Evidence.*

VA OIG's first finding of a false statement was that Mr. Trinka allegedly failed to disclose to OPM that his wife was in the U.S. illegally.[15]

That finding is arbitrary and capricious, and unsupported by evidence. The only evidence of what Mr. Trinka disclosed to OPM are his August 2014 e-QIP and the OPM summary of his OPM background interview. *See* Ex. 7, pp. 143, 272 of Evidence File. The e-QIP did not ask Mr. Trinka for the immigration status of his wife. Rather, it asked for her place of birth, and country of citizenship. During the OPM interview, the summary memorializes that he disclosed he made a mistake on the e-QIP when he listed her place of birth as the United States. OPM appears to have accepted this as a "mistake." *See* Proposal, Ex. 7, p. 145 of Evidence File. No one knows whether the OPM investigators followed up with Mr. Trinka when he revealed his wife was a Thai citizen to ask her immigration status, because no complete record of such an inquiry or any response by Mr. Trinka exists.

It was squarely in front of OPM investigators and adjudicators that Mr. Trinka had listed his wife's citizenship as the United States, but then corrected it to Thailand during his OPM interview. For the VA OIG, OAWP, and Proposing Official to find Mr. Trinka did not disclose to OPM his wife's immigration status is mere speculation. The interview was memorialized in an OPM investigation summary, not a verbatim transcript. *See* Proposal, Ex. 7, pp. 143-146 of Evidence File. Thus, the evidence does not support a finding that he failed to disclose to OPM his wife's immigration status or that he was asked to or required to do so.

Equally relevant is that OPM has the legal authority to bring an action directly against a federal employee for falsifying or lying in the background and suitability process. *See* 5 C.F.R. § 731.105(d). OPM declined to do so in this case, following Mr. Trinka's 2014 SF-85 process and subsequent December 2014 interview. Per VA OIG's ROI, it shared with an AUSA Mr. Trinka's OPM background file on April 21, 2016. The Department of Justice subsequently declined to prosecute Mr. Trinka for supposedly falsifying information to OPM, citing a lack of evidence. Thus, OPM, the government's subject matter expert on suitability and DOJ, the government's legal

---

[15] The Proposal described it as follows: "You listed your spouse, as a United States (US) citizen on your electronic background investigation (E-QIP) to the Office of Personnel Management (OPM). You later told OPM investigators you made a mistake and admitted she was not a U.S. citizen, but is instead a citizen of Thailand. However, you failed to disclose to OPM your wife was in the U.S. illegally (Exhibits 8 and 12)." *See* Proposal, pg. 1.

experts in prosecuting false statements, both declined to act on the information now presented to you by VA OIG for punishment. VA OIG asks you to pass judgment on Mr. Trinka for morality reasons, rather than any valid legal reason.

2. *VA OIG's Second Finding is not Supported by Evidence.*

The VA OIG's second finding referenced in the Proposal was that Mr. Trinka allegedly made a false statement when he failed to disclose his wife's unlawful immigration status by inputting his wife's IRS assigned tax identification (ITIN) in place of a Social Security number on VA insurance forms and to obtain her a military dependent identification card.[16]

VA OIG's finding is based on a false premise. When Mr. Trinka input his wife's IRS ITIN, it in fact disclosed his wife's immigration status.[17] As the Agency's own evidence demonstrates, "the first three digits of his wife's ITIN designated the number was issued to an individual with no lawful immigration status." *See* Proposal, Ex. 12, p. 2. Therefore, Mr. Trinka disclosed his wife's immigration status when he input her ITIN, and it is unclear why VA OIG found otherwise.[18]

In addition, neither the FEHB nor the FEGLI forms included in the evidence file require disclosure of citizenship, or immigration status. Therefore, aside from Mr. Trinka's use of an ITIN clearly belonging to a non-citizen, there would be no opportunity for disclosure of his wife's immigration status. *See* Exs. 16-17. Moreover, VA OIG and the Deciding Official fail to assert or cite to any legal authority that immigration status determines FEHB and/or FEGLI spousal beneficiary eligibility.

---

[16] The Proposal describes it as follows: "You failed to disclose your wife's unlawful immigration status to the VA when adding her as a dependent on your life insurance and health insurance records (Exhibit 8, 12, 16 and 17). You knowingly used your wife's IRS assigned tax identification (Exhibits 8, 12, 16 and 17). You again used your wife's ITIN to obtain a military dependent identification card, allowing her to access any military installation. You admitted you were previously employed by the IRS and were aware the first three digits of your wife's ITIN designated the number was issued to an individual with no lawful immigration status (Exhibits 8 and 12)."

[17] At the time Mr. Trinka completed this form, his wife did not have an SSN, and so this ITIN was the only identifying number available for use. Ms. Trinka was assigned an SSN on August 3, 2016. *See* Ex. 7.

[18] We note that OAWP, likely recognizing the same factual inconsistency in VA OIG's reasoning, did not substantiate that Mr. Trinka made a false statement when he input his wife's IRS assigned tax identification (ITIN) in place of a Social Security number on VA insurance forms and to obtain her a military dependent identification card. *See* Proposal, Ex. 14.

The only reasoning VA OIG provides for its conclusion is merely the personal opinion of the VA OIG Special Agent. In the VA OIG report, the Special Agent states: "I told TRINKA the VA would not know the origin of the number and would assume it was an actual SSN and its use was therefore a false statement." *See* Proposal, Ex. 12. This conclusion (that VA would not recognize the ITIN) is based solely on an assumption made by the investigator, and moreover does not speak to Mr. Trinka's intent. To reach this conclusion, the investigator ignored the feedback of two AUSAs that there was not enough evidence to charge a "false statement" based on this incident. *See* Proposal, Ex. 12. As is clear from the evidence, Mr. Trinka intended to provide an identification number that clearly disclosed his wife's immigration status, and did so.[19] Therefore, you should disregard any implication that Mr. Trinka made a false statement with regard to this incident.

3. *The Proposing Official Based his Decision to Propose Mr. Trinka's Termination on Unsupported, Uncharged Allegations of Misconduct.*

During a virtual meeting on Microsoft Teams or Zoom to issue the Proposal to Mr. Trinka, the Proposing Official stated that he was proposing Mr. Trinka's removal in part because of a "pattern of deception." However, as demonstrated above, there is no such pattern. The Proposing Official specifically mentioned Mr. Trinka's e-QIP form[20] and use of Ms. Trinka's ITIN instead of her SSN on forms to gain "access" to health insurance, life insurance, and military installations.[21]

The Proposing Offical also stated that a factor in his recommendation was that Mr. Trinka "was married to an illegal immigrant and made no attempt to legalize her immigration status," or words to that effect. Mr. Trinka responded that he and his wife were working through the legal

[19] When Mr. Trinka filled out the military dependent ID form, the enlisted officer he was working with informed him that if his wife did not have an SSN due to her immigration status, he should utilize her ITIN.

[20] The Agency's own evidence demonstrate that OPM, in its suitability investigation, did not find that Mr. Trinka made a false statement when it investigated the same conduct VA OIG later substantiated as a false statement. After conducting its own investigation, OPM (the subject matter experts) accepted Mr. Trinka's reasonable explanation that he made a mistake on his e-QIP form. *See* Proposal, Ex. 7, (p. 145 of evidence file).

[21] There is no reason Ms. Trinka should not have access to health insurance (5 C.F.R. § 890.302), life insurance (5 C.F.R. § 870.802), military dependent identification, and any other benefit gained due to her spousal status. Any implication otherwise is likely colored by animus towards her national origin or immigration status rather than concern for law or policy. Therefore, it may be that the proposed termination was infected with discriminatory animus under Title VII. *See James T. Hewitt v. Department of the Navy*, EEOC Appeal No. 01920086 (April 23, 1992) (finding that Complainant can meet *prima facie* case of national origin discrimination based on discrimination for having a spouse with a different national origin).

immigration process, and had a court date in December 2020 (which had been rescheduled from August 2019). The Proposing Official stated that he would "consider that in rebuttal," or words to that effect. But as you know, no such process exists for a Proposing Official to consider arguments on rebuttal. While Ms. Trinka is not yet a United States citizen, she is not in the United States illegally. This is not an unimportant distinction, given that the Proposing Official, without evidence, criticized[22] Mr. Trinka's alleged "continued refusal to accept responsibility and failure to take appropriate action to rectify the immigration status of your spouse," and stated that Mr. Trinka has "willfully chosen not to remediate or resolve the illegal status of your wife within federal guidelines and requirements." *See* Proposal, p. 2.

In this country, the process for naturalization of a spouse does not flow in its entirety overnight. Ms. Trinka has maintained a valid, and current, work authorization. *See* Ex. 7. She is therefore legally in the United States. Ms. Trinka has an individual hearing date for her green card application on December 7, 2020. *Id.* The Proposal's reliance on VA OIG's finding is unsubstantiated, and continued reliance on that finding will result in cancelation of the removal on judicial review.

The Proposing Official's comments doubled down on the false assertions in the Proposal. This conversation demonstrates that the Proposing Official based his decision to charge Mr. Trinka with Conduct Unbecoming a Federal Supervisor, and to propose Mr. Trinka's removal in part on unsupported and uncharged allegations of misconduct. The conversation also demonstrates that the Proposing Official based his decision to propose Mr. Trinka's termination in part based on false information about Mr. and Ms. Trinka's efforts to work through the legal immigration process. As a result, the Proposal must be canceled.

## III. PENALTY DETERMINATION

The CSEMO Letter directs Proposing Officials to propose a penalty that is "reasonable" and "commensurate with the facts of the case and the rationale for determining what constitutes the appropriate level of discipline will be included in the Proposal." *See* CSEMO Letter Section

---

[22] Throughout the Proposal, the Agency expresses animus towards Ms. Trinka for her immigration status. It also expresses animus towards Mr. Trinka for his association with her. At one point, the Proposal states that Mr. Trinka "may still be cohabitating with and supporting a known foreign national without legal entry into the United States." *See* Proposal, pp. 2-3. Put simply, the Department of Veterans Affairs does not get to determine, or criticize, who Mr. Trinka lives with in his home. It has nothing to do with his employment. Mr. Trinka is married to Ms. Trinka, and the Proposing Official cites no legal authority prohibiting Mr. Trinka from associating with her as they work through the legal naturalization process. The Agency is wrong to criticize Mr. Trinka's alleged failure to ensure that Ms. Trinka's immigration status was rectified, as that allegation is without evidence and controverted by the evidence attached to this reply. The Proposing Official's animus demonstrates the Agency's bias against Mr. Trinka for reasons other than the charged misconduct.

7.b. On judicial review, the court will review "the entirety of the VA's removal decision—including the penalty." *See Sayers v. Department of Veterans Affairs*, 954 F.3d 1370, 1379 (Fed. Cir. 2020).

The seminal case for adjudicating the "reasonableness" of a penalty in federal employee adverse actions is *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981). In *Douglas*, the MSPB[23] established the basic parameters of its authority to review the reasonableness of a penalty imposed by an agency. The *Douglas* decision cites twelve (12) factors that are referenced below, some or all of which are usually considered in determining whether the penalty imposed by an agency is appropriate under the circumstances. Douglas mandates that selection of an appropriate penalty be undertaken through a responsible balancing of all of the relevant factors present in an individual case. All of the factors will not be pertinent in every instance, but the relevant factors must be balanced in each case to arrive at the appropriate penalty. *Douglas*, at 306.

An agency may not simply go through the motions with regard to the Douglas factors; there must be "real consideration by the deciding official of the relevant mitigating factors and the particular circumstances of the case." *Zazueta v. Dep't of Justice*, 94 M.S.P.R. 493, 497 (2003) citing *Omites v. U.S. Postal Serv.*, 87 M.S.P.R. 223, 228 (2000). If the record fails to show that the deciding official considered both the relevant aggravating and mitigating Douglas factors, little deference is usually given to the agency's choice of penalty. *See Wynne v. Dep't of Veterans Affairs*, 75 M.S.P.B. 127, 133 (1997).

Under Douglas, the following factors are generally recognized as relevant to assessing an appropriate penalty:

(1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

(2) The employee's job level and type of employment, including supervisory, or fiduciary role, contacts with the public, and prominence of the position;

---

[23] In discussion of the *Douglas* factors in this reply, we cite to a number of MSPB cases. We recognize that 38 U.S.C. § 713 stripped VA senior executives of an MSPB appeal right, and that Mr. Trinka's statutory right is for judicial review of the VA decision. However, a federal court, even when evaluating an adverse personnel action under a statutory scheme independent of Title 5 of the U.S. Code, will defer to MSPB's expertise and holdings in the arena of federal personnel law. *See Butler v. West*, 164 F.3d 634, 642 (D.C. Cir. 1999). Federal courts "do not discount the special role that the MSPB has been assigned in the adjudication of federal personnel disputes, nor do we impugn its expertise. The degree of deference that federal courts must accord MSPB resolutions of nondiscrimination claims, see 5 U.S.C. § 7703(c) (limiting review to actions found to be arbitrary, capricious, an abuse of discretion, contrary to law, or unsupported by substantial evidence), speaks directly to its preeminent role in this area."

(3) The employee's past disciplinary record;

(4) The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

(5) The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties;

(6) Consistency of the penalty with those imposed upon other employees for the same or similar offenses;

(7) Consistency of the penalty with any applicable agency table of penalties;

(8) The notoriety of the offense or its impact upon the reputation of the agency;

(9) The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about conduct in question;

(10) Potential for the employee's rehabilitation;

(11) Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and;

(12) The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

*Douglas*, at 332.

The Proposal should be canceled because the charge is not supported by sufficient evidence, and because of the violations of VA policy and due process stated above. Following through with this Proposal will lead to reversal of your decision on judicial review. But because of VA's propensity to proceed against its employees in the face of clear violations of policy and due process, we provide an analysis of the relevant *Douglas* factors.

In directing you to consider the well-established *Douglas* factors that apply to agency consideration of penalty, we remind you again of your constitutional authority and power. We do so because of the historic pattern and practice of OAWP, OGC, and senior VA management officials pressuring and influencing the person designated to be the decisionmaker on a proposed disciplinary action. None of those employees, official or offices have any constitutional authority to direct your decision. Bowing to or allowing your decision to be influenced or dictated by anyone else is unconstitutional and will not withstand judicial review. According to well-established Supreme Court law, only you have the full constitutional authority to make this decision. As the decisionmaker, you are allowed to exercise your discretion to determine "the appropriateness or necessity" of the penalty, and to "decide [] not to dismiss [Mr. Trinka], notwithstanding [your] authority to do so." *Loudermill*, at 543-544.

*Douglas Factor #1 – Nature and Seriousness of the Offense*

In evaluating whether a penalty is merited, consideration is to be given to the nature and seriousness of the misconduct, including whether the offense was committed maliciously, was repeated after notice of its impropriety, or was committed for material gain. *See Dogar v. Dep't of Defense*, 95 M.S.P.R. 52, 60 (2003); *Rackers v. Dep't of Justice*, 79 M.S.P.R. 262, 282 (1998), *aff'd* 194 F.3d 1336 (Fed. Cir. 1999).

The Proposal finds that Mr. Trinka's alleged misconduct "seemed to be intentional; a direct effort not to bring attention to the fact that your spouse is in the country illegally or to the nature of your meeting." *See* Proposal. As stated above, there is no nexus between the alleged misconduct and Mr. Trinka's position at the Department of Veterans Affairs. As to the nature of his meeting his wife, nothing in this record explains how or why an employee's "how I met my wife" story is the Department of Veterans Affairs' business. It may be that many of your employees do not volunteer the real story of how they met their spouse. Employees are allowed to keep some aspects of their life private from their employer; how they met their spouse is one example. In addition, the record as it stands is devoid of evidence of intent.

You should also consider how often the Proposal relied on unearned, and baseless, attacks on Mr. Trinka's character in assessing whether removal was the appropriate penalty under these circumstances.

On Page 3 of the Proposal, in the "aggravating factors" section, the Proposing Official stated that Mr. Trinka "failed to act with high moral principle, adhere to the highest professional standards, and uphold the values expected of a VA SES employee." As an initial matter, the morality of any employee is not the government employer's business unless it interferes with the employee's service to the government. There is no evidence that Mr. Trinka committed misconduct related to his job as the Chief Talent Management Officer at the Department of Veterans Affairs. The only charged misconduct is a charge completely unrelated to his professionalism in that position or his supervisory or leadership responsibilities as an SES employee. Indeed, in the same paragraph, the Proposal mistakenly bases this conclusion on something that did not happen, accusing Mr. Trinka of failing "to take appropriate action to rectify the immigration status of [his] spouse." *Id.* Mr. and Ms. Trinka are fully engaged in the naturalization process. *See* Ex. 7. This allegation is based on erroneous speculation, and cannot be relied upon to support the penalty conclusions reached by the Proposing Official.

The harm of this false insinuation is also crystallized on page 3 of the proposal, which claims that Mr. Trinka "failed to meet the [I CARE] expectations" of "Integrity, Commitment, Advocacy, Respect and Excellence." *Id.* The Proposing Official singles out "Integrity," calling it the "first and a key value." *Id.* Thereby, the Proposal based its determination that removal was appropriate in part on its belief that Mr. Trinka's integrity was lacking. But outside of the Proposing Official's moral judgment about how Mr. Trinka met his wife, which is of no legal significance to the VA, there is no evidence in the file that demonstrates Mr. Trinka lacks integrity.

The United States Court of Appeals for the Federal Circuit, in *Russo v. USPS,* 284 F.3d 1304 (Fed. Cir. 2002), held that when an Agency imposes the maximum penalty based in part on an exaggerated perception of the conduct or an insinuation that the conduct was more sinister than it was in reality, removal is unreasonable.

In *Russo*, a Notice of Proposed Removal alleged that an employee made a "racist" comment to a co-worker. But after a hearing, the MSPB held that while the Agency proved the employee's conduct was unbecoming, he did not make a racist comment. Because the Proposal relied on its belief that the comment was racist to aggravate the penalty to removal, the appeals court found that removal was inappropriate. ("In other words, the agency imposed the maximum penalty because of its view as to the seriousness of the offense… However, the Board did not find that Mr. Russo engaged in conduct unbecoming a postal supervisor by making a racist comment. Rather, it found that he engaged in such conduct by making a comment that was offensive to Mr. Young."). *Id.*

The issue here is analogous to *Russo.* In both cases, the Proposal relies on insinuations about an employee's character that are unfounded. The Proposal here several times links the seriousness of the offense to concerns about Mr. Trinka failing to take steps to naturalize his spouse. Those concerns are not reasonable given the evidence that contradicts that claim. Because the Proposal improperly relies on serious and unfounded allegations of dishonesty and lack of integrity, mitigation of the penalty is warranted here.

Finally, you should take into consideration that Mr. Trinka is not charged with misconduct related to the original allegations under investigation by VA OIG. Instead, after a five-year series of investigations into how Mr. Trinka completed certain employment forms, the Agency charges Mr. Trinka with making a false statement to VA OIG about an unrelated conversation with his supervisors. We also note that it is a significant mitigating factor that there is evidence that one of Mr. Trinka's supervisors testified that Mr. Trinka *did* tell him about his wife's immigration status. *See* Proposal, Ex. 9.

The charged misconduct, minus the Proposal's irrelevant, unfounded and hyperbolic comments about Mr. Trinka's character, does not warrant the end of Mr. Trinka's federal career.

In sum, this *Douglas* factor requires you mitigate the penalty.

*Douglas Factor #2 – Employee's Job Level*

A supervisory role does not preclude penalty mitigation. *See Halper v. United States Postal Serv.*, 91 M.S.P.R. 170, 174 (2002) (mitigating proposed penalty for supervisor); *Vitanza v. United States Postal Serv.*, 89 M.S.P.R. 319, 322 (2001).

This *Douglas* factor does not preclude mitigation of the penalty.

*Douglas Factor #3 – Prior Disciplinary Record*

The absence of a prior permanent disciplinary record is a significant mitigating factor. *See Wentz v. U.S. Postal Serv.*, 91 M.S.P.R. 176, 185 (2002); *Robertson v. Dep't of Justice*, 81

M.S.P.R. 658, 664 (1999) (employee's past work record, which included more than twenty (20) years of federal service, and his lack of a prior disciplinary record were significant factors resulting in mitigation of proposed penalty). Mr. Trinka has no prior disciplinary record in his record of service. Mr. Trinka's record of service to the United States (both in the military and as a civilian employee) spans decades without any disciplinary action. That includes over eight years with the Department of Veterans Affairs.

Mr. Trinka's considerable record of prior service without a disciplinary record supports the imposition of penalty less than removal. *See Gibb v. Dep't of Treasury*, 88 M.S.P.R. 135, 148 (2001) (MSPB concluded the fact that an employee was never previously disciplined during his twenty (20) years of service to be significant mitigating factor); *Dangerfield v. U.S. Postal Serv.*, 77 M.S.P.R. 678, 686, (1998) (employee's more than thirty-five (35) years of service warranted mitigation); *Shelly v. Dep't of Treasury*, 75 M.S.P.B. 67, 68 (1997) ("The appellant's 23 years of service with no prior discipline is a factor supporting leniency."); *Marler v. Dep't of Veterans Affairs*, 58 M.S.P.R. 116, 118, (1993) (where an employee had thirty-nine (39) years of service, it was a mitigating factor); *Ceja v. Def. Logistics Agency*, 27 M.S.P.R. 531, 534 (1985) (thirty (30) years of service without prior discipline was a significant factor in penalty mitigation). Indeed, Mr. Trinka's years of excellent service, highlighted by numerous deserved recognitions, professional accomplishments, benefits to his employing Agency and the offices he was assigned, and promotions to increasingly complex assignments, illustrate that he has spent a lifetime serving the United States of America in accordance with the established rules and regulations.

The lack of any prior disciplinary action supports mitigating the penalty.

*Douglas Factor #4 – Past Work Record*

Performance records and years of service are significant mitigating factors. *Douglas*, 4 M.S.P.R. at 315. An employee's past work record is an appropriate factor to consider in evaluating the reasonableness of an agency-imposed penalty. *Luciano v. Dep't of Treasury*, 88 M.S.P.R. 325, 342-43 (2001). This includes his length of service, performance on the job and his dependability. *See Douglas*, 5 M.S.P.R. at 332.

Mr. Trinka's performance appraisals have been uniformly positive, and his job performance has earned him numerous recognitions and merit-based performance bonuses since he joined the VA.

This *Douglas* factor supports mitigation.

*Douglas Factor #5 – Effect on the Employee's Ability to Satisfactorily Perform His Duties*

An agency's claim that supervisors have lost trust and confidence in an appellant must be supported by evidence and cannot be based solely on a mere conclusory statement. See *Ciulla* v. USPS, 37 M.S.P.R. 627, 630-31 (1988); see also *Scott v. Department of Justice*, 69 M.S.P.R. 211, 243 (1995) (agency demonstrated that appellant's misconduct adversely affected agency's

trust in his performance, *citing Royster v. Department of Justice*, 58 M.S.P.R. 495, 499 (1993)), *aff'd*, 99 F.3d 1160 (Fed.Cir.1996)

In *Jefferson v. USPS,* 73 M.S.P.R. 376 (1997), the MSPB canceled the removals of several appellants, mitigating the penalty to suspensions, where an Agency merely concluded that it had lost trust in the appellants, citing vaguely to concerns about "integrity." *Id* at 384. The Board found that there was no specific evidence regarding any loss of trust, or any explanation as to why the Agency believed supervisors had lost trust in appellants. *Id.*

In its discussion of "aggravating factors," the Proposal casts Mr. Trinka in an unfair and false light, based on unfounded assessments of his character. It states on Page 3: "Due to the totality of the circumstances and your lack of candor, you have compromised the trust and confidence required of an employee of your position. Your continued refusal to accept responsibility and failure to take appropriate action to rectify the immigration status of your spouse only aggravates the situation and calls into question your judgement in difficult situations." These assessments assume as true a falsehood (that Mr. Trinka is not taking appropriate action to rectify the immigration status of his wife). Therefore, the Proposing Official's concern with Mr. Trinka's judgment is unfounded. Because the Proposal links the agency's "trust and confidence" in Mr. Trinka directly to its unfounded concerns about Mr. Trinka's "judgment," you should find that lack of trust and confidence unwarranted.

During the entirety of the VA OIG investigation and OAWP investigation, as well as during the brief notice period for this proposed termination, Mr. Trinka has performed his duties satisfactorily. In terms of his job duties and what the Agency expects of him at the workplace, there has been no reduction in responsibility signifying a loss of trust or confidence.

Accordingly, *Douglas* factor #5 supports mitigation of the penalty.

*Douglas Factor #6 – Consistency of the Penalty with Those Imposed on Other Employees*

The penalty imposed on an employee should be consistent with those imposed on other employees for the same or similar offenses that are charged. Where an agency knowingly and intentionally treats similarly situated employees differently with respect to a penalty, reversal or mitigation of the penalty is warranted. *See Williams v. Social Security Administration*, 586 F.3d 1365 (Fed. Cir. 2009); *Lewis v. Dep't of Veterans Affairs*, 113 M.S.P.R. 657 (2010); *Villada v. U.S. Postal Service*, 115 M.S.P.R. 268 (2010).

The Proposal does not state whether the Agency believes the penalty proposed against Mr. Trinka is consistent with penalties imposed for other similarly situated employees who committed similar misconduct.

Thus, this *Douglas* factor does not preclude mitigation.

*Douglas Factor #7 – Consistency of the Penalty with the Table of Offenses and Penalties*

The Agency's Table of Penalties lists "Reprimand" to "Removal" as the range of appropriate penalties for a first offense of "Intentional falsification, misstatement, or concealment of material fact."

Therefore, it is fundamentally within your constitutional authority and discretion and consistent with the Table of Penalties to mitigate Mr. Trinka's removal to a lesser penalty based on all of the factors at issue and in light of the circumstances presented, given the wide range of potential penalty decisions available to you. In accordance with this *Douglas* factor, you should mitigate the penalty.

*Douglas Factor #8 – Notoriety of the Charged Offense*

There is no evidence that the alleged misconduct became notorious or known by the community at all. Pure speculation about the actual notoriety in the community is improper. *See Brown v. USPS*, MSPB No. 0752-97-0123-I-1 (June 12, 1998).

Thus, this *Douglas* factor supports mitigation.

*Douglas Factor #9 – Notice of Relevant Rules*

While Mr. Trinka believes that employees must avoid making false statements or omitting material facts when rendering their official duties, there is no allegation that he did so. Indeed, the courts have found that when an agency proposes an employee's removal in whole or in part based on conduct in the employee's personal life, the removal is unwarranted. *See Doe v. Dep't of Justice*, 565 F.3d 1375, 1379 (Fed. Cir. 2009), *citing Brown v. Dep't of the Navy*, 229 F.3d 1356, 1358 (Fed. Cir. 2000).

Misconduct that is private in nature and that is allegedly "immoral" but does not implicate job performance in any direct and obvious way is often insufficient to justify removal. *See Doe,* at 1380-81, *citing Brown v. Dep't of the Navy*, 229 F.3d 1356, 1360 (Fed.Cir.2000), *Bonet v. U.S. Postal Serv.*, 661 F.2d 1071, 1078 (5th Cir.1981).

Mr. Trinka could not have been aware that he had any duty to tell his federal supervisors of his wife's immigration status. Indeed, neither the OIG, OAWP, or the Proposing Official assert or cite to any requirement to do so. Likewise, Mr. Trinka had no expectation that VA OIG had reason or permission to inquire about his conversations with his supervisors about his personal life, given that the investigation was purposed to determine whether Mr. Trinka made false statements on government employment forms, not to his supervisors. Although it appears Mr. Trinka did tell his most recent supervisor about his wife's immigration status, he had no duty to do so or to answer questions about conversations regarding his personal life.

If you sustain the charged misconduct, you should therefore mitigate the penalty due to the lack of notice provided to Mr. Trinka.

*Douglas Factor #10 – Employee's Potential for Rehabilitation*

The potential for rehabilitation is a consideration that relates to whether an employee has the ability to change his behavior and become a reliable, suitable employee who does not commit further misconduct. *Swazy v. Dep't of the Interior*, MSPB. No. AT-0752-02-0611-I-1 (2002). An employee who has served for a substantial period of time and possesses a good work ethic shows a good potential for rehabilitation. *Wentz v. U.S. Postal Serv.*, 91 M.S.P.R. 176 (2002); *Boltz v. Social Security Admin.*, 111 M.S.P.R. 568 (2009) (employee found to have potential for rehabilitation where she worked for agency for about 10 years with no prior disciplinary record, and supervisor consistently rated her performance as acceptable or higher levels and awarded her performance). Where an employee denies a charge or its underlying misconduct, that fact cannot be considered in determining the reasonableness of the penalty. *Montes v. U.S. Postal Serv.*, MSPB No. SF-0752-08-0487-I-1 (2009). An employee's service record alone can demonstrate a potential for rehabilitation, which constitutes a significant mitigating factor. *Omites v. U.S. Postal Serv.*, 87 M.S.P.R. 223, 228 and 230 (2000) (finding rehabilitative potential based on length of service and good performance record).

Mr. Trinka denies the charged misconduct. This record fails to include the actual evidence of what Mr. Trinka was asked in his VA OIG interview and how he actually answered those questions. If the Agency ever produced such evidence and it proved Mr. Trinka made false or inaccurate statements to VA OIG, then this factor would surely support mitigating a penalty of removal.

*Douglas Factor #11 – Additional Mitigating Circumstances*

In this written reply, Mr. Trinka provides evidence to you that controverts a central assumption of the "aggravating factors" section of the Proposal: that Mr. Trinka made no effort to go through the lawful immigration process with his wife.

Mr. Trinka and Ms. Trinka have for years sought to adhere to the lawful immigration process. Ms. Trinka obtained a Social Security number in 2016, has a recently renewed work authorization, and has a hearing date for her green card application on December 7, 2020. *See* Ex. 7. You should not penalize Mr. Trinka for the length of the process. Instead, you should take Mr. Trinka's attempts to "rectify the immigration status of [his] spouse" into consideration when you consider whether removal is the appropriate penalty.

*Douglas Factor #12 – Alternative Sanctions*

A separation is not the only corrective action available to the Agency. You, as the only VA official with the unfettered constitutional authority to decide the "appropriateness or necessity of the discharge," *Loudermill* at 543, have tremendous flexibility to take action based on all of the

circumstances of each individual case. In this case, the Agency can impose a sanction less than removal that will still serve the purpose of providing notice to Mr. Trinka of the Agency's concerns, and notice that any similar future incident will not be tolerated. A lesser penalty recognizes that this is Mr. Trinka's first offense.

Accordingly, this *Douglas* factor supports mitigating the penalty.

## IV. CONCLUSION.

Based on the Agency's multiple violations of due process and its own policies, as well as the lack of sufficient evidence to support the Proposal's sole specification, you must cancel the Proposal.

Sincerely,

Debra L. Roth
Conor D. Dirks

Enclosures
1. Exhibits 1-7 to the Written Reply.

cc: Ms. Mia Abraham
Human Resources Specialist
Mia.Abraham@va.gov

**From:** Cussatt, Dominic (SES)
**To:** Conor Dirks
**Cc:** Abraham, Mia; Debra Roth; Hackett, Tokay (OGC)
**Subject:** RE: Mr. James Trinka/Request for Extension to Respond to Proposed Removal
**Date:** Friday, September 18, 2020 8:59:27 AM

---

Mr. Dirks,

In accordance with 38 U.S.C. Section 713 (b)(1)(A), Mr. Trinka was provided with the file containing all of the evidence in support of the proposed action. The evidence file was provided to Mr. Trinka by the proposing official Mr. Cunningham.

V/R,

Dom Cussatt

-------------------------------------------------------------------

Dominic A. Cussatt, CGEIT, CISM
Principal Deputy Assistant Secretary for Information & Technology
Deputy Chief Information Officer (CIO)

Office of Information & Technology
Department of Veterans Affairs
810 Vermont Ave. NW
Washington, D.C. 20420
Phone: 202-461-6910
UNCLASS: dominic.cussatt@va.gov
SECRET: dominic.cussatt@dhs.sgov.gov
JWICS: dcussatt@dva.id.ic.gov

*VA Core Values:* **Integrity Commitment Advocacy Respect Excellence**
*VA Core Characteristics:* **Trustworthy | Accessible | Quality | Innovative | Agile | Integrated**

---

**From:** Conor Dirks <cdirks@shawbransford.com>
**Sent:** Thursday, September 17, 2020 8:14 PM
**To:** Cussatt, Dominic (SES) <Dominic.Cussatt@va.gov>
**Cc:** Abraham, Mia <Mia.Abraham@va.gov>; Debra Roth <droth@shawbransford.com>; Hackett, Tokay (OGC) <Tokay.Hackett@va.gov>
**Subject:** [EXTERNAL] RE: Mr. James Trinka/Request for Extension to Respond to Proposed Removal

Mr. Cussatt,

Exhibit 1

In addition to our request for extension, our letter asked whether the proposing official provided Mr. Trinka all the materials relied upon to support the proposed termination. Your e-mail below does not address that question. Please confirm that Mr. Trinka received all the evidence relied upon to support the proposed termination, and all evidence that you will review in making your decision on the proposed termination.

Thank you,

**Conor D. Dirks**
Associate Attorney

Shaw Bransford & Roth P.C. | Attorneys at Law
1100 Connecticut Avenue, NW, Suite 900
Washington, DC 20036
Phone: (202) 463-8400 Ext. 310 | Fax: (202) 833-8082
www.shawbransford.com | cdirks@shawbransford.com

This message originates from the law firm of Shaw Bransford & Roth P.C. This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying, or other use of this message or its attachments is strictly prohibited. All personal messages express solely the sender's views and not those of Shaw Bransford & Roth P.C. If you received this message in error, please notify us immediately at sbr@shawbransford.com.

---

**From:** Cussatt, Dominic (SES) <Dominic.Cussatt@va.gov>
**Sent:** Thursday, September 17, 2020 1:40 PM
**To:** Conor Dirks <cdirks@shawbransford.com>
**Cc:** Abraham, Mia <Mia.Abraham@va.gov>; Debra Roth <droth@shawbransford.com>; Hackett, Tokay (OGC) <Tokay.Hackett@va.gov>
**Subject:** RE: Mr. James Trinka/Request for Extension to Respond to Proposed Removal

Mr. Dirks,

After carefully reviewing your request for an extension and consulting with the VA Office of General Counsel, I do not find that exigent circumstances exist. Therefore, your request for an extension is hereby denied.

V/R,

Dom Cussatt

-------------------------------------------------------------------

Dominic A. Cussatt, CGEIT, CISM
Principal Deputy Assistant Secretary for Information & Technology
Deputy Chief Information Officer (CIO)

Office of Information & Technology
Department of Veterans Affairs
810 Vermont Ave. NW
Washington, D.C. 20420
Phone: 202-461-6910
UNCLASS: dominic.cussatt@va.gov
SECRET: dominic.cussatt@dhs.sgov.gov
JWICS: dcussatt@dva.id.ic.gov

*VA Core Values:* **Integrity Commitment Advocacy Respect Excellence**
*VA Core Characteristics:* **Trustworthy | Accessible | Quality | Innovative | Agile | Integrated**

---

**From:** Conor Dirks <cdirks@shawbransford.com>
**Sent:** Wednesday, September 16, 2020 7:08 PM
**To:** Cussatt, Dominic (SES) <Dominic.Cussatt@va.gov>
**Cc:** Abraham, Mia <Mia.Abraham@va.gov>; Debra Roth <droth@shawbransford.com>
**Subject:** [EXTERNAL] Mr. James Trinka/Request for Extension to Respond to Proposed Removal

Principal Deputy Assistant Secretary Cussatt:

This law firm represents Mr. James Trinka with regard to the Notice of Proposed Removal, dated September 11, 2020. Attached please find our notice of appearance and request for a brief, three-day extension of time to respond.

Thank you,

**Conor D. Dirks**
Associate Attorney

Shaw Bransford & Roth P.C. | Attorneys at Law
1100 Connecticut Avenue, NW, Suite 900
Washington, DC 20036
Phone: (202) 463-8400 Ext. 310 | Fax: (202) 833-8082
www.shawbransford.com | cdirks@shawbransford.com

This message originates from the law firm of Shaw Bransford & Roth P.C. This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you should immediately stop reading this

message and delete it from your system. Any unauthorized reading, distribution, copying, or other use of this message or its attachments is strictly prohibited. All personal messages express solely the sender's views and not those of Shaw Bransford & Roth P.C. If you received this message in error, please notify us immediately at sbr@shawbransford.com.

THE SECRETARY OF VETERANS AFFAIRS
WASHINGTON

July 7, 2017

**CORPORATE SENIOR EXECUTIVE MANAGEMENT OFFICE**
**LETTER NO: 006-17-1**
**Senior Executive Accountability and Grievance Procedures**

1. **Purpose:** To provide procedures to implement 38 United States Code (U.S.C.) §§ 323, 713, 731, as amended by the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017 (Public Law 115-41).

2. **Policy:** The Secretary of Veterans Affairs, or his or her designee, may reprimand, suspend, demote, or remove a Senior Executive at the Department of Veterans Affairs (VA) if the Secretary, or his or her designee, determines the employee's performance or misconduct warrants such an action. Procedural entitlements contained in VA Directive and Handbook 5021, part I, chapter 3, and 5027 do not apply to actions taken pursuant to this authority.

3. **Scope:** These procedures apply to all VA Senior Executives, as that term is defined herein. The content of this memorandum applies to both misconduct and performance, which results in the Secretary, or his or her designee, making a determination to reprimand, suspend, demote, or remove a Senior Executive, as defined below.

4. **References:**

   a. 38 U.S.C. § 713, as amended by title II, section 201, of the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017 (Public Law 115-41).

   b. 38 U.S.C. § 323, as added by title I, section 102, and title II, section 206, of the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017 (Public Law 115-41).

   c. 38 U.S.C. § 731, as renumbered and amended by title I, section 102, and title II, section 206, of the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017 (Public Law 115-41).

   d. VA Directive and Handbook 5013 (performance actions against Senior Executive Service equivalent employees).

   e. VA Directive and Handbook 5021 (disciplinary and adverse actions and related grievance procedures).

Exhibit 2

f. VA Directive and Handbook 5027 (performance actions against members of the Senior Executive Service).

g. 5 U.S.C. chapter 43, subchapter II.

h. 38 U.S.C. chapters 73 and 74.

5. **Delegation:** The Secretary of Veterans Affairs delegates his or her authority to reprimand, suspend, demote, or remove a VA Senior Executive, as provided in this policy and other applicable delegations.

6. **Definitions:** For the purpose of the Act and this policy, the following terms apply:

a. "Accompany a Position in a Transfer of Function" is the movement of a Senior Executive when a continuing function transfers from one competitive area to one or more other competitive areas where the function was not being performed, or the movement of the entire competitive area to another Commuting Area.

b. "Act" refers to the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017 (Public Law 115-41).

c. "Business days" refers to weekdays, which are Monday through Friday in Washington, D.C., except when such a day is designated as a Federal holiday by the Office of Personnel Management.

d. "Closeout rating" refers to the rating assigned by the Rating Official when a Senior Executive changes positions or transfers to another agency.

e. "Commuting Area" refers to the geographic area surrounding a work site that encompasses the localities where people live and reasonably can be expected to travel daily back and forth to work.

f. "Deciding Official" refers to the individual to whom the Secretary has delegated the authority to make an Initial Decision on an action. A Deciding Official must be a PAS or an individual delegated by the Secretary.

g. "Demotion" or "demote" refers to the involuntary transfer of a Senior Executive to a non-Senior Executive position at a grade for which the individual is qualified and the Secretary, or his or her designee, determines is appropriate.

h. "Directed Reassignment" means the management directed reassignment of a Senior Executive, while serving continuously within the same agency, from

one position to another.

i. "Final Decision" refers to a decision made by the Secretary. The decision will be based on the record that has been developed, including the Proposal, any response provided by the Senior Executive to the Proposal, the Initial Decision, the grievance, and the recommendation from the Grievance Official. The Final Decision states the:

   i. Decision of the Secretary of Veterans Affairs;
   ii. Basis of that decision;
   iii. Discipline, if any, to be imposed, and the effective date of the discipline; and
   iv. Right to seek judicial review.

j. "Final rating" refers to the annual summary rating that an appointing authority assigns at the end of the appraisal period after considering a Performance Review Board's recommendations.

k. "Grievance Official" refers to the official who has been designated to examine a grievance and make a recommendation to the Secretary on that grievance. A Grievance Official may be designated by the Secretary or otherwise is a head of an organization. A Grievance Official cannot have also served as the Deciding Official on the action.

l. "Initial Decision" refers to a memorandum from the Deciding Official to the Senior Executive that states the:

   i. Initial decision of the Deciding Official on a Proposal;
   ii. Basis of that initial decision;
   iii. Discipline, if any, to be imposed, and the effective date of the discipline;
   iv. Right to grieve the initial decision through the grievance process described in this policy or seek judicial review, if applicable; and
   v. Requirement that any grievance must be filed no later than 7 business days after the Initial Decision is issued and a failure to timely file a grievance would result in an Initial Decision becoming final and conclusive.

m. "Interim rating" refers to the rating assigned by the Rating Official, who is leaving his/her position, and provided to the Senior Executive who has been under the Rating Official's supervision.

n. "Malfeasance" is defined as an act that is unjustified, harmful, or contrary to law, rule, or regulation. It includes, but is not limited to:

   i. Conduct, actions, or inactions that are unbecoming a Senior

Executive or a civil service employee;

ii. Conduct, actions, or inactions that negatively impact VA or detract from VA's mission;
iii. Intentionally or negligently violating the law, rule, regulation, or VA policy; or
iv. Insubordination.

o. “Misconduct" refers to, but is not limited to:

   i. "Neglect of Duty," as such term is defined herein;
   ii. "Malfeasance," as such term is defined herein;
   iii. "Failure to Accept a Directed Reassignment," as the term "Directed Reassignment" is defined herein;
   iv. "Failure to Accompany a Position in a Transfer of Function," as the term "Accompany a Position in a Transfer of Function" is defined herein; or
   v. Retaliation against a “whistleblower” for making a lawful “whistleblower disclosure” as those terms are defined by 38 U.S.C. § 323(g).

p. "Neglect of Duty" includes, but is not limited to, failure to provide appropriate oversight, supervision, or control over matters or personnel that are assigned to or are the responsibility of the Senior Executive; and failure of Senior Executives to follow the guidance herein to address in a timely manner performance or disciplinary issues of their subordinates.

q. “OAWP” refers to the VA Office of Accountability and Whistleblower Protection, as represented by the Assistant Secretary for Accountability and Whistleblower Protection or his or her designee.

r. “OGC” refers to the VA Office of General Counsel, as represented by the General Counsel or his or her designee.

s. “OHRA” refers to the VA Office of Human Resources and Administration, as represented by the Assistant Secretary for Human Resources and Administration or his or her designee.

t. "OIG" refers to the VA Office of Inspector General, as represented by the Inspector General or his or her designee.

u. “OPM” refers to the U.S. Office of Personnel Management.

v. "Organization" refers to a VA Administration or Staff Office.

w. “PAS” refers to an individual who is appointed by the President and confirmed by the Senate.

x. “PPA” refers to Prohibited Personnel Action, as described in 38 U.S.C. § 733(c) (to be renumbered to 38 U.S.C. § 731(c)).

y. “Progress review” refers to a formal or informal feedback provided to a Senior Executive on his/her progress in meeting the performance elements and requirements described in the performance plan.

z. "Proposal" refers to a documentation from the Proposing Official to the Senior Executive that:

i. Notifies the Senior Executive of the proposed action;
ii. Notifies the Senior Executive of the basis of the proposed action;
iii. Provides the evidence supporting the proposed action;
iv. Notifies the Senior Executive that the action is being taken pursuant to 38 U.S.C. § 713;
v. Notifies the Senior Executive of the opportunity to provide a written reply to the Deciding Official within 7 business days and the means of transmitting such reply; and
vi. Notifies the Senior Executive of the ability to be represented by an attorney or other representative of the Senior Executive's choice.

Note: See paragraph 9 if a Proposal is taken based on matters covered by 38 U.S.C. § 731.

aa. “Proposing Official” refers to the official, usually the Senior Executive's immediate supervisor, who issues a notice of proposed Reprimand, Suspension, Demotion, or Removal.

bb. "Rating Official" refers to the official, usually the Senior Executive's immediate supervisor, who is responsible for developing the Senior Executive's performance plan, appraising the Executive's performance, and assigning an Initial Summary Rating.

cc. "Removal" or “remove” refers to the involuntary separation of a Senior Executive from the civil service.

dd. “Reprimand” is a written statement of censure given to a Senior Executive for Misconduct.

ee. “Retaliation” refers to a personnel action, as defined in 5 U.S.C. § 2302, or as described in 38 U.S.C. § 731, taken, threatened to be taken, or not taken by a supervisor against a “whistleblower” for making a lawful “whistleblower disclosure” as those terms are defined by 38 U.S.C. § 323(g).

ff. "Senior Executive" refers to:

i. A "career appointee" in a "Senior Executive Service position" as those terms are defined by 5 U.S.C. §§ 3132(a)(4) and (a)(2), respectively; or

ii. An individual who occupies an administrative or executive position and who was appointed under 38 U.S.C. §§ 7306(a), 7401(1), and 7401(4), including, but not limited to, medical center directors, chiefs of staff, and nurse executives appointed under those titles; except that an individual who is appointed under 38 U.S.C. § 7401(1) will not be considered a "Senior Executive" under this policy if the basis for either a Reprimand, suspension, Demotion, or Removal under this policy involves or includes a question of professional conduct or competence, as defined under 38 U.S.C. § 7461(c)(3). In such a case, 38 U.S.C. §§ 7461 and 7462, and applicable VA policies, will govern.

gg. "Standard of Proof" refers to the degree of evidence necessary to sustain an action taken under 38 U.S.C. § 713. For actions taken under this authority, Substantial Evidence is the Standard of Proof.

hh. "Substantial Evidence" means relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree.

ii. "Suspend" or "suspension" means placing a Senior Executive in a temporary status without duties and pay.

jj. "Title 5" refers to title 5 of the United States Code.

kk. "Title 38" refers to title 38 of the United States Code.

ll. "VA" refers to the U.S. Department of Veterans Affairs.

**7. Procedures:**

a. Actions based on Misconduct, performance, or Retaliation:

i. Organization heads or their designees shall refer all allegations of Misconduct, poor performance, or Retaliation involving Senior Executives to OAWP.

ii. OAWP will refer matters involving actual or possible violations of criminal laws to the OIG pursuant to section 1.204 of title 38 of the Code of Federal Regulations (C.F.R.).

iii. Investigation: OAWP or, as specifically delegated by OAWP, an Organization, shall review and, if necessary, investigate any allegation or other evidence of Misconduct, poor performance, or Retaliation, using appropriate processes such as administrative investigation boards or fact-finding inquiries.
   1. Unless the circumstances of the investigation make it impossible, unreasonable, or unnecessary to do so, a Senior Executive who is the subject of an investigation or review will be given an opportunity to respond to and provide evidence relating to the matters under investigation. Any statement or evidence provided by the Senior Executive will be included in the investigative file, and if relevant or used in support of a subsequent proposed action, the evidence file; and
   2. OAWP or, as specifically delegated by OAWP, the organization, will consult with OGC should procedural or legal questions arise about the investigation.
   3. Upon conclusion of the OAWP investigation, OAWP and OGC shall brief the Secretary or his or her designee on the results of the investigation and whether disciplinary action is recommended. The recommendation will be limited to whether disciplinary action should be pursued.
   4. If the Secretary or his or her designee concurs with OAWP and OGC's recommendation, OAWP and OGC shall coordinate with the organization or the Secretary to identify a Proposing Official who shall be briefed regarding the results of the investigation and the evidence gathered.

b. Acting on the Investigation and Evidence:

i. The Proposing Official will review the available evidence to determine whether a Reprimand, Suspension, Demotion, or Removal should be proposed; or whether no action is warranted. The Proposing Official will consult with OGC, OAWP, and OHRA.

Note: See the restrictions that apply on discipline in paragraph 9 of this policy.

Note: The Proposing Official will propose a penalty that is reasonable and commensurate with the facts of the case and the rationale for determining what constitutes the appropriate level of discipline will be included in the Proposal.

ii. "No action" may be warranted if the Proposing Official determines, by Substantial Evidence, that the evidence does not support any of the allegations against the Senior Executive.

iii. Once the Proposing Official has decided on a course of action,

the Proposing Official will work with OAWP and OGC to prepare a Proposal.

c. Additional requirements for actions based on performance:

   i. Senior Executives may be demoted or removed for performance under the Act, as implemented in this policy.
   ii. There is no requirement for the Senior Executive to have served a 90-day performance appraisal period prior to a performance-based Demotion or Removal. Such a performance-based action could, among other things, be based on a current progress review or immediately preceding Final rating, Interim rating, or Closeout rating against approved performance standards.
   iii. Organizations will work with OHRA, OGC and OAWP to identify a Proposing Official.
   iv. Proposing Officials will work with OHRA, OAWP, and OGC to prepare a performance-based Proposal. In addition to the requirements for a Proposal, defined earlier in this document, the Proposal will articulate or provide in evidence:
      1. The Senior Executive's performance standards;
      2. The Senior Executive's last performance rating, if one exists;
      3. Documentation that supports the Senior Executive's performance deficiencies; and
      4. A copy of the notice provided to the Senior Executive of the performance deficiencies.

d. Processing an action under the Act:

   i. The Proposing Official will, through OAWP in consultation with OHRA and OGC, provide the Senior Executive with a copy of the Proposal. OAWP will also provide a copy of the issued Proposal to OGC.

Note: In cases where a Senior Executive is being demoted, the Proposal shall state the position, title, grade, salary, and location of the position to which the individual will be demoted.

   ii. The Senior Executive will have 7 business days after receiving the Proposal to respond, in writing, to the Deciding Official.
   iii. Extensions to the reply period may be granted by the Deciding Official, after consulting with OGC and OAWP, but should only be granted in themost exigent circumstances and recognizing the statutory requirement to issue a decision within 15 business days from the date that the Proposal was issued.
   iv. The Deciding Official will give full and impartial consideration to

the Senior Executive's reply, if any, along with the Proposal. The Deciding Official will consult with OGC, OAWP and OHRA, but shall not consult or discuss the Proposal, response, or the pending matter with any other individual at VA.

v. Not later than 15 business days after the date of the Proposal, the Deciding Official shall issue an Initial Decision, after independently reviewing the Proposal, the evidence being relied upon, and considering the Senior Executive's reply. An Initial Decision that is not grieved within the timeframes prescribed in this policy shall be final and conclusive and shall only be entitled to judicial review as provided for under the Act. A copy of the Initial Decision should be provided to OAWP, OHRA, and OGC.
   1. In cases where a Senior Executive is being demoted, the Initial Decision shall state the position, title, grade, salary, and location of the position to which the individual will be demoted.
   2. In cases where a Senior Executive is to be demoted, the Secretary, or his or her designee, is the approving official for pay setting determinations.

vi. The aggregate period for notice, reply, and Initial Decision on a proposed action may not exceed 15 business days.

**8. Grievance Process:**

a. A Senior Executive who receives an Initial Decision for an action taken under the Act and this policy is entitled to grieve such an Initial Decision to a Grievance Official. The grievance must be in writing and contain the following information:

i. The specific action on which the grievance is based, the date the action occurred, and the date the individual first learned of the action (if appropriate);

ii. The reasons for which the individual believes that the action was not supported by Substantial Evidence; is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with a provision of law; or obtained without procedures required by a provision of law having been followed; and

iii. The corrective action desired by the individual.
   1. If the grievance does not include the above information, the Grievance Official will consider the grievance, as written, along with the record established under this policy.
   2. A grievance must be filed with the Grievance Official, containing the information in paragraph 8a of this policy, within seven business days from the date that the Initial Decision was received by the Senior Executive. A failure to file a grievance within this timeframe would result in an

Initial Decision becoming final and conclusive and subject only to judicial review under the Act.

3. Upon receipt of a grievance, the Grievance Official will consult with OAWP and OGC, who will advise the Grievance Official on issues raised by the grievant. The Grievance Official may not consult with other parties.
4. The Grievance Official will, within 20 calendar days of receiving the grievance, issue a recommendation to the Secretary through OAWP on the grievance. The Grievance Official may, after reviewing the record, including the grievance, Initial Decision, and Proposal, recommend to the Secretary to mitigate the discipline. The Grievance Official may recommend setting aside an Initial Decision that is the subject of the grievance if he or she determines that the record reflects that the action was:
    a. Not supported by Substantial Evidence; or
    b. Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with a provision of law; or
    c. Obtained without procedures required by a provision of law having been followed.
5. The Secretary, after reviewing the record, including the Grievance Official's recommendation, the grievance, the Initial Decision, and the Proposal, will issue a Final Decision.
    a. In cases where a Senior Executive is being demoted, the Final Decision shall state the position, title, grade, salary, and location of the position to which the individual will be demoted.
    b. In cases where a Senior Executive is to be demoted, the Secretary is the approving official for pay setting determinations.
6. The Final Decision will not uphold an Initial Decision that is the subject of the grievance if the Secretary determines that the record reflects that the action was:
    a. Not supported by Substantial Evidence; or
    b. Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with a provision of law; or
    c. Obtained without procedures required by a provision of law having been followed.
7. The Final Decision shall be subject to judicial review under 38 U.S.C. §§ 713(b)(4)-(6).

9. **Adverse Actions against Senior Executives who commit PPAs under 38 U.S.C. § 731:**

a. A Senior Executive against whom the Secretary, or his or her designee, the OIG, or unless the matter is still pending or under appeal, an administrative judge, the Merit Systems Protection Board, the Office of Special Counsel, an adjudicating body provided under a union contract, or a Federal judge, determines committed a PPA will face the following proposed discipline:

i. With respect to the first time such a determination has been made against the Senior Executive, a suspension of no less than 12 days and not more than removal; and
ii. With respect to the second time such a determination has been made against the Senior Executive, removal.

b. A Proposal issued against a Senior Executive for a PPA, as determined in paragraph 9a, should state that the proposed discipline is taken under the authority in this policy, as amended by 38 U.S.C. § 731, and that the 7 business day timeframe for reply (as stated in paragraph 7c(2)) for an action taken under this policy is amended to 10 calendar days.

c. For the purposes of paragraph 9:

i. An "administrative judge" refers to an administrative judge of the Merit Systems Protection Board; and
ii. An "adjudicating body provided under a union contract" refers to an arbitrator who VA and a union have selected to adjudicate a matter described in 5 U.S.C. § 7121(f).

David J. Shulkin, M.D.

DEPARTMENT OF VETERANS AFFAIRS

# OFFICE OF INSPECTOR GENERAL

*Office of Special Reviews*

OFFICE OF ACCOUNTABILITY & WHISTLEBLOWER PROTECTION

# Failures Implementing Aspects of the VA Accountability and Whistleblower Protection Act of 2017

Exhibit 3

REVIEW | REPORT #18-04968-249 | OCTOBER 24, 2019

The mission of the Office of Inspector General is to serve veterans and the public by conducting effective oversight of the programs and operations of the Department of Veterans Affairs through independent audits, inspections, reviews, and investigations.

*In addition to general privacy laws that govern release of medical information, disclosure of certain veteran health or other private information may be prohibited by various federal statutes including, but not limited to, 38 U.S.C. §§ 5701, 5705, and 7332, absent an exemption or other specified circumstances. As mandated by law, the OIG adheres to privacy and confidentiality laws and regulations protecting veteran health or other private information in this report.*

**Report suspected wrongdoing in VA programs and operations to the VA OIG Hotline:**

**www.va.gov/oig/hotline**

**1-800-488-8244**

# Executive Summary

The VA Office of Accountability and Whistleblower Protection (OAWP) was established in 2017 to improve VA's ability to hold employees accountable and enhance protections for whistleblowers.[1] This goal was to be accomplished, in part, by expanding VA's ability to hold senior executives accountable for specified misconduct; preventing retaliation against whistleblowers and initiating action against supervisors who retaliate; and addressing senior executives' poor performance.

A year later, in June 2018, the VA Office of Inspector General (OIG) received requests from Senators Tammy Baldwin, Richard Blumenthal, Sherrod Brown, Patty Murray, Jon Tester, and Representative Timothy Walz raising concerns that VA was not properly implementing the Department of Veterans Affairs Accountability and Whistleblower Protection Act (the Act). These requests came as a number of other complaints were being considered by the OIG regarding OAWP operations. In response, the OIG's Office of Special Reviews conducted an initial review from June 2018 through December 2018. During the review, additional allegations arose, prompting further work through August 2019.[2]

The OIG's review focused on answering the following questions that emerged from these complaints and allegations:

1. Whether the OAWP was exercising its authority in accordance with the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017 and other applicable laws
2. Whether the OAWP conducted adequate, thorough, and procedurally fair investigations of matters it investigated
3. Whether VA employees were held accountable by making appropriate use of the authorities provided in the Act

---

[1] *See* Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017, P.L. 115-41, 131 Stat. 862 (June 23, 2017). The legislation codified the establishment of the OAWP following an executive order issued in April 2017 to create an entity to "improve accountability and whistleblower protection" at VA. Improving Accountability and Whistleblower Protection at the Department of Veterans Affairs, Exec. Order No. 13793, 82 Fed. Reg. 20539 (Apr. 27, 2017). *See also* Dep't of Veterans Affairs, News Release, "Secretary David Shulkin Announces Establishment of Office of Accountability and Whistleblower Protection and Names Peter O'Rourke as its Senior Advisor and Executive Director" (May 12, 2017).

[2] From June 23, 2017, until January 7, 2019, the OAWP operated without an assistant secretary—a position called for by the Act. It was led by Executive Director Peter O'Rourke from June 23, 2107, to February 28, 2018, followed by Executive Director Kirk Nicholas until January 7, 2019. The current Assistant Secretary for Accountability and Whistleblower Protection took office on January 7, 2019, and soon began implementing changes, some of which address matters identified throughout the review.

4. Whether the OAWP was adequately protecting whistleblowers from retaliation as required by the Act and other applicable laws

5. Whether VA complied with other requirements of the Act, including making timely and accurate reports to Congress.

The OIG identified significant deficiencies with respect to each of these questions. Notably, in its first two years of operation, the OAWP acted in ways that were inconsistent with its statutory authority while it simultaneously floundered in its mission to protect whistleblowers. Even recognizing that organizing the operations of any new office is challenging, OAWP leaders made avoidable mistakes early in its development that created an office culture that was sometimes alienating to the very individuals it was meant to protect. Those leadership failures distracted the OAWP from its core mission and likely diminished the desired confidence of whistleblowers and other potential complainants in the operations of the office. A summary of key findings related to each of the review questions follows.

## The OAWP Misinterpreted Its Statutory Mandate, Resulting in Failures to Act Within Its Investigative Authority

The OAWP misconstrued its statutory investigative mandate both by accepting matters that it should not have and declining matters the Act requires it to investigate. The OAWP also investigated individuals who were not included within the scope of the OAWP's authority under the Act. This included investigating one of its own directors for allegations relating to the director's earlier position at another VA office. At the same time, it was too narrowly interpreting the scope of *what* the office should investigate. The OAWP inappropriately excluded investigations of misconduct and poor performance of covered individuals if the person making the allegations did not meet the statutory definition of whistleblower.

In addition to misinterpreting its statutory investigative mandate, the OAWP also failed to refer matters for investigation to other more appropriate investigative entities. VA employees must, for example, refer to the OIG matters that may be serious violations of criminal law related to VA. The OAWP investigated criminal matters involving possible felonies that it was required to refer to the OIG. Allegations of discrimination similarly should have been referred to VA's designated equal employment opportunity (EEO) office, the Office of Resolution Management (ORM), unless they fell within the OAWP's authority to investigate. Although the law does not require that the OAWP refer such matters to the ORM, filing with the ORM is the only way for employees to preserve their EEO rights and it has more expertise to handle investigations of discrimination.

## The OAWP Did Not Consistently Conduct Procedurally Sound, Accurate, Thorough, and Unbiased Investigations and Related Activities

Written policies and procedures are crucial to effective operations. During the tenures of Executive Directors O'Rourke and Nicholas, the OAWP did not adopt comprehensive written policies and procedures on any topic. As of July 2019, it still lacked OAWP-specific written policies and procedures.[3] The office also did not have a quality assurance process for identifying and preventing errors in its work.

The lack of clear written guidance for OAWP personnel contributed to the failure to consistently conduct investigations that were procedurally sound, accurate, thorough, and unbiased. Moreover, the OAWP Investigations Division was primarily staffed with human resources specialists whose position descriptions did not require extensive investigative training or experience. This deficiency was aggravated by the OAWP's failure to provide sufficient training on such critical topics as interviewing witnesses, conducting investigations, and writing reports.

A further investigative deficiency was the OAWP's practice of investigating to the "substantial evidence" standard. That is, OAWP investigators did not conduct investigations designed to ensure that all known or obviously relevant evidence was obtained.[4] Rather, in many instances, they focused only on finding evidence sufficient to substantiate the allegations without attempting to find potentially exculpatory or contradictory evidence. One disciplinary official described OAWP investigations as "a [disciplinary] action in search of evidence."

## VA Has Struggled with Implementing the Act's Enhanced Authority to Hold Covered Executives Accountable

A critical purpose of the Act was to facilitate holding Covered Executives accountable for misconduct and poor performance.[5] However, as of May 22, 2019, VA had removed only one Covered Executive from federal service pursuant to the authority provided by the Act. The OIG found that officials tasked with proposing and deciding disciplinary action had insufficient direction for how to determine the appropriate level of discipline that would ensure consistency and fairness for specific acts of misconduct and poor performance. In many cases, a disciplinary official mitigated the discipline recommended by OAWP as too severe or based on advice from

[3] OAWP staff reported during the review that written policies and procedures were being drafted.

[4] For example, the Council of Inspectors General on Integrity and Efficiency, Quality Standards for Investigations (November 15, 2011) provide that all known or obviously relevant evidence should be obtained during an investigation. While OAWP is not governed by these standards, they provide relevant guidance for conducting thorough and objective investigations in a similar context.

[5] "Covered Executives" in this report refer to VA personnel holding statutorily enumerated senior-level positions as defined in 38 U.S.C. §§ 323(c)(1)(H)(i) and (ii).

the VA's Office of General Counsel. In part, this was because of the absence of clear guidance and the OAWP's practice of not always including relevant exculpatory evidence.[6]

## The OAWP Failed to Fully Protect Whistleblowers from Retaliation

From June 2017 to May 2018, the OAWP referred 2,526 submissions to other VA program offices, facilities, or other components that were not all equipped to undertake such investigations and without adequate measures to track the referrals or safeguards to protect whistleblowers' identities.[7] Of these, at least 51 involved allegations of whistleblower retaliation by a supervisor (and so properly within the investigative authority of the OAWP). Complainants were not always advised of these referrals. Without guidance, OAWP personnel did not take sufficient steps to protect complainants' identities and prevent their concerns from being sent to the very facilities or network offices where the complainant worked or that were the subject of the allegations.

The OAWP also failed to establish safeguards sufficient to protect whistleblowers from becoming the subject of retaliatory investigations. One troubling instance involved the OAWP initiating an investigation that could itself be considered retaliatory. At the request of a senior leader who had social ties to the OAWP Executive Director, the OAWP investigated a whistleblower who had a complaint pending against the senior leader. After a truncated investigation, the OAWP substantiated the allegations without even interviewing the whistleblower.

In addition, former OAWP leaders made comments and took actions that reflected a lack of respect for individuals they deemed "career" whistleblowers. Moreover, at a time when the office was failing to meet its statutory requirements and purposes, then Executive Director Nicholas directed about 15 percent of the OAWP's FY 2018 budget to be obligated for contracts beyond its core mission.

## VA Did Not Comply with Additional Requirements of the Act and Other Authorities

VA did not meet many other requirements of the Act and other authorities. Significant among these shortcomings were the following failures:

- To revise supervisors' performance plans and provide required training
- To implement whistleblower protection training for all employees

[6] Under a pilot initiative implemented by Dr. Bonzanto in March 2019, VA's Office of General Counsel attorneys are now routinely provided access to the entire investigative file.

[7] In April and May 2019, Dr. Bonzanto directed, as part of an effort to review all 539 investigations of whistleblower retaliation allegations received from June 23, 2017, through April 15, 2019, to determine if they were properly developed. A plan has been submitted for reviewing 42 disclosures determined to need further review.

- To meet its statutory obligation to submit responsive congressionally mandated reports
- To file systems of records notices
- To disclose routine uses of information

A worthy objective of the OAWP is to promote an environment in which whistleblowers feel comfortable in making complaints without fear of retaliation or reprisal. The former leaders of OAWP engaged in misdeeds and missteps that appeared unsupportive of whistleblowers while also failing to meet many of the other important objectives of the Act. Given the magnitude of the situation inherited by new OAWP leaders in January 2019, significant enhancements are needed for OAWP to meet its mission and purpose.

The OIG made 22 recommendations to improve VA processes that increase employee accountability and whistleblower protection.

R. James Mitchell

R. JAMES MITCHELL, ESQ.
Acting Executive Director
for the Office of Special Reviews

# Contents

Abbreviations ..... vii

Introduction ..... 1

Findings and Analysis ..... 7

Finding 1: The OAWP Misinterpreted Its Statutory Mandate, Resulting in Failures to Act Within Its Investigative Authority ..... 7

Finding 2: The OAWP Did Not Consistently Conduct Procedurally Sound, Accurate, Thorough, and Unbiased Investigations and Related Activities ..... 21

Finding 3: VA Has Struggled with Implementing the Act's Enhanced Authority to Hold Covered Executives Accountable ..... 37

Finding 4: The OAWP Failed to Fully Protect Whistleblowers from Retaliation ..... 45

Finding 5: VA Did Not Comply with Additional Requirements of the Act, Including Timely and Accurate Congressional Reporting ..... 57

Finding 6: The OAWP Lacked Transparency in Its Information Management Practices ..... 65

Conclusion ..... 71

Recommendations 1–22 ..... 71

Management Comments ..... 73

OIG Response ..... 74

Concerns with VA Action Plans ..... 75

Appendix A: Scope and Methodology ..... 77

Appendix B: Management Comments ..... 79

OIG Contact and Staff Acknowledgments ..... 90

Report Distribution ..... 91

# Abbreviations

| | |
|---|---|
| A&A | Advisory & Analysis (Division) |
| HR&A | Human Resources and Administration |
| HVAC | U.S. House of Representatives Committee on Veterans' Affairs |
| OAR | Office of Accountability Review |
| OAWP | Office of Accountability and Whistleblower Protection |
| OGC | Office of General Counsel |
| OIG | Office of Inspector General |
| OMI | Office of the Medical Inspector |
| SVAC | U.S. Senate Committee on Veterans' Affairs |
| VISN | Veterans Integrated Service Network |

# Introduction

On May 12, 2017, then VA Secretary David Shulkin announced the establishment of the VA Office of Accountability and Whistleblower Protection (OAWP). Created by executive order, the OAWP was intended to improve VA's efforts to hold its "employees accountable for their actions if they violate the public trust, and at the same time protect whistleblowers from retaliation."[8] In June, Congress passed the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017, which was signed into law on June 23, 2017. The Act "codified and expanded [the] OAWP, assigned it specific responsibilities, and implemented new authorities to hold senior leaders and employees accountable."[9]

A year later, in June 2018, the VA Office of Inspector General (OIG) received requests from Senators Tammy Baldwin, Richard Blumenthal, Sherrod Brown, Patty Murray, Jon Tester, and Representative Timothy Walz for a review of how VA was implementing the Act in light of allegations they received that its authorities were being "used in an inconsistent and inappropriate manner." The OIG had also been receiving complaints from current and former VA employees, veterans, and members of the public raising similar concerns, particularly about OAWP's operations and leaders' actions. Although allegations varied in their specifics, some common themes emerged that focused the scope of the OIG's review on answering the following questions:

1. Whether the OAWP was exercising its authority in accordance with the Act and other applicable laws
2. Whether the OAWP conducted adequate, thorough, and procedurally fair investigations of matters it investigated
3. Whether VA employees were held accountable by making appropriate use of the authorities provided in the Act
4. Whether the OAWP was adequately protecting whistleblowers from retaliation as required by the Act and other applicable laws
5. Whether VA complied with other requirements of the Act, including making timely and accurate reports to Congress

During its review, the OIG also identified concerns relating to OAWP's compliance with the Privacy Act of 1974 and the Freedom of Information Act.

---

[8] VA Office of Public Affairs, Press Release: "Secretary David Shulkin Announces Establishment of Office of Accountability and Whistleblower Protection and Names Peter O'Rourke as its Senior Advisor and Executive Director," news release, May 12, 2017, https://www.va.gov/opa/pressrel/pressrelease.cfm?id=2904.

[9] VA Office of Accountability and Whistleblower Protection, *Report to the Committee on Veterans Affairs of the Senate and the Committee on Veterans Affairs of the House of Representatives on the Activities of the Office of Accountability and Whistleblower Protection for the Period June 30, 2017 – June 30, 2018*, June 30, 2018.

The OIG's primary review period began with the statutory establishment of the OAWP on June 23, 2017, and ended on December 31, 2018. Unless otherwise noted, the information and data presented in this report pertain to this period. Upon taking office in January 2019, the current Assistant Secretary for Accountability and Whistleblower Protection began to implement changes. To provide the most current information practicable, and address more recent complaints, the OIG conducted additional work through August 2019, including document review and interviews with the Assistant Secretary and other OAWP staff.[10]

## Creation of the Office of Accountability and Whistleblower Protection

Before the OAWP was established, the Office of Accountability Review (OAR) was responsible for investigating allegations of senior executive misconduct. Established as part of the VA Office of General Counsel (OGC) in 2014 at the direction of former VA Chief of Staff Jose Riojas, the OAR had a mandate to "receive, review, investigate, and resolve allegations of misconduct and lack of oversight by senior leaders."[11]

In April 2017, President Donald Trump issued an executive order directing that

> the Secretary shall establish in the VA the Office of Accountability and Whistleblower Protection (Office), and shall appoint a Special Assistant, reporting directly to the Secretary, to serve as Executive Director of the Office. The VA shall provide funding and administrative support for the Office, consistent with applicable law and subject to the availability of appropriations.[12]

Executive Order 13793 did not prescribe a particular scope of authority for the OAWP and it did not provide the OAWP with any specific investigative or disciplinary authority.

When the Act was signed into law on June 23, 2017, it statutorily established the OAWP and defined its functions and scope. The Act defined the functions of the OAWP as follows:

> (A) Advising the Secretary on all matters of the Department relating to accountability, including accountability of employees of the Department, retaliation against whistleblowers, and such matters as the Secretary considers similar and affect public trust in the Department.

---

[10] The OIG received several allegations of improper hiring practices within the OAWP. Most of these allegations related to past practices. However, some personnel moves made between January and June 2019 were also the subject of complaints. A commonly received complaint was that competitive service vacancies were being filled on a basis other than merit. The investigation of individual complaints of prohibited personnel practices was not within the scope of this review, although deidentified information was transmitted to VA. Witnesses raising allegations of whistleblower retaliation or prohibited personnel practices were encouraged to file complaints with the Office of Special Counsel or submit the allegations to the OIG hotline for handling in accordance with its usual protocols.

[11] OAR disbanded after OAWP was created and its staff and pending cases were reassigned to OAWP.

[12] Exec. Order No. 13793 (Apr. 27, 2017).

(B) Issuing reports and providing recommendations related to the duties described in subparagraph (A).

(C) Receiving whistleblower disclosures.

(D) Referring whistleblower disclosures received under subparagraph (C) for investigation to the Office of the Medical Inspector, the Office of Inspector General, or other investigative entity, as appropriate, if the Assistant Secretary has reason to believe the whistleblower disclosure is evidence of a violation of a provision of law, mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to public health or safety.

(E) Receiving and referring disclosures from the Special Counsel for investigation to the Medical Inspector of the Department, the Inspector General of the Department, or such other person with investigatory authority, as the Assistant Secretary considers appropriate.

(F) Recording, tracking, reviewing, and confirming implementation of recommendations from audits and investigations carried out by the Inspector General of the Department, the Medical Inspector of the Department, the Special Counsel, and the Comptroller General of the United States, including the imposition of disciplinary actions and other corrective actions contained in such recommendations.

(G) Analyzing data from the Office and the Office of Inspector General telephone hotlines, other whistleblower disclosures, disaggregated by facility and area of health care if appropriate, and relevant audits and investigations to identify trends and issue reports to the Secretary based on analysis conducted under this subparagraph.

(H) Receiving, reviewing, and investigating allegations of misconduct, retaliation, or poor performance involving—

> (i) an individual in a senior executive position (as defined in section 713(d) of this title) in the Department;
>
> (ii) an individual employed in a confidential, policy-making, policy-determining, or policy-advocating position in the Department; or
>
> (iii) a supervisory employee, if the allegation involves retaliation against an employee for making a whistleblower disclosure.

(I) Making such recommendations to the Secretary for disciplinary action as the Assistant Secretary considers appropriate after substantiating any allegation of misconduct or poor performance pursuant to an investigation carried out as described in subparagraph (F) or (H).

## Structure, Staffing, and Authorities of the OAWP

The Act established an Assistant Secretary for Accountability and Whistleblower Protection who is appointed by the President, confirmed by the Senate, and reports directly to the VA Secretary.[13] The Act mandated that the OAWP "shall not be established as an element of the Office of the General Counsel and the Assistant Secretary may not report to the General Counsel,"[14] and that "the Secretary may only assign to the Assistant Secretary responsibilities relating to the functions of the Office."[15]

From June 23, 2017, until January 7, 2019, the OAWP operated without an assistant secretary. It was instead led by an executive director—a role that was filled first by Mr. Peter O'Rourke and subsequently by Mr. Kirk Nicholas. Since January 7, 2019, the OAWP has been led by Dr. Tamara Bonzanto, DNP, the first Assistant Secretary of Veterans Affairs for Accountability and Whistleblower Protection.[16]

### OAWP's Structure and Staffing

The OAWP is organized into five divisions: Triage, Investigations, Advisory & Analysis, Knowledge Management, and Human Resources & Office Support. The functions of each division are summarized in Figure 1.




*Figure 1. Organizational components of the Office of Accountability and Whistleblower Protection*
*Source: VA OIG Analysis*

On June 12, 2017, then VA Secretary Shulkin reassigned OAR personnel to staff the OAWP. At that time, the OAR was composed of 52 staff (five executive leaders, six operations staff, five data analytics staff, 30 investigative staff, and six triage staff). By June 18, 2018, the OAWP

[13] 38 U.S.C. § 323(b).
[14] 38 U.S.C. § 323(e).
[15] 38 U.S.C. § 323(b)(4).
[16] DNP is an individual with a doctorate in nursing practice.

brought on additional employees to nearly double its personnel to 103 staff, distributed among its leadership and five divisions.

**Table 1. OAWP Staffing Numbers as of June 18, 2018**

| Division | Count |
|---|---|
| Executive Leadership | 9 |
| Triage Division | 26 |
| Investigations Division | 30 |
| Advisory & Analysis Division | 15 |
| Human Resources and Office Support | 14 |
| Knowledge Management Division | 9 |
| **Total** | **103** |

*Source: OIG Analysis of organizational charts dated June 18, 2018, confirmed as current by the OAWP as of March 7, 2019*

The primary organizational difference between the former OAR and the OAWP was the establishment of the Advisory & Analysis Division (A&A Division). Mr. O'Rourke explained to OIG investigators that the A&A Division was created to handle disciplinary decisions and related analysis to focus the Investigations Division's efforts on fact-finding and not discipline. Since November 2017, the A&A Division has been led by the A&A Director, a lawyer whose experience included practicing employee relations law for the U.S. Department of Justice for more than four years (hereafter A&A Director).

## OAWP's Investigative Authority

The Act broadly authorized the OAWP to investigate the conduct of any VA supervisory employee "if the allegation involves retaliation against an employee for making a whistleblower disclosure."[17] In addition, the Act gave the OAWP a specific scope of authority to investigate "allegations of misconduct, retaliation, or poor performance" for certain senior executives.[18] The Act did not authorize the OAWP to conduct investigations of any other class of employees or subject matters.

The OAWP receives submissions (typically complaints or allegations of wrongdoing) from many sources, including current, former, and prospective VA employees; veterans; elected officials; and members of the general public. All submissions are first reviewed by the Triage Division, and then routed in accordance with the Triage Division's procedures.

[17] 38 U.S.C. § 323(c) (1)(H)(iii).

[18] 38 U.S.C. § 323(c) (1)(H) (defining scope of OAWP investigative authority).

Submissions determined to fall within OAWP's investigative authority are referred to the OAWP Investigations Division. For other submissions, the Act authorizes the OAWP to refer

> whistleblower disclosures received [pursuant to the Act] for investigation to the Office of the Medical Inspector [OMI], the Office of Inspector General, or other investigative entity, as appropriate, if the Assistant Secretary has reason to believe the whistleblower disclosure is evidence of a violation of a provision of law, mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to public health or safety.[19]

To the extent that the OAWP receives allegations of potential felony criminal conduct, the OAWP must refer these to the OIG.[20] From June 23, 2017, to December 31, 2018, the OAWP referred 38 allegations to the OIG, eight allegations to VA's Office of Resolution Management (ORM), and 13 allegations to OMI.

## OAWP's Authority to Recommend Disciplinary Action

Once a matter has been investigated, the results of the investigation are forwarded to the A&A Division for review. The A&A Division assesses the results of the investigation and determines whether disciplinary action is appropriate. If disciplinary action is deemed appropriate, a memorandum is provided to the VA Secretary indicating that the OAWP is recommending disciplinary action without further details. Unless the Secretary objects, the OAWP then engages with a proposing official and drafts a proposal containing the A&A Division's disciplinary recommendation in consultation with the VA Office of General Counsel.[21]

OAWP's authority is limited to making recommendations about discipline. The determination about whether to discipline an employee is made by officials within the employee's supervisory chain or as designated by the VA Secretary. When the A&A Division recommends a disciplinary action, it engages with VA Office of General Counsel attorneys and management officials who are senior to the employee who is the subject of the recommendation. The management officials include a "proposing official" and "deciding official." The proposing official is responsible for reviewing the evidence file and proposing the disciplinary action to be taken. The deciding official reviews the proposed disciplinary action and reply from the subject employee, and

[19] 38 U.S.C. § 323(c)(1)(D).

[20] 38 CFR § 1.204. As discussed in Finding 1, VA employees are required to report potential criminal conduct to a supervisor or the OIG. Felonies must be referred to the OIG. Because of the potential challenge in parsing a felony versus a misdemeanor, the OIG encourages VA employees to refer all potential criminal conduct involving VA to its Office of Investigations or hotline.

[21] The memorandum simply indicates the OAWP is recommending a disciplinary action against an employee; it does not indicate the specific disciplinary action recommended, nor does it describe the circumstances giving rise to the recommendation. See Figure 6 on page 61 for more information on the OAWP triage and subsequent processes.

determines whether to sustain, mitigate, or set aside the proposed disciplinary action. A Covered Executive may also file a grievance contesting the deciding official's determination to a grievance official, who makes a final decision.[22]

# Findings and Analysis

## Finding 1: The OAWP Misinterpreted Its Statutory Mandate, Resulting in Failures to Act Within Its Investigative Authority

Under the Act, the functions of the OAWP include (1) receiving and referring whistleblower disclosures and (2) receiving, reviewing, and investigating defined categories of allegations involving specific VA employees. The OAWP, however, misconstrued its statutory mandate and investigative authority resulting in its staff investigating individuals outside the legislative scope, failing to refer matters to other investigative entities when appropriate, and simultaneously declining to investigate other matters that were within its scope.

[22] Corporate Senior Executive Management Office Letter No. 006-17-1, *Senior Executive Accountability and Grievance Procedures*, July 7, 2017.

## The OAWP's Advertisement of Its Scope Reflected a Lack of Understanding

The OAWP held itself out on its public website for more than a year as having "a broad and expansive mission" and as committed to "unbiased investigation of all allegations and concerns" relating to VA employees.[23]




*Figure 2. Excerpts from the OAWP website, describing its mission*
*Source: OIG analysis, website accessed on May 21, 2019*

Contrary to this description, however, the Act gives the OAWP a narrower scope of authority to investigate allegations against specific VA employees. Under the Act, the OAWP is authorized to investigate "allegations of misconduct, retaliation, or poor performance" as to three categories of employees.[24] First, it may investigate such allegations against a VA supervisory employee, but only "if the allegation involves retaliation against an employee for making a whistleblower disclosure."[25] It may also investigate such allegations against individuals who fall into one of two additional categories:

- VA personnel holding statutorily enumerated senior-level positions (Covered Executives).[26] This includes career members of the Senior Executive Service

[23] This language appeared on the OAWP website from April 2018 until July 18, 2019.

[24] 38 U.S.C. § 323(c)(1)(H).

[25] 38 U.S.C. § 323(c)(1)(H)(iii).

[26] 38 U.S.C. §§ 323(c)(1)(H)(i) and 713(d)(3).

(SES).[27] It also applies to individuals in an "administrative or executive position" who are
(a) members of the Office of the Under Secretary for Health,[28] or (b) "physicians, dentists, podiatrists, chiropractors, optometrists, registered nurses, physician assistants, and expanded-function dental auxiliaries."[29]

- VA personnel "employed in a confidential, policy-making, policy-determining, or policy-advocating position" (VA Policy Makers).[30]

From June 23, 2017, to December 31, 2018, the OAWP Triage Division received at least 3,694 submissions. Of these, only 547 were referred by the Triage Division to the Investigations Division (as discussed below, these submissions included allegations that the OIG determined exceeded the OAWP's statutory mandate to investigate). The OAWP's advertised mission of investigating "all allegations and concerns" was not consistent with its practices—which could have contributed to the frustration expressed by some complainants to the OIG hotline that OAWP was not fulfilling its stated objectives.

## The OAWP Investigated Employees and Matters Beyond Its Authority

Some of the confusion OAWP staff expressed surrounding OAWP's investigative authority can be attributed to a misplaced dependence on the former OAR duties and then a "delegation of authority" granted to OAWP's executive director—neither of which aligned with the OAWP's actual statutory authority. From June 23, 2017, until January 2019, the OAWP operated without an assistant secretary and was, instead, led by an executive director. Initially, the OAWP executive director relied on the authority delegated to the former OAR, which included authority to conduct investigations of certain senior officials. On February 7, 2018, the executive director was delegated authority to carry out various functions of the OAWP.[31] The delegation included

[27] 5 U.S.C. § 3132(a)(4). Other members of the Senior Executive Service that are not included are noncareer appointees, limited-term appointees, and limited emergency appointees. See 5 U.S.C. § 3132(a)(4) – (7).

[28] 38 U.S.C. § 7306(a).

[29] 38 U.S.C. § 7401(1).

[30] 38 U.S.C. § 323(c)(1)(H)(ii). Although the OAWP has not defined which positions fall within the VA Policy Makers classification, it has included political appointees in its scope.

[31] VA Memo No. VAIQ 7819162, Delegation of Authority—Executive Director of the Office of Accountability and Whistleblower Protection, February 7, 2018.

the authority to "receive, review, and as necessary, investigate allegations of misconduct related to accountability and whistleblower issues" for the following seven categories of personnel:

(1) All positions centralized to the Secretary of Veterans Affairs;

(2) Members of the Senior Executive Service;

(3) Employees who occupy an administrative or executive position and who are appointed under 38 U.S.C. §§ 7306, 7401(1), or 7401(4);

(4) Associate and Assistant Directors in the Veterans Health Administration;

(5) Cemetery Directors in the National Cemetery Administration;

(6) Individuals employed in a confidential, policy-making, policy-determining, or policy-advocating position in the Department; [32] and

(7) General Schedule (GS)-15 Program Office and Regional Office heads within VA Central Office and reporting directly to VA Central Office, including staff offices.

An OAWP Senior Advisor (hereafter the Senior Advisor), at the direction of then Executive Director O'Rourke, drafted the delegation. It appears from email records that the categories of personnel identified in the delegation were based, in part, on incorporating into the delegation the investigative scope of the defunct OAR, even though its authority differed from OAWP's statutory authority. The OAWP does not have authority to investigate individuals in all seven categories if the allegation is not whistleblower retaliation.[33] Specifically, not all positions centralized to the Secretary, cemetery directors, and GS-15 program and regional office heads are Covered Executives or VA Policy Makers under OAWP's legislative authority.[34]

Although the VA Secretary generally has broad latitude to delegate to subordinate officials to carry out VA's duties,[35] Congress limited the VA Secretary's ability to delegate to the OAWP in the Act. The Act provides that "the Secretary may only assign to the Assistant Secretary responsibilities relating to the functions of the Office set forth in [the Act]."[36] Accordingly, the

[32] Mr. O'Rourke told the OIG that the OAWP had not determined how to interpret "Individuals employed in a confidential, policy-making, policy-determining, or policy-advocating position in the Department."

[33] 38 U.S.C. § 323(c)(1)(H).

[34] Only the SES-level employees would be subject to the OAWP's authority to investigate misconduct and poor performance unless the allegation included whistleblower retaliation. See 38 U.S.C. § 323(c)(1)(H)(iii). With respect to cemetery directors, OAWP officials were aware that position-level grades range from GS-11 to SES, and that SES positions are "few and far between."

[35] 38 U.S.C. § 308(b).

[36] 38 U.S.C. § 323(b)(4).

Secretary did not have the authority to expand OAWP's investigative scope by delegating authority to investigate categories of individuals other than those identified in the Act.[37]

The VA Office of General Counsel (OGC) reviewed and approved a prior version of the delegation. Although it was revised slightly before it was signed by the former VA Secretary, the revisions did not change the OGC-approved categories of individuals covered by the delegation, which included individuals outside the scope of OAWP's investigative authority. In February 2018, soon after the delegation was signed and distributed, OGC attorneys raised concerns about the scope of the delegation.[38] On April 24, 2018, then General Counsel James Byrne provided Mr. Nicholas with a draft revision to the delegation, which aligned with the Act's description of the OAWP's investigative scope. Between April and November 2018, OGC attorneys had multiple communications with OAWP leaders regarding the delegation. OGC attorneys had understood that the OAWP had committed to changing the delegation to a version the OGC had approved that aligned with the Act. Additional emails reflect that the OGC continued raising this issue with Mr. Nicholas as late as November 2018, but that the delegation remained in effect.[39] Emails among OAWP leaders indicate that from at least June 2018 to March 2019, the OAWP was continuing to seek a delegation that was materially different from OGC's recommendation and included individuals in the investigative scope who were not within OAWP's authority under the Act.

### *The OAWP Investigated Employees Not Within Its Statutory Scope*

The OIG found that the OAWP investigated individuals who were outside of its statutory scope. In some instances, these individuals were within the scope of the February 2018 delegation; however, in others, the individuals were outside the scope of both OAWP's statutory and delegated authority. Instead of investigating these allegations, the OAWP should have declined or referred all such matters for investigation to another VA component or outside entity.

In its June 2018 annual report to Congress, the OAWP acknowledged limitations on its scope and requested congressional consideration of an expansion.

[37] The delegation at issue was to the executive director, not an assistant secretary. However, that distinction does not appear relevant to whether the scope of the OAWP's investigative authority under the Act could be expanded by a delegation from the VA Secretary. See 38 U.S.C. § 323(b)(4). The functions of the office are clearly defined in the statute and an expansion of the function of the office via a delegation to the executive director, even if not directly prohibited by the Act, appears contrary to Congress's intent.

[38] Two days after the delegation was signed, the then Executive Secretary to VA sent an email stating that the delegation "is rescinded" and that a "revised version will be issued upon approval." No memo of rescission nor a revised version of the delegation was ever issued. An OGC attorney told OIG investigators that it was unclear whether the delegation was, in fact, rescinded. The OAWP continued to operate as if the delegation were in effect.

[39] The delegation appears to be of little current effect given that an assistant secretary has been confirmed and there is no longer an executive director of OAWP. Nonetheless, to the extent that the delegation is being used by the OAWP to shape its scope, rescission would be appropriate to avoid perpetuating confusion.

> The current language in 38 U.S.C. section 323(c)(1)(H) describes a specific sub-set of individuals to be investigated by OAWP. While the listed individuals represent some senior leaders in the VA, a broader definition is needed to ensure all supervisors and managers responsible for leading major VA activities are consistently held to the same standard of accountability. For example, a typical VA medical center is led by a group of five employees (Medical Center Director; Chief of Staff; Nurse Executive; Assistant Director, and Associate Director). As currently written only three (Medical Center Director, Chief of Staff and Nurse Executive) of the five are within the scope of OAWP's statutory charter. Additionally, the senior leadership of other major VA facilities fall outside the current statutory coverage such as Cemetery Directors and General Schedule office directors of VBA Regional Offices.[40]

At the time of OAWP's report to Congress, the OAWP was operating under a delegation that purported to grant it authority to investigate some of these categories of individuals, which it conceded were outside the scope of its authority. The OIG identified a number of instances in which OAWP investigated individuals outside its authority, both before and after its June 2018 report to Congress.

### Example 1

> *In June 2018, the OAWP investigated allegations that a police officer, a GS-6, used excessive force against a patient. The allegation was investigated at the request of former Executive Director Nicholas "due to [VA Secretary] awareness." The OAWP did not substantiate the allegations.*

The allegation in Example 1 involved a GS-6 employee who is not within OAWP's statutory scope (where there is no allegation of whistleblower retaliation by a supervisor). This was similarly outside the scope of the February 2018 delegation, and the potentially serious criminal nature of the violation necessitated a referral to the OIG by the OAWP.[41] The OIG's records reflect reports about this incident from multiple other sources, but do not indicate any OAWP referrals.

### Example 2

> *In September 2018, a VHA employee relations specialist sought information relating to OAWP's scope. The Triage Division advised that the OAWP*

---

[40] VA Office of Accountability and Whistleblower Protection, *VA Report to the Committee on Veterans Affairs of the Senate and the Committee on Veterans Affairs of the House of Representatives on the Activities of the Office of Accountability and Whistleblower Protection for the Period June 30, 2017 – June 30, 2018*. This requested expansion is not the subject of any pending legislation at this writing.

[41] 38 CFR § 1.204.

*"currently does have jurisdiction over all GS-15 employees." This is an improper statement of OAWP's authority under the Act as well as the February 2018 delegation, which included only those "General Schedule (GS)-15 Program Office and Regional Office heads within VA Central Office and reporting directly to VA Central Office." As a result of the Triage Division's incorrect advice, a submission was made to the OAWP relating to allegations of misconduct by a GS-15 public affairs specialist. The Triage Division referred the matter to the Investigations Division. The OAWP determined there was no basis for a formal disciplinary action. However, changes were made to the public affairs specialist's performance standards and a "performance expectation" memorandum was prepared to reflect such changes.*

The OAWP did not have statutory authority to investigate the allegations in Example 2 because a GS-15 employee is not within the category of individuals the OAWP may investigate unless the allegation was whistleblower retaliation. This employee was also not covered by the February 2018 delegation because that was limited to only certain GS-15 employees. The public affairs specialist was not a program office or regional office head within, and reporting directly to, VA Central Office.

### Example 3

*In September 2018, the OAWP received a submission alleging gross mismanagement, including contracting issues, related to capital improvement projects at a VA medical center. The allegations involved three individuals: a division chief (GS-14), a capital asset manager (GS-14), and a contracting director (GS-15). In May 2019, the Triage Division referred the matter to the OIG, and the OIG declined because the allegations primarily related to personnel matters. Following the declination, the Triage Division referred the matter to the OAWP Investigations Division where it remains.*

Example 3 was not within OAWP's statutory authority to investigate because it does not have authority to investigate allegations of misconduct or poor performance involving GS-14 and GS-15 employees. These individuals also were not within the scope of the delegation, which included some, but not all, GS-15 employees. Following the OIG's declination, the matter should have been referred to another VA component for review, such as the Office of Acquisition, Logistics, and Construction for major construction or the VISN in which the allegations arose for minor construction.

### Example 4

*Also in September 2018, the OAWP received a submission with multiple allegations concerning a GS-13 cemetery director. The OAWP elected to*

> *investigate the portion of the allegations pertaining to the cemetery director's misuse of government time and resources. The remainder of the allegations, including that the cemetery director was disrespectful to the staff, were referred to the National Cemetery Administration leaders. This matter remained pending as of the end of May 2019.*

Although the February 2018 delegation included cemetery directors in the scope of the investigative authority delegated to the OAWP, this was inconsistent with the Act. In Example 4, the GS-13 cemetery director was not a Covered Executive or a VA Policy Maker and the allegations the OAWP investigated did not relate to whistleblower retaliation. As a result, the investigation exceeded OAWP's statutory mandate. The VA Office of Resolution Management had also received the allegations and was prepared to investigate if the OAWP declined.

### *The OAWP Investigated Its Own Division Director in a Matter Outside Its Scope*

OIG investigators received allegations and information from multiple sources within the OAWP alleging that OAWP staff had investigated one of its own directors but failed to hold this individual accountable for misconduct. The OIG partially substantiated the allegations, finding that the OAWP did investigate one of its directors and she/he had engaged in misconduct when this individual worked at another component of VA. As of July 2019, no disciplinary action had been taken against the director, who remains employed by VA. The OIG, however, identified no evidence that OAWP officials purposefully attempted to influence the investigation or the still-pending disciplinary process.

This investigation was not within OAWP's scope because it did not involve a Covered Executive or VA Policy Maker, nor did the allegations include a claim of whistleblower retaliation. The alleged misconduct related to when the subject employee was a Veterans Health Administration (VHA) employee prior to joining the OAWP. Emails reflect that OAWP staff considered referring this matter for investigation to the VHA component in which the alleged misconduct occurred. According to an email exchange, the OAWP retained the investigation, in part, because the VHA component "might feel intimidated by having to interview a now-OAWP employee." To mitigate the appearance of bias, an OAWP official assigned the matter to an investigator who did not know the OAWP leader in question "well."

Case notes reflect that the investigator submitted the investigation report on January 7, 2019, substantiating the misconduct allegations. An OAWP official told the OIG that after receiving the results of the investigation, the OAWP official directed another senior OAWP official to take another look to "make sure" because it was "a pretty serious matter." In late March 2019, multiple OAWP officials (excluding the director who was the subject of the investigation)

reviewed the results of the investigation, which resulted in referring the case file to OGC for advice.

In July 2019, the OIG learned that the matter remained unresolved and that current OAWP leaders are evaluating whether it is necessary to refer the matter to another investigative entity for independent investigation. Immediate referral to another investigative entity would have been appropriate both to adhere to its statutory scope and to avoid the appearance of bias or impropriety that can undermine confidence in an office trying to establish trust among VA employees.

## *The OAWP Investigated Subject Matters That It Should Have Referred*

The Act requires the OAWP to refer a whistleblower disclosure

> for investigation to the Office of the Medical Inspector, the Office of Inspector General, or other investigative entity, as appropriate, if the Assistant Secretary has reason to believe [a] whistleblower disclosure [received by the OAWP] is evidence of a violation of a provision of law, mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to public health or safety.[42]

Unless such a disclosure falls within the OAWP's statutory authority to investigate, it should be referred to another investigative entity, as appropriate. When the matter involves a felony, it must be referred to the OIG, and good practice would be to refer any possible crime to the OIG for consideration.

### *Some Allegations of Potential Crimes Not Referred to the OIG*

The OAWP investigated allegations of potential criminal matters that should have been referred to the OIG for consideration. VA regulations require VA employees to report potential criminal acts to a supervisor or to the OIG.[43] However, where the potential criminal act involves a felony, VA employees must *refer* the matter to the OIG.[44] The distinction between a crime that is classified as a felony and one that is classified as a misdemeanor is based on the seriousness of the offense and the length of the associated prison sentence.[45] In some cases, determining whether an alleged crime involves a felony may not be possible until after an investigation. As such, it may be difficult for VA employees to determine which potential crimes involve felonies

[42] 38 U.S.C. § 323(c)(1)(D).

[43] 38 CFR § 1.201.

[44] 38 CFR § 1.204.

[45] Under federal law, a felony is an "offense punishable by a maximum term of imprisonment of more than one year." 18 U.S.C. § 3156.

that must be referred to the OIG and which involve misdemeanors that need only be reported to a supervisor. Given that difficulty, the best practice for any VA employee is to refer *any* possible criminal acts to the OIG for potential investigation.[46]

Examples 5 and 6 summarize two allegations involving potential criminal conduct that the OAWP should have referred to the OIG or, at the very least, have coordinated with the OIG prior to initiating an investigation.[47]

### Example 5

> *In April 2018, the OAWP received allegations that a Covered Executive was engaging in contracting abuse, conflicts of interest, and violations of federal ethics rules. Some of these matters included alleged abuses of authority and/or potential felony criminal violations. These allegations were bundled with several others that included whistleblower retaliation and issues within OAWP's scope. The OIG could locate no records in OAWP's or OIG's databases indicating that the contracting abuse, conflict of interest, and ethics allegations had been referred to the OIG despite possibly involving felony violations of federal laws on receiving gifts, making false statements, or other related crimes.*[48]

In Example 5, the allegations the OAWP investigated included potential criminal violations (such as an employee's improper financial gain) that should have been referred to the OIG as required by regulation.[49] In this case, some of the allegations of potential criminal activity appear to have been sparked by the complainant's review of an OIG audit report, which analyzed the administration of a VA program but did not address individual wrongdoing.[50] Although there may have been some overlap between the scope of the OIG's audit and the allegations the OAWP investigated, there were sufficient differences in the allegations the OAWP received that

[46] As a practical matter, any serious allegations of waste, fraud, and abuse that affect VA programs, operations, or put veterans at risk for harm or financial loss should be reported to the OIG to determine if its resources and expertise should be employed, particularly those matters that are due to more than a single individual's error or action.

[47] The OIG review team referred these allegations, identified during its OAWP review, to the OIG hotline for processing.

[48] The OAWP initially substantiated that the Covered Executive's spouse received $520 worth of tickets to accompany the Covered Executive to a sporting event acting in an official capacity. It was later determined that the spouse had not received a gift after all.

[49] It is a felony to receive compensation for or have a financial interest in a federal government contract in which you are involved as a federal employee. See 18 U.S.C. §§ 203 and 208.

[50] Because the complainant was not a VA employee (or individual seeking VA employment), the complaint in Example 5 did not meet the statutory definition of a whistleblower disclosure under the Act. Nevertheless, the OAWP should have referred the matter to the OIG because of the potential felony violations as required by regulation (38 CFR § 1.204).

staff should have referred them to the OIG prior to conducting their own investigation.[51] The OAWP should not have assumed that the OIG had no further interest in the allegations simply because there was a somewhat-related audit report.

### *Example 6*

> *In January 2018, the OAWP received multiple allegations related to a GS-15 employee. The allegations included that the employee was attempting to steer the award of a contract to a personal friend's employer. OAWP's documentation is insufficient to determine whether its personnel reviewed the contract steering allegation as part of its investigation. As of May 2019, OAWP's investigation remained open.*

In Example 6, the allegation of steering a contract suggests a potential felony that should have been referred to the OIG under the Act and as required by regulation.[52]

#### *Inadequate Procedures and Role Clarification for Allegations of Discrimination*

The Senior Advisor indicated that allegations of a hostile work environment, which is a complaint predicated upon discriminatory workplace harassment, is one of OAWP's most commonly received complaints. It is a violation of law for an employer to discriminate on the basis of an employee's statutorily protected status.[53] To the extent that such allegations otherwise satisfy the Act's definition of a whistleblower disclosure and are not within OAWP's investigative authority, the Act requires the OAWP to refer such allegations to an "other investigative entity, as appropriate." It would be appropriate to refer allegations of discrimination to VA's Office of Resolution Management. ORM is responsible for providing equal employment opportunity (EEO) complaint processing services within VA, which includes conducting investigations pursuant to complaints of discrimination. Filing with the ORM is the only way for employees to preserve their EEO rights.[54] In addition, participating in the ORM's EEO process is

[51] Among other considerations, the OAWP should have confirmed that the OIG did not have an open criminal investigation stemming from the audit.

[52] 18 U.S.C. § 205. It is a crime to act as agent for another party in a matter in which the United States has an interest, including a federal contract. This is a good example of why it is difficult for OAWP or other VA components to determine whether an alleged criminal act is potentially a felony that must be referred to the OIG. A "willful" violation of the statute may be punished by up to five years in prison, and is thus considered a felony, whereas a violation that is not "willful" is subject to no more than one year imprisonment. 5 U.S.C. § 216(a) (setting forth the penalties for a violation of 18 U.S.C. § 205).

[53] *See*, *e.g*, 42 U.S.C. § 2000e-2 (prohibiting discrimination on the basis of race, color, religion, sex, or national origin). There are other statutorily protected classes.

[54] An aggrieved VA employee must begin the process with ORM within 45 calendar days of the date the alleged discrimination occurred, otherwise the right to pursue an EEO complaint may be lost. See the VA Office of Diversity and Inclusion's "Equal Employment Opportunity, Diversity and Inclusion, No FEAR, and Whistleblower Rights and Protection Policy Statement," July 5, 2017, rev. August 27, 2018 (EEO Policy Statement).

generally the only way that an aggrieved employee may be made whole through enforceable adjudication if a supervisor is found to have discriminated.[55]

It is not uncommon for an allegation of discrimination to coincide with allegations of other misconduct or poor performance that may be within the OAWP's statutory authority to investigate. In such circumstances, the OAWP needs a process to ensure that its review of the remaining allegations can proceed in a coordinated manner with the work of the ORM. In addition, the OAWP must communicate clearly about its investigative scope so that individuals submitting allegations of discrimination understand that the appropriate avenue for redress of EEO matters is with the ORM. The OIG determined that the Triage Division's procedures did not fully address the need to ensure that disclosing parties are advised that discrimination allegations should be raised with the ORM, and fully documenting OAWP's advisement in each case.

## The OAWP Declined Matters Within Its Statutory Mandate by Misconstruing Its Investigative Authority

Matters that fall within OAWP's statutory authority likely were overlooked because OAWP's triage procedures excluded complaints that did not qualify as whistleblower disclosures under the Act. The OAWP staff appear to have conflated its authority *to investigate* with its duty *to receive and refer whistleblower disclosures.*[56] The written standard operating procedures adopted by the Triage Division (the triage SOPs) limit investigations by the OAWP to submissions that meet the definition of a whistleblower disclosure under the Act.[57] This restriction does not appear to have any basis in the Act.[58] It is also inconsistent with the procedures issued by the VA Secretary in July 2017 (2017 accountability procedures), stating, "OAWP or, as specifically delegated by OAWP, an Organization, *shall* review and, if necessary, investigate *any* allegation or other evidence of Misconduct, poor performance, or Retaliation, using appropriate processes …." (emphasis added).[59]

---

www.diversity.va.gov/policy/statement.aspx. Allegations raised to avenues outside ORM—including the OAWP—do not constitute initiation of an EEO complaint and do not extend the 45-calendar day time limit.

[55] VA Directive 5977, *Equal Employment Opportunity Discrimination Complaints Process*, May 5, 2011; 38 U.S.C. § 516(b) and the VA Office of Diversity and Inclusion's EEO Policy Statement.

[56] 38 U.S.C. §§ 323(c)(1)(C) and 323(c)(1)(D).

[57] The OAWP appears to continue to misconstrue the statute. The OAWP's current website states that it "directly investigates *whistleblower* disclosures that raise allegations of misconduct, retaliation, or poor performance involving—" Covered Executives, VA Policy Makers, and supervisory employees if it is an allegation of whistleblower retaliation. (emphasis added)

[58] 38 U.S.C. § 323(c)(1)(H).

[59] VA Letter No. 006-17-1, *Senior Exec. Accountability and Grievance Procedures,* July 7, 2017. The July 2017 accountability procedures only apply to Covered Executives. The procedures do not apply to political appointees or

The OAWP has the authority to investigate *all allegations of misconduct and poor performance* involving Covered Executives or VA Policy Makers.[60] This would include allegations that do not qualify as whistleblower disclosures. The Act defines a whistleblower disclosure as

> any disclosure of information by an employee of the Department or individual applying to become an employee of the Department which the employee or individual reasonably believes evidences—(A) a violation of a law, rule, or regulation; or (B) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.[61]

Consequently, an allegation made by a non-employee or non-applicant (such as a former employee, member of Congress, veteran, family or community member) does not qualify as a whistleblower disclosure under the Act.

Moreover, an allegation that involves employee misconduct as defined in the statute—such as neglect of duty—may not be considered a whistleblower disclosure under the Act because it does not evidence a violation of law, rule or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; or a substantial and specific danger to public health or safety.[62]

OAWP's overly restrictive interpretation of its investigative authority could have resulted in allegations that fall within OAWP's scope being closed without further examination. One individual interviewed by the OIG said that he identified at least one instance in which an allegation against a Covered Executive or VA Policy Maker was closed by the Triage Division without an investigation because it did not rise to the level of a whistleblower disclosure. Notwithstanding what is in the triage SOPs, the former director of the Triage Division and the current OAWP Acting Deputy Executive Director reported that, in practice, the Triage Division did refer allegations involving "senior leaders" that did not qualify as whistleblower disclosures to the OAWP Investigations Division.[63]

Witnesses provided the OIG with conflicting responses when explaining whether the OAWP curtailed its investigative authority to investigate only matters that arose from whistleblower complaints. Similarly, the OIG's review of cases identified examples in which the source of the allegation was not a whistleblower. The conflicting information on this subject underscores the

---

supervisory employees, if the allegation is whistleblower retaliation, which the OAWP also has authority to investigate.

[60] 38 U.S.C. § 323(c)(1)(H).

[61] 38 U.S.C. § 323(g)(3).

[62] Misconduct is defined in 38 U.S.C. § 713 as "neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function."

[63] The Triage SOPs' definition of "senior leaders" mirrors the definition in the February 7, 2018, Delegation of Authority, which improperly expands the OAWP's scope to include categories of personnel not identified in the statute.

need for the OAWP to issue clear written triage guidance that conforms with the OAWP's statutory scope.

## Finding 1 Conclusion

The OIG determined that the OAWP investigated matters outside its scope; failed to refer certain matters, as appropriate, to other investigative entities; and misconstrued its investigative authority in ways that excluded matters actually within its scope.

## Recommendations 1–4

1. The Assistant Secretary for Accountability and Whistleblower Protection directs a review of the Office of Accountability and Whistleblower Protection's compliance with the VA Accountability and Whistleblower Protection Act of 2017 requirements in order to ensure proper implementation and eliminate any activities not within its authorized scope.
2. The VA Secretary rescinds the February 2018 Delegation of Authority and consults with the Assistant Secretary for Accountability and Whistleblower Protection, the VA Office of General Counsel, and other appropriate parties to determine whether a revised delegation is necessary, and if so, ensures compliance with statutory requirements.
3. The Assistant Secretary for Accountability and Whistleblower Protection, in consultation with the Office of General Counsel, Office of Inspector General, Office of the Medical Inspector, and the Office of Resolution Management establishes comprehensive processes for evaluating and documenting whether allegations, in whole or in part, should be handled within the Office of Accountability and Whistleblower Protection or referred to other VA entities for potential action or referred to independent offices such as the Office of Inspector General.
4. The Assistant Secretary for Accountability and Whistleblower Protection makes certain that policies and processes are developed, in consultation with the VA Office of General Counsel and Office of Resolution Management, to consistently and promptly advise complainants of their right to bring allegations of discrimination through the Equal Employment Opportunity process.

## Finding 2: The OAWP Did Not Consistently Conduct Procedurally Sound, Accurate, Thorough, and Unbiased Investigations and Related Activities

The OIG recognizes it takes tremendous effort to stand up a new office that operates under different statutory authority than its predecessor. That said, the failure to put in place key systems and quality controls has resulted in OAWP conducting investigations that were not always thorough, objective, and unbiased—undermining OAWP's credibility among some VA employees.

This finding discusses deficiencies that the OIG identified in the following areas:

- The OAWP lacks comprehensive policies and procedures suitable for its personnel. This is particularly important given that individuals' reputations are at stake, whistleblowers' identities must be protected, and the issues on which the OAWP is reporting affect veterans' lives in tremendously significant ways. Staff are either missing guidance or are piecing together direction largely based on the mandates of a prior office not entirely aligned with OAWP's legislative scope.
- The absence of quality control measures is particularly troubling given the hodgepodge of policies and procedures. Depending on disciplinary officials and VA's Office of General Counsel to identify OAWP's investigatory inadequacies cannot be a sustainable solution to effective oversight.
- The OAWP has failed to provide the staffing and training necessary to ensure it has the expertise, experience, and commitment that yield objective and thorough investigations that are critical to OAWP's success. While the OIG appreciates the dedication and commitment of the staff within OAWP to conduct investigations, they have not been given the training and access to expertise needed to perform at the level expected of that office.
- The OAWP has fallen short of its commitment to conduct "timely, thorough, and unbiased investigations" in all cases within its investigative jurisdiction. VA employees and other complainants must be assured that OAWP investigations are conducted with the highest ethical standards, which does not yet appear to have been achieved.

### The OAWP Lacked Suitable Policies and Procedures

The OAWP did not publish comprehensive policies and procedures on any topic during the tenures of then Executive Directors O'Rourke or Nicholas.[64] The OAWP continues to operate without comprehensive written policies and procedures specific to and consistent with its scope

[64] Mr. O'Rourke served as OAWP's executive director from June 23, 2017, until February 28, 2018. Mr. Nicholas then held that position until January 25, 2019.

of authority as of July 2019, although staff reported drafting was in progress. This affected triage activities, general operations, and the integrity of investigations.

### Triage Division's Procedures Blurred Scope of OAWP Authority

The Triage Division adopted written standard operating procedures (SOPs) dated August 2018 that it updated in November 2018. The triage SOPs cover many processes of the division in depth but may have perpetuated confusion about OAWP's scope of investigative authority.[65] The triage SOPs misconstrued OAWP's statutory scope, which, as discussed in Finding 1, contributed to OAWP staff

- Investigating matters outside the scope of OAWP's investigative authority,
- Failing to refer matters that should have been referred to other investigative entities, and
- Limiting investigations to submissions that met the definition of a whistleblower disclosure under the Act.

In addition, the triage SOPs do not provide direction for evaluating whether there is the risk of a conflict of interest or the appearance of bias in OAWP's acceptance of a matter for investigation.

### Operational Procedures Were Incomplete and Outdated

During its review, the OIG was provided a copy of a draft manual with SOPs maintained by the OAWP Knowledge Management Division. The draft SOPs cover numerous topics, including how a matter received by the OAWP makes its way through the case process, and how the OAWP "use[s] Sharepoint to support case management and reporting." Although accessible to OAWP staff via SharePoint, the draft SOPs have not been implemented or finalized, were last updated in December 2017, and continue to reference former activities and processes of the OAR, which disbanded when the OAWP was established. In particular, with respect to report-writing guidance, the related draft SOP incorporates by reference VA Directive 0700 and VA Handbook 0700, neither of which have been adopted by the OAWP in full.

### Investigations Division Used Selective Portions of Preexisting VA Procedures

The Investigations Division of the former OAR conducted its work in accordance with the policies and procedures published in VA Directive 0700 and VA Handbook 0700, both of which were last updated in 2002.[66] These policies and procedures were issued at the direction of former

[65] The categories of personnel identified in the triage SOPs as within the OAWP's scope to investigate are consistent with the February 2018 delegation but inconsistent with the Act. See Finding 1.

[66] VA Directive 0700, *Administrative Investigations*, March 25, 2002; VA Handbook 0700, *Administrative Investigations*, July 31, 2002.

VA Secretary Anthony Principi and included delegations of his authority for conducting investigations. OAWP's authority to conduct investigations comes from the Act, not from VA Directive 0700, and thus VA Directive 0700 and its related handbook are not mandatory procedures for the OAWP.[67] Former OAWP Executive Director O'Rourke told OIG investigators that the OAWP did not adopt VA Directive 0700 and VA Handbook 0700 because the procedures were "owned by OGC." Although the Act mandates that the OAWP not be established as an element of the OGC, it does not foreclose the OAWP from seeking or following legal advice provided by the OGC or from being guided by VA policies of general applicability.[68]

Nevertheless, the OIG determined that the OAWP Investigations Division continued to use certain forms and processes from VA Handbook 0700, with some investigative staff confused about the extent to which the handbook applied to their operations. This confusion created unnecessary work. For example, Dr. Bonzanto told OIG investigators that she questioned OAWP staff about the necessity of preparing charge memos, documents required by VA Handbook 0700 for convening an administrative investigation board. She stated that "no one could … explain where this all came from. They just said, well, we did that in OAR." The OIG did not assess to what extent the handbook provisions used related to any identified investigative inadequacies beyond some reported inefficiencies, but recognizes that policies and procedures should be tailored to OAWP's statutory scope and reflect standards of quality for investigations.

## The OAWP Lacked Effective Quality Assurance Processes to Ensure Thorough and Accurate Investigations

The OAWP did not have measures in place to ensure that investigations met high quality standards. Quality assurance programs are fundamental for any organization but are particularly critical for those entities whose activities affect the lives and reputations of employees and the population they serve. The OIG determined that the OAWP did not implement adequate quality assurance processes designed to detect and prevent errors in its work. The A&A Division observed some deficiencies in the thoroughness of the investigations conducted by the Investigations Division. The VA Office of General Counsel also identified concerns with the

[67] In addition to the authority to investigate granted by the Act, OAWP investigators have authority to administer oaths and issue subpoenas pursuant to a specific delegation from the VA Secretary.

[68] 38 U.S.C. §323(e). VA Handbook 0700 was adopted "to standardize and enhance the efficiency and usefulness of administrative investigations within VA." The handbook states that the "provisions of this Handbook are mandatory, except where the text or context indicates otherwise." The handbook specifically excludes several types of investigations, including those conducted by the OIG and OMI. Investigations conducted by the OAWP could fit within the handbook's definition of an administrative investigation ("a systematic process for determining facts and documenting evidence about matters of significant interest to VA"), and VA could elect to require the OAWP to follow the provisions of VA Handbook 0700. The OAWP did not exist when the handbook was adopted, and VA has issued no guidance as to the handbook's applicability to the OAWP.

work conducted by both the Investigations and A&A Divisions. Neither the A&A Division nor the OGC was responsible for overseeing the work quality of investigators.

### *The A&A Division Identified Issues with the Thoroughness of Investigations*

From June 23, 2017, until approximately March 2019, Investigations Division staff were responsible for fact-gathering as well as writing up their conclusions in an "executive summary" as to whether allegations were substantiated.[69] The investigators' executive summaries included their conclusions and supporting evidence. The OAWP Director of Investigations(hereafter, Investigations Director)was responsible for reviewing and approving summaries. After a summary was reviewed, the investigative file and executive summary were sent to the A&A Division for review and consideration of whether disciplinary action was appropriate. As mentioned above, the A&A Division was not established to supervise the work quality of the Investigations Division, an independent coequal division. Nonetheless, during their disciplinary analysis, A&A Division staff would identify material deficiencies in the evidentiary record.

The A&A Director indicated in a March 2019 interview with OIG staff that from OAWP's statutory inception in June 2017, she and her staff determined that there were instances in which investigations were inadequate or incomplete. When asked to describe these instances, the A&A Director attributed the shortcomings to lack of documentation, insufficient numbers of witnesses interviewed, absence of contemporaneous writings such as emails to corroborate testimony, and misinterpretations of witness statements. These shortcomings are evidenced in the following three examples.

#### *Example 7*

*In September 2018, an A&A Division staff member reviewed an allegation that a supervisor retaliated against an employee who filed a grievance (a protected activity) by modifying a telework agreement, issuing written counseling, and reducing the employee's performance rating. The Investigations Division determined that no retaliation occurred, but the A&A Division identified the following issues with the investigation: failure to develop issues raised in testimony, missing documents, omissions and inaccuracies in a timeline created by investigators based on the record, and redundant documents in the investigative file. The A&A Division recommended gathering additional documents, thoroughly reviewing all documentation, and conducting follow-up interviews. The Investigations Division responded to these concerns, agreeing to*

[69] After March 2019, Dr. Bonzanto transferred the responsibility for determining whether the allegations are substantiated from the Investigation Division to the A&A Division. As a result, OAWP investigators are no longer responsible for drafting the executive summary.

*follow-up interviews, but disagreeing that additional document collection was necessary as it would be "too voluminous." After conducting additional interviews and case development, the Investigations Division maintained its original conclusion that the allegations of retaliation were not substantiated. The A&A Division rejected the Investigations Division's conclusion and found that the evidence showed that the subject employee had experienced retaliation. A proposed notice of disciplinary action has not been issued due to additional allegations brought to the OAWP's attention, which have not yet been resolved.*

### Example 8

*During the review of an investigation relating to alleged retaliation in the form of removal as a contracting officer representative, an A&A Division staff member identified the following issues with the investigation: the scope of the allegations in the charge memo "provided no latitude for potential underlying misconduct that an investigation may reveal"; investigators uncovered and failed to investigate allegedly "unfounded statements" made by a subject during the investigation, which were potentially "slanderous or defamatory"; and investigators failed to consider action taken by a subject that may have been a prohibited personnel action. The Investigations Division responded to these concerns, focusing on the final one, and explained its view that the action by subject employees was not a personnel action, and thus, not retaliation. Following this response, the Investigations and A&A Divisions discussed the concerns, after which it was agreed that the retaliation allegations within OAWP's scope were not substantiated and the matter was referred to the VA administration for further investigation of other allegations.*

### Example 9

*An A&A Division staff member reviewed the results of an investigation into alleged prohibited personnel actions related to illegal hiring practices and retaliation. The Investigations Division substantiated the allegations that three VHA supervisory employees engaged in prohibited personnel practices and retaliation. The A&A Division staff member agreed with the Investigations Division's conclusion as to two of the supervisory employees, but disagreed as to the third. The staff member identified the following issues with the investigation: lack of evidence and failure to state the specific prohibited personnel action at issue. The A&A Division recommended conducting follow-up interviews. The Investigations Division questioned the A&A Division's analysis, and—apart from adding a copy of a relevant performance appraisal to its evidence—it elected not to conduct additional field work. The A&A Division continued to disagree that the*

> *evidence was sufficient to demonstrate that the third supervisory employee engaged in prohibited personnel practices and retaliation, and instead proposed a suspension for failure to follow instructions. This proposed suspension was mitigated by the proposing official to a less severe written counseling.*

The Investigations Director acknowledged that there had been occasions when the A&A Division disagreed with investigators' conclusions, but maintained they were limited to a handful of situations. When asked whether the Investigations Division has standards to determine which witnesses need to be interviewed, the Investigations Director indicated that this assessment and decision are left to the investigator, but a decision not to interview disclosing parties or subjects must be discussed with the regional directors. The Investigations Director explained that he has communicated to investigators that not every witness identified by a complainant or other witness is relevant to the investigation.

### *VA Office of General Counsel Attorneys Identified Deficiencies in the Work of the A&A Division and the Investigations Division*

The Office of General Counsel Personnel Law Group is responsible for providing legal advice on a range of issues relating to human resources, labor relations, and security and law enforcement. The group also receives and reviews all draft proposals prepared by the A&A Division. An attorney in the group provided the OIG with multiple examples of flaws in the OAWP investigations identified through legal reviews of draft disciplinary proposals between June 23, 2017, and December 31, 2018. The flaws generally related to the sufficiency of the evidence, failure to interview witnesses with potentially exculpatory information, thoroughness, the appearance of bias, or concerns about the excessive weight that OAWP investigators ascribed to details such as a witness's demeanor.

An OGC attorney told OIG investigators that the OGC attorney's role was to advise, but not to supervise, the OAWP. The OGC could not dictate outcomes or compel the Investigations Division to interview specific witnesses. Instead, the OGC attorney reviewing the case would spot vulnerabilities in the conclusion reached by the investigator and bring those to the OAWP's attention. OAWP staff were not obligated to take OGC's advice, and in some instances officials deciding disciplinary cases (deciding officials) would independently question the evidence and learn that the OGC had previously disagreed with the OAWP's position on the sufficiency of OAWP's evidence. Former OAWP Executive Director Nicholas explained his view on addressing the OGC's concerns about the sufficiency of OAWP's evidence-gathering in this way: "At the end of the day, our job is a recommendation. The recommendation should give enough to someone to say this did happen, it is substantiated, and we need to take some action, okay? You know, don't make this into solving world hunger. It doesn't have to be that." The following example highlights the types of issues identified by the OGC attorneys.

### *Example 10*

*One OGC attorney recalled an instance in which investigators had not interviewed witnesses previously identified by the subject as individuals who could support the subject's side of the story. The existence of these witnesses was not discovered by the deciding official until the subject responded to the notice of proposed disciplinary action and again made mention of such witnesses. According to an OGC attorney familiar with the matter, it appeared that investigators had either rushed through the investigation or simply failed to interview individuals that spoke favorably about the subject. Had the investigation been thorough and all relevant evidence made available to the proposing and deciding officials, the OGC attorney posited that these officials would have received a "fair picture of the individual" at the outset versus being surprised with new information during the reply period. When an OGC attorney raised this issue with the OAWP, the investigators stated that a determination was made to not waste more resources to interview additional people. In the OGC attorney's opinion, such an approach to investigations was problematic as investigations should be thorough. OAWP's records reflect that in April 2018, the subject employee in this instance was permitted to retire pursuant to a settlement agreement.*

## The Investigations Division Staff Did Not All Have Appropriate Expertise and Training

Determining appropriate staff competencies and recruiting for qualified staff were challenges that the OAWP faced in establishing its new organization. Former OAWP Executive Director O'Rourke told OIG investigators that he determined that the Investigations Division needed to recruit for administrative investigators, which was not a job classification that OAWP's predecessor had used. The OAWP also faced challenges providing appropriate training for its investigators.

### *The Investigations Division Shifted Its Staffing Strategy Away from Human Resources Specialists*

The OAWP inherited the investigative staff of the former OAR, which relied primarily on Human Resources (HR) specialists, whose position descriptions do not require extensive investigative training or experience. As of June 2018, the Investigations Division was staffed by a director, two regional supervisors, 23 HR specialists, one administrative investigator, and had five vacancies. Mr. O'Rourke told the OIG that his staffing strategy for the Investigations Division contemplated the use of administrative investigators rather than HR specialists. In his

view, the work of OAWP's Investigations Division required hiring staff with broader investigative expertise.

The OAWP began recruiting for administrative investigators in May 2018. The Investigations Director told OIG investigators that he was pleased with the recruiting effort and that it attracted many candidates with significant investigative experience. The Investigations Director also said the OAWP had explored whether it was possible to train and convert the HR specialists assigned from the OAR to become administrative investigators, but that the decision was put on hold indefinitely in December 2018. OAWP Deputy Executive Director Todd Hunter told the OIG that he was indirectly made aware that some of the HR specialists did not want to convert to administrative investigator positions and that the OAWP was "going to allow them options" because there were other roles for HR specialists. As of March 5, 2019, the staffing for the Investigations Division was composed of its director, two regional directors, 19 HR specialists, and five administrative investigators, with three vacancies. Although the composition of job types has changed slightly, the total number of staff allocated to the Investigations Division remained at 30 from June 23, 2017, to March 5, 2019.

### *The Investigations Division Lacked a Coordinated Strategy for Training*

The Investigations Director told OIG investigators that from June 23, 2017, until approximately July 2018, the Investigations Division had only provided its staff with web-based training on Administrative Investigation Boards, which the Investigations Director described as "not very good."[70] He acknowledged that in his view, the Investigations Division staff needed better training. According to the Investigations Director, the OAWP hired a senior advisor to assist with developing training programs for investigators. That senior advisor told the OIG that OAWP investigators were not receiving adequate training on interviewing witnesses, conducting investigations, and writing reports. He also told OIG investigators that due in part to quality issues that required frequent reworking, Investigations Division staff average seven cases per year, which he viewed as insufficient productivity. As of June 2019, no internal training program had been developed.

The Investigations Director told OIG investigators that the OAWP sought to address the Investigations Division's training needs by sending staff to training sessions provided by the U.S. Department of Homeland Security's Immigration and Customs Enforcement (ICE). The Investigations Director told the OIG that ICE's Management Inquiry Training Program contained practical exercises on witness interviewing, relevant for Investigations Division staff. The Investigations Division sent six HR specialists to the training in July 2018. According to the

[70] An Administrative Investigation Board is a group of individuals appointed to analyze evidence, ascertain facts, and document complete and accurate information regarding matters of interest to VA. VA Handbook 0700, *Administrative Investigations*, July 31, 2002. The Act does not require the OAWP to use Administrative Investigation Boards for conducting its investigative work.

Investigations Director, by September 30, 2019, nearly all Investigations Division staff will have attended this training. The OAWP training participants rated the practical aspects of the program highly, but also commented that significant portions of the agenda were ICE-specific and had no application to VA.

As part of the arrangement with ICE, the Investigations Director and the senior advisor also attended a week-long advanced interviewing course and received assurance that there would be opportunities for OAWP investigators to take the course in the future. The Investigations Director found the advanced interviewing course to be highly effective and advised OIG investigators that he would like to develop a similar program internally so that OAWP can have highly trained investigators going through the right courses.

## The Investigations Division Lacked a Timely, Thorough, and Balanced Approach to Fact-Finding

The OAWP did not have an approach that ensured comprehensive and impartial investigations. In part, this was because former leaders encouraged investigators to look for "substantial evidence" to support the charge of misconduct without investigating further to identify any relevant exculpatory evidence. The OAWP also conducted investigations involving political appointees instead of referring them to other qualified entities when it appeared OAWP personnel should not be involved because their ability to appear unbiased was impeded, as well as investigating one of its own directors as previously discussed. In addition, complainants voiced concern that investigations appeared to take too long, and that the OAWP did not always communicate promptly with complainants.

### *The Evidence Standard and Its Application Contributed to Limited and Unbalanced Investigations*

In its investigations, the OAWP sought to develop "substantial evidence," defined as "relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree."[71] That is, OAWP investigators did not conduct investigations designed to ensure that all known or obviously relevant evidence is obtained.[72] Rather, in many instances, they focused only on finding evidence sufficient to substantiate the allegations without attempting to find potentially exculpatory or contradictory evidence. This approach was inconsistent with reliably conducting an unbiased,

[71] VA adopted "substantial evidence" as the standard of proof necessary to sustain an action under the Act. Department of Veterans Affairs, Letter No. 006-17-1, Senior Exec. Accountability and Grievance Procedures (July 7, 2017).

[72] *See, e.g.*, Council of Inspectors General on Integrity and Efficiency, Quality Standards for Investigations (November 15, 2011). While OAWP is not governed by these standards, they provide relevant guidance for conducting thorough and objective investigations in a similar context.

balanced, and thorough investigation that includes developing relevant evidence that may disprove the allegations. In part, this was a result of failing to adopt policies and procedures requiring investigators to seek and consider contradictory or exculpatory evidence.

One deciding official described the appearance of a one-sided effort on the part of the Investigations Division stating, "[my] humble observation is that [the OAWP] had a mission to find wrongdoing." The deciding official elaborated, "from my perspective [I] certainly received cases that I thought were marginally supported at best and that it felt like . . . there was a [disciplinary] action in search of evidence." [73] In an interview with the OIG, one investigator recalled expressing a need to develop exculpatory information during the course of an investigation and being told by the A&A Director that this sort of information could be developed by the subject employee when replying to a disciplinary proposal.

Figure 3 provides an excerpt from an email with draft guidance prepared in June 2017 by a former OAWP investigator, which illustrates the impact that the substantial evidence burden of proof was anticipated to have on OAWP's investigative work.

> We must, however, take full advantage of the efficiency this lower burden of proof gives us to
>
> * end our investigations at the moment we have substantial evidence of misconduct,
> * make and communicate our assessments at that point, and
> * hone down our evidence files to just those documents that support charges.

***Figure 3.*** *Excerpt of Draft Guidance Prepared for OAWP Investigative Staff*
*Source: VA*

In response to then OAWP Executive Director O'Rourke's request for comment concerning the draft language excerpted in Figure 3, the Investigations Director wrote, "I think it hits the nail on the head and believe it is in keeping with the Secretary's intent. I would not change anything in it." Although this email does not appear to have been sent as drafted to all OAWP investigators, Mr. O'Rourke instructed the Investigations Director to apply this guidance to OAWP's investigations.[74] The Investigations Director confirmed that he expected investigators to exercise judgment and that the substantial evidence standard factors into that judgment.

[73] In examining whether employees were being properly held accountable under the Act's provisions, the OIG found that in some cases, employees appeared to be facing disciplinary action without sufficient supporting evidence. See Table 2, page 40.

[74] On June 9, 2017 in anticipation of the Act's passage, the Investigations Director emailed all investigators, instructing "Please stop what you are doing and let me [and other senior staff] know if you have any current investigations where you currently have 'substantial evidence' (less than preponderant evidence) substantiating misconduct." A senior OAWP investigator explained that this was part of an effort to identify at least ten pending

In the Investigations Director's view, an investigator would be justified to cease interviewing witnesses once "four or five" witnesses provided consistent testimony because at that point substantial evidence has been marshalled. The OIG identified one instance in which OAWP investigators reached a conclusion based on evidence collected that did not include any effort to interview the subject employee.[75] The 2017 accountability procedures require that, "unless the circumstances of the investigation make it impossible, unreasonable, or unnecessary to do so, a Senior Executive who is the subject of an investigation or review will be given an opportunity to respond to and provide evidence relating to the matters under investigation."

The OIG believes that the application of the substantial evidence standard by the OAWP may have contributed to its investigations being skewed to prove charges instead of to conduct fair and comprehensive investigations. As discussed, the Investigations Division has not published any written procedures to assist investigators in the exercise of this judgment. To reach objective and balanced findings, adequate guidance and training must be provided for investigative staff to apply standards correctly. Additionally, as discussed below, OAWP's practice of only including documents that support its charges when it prepares evidence files for disciplinary cases (and not those that might be exculpatory) has injected the appearance of bias, which could undermine employees' trust in the OAWP's process.

### *OAWP's Investigations of Some Political Appointees Had the Appearance of Bias*

The OAWP has statutory authority to investigate matters that overlaps with the authority granted several other investigative bodies, which means more than one entity can potentially investigate the same matters. The OIG identified instances in which the OAWP's objectivity was impaired by at least the appearance of bias.[76] In these instances, the OAWP should have referred the matters elsewhere or implemented measures sufficient to avoid the appearance of impropriety.[77] Key to this process is having the filter or apparatus for triaging which issues should remain within the OAWP. Guidance for employing that judgment would help ensure consistency and enhance the integrity of the office.

---

investigations where the OAWP could take prompt disciplinary action once the anticipated new authorities from the Act took effect. The investigator stated that Mr. O'Rourke set the goal of identifying ten actions that could be taken.

[75] See Finding 4, page 55.

[76] As discussed in Finding 1, the OAWP decided to investigate one of its directors in a case outside its statutory scope. The appearance of bias in that case was exacerbated by the slow progress of the matter at the discipline stage. Some OAWP staff familiar with the investigation questioned whether OAWP leaders were protecting a senior staff member.

[77] The OAWP has statutory authority to refer whistleblower disclosures to other investigative entities, including the OIG. 38 U.S.C. § 323(c)(1)(D).

Although the OAWP has authority to *investigate* a political appointee, the A&A Division would have no role in advising on any resulting disciplinary action.[78] The two provisions of the Act that govern the VA Secretary's authority *to take disciplinary action* against VA employees exclude political appointees.[79]

The OAWP has investigated misconduct allegations brought against four political appointees: a former VA Deputy Secretary, a former VA Chief of Staff, a former VA Assistant Secretary for Human Resources and Administration, and a former VA Assistant Secretary for Operations, Security, and Preparedness. None of these cases resulted in the OAWP substantiating misconduct.

As with its other work, the OAWP has an obligation to perform its investigation of political appointees in a manner that avoids bias, both actual and apparent. The OIG identified multiple instances in which the investigation of a political appointee posed special challenges for the OAWP with respect to managing at least the appearance of bias.

### Example 11

*From July 2017 to November 2017, the OAWP received four submissions from four different individuals relating to allegations involving Peter Shelby, who was then serving as VA Assistant Secretary for Human Resources and Administration. The allegations included retaliation, harassment, discrimination, and creating a hostile work environment.*

*By the time the allegations were under OAWP review, Mr. Shelby had developed a personal relationship with Mr. O'Rourke (then the OAWP executive director) and Mr. Nicholas (then a senior advisor to the OAWP), which included golf outings and other social engagements.*[80]

*Beyond social engagements, Mr. Shelby had influence over matters of importance to Mr. O'Rourke and Mr. Nicholas. For example, on September 19, 2017, Mr. Nicholas wrote to Mr. Shelby, "Please don't forget to see about a waiver on my retired annuity. It is a fairly large sum of money for me . . ."*[81] *Emails reflect that Mr. Nicholas pressed Mr. Shelby for assistance in obtaining the waiver*

[78] 38 U.S.C. §§ 323(c)(1)(H), 713, and 714. In general, presidential appointees serve at the pleasure of the President. Consistent with OAWP's interpretation of its authority, political appointees are not included in the adverse action authority given to the VA Secretary in 38 U.S.C. §§ 713-714. Presidential appointees are also specifically excluded by 5 C.F.R. § 752.401 from coverage under the adverse actions provision set forth in 5 C.F.R. § 752.

[79] 38 U.S.C. § 713(d)(1)(A) and 5 U.S.C. §3132(a)(4).

[80] Calendars and emails reflect at least five social events involving Mr. Shelby and/or Mr. O'Rourke and/or Mr. Nicholas during the OAWP investigation.

[81] Like any retiree of federal service, Mr. Nicholas was subject to a prohibition against receiving the dual compensation of his federal retirement plus a federal salary. In unusual circumstances, a waiver can be obtained.

> *through at least October 2017 and that the matter remained an open question through February 2018.*[82]
>
> *Email correspondence reflects that, as of March 9, 2018, the Investigations Director had completed the OAWP investigation and was drafting the report. The report was finalized on May 21, 2018, and it concluded that allegations against Mr. Shelby were not substantiated.*

With respect to the Shelby investigation, Mr. O'Rourke acknowledged there could be an appearance of bias, and told OIG investigators that because Mr. Shelby "was a political appointee, we firewall political employees away from them and give it to the career employees to investigate." The OIG determined that the OAWP had no procedures for "firewalling" its senior leaders from cases. Moreover, the OIG determined that Mr. O'Rourke personally intervened to change the investigator assigned to this matter from a career employee who was Mr. O'Rourke's indirect subordinate to the Investigations Director, who was a direct subordinate.[83]

Mr. O'Rourke also had periodic contact with Mr. Shelby relating to the investigation while it was pending. Mr. O'Rourke told OIG investigators that Mr. Shelby "vented" to him about the investigation, and that "[Mr. Shelby] had asked [Mr. O'Rourke] about the allegations," but he told OIG investigators that any discussion was related to the allegations, not the investigation itself. On September 25, 2017, an OAWP investigator emailed Mr. Shelby to request his availability for an interview on either October 3 or 4, 2017. Mr. Shelby did not respond. On October 4, 2017, Mr. O'Rourke wrote to Mr. Shelby, "Can you make yourself available to my investigator *so we can move this along*?" (emphasis added) Later, on December 7, 2017, when the investigator contacted Mr. Shelby to inquire about a new allegation relating to an incident that occurred subsequent to his initial interview, Mr. Shelby forwarded the email to Mr. O'Rourke commenting, "Sure... I'll meet with them but this is becoming ridiculous."[84]

In addition, one of the whistleblowers in the matter was a nonpolitical Covered Executive with whom Mr. O'Rourke had disagreed repeatedly. The whistleblower became the subject of an OAWP investigation requested by Mr. Shelby while the whistleblower's allegations concerning

---

[82] Mr. Nicholas wrote to Mr. Shelby on October 3, 2017, "Hey Golf Pro, Any movement on my retirement waiver yet?" Mr. Shelby responded, "My best folks are on it." Emails reflect that Mr. Shelby continued following up on this request for Mr. Nicholas through at least October 2017, and a determination was made in November 2017 that Mr. Nicholas's stated justification did not meet the requirements for a waiver. Mr. Shelby resumed inquiring on behalf of Mr. Nicholas's requested waiver on February 23, 2018, in connection with an anticipated change in position for Mr. Nicholas to executive director of the OAWP.

[83] The investigator to whom the allegations were originally assigned was a long-tenured VA employee with more than 14 years of experience conducting investigations.

[84] The OAWP's records reflect that investigators met with Mr. Shelby for 66 minutes on October 5, 2017, and 35 minutes on December 13, 2017.

Mr. Shelby were still pending.[85] Other VA employees familiar with the case told the OIG that they were reluctant to report allegations of wrongdoing pertaining to Mr. Shelby because of their perceptions of the close relationship between Mr. O'Rourke and Mr. Shelby.

### Example 12

*In August 2018, the OAWP received a referral from the U.S. Office of Special Counsel and initiated an investigation into the alleged misuse of executive protection services by then VA Deputy Secretary Thomas Bowman, reportedly authorized by then Assistant Secretary for Operations, Security and Preparedness Donald Loren.[86] After interviewing Mr. Loren, the investigator determined that it would be necessary to interview the then VA General Counsel James Byrne. The investigator wanted to speak to Mr. Byrne because Mr. Loren told the investigator that he relied upon advice provided by Mr. Byrne. the Investigations Director and Mr. Nicholas intervened to prevent the investigator from interviewing Mr. Byrne. Mr. Nicholas permitted the investigator to ask the witness only three questions in written form, each of which was subject to his preapproval.[87]*

Example 12 evidences the need for the OAWP to have adequate procedures for mitigating the appearance of bias in cases that have the potential to jeopardize its objectivity. In this instance, Mr. Nicholas's preapproval of the content and manner of questions to be posed of a fellow political appointee has the appearance of bias.

The OIG determined that the OAWP has not instituted procedures sufficient to ensure that investigations are safeguarded against actual or perceived bias. In Example 11, the allegations of discrimination were within the purview of the Office of Resolution Management. However, given Mr. Shelby's position as the Assistant Secretary of HR&A, referral to the Office of Resolution Management—which was within HR&A—may not have avoided the appearance of bias with respect to the discrimination allegations. Instead, the allegations could have been referred to the OIG. To the extent that other allegations of misconduct on the part of Mr. Shelby could not be referred to other investigative entities, the OAWP needed to implement and adhere to procedures reasonably designed to mitigate the appearance of bias. For allegations of misconduct involving senior VA officials, the matter may be investigated by the OIG.

---

[85] Finding 4, page 53 presents further discussion of this case.

[86] Consistent with the ordinary process for referrals received by VA from the U.S. Office of Special Counsel, the OIG also received these allegations. The OIG did not elect to initiate an investigation of its own. In such circumstances, VA is obligated to investigate the matters raised by the U.S. Office of Special Counsel's referral.

[87] The OAWP did not substantiate misconduct in this matter. When interviewed by the OIG, the investigator expressed frustration in the limitations placed on the investigation by OAWP managers.

## *Investigations Did Not Meet the Timeliness Expectations of Whistleblowers*

On its website, the OAWP promised "timely and unbiased investigation" of allegations and committed to "timely remedial resolutions." The OIG received numerous complaints from whistleblowers who felt that their submissions to the OAWP were not being handled in a timely manner, and that they were not even sure that the OAWP had accepted their allegations for investigation. In one example, the OIG found that an August 2017 submission by a VA employee (a veteran) alleged supervisor retaliation, which was followed the next month by a proposed termination and same-day resignation. After a year of inaction within the Triage Division, work was undertaken for several months before the OAWP investigator learned in January 2019 that the complainant had passed away in August 2018 with the matter unresolved.

Lengthy processing times can discourage whistleblowers from making further reports.[88] The OIG recognizes, however, that investigations must be afforded adequate time to ensure accurate results. Still, the OIG evaluated the time taken by the OAWP to resolve matters that were received by the OAWP Triage Division and referred for administrative investigation and found many took a year or more to close.[89]

Dr. Bonzanto told OIG investigators that she prioritized the need for prompt resolution of matters due in part to impacts on the subjects of investigations. She also stated that she was introducing standardized "touchpoints" with whistleblowers to improve communication about case statuses. She told OIG investigators that she instituted new expectations relating to timeliness of investigations. Her stated goal is to reduce to 90 days the time it takes from the receipt of a submission to the end of the A&A Division's involvement. Dr. Bonzanto explained that she is instituting check-in points to ensure that the staff of the Investigations Division are keeping up with their workload.

[88] GAO, *Office of Special Counsel: Actions Needed to Improve Processing of Prohibited Personnel Practice and Whistleblower Disclosure Cases*, GAO-18-400, (June 2018) 16, 21, https://www.gao.gov/assets/700/692545.pdf (discussing importance of timeliness in resolving whistleblower claims).

[89] The data show that from June 23, 2017, through December 31, 2018, the OAWP opened 628 matters for investigation and inherited 131 matters that had been pending with the OAR. Of the 628 OAWP matters, 299 were closed by the end of 2018, but 20 took more than a year to resolve. Of the 329 matters still pending at the end of 2018, 52 had been open more than a year. According to VA's *Administrative Investigations: Resource Guidebook* (June 2004), "[a]n administrative investigation is an impartial inquiry, authorized by a facility director or higher level manager, to be conducted at any time deemed necessary, to determine facts and collect evidence in connection with a matter in which the VA is or may be a part in interest." Directive 0700 also provides, "The term 'administrative investigation' refers to a systematic process for determining facts and documenting evidence about matters of significant interest to VA."

## Finding 2 Conclusion

The lack of comprehensive written procedures has left OAWP staff without sufficient and consistent guidance for conducting its work appropriately and fairly, particularly in regard to triaging and investigating complaints. These deficiencies have perpetuated confusion about OAWP's scope of authority discussed in Finding 1. In addition, the OAWP has not had a quality assurance program to ensure investigations are thorough and accurate. OAWP also had not established training for its investigative staff, which could affect staff's ability to conduct comprehensive and balanced investigations.

The OIG determined that the OAWP has struggled to meet its commitment to objective and timely investigations. Recent complaints to OIG's hotline reflect persistent concerns regarding OAWP's investigative processes.[90] The OAWP could have avoided some of these issues by referring investigative matters to another authorized entity when OAWP's objectivity and bias would be questioned. Investigations must take sufficient time to be accurate; however, the OAWP has created a timeliness expectation for whistleblowers that it has only recently been addressing.

## Recommendations 5–8

5. The Assistant Secretary for Accountability and Whistleblower Protection ensures that the divisions of the Office of Accountability and Whistleblower Protection adopt standard operating procedures and related detailed guidance to make certain they are fair, unbiased, thorough, and objective in their work.
6. The VA General Counsel updates VA Directive 0700 and VA Handbook 0700 with revisions clarifying the extent to which VA Directive 0700 and VA Handbook 0700 apply to the Office of Accountability and Whistleblower Protection, if at all.
7. The Assistant Secretary for Accountability and Whistleblower Protection assigns a quality assurance function to an entity positioned to review Office of Accountability and Whistleblower Protection divisions' work for accuracy, thoroughness, timeliness, fairness, and other improvement metrics.
8. The Assistant Secretary for Accountability and Whistleblower Protection directs the establishment of a training program for all relevant personnel on appropriate investigative techniques, case management, and disciplinary actions.

[90] Deidentified information regarding these complaints was transmitted to VA.

## Finding 3: VA Has Struggled with Implementing the Act's Enhanced Authority to Hold Covered Executives Accountable

The Act includes provisions to reduce perceived barriers to VA's ability to hold Covered Executives accountable for misconduct and poor performance.[91] These include a reduced standard of review, shorter deadlines for the presentation of defenses, and bypassing the Merit Systems Protection Board (MSPB) in favor of litigating all Covered Executive appeals directly before federal judges.[92]

Despite statements by former VA leaders—including former Secretary Shulkin—extolling the new accountability authority, as of May 22, 2019, VA removed only one Covered Executive from federal service pursuant to the authority provided by the Act (38 U.S.C. § 713).[93] Other disciplinary actions, such as demotions, suspensions, and reprimands have also been taken under this authority. From June 23, 2017, to March 22, 2019, officials involved in Covered Executive disciplinary actions (proposing, deciding, or grievance officials) mitigated the discipline recommended by the OAWP in 32 of the 35 Covered Executive cases that proceeded to a final decision.[94] The OIG found that the lack of adequate guidance for officials involved with the disciplinary process and the limited evidence the OAWP provided OGC and proposing officials could have led to reductions in the discipline OAWP recommended.

### VA Did Not Provide Adequate Guidance for Determining Appropriate Disciplinary Actions for Covered Executives

On July 7, 2017, then VA Secretary Shulkin issued Senior Executive Accountability and Grievance Procedures for implementing the Act.[95] Those procedures adopted a decision-making process that involves three management officials: a proposing official, who suggests what disciplinary action should be taken against the subject employee; a deciding official, who issues a decision on the proposed discipline; and a grievance official, who hears an appeal from the employee. The use of a proposing official and deciding official for Covered Executive discipline

---

[91] 38 U.S.C. § 713.

[92] 38 U.S.C. § 713.

[93] This Covered Executive, the medical center director of the Washington, DC VA Medical Center, was originally removed in July 2017. The MSPB ordered a stay of VA's removal action, the director was reinstated, and then subsequently removed under the Act's new authority. He filed an appeal in the U.S. District Court for the District of Columbia. On May 14, 2019, VA rescinded the removal action, reinstating his employment with back pay to a different position. As of July 2, 2019, VA and the former medical center director were negotiating a settlement.

[94] Mitigation, as used here, includes instances in which the OAWP made a recommendation, but the proposing official decided not to propose any disciplinary action. A final decision includes the decision of the proposing official not to propose discipline.

[95] VA Corporate Senior Executive Management Office Letter No. 006-17-1, Senior Executive Accountability and Grievance Procedures, July 7, 2017.

cases is consistent with the decision-making approach that VA used for all staff prior to the passage of the Act.[96]




***Figure 4.*** *VA disciplinary process for Covered Executives for June 23, 2017, to June 2019*
*Source: OIG Analysis*

### *VA Did Not Provide Adequate Guidance to Disciplinary Officials*

Although the process is similar to prior practices, VA eliminated the use of prior guidance and failed to adopt replacement guidance for proposing and deciding officials. Previously, such decision makers consulted VA's table of penalties and the *Douglas* factors (an MSPB-compiled list of factors for deciding officials to consider when making disciplinary determinations) to aid in determining the appropriate discipline.[97] The July 2017 accountability procedures provide that the proposing official will propose "a penalty that is reasonable and commensurate with the facts."[98] The A&A Director told OIG investigators that in making their recommendations to the proposing officials, A&A Division staff attempt to be consistent with prior A&A Division recommendations for similar cases.[99] The A&A Division's recommendations are not binding,

[96] There was no requirement in the Act that VA adopt the existing model.

[97] The table of penalties is published by VA as a "guide" "in the administration of disciplinary and major adverse actions to help ensure that like actions are taken for like offenses." According to OIG interviews, it was not used in disciplinary actions under the Act because of the different standard of proof required by the Act (substantial evidence instead of preponderance of the evidence). The *Douglas* factors are a summary of factors lifted by the MSPB from court decisions, the U.S. Office of Personnel Management, and other relevant guidance that the MSPB views as "relevant for consideration in determining the appropriateness of a penalty." *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981). Because senior executives are no longer able to appeal to the MSPB, VA determined that the *Douglas* factors, which are a feature of MSPB case law, do not apply to disciplinary actions under the Act.

[98] In addition, the July 2017 accountability procedures state that the degree of evidence necessary to sustain an action under 38 U.S.C. § 713 is "substantial evidence," however the application of that standard was not well understood by proposing and deciding officials.

[99] From June 23, 2017, to March 22, 2019, the A&A Division made 48 disciplinary recommendations for Covered Executives.

and the proposing official has discretion to propose whatever disciplinary actions he or she deems appropriate.

Deciding officials also have discretion to decide whether to accept, mitigate, or set aside the proposed disciplinary action. One deciding official told OIG investigators that, when determining the appropriate discipline to impose, he consulted OGC for advice in an effort to be consistent with discipline imposed in other cases. He also said that he applied his own judgment and attempted to be consistent with prior decisions he made in similar cases.

### *Disciplinary Officials Relied on Subjective Judgment to Decide Penalties*

It is appropriate for an official to mitigate a recommended penalty due to the consideration of additional evidence or predetermined standardized disciplinary factors. It is concerning, however, when the mitigation appears to result from officials substituting their own personal judgment for consistent and defensible criteria. A large number of OAWP's recommended actions appear to have been mitigated by disciplinary officials for subjective reasons or because the investigation or evidence was not adequate.

Some OAWP officials expressed concern about the frequency with which the OAWP's recommended disciplinary actions were declined by proposing and deciding officials. The A&A Director attributed this to some disciplinary officials applying subjective mitigating factors, such as, "I've known them for 25 years and they're a great guy." The OIG's review of OAWP data shows that, of the 35 Covered Executive disciplinary cases that proceeded to a final decision from June 23, 2017, to March 22, 2019, OAWP's recommended discipline was accepted only three times.[100] In all other cases, a disciplinary official mitigated the recommended discipline. Eleven cases were mitigated by more than one official. In an additional five cases, the subject resigned or retired before discipline was proposed.

The OAWP provided explanations for 10 of the actions in which the disciplinary officials mitigated the action recommended by OAWP. Table 2 provides a summary (without individual identifiers) of the disciplinary officials' reasons for mitigating those 10 actions.

[100] As discussed in Finding 5, VA did not report on the instances in which disciplinary officials mitigated the discipline recommended by the OAWP because of the OAWP's interpretation of the Act. A final decision, as used here, includes the proposing official's decision not to propose disciplinary action.

**Table 2. Reasons Officials Declined OAWP's Recommended Actions**

| OAWP | Proposing Official | Deciding Official | Grievance Official | Disciplinary Officials' Rationale[101] |
|---|---|---|---|---|
| 5-day suspension | no action[102] | n/a | n/a | The proposing official declined to issue any discipline because the subject's conduct in the circumstances that gave rise to the recommendation was consistent with the way the proposing official would have conducted himself. |
| 14-day suspension | 5-day suspension | 5-day suspension | n/a | Although the proposing official was comfortable with the evidence file, the penalty was lowered to a 5-day suspension. The proposing official acknowledged the mandatory minimum penalty of 12-day suspension for actions resulting from whistleblower retaliation, but interpreted the statute to be inapplicable. |
| 15-day suspension to removal | written counseling | n/a | n/a | The proposing official consulted OGC and factored internal issues at the facility into the decision to mitigate to counseling. |
| removal | 12-day suspension | retired in lieu of removal | n/a | The proposing official disagreed with the Office of Special Counsel's finding and did not want to damage the subject's career at its end. |
| 60-day suspension | 3-day suspension | reprimand | n/a | The proposing official relied upon OGC advice that OAWP's recommendation was "too high." The deciding official told the OAWP that he/she elected to further mitigate after "reviewing the totality of the evidence and the credibility of the witnesses." |
| removal | demotion from SES to GS-14 | demotion from SES to GS-14 | demotion from SES to GS-15 | The proposing official felt that [the subject] could still be a productive and beneficial VA employee, but not as a medical center director. The deciding official told the OAWP that he/she "concur[red] with the demotion to GS-14." The grievance official "felt jumping to the GS14 level was too harsh." |
| 10-day suspension | 3-day suspension | reprimand | n/a | The proposing official felt that OAWP's recommendation was too severe. The deciding official further mitigated due to the subject's medical condition and lack of any prior discipline. |
| 5- to 7-day suspension | 5-day suspension | written counseling | n/a | The proposing official consulted OGC because he/she disagreed with OAWP's recommendation. The deciding official found that the evidence was insufficient. |
| 5- to 10-day suspension | written counseling | n/a | n/a | The proposing official explained that the subject was a minor player in the action, it was a first offense and the subject's supervisor gave him/her bad advice. |
| 15- to 30-day suspension | no action | n/a | n/a | The proposing official relied on OGC's advice that the Administrative Judge erred in finding discrimination, and that VA's decision to accept that conclusion was incorrect. |

*Source: OIG analysis of mitigated cases*

[101] The rationale is based on the explanations provided by the OAWP to the OIG and is supplemented by information provided by the disciplinary officials to the OAWP.

[102] "No action" means the disciplinary official declined to issue a disciplinary action and "n/a" means the corresponding disciplinary official did not have to make a decision because the disciplinary process had ended.

In nine instances, the discipline was mitigated based on the subjective judgment of the disciplinary official that OAWP's recommended action was too severe for the conduct or under the given circumstances. In at least four cases, the proposing or deciding official consulted with the OGC in reducing the discipline originally recommended by OAWP.[103] Several cases reflected concern with the thoroughness of the investigation, including the sufficiency of the evidence presented.

### *Proposing Officials Also Need Additional Guidance on Statutorily Mandated Adverse Actions for Whistleblower Retaliation*

VA also uses proposing officials and deciding officials to determine disciplinary action in cases involving supervisors who have engaged in prohibited personnel actions.[104] By statute, VA is mandated to impose a minimum penalty of a 12-day suspension whenever the

> Secretary, an administrative judge, the Merit Systems Protection Board, the Office of Special Counsel, an adjudicating body provided under a union contract, a Federal judge, or the Inspector General of the Department determines [a supervisor] committed a prohibited personnel action.[105]

Second offenses carry a mandatory penalty of removal. The July 2017 accountability procedures include provisions that senior executives "will face" the mandatory penalties.

The OIG identified instances in which proposing officials would have benefited from guidance regarding mandatory minimum adverse actions beyond the admonition that senior executives "will face" the mandatory penalties. In one instance, the OAWP found a Covered Executive engaged in a prohibited personnel action, but the proposing official declined to propose the minimum 12-day suspension because he reasoned that the OAWP is not among the list of individuals identified in 38 U.S.C. § 731. In a second instance, a proposing official received a finding from the U.S. Office of Special Counsel, via the OAWP, that the subject employee (a Covered Executive) had engaged in a prohibited personnel action. The OAWP recommended removal. The proposing official (the subject's supervisor) disagreed and sought to develop evidence in support of the subject employee. In this instance, the issue became moot because the

[103] An OGC attorney explained that when OGC and the A&A Division disagreed, proposing officials were often confused about whose advice to follow.

[104] Although the July 2017 accountability procedures relate exclusively to Covered Executives, 38 U.S.C. § 731 applies to any supervisor found to have committed a prohibited personnel practice.

[105] The prohibited personnel actions described in this statutory provision relate primarily to whistleblower retaliation. 38 U.S.C. § 731(c). These mandatory minimum penalties were enacted in 2016. See *Continuing Appropriations and Military Construction, Veterans Affairs, and Related Agencies Appropriations Act, 2017, and Zika Response and Preparedness Act*, Public Law No. 114-223, 130 Stat 857 (2016) (codified as amended at 38 U.S.C. § 731).

subject employee resigned. These examples illustrate the need for further clarification and guidance for proposing officials on when mandatory penalties should be imposed.

## The A&A Division Compiled Incomplete Evidence Files to Support Proposed Disciplinary Actions

The A&A Division adopted a practice of culling OAWP's investigative files to prepare an evidence file that it provided to the OGC and the proposing official. The A&A Division focused on including material in the evidence file that supported the proposed disciplinary action, rather than compiling all relevant evidence. According to the A&A Director, the content of the evidence file was determined by "[t]he A&A specialist. When they're drafting the proposal, they are putting the evidence in there that they believe, as they're drafting it, supports the charges. So, the A&A specialist makes the decision of what goes in there."

The July 2017 accountability procedures contemplate the creation of separate investigative and evidence files, with the latter containing a subset of the evidence developed during the investigation limited to what is relevant.[106] Contrary to the A&A Division's practice, however, the July 2017 procedures seem to anticipate that the evidence file made available to proposing officials would contain all relevant evidence and not simply evidence that tends to support the charges.[107] The July 2017 accountability procedures specifically state that the evidence file should include "[a]ny statement or evidence provided by the [Covered Executive] . . . if *relevant or used in support of* the proposed action" (emphasis added). Further, by requiring "substantial evidence" to sustain an action, the procedures imply that other relevant evidence, even if not provided by the Covered Executive, also should be included.[108] The July 2017 accountability procedures define "substantial evidence," as "*relevant evidence* that a reasonable person, considering the *record as a whole* might accept as adequate to support a conclusion, even though other reasonable persons might disagree." (emphasis added)[109] It would be difficult for a disciplinary official to determine whether this standard is met without considering all relevant evidence developed during the investigation.

---

[106] The OAWP's draft SOPs reference an evidence file, developed by the investigator, to be provided to the proposing official, deciding official, and the subject. However, this requirement appears to have originated in the OAR procedures and was not updated to reflect the July 2017 accountability procedures or OAWP processes.

[107] The July 2017 accountability procedures do not define "relevant," however, the Federal Rules of Evidence, for example, state that evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401.

[108] The July 2017 accountability procedures state that the proposing official "shall be briefed on the investigation and the evidence be gathered" and "will review the available evidence to determine whether a Reprimand, Suspension, Demotion, or Removal should be proposed."

[109] Although this standard ultimately applies to the decision of the deciding official, the July 2017 accountability procedures state that "'No action' may be warranted if the Proposing Official determines, by Substantial Evidence, that the evidence does not support any of the allegations against the Senior Executive."

### Example 13

> *After receiving investigative results from the Investigations Division, the A&A Division determined that a Covered Executive's conduct constituted neglect of duty. In February 2019, the proposing official (the Covered Executive's supervisor) issued a proposed disciplinary action and provided the Covered Executive with access to the evidence file. The OAWP's evidence file did not contain a statement prepared by the Covered Executive, referenced in his/her testimony and provided to the OAWP investigators. The statement set forth a chronology of events that appeared to conflict with the neglect of duty charge. The Covered Executive's counsel referenced this statement and its non-inclusion in the evidence file when submitting the Covered Executive's response to the deciding official. The deciding official subsequently issued a written decision referencing the materials that the Covered Executive's attorney attached to his/her response to the disciplinary proposal. The deciding official wrote, "After carefully reviewing the proposed suspension and the documentary evidence supporting the proposed action, as well as your written response to the proposed suspension, I find that the charge is not supported by substantial evidence."*

With respect to Example 13, the July 2017 accountability procedures call for the inclusion of the Covered Executive's statement in the evidence file. Its non-inclusion prevented the proposing official from considering all relevant evidence.

The non-inclusion of relevant evidence in the preparation of the evidence file also impacted the OGC's ability to provide legal advice to the A&A Division. As it did with proposing officials, the A&A Division provided OGC attorneys with access to the evidence file it prepared. In September 2017, the OAWP provided an evidence file to an OGC attorney as support for a possible disciplinary action proposal. The evidence file did not contain the interview transcript of the employee who was the subject of the proposed discipline.

In response to the OGC attorney's request for access to the transcript, the A&A Director wrote,

> We will not be providing the transcript [of the employee facing discipline]. It's not relevant to the charges in the proposal. I do not think it's important for the proposing official to review it, since it is not relevant. I also fail to see how a document that is not referenced in the proposal is necessary to determine whether substantial evidence exists for the charges.

The OIG concluded that the employee's transcript was relevant because it contained the subject's denials, admissions, and contextualization of alleged misconduct referenced in the proposed discipline and, therefore, should have been included in the evidence file pursuant to the July 2017 accountability procedures.

The A&A Director recalled this instance and told the OIG that then OAWP Executive Director O'Rourke directed her not to provide the transcript to the OGC attorney who requested it.[110] The A&A Director could not recall other instances when the A&A Division denied the OGC access to requested evidence but caveated that it was "absolutely" possible.

The A&A Director told OIG investigators that, in other instances, the A&A Division would provide additional information from the investigative file if requested by the OGC. The OIG determined that this practice was problematic because OGC attorneys might not know what information to request. As one OGC attorney explained, neither the OGC attorney nor the disciplinary officials know what other information is in the investigative file until the subject responds, and even the subject might not know what is in the investigative file.[111]

Under a pilot initiative implemented by Dr. Bonzanto, OGC attorneys are now routinely provided access to the entire investigative file. The results of that pilot were not yet available.

## Finding 3 Conclusion

The OIG determined that VA's lack of adequate written guidance concerning penalties left disciplinary officials to largely rely upon subjective judgments in actions involving Covered Executives, which has resulted in frequent mitigation of OAWP's recommended discipline. The A&A Division also had a practice of providing only the evidence that supported the proposed action, which effectively excluded some relevant evidence from being provided to the OGC and disciplinary officials.

## Recommendations 9–11

9. The VA Secretary, in consultation with the VA Office of General Counsel, provides comprehensive guidance and training reasonably designed to instill consistency in penalties for actions taken pursuant to 38 U.S.C. §§ 713 and 714.
10. The VA Secretary ensures the provision of comprehensive guidance and training to relevant disciplinary officials to maintain compliance with the mandatory adverse action criteria outlined in 38 U.S.C. § 731.
11. The Assistant Secretary for Accountability and Whistleblower Protection makes certain that in any disciplinary action recommended by the Office of Accountability and Whistleblower Protection, all relevant evidence is provided to the VA Secretary (or the disciplinary officials designated to act on the Secretary's behalf).

---

[110] The A&A Director eventually provided the transcript to the OGC attorney.

[111] This problem is exacerbated by the Act's timelines, which provide only seven business days for the subject to respond and an additional eight business days for the deciding official to process and review new information before rendering a decision. An evidence file provided by the proposing official to the deciding official with all relevant information would reduce the information the subject must collect and the deciding official must review.

## Finding 4: The OAWP Failed to Fully Protect Whistleblowers from Retaliation

Under its former leadership, the OAWP did not fully exercise its authority under the Act to investigate allegations of whistleblower retaliation. Instead, it referred many complaints of whistleblower retaliation to other VA program offices, facilities, or other components that were not equipped to undertake such investigations and without adequate safeguards to protect whistleblowers' identities.

In addition, comments and actions of OAWP's former leaders evidenced that they did not properly value and respect the important role of whistleblowers in identifying fraud, waste, and abuse within the agency. Further, one of OAWP's former leaders allowed the diversion of a significant amount of resources to non-OAWP uses. Finally, the OAWP itself engaged in actions that could be considered retaliatory.

### OAWP's Referral Process Did Not Ensure Thorough Investigations by Other VA Components or Have Adequate Safeguards to Protect Whistleblowers' Identities

As referenced earlier, the OAWP held itself out on its public website as conducting "thorough, timely, and unbiased investigation of all allegations and concerns."[112] Although OAWP does have statutory authority to investigate allegations of misconduct by Covered Executives and whistleblower retaliation by all supervisory employees, the OAWP did not investigate "all allegations and concerns" itself, but instead made more than 2,500 referrals to other VA components for investigation over the approximately 18-month review period—without always notifying the complainant of those actions. Triaging matters to ensure that OAWP's investigative resources are focused on submissions that fall squarely within its statutory scope (and raise no appearance of bias) and referring other submissions to entities best positioned to address them is not inherently problematic. The concerns raised by OAWP's referrals are primarily threefold:

1. The recipient agency must be competent to conduct the investigation of the type of matter being referred in a comprehensive, accurate, and balanced manner.
2. The OAWP must have tracking and monitoring processes to determine if the recipient entity has reasonably and appropriately handled the referral.
3. The OAWP must be transparent with complainants about the referral process and have procedures in place to ensure that complainants' identities will be protected—particularly from individuals in VA who are the subject of the allegations or are

[112] As detailed in Finding 1, this statement exceeds the OAWP's statutory charge. It is not empowered to investigate "all allegations and concerns," but rather only those within the ambit of its enabling statute. See 38 U.S.C. § 323(c). In July 2019, the OAWP removed this statement from its website.

positioned to identify the complainant based on the nature of the submission or other released information.

As reflected in Table 3, from June 23, 2017, to December 31, 2018, the OAWP Triage Division referred 547 submissions to the OAWP Investigations Division and 2,526 submissions to other VA components (with 38 referrals to the VA OIG).[113]

**Table 3. OAWP Referrals – June 23, 2017, to December 31, 2018**

| VA Component | Count |
|---|---|
| Board of Veterans' Appeals (BVA) | 21 |
| National Cemetery Administration (NCA) | 4 |
| Office of Accountability and Whistleblower Protection (OAWP) | 547 |
| Office of Acquisition, Logistics and Construction (OALC) | 7 |
| Office of General Counsel (OGC) | 6 |
| Office of Human Resources and Administration (HR&A) | 2 |
| Office of Information and Technology (OIT) | 23 |
| Office of Inspector General (OIG) | 38 |
| Office of Medical Inspector (OMI) | 13 |
| Office of Operations, Security and Preparedness (OSP) | 6 |
| Office of Resolution Management (ORM) | 8 |
| Office of Small and Disadvantaged Business Utilization (OSDBU) | 1 |
| Office of the Secretary of Veterans Affairs | 3 |
| Veterans Benefits Administration (VBA) | 205 |
| VBA Office of Client Relations (VBA-OCR) | 122 |
| Veterans Experience Office (VEO) | 2 |
| Veterans Health Administration (VHA) | 1,624 |
| VHA Office of Client Relations (VHA-OCR) | 441 |
| **Total** | 3,073 |

*Source: OAWP Knowledge Management Division*

[113] There were 621 submissions received that OAWP triage staff did not refer because they lacked sufficient information, were duplicative, or for other reasons—bringing the total submissions to 3,694.

### *Some VA Components Mishandled Whistleblower Retaliation Allegations Referred by the OAWP*

Of the 2,526 referrals to other VA components, at least 51 of these involved allegations of whistleblower retaliation. The Act provides that one of the functions of the OAWP is to investigate retaliation allegations lodged against any VA supervisor irrespective of GS level (or equivalent).[114] Former OAWP Executive Director O'Rourke stated that he understood the Act to mean that the OAWP was "supposed to investigate every instance of retaliation across" the whole of VA, making "no exclusion for rank." However, he acknowledged that resource limitations played a role in the scope and referral decisions that were made. Other OAWP leaders echoed Mr. O'Rourke's sentiments about resource limitations necessitating the referral of whistleblower retaliation allegations to other VA components for investigation.

The A&A Director told OIG investigators that when she reviewed the results from investigations conducted by VA components, she identified instances in which the referral recipient concluded that no retaliation had occurred but that her review of the same evidence determined otherwise. In approximately April 2018, after assessing the results of some referred investigations, the OAWP determined that those VA components were not equipped to handle whistleblower retaliation investigations. As a result, in June 2018, the OAWP decided to begin investigating all whistleblower retaliation disclosures, including both senior executive and non-senior employees, from that point forward.[115] When it made this change, the OAWP did not reassess investigations that had already been completed by VA components. However, these were reviewed in April and May 2019 at the direction of Dr. Bonzanto as part of an effort to examine all 539 investigations of whistleblower retaliation allegations received from June 23, 2017, through April 15, 2019, to determine if they were properly developed. This review resulted in the identification of 42 cases that merit additional review. A plan has been submitted to Dr. Bonzanto for reviewing these 42 cases.

### *The OAWP Faced Challenges Ensuring Follow-Up on Referrals*

The former Triage Director explained to the OIG that it was a challenge to conduct follow-up once referrals were made for investigation by other VA components. She stated that the OAWP established deadlines for responses but had no ability to compel reports of work conducted. In her experience some referral recipients were responsive, but others were not.

In addition to being unable to compel reports of findings, the OIG determined that the Triage Division lacked adequate procedures for conducting follow-up. For example, email records indicate that Triage Division staff learned in March 2018 that 29 matters thought to have been referred by the OAWP to VISN 22 between July and December 2017 "fell through the cracks

[114] 38 U.S.C. § 323(c)(1)(H).

[115] The latest referral involving allegations of whistleblower retaliation was made on May 23, 2018.

and were not referred," and therefore no VISN investigations had commenced. This circumstance went undetected by the OAWP for nine months.

### *The OAWP Referred Allegations to Other VA Components for Investigation Without Sufficiently Safeguarding Whistleblowers' Identities*

The Act provides that, with respect to whistleblower disclosures it receives, the OAWP "may not disclose the identity of the employee without the consent of the employee, except in accordance with the provisions of section 552a of title 5, or as required by any other applicable provision of Federal law."[116] As discussed below, the OAWP would not investigate allegations of whistleblower retaliation unless the complainant consented to disclose his or her name.

The former Triage Director told OIG investigators that individuals making submissions to the OAWP were not always informed that their allegations might be referred to another VA component for investigation. The former Triage Director stated that, for allegations other than whistleblower retaliation, if a disclosing party did not consent to the disclosure of his or her name, the party's name was not disclosed in the referral. When asked whether steps were taken to exclude information that could be used to identify the disclosing party even if the individual's name was redacted, the former Triage Director stated, "I believe we talked about taking those efforts, you know, because you get an email string and you can trace it back. We talked about de-identifying more than just names." The triage SOP indicates only that case managers shall make "redacted copies of all case documents for further referral of the case outside of the OAWP," but no guidance is provided as to what information must be redacted or how to assess whether redaction alone is sufficient to safeguard the whistleblower's identity. This is particularly important in smaller components of VA where gender, job function, or even the nature of the complaint can trace an allegation to a specific individual.

The Investigations Director recalled situations in which the VISN receiving the referral simply directed the matter back to the very facility that the whistleblower was complaining about for investigation, which created "an obvious conflict of interest." Similarly, the former Triage Director recalled disclosing parties expressing concerns such as "I'm say[ing] this person retaliated against me and then you're sending it back to this facility, and although it's not going to that same person, it's still in that chain-of-command somehow."

## The OAWP Would Not Investigate Whistleblower Retaliation Unless the Whistleblower Consented to Disclose His or Her Identity

The OAWP took the position that allegations of whistleblower retaliation could not be investigated unless the whistleblower was willing to disclose his or her identity. The consent to disclose allowed the OAWP to further disclose the whistleblower's identity to other VA

[116] 38 U.S.C. § 323 (c)(3).

components. This policy places OAWP's obligation to investigate whistleblower retaliation in conflict with its obligation to maintain confidentiality of whistleblowers' identities. The Senior Advisor told the OIG that the OAWP adopted this policy because of the belief that to "investigate retaliation, you have almost no choice but to disclose the individual's identity." He said that the U.S. Office of Special Counsel takes this same position. Figure 5 displays OAWP's advisement to disclosing parties making allegations of retaliation that has been in use since February 2018.


PART 4: CONSENT, SIGNATURE AND SUBMISSION

1. PLEASE SELECT ONE *(if you are claiming retaliation review will not be possible without your consent.)*:

I DO CONSENT TO RELEASE OF MY IDENTITY     I DO NOT CONSENT TO RELEASE OF MY IDENTITY

2. SIGNATURE     3. DATE SUBMITTED

***Figure 5.*** *Excerpt from the disclosure form*
*Source: Employee Disclosure Form published by the OAWP, last revised in February 2018*

In the following example, OAWP staff insisted that an allegation of whistleblower retaliation be referred to the VISN and that the employee consent to disclose his or her identity in order to make the referral, even though the allegation was within OAWP's authority to investigate. The OAWP did not need to refer the matter to the VISN. In the end, the employee requested the OAWP stop work (and not refer the matter) pending the outcome of a related pending case with the U.S. Office of Special Counsel.

### Example 14

*In November 2017, a GS-13 psychologist in a VA medical center made a submission to the OAWP alleging misconduct and whistleblower retaliation. An employee with the OAWP Triage Division responded and informed the psychologist that the matter would be referred to the VISN for investigation. The consent form used by the OAWP at the time of the psychologist's submission did not contain the disclaimer that investigations of retaliation require consent to disclosure of the whistleblower's identity. The psychologist wanted to remain anonymous and objected to OAWP's referral for investigation by the VISN, stating, "I guess, bottom line--the facility knows it's me" and "I just don't want my own HR to 'investigate' this and stir up yet more problems when they've been involved at every step." The psychologist had a parallel case open with the Office of Special Counsel relating to the same issues. Correspondence between the psychologist and OAWP triage staff reflects that the psychologist was dissatisfied with the approach that the Office of Special Counsel was taking and wanted to pursue an alternative path. After learning that identity disclosure was required for the OAWP to proceed, the psychologist requested that the OAWP stop its work*

*pending the outcome of that related case. Triage Division staff subsequently closed the psychologist's case.*

Although the psychologist was able to pursue allegations through a non-VA office, this example demonstrates the issues created by the OAWP's approach of referring whistleblower disclosures without adequate safeguards to protect the confidentiality of whistleblowers. It effectively closed the OAWP's doors to VA employees who alleged retaliation for whistleblowing and did not want their identities revealed to other VA components.

## Investment in Former Whistleblower Mentorship Program Did Not Achieve Measurable Success and Motives for Its Creation Were Suspect

In 2017, the OAWP established a whistleblower reintegration program, which was later renamed the Whistleblower Mentorship Program. The OIG received complaints that the program was being used inappropriately to target whistleblowers.

The stated purpose of the program was to provide whistleblowers who had made complaints with transitional support resources if needed after the whistleblowing experience. The OIG recognizes that the goal of helping whistleblowers transition back into a workplace where colleagues or supervisors may be aware of allegations is laudable, but OIG interviews indicate that the motivation for the program was also focused on breaking the perceived routine of whistleblowers to continue reporting. According to then OAWP Deputy Executive Director Hunter, the purpose of the program was to "reintegrate those individuals into doing something very productive for the organization" and not become a "whistleblower as [a] profession." Stopping whistleblower activity is consistent with the complaints the OIG has received about the goals of former OAWP leaders that are detailed below.

Ultimately, in its approximately 18-month existence, the program served one whistleblower as a test case, which was described by OAWP staff as successful.[117] Dr. Bonzanto placed the program on hold because her assessment revealed that it had not met with identifiable or measurable success sufficient to warrant devotion of the resources that would be required to expand the program to serve more individuals.[118]

[117] The mentorship involved pairing a senior leader with the whistleblower to accomplish a local facility project. In this instance a VA medical center director agreed to mentor the whistleblower, a social worker in the medical center. The two were tasked with identifying and completing a project on which the mentor and mentee would collaborate and build a working relationship to achieve a common goal. According to OAWP staff, at the time of the program's cancellation, plans existed to expand the program to serve additional whistleblowers.

[118] Dr. Bonzanto has alternatively considered whether there was a need to provide resources to whistleblowers who had been returned to federal service after wrongful termination, but stated that, in her view, the OAWP lacks the capacity to attend to this, and such a role is not specifically required under the Act.

### *Leaders' Statements on the Whistleblower Mentorship Program Evidenced an Attitude of Disfavor Toward Some Whistleblowers*

The OIG received allegations from complainants characterizing the OAWP Whistleblower Mentorship Program in an unfavorable manner. Underlying these complaints was a concern that the OAWP was using the program to monitor or silence whistleblowers. The OIG confirmed that the OAWP gathered and analyzed whistleblower data from OAWP systems to identify candidates who might benefit from the mentoring services.

The OIG did not substantiate that the Whistleblower Mentorship Program was being used to silence whistleblowers. However, the OIG observed that some former OAWP leaders made statements that could be interpreted as evidencing an attitude of disfavor toward some whistleblowers. The comments by former OAWP leaders focused on a perceived need to return some whistleblowers to productive work:

- According to former OAWP Executive Director O'Rourke, VA was experiencing rampant abuse of the process by employees who would make what they deemed a whistleblower disclosure to gain protections related to activities or circumstances that did not merit such protection. Mr. O'Rourke told OIG investigators that VA has a "subculture" that evolved into a "community, a network" of whistleblowers as compared to other agencies where whistleblowing activity occurs in "isolated incidents."
- Subsequent OAWP Executive Director Nicholas told OIG investigators that from his perspective, some VA employees treat the whistleblower title as "a position description for them. They've joined Whistleblowers of America. They're in the papers. They can't seem to let go of it." He broadly characterized these employees as individuals who have "quit working or they decided that their new job was to go find more stuff to whistleblow on…and weren't performing what they had been hired to do."
- Former OAWP Deputy Executive Director Hunter told the OIG, "[u]nfortunately, some [of] our whistleblowers become career – a legacy of whistleblowers. They believe that's their only job."
- The Senior Advisor referred to the OAWP's perceived need "to get the employee out of the wearing [of] whistleblower as a [position description]. There is no job description in the federal government that says being a whistleblower is your job. You know, …—yes, please, by all means, make the disclosure. Let us know what's wrong in the agency. We'll work on going to go fix it. But your part is done, go forth, do good, avoid evil."

The culture of an organization is determined by its leaders. Setting the tone at the top can influence internal controls and the behaviors of subordinate managers and employees.[119]

[119] U.S. Government Accountability Office, *Standards for Internal Control in the Federal Government* (2014).

Mr. O'Rourke's perspective that VA had a problematic "subculture" of whistleblowers set an unwelcoming tone. These sentiments were communicated not just to the OIG but were also published by the OAWP in its June 2018 annual report to Congress: "An aspect of making disclosures of alleged wrongdoing is that the employee making the disclosure may feel themselves marginalized or excluded from the organizational group. Additionally, *for some employees, whistleblowing turns into an ad-hoc job description*." (emphasis added) Although the goal of helping whistleblowers transition back into a workplace is admirable and consistent with OAWP's mission, it is not required by the Act and draws on limited OAWP resources. Even if properly supported, any such effort must be designed to support and value whistleblowers rather than characterize repeat whistleblowing as an unwelcome recidivist behavior.

## Significant OAWP Resources Were Obligated for Purposes Not Related to Its Core Mission

During Mr. Nicholas's tenure, VA obligated $2.6 million from OAWP's fiscal year 2018 budget of $17.37 million (15 percent) on two separate contracts for process improvement and leadership development services. The first contract related to process improvements. According to Dr. Bonzanto, shortly after she became the assistant secretary she learned about the existence of the process improvement contract. She told OIG investigators that the contractor "was supposed to be helping us with our directives and our workload," but she learned after inquiring further that "everything that they were doing, none of it was related to OAWP." She also told the OIG that she ordered then Deputy Director Todd Hunter to refocus the contractor to "come back and start doing work that's related to OAWP." According to Dr. Bonzanto, by March 2019 the contractor's work was redirected to assisting the OAWP with developing its processes and procedures.

The services to be acquired under the second contract related to leadership development and coaching, which Mr. Nicholas intended for VA generally, not just the OAWP.[120] Each contract had two subsequent option years which, if exercised, would have brought the potential total obligation to over $6.8 million. In response to the OIG's inquiry concerning the contracts, VA suspended performance on the contract for leadership development and coaching, which limited VA's cost to the $88,000 already expended. The OIG did not find any evidence that VA leaders requested that Mr. Nicholas initiate either procurement or redirect OAWP funds to these contracts.[121] The connection between these services and OAWP's core mission appears tenuous.

[120] At the same time, Mr. Nicholas told a staff member that the OAWP did not have the resources available to do the work necessary to comply with a reporting obligation mandated by Congress under §103 of the Act. See Finding 5.

[121] The OIG identified evidence that the canceled contract was awarded to a vendor associated with an individual with whom Mr. Nicholas had a personal relationship, and that Mr. Nicholas had communications with this individual regarding both contractual opportunities before they were awarded. The individual was associated with vendors who bid on both contracts. Mr. Nicholas attempted unsuccessfully to cancel one of the contracts when he