The current VA chief of staff and the assistant secretary for Enterprise Integration both told OIG investigators that, in their view, attempting to address what Mr. Nicholas perceived to be VA's leadership and human resources issues was not within OAWP's mandate or Mr. Nicholas's job responsibilities.

## Under Its Former Leadership, the OAWP Participated in Two Actions That Could Be Considered Retaliatory

Contrary to its core mission to protect whistleblowers, the OAWP—under Mr. O'Rourke's leadership—participated in two actions that could be considered retaliatory. The first related to the proposed removal of an OAWP employee who had made a disclosure of misconduct. The second related to the initiation of an investigation of a whistleblower who had made allegations of misconduct relating to a senior political appointee.

### *Mr. O'Rourke Proposed the Removal of an OAWP Employee Who Made a Protected Whistleblower Disclosure*

Shortly after the OAWP was established, a senior OAWP employee (Whistleblower 1) reported that a senior VA official was interfering in a disciplinary matter and seeking to affect a predetermined outcome. This disclosure was made to then Executive Director O'Rourke and others.

According to Whistleblower 1, within a matter of days, Mr. O'Rourke downgraded Whistleblower 1's responsibilities and attempted to block Whistleblower 1 from leaving the OAWP for another job within VA. Within a few weeks, Mr. O'Rourke initiated an investigation by gathering documents and instructing the A&A Director to draft a disciplinary proposal to remove Whistleblower 1 from federal employment. Mr. O'Rourke issued a proposed removal action that Whistleblower 1 believed was calculated and timed to prevent Whistleblower 1 from starting a new job within VA. In December 2017, the OAWP rescinded its proposed removal action. Whistleblower 1 remains a VA employee (outside of the OAWP) and has a pending matter before the U.S. Office of Special Counsel relating to these circumstances.

### *The OAWP Failed to Guard Against the Initiation of Retaliatory Investigations*

Being the subject of an investigation can be stressful, time-consuming, intimidating, and humiliating. Congress recognized the possibility that the investigative process itself could be used in a retaliatory fashion, and protected VA whistleblowers from these negative impacts by

learned that it was not awarded to the vendor associated with this individual. Given the nature of the conduct at issue, the OIG referred this matter to the U.S. Department of Justice, where it remains under review.

expanding the definition of a prohibited personnel action to include the opening of a "retaliatory investigation" against a whistleblower.[122]

In OIG interviews, OAWP's leaders—including former Executive Directors O'Rourke and Nicholas, the A&A Director, and the Senior Advisor —demonstrated a lack of familiarity with this statutory provision. The OIG determined that the OAWP did not design any of its processes to evaluate whether the submission of an allegation could be an effort in itself to retaliate against a whistleblower. For example, although reference is made to the prohibitions of "retaliatory investigations," the triage SOP does not provide guidance to evaluate whether an investigation may be retaliatory, nor does it include any procedures to flag or otherwise code the incoming allegations as potentially retaliatory.

The OIG identified an instance in which the OAWP opened an investigation that could be considered retaliatory against a whistleblower. From September 2017 until at least July 2018, Peter Shelby, the then Assistant Secretary for Human Resources and Administration (HR&A), was the subject of multiple complaints lodged with the OAWP as well as the Office of Special Counsel and EEO Commission. In September 2017, a long-time career employee serving in an SES position within HR&A (Whistleblower 2) accused Mr. Shelby of violations of law including retaliation and discrimination against Whistleblower 2. Accusations made by Whistleblower 2 were investigated by the OAWP. Documents reflect that in August 2017, then OAWP Executive Director O'Rourke and Mr. Shelby began to view Whistleblower 2 as an obstacle to Mr. O'Rourke's effort to staff the OAWP because Whistleblower 2 had concurrence authority for some hiring actions.[123] In addition, Mr. O'Rourke told OIG investigators that Mr. Shelby had consulted him about reassigning Whistleblower 2 and some subordinate staff to other VA positions outside of Mr. Shelby's office.

While the allegations against Mr. Shelby were still pending, Whistleblower 2 became the subject of an OAWP investigation initiated after Mr. Shelby wrote to Mr. O'Rourke, "I am requesting an investigation and seeking disciplinary action for the pattern of negative conduct demonstrated by [Whistleblower 2]." Mr. Shelby alleged that Whistleblower 2 was "insubordinate" and had intimidated a fellow employee. Email records show that Mr. O'Rourke was personally involved in receiving the allegations from Mr. Shelby and communicating these to the OAWP staff assigned to the matter. OAWP's records show that its investigation of Whistleblower 2 began on

[122] 38 U.S.C. § 731(c)(3). The Act imposed a requirement that the Assistant Secretary for Accountability and Whistleblower Protection submit a report on whether VA's investigative processes were being used to retaliate against whistleblowers. Public Law 115-41, Title I, § 103(b)(2). The OIG determined that the report submitted by the OAWP in response did not fully respond to Congress's request. See Finding 5.

[123] At the time, Whistleblower 2's job functions included concurrence authority over certain senior hiring decisions made by Mr. O'Rourke, and Whistleblower 2 had raised concerns about the number and nature of senior executive positions considered for allocation to the OAWP. Whistleblower 2 also questioned the qualifications of a candidate for a senior OAWP position who was selected by Mr. O'Rourke, but did "not appear to have any significant experience with whistleblower protections or accountability . . ."

or about January 5, 2018, and concluded nine days later.[124] An OAWP employee took testimony from a single witness concerning the alleged intimidating altercation between that witness and Whistleblower 2. The OAWP never sought any testimony or information from Whistleblower 2.[125] The OAWP staff substantiated the allegations and referred the matter directly to the A&A Division for a disciplinary recommendation without further inquiry.

In February 2018, Whistleblower 2 received information revealing that disciplinary action may be proposed against him/her, which was the first time Whistleblower 2 had any information concerning the investigation. Whistleblower 2 voluntarily sought new employment and left VA in March 2018 prior to any disciplinary action being taken.

Multiple witnesses aware of the circumstances relating to Whistleblower 2 told OIG investigators that the treatment of Whistleblower 2 had a chilling effect on their willingness to come forward with allegations of wrongdoing. One witness quoted Mr. Shelby as saying, "I'll whip out my Accountability Act and just start firing people." When OIG investigators questioned another witness about whether he/she had filed an OAWP complaint about some additional allegations raised concerning Mr. Shelby, the witness responded,

> No, I did not, and I deliberately would never have because I didn't trust the office since the person that I had problems with, my boss at the time, Peter Shelby, seemed to be very tight with Peter O'Rourke, who led OAWP. So, frankly, I didn't trust the office.

Recent complaints to OIG's hotline, although outside the scope of this review, reflect ongoing concerns about the OAWP's commitment to preventing retaliation, including fear that raising concerns has recently resulted in, or may prompt, disciplinary action.[126]

## Finding 4 Conclusion

The OIG determined that, under its former leadership, the OAWP failed to take appropriate steps to protect whistleblowers, which is in direct conflict with its core mission. The OAWP referred allegations of whistleblower retaliation to other components of VA that were not equipped for such investigations, without sufficient tracking or oversight. This resulted in some cases going uninvestigated for long periods of time and without adequate safeguards to protect the identities

[124] The matter was opened and closed in fewer than nine days, compared to an average of 215 days.

[125] The OAWP was required to give a Senior Executive who is the subject of an investigation an opportunity to respond to and provide evidence relating to the matters under investigation unless the circumstances of the investigation made it impossible, unreasonable, or unnecessary to do so, VA Corporate Senior Executive Management Office Letter No. 006-17-1, Senior Executive Accountability and Grievance Procedures, July 7, 2017. The Privacy Act also requires agencies to "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal Programs." 5 U.S.C. § 552a(e)(2).

[126] Deidentified information regarding these complaints was transmitted to the VA and the OIG will monitor VA's response and evaluate the need for further oversight work through quarterly follow-up on open recommendations.

of whistleblowers who might be easily recognizable by the receiving facility or office. OAWP leaders lacked knowledge of processes for identifying whether accusations made to the OAWP could have been submitted to instigate an investigation as a means of retaliation. The OAWP itself participated in at least two actions that could be considered retaliatory. These actions occurred within a climate in which former leaders revealed their unfavorable opinion of some whistleblowers and focused resources on activities that did not support the core mission of the OAWP. More recent communications to the OIG hotline indicate that some individuals continue to report fear of OAWP retaliation or disciplinary action for reporting suspected wrongdoing.

## Recommendations 12–14

12. The Assistant Secretary for Accountability and Whistleblower Protection implements safeguards consistent with statutory mandates to maintain the confidentiality of employees that make submissions, including guidelines for communications with other VA components.
13. The Assistant Secretary for Accountability and Whistleblower Protection leverages available resources, such as VA's National Center for Organizational Development and the Office of Resolution Management, to conduct an organizational assessment of Office of Accountability and Whistleblower Protection employee concerns and develop an appropriate action plan to strengthen Office of Accountability and Whistleblower Protection workforce engagement and satisfaction.
14. The Assistant Secretary for Accountability and Whistleblower Protection develops a process and training for the Triage Division staff to identify and address potential retaliatory investigations.

## Finding 5: VA Did Not Comply with Additional Requirements of the Act, Including Timely and Accurate Congressional Reporting

VA has failed to comply with several other requirements of the Act. For example, VA has not modified supervisors' performance plans to include criteria relating to whistleblower protection and trained employees regarding whistleblower disclosures. In addition, the OIG identified deficiencies with the reports the Act mandated that VA submit to Congress.

### VA Has Failed to Revise Supervisors' Performance Plans and Provide Training as Required by the Act

The Act requires the VA Secretary, in consultation with the Assistant Secretary for Accountability and Whistleblower Protection, to "develop criteria that (1) the Secretary shall use as a critical element in any evaluation of the performance of a supervisory employee; and (2) promotes the protection of whistleblowers."[127]

The required criteria must include principles for the protection of whistleblowers. These include the degree to which supervisory employees

- Respond constructively when employees of the Department relay concerns,
- Take responsible action to resolve such concerns, and
- Foster an environment in which employees of the Department feel comfortable reporting concerns to the supervisory employees or to the appropriate authorities.[128]

In addition, the Act requires VA to periodically train its supervisory employees on whistleblower rights, employee motivation, and employee performance management.[129]

When asked in March 2019 whether supervisory performance plans had been modified to include the criteria required by the Act, the A&A Division Director indicated that the Senior Advisor had drafted an initial element "just to take a stab at it." The A&A Director further explained that it was complicated "because ... it's ... a strange element to have in a performance standard because it's hard to attach a metric or any sort of ... measurement to that." The A&A Director added that there was ultimately a question of who would be responsible for this task since adding criteria to performance appraisals "tends to be more of [a VA Human Resources and Administration] responsibility, not necessarily something that OAWP would take on."

The Act assigns responsibility for updating supervisory performance plans to the VA Secretary, with the advice of the Assistant Secretary for Accountability and Whistleblower Protection.

---

[127] 38 U.S.C. § 732(a).

[128] 38 U.S.C. § 732(b).

[129] Public Law 115-41, Title II, § 209.

According to a work plan provided to the OIG by Dr. Bonzanto, the OAWP will be working with Human Resources and Administration as well as the OGC to implement this requirement. VA did not provide an update on the status of efforts to implement the requirement for periodic supervisory training, although it is listed on the chart of other responsibilities of the Act requiring implementation provided by Dr. Bonzanto.

## VA Has Not Implemented Whistleblower Protection Training for All Employees as Required by the Act

The Act requires VA to provide biennial training to all employees regarding whistleblower disclosures.[130] The VA Secretary delegated this responsibility to the OAWP on February 7, 2018. In its 2018 annual report to Congress, the OAWP acknowledged that VA did not have training that met the Act's requirements. The OAWP projected that it would finalize the training materials and deployment plan by September 30, 2018. This did not occur. In his November 2018 interview with the OIG, OAWP Executive Director Nicholas acknowledged that the OAWP did not meet the deadline and that a new deadline had not been set. He explained that setting a new deadline was dependent on preparing the materials, which was difficult because of uncertainties about OAWP's scope under the statute.

In May 2019, Dr. Bonzanto told the OIG that she maintains a lengthy slide presentation that forms the basis of what this training should contain. She instructed her staff to consult with the Office of Special Counsel, the OGC, and the OIG to obtain comments, which she indicated have been received and addressed. OAWP staff have met with the VA training specialists to convert the draft presentation into training material that will be used for all VA employees. Dr. Bonzanto did not have an anticipated timeline of when the training would be complete.

## VA Failed to Meet Its Statutory Obligations to Submit Multiple Congressionally Mandated Reports

The Act mandates that VA file reports providing information about accountability and whistleblower protection.[131] In addition, Congress requires VA to file a report whenever disciplinary recommendations made to the VA Secretary are not taken or initiated within 60 days of the recommendation.[132] VA's responses fell short of the statutory requirements.

---

[130] 38 U.S.C. § 733.

[131] Public Law 115-41 §§ 211 and 103(b)(1).

[132] 38 U.S.C. § 323(f)(2).

## *VA Failed to Meet Act Requirements for Its December 2017 Report to Congress Analyzing Disciplinary Outcomes for the Prior Three Years*

The Act required VA to submit a report no later than December 31, 2017, detailing the "outcomes of disciplinary actions carried out by the Department of Veterans Affairs" from June 23, 2014, to June 23, 2017 (Outcomes Report).[133] VA failed to file this report on time, citing inadequate data. Although VA did have data challenges, this is only part of the story.[134] VA failed to disclose that the individual assigned to produce the Outcomes Report, then OAWP Executive Director Peter O'Rourke, was unaware of the requirement.

Documents show that, as of July 17, 2017, the Outcomes Report was added to VA's master tracking list of Congressionally Mandated Reports maintained by the Office of Congressional and Legislative Affairs (OCLA). The master tracking list indicated that the Outcomes Report was assigned to Mr. O'Rourke, a copy of which was sent to him by email on July 17, 2017. The OIG could not locate any records indicating that the OAWP took any affirmative steps to prepare the Outcomes Report before its due date.

On December 28, 2017, an OCLA staff member requested a status report from Mr. O'Rourke, which prompted a series of emails between Mr. O'Rourke, the Senior Advisor, Mr. Hunter, and others within the OAWP reflecting that Mr. O'Rourke was unaware that the OAWP was responsible for the Outcomes Report. After learning from the Senior Advisor that the report would require significant effort to prepare, Mr. O'Rourke responded, "If we're going to do it then [VA will] have to give us contract support, pulling folks off current issues to research the past makes no sense." In a subsequent reply, Mr. O'Rourke wrote to the Senior Advisor, "We need to all get together and we'll lead the effort -- please begin drafting a list of requirements that will satisfy the statue [sic] that can be shaped into a [Performance Work Statement for a contract proposal]."

Three weeks later, during his January 17, 2018, testimony before the Senate Committee on Veterans' Affairs (SVAC), Secretary Shulkin stated that VA staff "had extreme difficulty tracking what you've required in that report prior to the implementation of the accountability act. I've instructed them to give whatever data they have to you and tell you what data they can collect." He committed to submitting the Outcomes Report within two weeks. Internal emails show that the OAWP began working to devise a methodology for the report the next morning, January 18.

---

[133] Public Law 115-41 § 211. The Act required the Outcomes Report to include detailed information about VA's disciplinary actions, including length of time actions were pending, number of steps and reviews involved, data concerning the use of alternative dispute resolution, appeals data, and information concerning the use of paid administrative leave.

[134] As discussed in Appendix A, the OAWP did not have an adequate database for tracking and managing submissions, investigations, and disciplinary actions. The OAWP is implementing new systems that are expected to streamline data collection, enhance reporting capabilities, and create efficiencies.

VA finalized its report to Congress on January 29, 2018. The report was expedited through VA's concurrence process. In June 2018, the OAWP supplemented its annual report by appending several tables of data. The material was accompanied by a disclaimer indicating that VA lacked data sufficient to conduct the effectiveness analysis mandated by the Act. According to the Senior Advisor, VA has received persistent feedback (as recently as March 2019) from staff of the House Committee on Veterans' Affairs (HVAC) and SVAC that the report submitted and its supplement were insufficient.

### *OAWP's Report on Investigative Methods and Retaliation Was Not Responsive to the Act's Mandate*

The Act required the Assistant Secretary for Accountability and Whistleblower Protection to submit to the VA Secretary and Congress a report on the methods used to investigate VA employees (Report on Methods). The Act further required that the Report on Methods include the following:

> (1) An assessment of the use of administrative investigation boards, peer review, searches of medical records, and other methods for investigating employees of the Department.
>
> (2) A determination of whether and to what degree the methods described in paragraph (1) are being used to retaliate against whistleblowers.
>
> (3) Recommendations for legislative or administrative action to implement safeguards to prevent the retaliation described in paragraph (2).[135]

The Report on Methods was submitted by VA in December 2018. It analyzed only OAWP's data, which constitutes a small fraction of investigations conducted by VA, and is not representative of all methods of investigation conducted by VA.

The Senior Advisor told OIG investigators that in July 2018, he submitted a proposal to Mr. Nicholas that the OAWP gather and analyze relevant data from various VA components. The Senior Advisor stated that Mr. Nicholas rejected the broader proposal in August 2018 because the OAWP had insufficient resources to conduct the field work.[136] Instead, Mr. Nicholas directed the Senior Advisor to "describe the investigation tools and methods that we have available in the VA and leave it at that." Although Congress allotted 18 months for VA to perform the analysis, the OAWP did not begin work on the Report on Methods until approximately two months before it was due. The Senior Advisor told OIG investigators that it

[135] Public Law 115-41 § 103(b)(1) June 23, 2017.

[136] The Act mandates the VA Secretary to "ensure that the Assistant Secretary has such staff, resources, and access to information as may be necessary to carry out the functions of the Office." 38 U.S.C. § 323(d). The OIG could locate no evidence that the OAWP ever requested resources to support the statutorily required analysis.

took him approximately a week and a half to review the relevant OAWP case files for the analysis.

### *VA Does Not Interpret the Act as Requiring Congressional Notification When Disciplinary Officials Decline OAWP's Recommended Action*

The Act requires the submission of a detailed report if the VA Secretary receives a recommendation for discipline from the Assistant Secretary for Accountability and Whistleblower Protection and "does not take or initiate the recommended disciplinary action" within 60 days of receipt.[137] The Act directs the VA Secretary to submit the report to the Committees on Veterans' Affairs of both the Senate and the House of Representatives.[138] No reports have been provided to Congress pursuant to section 323(f)(2) of the Act.

On July 7, 2017, Secretary Shulkin issued the accountability procedures discussed earlier in the report, which require the OAWP to brief the Secretary on whether disciplinary action is recommended. This requirement is limited to whether an action should be pursued and not the specific action recommended. In practice, the OAWP has fulfilled this requirement by issuing a written accountability notification memorandum such as the one displayed in Figure 6.


Department of Veterans Affairs

**Memorandum**

Date: August 23, 2017

From: Executive Director, Office of Accountability and Whistleblower Protection (OAWP)

Subj: Accountability Notification

To: David J. Shulkin, Secretary, U.S. Department of Veterans Affairs

Pursuant to 38 U.S.C. § 323(c)(1)(I), the Office of Accountability and Whistleblower Protection is informing you that it is recommending that disciplinary action be proposed against the following individuals. Section 323(f)(2) requires that action be initiated within 60 days of your receipt of this recommendation.

***Figure 6.*** *Sample Accountability Notification provided by the OAWP to the VA Secretary*
*Source: OAWP*

In August 2018, staff of the HVAC majority asked VA to explain its "interpretation and implementation of the new section 323(f)(2) as it relates to congressional notification when a recommendation from OAWP is mitigated." VA responded as follows,

> Under 38 USC 323(f)(2), if "the Secretary receives a recommendation for disciplinary action" from the Assistant Secretary for Accountability and

[137] 38 U.S.C. § 323(f)(2).
[138] 38 U.S.C. § 323(f)(2).

> Whistleblower Protection under 38 USC 323(c)(1)(I) and does not take or initiate the recommended disciplinary action within 60 days from the receipt of the recommendation, the Secretary must notify the House and Senate Committees on Veterans' Affairs and provide a detailed justification for not taking or initiating such disciplinary action.
>
> VA does not have an Assistant Secretary for Accountability and Whistleblower Protection. Instead, OAWP is headed by an Executive Director. Significantly, the Executive Director for OAWP has not been delegated the functions of the Assistant Secretary for Accountability and Whistleblower Protection nor has he been designated the Acting Assistant Secretary. Instead, the Executive Director has been delegated a series of functions that are similar to, but do not mirror, the functions that would be performed by the Assistant Secretary.
>
> As implemented by VA, the Executive Director for OAWP makes a recommendation to the Secretary for disciplinary action. The Executive Director for OAWP does not recommend a specific disciplinary action to the Secretary; rather, the recommendation is simply that "disciplinary action be proposed against" the respective employee. Following the Executive Director's recommendation, disciplinary action is *initiated* against the respective employee in that VA *begins the process of engaging* with the proposing official regarding the action and drafting a proposed charge letter. Those steps are accomplished within 60 days from the receipt of the Executive Director's recommendation to the Secretary. Consequently, VA is in compliance with 38 USC 323(f)(2) in that it initiates an action, as described above, within 60 days from the receipt of the Executive Director's recommendation to the Secretary. (emphasis added)
>
> It is important to note that 38 USC 323(f)(2) does not require the Secretary to take the disciplinary action recommended by the Assistant Secretary for Accountability and Whistleblower Protection, even if a specific disciplinary action was recommended.[139]

According to VA's response, it viewed itself compliant with section 323(f)(2) of the Act because it "begins the process of engaging with the proposing official" within 60 days of the OAWP Executive Director recommending to the VA Secretary that disciplinary action be taken. In other words, as stated in the letter, VA equates "take or initiate the recommended disciplinary action" with "begins the process of engaging with the proposing official."[140]

---

[139] VA Office of Congressional and Legislative Affairs, Response to HVAC Majority, Email. (2018).

[140] In the response, VA noted that it did not have an assistant secretary at the time and that the executive director had not been delegated the same responsibilities. The Senior Advisor similarly told OIG investigators that VA took the

As a consequence, VA has not reported to Congress on the 32 instances from June 23, 2017, to March 22, 2019, in which the OAWP recommended a specific disciplinary action to a proposing official that was later mitigated.[141] Notwithstanding VA's interpretation of the Act, the OAWP did track the rationale for some, but not all, instances in which recommended penalties were mitigated.[142] To the extent that Congress's intent was to receive reports that illuminate the reasons why particular disciplinary actions initially recommended by OAWP were mitigated or otherwise not taken, VA has implemented the requirement in a manner that does not disclose this information.

## Finding 5 Conclusion

The OIG determined that VA failed to implement various requirements under the Act, including revising supervisors' performance plans and developing supervisors' training regarding whistleblower rights. VA also has not provided whistleblower protection training for all other employees. On numerous occasions, VA did not submit timely, responsive, and/or accurate reports to Congress on whistleblower investigations and related disciplinary actions as required by the Act. The causes of these lapses included

- OAWP's lack of an adequate database system to capture required information,
- OAWP leaders' failure to understand their responsibilities and deadlines under the Act and plan accordingly, and
- OAWP's inadequate procedures or processes to track the information requested by Congress.

In addition, VA has interpreted the requirement that it submit reports to Congress when the Secretary "does not take or initiate the recommended disciplinary action" within 60 days of receipt of a recommendation in such a way that VA disciplinary officials' mitigation or declination of OAWP's recommended actions are not reported to Congress.[143] By failing to meet these statutory obligations, the OAWP has undermined Congress's intent to create greater transparency with respect to employee accountability and whistleblower protection within VA.

position that section 323(f)(2) referenced an action by the Assistant Secretary for Whistleblower Protection, and that "without an assistant secretary, that [section 323(f)(2)] did not attach to the department's actions yet."

[141] In the July 2017 accountability procedures, the VA Secretary delegated to the proposing official the duty of reviewing the evidence and determining whether *or not* disciplinary action is warranted. This means that the VA Secretary gave the proposing official the authority to decide on behalf of the VA Secretary that no discipline is warranted.

[142] Justifications for 10 mitigations are presented in Table 2 on page 40.

[143] 38 U.S.C. § 323(f)(2).

## Recommendations 15–20

15. The Assistant Secretary for Accountability and Whistleblower Protection collaborates with the Assistant Secretary for Human Resources and Administration, and the VA Secretary to develop performance plan requirements as required by 38 U.S.C. § 732.
16. The Assistant Secretary for Accountability and Whistleblower Protection ensures the implementation of whistleblower disclosure training to all VA employees as required under 38 U.S.C. § 733.
17. The VA Secretary makes certain supervisors' training is implemented as required under § 209 of the VA Accountability and Whistleblower Protection Act of 2017.
18. The Assistant Secretary for Accountability and Whistleblower Protection confers with the VA Office of General Counsel to develop processes for collecting and tracking justification information related to proposed disciplinary action modifications consistent with 38 U.S.C. § 323(f)(2).
19. The VA Secretary in consultation with the Office of General Counsel and the Assistant Secretary for Accountability and Whistleblower Protection ensures compliance with the 60-day reporting requirement in 38 U.S.C. § 323(f)(2) consistent with congressional intent.
20. The Assistant Secretary for Accountability and Whistleblower Protection develops or enhances database systems to provide the capability to track all data required by the VA Accountability and Whistleblower Protection Act of 2017.

## Finding 6: The OAWP Lacked Transparency in Its Information Management Practices

In the course of the OIG review, staff identified issues outside the initial scope regarding OAWP's information management practices. VA has obligations under the Privacy Act of 1974 to disclose its uses of information collected from individuals, and it has obligations under the Freedom of Information Act (FOIA) to provide timely and accurate responses to requests for information. The OAWP failed to publish notices required by the Privacy Act concerning the collection of information from individuals and VA's routine uses of that information. The OIG also found that the OAWP did not communicate appropriately with individuals who made submissions to it, and that its responses to requests for information pursuant to FOIA have not met statutory deadlines and lag significantly behind other VA components.

### The OAWP Failed to File Systems of Records Notices Required by the Privacy Act

The Privacy Act's broadly stated purpose is to balance the federal government's "need to maintain information about individuals with the rights of individuals to be protected against unwarranted invasions of their privacy stemming from federal agencies' collection, maintenance, use, and disclosure of personal information about them."[144]

The Privacy Act, which applies to all federal agencies, requires agencies to publish a System of Records Notice (SORN) in the Federal Register whenever the agency establishes or modifies an existing system of records.[145] A "system of records" is "a group of any records under the control of an agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying information assigned to the individual."[146] According to the VA Privacy Act procedures, "[t]he requirement for agencies to publish a SORN allows the Federal Government to accomplish one of the basic objectives of the Privacy Act – fostering agency accountability through public notice."[147]

---

[144] Office of Privacy and Civil Liberties, U.S. Dept. of Justice, *Overview of the Privacy Act*, 2015.

[145] VA Handbook 6300.5, *Procedures for Establishing and Maintaining Privacy Act Systems of Records*, August 3, 2017.

[146] 5 U.S.C. § 552a(a)(5).

[147] VA Handbook 6300.5, *Procedures for Establishing and Maintaining Privacy Act Systems of Records*, August 3, 2017.

### *The OAWP Failed to Comply with the Public Notice Requirements of the Privacy Act of 1974*

The OAWP assumed control of its predecessor OAR system of records on or about June 23, 2017 (the legacy records system). The legacy system was operated until May 28, 2019, when the OAWP established and began using a new system of records.[148] Both records systems contain the following information: the names of whistleblowers and other individuals who make submissions to the OAWP; the allegations raised by these individuals and the OAWP's triage assessment of the allegations; data pertaining to OAWP investigations; and information relating to disciplinary actions against employees.

Records in both systems have unique case identifiers and can be retrieved using that identifier, or by searching the name of the person of interest, among other methods.[149] Because these records are retrievable by identifiers specific to individuals, they are considered a system of records covered by the Privacy Act. Figure 7 provides a screen capture of the Whistleblower Disclosure Tracker and the various methods by which staff could search for records, including "Disclosing Party Search," which provides the ability to identify records by whistleblower name.




***Figure 7.*** *Screen Capture of Menu from VA OAWP Whistleblower Disclosure Tracker (May 2019).*
*Source: VA OAWP*

[148] It has been preserved in a read-only state for reference purposes. Its data has been migrated to the OAWP 2019 records system.

[149] The VA-Wide Adverse Action Database does not appear to be searchable by name, but it was found to be a system of records subject to the Privacy Act by the arbitrator in a recent decision in a union grievance dispute between VA and the American Federation of Government Employees.

The OIG confirmed that OAWP staff are required to and did in fact search the OAWP legacy records system using individuals' names and other identifiers.[150] Based on the information contained in both systems and that the records in both are retrievable by identifiers specific to individuals, they are considered systems of records covered by the Privacy Act. Thus, the publication of a SORN was required with respect to both systems. The OAWP did not publish a SORN with respect to either system.

## OAWP's Submission Form Does Not Disclose Routine Uses of Information as Required by the Privacy Act

The OIG interviewed several complainants who expressed dissatisfaction in the way OAWP handled their allegations. The Accountability and Whistleblower Protection Act does not impose upon the OAWP any obligation to communicate status information about its work after receiving a submission. The OIG attributes many of these complaints to OAWP's failure to adequately *disclose its uses of information* and its process for communicating about matters to people before they submit information. Individuals submitting complaints may also have their own ideas of what customer service and response style should be, based on their individual experiences with federal or private sector agencies.

The Privacy Act requires agencies to disclose to individuals supplying information the reasons that the information is being collected and the uses to which the information may potentially be put. Specifically, agencies are required to

> inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual – (A) the authority (whether granted by statute, or by executive order of the President) which authorizes the solicitation of the information and whether disclosure of such information is mandatory or voluntary; (B) the principal purpose or purposes for which the information is intended to be used; (C) the routine uses which may be made of the information as published pursuant to paragraph (4)(D) of this subsection; and (D) the effects on him, if any, of not providing all or any part of the requested information.[151]

The OAWP submission form in use since at least February 2018 does not include any of this information. The VA OGC advised the OAWP that the draft submission form would not need to disclose the information required by the Privacy Act unless the information would be stored in a Privacy Act System of Records. As discussed above, however, the information submitted to the

[150] In addition, the OIG determined that the OAWP made use of the information within its legacy tracking system to identify and analyze whistleblowers who might benefit from participation in its whistleblower reintegration program. See Finding 4, at page 50. This potential use of the individuals' data was not disclosed by the OAWP on its submission form or anywhere else.

[151] 5 U.S.C. § 552a(e)(3).

OAWP was stored within a Privacy Act System of Records and therefore the OAWP needed to disclose the routine uses of the information being collected.

## The OAWP Lags Behind the VA Average for Response Time to Requests Made Pursuant to the Freedom of Information Act

FOIA provides members of the public with a statutory right to access federal agency records, subject to certain statutory exemptions and exclusions.[152] Individuals (including VA employees) who are seeking information about the activities of the OAWP can obtain information by submitting a request for information pursuant to FOIA.[153] After receiving a FOIA request, a federal agency must review its records and produce those that are not subject to an exemption or exclusion.[154] An agency has 20 days to review a FOIA request to determine whether to comply,[155] but this deadline can be extended in "unusual" circumstances.[156]

The OIG received several complaints about OAWP's FOIA process. According to the former Triage Director, the Triage Division also received complaints about the length of time it took for the OAWP to respond to FOIA requests. The OIG's review of VA's FOIA data revealed that the OAWP's response time significantly exceeded statutorily mandated processing times and the average processing times within VA, as detailed in Table 4.

**Table 4. Average Response Time for FOIA Requests Made to the OAWP from June 2017 to January 2019**

| Type of Request | OAWP Response Time | Overall VA Response Time |
|---|---|---|
| **Simple** | 110 days | 45 days |
| **Complex** | 193 days | 75 days |

*Source: VA Central FOIA Office.*

Data provided by the OAWP reflects processing times ranging from five to 739 days.

---

[152] 5 U.S.C. § 552.

[153] 5 U.S.C. § 552(a); see also https://www.oprm.va.gov/foia/howto_file_foia_request.aspx.

[154] 5 U.S.C. §§ 552(a)(3)(A)– (D).

[155] 5 U.S.C. § 552(a)(6)(A)(i).

[156] 5 U.S.C. § 552(a)(6)(B)(i). The deadline may be extended by up to 10 working days, but the agency must provide written notice to the requesting party detailing the unusual circumstances for such extension and the date on which a determination is expected to be made. 5 U.S.C. § 552(a)(7)(A). If the response to a FOIA request is expected to exceed 10 days, the agency is required to provide the requesting party with the tracking number assigned to the request; 5 U.S.C. § 552(a)(6)(E)(ii)(I). For expedited requests, agencies must make a determination of whether to provide expedited processing and notice of that determination must be provided to the requesting party within 10 days after the date of the request.

Email records reflect that the OAWP began focusing attention on assessing the size and status of its pending FOIA requests in August 2018, at which time the OAWP had 70 pending FOIA requests. Figure 8 depicts summary data from an internal OAWP report dated August 31, 2018:

| | | |
|---|---|---|
| 5 | | |
| 6 | **OAWP FOIA Summary** | |
| 7 | # of Open Requests: | 70 |
| 8 | # of Requests Closed YTD: | 4 |
| 9 | Average Backlog (Days): | 175 |
| 10 | | |
| 11 | # in Litigation: | 2 |
| 12 | # in Appeal: | 2 |
| 13 | | |

***Figure 8.*** *Summary Information Regarding OAWP Responses to FOIA Requests.*
*Source: OAWP records*

OAWP staff told the OIG that the volume of FOIA requests received by the OAWP was higher than what had been experienced by its predecessor OAR, but that staffing had not increased to meet the higher demand. A single staff member handled all FOIA requests received by the OAWP until November 2018. OAWP leaders also assigned this staff member duties unrelated to FOIA request processing, including purchase and travel card management. Considering these other assigned duties, the OAWP had the equivalent of one part-time FOIA officer until November 2018.

OAWP leaders began directing additional resources to address the pending FOIA requests in approximately January 2019. OAWP data reflects that, as of February 19, 2019, the OAWP had 116 pending FOIA requests. Staffing for OAWP's FOIA group has increased from a single staff person working part time on requests to seven staff people (three of whom are on detail from the OAWP Human Resources Office) working full time on FOIA issues. Once the pending requests are resolved, the detailed staff are expected to return to their regular duties.[157]

## Finding 6 Conclusion

The OIG determined that the OAWP failed to comply with the Privacy Act by failing to publish required notices related to its systems of records, operating two unauthorized systems of records, and failing to disclose its routine uses of information submitted by individuals. In addition, the OIG determined that the OAWP did not routinely and effectively communicate to whistleblowers the status of matters they submitted and failed to provide for the timely

[157] These staff members did not receive any formal training regarding FOIA requests, but the OAWP's FOIA officer provided informal training in February 2019.

disclosure of information under FOIA, due in large part to insufficient staffing of the OAWP's FOIA group. The OAWP's failures to comply with the Privacy Act and inability to respond to requests for information in a timely and complete manner undermine its accountability to the public and VA stakeholders.

## Recommendations 21–22

21. In consultation with the VA Office of General Counsel, the Assistant Secretary for Accountability and Whistleblower Protection completes the publication of Systems of Records Notices for all systems of records maintained by the Office of Accountability and Whistleblower Protection, and adopts procedures reasonably designed to ensure that the Office of Accountability and Whistleblower Protection does not create additional systems of records without complying with the requirements of the Privacy Act of 1974.
22. The Assistant Secretary for Accountability and Whistleblower Protection consults with the VA Chief Freedom of Information Act Officer to ensure adequate training and staffing of the Office of Accountability and Whistleblower Protection's Freedom of Information Act Office, and establishes procedures to comply with FOIA requirements including timeliness.

# Conclusion

The OIG found that VA has failed to properly implement several key provisions of the VA Accountability and Whistleblower Protection Act of 2017, as well as other authorities. In particular, OAWP's former leaders failed to understand the office's statutory mandates and investigative authority. They were also ineffective at establishing clear policies, procedures, and training sufficient to ensure that the OAWP and VA met their obligations to protect whistleblowers' identities and hold VA employees accountable. Although the OIG recognizes that there have been a series of improvements planned by the Assistant Secretary in 2019, there are significant steps that must be taken to restore the trust of whistleblowers and other complainants due to missteps and a culture set by former leaders who did not appear to value their contributions. The very office established to protect whistleblowers and enhance accountability lacked the basic structures needed to achieve its core mission. Recent communications to the OIG hotline indicate that some individuals continue to report fear of OAWP retaliation or disciplinary action for reporting suspected wrongdoing. The OAWP leaders and staff who are committed to improving VA programs and operations face considerable challenges in overcoming the deficiencies identified in the OIG review.

# Recommendations 1–22

1. The Assistant Secretary for Accountability and Whistleblower Protection directs a review of the Office of Accountability and Whistleblower Protection's compliance with the VA Accountability and Whistleblower Protection Act of 2017 requirements in order to ensure proper implementation and eliminate any activities not within its authorized scope.

2. The VA Secretary rescinds the February 2018 Delegation of Authority and consults with the Assistant Secretary for Accountability and Whistleblower Protection, the VA Office of General Counsel, and other appropriate parties to determine whether a revised delegation is necessary, and if so, ensures compliance with statutory requirements.

3. The Assistant Secretary for Accountability and Whistleblower Protection, in consultation with the Office of General Counsel, Office of Inspector General, Office of the Medical Inspector, and the Office of Resolution Management establishes comprehensive processes for evaluating and documenting whether allegations, in whole or in part, should be handled within the Office of Accountability and Whistleblower Protection or referred to other VA entities for potential action or referred to independent offices such as the Office of Inspector General.

4. The Assistant Secretary for Accountability and Whistleblower Protection makes certain that policies and processes are developed, in consultation with the VA Office of General Counsel and Office of Resolution Management, to consistently and promptly advise complainants of their right to bring allegations of discrimination through the Equal Employment Opportunity process.

5. The Assistant Secretary for Accountability and Whistleblower Protection ensures that the divisions of the Office of Accountability and Whistleblower Protection adopt standard operating procedures and related detailed guidance to make certain they are fair, unbiased, thorough, and objective in their work.

6. The VA General Counsel updates VA Directive 0700 and VA Handbook 0700 with revisions clarifying the extent to which VA Directive 0700 and VA Handbook 0700 apply to the Office of Accountability and Whistleblower Protection, if at all.

7. The Assistant Secretary for Accountability and Whistleblower Protection assigns a quality assurance function to an entity positioned to review Office of Accountability and Whistleblower Protection divisions' work for accuracy, thoroughness, timeliness, fairness, and other improvement metrics.

8. The Assistant Secretary for Accountability and Whistleblower Protection directs the establishment of a training program for all relevant personnel on appropriate investigative techniques, case management, and disciplinary actions.

9. The VA Secretary, in consultation with the VA Office of General Counsel, provides comprehensive guidance and training reasonably designed to instill consistency in penalties for actions taken pursuant to 38 U.S.C. §§ 713 and 714.

10. The VA Secretary ensures the provision of comprehensive guidance and training to relevant disciplinary officials to maintain compliance with the mandatory adverse action criteria outlined in 38 U.S.C. § 731.

11. The Assistant Secretary for Accountability and Whistleblower Protection makes certain that in any disciplinary action recommended by the Office of Accountability and Whistleblower Protection, all relevant evidence is provided to the VA Secretary (or the disciplinary officials designated to act on the Secretary's behalf).

12. The Assistant Secretary for Accountability and Whistleblower Protection implements safeguards consistent with statutory mandates to maintain the confidentiality of employees that make submissions, including guidelines for communications with other VA components.

13. The Assistant Secretary for Accountability and Whistleblower Protection leverages available resources, such as VA's National Center for Organizational Development and the Office of Resolution Management, to conduct an organizational assessment of Office of Accountability and Whistleblower Protection employee concerns and develop an appropriate action plan to strengthen Office of Accountability and Whistleblower Protection workforce engagement and satisfaction.

14. The Assistant Secretary for Accountability and Whistleblower Protection develops a process and training for the Triage Division staff to identify and address potential retaliatory investigations.

15. The Assistant Secretary for Accountability and Whistleblower Protection collaborates with the Assistant Secretary for Human Resources and Administration, and the VA Secretary to develop performance plan requirements as required by 38 U.S.C. § 732.

16. The Assistant Secretary for Accountability and Whistleblower Protection ensures the implementation of whistleblower disclosure training to all VA employees as required under 38 U.S.C. § 733.

17. The VA Secretary makes certain supervisors' training is implemented as required under § 209 of the VA Accountability and Whistleblower Protection Act of 2017.

18. The Assistant Secretary for Accountability and Whistleblower Protection confers with the VA Office of General Counsel to develop processes for collecting and tracking justification information related to proposed disciplinary action modifications consistent with 38 U.S.C. § 323(f)(2).

19. The VA Secretary in consultation with the Office of General Counsel and the Assistant Secretary for Accountability and Whistleblower Protection ensures compliance with the 60-day reporting requirement in 38 U.S.C. § 323(f)(2) consistent with congressional intent.

20. The Assistant Secretary for Accountability and Whistleblower Protection develops or enhances database systems to provide the capability to track all data required by the VA Accountability and Whistleblower Protection Act of 2017.

21. In consultation with the VA Office of General Counsel, the Assistant Secretary for Accountability and Whistleblower Protection completes the publication of Systems of Records Notices for all systems of records maintained by the Office of Accountability and Whistleblower Protection, and adopts procedures reasonably designed to ensure that the Office of Accountability and Whistleblower Protection does not create additional systems of records without complying with the requirements of the Privacy Act of 1974.

22. The Assistant Secretary for Accountability and Whistleblower Protection consults with the VA Chief Freedom of Information Act Officer to ensure adequate training and staffing of the Office of Accountability and Whistleblower Protection's Freedom of Information Act Office, and establishes procedures to comply with FOIA requirements including timeliness.

## Management Comments

The Assistant Secretary for OAWP concurred on behalf of VA with all 22 OIG recommendations in the report. Comments related to individual recommendations indicate that VA considers nine recommendations to be completed based on its issuance of Directive 0500 or other recent actions.

Action plans are provided for the remaining 13 recommendations.[158] The Assistant Secretary for OAWP also submitted general comments which took issue with two aspects of the OIG's report:

(1) The OIG implies "that the [Accountability and Whistleblower Protection] Act was designed to target senior executives for discipline. In reality, the Act included expanded disciplinary authorities that apply to all VA employees..."

(2) The OIG's report does not address in either the executive summary or the body of the report the many improvements and reforms made by the OAWP, and instead relegates them to footnotes.

The comments in their entirety can be found in Appendix B.[159]

## OIG Response

The following responds to the two issues raised by the general comments and then outlines concerns with the VA's proposed corrective action plans.

The first comment simply misses the point. The OIG's report is focused on the OAWP's operations and efforts to implement relevant sections of the Act. The expanded disciplinary authorities of the Secretary over VA employees generally, although part of the same legislation, are not directly relevant to OAWP's operations and, thus, this report. The VA Accountability and Whistleblower Protection Act of 2017 did expand the Secretary's disciplinary authority as to all VA employees (see 38 U.S.C. § 714), but that authority applies without regard to any involvement or action by OAWP. Indeed, the Act provides no role for OAWP in the disciplinary process of employees other than its authority to recommend discipline based on its investigation of allegations of misconduct, poor performance, and retaliation involving certain senior executives (i.e., the defined categories of Covered Executives) and allegations of retaliation on the part of supervisors.[160] It is this authority of the OAWP with respect to disciplinary proceedings that are addressed in this report.

Second, the report does, in fact, make multiple references in the text to OAWP progress. Moreover, as indicated by the OAWP's comments and related action plans for each OIG recommendation, many of the improvements and reforms to which the OAWP refers largely occurred between June and October 2019 and were outside the scope of the OIG's primary

[158] The OAWP states that it has taken actions that resolve 10 recommendations, but the OIG only identified nine recommendations for which the OAWP stated that actions were completed.

[159] The OIG publishes VA comments in full in response to every OIG report to provide VA with the opportunity to detail any accomplishments since the end of the review period and to highlight any concerns. In addition, the OIG gave the OAWP and the Office of General Counsel (OGC) an opportunity to provide technical comments to the draft during an in-person meeting on October 1, 2019.

[160] 38 U.S.C. § 323(c)(1)(H). The OAWP may also recommend appropriate discipline for employees based on investigations carried out by other entities such as the OIG, the Office of the Medical Inspector, and the Office of Special Counsel. 38 U.S.C. § 323(c)(1)(I).

review period, which was June 23, 2017, through December 31, 2018. Nevertheless, the OIG noted several of these efforts to acknowledge the changes the OAWP started implementing under its new leadership. Many of the issues that the OAWP purports to have "independently identified" were actually raised by the OIG during interviews with OAWP senior leaders months before any improvements were made to address these issues, as the following examples demonstrate:

- Determining when matters should be referred for review outside the OAWP (Recommendation 3) was raised as early as November 2018.
- Ensuring all relevant evidence is provided to disciplinary officials (Recommendation 11) was raised as early as March 2019.
- Maintaining the confidentiality of employees who make submissions (Recommendation 12) was raised as early as November 2018 and was brought to the direct attention of Dr. Bonzanto in April 2019.
- Developing processes for collecting and tracking justification information related to 38 U.S.C. § 323(f)(2) (Recommendation 18) was raised as early as December 2018.
- Ensuring compliance with the 60-day reporting requirement in 38 U.S.C. § 323(f)(2) (Recommendation 19) was raised in December 2018 and again in June 2019.
- Developing a database system to track all data required under the Act (Recommendation 20) was raised as early as June 2018 and continuously during interviews of OAWP senior leaders.

## Concerns with VA Action Plans

The Assistant Secretary's comments were generally responsive to the intent of the recommendations. However, some of the planned actions lacked sufficient clarity or specific steps to ensure corrective actions will adequately address the recommendations. In particular, the actions detailed in the responses to Recommendations 2, 3, 4, 7, 11, 12, 18, 19, and 20 were identified as completed as of October based on the issuance of Directive 0500 on September 10, 2019, or other actions taken in recent months. The OIG has not received sufficient documentation to determine whether recent actions and attempts to implement Directive 0500 fully address the recommendations.

The OIG notes that the planned actions for the following two recommendations do not appear sufficient to address the findings and will require updated action plans.

- **Recommendation 2.** The VA Secretary rescinds the February 2018 Delegation of Authority and consults with the Assistant Secretary for Accountability and Whistleblower Protection, the VA Office of General Counsel, and other appropriate

parties to determine whether a revised delegation is necessary, and if so, ensures compliance with statutory requirements.

The VA action plan relies on issuance of Directive 0500. That directive, however, continues to suffer from the same defects as the prior delegation, which the OIG identified in Finding 1. Specifically, it expands the scope of the OAWP's authority to investigate misconduct and poor performance for individuals other than those identified in the statute (38 U.S.C. § 323(c)(1)(H)).[161] The OIG has seen no evidence of consultation with Office of General Counsel or other analysis to justify how such an expansion of the OAWP's investigative authority complies with statutory requirements.

- **Recommendation 12.** The Assistant Secretary for Accountability and Whistleblower Protection implements safeguards consistent with statutory mandates to maintain the confidentiality of employees that make submissions, including guidelines for communications with other VA components.

The VA's action plan states that this recommendation is resolved by VA Directive 0500, paragraph 4a(3), which requires that whistleblowers' identities for matters received by the OAWP are not disclosed without the whistleblowers' consent, except in accordance with the Privacy Act, or as required by law. This, however, may not be sufficient to resolve the OIG's recommendation if the OAWP continues its practice of requiring whistleblowers to consent to the release of their identities in order for OAWP to investigate the allegations of whistleblower retaliation. The OAWP only provides complainants with two options: to consent to release identity or not. As a result, employees could only receive OAWP's investigative services, if they consented to release and risk disclosure of their identity.[162]

The OIG considers all 22 recommendations open and will monitor implementation of VA's planned and recently implemented actions to ensure that they have been effective and sustained.

[161] The delegated authority in Directive 0500 includes the following categories of employees outside the scope of OAWP's investigative authority (unless the employee is a supervisor and the allegation is whistleblower retaliation): Senior-level (SL) positions described in 5 CFR § 319.102; Scientific and Professional (ST) positions described in 5 CFR § 319.103; Veterans law judges (including chief veterans law judges); Veterans Health Administration (VHA) and Veterans Benefits Administration (VBA) directors, associate and assistant directors at General Schedule grade 14 or above; National Cemetery Administration (NCA) cemetery directors and district chiefs of operation at General Schedule grade 14 or above; and Other SES appointees (e.g., noncareer SES appointees and limited term SES appointees).

[162] In contrast, the U.S. Office of Special Counsel does not make investigations contingent on full consent and provides complainants three disclosure options related to information on their identity—full consent to disclose, consent to communicate with the agency but not disclose identity, and no consent to disclose.

# Appendix A: Scope and Methodology

## Scope

The OIG's review period extended from the statutory establishment of the Office of Accountability and Whistleblower Protection on June 23, 2017, through December 31, 2018. The OIG updated its fact-gathering through additional document review and interviews with the Assistant Secretary for Accountability and Whistleblower Protection and other OAWP staff in May, June, and August 2019.

## Methodology

To accomplish its objectives, the OIG team reviewed applicable laws, regulations, policies, procedures, and guidelines. The OIG team interviewed 74 individuals, including current and former OAWP senior leaders Dr. Tamara Bonzanto, Peter O'Rourke, Kirk Nicholas, and Todd Hunter; current and the former OAWP Division Director, the A&A Director, and the Investigations Director; the Senior Advisor; 29 current and former OAWP employees, VA Office of General Counsel staff, current and former VA Human Resources and Administration senior leaders and staff, VA Office of the Medical Inspector staff, and U.S. Office and Special Counsel staff; and 22 complainants and complainant representatives. Additionally, the OIG team collected and reviewed emails of relevant VA staff, including OAWP staff; data from the OAWP's SharePoint database; and documents received from the OAWP in response to document requests.

In this report, the OIG has generalized narratives and case scenarios, and has removed identifiers for individuals when appropriate to protect the privacy and identity of parties and witnesses.

## Scope Limitation

Prior to May 28, 2019, the OAWP managed and tracked its intake submissions, investigations, and disciplinary actions using a series of interconnected homegrown Microsoft SharePoint lists and libraries (collectively, OAWP databases). These systems were originally designed to support the workflows of the Office of Accountability Review (OAR). When the OAWP was established, the existing OAR SharePoint lists and libraries were retained and formed the basis of what became the OAWP databases. Over time, the OAWP's Knowledge Management Operations Division (KMO Division) modified the data elements collected in the OAWP databases to collect information needed for congressionally mandated reports as well as other requests from OAWP leaders. The OIG determined that while the OAWP databases lacked flexible built-in reporting capabilities, the staff of the KMO Division had sufficient expertise to extract, query, and report on the data using other software. These processes took significant

manual intervention and did not provide the KMO Division much flexibility to revise the reports to present data differently without significant additional effort.

The KMO director characterized the OAR data inherited by the OAWP as "basically unreportable because different folks were using different fields for different things, and those sorts of examples of just, you know, bad data in, bad data out." The KMO Division has been incrementally refining the OAWP databases and standardized inputs to enforce data integrity. These refinements have applied only to newly collected data, not revisions of old records. According to the KMO director, any reporting that relied upon the OAWP databases would be "looked at very, very closely . . . to ensure that [it is] as accurate as possible." The OAWP has implemented a new system using the Microsoft Dynamics business management platform, which is expected to have more streamlined data collection and reporting capabilities than the current OAWP databases. Additionally, the OAWP is working to create an online case submission form that will allow those reports to flow automatically into Microsoft Dynamics—creating efficiencies for the Triage Division staff currently responsible for data entry at intake.

Consistent with the KMO director's assessment, the OIG's review of the OAWP's SharePoint tracking lists revealed several areas of weakness related to blank fields, duplicate options, and a lack of standardization among the three primary lists used for tracking: Disclosure Tracker, Matter Tracker, and Discipline Tracker. The OAWP advised OIG investigators that there was a lack of quality control with respect to data entry, which changed over time as measures were taken to improve data integrity. In addition, data points were added through new fields, but the preexisting records were not updated, which results in incomplete searches for queries using the added fields.

As a result of these and other limitations, the OIG cannot independently validate the OAWP's reported data without a prohibitively resource-intensive review of all related underlying records, which may also be incomplete.

## Government Standards

The OIG conducted this review in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Investigations.*

# Appendix B: Management Comments

**Department of Veterans Affairs Memorandum**

Date: October 11, 2019

From: Assistant Secretary, Accountability and Whistleblower Protection (70)

Subj: VA OIG Draft Report, Office of Accountability and Whistleblower Protection: Failures Implementing Aspects of the VA Accountability and Whistleblower Protection Act of 2017 (VIEWS 01503662)

To: Inspector General (50)

1. I have reviewed the draft report and attached are general comments and responses to the recommendations. I concur with the report's 16 recommendations for the Assistant Secretary for Accountability and Whistleblower Protection. On behalf of the Department, I concur with the remained of the recommendations.
2. If you have any questions, please contact if you have questions about this information, please contact Mr. Matthew Gentil, Executive Assistant, at (202) 632-9626 or by e-mail at Matthew.Gentil@va.gov.

(Original signed by:)

Tamara Bonzanto, DNP, RN

Attachment

*For accessibility, the original format of this appendix has been modified to comply with Section 508 of the Rehabilitation Act of 1973, as amended.*

## General Comment

Under the leadership of the Department of Veterans Affairs' (VA) first Assistant Secretary for Accountability and Whistleblower Protection, Dr. Tamara Bonzanto, the Office of Accountability and Whistleblower Protection (OAWP) independently identified many of the issues highlighted by the Office of Inspector General (OIG). In fact, VA has already taken and resolved ten of the OIG's recommendations. Additional improvements include:

- restructuring OAWP to facilitate better oversight;
- improving communications with whistleblowers about the status of their matters;
- ensuring OAWP directly investigates all whistleblower retaliation allegations;
- implementing an information system to track investigations and begin to identify trends, as required by the Act;
- establishing a quality review team to ensure thorough and accurate investigations; and
- developing whistleblower rights and protections training in order to better protect whistleblowers and prevent retaliation.

While OAWP continues to improve under its new leadership, VA's institutional approach to accountability is completely different than that of past administrations, and the VA Accountability and Whistleblower Protection Act of 2017 (the Act) has been a key factor in that culture change.

When problems arise, VA quickly tackles them head on, and the Act gives VA another tool to help the Department hold those responsible accountable. In fact, since June 23, 2017, when the Act became law, VA has fired more than 8,630 people.

VA takes issue with two aspects of OIG's report. The first is its implication that the Act was designed to target senior executives for discipline. In reality, the Act included expanded disciplinary authorities that apply to all VA employees compared to the 2014's Veteran Access, Choice and Accountability Act which aimed at holding only VA senior executives accountable. This is a key distinction the report misses.

VA is also concerned that the report does not address OAWP's many improvements and reforms in the executive summary or body of the report, relegating them instead to fine-print footnotes.

Regardless, VA appreciates OIG's review and is committed to consistent improvement, and under OAWP's new leadership, the office will deliver just that.

## OAWP

Dr. Bonzanto appreciates the courage that it takes to report wrongdoing. Disclosures by VA employees and other individuals save Veterans' lives, combat fraud, and improves services delivered to Veterans.

Dr. Bonzanto recognizes the need for comprehensive, timely, and unbiased investigations into whistleblower disclosures, allegations of whistleblower retaliation, and allegations of senior leader misconduct and poor performance. Dr. Bonzanto recognizes the need for improvements in the way OAWP staff communicate to and about whistleblowers. Since Dr. Bonzanto's appointment, she has been assessing OAWP's operations and procedures to ensure that the organization properly implements the Act.

By April 2019, Dr. Bonzanto identified several deficiencies that needed to be corrected, including staff who were making decisions on her behalf with little to no oversight; teams who were duplicating efforts; investigators who were conducting investigations without sufficient training; a lack of communication with whistleblowers about the status of their matters; a lack of written policies and standard operating procedures; and reports and recommendations that displayed a lack of training.

Dr. Bonzanto developed and implemented a plan to correct these deficiencies. By April 2019, Dr. Bonzanto started reviewing all OAWP recommendations, including recommendations for disciplinary action or no action. She also stopped OAWP contractors from performing work unrelated to OAWP's statutory functions. She mandated that staff update whistleblowers about the status of their matters. In August 2019, Dr. Bonzanto realigned OAWP's operations to ensure that teams were not duplicating efforts and to increase the number of investigators. OAWP investigators also received training on conducting investigations in August and September 2019. OAWP is currently developing a customized investigative training course for its investigators. On September 10, 2019, VA issued Directive 0500. The directive governs how OAWP receives whistleblower disclosures; allegations of senior leader misconduct or poor performance; and allegations of whistleblower retaliation. The directive covers a number of the recommendations made by OIG.

Since her appointment in January 2019, Dr. Bonzanto made one recommendation for disciplinary action on September 20, 2019. Dr. Bonzanto recognizes that this number is low, but she believes that OAWP recommendations need to be accurate and based on thoroughly conducted investigations. Recommendations that she received before September 2019 had several deficiencies, including:

- citing to investigative reports where witnesses were not interviewed;
- conclusory statements that were not tied into evidence; and
- failing to properly address the elements required for whistleblower retaliation.

In August 2019, OAWP developed checklists to ensure that investigative reports and recommendations addressed some of the above deficiencies. So far, the quality review team have identified discrepancies in over 45 investigative reports, which have been routed back for further investigation.

Dr. Bonzanto continues to improve OAWP operations, including ensuring that investigations are conducted in a timely and thorough manner; improving customer service; developing whistleblower rights and protections training; ensuring that OAWP complies with its statutory functions, including tracking and confirming compliance with recommendations made by OIG, VA's Office of Medical Inspector, the U.S. Government Accountability Office, and the U.S. Office of Special Counsel; and identifying trends to proactively identify areas of improvement based on data collected by OAWP.

**Department of Veterans Affairs (VA) Action Plan**

OIG Draft Report, Office of Accountability and Whistleblower Protection: Failures Implementing Aspects of the VA Accountability and Whistleblower Protection Act of 2017.

**Date of Draft Report: September 20, 2019**

Recommendation 1. **The Assistant Secretary for Accountability and Whistleblower Protection directs a review of the Office of Accountability and Whistleblower Protection's compliance with the VA Accountability and Whistleblower Protection Act of 2017 requirements in order to ensure proper implementation and eliminate any activities not within its authorized scope.**

**VA Comment:** Concur. VA is completing actions to ensure that OAWP is not performing activities outside its authorized scope or responsibilities that are unrelated to the functions specified by the Act.

Since her appointment in January 2019, the Assistant Secretary for Accountability and Whistleblower Protection has assessed OAWP's operations and procedures to ensure that the organization properly implements the Act and is operating within its authorized scope. As part OAWP's ongoing performance assessment, Dr. Bonzanto plans on having a third-party conduct an evaluation of the investigations process and compliance with the Act targeting commencement in January 2020.

Recommendation 2. **The VA Secretary rescinds the February 2018 Delegation of Authority and consults with the Assistant Secretary for Accountability and Whistleblower Protection, the VA Office of General Counsel, and other appropriate parties to determine whether a revised delegation is necessary, and if so, ensures compliance with statutory requirements**

**VA Comment:** Concur. VA is completing the actions required to resolve this recommendation in October 2019.

On October 11, 2019, the Secretary of Veterans Affairs rescinded the February 2018 delegation of authority, which is no longer needed in light of VA Directive 0500, which was issued on September 10, 2019.

Recommendation 3. **The Assistant Secretary for Accountability and Whistleblower Protection, in consultation with the Office of General Counsel, Office of Inspector General, Office of the Medical Inspector, and the Office of Resolution Management establishes comprehensive processes for evaluating and documenting whether allegations, in whole or in part, should be handled within OAWP or referred to other VA entities for potential action or referred to independent offices such as the Office of Inspector General.**

**VA Comment:** Concur. VA completed the actions required to resolve this recommendation in September 2019.

VA Directive 0500, issued on September 10, 2019, governs how OAWP receives whistleblower disclosures; allegations of senior leader misconduct or poor performance; and allegations of whistleblower retaliation. The directive identifies matters that are more appropriately addressed by other remedial administrative processes, including equal employment opportunity allegations and hostile work environment allegations. Individuals making these allegations are notified that OAWP does not

investigate them and are provided information on the right forum to file their complaint. Allegations involving actual or potential crimes are sent to OIG for review. Templates and guidance about these processes have been disseminated to staff.

Recommendation 4. **The Assistant Secretary for Accountability and Whistleblower Protection makes certain that policies and processes are developed, in consultation with the VA Office of General Counsel and Office of Resolution Management, to consistently and promptly advise complainants of their right to bring allegations of discrimination through the Equal Employment Opportunity process.**

VA Comment: Concur. VA completed the actions required to resolve this recommendation in September 2019.

VA Directive 0500, issued on September 10, 2019, governs how OAWP receives whistleblower disclosures; allegations of senior leader misconduct or poor performance; and allegations of whistleblower retaliation. The directive identifies matters that are more appropriately addressed by other remedial administrative processes, including equal employment opportunity allegations and hostile work environment allegations. Individuals making these allegations to OAWP are notified that OAWP does not investigate them and are provided information on the right forum to file their complaint. Templates and guidance about these processes have been disseminated to staff.

Recommendation 5. **The Assistant Secretary for Accountability and Whistleblower Protection ensures that the divisions of the Office of Accountability and Whistleblower Protection adopt standard operating procedures and related detailed guidance to make certain they are fair, unbiased, thorough, and objective in their work.**

VA Comment: Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

The Assistant Secretary recognizes that the actions of OAWP staff must be unbiased, thorough, and objective. The Assistant Secretary is taking a number of steps to ensure that this occurs, including:

- issuing VA Directive 0500 on September 10, 2019. The directive governs how OAWP receives whistleblower disclosures; allegations of senior leader misconduct or poor performance; and allegations of whistleblower retaliation;
- establishing a quality review team to ensure thorough and accurate investigations;
- developing a comprehensive training program for its investigators. The program will cover investigative techniques, including report writing. The program will incorporate best practices from the Office of Special Counsel (OSC), the Council of Inspectors General on Integrity and Efficiency (CIGIE), and other governmental and non-governmental offices. This will serve as the foundation for continuous professional training and development that will be conducted throughout the next fiscal year;
- developing a comprehensive training program for individuals who review investigative reports to ensure the reports are done in a fair, unbiased, thorough, and objective manner. The program will incorporate best practices from OSC, CIGIE, and other governmental and non-governmental offices;
- developing standard operating procedures (SOP), checklists, and a reporting template to ensure consistent quality and timeliness with OAWP investigations;

- developing additional SOPs and policy as it complies with the other provisions of 38 United States Code (U.S.C.) § 323, including tracking and confirming the implementation of recommendations made by the Government Accountability Office, OSC, the Office of Medical Inspector, and OIG;
- ensuring that all staff are trained in and held accountable for providing customer service; and
- establishing a customer survey to measure the impact of these customer service improvements.

**Recommendation 6. The VA General Counsel updates VA Directive 0700 and VA Handbook 0700 with revisions clarifying the extent to which VA Directive 0700 and VA Handbook 0700 apply to the Office of Accountability and Whistleblower Protection, if at all.**

**VA Comment**: Concur. OAWP is not an element of the Office of General Counsel (OGC) and does not report to the General Counsel.

With regard to VA Directive 0700 and VA Handbook 0700, VA is taking actions required to resolve this recommendation and anticipates completing these actions by early 2020. OGC assigned a workgroup the task of updating VA Directive 0700 and VA Handbook 0700. The update will include clarification of the extent, if any, the Directive and Handbook apply to OAWP. As required under VA policy, impacted VA offices, including OAWP, will provide feedback on the Directive and Handbook.

**Recommendation 7. The Assistant Secretary for Accountability and Whistleblower Protection assigns a quality assurance function to an entity positioned to review OAWP divisions' work for accuracy, thoroughness, timeliness, fairness, and other improvement metrics.**

**VA Comment**: Concur. VA completed the actions required to resolve this recommendation in August 2019.

The Assistant Secretary recognizes that the actions of OAWP staff must be unbiased, thorough, and objective. In August of 2019, OAWP underwent a realignment of its operations to ensure quality performance: investigate matters on a timely basis; prepare and issue recommendations on a timely basis; reduce its backlog of cases and ensure that it can comply with the other provisions of 38 U.S.C. § 323. As part of this realignment, OAWP established a quality review team to ensure thorough and accurate investigations.

OAWP is developing a comprehensive training program for individuals who review investigative reports to ensure the reports are done in a fair, unbiased, thorough, and objective manner. The program will incorporate best practices from OSC, CIGIE, and other governmental and non-governmental offices. The quality review team is also developing SOPs, checklists, and a reporting template to ensure consistent quality and timeliness with OAWP investigations.

**Recommendation 8. The Assistant Secretary for Accountability and Whistleblower Protection directs the establishment of a training program for all relevant personnel on appropriate investigative techniques, case management, and disciplinary actions.**

**VA Comment**: Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

The Assistant Secretary recognizes that the actions of OAWP staff must be unbiased, thorough, and objective. OAWP is developing a comprehensive training program for its investigators. The program will cover investigative techniques, including report writing. The program will incorporate best practices from OSC, CIGIE, and other governmental and non-governmental offices. This will serve as the foundation of continuous professional training and development that will be conducted throughout the next fiscal year.

OAWP investigators have already started to receive standardized training on conducting investigations, which was presented in August and September 2019.

**Recommendation 9. The VA Secretary, in consultation with the VA Office of General Counsel, provides comprehensive guidance and training reasonably designed to instill consistency in penalties for actions taken pursuant to 38 U.S.C. §§ 713 and 714.**

**VA Comment:** Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions by the end of the calendar year.

Office of Human Resources and Administration/Operations, Security, and Preparedness (HRA/OSP) will prepare guidance regarding penalty selection for actions taken pursuant to 38 U.S.C. §§ 713 and 714. VA Handbook 5021 will be modified to incorporate this guidance. The guidance will be consistent with the authorities provided to the VA by Public Law 115-41, Executive Order 13839, and recent Office of Personnel Management comments posted in the Federal Register regarding Agency use of a Table of Penalties.

**Recommendation 10. The VA Secretary ensures the provision of comprehensive guidance and training to relevant disciplinary officials to maintain compliance with the mandatory adverse action criteria outlined in 38 U.S.C. § 731**

**VA Comment:** Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

HRA/OSP will issue guidance clarifying the procedures for actions taken under 38 U.S.C. § 731. VA Handbook 5021 will be modified to incorporate this guidance, and VA's enterprise-wide employee relations case management system will be used to maintain relevant evidence provided to the VA Secretary (or the designated disciplinary officials) and monitor compliance with the guidance.

**Recommendation 11. The Assistant Secretary for Accountability and Whistleblower Protection makes certain that in any disciplinary action recommended by the OAWP, all relevant evidence is provided to the VA Secretary (or the disciplinary officials designated to act on the Secretary's behalf).**

**VA Comment:** Concur. VA completed the actions required to resolve this recommendation in September 2019.

As described in VA Directive 0500, issued on September 10, 2019, OAWP no longer provides Human Resources (HR) services. Instead, these services are provided directly by HR servicing offices. In the case of senior executives, that would be the Corporate Senior Executive Management Office.

As required under VA Directive 0500, OAWP provides disciplinary officials with recommendations for disciplinary action and also provides those officials with access to the investigative file, so that they can consider it when deciding whether to propose or take a disciplinary action.

**Recommendation 12. The Assistant Secretary for Accountability and Whistleblower Protection implements safeguards consistent with statutory mandates to maintain the confidentiality of employees that make submissions, including guidelines for communications with other VA components.**

VA Comment: Concur. VA completed the actions required to resolve this recommendation in September 2019.

VA Directive 0500, paragraph 4a(3), requires that whistleblowers' identities for matters received by OAWP are not disclosed without the whistleblowers' consent, except in accordance with the Privacy Act, or as required by law.

When allegations are received, OAWP staff ask the individual whether they would like to remain anonymous. If so, OAWP staff go through a list of questions to determine what information the individual is willing to disclose and whether there are restrictions on sharing the information with specific individuals. Before referring a matter for investigation, OAWP redacts any information that the individual is not willing to disclose or identifies individuals who should not undertake the investigation. If an investigation is conducted by OAWP staff, staff abides by the restrictions on the disclosure of the individual's identity.

Additional training will be provided to staff about interacting with and conducting investigations regarding individuals who chose to remain anonymous.

**Recommendation 13. The Assistant Secretary for Accountability and Whistleblower Protection leverages available resources, such as VA's National Center for Organizational Development and the Office of Resolution Management, to conduct an organizational assessment of OAWP employee concerns and develop an appropriate action plan to strengthen OAWP workforce engagement and satisfaction.**

VA Comment: Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

VA's National Center for Organizational Development (NCOD) reviewed the results of OAWP's 2019 All Employee Survey with OAWP's management. Notably, the survey was conducted in June 2019, during a key transition point for OAWP when changes to bring the organization into alignment with the statute were underway. OAWP continues to engage with NCOD to improve OAWP workforce engagement and satisfaction.

OAWP is also establishing four employee workgroups, designed to solicit employee feedback as OAWP continues its realignment. The workgroups include a training workgroup, which will advise on training that is beneficial for OAWP staff; policy/process workgroup, which will advise on SOPs and policy for OAWP; employee engagement workgroup, which will advise on ways to improve employee engagement; and a technology workgroup, which will advise on ways to better utilize technology in OAWP.

OAWP is also collaborating with the Veterans Experience Office (VEO) to provide customer service training to all staff. OAWP is also working with VEO to develop a customer survey to measure the impact of these customer service improvements.

**Recommendation 14. The Assistant Secretary for Accountability and Whistleblower Protection develops a process and training for the Triage Division staff to identify and address potential retaliatory investigations.**

**VA Comment:** Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

On August 18, 2019, OAWP realigned staff and offices to ensure that it can: investigate matters on a timely basis; prepare and issue recommendations on a timely basis; reduce its backlog of cases and ensure that it can comply with the other provisions of 38 U.S.C. § 323. As part of this realignment, the Triage team was eliminated, and its responsibility for the informal development of matters was moved to the Investigations team to prevent a duplication of effort by both teams. The realignment did not result in a reduction in grade or a loss of pay for any OAWP employee.

OAWP will collaborate with OSC and consult with OGC on ways to help train OAWP staff to identify and address potential retaliatory investigations.

**Recommendation 15. The Assistant Secretary for Accountability and Whistleblower Protection collaborates with the Assistant Secretary for Human Resources and Administration, and the VA Secretary to develop performance plan requirements as required by 38 U.S.C. § 732.**

**VA Comment:** Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

HRA/OSP collaborated with OAWP to develop criteria as required by 38 U.S.C. § 732. The criteria will be incorporated in Senior Executive Service performance plans in the first quarter of Fiscal Year (FY) 2020, and guidance issued to Under Secretaries, Assistant Secretaries, and Key Officials by the Assistant Secretary of HRA/OSP to evaluate the performance of supervisors under the same criteria.

**Recommendation 16. The Assistant Secretary for Accountability and Whistleblower Protection ensures the implementation of whistleblower disclosure training to all VA employees as required under 38 U.S.C. § 733.**

**VA Comment:** Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

OAWP has been working with OSC and OIG to collaborate and develop training required for all employees under 38 U.S.C. § 733. This training has been developed at the same time as OAWP continues to improve its operations, including ensuring that investigations are conducted in a timely and thorough manner; establishing a compliance team; and issuing written policy on OAWP investigations.

VA anticipates issuance of the 38 U.S.C. § 733 training, including a specialized module for supervisors, via VA's Talent Management System (TMS) which captures completed training for each employee.

**Recommendation 17. The VA Secretary makes certain supervisors' training is implemented as required under § 209 of the VA Accountability and Whistleblower Protection Act of 2017.**

**VA Comment**: Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions by the end of the calendar year.

VA's Chief Learning Officer is working with OAWP and other organizations to design the training required under § 209 and implement through TMS. TMS will allow VA to assign the training to certain supervisors and monitor compliance with the requirement.

**Recommendation 18. The Assistant Secretary for Accountability and Whistleblower Protection confers with the VA Office of General Counsel to develop processes for collecting and tracking justification information related to proposed disciplinary action modifications consistent with 38 U.S.C. § 323(f)(2).**

**VA Comment**: Concur. VA completed the actions required to resolve this recommendation in June 2019.

In June 2019, OAWP implemented an information system to track investigations and recommendations made by the Assistant Secretary. This system will allow OAWP to identify trends, as required by the Act. VA Directive 0500 also requires that Under Secretaries, Assistant Secretaries, and other Key Officials, will in accordance with 38 U.S.C. § 323(f)(2), respond to OAWP recommended actions, including providing a copy of the action taken or proposed and, if the recommended action was not taken or proposed, providing a detailed justification why such an action was not taken or proposed within 60 calendar days of OAWP's recommendation. This information is then relayed to Congress, as required under 38 U.S.C. § 323(f)(2). Data on disciplinary actions impacting pay are maintained in VA's official systems of records for the Department, HRSmart.

**Recommendation 19. The VA Secretary in consultation with the Office of General Counsel and the Assistant Secretary for Accountability and Whistleblower Protection ensures compliance with the 60-day reporting requirement in 38 U.S.C. § 323(f)(2) consistent with congressional intent.**

**VA Comment**: Concur. VA completed the actions required to resolve this recommendation in September 2019.

The Secretary fully intends to comply with the Act, including that reporting requirement. This requirement is memorialized in VA Directive 0500, issued on September 10, 2019, which states that Under Secretaries, Assistant Secretaries and other Key Officials will respond to OAWP recommended actions, including providing a copy of the action taken or proposed and, if the recommended action was not taken or proposed, providing a detailed justification why such an action was not taken or proposed within 60 calendar days of OAWP's recommendation. This information is then relayed to Congress, as required under 38 U.S.C. § 323(f)(2).

**Recommendation 20. The Assistant Secretary for Accountability and Whistleblower Protection develops or enhances database systems to provide the capability to track all data required by the VA Accountability and Whistleblower Protection Act of 2017.**

**VA Comment**: Concur. VA completed the actions required to resolve this recommendation in June 2019.

In June 2019, OAWP implemented an information system to track investigations and begin to identify trends, as required by the Act. Data on disciplinary actions impacting pay are maintained in VA's official systems of records for the Department, HRSmart, which is managed by HRA/OSP.

**Recommendation 21. In consultation with the VA Office of General Counsel, the Assistant Secretary for Accountability and Whistleblower Protection completes the publication of Systems of Records Notices for all systems of records maintained by the Office of Accountability and Whistleblower Protection, and adopts procedures reasonably designed to ensure that the OAWP does not create additional systems of records without complying with the requirements of the Privacy Act of 1974.**

**VA Comment:** Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

OAWP is consulting with OGC and the Office of Information and Technology (OIT) as it develops and publishes a Systems of Records Notice to cover the information that it obtains and maintains. OAWP will ensure that it does not create additional systems of records without complying with the requirements of the Privacy Act.

**Recommendation 22. The Assistant Secretary for Accountability and Whistleblower Protection consults with the VA Chief Freedom of Information Act Officer to ensure adequate training and staffing of the Office of Accountability and Whistleblower Protection's Freedom of Information Act Office, and establishes procedures to comply with FOIA requirements including timeliness.**

**VA Comment:** Concur. VA is taking actions required to resolve this recommendation and anticipates completing these actions before the end of the calendar year.

OAWP is working with OIT to ensure that its Freedom of Information Act (FOIA) staff are properly trained. OAWP FOIA staff are also solely focused on OAWP FOIA matters. OAWP is also developing a FOIA SOP and has leveraged contract FOIA services already established in VA to assist the office with eliminating its FOIA backlog and handling future FOIA requests.

There are 65 pending FOIA requests that OAWP is currently reviewing. OAWP is working expeditiously so that it can eliminate its FOIA backlog before the end of the calendar year.

# OIG Contact and Staff Acknowledgments



| | |
|---|---|
| **Contact** | For more information about this report, please contact the Office of Inspector General at (202) 461-4720. |
| **Primary Contributors** | R. James Mitchell, Esq., Acting Executive Director, Office of Special Reviews<br><br>Domingo Alvarez, Administrative Investigator<br>Sabrina Gregory, Auditor<br>Dyanne Griffith, Attorney-Advisor<br>Michele Hale, Administrative Investigator<br>Daniel Hollis, Administrative Investigator<br>Nate Landkammer, Special Agent in Charge<br>Sarah Lanks, Attorney-Advisor<br>Jonathan Lebruto, Attorney-Advisor<br>Samantha Petrich, Attorney-Advisor<br>Martha Plotkin, Special Assistant to the Inspector General<br>Barbara H. Wright, Esq., Senior Advisor |
| **Other Acknowledgments** | Katharine Brown, Attorney-Advisor<br>Debbie Crawford, Program Manager<br>Scott Eastman, Supervisory Management & Program Analyst<br>Sharon Forbes, IT Specialist<br>Lisette Howells, Attorney-Advisor<br>Charles Millard, Senior Administrative Investigator<br>Thomas Pasquini, Executive Assistant<br>Deborah Raviv, Attorney-Advisor<br>Tamara Schulman, Attorney-Advisor<br>Jonathan Toy, Special Agent<br>Leanne Watkins, Administrative Investigator |

# Report Distribution

## VA Distribution

Office of the Secretary
Veterans Health Administration
Assistant Secretaries
General Counsel

## Non-VA Distribution

House Committee on Veterans' Affairs
House Appropriations Subcommittee on Military Construction, Veterans Affairs, and Related Agencies
House Committee on Oversight and Reform
Senate Committee on Veterans' Affairs
Senate Appropriations Subcommittee on Military Construction, Veterans Affairs, and Related Agencies
Senate Committee on Homeland Security and Governmental Affairs
National Veterans Service Organizations
Government Accountability Office
Office of Management and Budget
U.S. Senate: Tammy Baldwin, Richard Blumenthal, Sherrod Brown, Patty Murray, and Jon Tester

**OIG reports are available at www.va.gov/oig**

https://dvagov.sharepoint.com/sites/VACOOAWP/incident/Forms/AllItems.aspx?FolderCTID=0x012000B651B33903AF6F4D8989C105DA9A6A3C8

Search...

Office of Accountability an...

SharePoint

OA

# Office of Accountability and Whistleblower Protection

Not following

Search

695

Exhibit 4



This item might not exist or is no longer available

This item might have been deleted, expired, or you might not have permission to view it. Contact the owner of this item for more information.

Retry

Correlation ID: 4f9c7b9f-206b-b000-e94b-ca26c7c70987

Return to classic SharePoint

100%

Type here to search

2:22 PM
9/19/2020

Protected View: This file originated from a potentially unsafe location, and most features have been disabled to avoid potential security risks.

696

Trinka began his VA career as a Senior Executive Service (SES) employee on January 15. 2012.[4]

According to OIG's ROI. its investigation was initiated based on information received from a special agent with HSI.[5] The information alerted OIG that an email sent to Trinka's VA email account was from an individual believed to be involved in a sex trafficking organization.[6]

OIG launched an investigation into the information received from HSI. According to OIG's ROI. investigators discovered that Trinka made false statements. specifically about his wife's immigration status.[7]

---

[1] Exhibit 001
[2] Exhibit 020
[3] Exhibit 001, pp.1-2
[4] Exhibit 002
[5] Exhibit 001
[6] *Id.*, p. 1
[7] Exhibit 001, pp.1-2

•••

The information contained herein is covered by the Privacy Act, 38 U.S.C. 323(c)(3), and other laws. This information is being shared with you under the Privacy Act's need to know exception, 5 U.S.C. § 552a(b)(1), which allows for the disclosure of information to agency personnel who have a need for information for the performance of their duties. You may not share the information contained herein with any individual, unless it is necessary for the performance of that individual's duties and after you have consulted with OAWP.

Exhibit 5

# Access Denied

jim.trinka@va.gov does not have permissions to access this resource

Here are a few ideas.

- Please ask the site admin to give you access.
- If you have a different account, try signing in with that account.
  This will sign you out of all other Office 365 services that you're signed into at this time.

If this problem persists, contact your support team and include these technical details:

User: jim.trinka@va.gov
Issue Type: User does not have permissions.

# THE VA ACCOUNTABILITY AND WHISTLEBLOWER PROTECTION ACT OF 2017:

# Impact on VA's Performance and Conduct-Based Adverse Actions

Department of Veterans Affairs
Office of Human Resources Management
Employee Relations and Performance Management Service

## Presenters

From OHRM Employee Relations and Performance Management Service:

- Jennifer Hayek, Team Leader
- Elizabeth Hill, Team Leader



Exhibit 6

## Don't Forget…….

TITLE 5/FT HYBRID



Some MSPB case law that will likely still apply:

- Making sure there is a nexus between the employee's job and the charged misconduct.
- Ensuring the employee's right to due process is not violated, as failure to do so will result in the action being overturned.
- Ensuring ex parte communication issues such as those found in *Ward v. USPS* and *Stone v. FDIC* do not occur as a finding of a due process violation may result.

P.L. 115-41: Impact on VA's Performance and Conduct-Based Adverse Actions

## 38 U.S.C. § 731 – Supervisory Employees

If a supervisor is found to have engaged in Whistleblower retaliation in conjunction with a finding by the Secretary, the Office of Inspector General (OIG), or, if the matter is still pending or under appeal, an administrative judge, the MSPB, or a Federal judge, consult with the OAWP.



P.L. 115-41: Impact on VA's Performance and Conduct-Based Adverse Actions

**Jim Trinka**

---

**From:** Matthew W. Rau <immigrantlawyer@aol.com>
**Sent:** Friday, January 3, 2020 8:07 PM
**To:** [redacted] jtrinka@cox.net
**Subject:** [redacted]

Dear Piya & Jim:

[redacted]

As you know, our individual hearing date on Piya's green card application is Pearl Harbor Day, December 7, 2020 at 1:00 p.m. at the immigration court in Arlington. [redacted]

Happy New Year!

Best wishes,

Matthew W. Rau, Esq.

*Law Office of Matthew W. Rau*
*2007 15th Street N., Suite 7*
*Arlington, VA 22201*
*Tel. (703) 312-8310*
*Fax (703) 312-8312*

Exhibit 7

Department of Homeland Security
U.S. Citizenship and Immigration Services

# I-797, Notice of Action

THE UNITED STATES OF AMERICA

| | |
|---|---|
| RECEIPT NUMBER [redacted] | CASE TYPE I130 PETITION FOR ALIEN RELATIVE |
| RECEIPT DATE January 8, 2016 / PRIORITY DATE January 8, 2016 | PETITIONER TRINKA, JAMES A. |
| NOTICE DATE May 16, 2016 / PAGE 1 of 1 | BENEFICIARY [redacted] TRINKA, PIYAPORN |

JAMES ALAN TRINKA
[redacted]

**Notice Type:** Approval Notice
**Section:** Husband or wife of U.S. Citizen, 201(b) INA

The above petition has been approved. The petition indicates that the person for whom you are petitioning is in the United States and will apply for adjustment of status. He or she should contact the local USCIS office to obtain Form I-485, Application for Permanent Residence. A copy of this notice should be submitted with the application.

If the person for whom you are petitioning decides to apply for a visa outside the United States based on this petition, the petitioner should file Form I-824, Application for Action on an Approved Application or Petition, to request that we send the petition to the Department of State National Visa Center (NVC).

The NVC processes all approved immigrant visa petitions that require consular action. The NVC also determines which consular post is the appropriate consulate to complete visa processing. It will then forward the approved petition to that consulate.

The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status.

**THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA.**

NOTICE: Although this application/petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify the information submitted in this application, petition and/or supporting documentation to ensure conformity with applicable laws, rules, regulations, and other authorities. Methods used for verifying information may include, but are not limited to, the review of public information and records, contact by correspondence, the internet, or telephone, and site inspections of businesses and residences. Information obtained during the course of verification will be used to determine whether revocation, rescission, and/or removal proceedings are appropriate. Applicants, petitioners, and representatives of record will be provided an opportunity to address derogatory information before any formal proceeding is initiated.

Please see the additional information on the back. You will be notified separately about any other cases you filed.
USCIS
CALIFORNIA SERVICE CENTER
P. O. BOX 30111
LAGUNA NIGUEL CA 92607-0111
**Customer Service Telephone: (800) 375-5283**

COPY A
FOR CLERK OF COURT

0014311607

# COMMONWEALTH OF VIRGINIA
## MARRIAGE REGISTER

BOOK 00143 / 1607

CIRCUIT COURT FOR CITY OR COUNTY OF FAIRFAX COUNTY, VIRGINIA

CLERK'S NUMBER 2013 05326

**GROOM**

1. FULL NAME OF GROOM (first) (middle) (last) JAMES ALAN TRINKA
2. AGE [redacted] Years
3. DATE OF BIRTH (Month, Day, Year) [redacted]
4. PLACE OF BIRTH (state or foreign country) NORTH DAKOTA
5. RACE [redacted]
6. NUMBER OF THIS MARRIAGE (first, second, etc.) [redacted]
7. MARITAL STATUS (If previously married) WIDOWED ☐ DIVORCED ☑
8. EDUCATION (Specify only highest grade completed) Elementary or Secondary [redacted] College (1-4 [redacted])
9a. USUAL RESIDENCE: STREET ADDRESS OR RT. NUMBER [redacted]
9b. CITY OR TOWN OF RESIDENCE [redacted]
9c. COUNTY (if independent city, leave blank) [redacted]
9d. STATE (OR FOREIGN COUNTRY) [redacted]
10. NAME OF FATHER [redacted]
11. FULL MAIDEN NAME OF MOTHER [redacted]

**BRIDE**

12. PRESENT NAME OF BRIDE (first) (middle) (last) PIYAPORN JINDACHAI
MAIDEN SURNAME (if different)
13. AGE [redacted] Years
14. DATE OF BIRTH (Month, Day, Year) [redacted]
15. PLACE OF BIRTH (state or foreign country) THAILAND
16. RACE [redacted]
17. NUMBER OF THIS MARRIAGE (first, second, etc.) [redacted]
18. MARITAL STATUS (If previously married) WIDOWED ☐ DIVORCED ☑
19. EDUCATION (Specify only highest grade completed) Elementary or Secondary (0-12) [redacted] College (1-4 or 5+) [redacted]
20a. USUAL RESIDENCE: STREET ADDRESS OR RT. NUMBER [redacted]
20b. CITY OR TOWN OF RESIDENCE [redacted]
20c. COUNTY (if independent city, leave blank) [redacted]
20d. STATE (OR FOREIGN COUNTRY) [redacted]
21. NAME OF FATHER [redacted]
22. FULL MAIDEN NAME OF MOTHER [redacted]

## MARRIAGE LICENSE

23. TO ANY PERSON LICENSED TO PERFORM MARRIAGES
You are hereby authorized to join the above-named persons in marriage under procedures outlined in the statutes of the Commonwealth of Virginia.

Date Issued DECEMBER 11, 2013
License Expires Sixty Days After Above Date

Signature ▶ [signature] Clerk of Court or Deputy

Date Received by Clerk of Court from Officiant DEC 26 2013

## MARRIAGE CERTIFICATE

TO OFFICIANT:
Complete and sign certificates on both copies.
Return both copies within five days to Clerk of Court issuing license.
Section 32.1-267, Code of Virginia

24. DATE OF MARRIAGE (Month, Day, Year) 12-20-2013
25. PLACE OF MARRIAGE (county or independent city) Fairfax VIRGINIA
26. TYPE OF CEREMONY CIVIL ☑ RELIGIOUS ☐
27. I CERTIFY THAT I JOINED THE ABOVE-NAMED PERSONS IN MARRIAGE ON THE DATE AND AT THE PLACE SPECIFIED.

SIGNATURE OF OFFICIANT [signature] TITLE OF OFFICIANT Marriage Celebrant

Authorized to perform marriages by the Circuit Court for Fairfax (city or county), Virginia, in 1992 (year of authorization)

NAME OF OFFICIANT (type or print) Leora M Motley

ADDRESS OF OFFICIANT 6110 Castletown Way (street or route number) Alexandria (city or town), Virginia (state)

VS3-7/01

A COPY TESTE:
JOHN T. FREY, CLERK
BY: [signature] Deputy Clerk
Date: 01-02-2014
Original retained in the office of the Clerk of the Circuit Court of Fairfax County, Virginia

1/31/14 LR/VR/SP

VIRGINIA

FAIRFAX CIRCUIT COURT

2014-00063

In the matter of the change of name of
Piyaporn Jindachai

to Piyaporn Trinka

Civil No. ____________

## FINAL ORDER

This day came the petitioner, seeking to change her name.

IT APPEARING to the Court that:

The current address of the petitioner, including street, city and state of residence is [redacted].

The petitioner has never previously had a change of name.

**ADJUDGED, ORDERED and DECREED** that the name of the petitioner is hereby changed from Piyaporn Jindachai to Piyaporn Trinka, and further

**ADJUDGED, ORDERED, and DECREED** that the Clerk of this Court, pursuant to the provisions of Virginia Code §8.01-217 shall spread this order upon the current deed book, index it in both the old and new names, and transmit a certified copy to both the State Registrar of Vital Statistics and the Criminal Records Exchange.

Entered this 28 day of January, 2014.

JUDGE

I ASK FOR THIS:

Signature of Petitioner(s)

A COPY TESTE:
JOHN T. FREY, CLERK
BY: Faye P. [signature]
Deputy Clerk
Date: 1/31/2014
Original retained in the office of the Clerk of the Circuit Court of Fairfax County, Virginia



CCR A-160 5-6 October 2006


UNITED STATES OF AMERICA
EMPLOYMENT AUTHORIZATION
Surname
TRINKA
Given Name
PIYAPORN
USCIS# Category Card#
[redacted]
Country of Birth
Thailand
Terms and Conditions
None
Date of Birth Sex
[redacted] F
Valid From: 12/27/19
Card Expires: 12/26/20
NOT VALID FOR REENTRY TO U.S.


FORM I-766 Rev (02-2016)
35813153
123
If found, drop in any US Mailbox
[redacted]<<
[redacted]<<<<<<<<<<<<2
TRINKA<<PIYAPORN<<<<<<<<<<<<<<


YOUR SOCIAL SECURITY CARD
ADULTS: Sign this card in ink immediately.
CHILDREN: Do not sign until age 18 or your first job, whichever is earlier.
Keep your card in a safe place to prevent loss or theft.
DO NOT CARRY THIS CARD WITH YOU.
Do not laminate.
SOCIAL SECURITY
VALID FOR WORK ONLY
WITH DHS AUTHORIZATION
[redacted]
THIS NUMBER HAS BEEN ESTABLISHED FOR
PIYAPORN
TRINKA
SIGNATURE
08/03/2016
USA

Department of Homeland Security
U.S. Citizenship and Immigration Services

# Form I-797C, Notice of Action

**THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.**

| NOTICE TYPE | | NOTICE DATE |
|---|---|---|
| Receipt | | March 30, 2016 |
| CASE TYPE | | USCIS ALIEN NUMBER |
| I-765, Application for Employment Authorization | | [redacted] |
| RECEIPT NUMBER | RECEIVED DATE | PAGE |
| [redacted] | March 17, 2016 | 1 of 1 |
| | | DATE OF BIRTH [redacted] |

PIYAPORN TRINKA [redacted]
[redacted]

NAME AND MAILING ADDRESS

**PAYMENT INFORMATION:**

| | |
|---|---|
| **Application/Petition Fee:** | $0.00 |
| **Biometrics Fee:** | $0.00 |
| **Total Amount Received:** | $0.00 |
| **Total Balance Due:** | $0.00 |

The above application/petition has been received by our office and is in process.

Please verify your personal information listed above and immediately notify the USCIS National Customer Service Center at the phone number listed below if there are any changes.

Please note that if a priority date is printed on this notice, the priority does not reflect earlier retained priority dates.

As a reminder, if you have an underlying Form I-140 that is approved or is still pending, you may request to change employers under INA 204(j) if your Form I-485 Adjustment application has been pending for at least 180 days. In order to do so, you should supplement the Form I-485 record of proceeding with documentation relating to the new job offer that forms the basis of the INA 204(j) portability request. For more information on how to request to change employers and what information is required to supplement the Form I-485, please visit www.uscis.gov.

If you have questions about possible immigration benefits and services, filing information, or USCIS forms, please call the USCIS National Customer Service Center (NCSC) at **1-800-375-5283**. If you are hearing impaired, please call the NCSC TDD at **1-800-767-1833**. Please also refer to the USCIS website: www.uscis.gov.

If you have any questions or comments regarding this notice or the status of your case, please contact our customer service number.

You will be notified separately about any other case you may have filed.

**USCIS Office Address:**

USCIS
National Benefits Center
P.O. Box 648003
Lee's Summit, MO 64002

**USCIS Customer Service Number:**

(800)375-5283

2007 15th Street N., Suite 7
Arlington, Virginia 22201
(Admitted in MO & KS)

**Matthew W. Rau**
*Attorney-at-Law*
*Virginia Practice Limited to Immigration*

Tel. (703) 312-8310
Fax (703) 312-8312
ImmigrantLawyer@aol.com

VIA CERTIFIED MAIL (7015 0640 0004 0336 4702)

COPY

March 14, 2016

USCIS
P. O. Box 805887
Chicago, IL 60680-4120

RE: **Form I-765, Application for Employment Authorization**
**Alien: TRINKA, Piyaporn (a.k.a. JINDACHAI, Piyaporn)**
**A Number:** [redacted]

To Whom It May Concern:

The above-referenced individual, represented by this office, is the beneficiary of an I-130 petition filed by her U.S. citizen husband and her I-485 application (for which the fee was paid as reflected by the receipt issued by the USCIS Texas Service Center) has been filed and is currently pending with the immigration court in Arlington, Virginia. She hereby applies for employment authorization. There is no filing fee for this I-765, as the I-485 filing fee has already been paid.

Enclosed please find:

1. Form I-765, Application for Employment Authorization, with two (2) color photos of the applicant attached thereto
2. Form G-28, Notice of Entry of Appearance as Attorney, for undersigned counsel
3. Form I-797C, USCIS Receipt Notice, reflecting payment of $1,070.00 for filing/biometrics fee for I-485 application on 02/19/2016, along with biometrics appointment notice for pending I-485 application
4. Copy of court-stamped adjustment of status cover and court stamped I-485 application filed with the immigration court in Arlington, Virginia on 03/14/2016
5. Copy of next master calendar hearing notice for the immigration court
6. Copy of the applicant's current passport, I-94 and court order changing her name

Very truly yours,

Matthew W. Rau
Attorney-at-Law

Enclosures (as stated)

cc: Mrs. Piyaporn Trinka
[redacted]

Department of Homeland Security
U.S. Citizenship and Immigration Services

OMB No. 1615-0040; Expires 02/28/2018

# I-765, Application For Employment Authorization

| For USCIS Use Only | Fee Stamp | Action Block | Initial Receipt | Resubmitted |
|---|---|---|---|---|
| | | | Relocated | |
| | | | Received | Sent |
| | | | Completed | |
| | | | Approved | Denied |
| | | | A# | |

☐ Application Approved
☐ Authorization/Extension Valid From ______
☐ Authorization/Extension Valid To ______
Subject to the following conditions: ______

☐ Application Denied - Failed to establish:
☐ Eligibility under 8 CFR 274a.12 (a) or (c)
☐ Economic necessity under 8 CFR 274a.12(c)(14), (18) and 8 CFR 214.2(f)

☐ Applicant is filing under section 274a.12 ______

**I am applying for:** ☒ Permission to accept employment. ☐ Replacement (of lost employment authorization document).
☐ Renewal of my permission to accept employment (attach a copy of your previous employment authorization document).

1. **Full Name**
(Family Name) Trinka (First Name) Piyaporn (Middle Name)

2. **Other Names Used** (include Maiden Name)
Piyaporn Jindachai

3. **U.S. Mailing Address**
(Street Number and Name) [redacted] (Apt. Number)
(Town or City) [redacted] Code)

4. **Country of Citizenship or Nationality**
Thailand

5. **Place of Birth**
(Town or City) [redacted] (State/Province) (Country) Thailand

6. **Date of Birth** (mm/dd/yyyy) [redacted]

7. **Gender** ☐ Male ☒ Female

8. **Marital Status**
☒ Married ☐ Single ☐ Divorced ☐ Widowed

9. **Social Security Number** (Include all numbers you have ever used if any)
[redacted]

10. **Alien Registration Number (A-Number) or Form I-94 Number** (if any)
[redacted]

11. **Have you ever before applied for employment authorization from USCIS?**
☐ Yes (Complete the following questions.)
Which USCIS Office? Dates
Results (Granted or Denied - attach all documentation)
☒ No (Proceed to Question 12.)

12. **Date of Last Entry into the U.S.** [redacted] yyyy)

13. **Place of Last Entry into the U.S.**
[redacted]

14. **Status at Last Entry** (B-2 Visitor, F-1 Student, No Lawful Status, etc.)
[redacted]

15. **Current Immigration Status** (Visitor, Student, etc.)
[redacted]

16. **Eligibility Category.** Go to the "**Who May File Form I-765?**" section of the Instructions. In the space below, place the letter and number of the eligibility category you selected from the instructions. For example, (a)(8), (c)(17)(iii), etc.
[redacted] ) ( )

17. **(c)(3)(C) Eligibility Category.** If you entered the eligibility category (c)(3)(C) in **Question 16** above, list your degree, your employer's name as listed in E-Verify, and your employer's E-Verify Company Identification Number or a valid E-Verify Client Company Identification Number in the space below.
Degree Employer's Name as listed in E-Verify
Employer's E-Verify Company Identification Number or a Valid E-Verify Client Company Identification Number

18. **(c)(26) Eligibility Category.** If you entered the eligibility category (c)(26) in **Question 16** above, please provide the receipt number of your H-1B principal spouse's most recent Form I-797 Notice of Approval for Form I-129.

**Certification**

I certify, under penalty of perjury, that the foregoing is true and correct. Furthermore, I authorize the release of any information that U.S. Citizenship and Immigration Services needs to determine eligibility for the benefit I am seeking. I have read the "**Who May File Form I-765?**" section of the instructions and have identified the appropriate eligibility category in **Question 16**.

**Applicant's Signature** [signature]
**Date of Signature** (mm/dd/yyyy) 03/14/2016
**Telephone Number** (703) 577-0889

**Signature of Person Preparing Form, If Other Than Applicant**

I declare that this document was prepared by me at the request of the applicant and is based on all information of which I have any knowledge.

**Preparer's Signature** [signature]
**Date of Signature** (mm/dd/yyyy) 03/14/2016
**Printed Name** Matthew W. Rau, Esq.
**Address** 2007 15th Street N., Suite 7
Arlington, VA 22201

# Notice of Entry of Appearance as Attorney or Accredited Representative

Department of Homeland Security

DHS Form G-28
OMB No. 1615-0105
Expires 03/31/2018

## Part 1. Information About Attorney or Accredited Representative

1. USCIS ELIS Account Number *(if any)* ▶

### *Name and Address of Attorney or Accredited Representative*

2.a. Family Name (Last Name): Rau
2.b. Given Name (First Name): Matthew
2.c. Middle Name: William
3.a. Street Number and Name: 2007 15th Street North
3.b. Apt. ☐ Ste. ☒ Flr. ☐ 7
3.c. City or Town: Arlington
3.d. State: VA 3.e. ZIP Code: 22201
3.f. Province:
3.g. Postal Code:
3.h. Country: USA
4. Daytime Telephone Number: 7033128310
5. Fax Number: 7033128312
6. E-Mail Address *(if any)*: ImmigrantLawyer@aol.com
7. Mobile Telephone Number *(if any)*: 7035979952

## Part 2. Notice of Appearance as Attorney or Accredited Representative

This appearance relates to immigration matters before *(Select **only one** box)*:

1.a. ☒ USCIS
1.b. List the form numbers: I-765
2.a. ☐ ICE
2.b. List the specific matter in which appearance is entered:
3.a. ☐ CBP
3.b. List the specific matter in which appearance is entered:

I enter my appearance as attorney or accredited representative at the request of:

4. Select **only one** box:
☒ Applicant ☐ Petitioner ☐ Requestor
☐ Respondent (ICE, CBP)

### *Information About Applicant, Petitioner, Requestor, or Respondent*

5.a. Family Name (Last Name): Trinka
5.b. Given Name (First Name): Piyaporn
5.c. Middle Name:
6. Name of Company or Organization *(if applicable)*:

## Part 2. Notice of Appearance as Attorney or Accredited Representative *(continued)*

### *Information About Applicant, Petitioner, Requestor, or Respondent (continued)*

7. USCIS ELIS Account Number *(if any)*
▶

8. Alien Registration Number (A-Number) or Receipt Number
[redacted]

9. Daytime Telephone Number
[redacted]

10. Mobile Telephone Number *(if any)*
[redacted]

11. E-Mail Address *(if any)*
[redacted]

### *Mailing Address of Applicant, Petitioner, Requestor, or Respondent*

**NOTE:** Provide the mailing address of the applicant, petitioner, requestor, or respondent. If the applicant, petitioner, requestor, or respondent has used a safe mailing address on the application, petition, or request being filed with this Form G-28, provide it in these spaces.

12.a. Street Number and Name [redacted]

12.b. Apt. ☐ Ste. ☐ Flr. ☐

12.c. City or Town [redacted]

12.d. State [redacted] 12.e. ZIP Code [redacted]

12.f. Province

12.g. Postal Code

12.h. Country
[redacted]

## Part 3. Eligibility Information for Attorney or Accredited Representative

Select **all applicable** items.

1.a. ☒ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest courts of the following states, possessions, territories, commonwealths, or the District of Columbia. *(If you need additional space, use **Part 6.**)*

Licensing Authority
Missouri

1.b. Bar Number *(if applicable)*
39582

1.c. Name of Law Firm
Law Office of Matthew W. Rau

1.d. **I** *(choose one)* ☒ ***am not*** ☐ ***am***
subject to any order of any court or administrative agency disbarring, suspending, enjoining, restraining, or otherwise restricting me in the practice of law. If you are subject to any orders, explain in the space below. *(If you need additional space, use **Part 6.**)*

2.a. ☐ I am an accredited representative of the following qualified nonprofit religious, charitable, social service, or similar organization established in the United States, so recognized by the Department of Justice, Board of Immigration Appeals, in accordance with 8 CFR 292.2. Provide the name of the organization and the expiration date of accreditation.

2.b. Name of Recognized Organization

2.c. Date accreditation expires
*(mm/dd/yyyy)* ▶

## Part 3. Eligibility Information for Attorney or Accredited Representative *(continued)*

3. ☐ I am associated with

______________________,

the attorney or accredited representative of record who previously filed Form G-28 in this case, and my appearance as an attorney or accredited representative is at his or her request.

**NOTE:** If you select this item, also complete **Item Numbers 1.a. - 1.b. or Item Numbers 2.a. - 2.c.** in **Part 3.** *(whichever is appropriate).*

4.a. ☐ I am a law student or law graduate working under the direct supervision of the attorney or accredited representative of record on this form in accordance with the requirements in 8 CFR 292.1(a)(2)(iv).

4.b. Name of Law Student or Law Graduate

______________________

## Part 4. Applicant, Petitioner, Requestor, or Respondent Consent to Representation, Contact Information, and Signature

### *Consent to Representation and Release of Information*

1. I have requested the representation of and consented to being represented by the attorney or accredited representative named in **Part 1.** of this form. According to the Privacy Act of 1974 and DHS policy, I also consent to the disclosure to the named attorney or accredited representative of any record pertaining to me that appears in any system of records of USCIS, ICE or CBP.

When you (the applicant, petitioner, requestor, or respondent) are represented, DHS will send notices to both you and your attorney or accredited representative either through mail or electronic delivery.

DHS will also send the Form I-94, Arrival Departure Record, to you **unless** you select **Item Number 2.a.** in **Part 4.** All secure identity documents and Travel Documents will be sent to you (the applicant, petitioner, requestor, or respondent) unless you ask us to send those documents to your attorney of record or accredited representative.

If you do not want to receive original notices or secure identity documents directly, but would rather have such notices and documents sent to your attorney of record or accredited representative, please select **all applicable** boxes below:

2.a ☐ I request DHS send any notice (including Form I-94) on an application, petition, or request to the business address of my attorney of record or accredited representative as listed in this form. I understand that I may change this election at any future date through written notice to DHS.

2.b. ☐ I request that DHS send any secure identity document, such as a Permanent Resident Card, Employment Authorization Document, or Travel Document, that I am approved to receive and authorized to possess, to the business address of my attorney of record or accredited representative as listed in this form. I consent to having my secure identity document sent to my attorney of record or accredited representative and understand that I may request, at any future date and through written notice to DHS, that DHS send any secure identity document to me directly.

3.a. Signature of Applicant, Petitioner, Requestor, or Respondent

[signature]

3.b. Date of Signature *(mm/dd/yyyy)* ▶ 3/14/2016

## Part 5. Signature of Attorney or Accredited Representative

I have read and understand the regulations and conditions contained in 8 CFR 103.2 and 292 governing appearances and representation before the Department of Homeland Security. I declare under penalty of perjury under the laws of the United States that the information I have provided on this form is true and correct.

1. Signature of Attorney or Accredited Representative

[signature]

2. Signature of Law Student or Law Graduate

______________________

3. Date of Signature *(mm/dd/yyyy)* ▶ 03/14/2016

## Part 6. Additional Information

Use the space below to provide additional information pertaining to **Part 3., Item Numbers 1.a. - 1.d.**

I am also licensed to practice in Kansas, by the Supreme Court of Kansas, Kansas Bar No. 14668

[redacted] "JINDACHAI, Piyaporn"

Department of Homeland Security
U.S. Citizenship and Immigration Services

# I-797, Notice of Action

THE UNITED STATES OF AMERICA

| Receipt Number | USCIS Account Number | Case Type |
| --- | --- | --- |
| [redacted] | | I765 - APPLICATION FOR EMPLOYMENT AUTHORIZATION |
| Received Date 03/20/2017 | Priority Date | Applicant [redacted] PIYAPORN TRINKA |
| Notice Date 07/18/2017 | Page 1 of 1 | |

PIYAPORN TRINKA
[redacted]

**Notice Type:** Approval Notice
Class: [redacted]
Valid from 07/18/2017 to 07/17/2018

**We have approved your application for employment authorization.** We will send your Employment Authorization Document (EAD) (also known as an EAD card or Form I-766) to you separately.

Your EAD card is proof that you are allowed to work in the United States. Show the card to your employer to verify your authorization to work during the dates on the card. You cannot use this approval notice as proof of your employment authorization.

When you receive your EAD card, please check that all the information on the card is correct. If you need to change any information on the card, please mail all of the following to the office listed below:

- A letter explaining what information needs to be corrected,
- Your EAD card,
- A photocopy of this notice, and
- Evidence to show what the correct information should be. For example, if you need to correct your name, submit a copy of your birth certificate or official name change.

If You Have a Pending Form I-485

If you have a pending or approved Form I-140 and a pending Form I-485, you may request to change employers if your Form I-485 has been pending for at least 180 days. In order to do so, you need to submit documentation about your new job offer. For more information on how to request a change of employers and what information you must submit, please visit the USCIS website at www.uscis.gov.

If your EAD card expires before we make a final decision on your Form I-485, you may apply for a new EAD card.

**THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA OR EVIDENCE OF EMPLOYMENT AUTHORIZATION.**

**NOTICE:** Although this application or petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

National Benefits Center
U. S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 648004
Lee's Summit MO 64064

**Customer Service Telephone: 800-375-5283**



Form I-797 (Rev. 01/31/05) N

THE UNITED STATES OF AMERICA

# I-797 | NOTICE OF ACTION | DEPARTMENT OF HOMELAND SECURITY U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| Receipt Number | USCIS Account Number | Case Type |
| --- | --- | --- |
| [redacted] | | I765 - APPLICATION FOR EMPLOYMENT AUTHORIZATION |
| **Received Date** 03/21/2018 | **Priority Date** | **Applicant** [redacted] PIYAPORN TRINKA |
| **Notice Date** 11/05/2018 | **Page** 1 of 1 | |

PIYAPORN TRINKA
[redacted]

**Notice Type:** Approval Notice
Class: [redacted]
Valid from 11/05/2018 to 11/04/2019

**We have approved your application for employment authorization.** We will send your Employment Authorization Document (EAD) (also known as an EAD card or Form I-766) to you separately.

Your EAD card is proof that you are allowed to work in the United States. Show the card to your employer to verify your authorization to work during the dates on the card. You cannot use this approval notice as proof of your employment authorization.

When you receive your EAD card, please check that all the information on the card is correct. If you need to change any information on the card, please mail all of the following to the office listed below:

- A letter explaining what information needs to be corrected,
- Your EAD card,
- A photocopy of this notice, and
- Evidence to show what the correct information should be. For example, if you need to correct your name, submit a copy of your birth certificate or official name change.

If You Have a Pending Form I-485

If you have a pending or approved Form I-140 and a pending Form I-485, you may request to change employers if your Form I-485 has been pending for at least 180 days. In order to do so, you need to submit documentation about your new job offer. For more information on how to request a change of employers and what information you must submit, please visit the USCIS website at www.uscis.gov.

If your EAD card expires before we make a final decision on your Form I-485, you may apply for a new EAD card.

**THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA OR EVIDENCE OF EMPLOYMENT AUTHORIZATION.**

**NOTICE:** Although this application or petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

National Benefits Center
U. S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 648004
Lee's Summit MO 64064

**Customer Service Telephone: 800-375-5283**



FORM I-797 [REV. 08/01/16]

THE UNITED STATES OF AMERICA

# I-797 | NOTICE OF ACTION

DEPARTMENT OF HOMELAND SECURITY
U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| Receipt Number | USCIS Account Number | Case Type |
| --- | --- | --- |
| [redacted] | | I765 - APPLICATION FOR EMPLOYMENT AUTHORIZATION |
| Received Date<br>05/09/2019 | Priority Date | Applicant<br>[redacted]<br>PIYAPORN TRINKA |
| Notice Date<br>12/27/2019 | Page<br>1 of 1 | |

PIYAPORN TRINKA
[redacted]

**Notice Type:** Approval Notice
Class: [redacted]
Valid from 12/27/2019 to 12/26/2020

**We have approved your application for employment authorization.** We will send your Employment Authorization Document (EAD) (also known as an EAD card or Form I-766) to you separately.

Your EAD card is proof that you are allowed to work in the United States. Show the card to your employer to verify your authorization to work during the dates on the card. You cannot use this approval notice as proof of your employment authorization.

When you receive your EAD card, please check that all the information on the card is correct. If you need to change any information on the card, please mail all of the following to the office listed below:

- A letter explaining what information needs to be corrected,
- Your EAD card,
- A photocopy of this notice, and
- Evidence to show what the correct information should be. For example, if you need to correct your name, submit a copy of your birth certificate or official name change.

If You Have a Pending Form I-485

If you have a pending or approved Form I-140 and a pending Form I-485, you may request to change employers if your Form I-485 has been pending for at least 180 days. In order to do so, you need to submit documentation about your new job offer. For more information on how to request a change of employers and what information you must submit, please visit the USCIS website at www.uscis.gov.

If your EAD card expires before we make a final decision on your Form I-485, you may apply for a new EAD card.

**THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA OR EVIDENCE OF EMPLOYMENT AUTHORIZATION.**

**NOTICE:** Although this application or petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

National Benefits Center
U. S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 648003
Lee's Summit MO 64002

**Customer Service Telephone: 800-375-5283**



FORM I-797 [REV. 08/01/16]

Department of Homeland Security
U.S. Citizenship and Immigration Services

**Form I-797C, Notice of Action**

# THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| NOTICE TYPE | | NOTICE DATE |
|---|---|---|
| Receipt | | August 22, 2020 |
| CASE TYPE | | USCIS ALIEN NUMBER |
| I-765, Application for Employment Authorization | | [redacted] |
| RECEIPT NUMBER | RECEIVED DATE | PAGE |
| [redacted] | August 11, 2020 | 1 of 1 |
| | | DATE OF BIRTH |
| | | [redacted] |

PIYAPORN TRINKA
[redacted] [redacted]

**NAME AND MAILING ADDRESS**

**PAYMENT INFORMATION:**

| | |
|---|---|
| **Application/Petition Fee:** | $0.00 |
| **Biometrics Fee:** | $0.00 |
| **Total Amount Received:** | $0.00 |
| **Total Balance Due:** | $0.00 |

**Eligibility Category:** [redacted]

The above case has been received by our office and is in process. Please verify your personal information listed above and immediately notify the USCIS Contact Center if there are any changes.

Please note that if a priority date is printed on this notice, the priority does not reflect earlier retained priority dates.

As a reminder, if you have an underlying Form I-140 that is approved or is still pending, you may request to change employers under INA 204(j) if your Form I-485 Adjustment application has been pending for at least 180 days. In order to do so, you should supplement the Form I-485 record of proceeding with documentation relating to the new job offer that forms the basis of the INA 204(j) portability request. For more information on how to request to change employers and what information is required to supplement the Form I-485, please visit www.uscis.gov.

If you have questions, please visit the USCIS Contact Center at www.uscis.gov/contactcenter to connect with a live USCIS representative in English or Spanish.

If you have any questions or comments regarding this notice or the status of your case, please contact the USCIS Contact Center.

You will be notified separately about any other case you may have filed.

This notice, by itself, does not grant any immigration status or benefit, nor is it evidence that this case is still pending. However, **if**:

- You have timely filed to renew your current Form I-766 Employment Authorization Document (EAD); **and**
- Your EAD renewal is under a category that is eligible for an automatic 180-day extension (see www.uscis.gov/I-765 for a list of categories); **and**
- The Category on your current EAD matches the "Class Requested" listed on this Notice of Action; (Note: If you are a TPS beneficiary or applicant, your EAD and this Notice must contain either the A12 or C19 class, but they do not need to match each other.); **and**
- You do not receive your renewal EAD before your current EAD expires;,
- **then** this Notice of Action automatically extends the validity of your EAD for up to 180 days from the expiration date printed on the face of the card. If all of the above conditions apply with respect to your EAD renewal application, you may present this Notice of Action with your expired EAD to your employer for employment eligibility verification (Form I-9) purposes. If your renewal application is denied, the automatic extension immediately terminates, and you may not provide this Notice of Action with your expired EAD for Form I-9 purposes. If your EAD is a combo card, the automatic extension does not apply to advance parole. For more information, please visit our website at www.uscis.gov/I-765.

**USCIS Office Address:**

USCIS
National Benefits Center
P.O. Box 648003
Lee's Summit, MO 64002

**USCIS Contact Center Number:**

(800)375-5283



**If this is an interview or biometrics appointment notice, please see the back of this notice for important information.**

Form I-797C 04/01/19

2007 15th Street N., Suite 7
Arlington, Virginia 22201
(Admitted in MO & KS)

**Matthew W. Rau**
*Attorney-at-Law*
*Virginia Practice Limited to Immigration*

Tel. (703) 312-8310
Fax (703) 312-8312
ImmigrantLawyer@aol.com

VIA CERTIFIED MAIL (7019 2970 0000 6388 8462)

August 6, 2020

COPY

USCIS
Attn: FBAS
P. O. Box 805887
Chicago, IL 60680-4120

RE: **Form I-765, Application for Employment Authorization (Renewal)**
**Alien:** **TRINKA, Piyaporn (f.k.a. JINDACHAI, Piyaporn)**
**A Number:** [redacted]

To Whom It May Concern:

The above-referenced individual, represented by this office, is the beneficiary of an approved I-130 petition filed by her U.S. citizen husband and her I-485 application (for which the fee was paid as reflected by the receipt issued by the USCIS Texas Service Center) has been filed and is currently pending with the immigration court in Arlington, Virginia. She hereby applies to renew her employment authorization. There is no filing fee for this I-765 renewal application, as the I-485 filing fee has already been paid.

Enclosed please find:

1. Form I-765, Application for Employment Authorization, with two (2) color photos of the applicant attached thereto
2. Form G-28, Notice of Entry of Appearance as Attorney, for undersigned counsel
3. Copy of current employment authorization card, which expires on 12/26/2020, along with copies of previously issued EADs
4. Form I-797C, USCIS Receipt Notice, reflecting payment of $1,070.00 for filing/biometrics fee for I-485 application on 02/19/2016, along with biometrics appointment notice for pending I-485 application
5. Copy of court-stamped adjustment of status cover page, showing that the I-485 was filed with the immigration court in Arlington, Virginia on 03/14/2016
6. Copy of next hearing notice for the immigration court

Very truly yours,

Matthew W. Rau
Attorney-at-Law

Enclosures (as stated)

cc: Mrs. Piyaporn Trinka
[redacted]

# Application For Employment Authorization

Department of Homeland Security
U.S. Citizenship and Immigration Services

USCIS
Form I-765
OMB No. 1615-0040
Expires 05/31/2020

| For USCIS Use Only | | | |
|---|---|---|---|
| ☐ Authorization/Extension Valid From | Fee Stamp | | Action Block |
| ☐ Authorization/Extension Valid Through | | | |
| Alien Registration Number A- | | | |
| Remarks | | | |

| To be completed by an attorney or Board of Immigration Appeals (BIA)-accredited representative (if any). | ☒ Select this box if Form G-28 is attached. | Attorney or Accredited Representative USCIS Online Account Number (if any) |
|---|---|---|

► **START HERE - Type or print in black ink.**

## Part 1. Reason for Applying

**I am applying for** (select **only one** box):

1.a. ☐ Initial permission to accept employment.

1.b. ☐ Replacement of lost, stolen, or damaged employment authorization document, or correction of my employment authorization document **NOT DUE** to U.S. Citizenship and Immigration Services (USCIS) error.

**NOTE:** Replacement (correction) of an employment authorization document due to USCIS error does not require a new Form I-765 and filing fee. Refer to **Replacement for Card Error** in the **What is the Filing Fee** section of the Form I-765 Instructions for further details.

1.c. ☒ Renewal of my permission to accept employment. (Attach a copy of your previous employment authorization document.)

## Part 2. Information About You

### *Your Full Legal Name*

1.a. Family Name (Last Name): Trinka

1.b. Given Name (First Name): Piyaporn

1.c. Middle Name:

### *Other Names Used*

Provide all other names you have ever used, including aliases, maiden name, and nicknames. If you need extra space to complete this section, use the space provided in **Part 6. Additional Information**.

2.a. Family Name (Last Name): Jindachai

2.b. Given Name (First Name): Piyaporn

2.c. Middle Name:

3.a. Family Name (Last Name):

3.b. Given Name (First Name):

3.c. Middle Name:

4.a. Family Name (Last Name):

4.b. Given Name (First Name):

4.c. Middle Name:

## Part 2. Information About You (continued)

### Your U.S. Mailing Address

5.a. In Care Of Name (if any)

5.b. Street Number and Name [redacted]

5.c. ☐ Apt. ☐ Ste. ☐ Flr.

5.d. City or Town [redacted]

5.e. State [redacted] 5.f. ZIP Code [redacted]

6. Is your current mailing address the same as your physical address? ☒ Yes ☐ No

NOTE: If you answered "No" to **Item Number 6.**, provide your physical address below.

### U.S. Physical Address

7.a. Street Number and Name

7.b. ☐ Apt. ☐ Ste. ☐ Flr.

7.c. City or Town

7.d. State 7.e. ZIP Code

### Other Information

8. Alien Registration Number (A-Number) (if any)
▶ A- [redacted]

9. USCIS Online Account Number (if any)
▶

10. Gender ☐ Male ☒ Female

11. Marital Status
☐ Single ☒ Married ☐ Divorced ☐ Widowed

12. Have you previously filed Form I-765? ☒ Yes ☐ No

13.a. Has the Social Security Administration (SSA) ever officially issued a Social Security card to you? ☒ Yes ☐ No

NOTE: If you answered "No" to **Item Number 13.a.**, skip to **Item Number 14.** If you answered "Yes" to **Item Number 13.a.**, provide the information requested in **Item Number 13.b.**

13.b. Provide your Social Security number (SSN) (if known)
▶ [redacted]

14. Do you want the SSA to issue you a Social Security card? (You must also answer "Yes" to **Item Number 15., Consent for Disclosure**, to receive a card.) ☐ Yes ☒ No

NOTE: If you answered "No" to **Item Number 14.**, skip to **Part 2., Item Number 18.a.** If you answered "Yes" to **Item Number 14.**, you must also answer "Yes" to **Item Number 15.**

15. **Consent for Disclosure:** I authorize disclosure of information from this application to the SSA as required for the purpose of assigning me an SSN and issuing me a Social Security card. ☐ Yes ☐ No

NOTE: If you answered "Yes" to **Item Numbers 14. - 15.**, provide the information requested in **Item Numbers 16.a. - 17.b.**

**Father's Name**

Provide your father's birth name.

16.a. Family Name (Last Name)

16.b. Given Name (First Name)

**Mother's Name**

Provide your mother's birth name.

17.a. Family Name (Last Name)

17.b. Given Name (First Name)

### Your Country or Countries of Citizenship or Nationality

List all countries where you are currently a citizen or national. If you need extra space to complete this item, use the space provided in **Part 6. Additional Information.**

18.a. Country
Thailand

18.b. Country

## Part 2. Information About You (continued)

### *Place of Birth*

List the city/town/village, state/province, and country where you were born.

19.a. City/Town/Village of Birth
[redacted]

19.b. State/Province of Birth
[redacted]

19.c. Country of Birth
Thailand

20. Date of Birth (mm/dd/yyyy) [redacted]

### *Information About Your Last Arrival in the United States*

21.a. Form I-94 Arrival-Departure Record Number (if any)
►

21.b. Passport Number of Your Most Recently Issued Passport
[redacted]

21.c. Travel Document Number (if any)

21.d. Country That Issued Your Passport or Travel Document
Thailand

21.e. Expiration Date for Passport or Travel Document (mm/dd/yyyy) [redacted]

22. Date of Your Last Arrival Into the United States, On or About (mm/dd/yyyy) [redacted]

23. Place of Your Last Arrival Into the United States
[redacted]

24. Immigration Status at Your Last Arrival (for example, B-2 visitor, F-1 student, or no status)
[redacted]

25. Your Current Immigration Status or Category (for example, B-2 visitor, F-1 student, parolee, deferred action, or no status or category)
[redacted]

26. Student and Exchange Visitor Information System (SEVIS) Number (if any)
► N-

### *Information About Your Eligibility Category*

27. **Eligibility Category.** Refer to the **Who May File Form I-765** section of the Form I-765 Instructions to determine the appropriate eligibility category for this application. Enter the appropriate letter and number for your eligibility category below (for example, (a)(8), (c)(17)(iii)).
( [redacted] ) ( )

28. **(c)(3)(C) STEM OPT Eligibility Category.** If you entered the eligibility category **(c)(3)(C)** in **Item Number 27.**, provide the information requested in **Item Numbers 28.a - 28.c.**

28.a. Degree

28.b. Employer's Name as Listed in E-Verify

28.c. Employer's E-Verify Company Identification Number or a Valid E-Verify Client Company Identification Number

29. **(c)(26) Eligibility Category.** If you entered the eligibility category (c)(26) in **Item Number 27.**, provide the receipt number of your H-1B spouse's most recent Form I-797 Notice for Form I-129, Petition for a Nonimmigrant Worker.
►

30. **(c)(8) Eligibility Category.** If you entered the eligibility category (c)(8) in **Item Number 27.**, have you **EVER** been arrested for and/or convicted of any crime?
☐ Yes ☐ No

**NOTE:** If you answered "Yes" to **Item Number 30.**, refer to **Special Filing Instructions for Those With Pending Asylum Applications (c)(8)** in the **Required Documentation** section of the Form I-765 Instructions for information about providing court dispositions.

31.a. **(c)(35) and (c)(36) Eligibility Category.** If you entered the eligibility category (c)(35) in **Item Number 27.**, please provide the receipt number of your Form I-797 Notice for Form I-140, Immigrant Petition for Alien Worker. If you entered the eligibility category (c)(36) in **Item Number 27.**, please provide the receipt number of your spouse's or parent's Form I-797 Notice for Form I-140.
►

31.b. If you entered the eligibility category (c)(35) or (c)(36) in **Item Number 27.**, have you **EVER** been arrested for and/or convicted of any crime? ☐ Yes ☐ No

**NOTE:** If you answered "Yes" to **Item Number 31.b.**, refer to **Employment-Based Nonimmigrant Categories, Items 8. - 9.**, in the **Who May File Form I-765** section of the Form I-765 Instructions for information about providing court dispositions.

## Part 3. Applicant's Statement, Contact Information, Declaration, Certification, and Signature

**NOTE:** Read the **Penalties** section of the Form I-765 Instructions before completing this section. You must file Form I-765 while in the United States.

### *Applicant's Statement*

**NOTE:** Select the box for either **Item Number 1.a.** or **1.b.** If applicable, select the box for **Item Number 2.**

**1.a.** [X] I can read and understand English, and I have read and understand every question and instruction on this application and my answer to every question.

**1.b.** [ ] The interpreter named in **Part 4.** read to me every question and instruction on this application and my answer to every question in ____, a language in which I am fluent, and I understood everything.

**2.** [X] At my request, the preparer named in **Part 5.**, Matthew W Rau Esq, prepared this application for me based only upon information I provided or authorized.

### *Applicant's Contact Information*

**3.** Applicant's Daytime Telephone Number
[redacted]

**4.** Applicant's Mobile Telephone Number (if any)
[redacted]

**5.** Applicant's Email Address (if any)
[redacted]

**6.** [ ] Select this box if you are a Salvadoran or Guatemalan national eligible for benefits under the ABC settlement agreement.

### *Applicant's Declaration and Certification*

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS may require that I submit original documents to USCIS at a later date. Furthermore, I authorize the release of any information from any and all of my records that USCIS may need to determine my eligibility for the immigration benefit that I seek.

I furthermore authorize release of information contained in this application, in supporting documents, and in my USCIS records, to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

1) I reviewed and understood all of the information contained in, and submitted with, my application; and

2) All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that all of the information in my application and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my application and that all of this information is complete, true, and correct.

### *Applicant's Signature*

**7.a.** Applicant's Signature
[signature]

**7.b.** Date of Signature (mm/dd/yyyy) 08/06/2020

**NOTE TO ALL APPLICANTS:** If you do not completely fill out this application or fail to submit required documents listed in the Instructions, USCIS may deny your application.

## Part 4. Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter.

### *Interpreter's Full Name*

**1.a.** Interpreter's Family Name (Last Name)

**1.b.** Interpreter's Given Name (First Name)

**2.** Interpreter's Business or Organization Name (if any)

## Part 4. Interpreter's Contact Information, Certification, and Signature

### *Interpreter's Mailing Address*

3.a. Street Number and Name

3.b. ☐ Apt. ☐ Ste. ☐ Flr.

3.c. City or Town

3.d. State 3.e. ZIP Code

3.f. Province

3.g. Postal Code

3.h. Country

### *Interpreter's Contact Information*

4. Interpreter's Daytime Telephone Number

5. Interpreter's Mobile Telephone Number (if any)

6. Interpreter's Email Address (if any)

### *Interpreter's Certification*

I certify, under penalty of perjury, that:

I am fluent in English and ______, which is the same language specified in **Part 3., Item Number 1.b.**, and I have read to this applicant in the identified language every question and instruction on this application and his or her answer to every question. The applicant informed me that he or she understands every instruction, question, and answer on the application, including the **Applicant's Declaration and Certification**, and has verified the accuracy of every answer.

### *Interpreter's Signature*

7.a. Interpreter's Signature

7.b. Date of Signature (mm/dd/yyyy)

## Part 5. Contact Information, Declaration, and Signature of the Person Preparing this Application, If Other Than the Applicant

Provide the following information about the preparer.

### *Preparer's Full Name*

1.a. Preparer's Family Name (Last Name)
Rau

1.b. Preparer's Given Name (First Name)
Matthew

2. Preparer's Business or Organization Name (if any)
Law Office of Matthew W Rau

### *Preparer's Mailing Address*

3.a. Street Number and Name: 2007 15th Street North

3.b. ☐ Apt. ☒ Ste. ☐ Flr. 7

3.c. City or Town: Arlington

3.d. State: VA 3.e. ZIP Code: 22201

3.f. Province

3.g. Postal Code

3.h. Country
USA

### *Preparer's Contact Information*

4. Preparer's Daytime Telephone Number
7033128310

5. Preparer's Mobile Telephone Number (if any)
7035979952

6. Preparer's Email Address (if any)
ImmigrantLawyer@aol.com

**Part 5. Contact Information, Declaration, and Signature of the Person Preparing this Application, If Other Than the Applicant** (continued)

***Preparer's Statement***

7.a. ☐ I am not an attorney or accredited representative but have prepared this application on behalf of the applicant and with the applicant's consent.

7.b. ☒ I am an attorney or accredited representative and my representation of the applicant in this case ☒ extends ☐ does not extend beyond the preparation of this application.

**NOTE:** If you are an attorney or accredited representative, you may need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, with this application.

***Preparer's Certification***

By my signature, I certify, under penalty of perjury, that I prepared this application at the request of the applicant. The applicant then reviewed this completed application and informed me that he or she understands all of the information contained in, and submitted with, his or her application, including the **Applicant's Declaration and Certification**, and that all of this information is complete, true, and correct. I completed this application based only on information that the applicant provided to me or authorized me to obtain or use.

***Preparer's Signature***

8.a. Preparer's Signature
[signature]

8.b. Date of Signature (mm/dd/yyyy) 08/06/2019

## Part 6. Additional Information

If you need extra space to provide any additional information within this application, use the space below. If you need more space than what is provided, you may make copies of this page to complete and file with this application or attach a separate sheet of paper. Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.a.** Family Name (Last Name) Trinka

**1.b.** Given Name (First Name) Piyaporn

**1.c.** Middle Name

**2.** A-Number (if any) ► **A-** [redacted]

**3.a.** Page Number **3.b.** Part Number **3.c.** Item Number

**3.d.**

**4.a.** Page Number **4.b.** Part Number **4.c.** Item Number

**4.d.**

**5.a.** Page Number **5.b.** Part Number **5.c.** Item Number

**5.d.**

**6.a.** Page Number **6.b.** Part Number **6.c.** Item Number

**6.d.**

**7.a.** Page Number **7.b.** Part Number **7.c.** Item Number

**7.d.**

# Notice of Entry of Appearance as Attorney or Accredited Representative

Department of Homeland Security

DHS Form G-28
OMB No. 1615-0105
Expires 05/31/2021

## Part 1. Information About Attorney or Accredited Representative

1. USCIS Online Account Number (if any) ▶ 

### Name of Attorney or Accredited Representative

2.a. Family Name (Last Name): Rau
2.b. Given Name (First Name): Matthew
2.c. Middle Name: William

### Address of Attorney or Accredited Representative

3.a. Street Number and Name: 2007 15th Street North
3.b. ☐ Apt. ☒ Ste. ☐ Flr. 7
3.c. City or Town: Arlington
3.d. State: VA 3.e. ZIP Code: 22201
3.f. Province:
3.g. Postal Code:
3.h. Country: USA

### Contact Information of Attorney or Accredited Representative

4. Daytime Telephone Number: 7033128310
5. Mobile Telephone Number (if any): 7035979952
6. Email Address (if any): ImmigrantLawyer@aol.com
7. Fax Number (if any): 7033128312

## Part 2. Eligibility Information for Attorney or Accredited Representative

Select **all applicable** items.

1.a. ☒ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest courts of the following states, possessions, territories, commonwealths, or the District of Columbia. If you need extra space to complete this section, use the space provided in **Part 6. Additional Information**.

Licensing Authority: Supreme Court of Missouri

1.b. Bar Number (if applicable): 39582

1.c. I (select **only one** box) ☒ am not ☐ am subject to any order suspending, enjoining, restraining, disbarring, or otherwise restricting me in the practice of law. If you are subject to any orders, use the space provided in **Part 6. Additional Information** to provide an explanation.

1.d. Name of Law Firm or Organization (if applicable): Law Office of Matthew W Rau

2.a. ☐ I am an accredited representative of the following qualified nonprofit religious, charitable, social service, or similar organization established in the United States and recognized by the Department of Justice in accordance with 8 CFR part 1292.

2.b. Name of Recognized Organization:

2.c. Date of Accreditation (mm/dd/yyyy):

3. ☐ I am associated with _____, the attorney or accredited representative of record who previously filed Form G-28 in this case, and my appearance as an attorney or accredited representative for a limited purpose is at his or her request.

4.a. ☐ I am a law student or law graduate working under the direct supervision of the attorney or accredited representative of record on this form in accordance with the requirements in 8 CFR 292.1(a)(2).

4.b. Name of Law Student or Law Graduate:

## Part 3. Notice of Appearance as Attorney or Accredited Representative

If you need extra space to complete this section, use the space provided in **Part 6. Additional Information.**

This appearance relates to immigration matters before (select **only one** box):

**1.a.** [X] U.S. Citizenship and Immigration Services (USCIS)

**1.b.** List the form numbers or specific matter in which appearance is entered.

I-765

**2.a.** [ ] U.S. Immigration and Customs Enforcement (ICE)

**2.b.** List the specific matter in which appearance is entered.

**3.a.** [ ] U.S. Customs and Border Protection (CBP)

**3.b.** List the specific matter in which appearance is entered.

**4.** Receipt Number (if any)

▶

**5.** I enter my appearance as an attorney or accredited representative at the request of the (select **only one** box):

[X] Applicant [ ] Petitioner [ ] Requestor [ ] Beneficiary/Derivative [ ] Respondent (ICE, CBP)

### *Information About Client (Applicant, Petitioner, Requestor, Beneficiary or Derivative, Respondent, or Authorized Signatory for an Entity)*

**6.a.** Family Name (Last Name) Trinka

**6.b.** Given Name (First Name) Piyaporn

**6.c.** Middle Name

**7.a.** Name of Entity (if applicable)

**7.b.** Title of Authorized Signatory for Entity (if applicable)

**8.** Client's USCIS Online Account Number (if any)

▶

**9.** Client's Alien Registration Number (A-Number) (if any)

▶ A- [redacted]

### *Client's Contact Information*

**10.** Daytime Telephone Number

[redacted]

**11.** Mobile Telephone Number (if any)

[redacted]

**12.** Email Address (if any)

[redacted]

### *Mailing Address of Client*

**NOTE:** Provide the client's mailing address. **Do not** provide the business mailing address of the attorney or accredited representative **unless** it serves as the safe mailing address on the application or petition being filed with this Form G-28.

**13.a.** Street Number and Name [redacted]

**13.b.** [ ] Apt. [ ] Ste. [ ] Flr.

**13.c.** City or Town [redacted]

**13.d.** State [redacted] **13.e.** ZIP Code [redacted]

**13.f.** Province

**13.g.** Postal Code

**13.h.** Country

USA

## Part 4. Client's Consent to Representation and Signature

### *Consent to Representation and Release of Information*

I have requested the representation of and consented to being represented by the attorney or accredited representative named in **Part 1.** of this form. According to the Privacy Act of 1974 and U.S. Department of Homeland Security (DHS) policy, I also consent to the disclosure to the named attorney or accredited representative of any records pertaining to me that appear in any system of records of USCIS, ICE, or CBP.

## Part 4. Client's Consent to Representation and Signature (continued)

### *Options Regarding Receipt of USCIS Notices and Documents*

USCIS will send notices to both a represented party (the client) and his, her, or its attorney or accredited representative either through mail or electronic delivery. USCIS will send all secure identity documents and Travel Documents to the client's U.S. mailing address.

If you want to have notices and/or secure identity documents sent to your attorney or accredited representative of record rather than to you, please select **all applicable** items below. You may change these elections through written notice to USCIS.

**1.a.** ☐ I request that USCIS send original notices on an application or petition to the business address of my attorney or accredited representative as listed in this form.

**1.b.** ☐ I request that USCIS send any secure identity document (Permanent Resident Card, Employment Authorization Document, or Travel Document) that I receive to the U.S. business address of my attorney or accredited representative (or to a designated military or diplomatic address in a foreign country (if permitted)).

**NOTE:** If your notice contains Form I-94, Arrival-Departure Record, USCIS will send the notice to the U.S. business address of your attorney or accredited representative. If you would rather have your Form I-94 sent directly to you, select **Item Number 1.c.**

**1.c.** ☐ I request that USCIS send my notice containing Form I-94 to me at my U.S. mailing address.

### *Signature of Client or Authorized Signatory for an Entity*

**2.a.** Signature of Client or Authorized Signatory for an Entity

➡ [signature]

**2.b.** Date of Signature (mm/dd/yyyy) 08/06/2020

## Part 5. Signature of Attorney or Accredited Representative

I have read and understand the regulations and conditions contained in 8 CFR 103.2 and 292 governing appearances and representation before DHS. I declare under penalty of perjury under the laws of the United States that the information I have provided on this form is true and correct.

**1. a.** Signature of Attorney or Accredited Representative

[signature]

**1.b.** Date of Signature (mm/dd/yyyy) 08/06/2020

**2.a.** Signature of Law Student or Law Graduate

**2.b.** Date of Signature (mm/dd/yyyy)

## Part 6. Additional Information

If you need extra space to provide any additional information within this form, use the space below. If you need more space than what is provided, you may make copies of this page to complete and file with this form or attach a separate sheet of paper. Type or print your name at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

1.a Family Name (Last Name): Trinka

1.b. Given Name (First Name): Piyaporn

1.c. Middle Name:

2.a. Page Number 2.b. Part Number 2.c. Item Number

2.d.

3.a. Page Number 3.b. Part Number 3.c. Item Number

3.d.

4.a. Page Number 4.b. Part Number 4.c. Item Number

4.d.

5.a. Page Number 5.b. Part Number 5.c. Item Number

5.d.

6.a. Page Number 6.b. Part Number 6.c. Item Number

6.d.


UNITED STATES OF AMERICA
EMPLOYMENT AUTHORIZATION CARD
Surname
TRINKA
Given Name
PIYAPORN
[redacted]
Country of Birth
Thailand
Terms and Conditions
None
[redacted]
Sex
F
Valid From: 06/09/16
Card Expires: 06/08/17
NOT VALID FOR REENTRY TO U.S.


28134373
U.S. Citizenship and Immigration Services
This card is not evidence of U.S. citizenship or permanent residence
This document is void if altered, and may be revoked by the U.S. Government
The person identified is authorized to work in the U.S. for the validity of this card
FORM I-766 Rev. (10-2014)
[redacted]


UNITED STATES OF AMERICA
EMPLOYMENT AUTHORIZATION CARD
Surname
TRINKA
Given Name
PIYAPORN
Category Card#
[redacted]
Country of Birth
Thailand
Terms and Conditions
None
[redacted]
Sex
F
Valid From: 07/18/17
Card Expires: 07/17/18
NOT VALID FOR REENTRY TO U.S.
Signature Waived


30404697
U.S. Citizenship and Immigration Services
This card is not evidence of U.S. citizenship or permanent residence.
This document is void if altered, and may be revoked by the U.S. Government.
The person identified is authorized to work in the U.S. for the validity of this card
If found, drop in any US Mailbox. USPS: Mail to USCIS, 7 Product Way, Lees Summit, MO 64002
[redacted]


UNITED STATES OF AMERICA
EMPLOYMENT AUTHORIZATION
Surname
TRINKA
Given Name
PIYAPORN
Category Card#
[redacted]
Country of Birth
Thailand
Terms and Conditions
None
[redacted]
Sex
F
Valid From: 11/05/18
Card Expires: 11/04/19
NOT VALID FOR REENTRY TO U.S.


FORM I-766 Rev (02-2016)
33579993
If found, drop in any US Mailbox. USPS: Mail to USCIS, 7 Product Way, Lees Summit, MO 64002
[redacted]

# TAB X

October 2, 2020

James A. Trinka
Chief Talent Management Officer
Office of Information and Technology
810 Vermont Avenue NW
Washington, DC 20420
c/o Shaw Bransford & Roth P.C.
cdirks@shawbransford.com

**Subject: Decision on Proposed Removal**

In accordance with 38 U.S.C. §713, this is an initial decision on the notice of proposed removal issued to you on September 11, 2020. My decision is to uphold the charge and specification as written and uphold the penalty of removal from your position of Chief Talent Management Officer, Office of Information and Technology and the Senior Executive Service (SES). The proposed removal set forth one charge. Specifically, the charge was: Conduct Unbecoming A Federal Supervisor.

You were notified in the proposed removal that you had seven business days to provide a written response to me. On September 22, 2020, you submitted a written response to me. After carefully reviewing the proposed removal and the documentary evidence supporting the proposed action, as well as your written response to the proposed removal and attachments, I find that substantial evidence supports the proposed charge. Your removal will be effective October 2, 2020.

**DISCUSSION**

In reaching my decision, I considered the proposed removal, the evidence file supporting the proposed removal and your written response. I have also considered the nature of your position, and your responsibilities and duties as a member of the SES.

I find that you engaged in conduct unbecoming a Federal Supervisor when you provided false and inaccurate information to VA Office of Inspector General (OIG) investigators. Senior Executives are held to a higher standard of conduct. In your written reply, you contend that the agency provides no evidence for the charge except hearsay. According to the Federal Rules of Evidence, Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. *See*, Federal Rules of Evidence 801. Further, Hearsay is usually not admitted in a court proceeding or hearing unless a hearsay exception applies. Some examples of hearsay exceptions are present sense impression, excited utterance, recorded recollection, etc. However, in this administrative process as governed by 38 U.S.C. §713, hearsay evidence can be used to meet the burden of substantial evidence.

Grievance Enclosure C

The Due Process Clause of the United States Constitution provides that certain substantive rights such as life, liberty, and property, cannot be deprived. In federal removal cases such as yours, due process requires that the employee be provided with "notice of the charges, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Young v. Department of Housing and Urban Development*, 706 F.3d 1372, 1377 (Fed. Cir. 2013). Mr. Trinka you have been afforded all of the due process rights afforded to you by the U.S. Constitution. Further, in accordance with 38 U.S.C. §713[1] and the CSEMO Letter, the individual who is the subject of a proposed action is entitled to advance notice of the action and a file containing all of the evidence used in support of the proposed action. You were provided with advanced notice as prescribed within the law and were also provided with the evidence file used to support the proposed charge. The proposing official provided you with the exact evidence he used to make the decision to propose the action. You were supplied with all of the evidence relied upon by the proposing official. Further, you were afforded an opportunity to be heard when you submitted a response to the proposal. Therefore, you were afforded the due process rights pursuant to the law.

The VA OIG's summary of your interview was used by the proposing official to make the determination to propose the action. The proposing official was not privy to the transcript or recording of your interview. You were provided with all the documents used by the proposing official to make his determination. The agency strictly adhered to 38 U.S.C. §713 and agency policy based on the law. By providing you **the evidence file *in support of the proposed action***, the agency has provided you the due process afforded to you by the U.S. Constitution and 38 U.S.C. §713.

In your written reply, you also contend that the fact that you provided false or misleading statements is not misconduct as defined by 38 U.S.C. §713(d)(2). The statue states that misconduct is "neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function. Malfeasance is defined as wrongful or unjust conduct.[2] Lack of candor by a federal civilian employee with an agency investigator is wrongful conduct. As a supervisor and member of the SES, there is an expectation to exhibit a high standard of professionalism, integrity, care, candor and judgement. Not only is this a nexus between your work with the VA, it is an inherent trait that all federal employees should exhibit within their day to day duties. In accordance with 38 U.S.C. §713(a)(1), the Secretary may reprimand or suspend, involuntarily reassign, demote, or remove a covered individual from a senior executive position at the Department, if the Secretary determines that the misconduct or performance of the covered individual warrants such action. Here, I find that substantial evidence supports the charge and removal is warranted for such action.

---

[1] 38 U.S.C. Section 713 (b)(1) also affords the covered individual the right to be represented by an attorney or other representative to grieve the action in accordance with an internal grievance process.
[2] Bouvier's Law Dictionary, Desk Edition, (Lexis Nexis)

Next, I will address your other assertions as written in your reply:

**A. The Statute and the Agency's Implementation of the Statute Are Unconstitutional and Designed to Make it More Difficult for Employees to Vindicate Themselves.**

According to the legislative history, the intent of the 38 U.S.C. §713 The purpose of the statue was to hold senior executives accountable by providing swift discipline to its senior leaders who were not performing or displaying the conduct necessary and required to fulfill the nature of their roles within the VA. Regarding your contention that changes in the agency's removal authority makes 38 U.S.C. §713 unconstitutional is unfounded. This argument is not supported by case precedence. According to 38 U.S.C. §713, you were provided with 7 business days to respond. I consulted with the Office of General Counsel (OGC) before making my decision as to whether I should have granted your extension request and whether I concluded that your situation was, as stated in the CSEMO letter, "in the most exigent circumstances." After careful deliberation, I found that your request did not warrant exigent circumstances.[3] Your attorney stated in the extension request that they could not assist you with the reply during the week of September 14-18, 2020, because of deadlines on September 16 and September 18, 2020. Deadlines are not exigent circumstances. When you retained Shaw Bransford and Roth, P.C., you retained the entire firm to assist you with your case, not just a single attorney. Therefore, it was the firm's responsibility after being retained by you, to ensure that it could meet any statutory deadlines regarding your case. Pursuant to 38 U.S.C. §713, a decision shall be issued not later than 15 business days after notice of the action is provided to the covered individual. All parties involved must adhere to a strict timeline unless exigent circumstances exist for an extension. There were no exigent circumstances in your request.

Regarding your argument that 38 U.S.C. §713 is unconstitutional because it removed the post-termination administrative hearing at the Merit Systems Protection Board (MSPB) as previously available to career SES under 5 USC 7543(d). I find this argument without merit and unsupported by case precedence. As aforementioned, in federal removal cases such as yours, due process requires that the employee be provided with "notice of the charges, and explanation of the employer's evidence, and

---

[3] Emergency. Exigency has several distinct senses, both of which depict a circumstance that requires action without delay. In its primary (and older) sense, exigency is an urgent condition requiring immediate action. This urgent sense of exigence is still very important in law as the sense in which an exigent circumstance is an exception to the warrant requirement for searches. In this sense, an exigent condition is immediate and compelling, and not merely important or difficult. The term comes from the medieval Latin exigentia, or urgency. An exigent condition in this sense may justify or excuse an official who omits a legal or procedural requirement in carrying out an official task. This allowance is only available in circumstances in which the official might reasonably believe that whatever permission, approval, or form might have been sought would be granted, but the present emergency would make such procedures moot. Exigency has a second, distinct sense, as a condition that must be overcome to achieve some goal. This sense gives rise to a third, in which something exigent is the means of overcoming the condition interfering with attaining a goal, and in this sense, exigence might not even be intended to suggest that some exigent action is the only means of overcoming such a condition. This sense of exigency is unlikely to have anything urgent about it. In this sense, the exigency of a situation is just the requirements of some task, such as the exigency of feeding a prisoner. It is easy to confuse these various senses of the word, but it is essential to distinguish them. Exigency in the first sense, which excuses procedural defects, can be confused with exigency in the second, which ought not to be the basis for altering procedures or excusing a failure of any procedural safeguard. Erosion of procedural safeguards from such confusion is apparent in the use of the term, as exigencies are more and more suggested that turn out to be mere obligations or inconveniences, rather than a genuinely urgent demands for action.

an opportunity to present his side of the story." *Young v. Department of Housing and Urban Development*, 706 F.3d 1372, 1377 (Fed. Cir. 2013). Further, 38 U.S.C. §713 offers extensive due process rights because if you disagree with my decision you have the opportunity to grieve this decision with the Secretary of the VA. In addition, if you disagree with the Secretary's decision, 38 U.S.C. §713(6) provides you the opportunity to seek judicial review.

**B. The Agency Violated Its Own Procedures to Secure Your Termination.**

You state in your response that the Agency violated CSEMO Letter Section (7)(a)(iii)(3) which states "The recommendation will be limited to whether disciplinary action should be pursued." You allege that OAWP disregarded this policy and instead recommended a specific penalty: removal. You also stated that this was a violation of the Due Process Clause of the U.S. Constitution. Conversely, Section (7)(a)(iii)(4) states that if the Secretary or his or her designee concurs with OAWP and OGC's recommendation, OAWP and OGC shall coordinate with the organization or the Secretary to identify a Proposing Official who shall be briefed regarding the results of the investigation and the evidence gathered. Further, Section (7)(b)(i) of the CSEMO Letter states that the Proposing Official will review the available evidence to determine whether a Reprimand, Suspension, Demotion, or Removal should be proposed; or whether no action is warranted while consulting with OGC, OAWP, and Office of Human Resources and Administration. In the current case, after adhering to the CSEMO policy letter, OAWP made a recommendation to the proposing official (or his designee). The OAWP recommendation memorandum dated July 16, 2020, stated in pertinent part:

> This is a ***recommendation*** for disciplinary action under 38 U.S.C. § 323(c)(1)(I)....Under 38 U.S.C. § 323(f)(2), if you or your designee fail to propose the disciplinary action recommended in this paragraph within 60 calendar days from the date of this memorandum, you must provide OAWP with a detailed justification why the recommended action was not proposed.

OAWP merely made a recommendation to the proposing official in accordance with its investigation. The proposing official, pursuant to the CSEMO letter, has the ultimate authority to recommend a specific punishment (or no punishment) to the deciding official; therefore, the Due Process Clause was not violated and there was no violation of internal policy or procedure.

In your response, you allege that the Agency violated CSEMO Letter Section (7)(a)(iii)(1) which states that the Agency is required to provide any statement or evidence unless the circumstances of the investigation make it impossible, unreasonable, or unnecessary to do so. The agency provided you with the evidence that was relevant and used in support of the proposed action in accordance with CSEMO letter Section 7.a.iii.1. The recorded statement as mentioned in the Report of Investigation (ROI) was never provided to the proposing official or the deciding official. Bear in mind that OAWP is only required to forward evidence that is deemed necessary.

Based on the evidence provided, I find that the charge is supported by substantial evidence.

**C. The Agency Violated Your Entitlement to Constitutional Due Process by Withholding the Recording or Transcript of your Interview and Other Evidence.**

The exhibits as listed within OAWP's ROI were provided to you; however, the exhibits were renamed when the evidence file was complied. Specifically, they were renamed as described below:

- 001 Comprehensive Report of Investigation renamed exhibit 12
- 002 SF-50 Trinka SES Redacted renamed exhibit 2
- 004 Interview with James Trinka renamed exhibit 8
- 005 Interview with John Oswalt renamed exhibit 9
- 006 Interview with Richard Chandler renamed exhibit 10
- 007 Interview with Martha Orr renamed exhibit 11
- 009 Interview with Piyaporn Trinka renamed exhibit 6
- 020 OIG Referral to OAWP renamed exhibit 13
- 021 OPM Investigative File- Trinka renamed exhibit 7

You were provided with the exhibits as listed above. Nevertheless, it is your contention that the Agency's failure to provide the actual interview recording or transcript of the interview violated your due process rights. In your response, you cite to *Ramirez v. Department of Homeland Security, Case No. 19-1534 (Fed. Cir. 2020)*. The facts in Ramirez are distinguishable different from your case. In *Ramirez*, the petitioner sought judicial review of an arbitrator's final award sustaining his removal from his job as a Customs and Border Protection Officer for the Department of Homeland Security. Among other things, Mr. Ramirez contended that he was denied due process when the agency refused to provide him with the records of the written psychological assessments (Minnesota Multiphasic Personality Inventory) underlying his psychiatric evaluations. *Id.* at 2-3. The Court held that when an agency relies directly or indirectly on the results of a ***psychological assessment*** in justifying an employee's removal, the agency must provide the employee with a meaningful opportunity to review and challenge the data, analysis, and results of that assessment.[4] *Id.* at 19. Here, your removal was proposed because you gave false or misleading information to OIG investigators when you stated that you had informed three supervisors about your wife's undocumented immigration status when in fact substantial evidence supports a conclusion that you did not.[5] The OIG report was provided to you and you were given the opportunity to rebut the allegation that was the basis for the charge.

[4] In comparable circumstances, the Fifth Circuit has held that when a government agency removes its employees based on drug charges established through urinalysis, due process requires that the employees have access to samples of the urinalysis for independent verification, *Banks v. Fed. Aviation Admin*., 687 F.2d 92, 94-96 (5th Cir. 1982).

[5] In May 2019, VA OIG investigators independently interviewed your former supervisors to corroborate the information and all three denied having any prior knowledge of your wife's undocumented immigration status until after interview attempts were made by OIG investigators.

**D. The Agency may have engaged in Constitutionally Impermissible Ex Parte Communications with the Deciding Official during the Disciplinary Process.**

OAWP submitted the memorandum directly to me on July 16, 2020, as the proposing official or his/her designee. I did not utilize any of the links therein. It had been sent to me (or my designee) as proposing official. After further review, it was decided that Mr. Cunningham would be designated as the proposing official and that I would assume the role of the deciding official. The decision for the change was approved by OGC; OAWP was apprised accordingly. At no point did I speak with Mr. Cunningham regarding this case. I limited my discussions regarding to this case to Human Resources and OGC. I was provided with only the evidence used by the proposing official which is the same evidence provided to you. There was no ex-parte communication involved in this case and no violation of your due process rights.

**E. The Agency's only Evidence of the Only Charged Allegation of Misconduct is Hearsay and the Charge Cannot be Sustained.**

As stated above, within this administrative process, 38 U.S.C. §713 does not preclude the use of hearsay as acceptable evidence. The burden of proof in this case is limited to substantial evidence pursuant to 38 U.S.C.§713(6)(C). I find that the charge is supported by substantial evidence.

**F. There is no nexus between your statements to VA OIG regarding conversations with your supervisors about your personal life and your position as Chief Talent Management Officer at the Department of Veterans Affairs**

You assert that there is no nexus between your statement and your position at the VA. A nexus between an employee's misconduct and his duties is not a requirement when removal is proposed in accordance with 38 U.S.C. §713. The Secretary may remove a covered individual from a senior executive position if the Secretary determines that the misconduct or performance of the covered individual warrants such action. You are a senior executive and a top official of the agency. A review of the evidence reveals that you engaged in an unacceptable example of behavior for a leader of your position. At all times, you are expected to exhibit the highest standards of integrity. You exhibited dishonest conduct of a serious nature (providing false or misleading information to OIG Agents). Your position requires credibility, generally tied to the Agency's interest in maintaining public trust.

A review of the evidence file before me reveals several decision-making lapses that set an unacceptable example for those you lead. An essential function of your position as a Senior Executive is to lead people and to behave in an honest, fair and ethical manner; to model a high standard of ethics. It is also imperative that supervisors make good, honest and well-informed decisions even when they may produce unpleasant consequences, also to perceive the impact of the decisions made and the implications therein. Your failure to provide accurate information to OIG investigators is unacceptable behavior for a federal civilian employee and constitutes Conduct

Unbecoming a Federal Supervisor. I find that pursuant to 38 U.S.C. §713 the charge is supported by substantial evidence. After weighing the evidence and considering the nature and seriousness of your misconduct and the fact that you are an SES employee, I find, in accordance with 38 U.S.C. §713, that your conduct warrants removal from federal service.

**APPEAL RIGHTS**

You may:

a. grieve this decision in accordance with CSEMO Letter 006-17-1; or

b. file a discrimination complaint with the Office of Resolution Management (ORM).

If you choose to grieve this action you must submit your written grievance to the Grievance Official within seven (7) business days from the date you received this Initial Decision. Your written grievance must contain the following information:

a. the specific action on which the grievance is based, the date the action occurred, and the date you first learned of the action (if appropriate);

b. the reasons you believe that the action was not supported by the substantial evidence; is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with a provision of law; or obtained without procedures required by a provision of law having been followed; and

c. the corrective action you desire.

If your written grievance does not include the above information, the Grievance Official will consider your grievance as written, along with the developed record. If you do not grieve this action, or your grievance is untimely filed, this Initial Decision will become final and conclusive as the Final Decision in this matter. Otherwise, the Grievance Official will submit a recommendation to the Secretary who will issue the Final Decision in this matter. The Final Decision is subject to judicial review in accordance with 38 U.S.C. §713(b)(4)-(6).

Your written grievance should be addressed to Mr. James Gfrerer, Assistant Secretary for Information and Technology, Department of Veterans Affairs. You may submit your written grievance to Hughes Brandon, Executive Assistant, Assistant Secretary for Information and Technology, at Brandon.Hughes1@va.gov, and Mia R. Abraham, Human Resources Specialist, CSEMO Policy & Programs Division, at Mia.Abraham@va.gov . “Business days” refers to weekdays, which are Monday through Friday in Washington, D.C., except when such a day is designated as a Federal holiday by the Office of Personnel Management.

If you believe this action is based on discrimination on the basis of race, color, religion, sex, national origin, age, or handicap, you may file a complaint of discrimination. If you elect to file a complaint of discrimination, you may do so by contacting the Office of Resolution Management (ORM) at 1-888-737-3361. Your complaint will be processed in accordance with EEOC regulations at 29 C.F.R. Part 1614. Your initial contact with the ORM office must be done within 45 calendar days of the effective date of this action.

A further explanation of your appeal rights may be obtained by consulting Ms. Abraham at Mia.Abraham@va.gov or (202) 461-7821.

Dominic Cussatt
Principal Deputy Assistant Secretary

**Acknowledgment of Receipt of Initial Decision**

**I acknowledge receiving and reading the notice of the Initial Decision on my Proposed Removal from Federal service.**

| | |
|---|---|
| ______________________________ | ______________________ |
| **James A. Trinka** | **Date** |

# TAB Y

**REPORT OF FINDINGS AND RECOMMENDATIONS IN THE GRIEVANCE OF MR. JAMES TRINKA**

## I. INTRODUCTION

In accordance with 38 U.S.C. §713 and Department of Veterans Affairs (VA) Policy[1], this is a recommendation to the Secretary of Veterans Affairs on the Grievance that Mr. Trinka filed on October 14, 2020, grieving the decision to remove him from federal service. The removal was issued to him in a Decision Memorandum signed by Mr. Dominique Cussatt on October 2, 2020. My recommendation is to sustain the penalty of removal from his position of Chief Talent Management Officer, Office of Information and Technology, Senior Executive Service (SES). My recommendation is to deny his requested relief.

## II. PROCEDURAL HISTORY

By letter dated September 11, 2020, Mr. Trinka was served with written notice of the proposal to remove him from his position as Chief Talent Management Officer, Office of Information and Technology. The proposed removal set forth one charge. Specifically, the charge was: Conduct Unbecoming a Federal Supervisor. Mr. Trinka was notified in the proposed removal that he had seven business days to provide a written response to the Deciding Official. He submitted a written response to the Deciding Official on September 22, 2020. After a careful review of the proposed removal and the documentary evidence supporting the proposed action, as well Mr. Trinka's written response to the proposed removal, the Deciding Official found that substantial evidence supported the proposed charge and Mr. Trinka's removal became effective on October 2, 2020. In the Deciding Official's Memorandum, Mr. Trinka was notified of his right to grieve the decision in accordance with the Corporate Senior Executive Management Office (CSEMO) Letter Number 006-17-1 dated July 7, 2017. Mr. Trinka filed his Grievance on October 14, 2020.

## III. DISCUSSION AND ANALYSIS

In his grievance, Mr. Trinka set forth the basis on which he believed the removal was violative of his due process rights, inter alia. His requested relief is that the removal decision be canceled and his reemployment at the Department of Veterans Affairs be restored.

On May 22, 2014, the VA was informed by U.S. Department of Homeland Security (DHS) that Mr. Trinka was a subject of an investigation and it was revealed that he was married to a non-US citizen who is illegally in the country. The investigation noted that Mr. Trinka was aware of the federal immigration law regarding non-US citizenry and the proper procedures to seek citizenship for his spouse.

---

[1] See, CSEMO Letter NO:006-17-1, July 7, 2017.

Additionally, VA Office of Inspector General (OIG) issued a report of investigation (ROI), dated June 24, 2019, based on a joint investigation with the Department of Homeland Security. Specifically, the ROI stated, in relevant part, that Mr. Trinka made false statements to the government on the following occasions:

a) Mr. Trinka listed his spouse, as a United States (US) citizen on his electronic background investigation (E-QIP) to the Office of Personnel Management (OPM). He later told OPM investigators he made a mistake and admitted she was not a U.S. citizen, but is instead a citizen of Thailand. However, he failed to disclose to OPM his wife was in the U.S. illegally.

b) Mr. Trinka failed to disclose his wife's unlawful immigration status to the VA when adding her as a dependent on his life insurance and health insurance records. Mr. Trinka knowingly used his wife's IRS assigned tax identification. He again used his wife's ITIN to obtain a military dependent identification card, allowing her to access any military installation. Mr. Trinka admitted he was previously employed by the IRS and was aware the first three digits of his wife's ITIN designated the number was issued to an individual with no lawful immigration status.

c) Mr. Trinka was interviewed by VA OIG investigators. During the interview, he stated he verbally reported his wife's undocumented immigration status to three different supervisors who managed him during his tenure in the VA Office of Information Technology. In May 2019, VA OIG investigators independently interviewed his former supervisors to corroborate the information. All three denied having any prior knowledge of his wife's undocumented immigration status until after interview attempts were made by VA OIG investigators.

On January 6, 2020, VA Office of Accountability and Whistleblower Protection (OAWP), received the ROI from VA's OIG regarding Mr. Trinka. OAWP conducted their own investigation into the allegations against Mr. Trinka as a Senior Leader. OAWP substantiated allegations that Mr. Trinka made false or inaccurate statements or provided false or inaccurate information to the government on at least two occasions: when completing his Electronic Questionnaire for Investigations Processing (e-QIP) and when he stated to OIG investigators that he had informed three supervisors about his wife's immigration status. Based on this investigation, on July 16, 2020, OAWP recommended Mr. Trinka's removal from federal service. I will now address Mr. Trinka's allegations that were made in his grievance:

***1. The decision violated Mr. Trinka's due process and constitutional rights.***

In the grievance filed by Mr. Trinka, a consistent theme of contention is a violation of his due process and constitutional rights. (See grievance Part I, Part II C, Part II E). After careful review of the applicable statute and appropriate case law, I conclude that Mr. Trinka's constitutional rights have not been violated in any way.

Mr. Trinka has been afforded the opportunity to provide evidence that may refute the considerable amount of substantial evidence supporting the decision to remove him. As stated in the decision to remove Mr. Trinka from federal services, the Due Process Clause of the United States Constitution provides that certain substantive rights such as life, liberty, and property, cannot be deprived. In federal removal cases such as this one, due process requires that the employee be provided with “notice of the charges, an explanation of the employer’s evidence, and an opportunity to present his side of the story.” *Young v. Department of Housing and Urban Development*, 706 F.3d 1372, 1377 (Fed. Cir. 2013). Mr. Trinka was afforded these rights and no violation of the due process clause is found.

Furthermore, Mr. Trinka was removed in accordance with 38 U.S.C. §713. In accordance with this statute, it specifically states in paragraph (b) that a covered individual who is the subject of an action under subsection (a) is entitled to: (A) advance notice of the action and a file containing all evidence in support of the proposed action; (B) be represented by an attorney or other representative of the covered individual’s choice; and (C) grieve the action in accordance with an internal grievance process that the Secretary, in consultation with the Assistant Secretary for Accountability and Whistleblower Protection, shall establish for purposes of this subsection. Mr. Trinka was afforded the due process rights afforded to him by 38 U.S.C. §713.

***2. The Decision Violated Mr. Trinka’s right to a post-determination hearing.***

In his grievance, Mr. Trinka argues that he is entitled to a post-determination hearing by an independent and impartial third party who is able to correct error (grievance part II B). As stated earlier, 38 U.S.C. § 713 does not provide for a post-determination hearing. The decision to remove Mr. Trinka is a decision made solely by the employing agency. The agency has provided Mr. Trinka an opportunity to refute allegations against him in accordance with 38 U.S.C. § 713. Mr. Trinka was able to respond to the proposed removal, and he was given an opportunity to grieve the final decision to remove him. In accordance with 38 U.S.C. § 713, if Mr. Trinka disagrees with the SECVA’s finding, he can seek judicial review. Therefore, Mr. Trinka’s due process rights have not been violated.

***3. Mr. Trinka was denied an opportunity to review and confront purported witnesses and evidence against him.***

Mr. Trinka contends that there was a “secret” OAWP process that purposely excluded specific evidence. In fact, the entire evidence file that was used by the proposing and deciding officials was provided to Mr. Trinka. Mr. Trinka raises the point that the evidence file did not include the actual transcript of the conversation between himself and the OIG investigator. Mr. Trinka does not allege that the summation provided by the OIG investigator is inaccurate. Conversely, he argues that the actual transcript was not in the evidence file. The VA OIG’s summary of Mr. Trinka’s interview was used by the proposing official and the deciding official to make the determination to propose and sustain the action. Neither the proposing official nor the deciding official was privy to the

transcript or recording of Mr. Trinka's interview. Mr. Trinka was provided with all the documents used by the proposing and deciding official to make their determination. The agency strictly adhered to 38 U.S.C. §713 and agency policy based on the law. By providing Mr. Trinka the **evidence file *in support of the proposed action***, the Agency has provided Mr. Trinka the due process afforded to him by the U.S. Constitution and 38 U.S.C. §713.

***4. Mr. Trinka demands a post-termination name clearing hearing***

Mr. Trinka alleges in his grievance that an agency may not publish false or stigmatizing statements about an employee without affording due process. The grievance further states that a liberty interest is impacted when an agency falsely charges the employee with dishonesty or impugns him with stigma that could hamper future employment (see grievance page 5). The agency charged Mr. Trinka with conduct unbecoming of a federal supervisor – not "dishonesty" per se. Second, and more importantly – the charge was substantiated by substantial evidence in accordance with 38 U.S.C. §713. Hence, the agency has not made any false statements against Mr. Trinka. The agency rather has proven, by the substantial evidence standard, that Mr. Trinka engaged in conduct unbecoming a federal supervisor by providing false or inaccurate information to VA OIG investigators on December 21, 2018 when Mr. Trinka's stated that he informed three supervisors about his wife's immigration status. Conversely, when the OIG interviewed three of his supervisors in OIT, all three denied, under oath, having any prior knowledge of his wife's undocumented immigration status until after interview attempts were made by VA OIG investigators. Therefore, I conclude based on the evidence and applying the substantial evidence standard that Mr. Trinka engaged in conduct unbecoming a federal supervisor.

***5. The decision on the proposed action must be reversed***

***A. Based on the agency providing the incorrect standard of evidence***

Mr. Trinka's grievance points out that the proposal letter dated September 11, 2020, stated that "the preponderance of evidence provides and supports a narrative of high-risk behaviors unbecoming of the position you hold (proposal letter page 3, paragraph 2)." Nevertheless, the proposal letter specifically states in paragraph 1 that Mr. Trinka's proposed removal was in accordance with 38 U.S.C. §713. This statute specifically provides the applicable standard of proof as substantial evidence. Mr. Trinka was afforded legal counsel who understood the burden of proof. For instance, in Mr. Trinka's response to the proposed removal, he states on page 4 that "Section 713 unconstitutionally decreased the burden of proof on judicial review at federal district court from preponderance of the evidence to substantial evidence." Furthermore, even if this is an error, I find that it is harmless, because the agency actually held itself to a higher standard than what is actually necessary, which is the substantial level of evidence.

Evidentiary errors are subject to harmless error analysis, under the Federal Rules of Evidence rule 103(a). The rule states that a party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and if the ruling admits evidence, a party on the record timely objects and states the specific ground unless it was apparent from the contest; or, if the ruling excludes evidence, a party informs the court of its substance by an offer of proof unless the substance was apparent from the context. *Fed. Rule of Evidence* 103. The general burden when alleging that evidence was improperly excluded or included is to show that the proper ruling by the trial judge may have, on the balance of probabilities, resulted in the opposite determination of fact. *United States v. Monroe*, 353 F.3d 1346, (If a reviewing court is certain that an evidentiary error did not have a substantial and injurious effect or influence on the jury's verdict, the error is harmless and the jury verdict stands, see, *United States v. Sargent*, 98 F.3d 325. In the evidentiary context, a harmless error is usually one where the evidence had no relevance to the issues to be decided by the trier of fact, evidence admitted actually helped the party seeking the reversal, or the remaining evidence was overwhelmingly against the party seeking reversal. Clearly, if the agency has a preponderance of evidence in favor of its decision, then the substantial level had to have been met. In addition, when I examine the evidence in total, I also find that the remaining evidence is overwhelmingly against Mr. Trinka.

Furthermore, Mr. Trinka was represented by counsel and the proposal letter stated that the proposed removal was proposed in accordance with 38 U.S.C. §713 which placed Mr. Trinka on notice of the substantial evidence standard of which Mr. Trinka alludes to in his response to the proposal. The fact that preponderance of the evidence was mentioned in the proposed removal does not have a substantial and injurious effect or influence on the deciding official's decision. *United States v. Hanson*, 994 f.2d 403,407 (7th Cir. 1993). Therefore, reversal of the decision set forth on October 2, 2020, is not warranted.

***B. The hearsay evidence used to terminate Mr. Trinka is not sufficient evidence where there is no post-determination hearing.***

Mr. Trinka cites in his grievance caselaw that essentially holds that hearsay evidence was only sufficient to meet a substantially evidence burden. 38 USC section 713 only requires a substantial level of evidence – therefore, the hearsay evidence used in part to make a final determination here is valid and properly relied upon. Courts have held that hearsay is sufficient to meet the burden of substantial evidence in support of the agency's removal of the employee. For instance, in *Klinestiver v. Drug Enforcement Administration*, the Court held that hearsay is both admissible and may, standing by itself, constitute substantial evidence in support of an administrative decision." *Klinestiver v. Drug Enforcement Admin*., 606 F.2d 1128, 1129 (D.C. Cir. 1979). In addition, the Court in *Sykes v. D.C.* held that hearsay is both appropriate and useful as evidence in administrative proceedings. *Sykes v. D.C.* 518 F. Supp. 2d 261, 268 (D.D.C. 2007). It is undisputed that an adjudicative official at an administrative hearing can consider hearsay. The Supreme Court has explained that hearsay has not been rejected for consideration at administrative hearings, but only hearsay without a basis in

evidence having rational probative value." *Leitman v. McAusland*, 934 F.2d 46, 51 (4th Cir. 1991) (internal citations omitted).

Therefore, I find that case precedence supports the conclusion that hearsay evidence was properly relied upon in this case because it had a rational probative value, based on the administrative process, and the level of evidence required in accordance with 38 USC §713.

***C. VA denied Mr. Trinka due process when it intentionally withheld from him the OIG interview transcript over his objection.***

The exhibits as listed within OAWP's ROI were provided to Mr. Trinka; however, the exhibits were renamed when the evidence file was complied. Specifically, they were renamed as described below:

001 Comprehensive Report of Investigation renamed exhibit 12
002 SF-50 Trinka SES Redacted renamed exhibit 2
004 Interview with James Trinka renamed exhibit 8
005 Interview with John Oswalt renamed exhibit 9
006 Interview with Richard Chandler renamed exhibit 10
007 Interview with Martha Orr renamed exhibit 11
009 Interview with Piyaporn Trinka renamed exhibit 6
020 OIG Referral to OAWP renamed exhibit 13
021 OPM Investigative File- Trinka renamed exhibit 7

Mr. Trinka was provided with the exhibits as listed above. Nevertheless, it is his contention that the Agency's failure to provide the actual interview recording or transcript of the interview violated his due process rights. In the grievance, Mr. Trinka cites to *Ramirez v. Department of Homeland Security*, Case No. 19-1534 (Fed. Cir. 2020). The facts in *Ramirez* are distinguishably different from Mr. Trinka's case. In *Ramirez*, the petitioner sought judicial review of an arbitrator's final award sustaining his removal from his job as a Customs and Border Protection Officer for the Department of Homeland Security. Among other things, Mr. Ramirez contended that he was denied due process when the agency refused to provide him with the records of the written psychological assessments (Minnesota Multiphasic Personality Inventory) underlying his psychiatric evaluations. Id. at 2-3. The Court held that when an agency relies directly or indirectly on the results of a ***psychological assessment*** in justifying an employee's removal, the agency must provide the employee with a meaningful opportunity to review and challenge the data, analysis, and results of that assessment.4 Id. at 19. Here Mr. Trinka's removal was proposed because he gave false or misleading information to OIG investigators when he stated that he informed three supervisors about his wife's undocumented immigration status when in fact substantial evidence supports a conclusion that he did not. The OIG report was provided to Mr. Trinka and he was given the opportunity to rebut the allegation that was the basis for the charge.

In the grievance, Mr. Trinka cites to *Richardson v. Perales*, 402 U.S. 389 (1971.) *In Richardson v. Perales, the Supreme Court found that the written reports of a licensed physicians who examined the claimant, but who did not testify at the hearing, constituted substantial evidence in support of the agency's decision to deny the claimant social security benefits. The Court found that, even though the claimant and his physician both testified to the contrary, the Agency met its substantial evidence burden to deny the claimant benefits when it relied on multiple physicians' reports finding that the claimant was not disabled.*

In support of its reasoning the Court looked to the totality of the circumstances with the evidence and identified nine pertinent factors:

1. The physicians who wrote the report were unbiased and produced the reports in the normal course of their duties. The findings and outcomes of the reports had no effect on the physicians' employment.

2. The agency functioned as a fact-finder and was non-adversarial, reliable, and impartial.

3. The medical reports contained elements of detail and value and were conducted in a routine and standard manner.

4. The medical reports were thorough.

5. Each report was consistent and corroborated by the findings in the other reports.

6. The claimant had the opportunity to subpoena and cross examine the physicians during a hearing and failed to do so.

7. Courts have recognized the reliability and probative worth of written medical reports, even while acknowledging that they are hearsay.

8. The reviewing Courts have uniformly recognized the reliability and probative value of such reports.

9. The Agency has a large administrative burden of processing thousands of disability claims and are entitled to an efficient process to process the claims.

For arguendo purposes, many of these factors are favorable to the agency in Mr. Trinka's case. Specifically, the VA OIG investigators are unbiased, they performed the investigation, and drafted the summary in the normal course of their duties. The outcome of the investigation did not affect their employment as investigators. The investigators were quite literally acting as fact finders and were not adversarial. The report was thorough and detailed and provided value as a routine and standard investigation. Lastly, agencies often rely on investigative reports and statements from

employees to support disciplinary action of agency employees, which has been routinely accepted by the Courts as sufficient. Therefore, it was proper to use the summary of the report to support the proposed removal and decision.

Mr. Trinka's points to the one factor that is not applicable here, that the claimant in *Richardson* had the ability to subpoena and cross examine the creator of the reports, i.e. the physicians, while Mr. Trinka does not have that right through the internal grievance process. However, contrary to what Mr. Trinka claims, this is not the sole factor that the Court considered in *Richardson*. Rather, it was one of nine factors cited by the Court in support for its holding that "hearsay" can constitute substantial evidence in support of an agency's decision. Further, the grievance points to the one factor that is not applicable here, that the claimant in *Richardson* had the ability to subpoena and cross examine the creator of the reports, i.e. the physicians, while Mr. Trinka does not have that right through the internal grievance process. However, contrary to what Mr. Trinka claims, this is not the sole factor that the Court considered in *Richardson*. Rather, it was one of nine factors cited by the Court in support for its holding that "hearsay" can constitute substantial evidence in support of an agency's decision.

## IV. Findings

I conclude that Mr. Trinka's grievance with attachments does not persuade the recommending official to recommend reversing the decision based on the allegations raised in the grievance. I conclude, contrary to Mr. Trinka's assertions to the opposite, that the charge is supported by substantial evidence and removal is an appropriate penalty.

## V. Recommendations

I recommend that you sustain the charge of Conduct Unbecoming a Federal Supervisor.
I recommend that you affirm the decision to remove Mr. Trinka from federal service.
I recommend that Mr. Trinka's requested relief be denied.

James Gfrerer, Assistant Secretary
Office of Information and Technology
U.S. Department of Veterans Affairs

# TAB Z

**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

November 3, 2020

Mr. James A. Trinka
c/o Debra Roth and Conor Dirks
Shaw Bransford & Roth P.C. Attorneys at Law
1100 Connecticut Avenue, NW
Suite 900
Washington, DC 20036

RE: Grievance Decision

Dear Mr. Trinka:

In accordance with 38 U.S.C. §713 and Department of Veterans Affairs (VA) Policy,[1] this is my decision regarding your grievance that you filed on October 14, 2020, grieving the decision to remove you from Federal service. By letter dated September 11, 2020, you were issued a notice of proposed removal, from your position as Chief Talent Management Officer, Office of Information and Technology. The proposed removal set forth one charge. Specifically, the charge was: Conduct Unbecoming a Federal Supervisor. You were given seven business days to provide a written response to the Deciding Official. You submitted a written response to the Deciding Official on September 22, 2020.

After a careful review of the proposed removal and the documentary evidence supporting the proposed action, as well as your written response to the proposed removal, the Deciding Official found that substantial evidence supported the proposed charge and your removal became effective on October 2, 2020. The Deciding Official also found that even if preponderant evidence were required to support the charge, preponderant evidence supported the charge as well. Your removal became effective on October 2, 2020.

In the Deciding Official's Memorandum, issued to you on October 2, 2020, by Dominic Cussatt, you were notified of your right to grieve the decision in accordance with the Corporate Senior Executive Management Office (CSEMO) Letter Number 006-17-1 dated July 7, 2017. Your grievance was filed on October 14, 2020. I appointed Mr. James Gfrerer, Assistant Secretary, Office of Information and Technology to serve as the Grievance Official and to make a recommendation to me as to whether to grant or deny your grievance. I have carefully reviewed the Grievance Official's recommendation, your grievance, the materials you attached in support of the

[1] *See*, CSEMO Letter NO:006-17-1, July 7, 2017.

grievance, and the underlying evidence for the grievance. My decision is to sustain the penalty of removal from your position of Chief Talent Management Officer, Office of Information and Technology, ES-0340, with a salary of $186,216.00 for the reasons stated below.

On May 22, 2014, VA was informed by U.S. Department of Homeland Security (DHS) that you were a subject of an investigation and it was revealed that you were married to a non-U.S. citizen who is illegally in the country. The investigation noted that you were aware of the Federal immigration law regarding non-U.S. citizenry and the proper procedures to seek citizenship for your spouse.

Additionally, VA's Office of Inspector General (OIG) issued a report of investigation (ROI), dated June 24, 2019, based on a joint investigation with the Department of Homeland Security. Specifically, the ROI stated, in relevant part, that you made false statements to the government on the following occasions:

a) You listed your spouse, as a United States (U.S.) citizen on your electronic background investigation (E-QIP) to the Office of Personnel Management (OPM). You later told OPM investigators you made a mistake and admitted she was not a U.S. citizen, but is instead a citizen of Thailand. However, you failed to disclose to OPM your wife was in the U.S. illegally.

b) You failed to disclose your wife's unlawful immigration status to VA when adding her as a dependent on your life insurance and health insurance records. You knowingly used your wife's Internal Revenue Service (IRS) assigned tax identification. You again used your wife's Individual Taxpayer Identification Number (ITIN) to obtain a military dependent identification card, allowing her to access any military installation. You admitted you were previously employed by the IRS and was aware the first three digits of your wife's ITIN designation and the number was issued to an individual with no lawful immigration status.

c) You were interviewed by VA OIG investigators. During the interview, you stated that you verbally reported your wife's undocumented immigration status to three different supervisors who managed you during your tenure in the VA Office of Information Technology. In May 2019, VA OIG investigators independently interviewed your former supervisors to corroborate the information. All three denied having any prior knowledge of your wife's undocumented immigration status until after interview attempts were made by VA OIG investigators.

On January 6, 2020, VA Office of Accountability and Whistleblower Protection (OAWP), received the ROI from VA's OIG regarding you. OAWP conducted their own investigation into the allegations against you as a Senior Leader. OAWP substantiated allegations that you made false or inaccurate statements or provided false or inaccurate information to the government on at least two occasions: when completing your Electronic Questionnaire for Investigations Processing (e-QIP) and when you stated to OIG investigators that you had informed three supervisors about your wife's immigration

status. Based on this investigation, on July 16, 2020, OAWP recommended your removal from Federal service.

In your grievance, you set forth the basis on which you believed the removal was not supported by substantial evidence, was arbitrary, capricious, an abuse of discretion, not in accordance with relevant law, and obtained without following required legal process. Your requested relief was as follows: (1) that the removal decision be canceled and (2) for your employment at the Department of Veterans Affairs be restored.

I will now address the allegations that were made in your grievance:

***1. The decision violated Mr. Trinka's due process and constitutional rights.***

In the grievance you filed, a consistent theme of contention is a violation of your due process and constitutional rights. (See grievance Part I, Part II C, Part II E). After careful review of the applicable statute and appropriate case law, I conclude that your constitutional rights have not been violated in any way. You have been afforded the opportunity to provide evidence that may refute the considerable amount of substantial evidence supporting the decision to remove you. As stated in the decision to remove you from Federal service, the Due Process Clause of the United States Constitution provides that certain substantive rights such as life, liberty, and property, cannot be deprived. In Federal removal cases such as this one, due process requires that the employee be provided with "notice of the charges, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Young v. Department of Housing and Urban Development*, 706 F.3d 1372, 1377 (Fed. Cir. 2013). You were afforded these rights and no violation of the due process clause is found.

Furthermore, you were removed in accordance with 38 U.S.C. §713. In accordance with this statute, it specifically states in paragraph (b) that a covered individual who is the subject of an action under subsection (a) is entitled to: (A) advance notice of the action and a file containing all evidence in support of the proposed action; (B) be represented by an attorney or other representative of the covered individual's choice; and (C) grieve the action in accordance with an internal grievance process that I, the Secretary of VA, in consultation with the Assistant Secretary for Accountability and Whistleblower Protection, shall establish for purposes of this subsection. You were afforded the due process rights afforded to you by 38 U.S.C. §713.

***2. The Decision Violated Mr. Trinka's right to a post-determination hearing.***

In your grievance, you argue that you are entitled to a post-determination hearing by an independent and impartial third party who is able to correct error (grievance part II B). As stated earlier, 38 U.S.C. § 713 does not provide for a post-determination hearing. The decision to remove you is a decision made solely by the employing agency. The agency has provided you an opportunity to refute allegations against you in accordance with 38 U.S.C. § 713. You were able to respond to the proposed removal, and you were given an opportunity to grieve the

final decision to remove you. In accordance with 38 U.S.C. § 713, if you disagree with my finding, you can seek judicial review. Therefore, your due process rights have not been violated.

***3. Mr. Trinka was denied an opportunity to review and confront purported witnesses and evidence against him.***

You contend that there was a "secret" OAWP process that purposely excluded specific evidence. In fact, the entire evidence file that was used by the proposing and deciding officials was provided to you. You raise the point that the evidence file did not include the actual transcript of the conversation between yourself and the OIG investigator. However, you did not allege that the summation provided by the OIG investigator was inaccurate. Conversely, you argue that the actual transcript was not in the evidence file. VA's OIG's summary of your interview was used by the proposing official and the deciding official to make the determination to propose and sustain the action. Neither the proposing official nor the deciding official were privy to the transcript or recording of your interview. You were provided with all the documents used by the proposing and deciding official to make their determination. The agency strictly adhered to 38 U.S.C. § 713 and agency policy based on the law. By providing you the evidence file in support of the proposed action, the Agency has provided you the due process afforded to you by the U.S. Constitution and 38 U.S.C. § 713.

***4. Mr. Trinka demands a post-termination name clearing hearing.***

You allege in your grievance that an agency may not publish false or stigmatizing statements about an employee without affording due process. The grievance further states that a liberty interest is impacted when an agency falsely charges the employee with dishonesty or impugns an employee with stigma that could hamper future employment (see grievance page 5). The agency charged you with conduct unbecoming of a Federal supervisor – not "dishonesty" per se. Second, and more importantly – the charge was substantiated by substantial evidence in accordance with 38 U.S.C. § 713. Hence, the agency has not made any false statements against you. The agency rather has proven, by the substantial evidence standard, that you engaged in conduct unbecoming a Federal supervisor by providing false or inaccurate information to VA OIG investigators on December 21, 2018, when you stated that you informed three supervisors about your wife's immigration status. Conversely, when the OIG interviewed three of your supervisors in OIT, all three denied, under oath, having any prior knowledge of your wife's undocumented immigration status until after interview attempts were made by VA OIG investigators. Therefore, I conclude based on the evidence and applying the substantial evidence standard that you engaged in conduct unbecoming a Federal supervisor.

***5. The decision on the proposed action must be reversed.***

***A. Based on the agency providing the incorrect standard of evidence.***

The grievance points out that the proposal letter dated September 11, 2020, stated that "the preponderance of evidence provides and supports a narrative of high-risk behaviors unbecoming of the position you hold (proposal letter page 3, paragraph 2)." Nevertheless, the proposal letter specifically states in paragraph 1, page 1 that your proposed removal was in accordance with 38 U.S.C. §713. This statute specifically provides the applicable standard of proof as substantial evidence. You were afforded legal counsel who understood the burden of proof. For instance, in your response to the proposed removal, you state on page 4 that "Section 713 unconstitutionally decreased the burden of proof on judicial review at Federal district court from preponderance of the evidence to substantial evidence." Furthermore, even if this is an error, I find that it is harmless, because the agency actually held itself to **a higher standard than what is actually necessary**, which is the substantial level of evidence.

Evidentiary errors are subject to harmless error analysis, under Federal Rule of Evidence 103(a). The rule states that a party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and if the ruling admits evidence, a party on the record timely objects and states the specific ground unless it was apparent from the contest; or, if the ruling excludes evidence, a party informs the court of its substance by an offer of proof unless the substance was apparent from the context. *Fed. Rule of Evidence* 103.

The general burden when alleging that evidence was improperly excluded or included is to show that the proper ruling by the trial judge may have, on the balance of probabilities, resulted in the opposite determination of fact. *United States v. Monroe*, 353 F.3d 1346. (If a reviewing court is certain that an evidentiary error did not have a substantial and injurious effect or influence on the jury's verdict, the error is harmless and the jury verdict stands, see, *United States v. Sargent*, 98 F.3d 325.) In the evidentiary context, a harmless error is usually one where the evidence had no relevance to the issues to be decided by the trier of fact, evidence admitted actually helped the party seeking the reversal, or the remaining evidence was overwhelmingly against the party seeking reversal. Clearly, if the agency has a preponderance of evidence in favor of its decision, then the substantial level had to have been met. In addition, when I examine the evidence in total, I also find that the remaining evidence is overwhelmingly against you.

Furthermore, you are represented by counsel and the proposal letter stated that the proposed removal was proposed in accordance with 38 U.S.C. § 713, which placed you on notice of the substantial evidence standard of which you allude to in your response to the proposal. The fact that preponderance of the evidence was mentioned in the proposed removal does not have a substantial and injurious effect or influence on the deciding official's decision. *United States v.*

*Hanson*, 994 f.2d 403,407 (7th Cir. 1993). Therefore, reversal of the decision set forth on October 2, 2020, is not warranted.

***B. The hearsay evidence used to terminate Mr. Trinka is not sufficient evidence where there is no post-determination hearing.***

You cite in your grievance caselaw that essentially holds that hearsay evidence was only sufficient to meet a substantially evidence burden. Title 38 USC section 713 only requires a substantial level of evidence – therefore, the hearsay evidence used in part to make a final determination here is valid and properly relied upon. Courts have held that hearsay is sufficient to meet the burden of substantial evidence in support of the agency's removal of the employee. For instance, in *Klinestiver v. Drug Enforcement Administration*, the Court held that hearsay is both admissible and may, standing by itself, constitute substantial evidence in support of an administrative decision." *Klinestiver v. Drug Enforcement Admin*., 606 F.2d 1128, 1129 (D.C. Cir. 1979). In addition, the Court in *Sykes v. D.C.* held that hearsay is both appropriate and useful as evidence in administrative proceedings. *Sykes v. D.C.* 518 F. Supp. 2d 261, 268 (D.D.C. 2007). It is undisputed that an adjudicative official at an administrative hearing can consider hearsay. The Supreme Court has explained that hearsay has not been rejected for consideration at administrative hearings, but only hearsay without a basis in evidence having rational probative value." *Leitman v. McAusland*, 934 F.2d 46, 51 (4th Cir. 1991) (internal citations omitted).

Therefore, I find that case precedence supports the conclusion that hearsay evidence was properly relied upon in this case because it had a rational probative value, based on the administrative process, and the level of evidence required in accordance with 38 USC §713.

***C. VA denied Mr. Trinka's due process when it intentionally withheld from him the OIG interview transcript over his objection.***

The exhibits as listed within OAWP's ROI were provided to you; however, the exhibits were renamed when the evidence file was complied. Specifically, they were renamed as described below:

001 Comprehensive Report of Investigation renamed exhibit 12;

002 SF-50 Trinka SES Redacted renamed exhibit 2;

004 Interview with James Trinka renamed exhibit 8;

005 Interview with John Oswalt renamed exhibit 9;

006 Interview with Richard Chandler renamed exhibit 10;

007 Interview with Martha Orr renamed exhibit 11;

009 Interview with Piyaporn Trinka renamed exhibit 6;

020 OIG Referral to OAWP renamed exhibit 13; and

021 OPM Investigative File- Trinka renamed exhibit 7.

You were provided with the exhibits as listed above. Nevertheless, it is your contention that the Agency's failure to provide the actual interview recording or transcript of the interview violated your due process rights. In the grievance, you cite to *Ramirez v. Department of Homeland Security*, Case No. 19-1534 (Fed. Cir. 2020). The facts in *Ramirez* are distinguishably different from your case. In *Ramirez*, the petitioner sought judicial review of an arbitrator's final award sustaining his removal from his job as a Customs and Border Protection Officer for the Department of Homeland Security. Among other things, Mr. Ramirez contended that he was denied due process when the agency refused to provide him with the records of the written psychological assessments (Minnesota Multiphasic Personality Inventory) underlying his psychiatric evaluations. Id. at 2-3.

The Court held that when an agency relies directly or indirectly on the results of a ***psychological assessment*** in justifying an employee's removal, the agency must provide the employee with a meaningful opportunity to review and challenge the data, analysis, and results of that assessment.4 Id. at 19. Here, your removal was proposed because you gave false or misleading information to OIG investigators when you stated that you informed three supervisors about your wife's undocumented immigration status when in fact substantial evidence supports a conclusion that you did not. The OIG report was provided to you and you were given the opportunity to rebut the allegation that was the basis for the charge.

In the grievance, you cite to *Richardson v. Perales*, 402 U.S. 389 (1971.) *In Richardson v. Perales, the Supreme Court found that the written reports of a licensed physicians who examined the claimant, but who did not testify at the hearing, constituted substantial evidence in support of the agency's decision to deny the claimant social security benefits. The Court found that, even though the claimant and his physician both testified to the contrary, the Agency met its substantial evidence burden to deny the claimant benefits when it relied on multiple physicians' reports finding that the claimant was not disabled.*

In support of its reasoning the Court looked to the totality of the circumstances with the evidence and identified nine pertinent factors:

1. The physicians who wrote the report were unbiased and produced the reports in the normal course of their duties. The findings and outcomes of the reports had no effect on the physicians' employment.

2. The agency functioned as a fact-finder and was non-adversarial, reliable, and impartial.

3. The medical reports contained elements of detail and value and were conducted in a routine and standard manner.

4. The medical reports were thorough.

5. Each report was consistent and corroborated by the findings in the other reports.

6. The claimant had the opportunity to subpoena and cross examine the physicians during a hearing and failed to do so.

7. Courts have recognized the reliability and probative worth of written medical reports, even while acknowledging that they are hearsay.

8. The reviewing Courts have uniformly recognized the reliability and probative value of such reports.

9. The Agency has a large administrative burden of processing thousands of disability claims and are entitled to an efficient process to process the claims.

For arguendo purposes, many of these factors are favorable to the agency in your case. Specifically, the VA OIG investigators are unbiased, they performed the investigation, and drafted the summary in the normal course of their duties. The outcome of the investigation did not affect their employment as investigators. The investigators were quite literally acting as fact finders and were not adversarial. The report was thorough and detailed and provided value as a routine and standard investigation. Agencies often rely on investigative reports and statements from employees to support disciplinary action of agency employees, which has been routinely accepted by the Courts as sufficient. Therefore, it was proper to use the summary of the report to support the proposed removal and decision.

You point to the one factor that is not applicable here, that the claimant in *Richardson* had the ability to subpoena and cross examine the creator of the reports, i.e. the physicians, while you do not have that right through the internal grievance process. However, contrary to what you claim, this is not the sole factor that the Court considered in *Richardson*. Rather, it was one of nine factors cited by the Court in support for its holding that "hearsay" can constitute substantial evidence in support of an agency's decision. Further, the grievance points to the one factor that is not applicable here, that the claimant in *Richardson* had the ability to subpoena and cross examine the creator of the reports, i.e. the physicians, while you do not have that right through the internal grievance process. However, contrary to what your claim, this is not the sole factor that the Court considered in *Richardson*. Rather, it was one of nine factors cited by the Court in support for its holding that "hearsay" can constitute substantial evidence in support of an agency's decision.

I have carefully reviewed the entire record for myself which includes the evidence file, the OAWP recommendation, the Proposed Removal, your response to the Proposed Removal, the Removal Decision, the Grievance Official's recommendation, your grievance and the materials you attached in support of the grievance. I conclude, contrary to your assertions, that the decision to remove you from Federal service was not violative of your due process rights or the Constitution, followed proper processes as outlined by 38 U.S.C. § 713, and was not contrary to law; and the removal was supported by substantial evidence. In fact, the removal was supported by the higher standard of preponderant evidence, if necessary. I reach the same conclusion under plenary review. My decision is to sustain the charge of Conduct Unbecoming a Federal Supervisor and affirm the decision to remove you from your position of Chief Talent Management Officer, Office of Information and Technology, ES-0340, with a salary of $186,216.00. Therefore, your requested relief is hereby denied.

This final decision is subject to judicial review under 38 U.S.C. §§ 713 (b)(4)-(6).

Sincerely,

Robert L. Wilkie

# TAB AA

**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

November 9, 2020

**MEMORANDUM FOR UNDER SECRETARIES, ASSISTANT SECRETARIES AND OTHER KEY OFFICIALS**

**SUBJECT:** Delegation of Authority for Actions under 38 U.S.C. §§ 713, 714 and 5 U.S.C. § 7515, including those actions prescribed under 38 U.S.C. § 731 (VIEWS 1491106)

1. **DELEGATIONS.** Under the authority vested in me as the Secretary of the Department of Veterans Affairs (VA) and pursuant to 38 U.S.C. §§ 303 and 512, I delegate authority for personnel actions taken under 38 U.S.C. §§ 713, 714, and 5 U.S.C. § 7515 as follows:

**a. Delegations under 38 U.S.C. § 713, including Actions Required under 38 U.S.C. § 731.** The delegations of authority under the provisions of 38 U.S.C. § 713* are as follows:

(1) Proposing Official – Supervisor who is at least one supervisory level above and within the same supervisory line as the receiving employee, or other individual who is otherwise delegated such authority by the Secretary.

(2) Deciding Official – Supervisor who is at least one supervisory level above and within the same supervisory line as the Proposing Official, or other individual who is otherwise delegated such authority by the Secretary.

(3) Grievance Official – Under Secretary, Assistant Secretary or other individual delegated such authority by the Secretary, but such individual may not have served as either the Proposing Official or Deciding Official.

*Note: See attached Corporate Senior Executive Management Office (CSEMO) Letter 006-17-1 for detailed explanation and procedures on 38 U.S.C. § 713.

**b. Delegations under 38 U.S.C. § 714, including Actions Required under 38 U.S.C. § 731.** For suspensions, demotions and removals taken under this authority, the Proposing Officials and Deciding Officials as defined in VA Handbook 5021 will apply, unless otherwise delegated by the Secretary.

**c. Delegations under 5 U.S.C. § 7515.** For suspensions, demotions and removals taken under this authority:

(1) Supervisory employees covered by 38 U.S.C. § 713* – the Proposing Officials and Deciding Officials are defined in section 1.a. of this memorandum.

Subj: Delegation of Authority for Actions under 38 U.S.C. §§ 713, 714 and 5 U.S.C. § 7515, including those actions prescribed under 38 U.S.C. § 731 (VIEWS 1491106)

*Note: See attached CSEMO Letter 006-17-1 for detailed explanation and procedures on supervisory employees covered under 38 U.S.C. § 713.

(2) All other supervisory employees – the Proposing Officials and Deciding Officials are defined in VA Handbook 5021 unless otherwise delegated by the Secretary.

**d. Delegation to Deputy Secretary.** I delegate to the Deputy Secretary, the Secretary's authority to designate other individuals as Proposing or Deciding Officials as set forth in section 1.a., b. and c. of this memorandum. This delegation is concurrent with the Secretary's authority.

**2. AUTHORITY.** 38 U.S.C. §§ 303, 512, 713, 714, 731 and 5 U.S.C. § 7515.

**3. REFERENCES.** CSEMO Letter 006-17-1; VA Handbook 5021, Employee-Management Relations; VA Directive 0000, Delegations of Authority.

**4. RESTRICTIONS.** None. These delegations are concurrent with the Secretary's authority.

**5. REDELEGATION.** Redelegation is not permitted for actions taken under 38 U.S.C. § 713. Redelegation for actions under 38 U.S.C. § 714 and 5 U.S.C. § 7515 is permitted in accordance with the limitations imposed in VA Handbook 5021.

**6. EFFECTIVE DATE.** This delegation shall have retroactive effect for sections 1.a. and 1.b. of this memorandum. The delegation shall be effective beginning July 5, 2019, with respect to actions taken under 1.b. of this delegation and October 5, 2019, with respect to actions taken under 1.a. of this delegation. The delegation in section 1.c. shall be effective upon signature.

In accordance with VA Directive 0000, the Secretary waives the 2-year expiration date for delegations of authority. This delegation shall expire 4 years from the date of signature, unless the Secretary rescinds or issues a superseding delegation at an earlier date or until the delegations referenced herein are set forth in policy, negating the need for delegation.

Robert L. Wilkie

Attachment

# TAB BB

**From:** Abraham, Mia
**To:** Conor Dirks; Gfrerer, James
**Cc:** Hughes, Brandon S. (GOVERNMENT CIO); Debra Roth; Hackett, Tokay (OGC)
**Bcc:** Russo, Arnold
**Subject:** RE: James Trinka/Request for Grievance Official Recommendation
**Date:** Friday, November 13, 2020 10:32:00 AM

Good morning Mr. Dirks,

The recommendation was submitted to the Secretary and the Secretary reviewed the recommendation, the grievance, the initial decision letter, the response to the proposal and the proposal letter to include the entire evidence file; and made a final decision as to whether the action was supported by substantial evidence, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with a provision of law; or obtained without procedures required by a provision of law having been followed.

Neither the 38 USC Section 713 nor internal policy requires us to provide the recommendation letter. Based on legal advice, we will not provide the recommendation letter. However, rights can be exercised through a judicial review.

Thanks,

Mia

---

**From:** Conor Dirks <cdirks@shawbransford.com>
**Sent:** Thursday, November 12, 2020 3:15 PM
**To:** Gfrerer, James <James.Gfrerer@va.gov>
**Cc:** Hughes, Brandon S. (GOVERNMENT CIO) <Brandon.Hughes1@va.gov>; Abraham, Mia <Mia.Abraham@va.gov>; Debra Roth <droth@shawbransford.com>
**Subject:** [EXTERNAL] James Trinka/Request for Grievance Official Recommendation

Honorable Assistant Secretary Gfrerer:

Attached is Mr. James Trinka's request for your recommendation to the Secretary regarding his removal from federal service under 38 U.S.C. 713. Please provide Mr. Trinka with a copy of your recommendation as soon as possible.

Thank you,

**Conor D. Dirks**
Associate Attorney

Shaw Bransford & Roth P.C. | Attorneys at Law
1100 Connecticut Avenue, NW, Suite 900
Washington, DC 20036
Phone: (202) 463-8400 Ext. 310 | Fax: (202) 833-8082
www.shawbransford.com | cdirks@shawbransford.com

This message originates from the law firm of Shaw Bransford & Roth P.C. This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying, or other use of this message or its attachments is strictly prohibited. All personal messages express solely the sender's views and not those of Shaw Bransford & Roth P.C. If you received this message in error, please notify us immediately at sbr@shawbransford.com.